# EXHIBIT A

BEECHER & HORVATH
REPORTING ASSOCIATES
73 MILLBROOK ROAD
NORTH HAVEN, CT.   06473
(203) 230-0010
FAX (203) 281-3429

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILE COPY

* * * * * * * * * * * * * * * *

DEBORAH ADAMS,

                               *

                     PLAINTIFF,   * CIVIL ACTION NO.
                                    3:07-CV-1035 (JCH

           VS                   *

                                 * SEPTEMBER 24, 2008

NATIONAL ENGINEERING SERVICE
CORPORATION AND VERIFICATIONS,
INC.                             *

                    DEFENDANTS.

* * * * * * * * * * * * * * * *

```
 1   APPEARANCES:

 2
          FOR THE PLAINTIFF:
 3            MADSEN, PRESTLEY & PARENTEAU, LLC
              44 CAPITAL AVENUE, 2ND FLOOR
 4            HARTFORD, CONNECTICUT  06106
          BY:  WILLIAM G. MADSEN, ESQ., OF COUNSEL
 5

 6
          FOR THE DEFENDANT, NATIONAL ENGINEERING
 7                           SERVICE CORPORATION:
              GOLDSTEIN & PECK, P.C.
 8            1087 BROAD STREET
              BRIDGEPORT, CONNECTICUT  06604
 9        BY:  WILLIAM J. KUPINSE, JR., ESQ., OF COUNSEL

10

11        FOR THE DEFENDANT, VERIFICATIONS INC:
              WILSON, ELSER, MOSKOWITZ,
12            EDELMAN & DICKER, LLP
              3 GANNETT DRIVE
13            WHITE PLAINS, NEW YORK  10604
          BY:  MICHAEL WILLIAM COFFEY, ESQ., OF COUNSEL
14

15

16

17

18

19

20

21

22

23

24


                    BEECHER & HORVATH
```

21

22            IT IS STIPULATED AND AGREED between counsel

23    for the parties that any defect as to the notice for

24    the deposition is waived.

                              BEECHER & HORVATH

3

1                    S T I P U L A T I O N S

2

3            IT IS STIPULATED by the attorney for the

4    Plaintiff and the attorney for the Defendant that

5    each party reserves the right to make specific

6    objections in open court to each and every question

7    asked and the answers thereto given by the witness,

8    reserving the right to move to strike out where

9    applicable, except such objections as to the form

10   of the question, which would be stated during the

11   course of the deposition.

12

13           IT IS STIPULATED AND AGREED between counsel

4

1                         MARY POQUETTE

2

3         A witness called for examination by

4         counsel for the Defendant, being first

5         duly sworn, was examined and testified

6         as follows:

7                         THE REPORTER:  State your name

8             and address for the record.

9                         THE WITNESS:  Mary Poquette,

10            10974 Highland Road, Bloomington,

11            Minnesota 55438.

12   DIRECT EXAMINATION

13   BY MR. KUPINSE:

14         Q    Ms. Poquette, I'm Bill Kupinse, and I

15   represent National Engineering Service

16   Corporation.  I'm going to ask you a few

17   questions this morning.

18              Have you been deposed before?

19         A    No, I have not.

20         Q    Okay.  If you have not, a few ground

21   rules, if I may.  First of all, when I ask you

22   a question, if you answer it, I will assume

23   that you understood it.  If you don't

24   understand it, please ask me to clarify it or

BEECHER & HORVATH

1     rephrase it.  Is that okay with you?

2        A    Yes.

3        Q    And I notice you said yes.  You do

4     have to answer audibly, because the court

5     reporter is going to take down everything we

6     say verbatim, and uh-uhs and uh-huhs are hard

7     to interpret sometimes.  So if you would do

8     your best to answer audibly and to answer with

9     words as opposed to motions or gestures or

10    nods.

11        Is there any reason why your

12    deposition cannot be taken this morning?  Are

13    you feeling okay?  Everything fine?

14       A    Everything is fine.  There's no

15    reason.

16       Q    Good.  What's your position with

17    Verifications Inc.?

18       A    I am the chief compliance officer.

19       Q    What does that mean?

20       A    I am responsible for ensuring that

21    the information we obtain from our sources is

22    obtained legally; that the information we

23    provide to our clients is -- that we are

24    legally permitted to provide it to our clients.

BEECHER & HORVATH

1    So I am responsible for ensuring that all of

2    the laws and regulations that govern what we do

3    are followed.

4         Q    How long have you been with

5    Verifications?

6         A    I am in my 14th year.  I started in

7    August of 1995.

8         Q    Give me a brief resume of your

9    educational background, if you would.

10        A    I graduated from North Michigan

11   University in Marquette, Michigan.  Following

12   that, I did some graduate work at both the

13   University of Michigan and Oakland University.

14        Q    Did you have any special training in

15   the area of compliance that you deal with now?

16        A    No, I did not have any outside

17   training.

18        Q    Okay.  Did you have inside training?

19        A    On-the-job training.

20        Q    Okay.  Do National Engineering and

21   Verifications have a contract related to

22   performing background investigations?

23        A    We have a user certification and

24   client services agreement.

                         BEECHER & HORVATH

1          Q     And showing you a document, can you

2     identify that?

3          A     Yes, that is the user certification.

4          Q     Okay.

5                MR. KUPINSE:  We can mark that

6          as Defendant's Exhibit 1.

7

8          (Received and marked Defendant's

9           Exhibit 1 for Identification.)

10               (USER CERTIFICATION)

11

12         Q     Showing you Defendant's Exhibit 1, do

13    you know who prepared that document, the basic

14    document itself, before the form was filled in?

15         A     Either I or members of the compliance

16    department would have prepared that document.

17         Q     Okay.  And do you know who prepared

18    it as filled in involving National Engineering

19    Services Corporation?

20         A     I do not know who entered the text in

21    terms of identification of National Engineering

22    Service Corporation.  This is a standard

23    document.

