1    typically, what they will do is go to their

2    team leader.  They might then go to a group

3    leader or a manager.  So there are several

4    levels of people that might be involved in

5    doing this.

6            In the case of this particular

7    record, we made the decision that, based upon a

8    full date of the birth match, last name match,

9    and a similar first name, that, in fact, it was

10   close enough, we felt that we needed to report

11   it to our client, National Engineering.

12       Q    Okay.  Let me ask you this:  If the

13   name had come back with the last name spelled

14   Adams with two Ds, A-D-D-A-M-S, under the

15   procedures and protocols at Verifications Inc.,

16   would that report have been passed along to

17   National Engineering as a positive match,

18   because it's a similar name?

19       A    First of all, we didn't report it as

20   a positive match.  We reported that we found a

21   record under Deborah Jean Adams, with a

22   matching date of birth.  In the case of there

23   being two Ds in the surname, and the difference

24   in the spelling of the first name, I doubt that

                        BEECHER & HORVATH

1     we would have reported it.

2          Q     And why is that?

3          A     Because the surname -- because we had

4     a variance both in surname as well as first

5     name.

6          Q     Okay.  What if the first name matched

7     and the last name was spelled A-D-D-A-M-S,

8     would that have been passed along to the

9     customer as a concern?

10         A     Assuming there was a full date of

11    birth match?

12         Q     Yes.

13         A     I believe it would have been, yes.

14         Q     But you're not certain, as you sit

15    here now?

16         A     No, because --

17         Q     Okay.

18         A     -- because -- because there is --

19    there is a judgment --

20         Q     Okay.

21         A     -- call -- there is a judgment that

22    that must be applied to this.

23         Q     Okay.

24         A     And, of course, the reason -- the

                    BEECHER & HORVATH

1    adverse action requirements under the Fair

2    Credit Reporting Act are designed to allow us

3    to report, in good faith, this kind of

4    information, and still give the consumer the

5    opportunity to dispute and not lose an

6    employment opportunity.

7        Q    Okay.  But you agree that in deciding

8    whether or not to pass along this information,

9    that a judgment call is required, correct?

10       A    Absolutely.

11       Q    Okay.  And that judgment call is not

12   spelled out -- because it is a judgment call,

13   the decision is not spelled out with precision

14   in Verifications Inc.'s procedures and

15   protocols?

16       A    I would say that's fair.

17       Q    Now, what if the match came back from

18   Mohr Investigation Services, and it said Adams

19   comma Dabra D-A-B-R-A, and the individual

20   looking in the public records department

21   reviewing that said, you know, maybe there's a

22   misspelling there, it's something we should

23   probably check up on.  Would they have had the

24   opportunity to go back to Mohr Investigation

                    BEECHER & HORVATH

124

1    Services and say, "Can you please get some more

2    information for us, we think there may be a

3    match, but we are not quite sure," is that

4    possible?

5         A    Yes, it is certainly possible.

6         Q    They have the discretion to do that?

7         A    They have the discretion, yes.

8         Q    Okay.  So if there is a divergence in

9    the spelling of the name, or a divergence in

10   other information which might cause them to

11   suspect that it could or might not be a match,

12   they do have the discretion to go back to Mohr

13   and say, we want more information, so that we

14   can either positively identify this as a match

15   or rule it out?

16        A    Um-hum.  Yes, that is correct.

17        Q    Okay.  Does that cost additional

18   money to Verifications Inc., to have that

19   additional information obtained by Mohr

20   Investigation Services?

21        A    I don't believe so, but I'm not

22   absolutely sure.  I believe that is part of the

23   service that our field researchers provide to

24   us.

1        Q      Just so that I understand how

2    Verifications Inc.'s business -- Verifications'

3    business works, if Macy's, a department store

4    that happens to be across the street from us

5    today, I'm sure they're there on most days, if

6    they contacted Verifications and said, we're

7    thinking of hiring a sales person for our

8    jewelry department, we would like you to do a

9    background check, okay, does the Fair Credit

10   Reporting Act require that you supply the

11   information directly to the job applicant, in

12   addition to Macy's?

13       A      Do you mean does, the Fair Credit

14   Reporting Act require that we supply a copy of

15   the report to the applicant --

16       Q      Yes.

17       A      -- as well as Macy's?

18       Q      Yes.

19       A      Only if the applicant requests it.

20       Q      Okay.  Is the applicant supposed to

21   be provided with an opportunity to request it?

22       A      In the states of Minnesota, Oklahoma,

23   and California, there needs to be a check box

24   on the authorization form that the applicant

BEECHER & HORVATH

1    signs, so they have the opportunity to order a

2    copy of their background report at the same

3    time they authorize its procurement.  Other

4    than that, there is supposed to be a statement

5    on the authorization that says the applicant

6    can contact the consumer reporting agency to

7    obtain a copy of the report.

8         Q    Okay.  And if the applicant does not

9    make the request to be provided with the

10   report, then your understanding is that

11   Verifications needs only to provide the report

12   directly to the customer?

13        A    That is correct.

14        Q    Okay.  Incidentally, on occasion,

15   verifications Inc. does go back to an

16   investigation services to request additional

17   information, isn't that correct?

18        A    Yes, it is.

19        Q    And generally, what is entailed in

20   going back and requesting for additional

21   information?

22        A    Usually -- do you mean why do we do

23   it or what occurs?

24        Q    No.  Yes, what occurs.

                         BEECHER & HORVATH.

1          A      Typically, what happens is that

2     additional documents are requested.

3          Q      Okay.

4          A      These are documents that are not part

5     of an accessible through the public access

6     system.  Often these records have to be pulled

7     by a court clerk, and, typically, it involves

8     some amount of time, a few days, most often,

9     for the court clerk to actually pull a file.

10         Q      Okay.  But in terms of the request by

11    Verifications Inc. to a investigation service

12    provider, could that be as simple as making a

13    phone call to them, saying, "Hey, remember that

14    order that you filled for us on Deborah Adams,

15    we would like some more information, can you

16    please go back and do that for us"?

17         A      Yes, it could be requested that way.

18         Q      Okay.  So it could be that simple?

19         A      Yes.

20         Q      Could be an e-mail?

21         A      Yes.

22         Q      Okay.  And so the public record

23    specialist has the discretion to look at a

24    report and say, you know what, something

                         BEECHER & HORVATH

1       doesn't match here, I -- just to be safe, I'm

2       going to follow up.  They have the discretion

3       to call the investigation service and say, I'd

4       like you to check out some more information for

5       me?