24         Q     Okay.  Do you know who negotiated the

BEECHER & HORVATH

8

```
 1        arrangement with National Services Engineering?
 2             A     No, I do not.
 3             Q     Do you know how long they've been,
 4        National Service, has been a customer or a
 5        client of Verifications?
 6             A     According to our records, since 2004.
 7                   MR. MADSEN:  Bill, I just want
 8             you to confirm that when you refer to
 9             National Services, you mean National
10             Engineering Services Corporation.
11                   MR. KUPINSE:  National
12             Engineering Services Corporation.
13                   MR. MADSEN:  Thanks.
14             Q     Did Verifications also provide
15        National Engineering Services Corporation with
16        a disclosure-and-release-of-information
17        authorization?  And showing you a document,
18        this document.
19             A     This appears to be one of our sample
20        documents that we provide to clients.
21             Q     When you say sample documents, are
22        there various forms of this document?
23             A     We provide a sample of this
24        disclosure and authorization for the
```

9

1      convenience of our clients.  They are not

2      required to use this specific document.

3           Q    Okay.

4           A    The document, over time, will change

5      in terms of the standard text.

6           Q    Do you know when this particular

7      version was prepared?

8           A    Based upon the revision date,

9      December 22nd, excuse me December 23rd, 2002.

10          Q    Did you have any participation in

11     preparing the document?

12          A    Most likely, I did.  All sample

13     documents come from my department.

14               MR. KUPINSE:  Let's mark that

15          as Defendant's Exhibit 2.

16

17          (Received and marked Defendant's

18           Exhibit 2 for Identification.)

19               (SAMPLE DOCUMENT)

20

21          Q    Referring to Defendant's Exhibit 2,

22     do you know who was involved in obtaining the

23     information or obtaining this document back

24     from National Engineering?

BEECHER & HORVATH

1        A    I'm sorry, I don't understand the
2    question.
3        Q    Okay.  Did Defendant's Exhibit 2
4    eventually come back to Verifications?
5        A    I don't know.
6        Q    Okay.  Do you require that document
7    before you provide services?
8        A    No, we do not.
9        Q    Okay.  Were you involved with Deborah
10   Adams at all in terms of providing services
11   relating to her?
12       A    Yes.
13       Q    And what was your involvement?
14       A    My involvement was, after the report
15   had been prepared, I spoke with Deborah Adams
16   several times on the phone.
17       Q    Okay.  Who at Verifications then
18   would have been responsible to start the
19   process with Deborah Adams initially?
20       A    The order for a background search on
21   Deborah Adams was placed by National
22   Engineering Services Corporation, so that that
23   was the initiating event.
24       Q    And who at Verifications would have

BEECHER & HORVATH

1    seen that placement and done something with it?

2         A    It would have -- it was placed

3    electronically.  It would have come in to one

4    of our operations centers for processing.

5         Q    And when you say one of your

6    operation centers, do you know which operation

7    center?

8         A    I can find that by looking back at

9    the documents that were provided in -- what's

10   it called?

11              MR. COFFEY:   Discovery.

12        A    In discovery.  Thank you.

13        Q    Sure.  Please feel free to look.

14

15              (Off the record discussion.)

16

17        A    It was -- processing was started at

18   Verifications.  I would have to go back to

19   determine to whom the initial CXV belonged to,

20   but that was the person that originally

21   received the order and entered it into our

22   system for processing.

23        Q    Okay.  I take it you were not

24   involved at that point?

                        BEECHER & HORVATH

1          A       No.

2          Q       Can you explain to me, even though

3    you weren't involved, the general process that

4    happens when an order comes in?

5          A       Yes.   Orders come in to us either by

6    fax or they come in online.   When an order is

7    received, it begins processing by going to our

8    intake department.   Our intake department

9    checks the order to see if we have enough

10   information with which to work.   They also

11   check to be sure that it's generally legible,

12   that we can read key information, like name,

13   date of birth, social security number.

14               From intake, it goes to data entry.

15   And the information provided with the order

16   goes into our system, and background check

17   shells are created, if you will.   It is like a

18   place holder in our system.   So if a client

19   orders an academic check, for example, we will

20   enter into our system what the applicant

21   reported, or what the applicant provided on

22   their employment application.   So if they said

23   they went to Harvard and they graduated in

24   1985, that is what we would put into our

1       system.  And it creates a background check for

2       us to work with.

3               So the information that is relevant

4       gets into our system.  And then people called

5       verifiers get involved, as well as public

6       record specialists.  And what they do is take

7       those individual background checks, those

8       shells, if you will, and then do the research

9       or initiate the research to obtain the

10      information.  Using the Harvard example, one of

11      our verifiers would actually contact Harvard

12      and speak with the registrar's office to

13      confirm -- actually, they will ask for

14      information about that person.  They will

15      provide that person's name, social security

16      number, and then they will get information as

17      to the applicant's academic credentials from

18      that institution.  So that's an example of how

19      it works.

20              As those results are received, they

21      are also entered into our system, so we have

22      visually, sort of a before and after, what the

23      applicant said, what the information source

24      said.

                                BEECHER & HORVATH

14

1           In the case of public record

2     searches, we have a network of field

3     researchers throughout the United States, and

4     actually outside the U.S. as well.  And when we

5     need a criminal record search done in a

6     particular location, we will communicate

7     electronically with that field researcher,

8     giving them the information that we have on the

9     person we are researching.

10          They invent -- they, in turn, will

11    typically go to the superior court in the

12    county and use the public -- the public system,

13    the public access terminal, to see -- to enter

14    that person's name and other identifiers to see

15    if that person has a criminal record.  They

16    will report back to us whether they found

17    something or it was clear.  We put that in our

18    report.

19          Eventually, all of the pieces that

20    have been ordered by our client get completed.

21    The report gets proofed, and it gets either

22    returned to our client, or they might go online

23    to retrieve results.  So that is basically the

24    way in which the process works.

1          Q      Thank you.  That was very helpful.

2                 You mentioned the system, and I take

3     it it's a system that is online?

4          A      Internally, our processing system is

5     referred to as the data verification system, or

6     DVS.  When clients access information through

7     the Internet, that system is referred to either

8     as VI online or save screen.

9          Q      Okay.  And showing you a document --

10    thank you for the intro -- can you identify

11    that?

12         A      In appears to be a screen shot from

13    our save screen system.

14         Q      Would this be --

15                MR. KUPINSE:   Let's mark it as

16         Defendant's Exhibit 3.

17

18         (Received and marked Defendant's

19         Exhibit 3 for Identification.)

20          (SCREEN SHOT FROM SAVE SCREEN)

21

22         Q      When you say a screen shot, is this

23    something that would be used to initiate a

24    verification or an investigation?