6              A     They do.  Typically, they would go to

7       a leader first, for another opinion.

8              Q     Okay.  Do they have to get

9       authorization from a leader?

10             A     No, they do not.

11             Q     So they can make that call on their

12      own?

13             A     Yes, they can.

14             Q     Now, in this case, the public record

15      specialist would have received Defendant's

16      Exhibit 4 directly from Mohr Investigation

17      Services, correct?

18             A     Yes.

19             Q     And then what happens to the report

20      from there?

21             A     To the what?

22             Q     This report.

23             A     This report, this information is

24      retained, it is scanned, and that is the reason

1    you see the label in the upper left corner.   It

2    is scanned and retained within our imaging

3    system.   The original document, assuming it

4    came in via fax, is going to be securely

5    destroyed.

6         Q    Okay.   How is something securely

7    destroyed?

8         A    According to the rule published, it

9    can be destroyed by pulverizing, is one option.

10   We don't use that one.   But one option is to

11   have the paper picked up by a legitimate

12   document destruction company --

13        Q    Okay.

14        A    -- that we have checked out, and we

15   know them to be a legitimate enterprise, and

16   that is how our documents are destroyed.

17        Q    Okay.   Now, in this particular case

18   involving the background check for Deborah

19   Adams, after the public record specialist

20   received this report from Mohr Investigation

21   Services, is it your understanding that that

22   specialist facilitated the imaging of this

23   document?

24        A    I cannot speak to the process in

BEECHER & HORVATH

130

1   terms of how this document -- I don't know

2   where it goes.  I don't know if it goes in a,

3   in a file folder.  I don't know if it's picked

4   up everyday off somebody's desk.  I don't know

5   the process by which this gets to the person

6   who does the imaging.  I only know that it

7   does.

8          Q    Okay.  It does take place?

9          A    Um-hum.

10         Q    And then, just walk me through how

11  this criminal background information got from

12  the public record specialist, who received it

13  from Mohr Investigation Services, to National

14  Engineering.  What happened?

15         A    The public record specialist working

16  with this report entered this information into

17  our data verification system, our work flow

18  system.  And when they enter this information,

19  they entered -- there is a case number, a case

20  number CR98000228 dash 0102 and 00, so there

21  were three counts connected with this case.  So

22  they entered those three counts as relating to

23  this same case.

24         Q    Okay.

BEECHER & HORVATH

1    A  And then they also entered one other,

2   the other report here, which deals with driving

3   under revocation.  And so this information was

4   put into --

5    Q If you could turn to Defendant's 9.

6    A  Actually, on Defendant's 9, it has

7   already been removed.

8       MR. COFFEY:  It's Defendant's

9    6.

10      MR. MADSEN:  Defendant's --

11   I'm sorry, Defendant's 6.

12    A  Thank you.  Um-hum.  So there you see

13   the two cases that we reported.

14    Q I see.  So there -- so Defendant's 6,

15   is a form that is generated by Verifications'

16   information technology system; is that correct?

17    A  Yes, it is.

18    Q And the data that's inputted into

19   this form, as it relates to the criminal

20   background information, was inputted by the

21   public record specialist?

22    A  That is correct.

23    Q Okay.  And then what happens to this

24   background investigation report after the data

1        is inputted by the public record specialist?

2                A       This information resides within our

3        work flow systems.

4                Q       Okay.

5                A       This report is dynamically produced,

6        which means, each time someone wants to look at

7        a copy of this report, the information that

8        comprises the report is pulled -- excuse me, is

9        pulled in to create it.

10               Q       Okay.  And does any -- does anyone at

11       Verifications Inc. have the responsibility for

12       reviewing the background investigation report,

13       other than the public record specialist, after

14       this information is inputted?

15               A       Yes, it does go through a proofing,

16       what's called a proofing cycle.

17               Q       Okay.  And who conducts the proofing

18       cycle?

19               A       A proofer by title, a proofer.

20               Q       Is that a person employed in the

21       public records department?

22               A       Yes.

23               Q       Okay.

24               A       The first instance that I see of

                         BEECHER & HORVATH

1     proofing goes back to 5-8.

2        Q    And what document are you looking at?

3        A    I am looking at the -- let's see --

4     I'm looking at this document from discovery,

5     document discovery four.

6        Q    Okay.

7        A    And in the history section, it shows

8     that it was proofed, first time, 5-8, at 2:29.

9     It was proofed by -- I have the initials here,

10    and a phone extension.

11        Q    Okay.

12        A    I cannot equate the initials to a

13    specific person.

14        Q    All right.  And what is the purpose

15    of that proofing?

16        A    The purpose of the proofing is to

17    ensure that the information is being properly

18    presented, that it follows our standards.

19        Q    Is it the proofer's responsibility

20    more to do with the form than with the content;

21    is that fair to say?

22        A    Yes.

23        Q    Okay.  So the proofer doesn't

24    evaluate the background investigation report,

BEECHER & HORVATH

1      an example of which has been marked as

2      Defendant's Exhibit 6, to ascertain whether or

3      not the criminal information being reported

4      here is accurately associated with the

5      consumer?

6           A     That is correct.

7           Q     Okay.  What happens after this

8      document is proofed, what happens to this

9      information?

10          A     It then becomes available to -- it is

11     released, so to speak, within the system, and

12     it becomes visible to our client online.

13          Q     Okay.

14          A     Assuming they have proper

15     permissions.

16          Q     And in this case, National

17     Engineering did have proper permission,

18     correct?

19          A     Yes.

20          Q     Okay.  So there is no other

21     individual who evaluates the content of the

22     information being released to the customer,

23     other than the public relations specialist, or

24     public record specialist?

                         BEECHER & HORVATH

1          A      Unless the public record specialist

2      takes it to a leader or a colleague for another

3      opinion, no, there is not, to my knowledge, a

4      second level built in --

5          Q      Okay.

6          A      -- to evaluate that.

7          Q      Let's say that Mohr did a really bad

8      job, and they made a -- they presented a false

9      positive, where instead of the person being

10     Deborah Adams, it was Janice Adams, and the

11     public record specialist didn't catch that and

12     decided to pass it along to the customer.

13     There are no controls in place to ensure that

14     something like that doesn't happen at

15     Verifications Inc.?

16         A      Well, there is a control from the

17     standpoint of, on the report itself, one sees

18     the name of the applicant.

19         Q      Okay.

20         A      And one -- and the proofer can also

21     see the name under which a record was found.