                        BEECHER & HORVATH

1        A      Yes.   This is the screen that a

2    client would see, and they would provide --

3    excuse me, they would provide this information

4    as part of initiating a background

5    investigation.

6        Q      What is the minimum information which

7    is required by a client, such as National

8    Engineering Service Corp., to start a

9    background investigation?  What is the minimum

10   that needs to be entered into the save screen?

11       A      The minimum would be the social

12   security number, the last name, the first name,

13   the home address, including street, city,

14   state, zip code.  Those are all required

15   fields.

16       Q      Okay.

17       A      That would have to be completed by

18   the client.  In addition, they would have to

19   have selected the background checks that they

20   wanted us to complete.

21       Q      Okay.  How does one get into this

22   save screen?  Can anyone log in, or do you have

23   to have some kind of a code to get to it or

24   what?

BEECHER & HORVATH

1         A      You need to have a user ID and
2    password.
3         Q      Okay.   And do you know whether or not
4    National Engineering Service Corp. had such
5    user ID and password?
6         A      Yes.
7         Q      And did they?
8         A      According to our records, yes.
9         Q      Could anyone at National Engineering
10   access the screen, or were only certain people
11   allowed to access it?
12        A      As I recall, there were two people at
13   National Engineering that had user ID and
14   passwords.
15        Q      And do you remember who those persons
16   were?   Can you tell by looking at your records
17   who those persons were?
18        A      One person was -- one person was
19   Maura Demars.   And the other was Travis Grogan.
20        Q      Now, Defendant's Exhibit 3, has
21   been -- is a blank.   Can you tell from your
22   records when the information was entered with
23   respect to Deborah Adams, whether or not her
24   social security number was entered?   Do you

                          BEECHER & HORVATH

1          have a copy of the screen as entered, or not?

2                    A      I do not.

3                    Q      Okay.   Can you tell me, as a matter

4          of practice, would it have been required that

5          the social security number was entered?

6                    A      Yes.   The social security number is a

7          required field.

8                    Q      Can the required fields be

9          overwritten?

10                   A      No, they cannot, not by a user.

11                   Q      So that there's no way for a user to

12         submit an application without putting in the

13         social security number?

14                          Well, let me take that back.   I

15         suppose they could, but if they tried to submit

16         it without the social security number, it would

17         not be accepted by Verifications; is that

18         correct?

19                   A      That is correct.   A window, or not a

20         window, but a message would come back to the

21         person using the online system saying that a

22         social security number needed to be entered.

23                   Q      So to the best of your knowledge,

24         when the request was made for a background

                              BEECHER & HORVATH

1       check on Deborah Adams, her social security

2       number would have been entered into the save

3       screen?

4              A      That is correct.

5                     MR. MADSEN:  Could you read

6              back the last question.

7

8              (The record was read by the

9              Reporter.)

10

11             Q      Other than the initial save screen,

12      are there other screens which you can access by

13      virtue of a user number and password?

14             A      Yes, there are.

15             Q      And can you tell me what those are?

16             A      The screens that a user can access

17      depends on the permissions that they have set

18      up in our system.  For a user placing an order,

19      as I said in the example of, the Harvard

20      example, that user entering the order would

21      access that screen to enter the information

22      that the applicant had supplied.  The user

23      entering an order will see those screens that

24      are needed to process the order.  So if a user

BEECHER & HORVATH

1      has asked us to verify prior employment, the

2      screen will come up for them to enter

3      employment history.  So it is permission based.

4              In terms of retrieval, once again,

5      that is permissions based.  So some users will

6      be able to see full reports on their

7      applicants.  Some users might have certain

8      things redacted, suppressed.  It is a

9      permissions-based system.

10         Q    Do you know what permissions National

11     Engineering Service Corp had?

12             MR. COFFEY:  I just want to

13         clear this up, that your client

14         requested -- I'm still -- I'm a little

15         confused with the question.

16             MR. KUPINSE:  Okay.

17             MR. COFFEY:  If you just

18         rephrase it, because the question is

19         almost implying that she sets it, and I

20         know where I think you're going, and I

21         still think it's unclear who sets its.

22             MR. KUPINSE:  Let me try to

23         rephrase the question.

24         Q    Did National Engineering Service

BEECHER & HORVATH

21

1      Corporation have permission to get into what

2      has been marked as Defendant's Exhibit 3?

3            A     Yes.   Someone did.

4            Q     Someone did.   The two people you

5      mentioned?

6            A     They may have had different

7      permissions, I don't know.

8            Q     Okay.   Do you know what other

9      permissions National Service -- National

10     Engineering Service Corporation's personnel

11     had?

12                     MR. COFFEY:   Bill, if you

13              could just clear up, could you ask who

14              designates this, because that's unclear.

15                     MR. KUPINSE:   Okay.   Sure.

16                     MR. COFFEY:   I mean, because

17              your question seems to be implying like

18              she determines who all these people

19              were.

20                     MR. KUPINSE:   I wasn't trying

21              to imply that.

22            Q     Let's ask the question, who

23     designates what the permissions are?

24            A     The client.

BEECHER & HORVATH

1        Q     Okay.  And did National Engineering

2     designate certain permissions with respect to

3     the use of the Verifications system?

4        A     Yes, they would have.

5        Q     And what permissions were those?

6        A     I don't know the specific permissions

7     that users had.  Because the order was placed

8     online, someone, and actually Maura Demars,

9     that is the sign-on that was used when the

10    order was placed.  So for that person, the

11    permissions included the ability to place an

12    online order.

13       Q     Do you or do you not know what other

14    permissions Maura Demars may have had?

15       A     I do not know at this time.  It is

16    captured in our system.

17       Q     So if I ask you the question, do you

18    know whether or not she had permission to look

19    at the final report, or the completed report,

20    would you know the answer to that?

21       A     I know that we sent the final report

22    to her.

23       Q     Did you send --

24       A     Electronically.

BEECHER & HORVATH

1          Q     When you send the final report to her

2    electronically, was that different from her

3    being able to go, with permission, to look at

4    the final report online?

5          A     No, it's the same information.

6          Q     But from the fact that you sent her

7    the final report, you cannot tell me if she

8    could have gone in herself and looked at the

9    final report?

10         A     I do not know if she had that viewing

11   permission.

12         Q     Okay.  Do you know if anyone at

13   National Engineering Services had that viewing

14   permission?