22         Q      Okay.

23         A      And so if, in fact, one has Janice

24     Adams and George Adams, or whatever, that

BEECHER & HORVATH

1 discrepancy would be noted during the proofing

2 process.

3  Q Okay.  So the proofer could catch

4 discrepancies in spelling of names?

5  A Yes.

6  Q They could catch discrepancies in

7 dates of birth?

8  A Yes.

9  Q They could catch discrepancies in

10 social security numbers?

11  A Yes.

12  Q Are they trained to catch those

13 specific discrepancies?

14  A Yes.

15  Q What type of training is provided to

16 the public -- to the proofers with respect to

17 name spelling?

18  A I cannot -- I don't have the details

19 on that.  I couldn't tell you.

20  Q Okay.  Now, you testified earlier

21 that there was some magic to the first three

22 letters of the person's first name?

23  A Did I say magic?

24    MR. COFFEY:  Objection.  This

BEECHER & HORVATH

1 is a deposition and just, I'll humor

2 hypotheticals to an extent.  I mean,

3 she's a fact witness here.  She might be

4 an expert, because she has a lot of

5 experience in this stuff, but let's keep

6 it to the facts.  Okay.  I mean, I have

7 given you guys a lot of leeway with that

8 today, and I think you know she's a fact

9 witness.

10     MR. MADSEN:  Much appreciated.

11     MR. COFFEY:  No, so I'm

12 saying, your hour is already an hour 20,

13 so --

14     MR. MADSEN:  Well, I may go

15 longer than that.

16     MR. COFFEY:  Well, I'm holding

17 you to your expectation.  Now, you can

18 go as long as you want, but I'm saying

19 you made a promise, so your

20 hypotheticals are starting to --

21     MR. MADSEN:  Okay.

22     THE WITNESS:  I've forgotten

23 the question.

24     MR. COFFEY:  Under the federal

BEECHER & HORVATH

```
1              rules, you don't have the right to ask
2              her -- she's here as a fact witness, not
3              an expert, so I mean --
4                        MR. MADSEN:  She's in charge
5              of compliance.
6                        MR. COFFEY:  But not for every
7              hypo you want to ask.  If she sees Micky
8              Mouse, is it really Dumbo?  I mean, were
9              not, you know, okay.
10                       MR. MADSEN:  All right.
11   BY MR. MADSEN:
12        Q    So, to your knowledge, again, there
13   is no procedure in place whereby the public
14   record specialist team leader reviews all
15   criminal background investigation reports
16   before they are released to the customer?
17        A    Not to my knowledge.
18        Q    Okay.  So the only procedure in
19   place, that you're aware of, is that a proofer
20   reviews the information for form before it is
21   released to the customer?
22        A    For form, and also for matching
23   identifiers, to go back to your example of
24   Janice Adams, versus --
```

                         BEECHER & HORVATH

1      Q      Okay.

2      A      -- the other one.

3      Q      Okay.  Does the proofer have the --

4    if the proofer sees a discrepancy, does the

5    proofer have the authority to call up Mohr

6    Investigations directly and say, "Hey, I see a

7    problem with this, can you provide us with more

8    information"?

9      A      The proofer would not do that.  The

10   proofer would return it to a, either to the

11   public record specialist, or to a team leader.

12   But if they felt that there was something

13   incorrect in what they were seeing, they would

14   return it to the originating department.

15     Q      What if there is a problem in the

16   content, not the form, but in the content of

17   the report, is there anyone at Verifications

18   Inc. who reviews the report for content before

19   it is released to the customer, other than the

20   public record specialist?

21     A      For content?

22     Q      Yes.

23     A      Meaning -- meaning the basis that was

24   used to determine --

BEECHER & HORVATH

1          Q      Yes.

2          A      -- the reporting or --

3          Q      Yes.

4          A      Okay.   To my knowledge, that decision

5     is made by the public record specialist who has

6     been trained to do their job.

7          Q      Okay.

8          A      And that is their job --

9          Q      Okay.

10          A      -- to receive the information, to

11     enter it -- I should say to receive the

12     information, to evaluate what they have

13     received, to know when they need to take it to

14     a leader for another opinion or to someone who

15     has more experience, and then to enter it into

16     the system.

17          Q      Now, I believe you testified earlier

18     that in evaluating whether there is a name

19     match that, for the first name, that you look

20     at least for the first three letters of the

21     name to match; is that correct?

22          A      Yes.

23          Q      Okay.   Who came up with that

24     standard, of at least three letters must match?

BEECHER & HORVATH

1          A      It is -- it is somewhat of an

2     industry standard.  I cannot speak to, for

3     example, the guidelines provided by, like ASIS

4     International has a background -- a recommended

5     background process, and as do many

6     organizations.  So I cannot speak to the origin

7     of the first three letters.

8          Q      Okay.  But it is a standard that is

9     used --

10         A      Commonly.

11         Q      -- at Verifications Inc.?

12         A      It is commonly used at Verifications,

13    yes.

14         Q      Okay.  And you referred to ASIS

15    International, what is that?

16         A      It used to stand for the American

17    Society for Industrial Security.  As it

18    expanded to include international chapters, the

19    name was changed to ASIS International.  As a

20    security organization, of course, one of the

21    things that they are concerned with is

22    background investigations.

23         Q      Do consumer reporting agencies

24    receive accreditation from any public bodies,

1      like --

2            A      Consumer reporting agencies could

3      seek, for example, to be accredited by ISO, as

4      we are, as Verifications is.

5            Q      Okay.

6            A      We are certified under the ISO 9001

7      2000 standard, and have been certified since

8      July of 2001.

9            Q      Okay.

10           A      There is a National Association of

11     Professional Background Screeners, NAPBS for

12     short.

13           Q      Okay.

14           A      That organization is between five and

15     six years old.  The organization -- NAPBS is

16     currently working on, as expected to roll out

17     next month at its mid year meeting,

18     certification standards for consumer reporting

19     agencies.

20           Q      Okay.  Currently, they do not have

21     certification standards in place?

22           A      They do not.

23           Q      But ISO 9001 sets forth standards for

24     conducting consumer background checks?

                        BEECHER & HORVATH

1          A     Not specifically for consumer

2     background checks.

3          Q     Okay.

4          A     ISO is rather a -- ISO is a quality

5     management system that is applicable to many

6     different types of industries.