15         A     Based upon my records, someone had

16   viewing permission, because when we sent the

17   client report, we can either send the report in

18   its entirety, or we can send a notice to the

19   client saying, "The report is ready.  Go online

20   and look at it."  And so one -- at least one of

21   these instances, we sent them what is called a

22   website notification, via e-mail, telling them

23   to go online and look at the report.

24         Q     So that, to your knowledge, would

BEECHER & HORVATH

1       imply that someone from National Engineering

2       Service Corporation could have done that, or

3       you wouldn't have told them to go ahead and do

4       it?

5           A    Correct.

6           Q    I assume -- well, maybe I shouldn't

7       assume.  Is there any way for you to tell

8       whether or not the person who is accessing the

9       Verifications system is really the person who

10      has the user ID and the number and the

11      password?

12          A    No.

13          Q    So that if, for example, a employee

14      were to give out their user number and password

15      to somebody else, that somebody else could

16      access the system in the same fashion the --

17          A    That is correct.

18          Q    -- authorized person could?  Okay.

19               Do you know whether anyone at the

20      Guidant -- first of all do you know what the

21      GuIdant Group is or who the Guidant Group is?

22          A    No.

23          Q    Okay.  Do you know who Comensura is?

24          A    Yes.

1          Q    Okay.  Have you had dealings with

2     Comensura?

3          A    Yes.

4          Q    They have changed their name to the

5     Guidant Group.

6          A    All right.

7          Q    So that you sometimes may get a

8     reference to the Guidant Group when I'm asking

9     questions.

10              Do you know whether or not anyone at

11    Comensura had the ability to access the

12    Verifications system?

13              MR. MADSEN:  Objection.  You

14         can answer.

15         Q    You can still answer, if you know.

16         A    I do know.  It would have been

17    standard practice for one or more people at

18    Comensura to be able to access our system.

19    However, being able to access our system, that

20    does not mean that they can -- when someone has

21    access, they can access only their applicants,

22    no one else's.

23         Q    Was Deborah Adams an applicant that

24    was submitted by National Engineering Service

                         BEECHER & HORVATH

1        Corporation?

2              A      Yes.

3              Q      Could Comensura have accessed

4        anything with respect to Deborah Adams,

5        without, I don't mean in a technical sense, I

6        mean, if somebody gave them the password, could

7        they, on their own, be able to access anything

8        concerning Deborah Adams?

9              A      They would have to have a user ID and

10       password to access -- they would have -- only

11       people from National Engineering Services

12       Corporation could access Deborah Adams'

13       information in our system.  So unless they gave

14       that user ID and password to someone at

15       Comensura, or unless they printed the report,

16       for example, and handed it to them, no one at

17       Comensura would have had access to that

18       information.

19             Q      Okay.  Just so I understand, so if

20       National Engineering Service Corporation has a

21       user number and password --

22             A      Um-hum.

23             Q      -- if they keep it confidential, even

24       if Comensura has its own user number and

1       password, they cannot access Deborah Adams'

2       information?

3               A     That is correct.

4               Q     Okay.  What is National Background

5       Data, is that a company?

6               A     Yes, it's a company.

7               Q     Is it a company that Verifications

8       Inc. deals with?

9               A     Yes, it is.

10              Q     And what is your dealings with

11      National Background Data?

12              A     National Background Data has a very

13      large database of criminal, and in some cases,

14      civil records.  We use that information.  When

15      a client orders that search, we will go to that

16      database to see if the person we are searching,

17      the person being screened, has a record in that

18      database.  So that is what we do with National

19      Background Data.

20              Q     Do you know what National Background

21      Data did in connection with the background

22      investigation of Deborah Adams?

23              A     They would not have done anything.

24      What -- they would not have done anything.

                        BEECHER & HORVATH

1       Q      Would somebody at Verifications have

2   done something with respect to their database?

3       A      Yes.

4       Q      And what would that someone have

5   done?

6       A      They would have used -- they would

7   have used Deborah Adams' name and date of birth

8   to search that database.

9       Q      And do you know whether that did

10  occur in this case?

11      A      Yes, it did.

12      Q      And do you know what the result of

13  that search was?

14      A      The result of the search was that

15  several possible -- several criminal records

16  were identified.

17      Q      And once those several criminal

18  records were identified, what happened from

19  Verifications standpoint?  What did you do?

20  What did Verifications do?

21      A      We took those criminal records that

22  we found and we -- we used them to identify

23  jurisdictions in which we needed to do a

24  criminal record search.  So we took the cases

BEECHER & HORVATH

1     that we found and we took the locations and

2     then did a criminal record search in the

3     superior court of the county.

4           Q    So someone at Verifications, after

5     they found some indication in the National

6     Background database --

7           A    Um-hum.

8           Q    -- then did a further search in the

9     criminal records; is that correct?

10          A    That is correct.  The person at

11    Verifications would have ordered additional

12    research to be done by our field researcher in

13    the jurisdiction.

14          Q    Do you know what jurisdictions you

15    were working in with respect to Deborah Adams?

16          A    We were working in Pennsylvania

17    County, Virginia.

18          Q    And as a result of ordering further

19    searches, did any information come back with

20    respect to a criminal record?

21          A    Yes, it did.

22          Q    And showing you another document, can

23    you identify that?

24          A    This is the document that was

BEECHER & HORVATH

1       returned to us by our field research partner in

2       that jurisdiction.

3               Q       Okay.

4                       MR. KUPINSE:   Mark that as

5               Defendant's Exhibit 4.

6

7               (Received and marked Defendant's

8               Exhibit 4 for Identification.)

9       (DOCUMENT FROM FIELD RESEARCH PARTNER)

10

11              Q       Now, when Defendant's Exhibit 4 came

12      back to you, do you know whether it came back

13      to you electronically, or whether it came back

14      in hard copy in some fashion?

15              A       Most likely, this came back by fax.

16              Q       Once this document, which has been

17      marked as Defendant's Exhibit 4 came back, what

18      did Verifications do?

19              A       A public records researcher would

20      have reviewed this information and made a

21      determination as to whether any of this

22      information should be reported to the client.

23              Q       And was there a determination that

24      some of this information should be reported to

BEECHER & HORVATH

1    the client?

2         A    Yes.

3         Q    And how did you report it to the

4    client?

5         A    We reported it as a record had been

6    found under the name, we provided the name, and

7    said that the record also had a matching date

8    of birth.