7          Q     Okay.

8          A     We have -- we sought that ISO

9     certification, as I said, and obtained it in

10     July of 2001.  We are also Safe Harbor

11     certified, but that is a self certification in

12     terms of transferring information between the

13     European union and the United States.

14          Q     Okay.  Are there any accreditation

15     agencies which set forth, to your knowledge,

16     any standards regarding appropriate procedures

17     to be utilized by a consumer reporting agency

18     in conjunction with conducting criminal

19     background checks?

20          A     Not to my knowledge.  The closest

21     would be the certification standards that are

22     set to be released next month by NAPBS.

23          Q     Okay.  Now, when you contract with a

24     customer, such as National Engineering Services

BEECHER & HORVATH

1    Corporation, to provide a criminal background

2    check, do you communicate to them that they

3    should handle -- that they should carefully

4    review the information that you provide to

5    them?

6         A    Yes.

7         Q    Okay.  You do communicate that?

8              MR. COFFEY:  I'm just going to

9         object.

10        A    Are you asking if we tell them to

11   read what we provide to them?

12        Q    To carefully review it.

13             MR. COFFEY:  I'm just going to

14        object.

15             MR. MADSEN:  That's fine.  She

16        can answer it.

17        A    As part of our implementation

18   process, I mean, we have a very set process

19   that we follow.  I do not know if we tell them

20   that they're supposed to carefully read the

21   reports.

22        Q    Okay.  Do you communicate to them,

23   either in the initial contract for services, or

24   otherwise, that they have the opportunity for a

                    BEECHER & HORVATH

1    reinvestigation if they see a discrepancy, or

2    if the consumer objects?

3         A    The closest that we have to that is

4    in a user certification, and it speaks to, and

5    they sign off on the fact, among other things,

6    that if they are going to -- if they are

7    considering adverse action, based in whole or

8    part, on information in the consumer report,

9    they must follow adverse action procedures.

10        Q    Okay.  And the adverse action

11   procedures, what is your -- please feel free to

12   consult with the document -- what are those

13   adverse action procedures that --

14        A    The adverse action procedures as laid

15   out by the Fair Credit Reporting Act say that

16   if the employer is considering an adverse

17   employment action, which could be not hiring,

18   not retaining, not promoting, then before they

19   make a final decision, they are supposed to

20   advise the consumer, they are supposed to

21   provide them with a copy the background report

22   and a summary of their rights.

23             They are also supposed to give the

24   consumer a certain amount of time to dispute --

BEECHER & HORVATH

1    and they also have to tell the consumer how to

2    contact the consumer reporting agency.

3         Before they make a final employment

4    decision, they must give the consumer a certain

5    amount of time to contact the consumer

6    reporting agency to dispute.  Federal law does

7    not lay out what that time frame is.  The fair,

8    excuse me, the Federal Trade Commission

9    suggested in one of their opinion letters that

10   five days was reasonable.

11        Q    Okay.

12        A    And so if the consumer contacts the

13   consumer reporting agency, then everything is

14   sort of put on hold while reinvestigation

15   occurs.  If the consumer does not contact us to

16   dispute, then typically, five days later, the

17   employer, what would have been the employer,

18   pardon me, is supposed to send a final notice

19   of adverse action.

20        Q    Okay.  And those procedures are in

21   place in order to protect the consumer; is

22   that, in part, correct?

23        A    Certainly, according to the FTC

24   opinion letter, letters, that is why those

BEECHER & HORVATH

1   procedures are in place, yes.

2          Q    Okay.  And those procedures apply to

3   recipients of consumer information?

4          A    Our client, you mean?

5          Q    Yes.

6          A    Yes, they do.

7          Q    And your clients, including National

8   Engineering Services Corporation, are

9   obligated, by law, to comply with those

10  obligations, based on your understanding?

11         A    They are required to, and they also

12  sign a user certification saying that they

13  will.

14         Q    Okay.  And you testified that the

15  standards that you use include looking for a

16  minimum of two identifiers --

17         A    Yes.

18         Q    -- correct?

19              And in this case, there were three

20  identifiers, the social security number, the

21  name, and the date of birth, correct?

22         A    There were three identifiers that we

23  provided to Mohr Investigation Services.

24         Q    Okay.

                        BEECHER & HORVATH

1      A      They could only match -- they

2      couldn't match on all three, because the social

3      security number was not part of the record.

4          Q.   Okay.  But if, for instance, they

5      were only to match on one of the identifiers,

6      then there would not have been a sufficient

7      basis for generating a criminal background

8      investigation report; is that fair to say?

9          A      I would say in most cases.  Once

10     again, you get into a judgment call.  And so,

11     for example, if all we had on a very common

12     name was a name match, without a date of birth

13     match or anything else to support it, most

14     likely we would not report that, because there

15     is only a single identifier.

16         Q      All right.

17         A      However, if, in fact, it was -- if it

18     was a very unusual name, it would depend --

19     that might be one of the factors.  It also

20     might depend on -- well --

21         Q      Okay.  Who, and again, that's a

22     judgement call that is made by the public

23     record specialist?

24         A      Yes, but it would be very unusual to

BEECHER & HORVATH

1      report something as what we call a "name match"

2      only.  And if we ever do report that, it is

3      clearly identified as, "Please note, this is a

4      name match only."

5           Q    Okay.  Now, but the general rule that

6      you operate with is to have -- is to look for a

7      minimum of two identifiers?

8           A    That is correct.

9           Q    Okay.  Where did that standard come

10     from?

11          A    I would say it came from best

12     practices within the industry.

13          Q    Okay.  It's not set out under the

14     Fair Credit Reporting Act, or the implementing

15     regulations, to your knowledge?

16          A    That is correct, it is not.

17          The Fair Credit Reporting Act rather

18     speaks to strict procedures to ensure that what

19     we report is the same as the status of the

20     current public record.

21         Q    And again, so National Engineering

22     had duties with respect to maintaining the

23     security of the information that you provided

24     to them regarding Deborah Adams; is that

BEECHER & HORVATH

1      correct?

2            A      Yes.

3            Q      Okay.   In other words, they were not

4      free to publicly disclose the criminal

5      background information regarding Deborah Adams,

6      correct?

7            A      That's correct.

8            Q      And they were not at liberty to

9      disclose it to a third party, without

10     authorization, regarding the criminal

11     background, the false positive that we have

12     here; is that correct?

13           A      Could you repeat the question,

14     please.

15           Q      They would not have had -- they would

16     have had an obligation not to report the

17     criminal background findings to a third party?

18     And when I say third party, I mean, other than,

19     obviously, you folks are in possession of it,

20     Deborah Adams is in possession of it, and

21     National Engineering is in possession of it.

22           A      Right.

23           Q      I'm talking about a party, other than

24     those?