9         Q    Going back to when you took a look

10   at -- or when you took a look at the National

11   Background Data information, what did you input

12   to see whether there might be some criminal

13   record?

14        A    We provided Deborah Adams' name,

15   first and last name.  We provided date of

16   birth.  And we also provided social security

17   number.

18        Q    Okay.  And when Defendant's Exhibit 4

19   came back, did you compare the, or did somebody

20   at Verifications, compare the information that

21   you had from the client, National Engineering,

22   to this court search record, Defendant's

23   Exhibit 4?

24        A    Could you repeat that, please.

                        BEECHER & HORVATH

32

1        Q     Sure.

2        A     Sorry.

3        Q     You had certain information

4    originally from National Engineering, the

5    name --

6        A     Um-hum.

7        Q     -- the date of the birth, the social

8    security number?

9        A     Yes.

10       Q     Now, when this court search record,

11   Defendant's Exhibit 4 came back, did you

12   compare the information on the court search

13   record against the information that you had

14   from the client?

15       A     Yes.

16       Q     And did you find it to be the -- do

17   you know whether it was found to be the same or

18   different?

19       A     It was not identical.  It was

20   similar.

21       Q     Okay.  And I take it, again, you did

22   not make the actual comparison?

23       A     I did not.

24       Q     Somebody in Verifications did that.

1          What is your procedure when

2    information comes back, which is similar, but

3    not the same?

4          A    Our procedure is to look for a

5    minimum of two identifiers.  Those identifiers

6    are typically name, date of birth, and social

7    security number.

8          Q    So you look for two out of the three?

9          A    At a -- yes.

10         Q    At a minimum?

11         A    Yes, at a minimum, we, typically, we

12    want to see at least two identifiers.

13         Q    Why is the number two identifiers

14    chosen, why not one or three?

15         A    Three is not chosen because it is

16    unlikely that the three key identifiers, name,

17    date of birth, and social security number, will

18    all be included in the public record.  Why do

19    we not use just one, because we would have too

20    many false positives.

21         Q    Once you received what has been

22    marked as Defendant's Exhibit 4, did you

23    provide it to National Engineering?  Did

24    Verifications provide it?

                         BEECHER & HORVATH

1          A     Do you mean this exact report?

2          Q     Yes.

3          A     No.

4          Q     What did you provide?

5          A     We provided a summarized version of

6     this information.

7          Q     In the process, after you provided

8     the summarized version of the information, from

9     Verifications' standpoint, do you know what

10    happened next?

11         A     We provided that information on May

12    8th.  I do not know what happened next with

13    that information in terms of National

14    Engineering.  I don't know what they did.

15         Q     No, I was interested in what next

16    happened --

17         A     Okay.

18         Q     -- from Verifications' standpoint.

19    Did you receive a contact after you provided

20    the information from anyone?

21         A     Did we receive a contact?

22         Q     Yes.  Did somebody call you from

23    National Engineering?  Did somebody fax you?

24    Did somebody write to you?  Did somebody ask

BEECHER & HORVATH

1    you about the information that you had

2    provided?

3         A    To my knowledge, no.

4         Q    Okay.  What was the next event that

5    you have knowledge of that arose after you

6    provided this information, from Verifications'

7    standpoint?

8         A    Deborah Adams contacted us.

9         Q    When did Deborah Adams contact you?

10        A    As I recall, May 9th.

11        Q    And how did she contact you?

12        A    Via fax.

13        Q    Did you become involved at that

14   point?

15        A    No, I did not.

16        Q    Who was involved from Verifications,

17   at that point?

18        A    It would have -- I'm looking for the

19   faxed document.  On May 9th, according to a

20   letter dated May 9th, from Deborah Adams to the

21   Federal Trade Commission, Verifications --

22   Verifications was copied on this letter to the

23   Federal Trade Commission.

24        Q    And do you know what Verifications

BEECHER & HORVATH

1     did when they received the copy of the letter

2     of May 9th?

3          A     Yes.   Our process -- our process to

4     reinvestigate, we would have contacted our

5     client to advise them there a dispute.   We

6     would have placed that particular verification

7     on a hold status.   So no information -- no

8     detailed information was visible to our client.

9     And then we would have begun a reinvestigation,

10    a further investigation.

11

12               (Off the record discussion.)

13

14          Q    So that I understand what happened

15    from Verifications' end, on May 8th, the

16    information was provided in summary form.   The

17    information on the court search record was

18    provided in summary form to National

19    Engineering, and the next contact you got with

20    respect to Deborah Adams was the copy of the

21    letter to the Federal Trade Commission; is that

22    correct?

23          A    That -- I believe so.

24          Q    But you weren't involved, so you

1        don't know for certain?

2              A     That is correct.

3              Q     Okay.   What is Mohr Information

4        Services?

5              A     Mohr Information Services is the name

6        of the research company with which we work.

7        They do research for us in the State of

8        Virginia.

9              Q     Would that have been the entity which

10       did the research in connection with Deborah

11       Adams?

12             A     That's correct.

13             Q     And how would they have gotten the

14       information that you needed to search in

15       Virginia?

16             A     It is an automated process by which

17       we provide identifiers to them, so they have

18       information with which to conduct the search.

19             Q     And then would it have been Mohr

20       Information that sent you back Defendant's

21       Exhibit 4?

22             A     That is correct.

23             Q     Now, do you know what identifiers you

24       sent to Mohr Information?

                              BEECHER & HORVATH

1            A     Based upon what it says here, we

2       provided the name Deborah Adams, a full social

3       security number, and a date of birth.  The

4       document says court search record requested,

5       and those three identifiers are provided.

6            Q     I think you told me before that

7       Defendant's Exhibit 4 was similar to the

8       information which had been provided you by

9       National Engineering in its original input, can

10      you tell me where it differed?

11           A     I'm sorry, I don't understand the

12      question.

13           Q     Okay.  National Engineering provided

14      you with certain information concerning the

15      person whose background check was to be made;

16      is that correct?

17           A     Yes.

18           Q     And they provided you with what?

19           A     They provided us with first name,

20      last name, sosh, date of birth.  They would

21      have provided home address, city, state and zip

22      code.

23           Q     Okay.  Now --

24                 MR. MADSEN:  I just want to

                    BEECHER & HORVATH

1          get clarification, you said sosh --

2                    THE WITNESS:   Social security

3          number.   I'm sorry.