                          BEECHER & HORVATH

1          A     All right.  There would be -- unless

2     Deborah Adams had specifically authorized them

3     to pass along the information, then, no, they

4     should have -- then National Engineering should

5     have been maintaining it confidentially.

6          Q     And the information belongs to

7     Deborah Adams; is that fair to say?

8          A     I don't know if it's fair to say that

9     or not.  It is her information, however, the

10    report itself has been -- belongs to our client

11    who paid for it.

12         Q     Now, with regard to your contract

13    with Mohr Investigation Services, has

14    Verifications utilized Mohr Investigation

15    Services in that jurisdiction in the past?

16         A     Yes, according to the records, we

17    have used them since 2004.

18         Q     Okay.  And do you still use them?

19         A     Yes, we -- to my knowledge, yes, we

20    do.

21         Q     And what happens if Mohr engages in

22    negligence, and you rely upon their negligently

23    obtained information in providing it to a

24    customer, does Mohr have any indemnification

                              BEECHER & HORVATH

1       obligations to you, to Verifications Inc.?

2            A    They have an obligation to -- I'm not

3       sure if I am answering your question, but they

4       have an obligation, for example, to have errors

5       and omissions insurance, is that --

6            Q    I see.  In conjunction with your

7       business relationship with Mohr, they're

8       required to have an E and O policy?

9                 MR. COFFEY:  Errors and

10               omissions policy.

11           A    Right.  I don't know.

12                MR. COFFEY:  If you know.

13           A    Yeah, certainly it is recommended

14      that they have it for their own business.  I do

15      not know if we are requiring it, and I don't

16      know if we required it in 2004.

17                MR. MADSEN:  All right.  I

18               would like to mark -- I think we are --

19               did we end up at 12?  All right.  Were

20               on to Lucky 13.

21

22               (Off the record discussion.)

23

24               (Received and marked Plaintiff's

                      BEECHER & HORVATH

```
1                  Exhibit 1 for Identification.)
2                     (BACKGROUND REPORT)
3
4                  MR. COFFEY:  Just to put on
5           the record, I just object to any
6           evidence that is supposedly
7           subsequent -- if it's something we did
8           subsequent to this, I don't think it's
9           part of this.
10                 MR. MADSEN:  Okay.
11                 MR. COFFEY:  I'm just placing
12          an objection.
13                 MR. MADSEN:  All right.  It is
14          a follow up to 12.
15                 THE WITNESS:  Okay.
16                 MR. MADSEN:  Exhibit 12, which
17          is an Exhibit.
18   BY MR. MADSEN:
19          Q    Ms. Poquette, is it pronounced
20     Poquette or Poquette?
21          A    Poquette.
22          Q    Ms. Poquette, I just handed you
23     Plaintiff's 1 for identification.  And can you
24     identify that document by looking at it?
```

BEECHER & HORVATH

1          A    Yes, this appears to be a

2     Verifications' generated background report.

3          Q    Okay.  And when was this background

4     report conducted?

5          A    It says on the cover page, that it

6     was entered, meaning initiated, on June 12th of

7     2008.

8          Q    Okay.  And why was this generated?

9          A    We received an order from a client,

10     Kelly Services, asking that we do the

11     background checks that are listed on this cover

12     page.

13          Q    Okay.  And if you look at Plaintiff's

14     (sic) Exhibit 12 for identification, there is

15     an e-mail from Shannon Hoffmann of

16     Verifications Inc. to Kelly Services, on the

17     second page of that document, do you see that?

18          A    I don't have --

19          Q    Defendant's 12.

20               MR. COFFEY:  We're switching

21          documents.  Okay.  If you could just

22          explain it to --

23               MR. MADSEN:  That's fine.

24          Q    Defendant's 12, which was the last

                         BEECHER & HORVATH

1      document, that Mr. Kupinse --

2         A    All right.  Okay.

3         Q    Now, do you see on the second page of

4      Defendant's 12, that there is a report of a

5      criminal record search that was conducted by

6      Verifications Inc. that was communicated to

7      Kelly Services, do you see that?

8         A    Yes, I do.

9         Q    Okay.  And the report showed that

10     there was a concern of a criminal background

11     record for Deborah Jean Adams, do you see that?

12        A    Yes, I do.

13        Q    And if you look at Plaintiff's 1,

14     which is the Exhibit I just gave to you, what

15     is --

16        A    All right.

17        Q    -- what is the relationship between

18     Plaintiff's 1 and Defendant's 12?

19        A    The relationship is that in --

20     Defendant's 12 includes an e-mail that shows

21     the identified concern relative to the

22     background.

23        Q    Okay.

24        A    Okay.  This was -- one of the options

BEECHER & HORVATH

1     that a client has is to be alerted via e-mail
2     whenever we find something that, per their
3     criteria or ours, we flag as a concern.  Now,
4     in the case of this particular client, they do
5     not use the terminology concern.  They use the
6     terminology unfavorable.
7          Q     Okay.
8          A     And so this was originally reflected.
9                The connection between that, and then
10    Plaintiff's 1, is that there is a county
11    criminal search from Pennsylvania County,
12    Virginia.  This is now showing favorable for
13    Pennsylvania -- I can't say that --
14    Pennsylvania County.  This is now showing
15    favorable.  This reflects the updated record.
16         Q     Okay.
17         A     Yes.
18         Q     So Plaintiff's 1 was generated as
19    part of a reinvestigation?
20         A     Yes.
21         Q     Okay.  Because Deborah Adams received
22    yet another false positive from Verifications
23    Inc.  She contested it.  And then it was
24    cleared up as reflected in Plaintiff's 1?

                    BEECHER & HORVATH

1         A     That is --

2                    MR. COFFEY:  Objection to the

3         form.  You can answer it.

4         A     Yes.

5         Q     Okay.  And if you would look at the

6    first page of Plaintiff's 1.

7         A     Um-hum.

8         Q     Do you see that it lists the

9    applicant and her address on the first page?

10        A     Yes.

11        Q     And then underneath it, it says

12   A-K-A, do you see that?

13        A     Yes.

14        Q     Who inputted that information,

15   Deborah Jeans Adams?

16        A     That would have been automatically

17   input.  Part of what was ordered on this

18   background investigation was a social security

19   number trace.  And by virtue of doing a social

20   security number trace, A-K-As are found on the

21   trace.  So at some point -- at some point, when

22   Deborah Adams was applying for credit, some

23   subscriber to the credit bureau entered the

24   name Deborah Jeans Adams.  That's --

                    BEECHER & HORVATH

1      Q.    Jeans with an S?

2      A     We certainly didn't enter it, yes.

3  Those are automatically pulled through from the

4  social security number trace.