4                    MR. MADSEN:   Thank you.

5          Q.   Now, with respect -- was the

6     information which was provided by National

7     Engineering the same, as far as identifiers, as

8     the information that came back on Defendant's

9     Exhibit 4?

10         A    No.

11         Q    What was the difference?

12         A    The difference was the spelling of

13    the first name.   National Engineering Services

14    had provided a spelling of D-E-B-O-R-A-H.   The

15    information that came back from Mohr

16    Investigation Services showed a first name of

17    D-E-B-R-A, as well a middle name of Jean.

18         Q    Was the date of birth the same?

19         A    Yes.

20         Q    And was the social security number

21    the same?

22         A    The social security number was not an

23    identifier on the record.

24         Q    When you say it was not an identifier

                    BEECHER & HORVATH

1    on the record, does that mean that Mohr did not

2    report back what the social security number was

3    for the person who had the criminal record?

4        A    The identifiers on the file included

5    last name, first name, middle name, and full

6    date of birth.  The social security number was

7    not part of the file.

8        Q    The file that came up from Virginia

9    that Mohr supplied to you?

10       A    That is correct.

11       Q    Do you know whether or not the social

12   security number was available in the court

13   records that Mohr supplied to you?

14       A    It was not available as part of the

15   public record, which is accessed through the

16   public access terminal.

17       Q    So that what you're saying is the way

18   that Mohr got the information, was that they

19   went to a public access terminal, inputted

20   certain information, and got back certain

21   information from the Virginia court system; is

22   that correct?

23       A    Yes.

24       Q    And when they got that information

                    BEECHER & HORVATH

1     back, the social security number was not

2     included in that information?

3          A     Correct.

4          Q     Do you know whether there was any way

5     they could have gone to the physical court

6     system, rather than accessing it online?

7                MR. MADSEN:   Objection.

8          Q     You can answer it, if you can.

9          A     Would you repeat the question,

10    please.

11         Q     Sure.  Do you know whether there was

12    any way for Mohr to go directly to the physical

13    court record, rather than accessing it through

14    the public terminal?

15         A     Most likely there was.

16         Q     And do you know whether or not they

17    do that in any cases?

18         A     Field researchers do that when

19    additional investigation is required.

20         Q     Was additional investigation required

21    in connection with the Deborah Adams case, at

22    any time, of Mohr?

23         A     Could you rephrase that, please.

24         Q     Sure.  Did Verifications ask Mohr to

                      BEECHER & HORVATH

1   do anything after Defendant's Exhibit 4 was

2   provided?

3        A   To my knowledge, no, we did not.

4        Q   Let's go back to the sequence we were

5   in.

6             May 8th you provide a summary of the

7   information to National Engineering.  May 9th,

8   you get a copy of Ms. Deborah Adams' letter to

9   the Federal Trade Commission.  What happened

10  next from Verifications' standpoint?

11       A   Because Deborah Adams was disputing

12  the information that we had reported, we would

13  have initiated a reinvestigation.  We would

14  have placed the original results on hold.  And

15  we would have advised our client that Deborah

16  Adams was disputing the result.

17       Q   Other than the copy of the letter to

18  the Federal Trade Commission, did you have any

19  other source to indicate that Deborah Adams was

20  disputing the results?

21       A   Deborah Adams also contacted us

22  directly.

23       Q   Do you remember when she contacted

24  you directly?

BEECHER & HORVATH

1      A      She did not contact me directly, as I
2      recall.   Normally, if an applicant is disputing
3      information, the call will go into our client
4      services representative department.   And
5      depending upon the nature of the dispute, it
6      will get routed to the appropriate department.
7      Q      Do you know what happened -- first of
8      all, do you know when Deborah Adams contacted
9      Verifications?
10      A      I believe she also contacted us by
11      phone on the 9th, on May 9th.
12      Q      And do you know what happened to that
13      call, who it went to.
14      A      I do not know where the original call
15      went.
16      Q      Do you know who it got referred to
17      for action?
18      A      Robin Mack, who is a public
19      records -- I believe she's a public record team
20      leader at Verifications.
21      Q      Do you know what she did?
22      A      She put the verification on hold.
23      She contacted -- she contacted Mohr
24      Information, and requested that the record be

BEECHER & HORVATH

1       faxed.  She put the verification on hold.  She

2       advised the client.  She also ran -- she also

3       used another online tool to bring up additional

4       information about Deborah Adams.  She was doing

5       research further research to try to determine

6       whether the record that we found really

7       belonged to the applicant, Deborah Adams.

8            Q     What online tool did she use?

9            A     She used an online tool called

10      Accurant.

11           Q     And what is the purpose of Accurant?

12           A     Accurant gives us another source to

13      compare name, sosh, date of birth, address

14      history.  It will vary -- the amount of

15      information will vary, based upon the person.

16      But it is a -- it is another database that we

17      use for additional identifiers, when additional

18      research is needed.

19           Q     And do you know what the result of

20      the additional research with Accurant was?

21           A     The eventual result, using the

22      information provided by Deborah Adams, as well

23      as the information in the Accurant file, we

24      were able to remove the -- we were able to

                        BEECHER & HORVATH

1    remove the criminal information from the

2    background report.   We were able to make the

3    determination that it was not Deborah Adams,

4    the applicant.

5        Q    When you were telling me the process

6    before, you said that the Verifications

7    employee asked that the court search record be

8    faxed to you?

9        A    Um-hum.

10       Q    Defendant's Exhibit 4?

11       A    Um-hum.

12       Q    And was that done?

13       A    I don't know.   Normally this is what

14   a field researcher would return, based upon

15   their initial search.   I don't know if we

16   received additional information from Mohr

17   Information Services.   It does not appear that

18   we did.

19       Q    What I was questioning was that you

20   said Defendant's -- that your employee asked

21   Defendant's Exhibit 4 be faxed to them, and

22   that would have been on the 9th; is that

23   correct?

24       A    Actually, the 10th.

                    BEECHER & HORVATH

1          Q     The 10th.  Okay.  Prior to the 10th,

2     did you have Defendant's Exhibit 4, or did you

3     just have information that there was a question

4     about criminal background in Virginia?  When I

5     say you, I mean, Verifications.

6          A     Right.  It would be standard practice

7     for this to be returned by our field

8     researcher.  Standard practice would have been

9     for Mohr Investigation Services to fax this to

10    us in response to our request for the search

11    originally.