5      Q     And the social security number trace,

6  in this case, was done through the organization

7  CSC/Equifax?

8      A     That is correct.

9      Q.    And you're aware that Deborah Adams

10  ended up losing her employment opportunity in

11  this particular case with Northeast Utilities?

12      A     That is my understanding.

13      Q     Does Verifications Inc. take any

14  responsibility for the fact that Deborah Adams

15  lost that assignment?

16              MR. COFFEY:  Objection.  She

17       can't -- I'm not letting her answer

18       that.

19              MR. MADSEN:  You're really

20       instructing her not to answer?

21              MR. COFFEY:  Do they take

22       responsibility.  You can't ask that,

23       Will.

24              MR. MADSEN:  Yes, I can.  I

BEECHER & HORVATH

1    thought we are just going to be we --
2    were going to reserve --
3            MR. COFFEY:  You're asking
4    facts.  I mean, you're asking her if she
5    takes responsibility, that's your
6    basis -- you're asking her to go to a
7    conclusional law.
8            MR. MADSEN:  She can answer
9    it.  If you want to object to the form,
10   that's fine.  If you want to instruct
11   her not to answer, go ahead.
12           MR. COFFEY:  Go ahead.  Well,
13   I'm just going to tell you, that's Bush
14   League, it really is.  I mean, I'll let
15   her answer, just because I'm not going
16   to call a judge, but that's -- you know
17   what, you shouldn't even ask it at all,
18   "Are you responsible," it's the ultimate
19   question of the fact.
20           MR. MADSEN:  I said
21   Verifications.
22           MR. COFFEY:  Verifications, do
23   they take responsibility.  You know you
24   can't.  I think it palpably irrelevant.

                    BEECHER & HORVATH

1           I'm not going to fight with you over it,

2           but I think it's a ridiculous question.

3                   Go ahead answer it.  Wait a

4           second, no --

5                   THE WITNESS:  No, I don't mind

6           answering it.

7           A    No, we do not take responsibility.

8                   National Engineering Service

9    Corporation had a responsibility to provide

10   Deborah Adams with the opportunity to dispute,

11   prior to a final employment decision being

12   made.  They agreed to that when they signed

13   their user certification.  Based on what

14   Deborah Adams communicated to us, she was never

15   afforded that opportunity by National

16   Engineering Service Corporation.

17          Q    Okay.

18          A    So do we take -- is it our

19   responsibility, is it our fault that she was

20   not hired for this position, absolutely not.

21          Q    Okay.

22          A    We, in good faith, reported that

23   record, based upon two identifiers.

24                  Also, may I make a -- am I permitted

                    BEECHER & HORVATH

1    to make a comment?

2                    MR. COFFEY:  No.

3        Q    All right.  Is there any way that

4    Verifications Inc., to ensure that a false

5    positive does not arise again in conjunction

6    with any criminal background checks conducted

7    by Deborah Adams?

8        A    If I understand the question

9    correctly, you're asking if we were to do

10   another background check on Deborah Adams,

11   would we report the same thing, is that the

12   question?

13       Q    No.

14       A    Oh.  Could you rephrase it for me,

15   please.

16       Q    Let me back up.

17            Verifications reported a false

18   positive on behalf of Deborah Adams to National

19   Engineering Services Corporation?

20       A    Yes.

21       Q    A year later, Verifications Inc.

22   reported another false positive, this time to

23   Kelly Law Registry?

24                    MR. COFFEY:  Again, I'm going

                    BEECHER & HORVATH

1           to object to that, but she can answer.

2           Q    Okay.

3           A    Yes.

4           Q    Is there any way to ensure that it

5      doesn't happen again?

6                     MR. COFFEY:  I'll object to

7           that.  She can answer it.

8           A    To ensure.  It should -- it should

9      not occur.  Is there any way to be positive it

10     would not, probably not, no.

11          Q    So for the rest of Deborah Adams'

12     working life, whenever she applies for a job,

13     which uses Verifications Inc. to conduct a

14     criminal background check, your testimony is

15     that Deborah Adams is at risk that a false

16     positive will be reported again?

17                    MR. COFFEY:  Objection.  Calls

18          for an expert opinion.  She can --

19          Q    Please answer it.

20                    MR. COFFEY:  Can I finish my

21          objection?

22                    MR. MADSEN:  You don't have to

23          put a speaking objection.

24                    MR. COFFEY:  I think you're

1          asking, again, and I'll just make this

2          clear, I think you're asking for expert

3          conclusions out of a fact witness.  If

4          you ask whether she believes in the

5          future -- you're not allowed to do that

6          under the federal rules of a fact

7          witness, about a hypothetical of the

8          future to her, whether they're at risk.

9          I don't know what at risk means to a

10         fact witness.  That's not a fact based

11         question.

12                MR. MADSEN:  I disagree,

13         because she has testified, A, that she

14         is trained and fully acquainted and

15         understands the mechanics and

16         obligations of the Fair Credit Reporting

17         Act.  She's the compliance officer for

18         the company, and she understands

19         intimately how the operations of the

20         company works, what checks and balances

21         they have in place, and what procedures

22         there are in place.  I believe a judge

23         would allow me to ask that in open court

24         so.

BEECHER & HORVATH

1                MR. COFFEY:  I don't believe

2        you're allowed to ask my witness to

3        opine, a fact witness, this is a fact,

4        we both have experts, we're able to ask

5        our experts to opine.  I can ask yours,

6        your can ask mine, and we can ask them

7        to opine, but to ask a fact witness to

8        opine, I believe that's outside the

9        fold.  I'm not going to get into motion

10       practice over one question.

11               MR. MADSEN:  All right.

12               MR. KUPINSE:  I'll let her

13       answer it, but I'm telling you, I'm not

14       going to -- I've said it three times,

15       and you keep asking fact questions that

16       are expert based.  Go ahead, you can

17       answer it.

18       A     It is certainly possible that

19  Verifications, or perhaps Choice Point as well,

20  having reported this in the past, might again

21  report it in the future.

22               And what I would suggest to Deborah

23  Adams, and have suggested to other consumers

24  that continue to have a problem like this, is

1        that when they are being considered for

2        another -- for a position, that they share, up

3        front, that this has occurred in the past, and

4        it is likely to come up again.  I have provided

5        letters to applicants that they can use as part

6        of their application process.