12         Q     Now, I think you took me to the point

13    on the -- withdrawn.

14               Did Deborah Adams call on the 9th or

15    the 10th, if you can tell?

16         A     I cannot tell.

17         Q     Okay.  In any event, the employee

18    began to do further research as a result of

19    Deborah Adams' call; is that correct?

20         A     May we back up to the previous

21    question?

22         Q     Sure.

23         A     Okay.  And would you repeat that

24    previous question.

1        Q    Sure.  My previous question was, did

2    Deborah Adams call on the 9th or the 10th?

3        A    I believe that she called on the 9th.

4        Q    And after --

5        A    I believe there was a fax

6    communication.  I believe there was also a

7    phone call, or more than one phone call.

8        Q    Okay.  So let me just make sure I

9    understand.  On the 8th, a summary of the

10   information goes to the client, National

11   Engineering?

12       A    Correct.

13       Q    On the 9th, you get a copy of the

14   letter from Deborah Adams to the FTC; is that

15   correct?

16       A    Um-hum.  Yes.

17       Q    On the 9th, you start your process,

18   as you say, of putting it on hold, doing some

19   further investigation?

20       A    Um-hum.

21       Q    Sometime probably on the 9th, Deborah

22   Adams calls?

23       A    Yes.

24       Q    And now you mentioned there may have

BEECHER & HORVATH

1      been several calls from Deborah Adams.  Do you

2      think those several calls occurred on the 9th

3      or on different dates?

4           A     They occurred -- there were a lot of

5      calls.  There was a lot of communication, and

6      it occurred on different dates.  Deborah Adams

7      contacted numerous people at Verifications.

8           Q     Is there any record of who and when

9      she contacted them?

10          A     Yes, there is.

11          Q     And is that available in some format?

12          A     Yes, in these documents, there are

13     multiple faxes from Deborah Adams.  There are

14     notes about phone calls.

15                     MR. COFFEY:  You have those.

16                     MR. KUPINSE:  I don't think

17     so.

18          Q     Okay.  And I asked your counsel if he

19     would provide those, and he said he would

20     subsequent to the deposition, so we don't need

21     to go through each of them.

22                Now, in between the 8th, when you

23     first supplied the summary information and

24     there was an investigation done, when was it

BEECHER & HORVATH

```
1        indicated that you could take the concerns

2        about the criminal record off Deborah Adams'

3        record, off the report?

4               A     Do you mean when did we?

5               Q     What date did you do it?

6               A     It was either the 9th, or the 10th.

7        It was either the end of the day on the 9th or

8        early on the 10th.

9               Q     And when did you report that to the

10       client?

11              A     On the 10th.

12              Q     And how did you report it to the

13       client?

14              A     We e-mailed the client, and we would

15       have also called them.

16              Q     And did you notify Deborah Adams

17       directly at any time?

18              A     Yes.  We would have notified Deborah

19       Adams as well.

20              Q     And do you know how you notified her?

21              A     By phone.

22              Q     And do you know when you notified

23       her?

24              A     I spoke to her on May 11th at 4:14.
```

1      I called her and I said that we had corrected

2      the report, we had changed the report, we had

3      contacted the client.

4          Q    Okay.  So that if I understand the

5      process, on May 8th, a summary report was sent

6      to the client, and by May 11th, the client and

7      the applicant had been notified that the issue

8      had been cleared?

9          A    Correct.

10         Q    I'm showing you another document, and

11     if you can just identify that, that would be

12     helpful, if you know what it is?

13         A    This is a -- this is a notice sent to

14     a client indicating that they have a report

15     ready for viewing.

16         Q    Okay.

17              MR. KUPINSE:  If we could mark

18         that as Defendant's Exhibit 5.

19

20         (Received and marked Defendant's

21         Exhibit 5 for Identification.)

22              (NOTICE SENT TO CLIENT)

23

24         Q    Who is Amy Vikander?

                    BEECHER & HORVATH

51

```
1           A     Amy Vikander, a former employee of

2      Verifications.  I believe former.  I need to

3      double check that, but --

4                 MR. KUPINSE:  Off the record.

5

6                 (Off the record discussion.)

7

8                 MR. KUPINSE:  Back on the

9      record.

10          Q     There was a brief discussion off the

11     record, and we determined that you were

12     uncertain as to whether she was a former or a

13     current employee; is that correct?

14          A     That is correct.

15          Q     Okay.

16          A     I believe she's a former employee.

17          Q     Okay.  If she is a former employee,

18     did the fact that she's a former employee have

19     anything whatsoever to do with the Deborah

20     Adams matter?

21          A     No.

22          Q     Thank you.  Now, I'm going to show

23     you another document and ask you if you can

24     identify that?
```

BEECHER & HORVATH

1          A     Yes.   This is a background report as

2     produced by Verifications.

3                    MR. KUPINSE:   And we can mark

4          that as Defendant's Exhibit 6.

5

6          (Received and marked Defendant's

7           Exhibit 6 for Identification.)

8                 (BACKGROUND REPORT)

9

10         Q     Would Defendant's Exhibit 6 have been

11    provided to National Engineering?

12         A     This particular document is what's

13    called an applicant copy.   This did not go to

14    National Engineering.   This would have gone to

15    Deborah Adams.

16         Q     Do you know when this went to Deborah

17    Adams?

18         A     I cannot tell.

19         Q     Okay.   I notice on Defendant's

20    Exhibit 6, that there are some boxes in the

21    middle of the report that are checked complete.