7                 If the next time Deborah Adams looks

8        for a job, if the request for the background

9        goes to a different consumer reporting agency,

10       besides Verifications or Choice Point, it is

11       extremely likely the same thing will be

12       reported.

13          Q    So the answer is, to your knowledge,

14       based on the operations and the procedures in

15       place at Verifications Inc., there is nothing

16       that the company can affirmatively do to ensure

17       that this doesn't happen to Deborah Adams

18       again?

19                 MR. COFFEY:  Objection.

20          Q    Please answer.

21                 MR. COFFEY:  Are you saying,

22             other than what she's already explained

23             about the -- that she'll provide a

24             letter, and she explained that.

                        BEECHER & HORVATH

1   BY MR. MADSEN:

2            Q     Other than when Deborah applies for a

3       position of employment, that she has to say,

4       "Oh, by the way, when you do the criminal

5       background check, there happens to be someone

6       who used to live in Virginia, who I'm often

7       confused with, who has a felony record, and

8       served time in jail, I just want to let you

9       know, I'm not that person."  Other than that?

10               MR. COFFEY:   I'll just object

11          to the mischaracterization, but she can

12          answer it.

13               MR. MADSEN:   Okay.

14       A     I suppose one of the things that we

15       could do would be to build in some different

16       technology rules that might catch this in the

17       future.

18       Q     Okay.

19       A     But today, do we have any mechanism

20       by which I could say with absolute certainty,

21       that this would never happen again, no, I

22       cannot.

23               MR. MADSEN:   No further

24          questions.

                        BEECHER & HORVATH

1                    MR. KUPINSE:  I have just a

2            couple of follow-up questions.

3

4   REDIRECT EXAMINATION

5   BY MR. KUPINSE:

6            Q    I think when you were speaking to Mr.

7   Madsen, you indicated that Deborah Adams had

8   said to you, at some point, that NESC did not

9   give her an opportunity to dispute the false

10  positive prior to the adverse employment

11  action; is that correct?

12           A    Yes.

13           Q    When did Deborah Adams tell you that?

14           A    I do not -- I do not have an exact

15  date.  I had many conversations with Deborah

16  Adams.

17           Q    Do you know whether that's true?

18           A    No, I do not.

19           Q    Okay.  And, in fact, when you

20  referred to an obligation on the part of

21  National Engineering, were you referring to

22  what's been marked as Defendant's Exhibit 1 and

23  in particular, subsection D?

24           A    Yes, I was.

                         BEECHER & HORVATH

1          Q     Okay.  But as a fact witness, you do

2     not know whether or not NESC did give her an

3     opportunity to dispute, prior to the adverse

4     action?

5          A     I only -- sorry -- I only know what

6     she told me.

7          Q     Okay.  Now, I'll try to ask these as

8     a fact witness.  You were asked several

9     questions as to whether various entities were

10    consumer reporting agencies.  I take it from

11    what you told me before, that you are not a

12    lawyer, qualified to make that as a legal

13    opinion; is that correct?

14         A     I am not a lawyer.

15         Q     And you are not here as an expert

16    witness to make that kind of a determination?

17         A     Correct.

18         Q     Okay.  Now, let me ask you, as a

19    plain old ordinary fact witness, I think you

20    said that Verifications is, in fact, a consumer

21    reporting agency, did you not, at one point?

22         A     Yes.

23         Q     Is Verifications always a consumer

24    reporting agency?  Does Verifications conduct,

                    BEECHER & HORVATH

1      or does Verifications conduct activities that

2      are not conducted as a consumer reporting

3      agency?

4            A     Our business is that of a consumer

5      reporting agency.  We do not -- we do not do

6      other -- we do not have other business lines

7      that would be -- that would take us out of that

8      role.  You can't just step out of that role.

9      At least, I'm told by the Federal Trade

10     Commission, that you can't just step out of

11     your role as a consumer reporting agency.

12           Q     Verifications acts through its

13     employees, one of which is you; is that

14     correct?

15           A     Yes.

16           Q     And if you call up the local pizza

17     shop and order a pizza for lunch, are you

18     acting as a consumer reporting agency?

19           A     I don't believe so, because I'm not

20     providing any information to anybody, other

21     than the kind of pizza I want.

22           Q     How about if you hire, you yourself,

23     on behalf of Verifications, hire a secretary,

24     are you acting as a consumer reporting agency?

BEECHER & HORVATH

1          A     The secretary is going to work for a

2     consumer reporting agency.

3          Q     But are you acting as a consumer

4     reporting agency in hiring that secretary, as

5     her employer?

6          A     Okay.  I do not believe that our

7     hiring that secretary would be an activity that

8     would fall under --

9          Q     And, in fact --

10          A     I --

11          Q     Go ahead.  Finish your answer.

12          A     I'm sorry.  Would you rephrase for

13     me, please.

14          Q     Sure.  If you, on behalf of

15     Verifications, hired a secretary to be your own

16     employee, are you acting as a consumer

17     reporting agency?

18          A     My opinion would be that, no, we are

19     not.

20          Q     Okay.  And is that because employers

21     are not consumer reporting agencies?

22                    MR. MADSEN:  Objection.

23                    MR. KUPINSE:  Oh, I like that.

24          It's more a fact question than some of

BEECHER & HORVATH

1          the ones I heard.

2          A     Okay.   The question was?

3          Q     Are employers --

4          A     Why is it that we would not be a

5     consumer reporting agency?

6          Q     Yes.

7          A     Because there's no third party

8     involved.   It is a relationship between the

9     employer and an applicant for employment.

10         Q     Now, I just want to carry this a

11    little further.

12         A     Okay.

13         Q     Mr. Madsen also asked you if National

14    Engineering Services Corporation were a

15    consumer reporting agency, and I think you

16    pretty quickly answered yes.

17         A     I answered yes.

18         Q     I thought.   Am I right?  Or do you --

19    well let me ask you, do you believe that

20    National Engineering Services Corporation is a

21    consumer reporting agency?

22              MR. COFFEY:   Again, I'm just

23         going to object, because I think you're

24         asking for expert --

1  BY MR. KUPINSE:

2          Q    I thought you said yes before.

3          A    Perhaps I did not understand the

4     question.  But in the relationship that we have

5     with National Engineering Service Corporation,

6     they are a user of consumer reports, not a

7     consumer reporting agency.