22    Can you tell me what that means?

23         A     You are referring to -- you are

24    referring to --

```
 1          Q.    Well, next to County Criminal
 2    Virginia, Pennsylvania, there is a box marked
 3    complete.   And the same thing on National
 4    Criminal Record loge National Databases?
 5          A     The X in the complete box means that
 6    our search has been completed and results have
 7    been provided.
 8          Q     Okay.   And if the applicant, after
 9    you have provided or you have completed your
10    search, raises a concern, is the search
11    reopened at that point, or is further
12    investigation done?
13          A     Would you repeat that, please.
14          Q     Sure.   You indicate that you provided
15    this summary to Deborah Adams at some time, and
16    it had a complete check box.   And I'm asking,
17    after the applicant disputed the result, do you
18    do -- you do do, from what you have told us, a
19    further investigation, and do you prepare
20    another report that indicates complete, and the
21    concerned discrepancy taken off?
22          A     Yes.
23          Q     And I think you referred to your
24    notes or your records, and you said that you
```

BEECHER & HORVATH

1    talked to Deborah Adams on May 11th; is that
2    correct?
3         A    That is correct.
4         Q    Was that the first time you talked to
5    her?
6         A    I don't know.  I don't remember.
7         Q    Do you know when you became involved
8    in the Deborah Adams matter?
9         A    I believe that would have been on May
10   10th.  It would have been on either May 9th or
11   10th.
12        Q    And how did you learn there was some
13   question concerning the Deborah Adams matter?
14        A    The compliance department is
15   typically involved in a dispute when an
16   applicant is upset or --
17        Q    Okay.
18        A    End of sentence.
19        Q    Okay.  Are there a number of people
20   in the compliance department?
21        A    Yes, there are.
22        Q    And how did you happen to wind up
23   with this one, was it just the luck of the
24   draw?

                    BEECHER & HORVATH

1          A     Deborah Adams also communicated with

2     Melissa Sorenson, who is a compliance officer

3     on my team.  At some point I became involved,

4     either because Melissa was not available, or we

5     thought it was appropriate to for me to speak

6     to Deborah Adams.

7          Q     You are the chief compliance officer;

8     is that correct?

9          A     That is correct, sir.

10         Q     Does Ms. Sorenson have a title also?

11         A     Compliance officer.

12         Q     Is it fair to say that you are the

13    top person in the compliance departments?

14         A     Yes, it is.

15         Q     Can you describe your conversations

16    with Deborah Erickson (sic) in terms of how she

17    approached the problem?

18              MR. COFFEY:  Who is --

19         A     Deborah?

20         Q     I'm sorry.

21              MR. COFFEY:  Melissa Sorenson

22    or Deborah Adams?

23         A     Deborah Adams.

24         Q     Your conversation with Deborah Adams

                    BEECHER & HORVATH

1      in terms of how she was approaching the issue?

2          A     My initial conversations with Deborah

3      Adams were very straightforward.  I said that

4      we had reinvestigated.  We were able to

5      determine that the record, that the criminal

6      records, in fact, belonged to a different

7      person.  It was very factual.  That was the, as

8      I recall, that was the tone of the initial call

9      that I had with Deborah.

10         Q     What do you recall about the next

11     call you had with Deborah?

12         A     There were several follow-up calls

13     with Deborah; some that she initiated, some

14     that I initiated.  She was very upset that she

15     did not get this position.  Her calls to me

16     ranged from tears to anger to a calm

17     conversation, in which she thanked me for my

18     help.

19         Q     Did Deborah Adams ask you to do

20     anything with respect to the job that she was

21     applying for?

22         A     I don't recall if she asked me, or if

23     I offered.  But I did contact National

24     Engineering Services Corporation several times,

BEECHER & HORVATH

1      to ensure that they knew there was not a

2      criminal record associated with their

3      applicant, Deborah Adams.

4            Q      And did they know that as a result of

5      your calls?

6            A      Oh, yes.

7            Q      Did you have occasion at all to

8      contact Comensura, now known as Guidant?

9            A      No, I did not.

10           Q      Did you have occasion to contact

11     Northeast Utilities at all?

12           A      No, I did not.

13           Q      Do you know whether or not anyone

14     else from Verifications contacted Comensura?

15           A      There -- to my knowledge, they did

16     not.  There is nothing recorded, or documented,

17     excuse me.

18           Q      Okay.  Do you know whether or not

19     anybody from Verifications contacted Northeast

20     Utilities?

21           A      Once again, to my knowledge, no one

22     contacted Northeast Utilities regarding Deborah

23     Adams.  There is no documentation of such

24     contact having occurred.

                        BEECHER & HORVATH

58

1          Q    Did you know, around the time that

2     this event was occurring, around May 8th, 9th,

3     10th, 11th, did you know where -- withdrawn.

4               Did you know the location at which

5     Deborah Adams was to be employed?

6          A    No, I did not.

7          Q    Did you know who her employer was to

8     be?

9          A    Her employer was -- or her employer

10    was to be National Engineering Services

11    Corporation.  As to where they were placing

12    her, we didn't -- I did not know, we did not

13    know.  National Engineering Services

14    Corporation was the employer.

15         Q    National Engineering Services

16    Corporation uses Verifications for other

17    searches, does it not?

18               MR. MADSEN:  Say that again.

19         I'm sorry, can you --

20         Q    For other investigations?

21         A    On other applicants?

22         Q    On other applicants.

23         A    That is correct.

24         Q    And is National Engineering Services

1    Corporation, to your knowledge, always the

2    employer?

3         A    I don't know.  We may background

4    check some people for National Engineering that

5    are going to work at National Engineering.  We

6    may also check some people that National

7    Engineering intends to put on assignment

8    somewhere.  We cannot tell.  We do not know the

9    work site, I'll put it that way.

10        Q    Okay.  In this particular case, how

11   did you know that Deborah Adams was going to be

12   employed by National Engineering?

13        A    Could you rephrase that, please.

14        Q    Sure.  In this particular case, I

15   thought you told me that you knew that National

16   Engineering was to be the employer of Deborah

17   Adams; is that correct?

18        A    Yes.

19        Q    How --

20        A    They were -- they ordered the

21   background on Deborah Adams.  They had a

22   permissible purpose under federal law, under

23   the FCRA, because this was for employment

24   purposes.  So National Engineering was, in

                          BEECHER & HORVATH

1      fact, going to pay Deborah Adams when she

2      worked.

3           Q    Okay.  I was trying to -- how did you

4      distinguish that from the fact that National

5      Engineering might have been ordering an

6      investigation for somebody they were not going

7      to directly employ, but rather place with

8      someone else?  Do you see the distinction I'm

9      making?

10          A    I believe so.  In both cases, the

11     individual is an employee of National

12     Engineering.  One, in one case, the person

13     happens to work for National Engineering,

14     perhaps as a headhunter or receptionist or

15     whatever it might be, versus someone who is

16     employed by National Engineering and, in fact,

17     is sent to client's locations to do work.

18          Q    So you have distinguished two

19     situations, if I may, one where National

20     Engineering actually employs the person that

21     they do a background check in their own

22     operations?

23          A    Um-hum.

24          Q    Is that correct?

BEECHER & HORVATH