8               If, in fact, as part of their

9     business model, they are a consumer reporting

10    agency in some other part of their -- what they

11    do, that they are not a consumer reporting

12    agency in our relationship with them.  I know,

13    I did say National Background Data was a

14    consumer reporting agency.

15              MR. KUPINSE:  Maybe I

16         misunderstood.  Thanks very much.  I

17         have no further questions.

18              MR. COFFEY:  I have a

19         question.

20

21  CROSS EXAMINATION

22  BY MR. COFFEY:

23         Q    When you did the 6-12-08 report, and

24    it talks about, under the Equifax detect trace

BEECHER & HORVATH

1    reports, what names has Deborah Adams used, as

2    far as you were able to determine?

3         A    When we -- this social security

4    number trace is done by inputting the social

5    security number into the CSC/Equifax system.

6    Equifax being one of the three major credit

7    bureaus in the United States.  What came back,

8    and what is shown on Plaintiff's 1, on page

9    four of five is Adams, Deborah, D-E-B-O-R-A-H,

10   middle name, J-E-A-N-S.  That's how it got --

11   it came directly from Equifax, and this is put

12   into this report automatically.  It's not even

13   rekeyed.

14        Q    So when they looked at the Equifax,

15   the name Deborah Jeans Adams, did that come

16   from any of the criminal reports, or is that a

17   different report that they looked it, from what

18   you're looking at, if you can tell?

19        A    Could you repeat, please.

20        Q    Right.  Using the name Deborah Jeans

21   Adams, it's under the Equifax trace report,

22   that would be wholly and apart different from

23   court search records and criminal records; is

24   that correct?

BEECHER & HORVATH

1        A        That's correct.  This came from a

2     credit transaction.  And so at some point, when

3     a subscriber to this credit bureau, whether it

4     was Macy's, or whomever it was, when they sent

5     in a request for a credit check, somehow the

6     name Deborah Jeans, with an S, and Adams, was

7     inputted.

8        Q        Okay.

9        A        And errors like that are -- I should

10    say, information like that is very common.

11       Q        Okay.  And then the name that you

12    found showing on Defendant's 4, what was the

13    name that was the identifier on the record file

14    from the 9-25-01?

15       A        The name on the file, as it was

16    returned to us by Mohr Information Services,

17    was Debra, D-E-B-R-A, Jean, Adams.

18       Q        Okay.  And then one other thing.

19    When you first spoke with Ms. Adams, did she

20    talk -- when you first spoke with her, did she

21    talk to you and tell you about the Choice Point

22    problem that she had had before?

23       A        Absolutely.  And she also had

24    provided the letter from Choice Point,

                          BEECHER & HORVATH

1   explaining to her how they had done the match,

2   which was based on name and date of birth.

3        Q    Okay.

4             MR. COFFEY:  Thank you.

5             MR. KUPINSE:   I have nothing

6        further.

7             MR. MADSEN:   I have nothing

8        further.

9

10       (THE DEPOSITION CONCLUDED AT 3:01 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24


                        BEECHER & HORVATH

1                   W I T N E S S   I N D E X

2

3

4                                          PAGE

5

6   DIRECT EXAMINATION
    BY MR. KUPINSE                         4
7

8
    CROSS EXAMINATION
9   BY MR. MADSEN                          83

10

11  REDIRECT EXAMINATION
    BY MR. KUPINSE                        167
12

13
    RECROSS EXAMINATION
14  BY MR. COFFEY                         172

15

16

17

18

19

20

21

22

23

24

                          BEECHER & HORVATH

177

1                    E X H I B I T     I N D E X

2

3

4

5

6    DEFENDANT'S EXHIBITS
     FOR IDENTIFICATION                         PAGE
7

8
     1 - USER CERTIFICATION                       7
9

10   2 - SAMPLE DOCUMENT                          9

11
     3 - SCREEN SHOT - SAVE SCREEN               15
12

13   4 - DOCUMENT FROM FIELD RESEARCH
         PARTNER                                 30
14
     5 - NOTICE SENT TO CLIENT                   50
15

16   6 - BACKGROUND REPORT                       52

17
     7 - LETTER FROM DEBORAH ADAMS               63
18

19   8 - GROUP OF DOCUMENTS                      65

20
     9 - FINAL UPDATED REPORT                    69
21

22   10 - LETTER FROM MELISSA SORENSON           71

23
     11 - E-MAIL FROM ROBIN MACK                 73
24


                        BEECHER & HORVATH

1                    E X H I B I T    I N D E X

2

3

4

5
    CONTINUED
6   DEFENDANT'S EXHIBITS
    FOR IDENTIFICATION                         PAGE
7

8
    12 - LETTER AND E-MAIL                      79
9

10

11  PLAINTIFF'S EXHIBITS
    FOR IDENTIFICATION
12

13   1 - BACKGROUND REPORT                     153

14

15

16

17

18

19

20

21

22

23

24


                    BEECHER  &  HORVATH

1                C E R T I F I C A T E

2    STATE OF CONNECTICUT)

3    COUNTY OF NEW HAVEN )

4              I, Kathleen Horvath, a Notary Public duly
     commissioned and qualified in and for the County of
5    New Haven, State of Connecticut, do hereby certify
     that pursuant to the notice of deposition, the said
6    witness came before me at the aforementioned time
     and place and was duly sworn by me to testify to the
7    truth and nothing but the truth of the deponent's
     knowledge touching and concerning the matters in
8    controversy in this cause; that the deponent was
     thereupon carefully examined upon their oath and
9    their supervision; and that the deposition is a true
     record of the testimony given by the witness.

10

11

12             I further certify that I am neither
     attorney of nor counsel for, nor related to or
13   employed by any of the parties to the action in
     which this deposition is taken, and further that
14   I am not a relative or employee of any attorney
     or counsel employed by the parties thereto, or
15   financially interested in the action.

16

17             In witness whereof, I have hereunto set my
     hand and affixed my notarial seal this 8th day of
18   October, 2008.

19

20   ___Kathle WHorvath_____

21   KATHLEEN W. HORVATH CSR No. 00201
     Licensed and Certified Shorthand Reporter
22   and Notary Public.
     My Commission expires: FEBRUARY 28, 2012

23

24


                    BEECHER & HORVATH

```
1                                            kh

2                    J U R A T

3

4

5                    _____

6                    MARY POQUETTE

7

8

9   Sworn to and subscribed before me on

10  this_____day of _____.

11

12

13

14

15                   _____

16                   NOTARY PUBLIC

17

18  My Commission expires _____

19

20

21

22

23

24

                    BEECHER & HORVATH
```