# <u>EXHIBIT B</u>

RCVD:07/13/2004 01:49PM  PRINTED:07/13/2004  02:06PM  LOC:MPLS  MAILBOX:MAIN_INCOMING  IMAGE:B007A6ED * Pg 2/10
07/13/2004  12:55    16058841140                VERIFICATIONS INC                                    PAGE  02/10

Page 1 of 3
Version 05/22/04
Background Investigations and Substance Abuse Testing



**Verifications** INC

THE EMPLOYMENT SCREENING COMPANY

## USER CERTIFICATION
### As Required by the Federal Fair Credit Reporting Act and Its State Analogues
## AND CLIENT SERVICES AGREEMENT

*This Certification/Agreement is made by and between Verifications Incorporated (VERIFICATIONS) and the CLIENT named below:*

| | |
|---|---|
| **VERIFICATIONS INCORPORATED** | **CLIENT:** National Engineering Service Corp. |
| *6900 Wedgwood Road North, Suite 120* | **Address:** 72 Mirona Road |
| *Maple Grove, MN 55311* | **City, State ZIP:** Portsmouth, NH 03801 |
| *Phone:* 800-247-0717 / 763-420-0600 | **Phone:** 603.431.9740 |
| *Fax:* 800-888-5001 / 763-420-0683 | **Fax:** 603.427.0573 |
| *Email:* info@verificationsinc.com | **Email:** tgrogan@natleng.com |
| *www.verificationsinc.com* | **Website:** www.natleng.com |
| *Verifications'* *Account Executive:* _____ | **Nature of Client's** **Business/Industry** Staffing |

1. CLIENT desires to purchase Employment Screening Products and related services from VERIFICATIONS, including but not limited to Background Investigations and/or Substance Abuse Services. CLIENT acknowledges:

    A. VERIFICATIONS is defined as a "Consumer Reporting Agency" by the US Federal *Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681, et seq.* as amended, and its State analogues.

    B. Employment Screening Reports provided by VERIFICATIONS, purchased and used by CLIENT are defined as "Consumer Reports" or "Investigative Consumer Reports" (Consumer Reports) by the FCRA.

    C. Substance Abuse Test results, when provided by a Consumer Reporting Agency, are considered to be "Consumer Reports" by the US Federal Trade Commission and therefore subject to FCRA regulations.

    D. By using the services of VERIFICATIONS, CLIENT is considered a "User" of Consumer Reports under the FCRA and must comply with the FCRA.

2. CLIENT and VERIFICATIONS agree to bear their respective responsibilities as defined in the FCRA, its State analogues, the Federal Drivers Privacy Protection Act, and all applicable Federal and State laws and regulations relating to Consumer Reports. CLIENT agrees to order and use Consumer Reports in full compliance with the FCRA and, therefore, makes the following certifications as required in the FCRA:

    A. CLIENT agrees the information in Consumer Reports provided by VERIFICATIONS will not be used in violation of any applicable Federal or State law, including but not limited to equal employment opportunity laws or regulations.

    B. CLIENT agrees Consumer Reports will be ordered only when intended for employment purposes and will not be used for any other purpose/s. CLIENT specifically agrees not to sell, assign, or otherwise transfer any information or portions of information obtained pursuant to this Certification/Agreement to any third party. CLIENT agrees that distribution and review of all Consumer Reports, whether oral or written, will be limited to those with a legitimate business need for the information, or as permitted or required by law.

    C. Unless CLIENT suspects misconduct relating to employment or compliance with Federal, State, or local laws, CLIENT agrees to:

        1. Notify each "applicant for employment or continued employment" (Consumer) in a clear and conspicuous disclosure a Consumer Report will be obtained. Such disclosure will be made in writing before the Consumer Report is ordered and the disclosure will be made in a document consisting solely of the disclosure or the disclosure and authorization.

        2. Obtain a signed authorization from every person on whom a Consumer Report will be ordered and upon request provide a copy of the authorization to VERIFICATIONS. CLIENT agrees this authorization will be signed and in CLIENT'S possession before VERIFICATIONS is directed to prepare a Consumer Report.

    D. CLIENT agrees that if adverse employment action is to be taken, based either in whole or part on information provided by VERIFICATIONS in a Consumer Report, CLIENT will comply with adverse action requirements as defined in the FCRA.

    E. CLIENT acknowledges receipt of *"Notice to Users of Consumer Reports: Obligations of Users under the FCRA"* as prepared by the Federal Trade Commission. A copy of this notice is provided at the end of this Certification/Agreement.

*(Continued on next page)*

VERIFICATIONS, INC.                                                                    Page 2 of 3
User Certification and Client Services Agreement                                       Version 05/22/04

   F.   CLIENT and VERIFICATIONS acknowledge every Consumer Report provided to a Consumer must include *"A Summary of Your Rights under the Fair Credit Reporting Act,"* hereinafter referred to as "Consumer Rights." By initialing below;

       CLIENT relieves VERIFICATIONS of responsibility of attaching Consumer Rights to each Consumer Report provided to CLIENT. CLIENT agrees to attach to each Consumer Report received from VERIFICATIONS a copy of Consumer Rights whenever providing a copy of Consumer Report to Consumer.

3.  **If employment is in California,** CLIENT acknowledges specific requirements imposed by *California Investigative Consumer Reporting Agencies Act* and, unless CLIENT has reason to believe Consumer is or has been engaged in criminal activity likely to result in loss to CLIENT or CLIENT has reasonable suspicion of other wrongdoing on part of Consumer, CLIENT agrees to:

   A.   Make the applicable disclosures to the Consumer and obtain authorization from the Consumer as required by California Civil Code 1786.16 each time a Consumer Report is requested, and

   B.   Provide the Consumer a means by which the Consumer may indicate on a written form, by means of a check box, that the Consumer wishes to receive a copy of any Consumer Report that is prepared, and

   C.   Comply with California Civil Code 1786.40 if adverse action is taken.

4.  CLIENT acknowledges special requirements are imposed by some States Department of Motor Vehicles. If requesting driving records as part of a Consumer Report, CLIENT agrees to obtain a signed (not electronically) authorization containing the term "driving records." If the authorization is not provided to VERIFICATIONS at time of order, CLIENT agrees to retain authorization for five (5) years and to provide a copy of authorization to VERIFICATIONS upon request.

5.  CLIENT acknowledges special requirements are imposed by credit bureaus. If CLIENT requests Consumer Reports that include consumer credit information and/or residential history (commonly referred to as "Trace" or "Header" information) linked to a Consumer's Social Security Number (SSN), CLIENT acknowledges credit bureaus report information as supplied by third party sources and the credit bureaus do not guarantee accuracy of information. CLIENT therefore agrees to:

   A.   Make no employment decisions based solely on credit bureau alerts/warnings regarding addresses and/or SSN.

   B.   Ensure security programs and appropriate access requirements are in place to prevent unauthorized ordering, accessing and/or unauthorized viewing of consumer information; to inform all accessing employees that they may not access their personal information, information of friends and/or relatives, or any other person unless it is specifically for employment purposes of CLIENT.

   C.   Release and indemnify the credit bureau from all liability to the extent such liability is limited to direct damages and directly attributable to CLIENT'S unauthorized access, improper use, or improper reliance on consumer credit information.

6.  CLIENT acknowledges special requirements are imposed if Consumer Reports obtained by CLIENT include **substance abuse testing** information. CLIENT therefore agrees to:

   A.   Have a written Drug Free Workplace Policy, inform employees and applicants for employment of this policy, make this policy available to employees, and provide a copy of policy to VERIFICATIONS upon execution of this Certification/Agreement. Nothing in this Certification/Agreement, however, shall imply VERIFICATIONS certifies CLIENT'S policy as being in compliance with Federal and/or State laws or regulations.

   B.   Name one person, and back-up person if desired, as CLIENT'S authorized agent to provide names of "Designated Employer Representative/s" (DER/s) to VERIFICATIONS. VERIFICATIONS will report drug testing results <u>only</u> to DER/s and access to drug testing results will be made available by VERIFICATIONS <u>only</u> to DER/S. CLIENT acknowledges DER/s will have access to substance abuse test results for all employees and prospective employees tested by CLIENT.

      CLIENT names the following as agent/s authorized to name, add, delete, or change CLIENT'S DER/s. CLIENT agrees authorized agent/s will inform VERIFICATIONS in writing each time a change is made in CLIENT DER/S.

      Authorized Representative  TRAVIS CROGAN      Phone  603, 431, 9740

      Authorized Back-Up (optional)              Phone

7.  As part of the services provided to CLIENT, VERIFICATIONS makes available on a best-effort basis its Internet-based services, hereinafter referred to as SafeScreen, the features and functions of which may change from time to time as determined solely by VERIFICATIONS. CLIENT is under no obligation to use SafeScreen; however, use of SafeScreen does not in any way alter the legal responsibilities of the CLIENT, particularly those imposed by the FCRA.

   A.   CLIENT and VERIFICATIONS agree that all CLIENT ID's, passwords, and access information will be kept confidential and distribution will be limited to those with a legitimate business need to know. CLIENT further agrees to prevent, as reasonably practical, unauthorized viewing of consumer information through SafeScreen.

   B.   CLIENT agrees to notify VERIFICATIONS when CLIENT requires enabling or disabling of one or more CLIENT ID's and Passwords to access SafeScreen. If a SafeScreen user leaves the employ of CLIENT, CLIENT acknowledges that until a written request to disable a password is made of VERIFICATIONS, any previously issued CLIENT ID's and Passwords

*(Continued on next page)*

RCVD:07/13/2004 01:49PM  PRINTED:07/13/2004  02:06PM  LOC:MPLS  MAILBOX:MAIN_INCOMING  IMAGE:B007A6ED * Pg 4/10
07/13/2004  12:55    16058841140              VERIFICATIONS INC                              PAGE  04/10

**VERIFICATIONS, INC.**
User Certification and Client Services Agreement

remain active and will permit access to SafeScreen.  CLIENT is fully liable for any and all actions of CLIENT's representative until CLIENT requests a password be disabled.

C.   VERIFICATIONS and/or CLIENT shall not be liable for any CLIENT Consumer Report Information being disclosed as a result of a party accessing VERIFICATIONS' or CLIENT'S computer system/s without either party's authority (i.e., hackers).

D.   CLIENT acknowledges that SafeScreen remains the sole property of VERIFICATIONS and that no title to, or ownership of, any software is transferred to CLIENT.

8.   CLIENT and VERIFICATIONS acknowledge that under Federal law Consumer Reports may be provided only to legitimate business entities.  Unless CLIENT is a recognized national or regional entity, VERIFICATIONS or their representative may conduct a physical inspection of CLIENT premises, such inspection to be non-intrusive in nature, exclude any confidential information and secured areas, and whose purpose is solely to verify CLIENT is a business enterprise.  VERIFICATIONS may also request CLIENT'S business license or other form/s of identification before service may commence.  CLIENT is not obligated to permit inspection and/or provide identification; however, VERIFICATIONS reserves the right not to provide Consumer Reports to CLIENT in such circumstances.

9.   All products and services made available to CLIENT are furnished by VERIFICATIONS subject to the conditions that there will be no abuse, fraudulent activity, or illegal use of such products and services.

10.  Without limiting any of the foregoing, CLIENT acknowledges it has had an opportunity to consult with its own legal counsel regarding the laws and regulations applicable to this Certification/Agreement and is solely responsible for its compliance therewith.

11.  CLIENT agrees this Certification/Agreement applies to all Consumer Reports made by VERIFICATIONS to CLIENT regardless of which office of CLIENT requests and/or receives such reports.  CLIENT further agrees no changes in this Certification/Agreement may be made except by written consent of an authorized agent of VERIFICATIONS and an authorized agent of CLIENT.

IN WITNESS WHEREOF, the parties have caused this Certification/Agreement to be signed by their respective duly authorized representatives as of the day and year shown.

By:   **VERIFICATIONS INCORPORATED**            **CLIENT**

_____            _____
Signature, Authorized Representative            Signature, Authorized Representative
                                                Travis Grogan

Brad Carlson                                _____
Printed Name                                Printed Name
                                            Account Manager          07/13/2004
VP Sales          7/13/04
Title          Date                         Title          Date

NOTE: As a Consumer Reporting Agency, VERIFICATIONS is required to obtain evidence that any organization to which Consumer Reports are provided is a legitimate business entity with a permissible purpose for receiving Consumer Reports.  Therefore, the following information is required before we can commence service.

| Please attach a copy of BUSINESS LICENSE or ARTICLES OF INCORPORATION to this Certification/Agreement when returning to Verifications, Inc. This is required to establish your account. | | | |
|---|---|---|---|
| Business Type (Check One) | ☐ Sole Proprietorship | ☐ Partnership | X Corporation |
| Building Type (Check One) | X Commercial    ☐ Residential | ☐ Apartment Complex | ☐ Apartment Complex with Storefront |
| Corporate Headquarters Address (if different than provided on Page 1) Physical Address; not PO Box | | | Main Phone Number 603.431.9740 |
| Website (if different than provided on Page 1) | | | |
| Years in Business (if less than one, please attach copy of BUSINESS LEASE.) 20 | | | Number of Employees  50 |
| Is Company Publicly Traded? | ☐ Yes  X No | Stock Exchange | Symbol |

The Notice to Users of Consumer Reports: Obligations of Users under the FCRA, as prepared by the Federal Trade Commission follows.  Please retain for your records.  Do not return to VERIFICATIONS.

# **<u>EXHIBIT C</u>**

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DEBORAH ADAMS,                    )
        Plaintiff,                )
                                  )
        vs.                       )
                                  ) Civil Action No.
NATIONAL ENGINEERING              ) 3:07-CV-01035 (AVC)
SERVICE CORPORATION AND           )
VERIFICATIONS, INC.,              )
        Defendants.               )

DEPOSITION OF:    CHRISTOPHER SULLIVAN

DATE:             SEPTEMBER 19, 2008

HELD AT:          BRANDON SMITH REPORTING
                  44 CAPITOL AVENUE
                  HARTFORD, CT

                  BRANDON SMITH REPORTING SERVICE, LLC
        44 Capitol Avenue              Six Landmark Square
        Hartford, CT 06106             4th Floor
        (860) 549-1850                 Stamford, CT  06901
        (800) 852-4589                  (800) 852-4589

              Reporter:  Tiffany V. Pratt, LSR #00128

Adams v. National Engineering

9/19/2008                                                    Christopher Sullivan



Page 2

APPEARANCES:


REPRESENTING THE PLAINTIFF:

    Madsen, Prestley & Parenteau, LLC
    44 Capitol Avenue, Suite 201
    Hartford, CT  06106
    By:  William G. Madsen, Esq.

REPRESENTING THE DEFENDANT VERIFICATIONS, INC.:

    Wilson Elser
    3 Gannett Drive
    White Plains, NY  10604
    (914) 323-7000 ext. 4207
    By:  Michael Coffey, Esq.


REPRESENTING THE DEFENDANT NATIONAL ENGINEERING SERVICE
CORPORATION:

    Goldstein and Peck, P.C.
    1087 Broad Street
    Bridgeport, CT  06604
    By:  William J. Kupinse, Jr., Esq.

Adams v. National Engineeri...

Page 3

INDEX

WITNESS:                                                            PAGE:

Christopher Sullivan

        Direct Examination by Mr. Coffey                          5.
        Cross-Examination by Mr. Madsen                          45

---

EXHIBITS
(for identification)

EXHIBIT:                                                           PAGE:

(No exhibits were marked.)

---

Adams v. National Engineering

9/19/2008                                    Christopher Sullivan

Page 4

S T I P U L A T I O N S

IT IS STIPULATED by the attorneys for the parties that
each party reserves the right to make specific objections
in open court to each and every question asked and the
answers given thereto by the witness, reserving the right
to move to strike out where applicable, except as to such
objections as are directed to the form of the question.

IT IS STIPULATED and agreed among counsel for the
parties that the proof of the authority of the Notary
Public before whom this deposition is taken is waived.

IT IS FURTHER STIPULATED and agreed that the reading
and signing of this deposition is not waived and any
defects in the Notice are waived.

Adams v. National Engineeri...

Page 5

1              (Deposition commenced:  12:12 p.m.)

2

3              CHRISTOPHER SULLIVAN, called as a

4      witness, having been first duly sworn by

5      a Notary Public in and for the State of Connecticut,

6      was examined and testified as follows:

7

8              D I R E C T    E X A M I N A T I O N

9

10    BY MR. COFFEY:

11       Q    Good morning, Mr. Sullivan.  My name is

12    Mike Coffey, and I represent the defendant Verifications in

13    this matter.  I'm going to ask you some questions.  If for

14    some reason you don't understand, tell me.  I'll be happy

15    to rephrase the question.  If you need to take a break,

16    tell me.  And for any reason you need to talk to your

17    attorney, tell me.  We'll take a break.  Whatever you need.

18    Do you understand what I've said?

19       A    Yes.

20       Q    What is -- who are you currently employed by?

21       A    National Engineering.

22       Q    What is your position?

23       A    Account manager/recruiter.

24       Q    And what is National Engineering Services

25    Corporation's business?

Brandon Smith Reporting Service

Adams v. National Engineering

Christopher Sullivan

Page 6

1       A     Staffing agency.

2       Q     Okay.  Do you specialize in any type of line of

3   staffing, or is it -- how does that work?  If you can

4   explain?

5       A     We typically stick to engineering, and then we

6   have clients that after a while you -- we work with IT and

7   professional accounting positions as well, so...

8       Q     Okay.  And how long have you been there?

9       A     I started there January 31 of '05 or January 30

10  or something.

11      Q     And what's your -- where were you immediately

12  prior to that?  Was that Hallmark Total Tech?

13      A     Correct.

14      Q     And your highest level of education?

15      A     I have a bachelor's degree.

16      Q     What year was that?

17      A     That was '04.

18      Q     From what institution?

19      A     University of Southern Maine.

20      Q     Now, how many employees does National Engineering

21  Services Corporation have?

22      A     Clarification.  In terms of in-house staff?

23      Q     Yes.

24      A     Or are we talking contract employees?

25      Q     In-house staff.

Brandon Smith Reporting Service

Adams v. National Engineering

9/19/2008                                    Christopher Sullivan

1       A      In-house staff in our office, there's

2    approximately 25 of us, and then there's an office in

3    Woburn and Houston, and I don't know their exact head

4    counts.

5       Q      Woburn and Houston?

6       A      Yes.

7       Q      Houston, Texas?

8       A      Yes.  Sorry.

9       Q      Is Woburn Massachusetts?

10      A      Yes.

11      Q      And Portsmouth, New Hampshire?

12      A      Yes.

13      Q      So there's three offices.  And so typically what

14   do you do?  Do you place people in full-time positions,

15   contract positions, or how would you explain that?

16      A      Most of what I do is contract employment.

17      Q      What is contract employment?

18      A      Contract employment is an at-will need of a

19   customer, whether it be for a specific project, whether it

20   be for just an open-ended assignment with additional work.

21   Each position is a little different on the scope, I

22   guess.

23      Q      Okay.  So were you -- did you have any

24   involvement in the project with filling Ms. Adams?  Was

25   that --

Brandon Smith Reporting Service

Adams v. National Engineering

Christopher Sullivan

Page 8

```
 1        A     I did in terms of I received the order from the

 2    program.  In terms of, like, establishing the need and that

 3    type of thing, no.

 4        Q     Okay.  So who is the -- who is the contract to be

 5    filled with with?  What company?

 6        A     Technically it's it goes out to different

 7    staffing companies, and when that person goes to work, they

 8    go to work at Northeast Utilities or whoever.

 9        Q     Now, did your company have an agreement in place

10    with Northeast Utilities?

11        A     To be honest with you, I don't know the exact

12    structure.  It's through Comensura on site at the client.

13        Q     So who is Comensura?

14        A     Comensura is the on-site vendor management

15    company.  So our contract would be with them to provide

16    services to their on-site client.

17              MR. KUPINSE:  If I can interrupt at this

18    point, too?  You did ask for certain information, most of

19    which we've already disclosed, but here is some that we

20    have not given you previously.

21              MR. MADSEN:  Thank you.

22              MR. COFFEY:  Thank you.

23    BY MR. COFFEY:

24        Q     Okay.  So there's a staffing company agreement

25    that was in place between National Engineering Services and
```

Adams v. National Engineeri..

Christopher Sullivan

1    Comensura; is that correct?

2         A    Correct.  And they have other client accounts.

3    They're not necessarily on all of them.  It's referral,

4    essentially.

5         Q    So there's a staffing company agreement, and that

6    would be the document that you handed over?  I'm not going

7    to quiz you on that or anything like that, but that would

8    be what counsel --

9         A    I think so, yes.

10        Q    This would be the agreement.  Okay.  Now,

11   Comensura is no longer Comensura?

12        A    It's Guidant Group.

13        Q    And this would be the agreement that was in place

14   back on the day of the --

15        A    Yes, at that time, yes.

16        Q     -- the subject of this lawsuit?

17        A    Correct.  Contractually, when they changed names,

18   they just sent an addendum to that contract saying all

19   stipulations remain the same.

20        Q    Right, and then as a successor corporation, they

21   stepped into those obligations?

22        A    (The witness moves head in response.)

23        Q    Okay.  So, now Guidant -- and that would be --

24   now it's Guidant companies?  What did you say?

25        A    Guidant Group.

Adams v. National Engineering

Christopher Sullivan

1        Q      Where are they located out of?

2        A      Houston, Texas.

3        Q      And Comensura, did they have an office in --

4     withdrawn.

5               What state were you going to place Ms. Adams in?

6        A      Connecticut.

7        Q      Okay.  Now, when did you first learn of a

8     position that you needed to -- the position that's part of

9     this litigation for Comensura?  When did you get involved

10    with it?

11       A      I'd have to see the actual order, when it came

12    out.  Late March, early April is the -- without seeing the

13    form, is the best I can tell you.

14       Q      So late March or early April you received an

15    order for a certain position?

16       A      Correct.

17       Q      And do you know what type of position it was?

18       A      It was titled Contract Analyst.

19       Q      How would that get communicated to you?  That

20    would come from Comensura?

21       A      Yes, it comes in the form of e-mail alerting you

22    to go on to their site and open the new order.

23       Q      And that position was intended to be a position

24    for a period of time or was it --

25       A      Correct.

Adams v. National Engineering

1       Q    -- an open-ended one?

2       A    It was a period of time.  Again, I'd have to see

3    the order.  It was either six months -- their max is 50

4    weeks under a certain dollar amount.  I'd have to see the

5    actual --

6       Q    So the period of time --

7       A    If you have it, I can --

8             MR. COFFEY:  Do you have it?

9             MR. MADSEN:  I do.  Actually, it was

10   Defendant's 1, wasn't it --

11            MR. KUPINSE:  I think so.

12            MR. MADSEN:  -- in the last deposition, but

13   I don't have a copy.

14            THE WITNESS:  On that they generally place

15   a pretty specific start and end date.

16            MR. MADSEN:  You've got it.

17            MR. COFFEY:  Okay.

18   BY MR. COFFEY:

19       Q    Okay.  I'm going to show you what's previously

20   been marked as Defendant's Number 1.  Would that be the

21   order?

22       A    Yes.

23       Q    And who did you deal -- did you deal with any

24   individual there at Guidant?

25       A    They break down the orders depending on skill

Adams v. National Engineering

Christopher Sullivan

```
 1   set.  On this particular order it was Kathy Shapleigh.

 2        Q    What is Kathy Shapleigh's position?

 3        A    She is on-site -- I believe they call themselves

 4   account representatives.

 5        Q    On-site account rep?

 6        A    Yeah.

 7        Q    What do you mean on site?  She was on site at

 8   Northeast Utilities?

 9        A    Correct.  She's employed by Comensura/Guidant,

10   but she's physically on site at Northeast Utilities.  She

11   has an office there, but she's not technically a Northeast

12   Utilities employee, from what I've been told.

13        Q    Okay.  So the order would come -- it came from

14   her?

15        A    Yes.

16        Q    And then you would -- your company would try to

17   find suitable employees who would match that and place them

18   there?

19        A    Correct.

20        Q    Now, once this order came in, what did you do at

21   NESC?

22        A    Well, you can either accept it or reject it.  I

23   accepted it, obviously, and then distributed it through our

24   company's database to the individual recruiters on site

25   that work with me.
```

Adams v. National Engineering

Christopher Sullivan

1      Q     So you guys accepted the offer.  Now, when you

2    get that, do you guys have an exclusive agreement for that

3    position?

4      A     No.

5      Q     Or is that a non-exclusive, there could have been

6    other agencies out there?

7      A     Yes, absolutely.  And it all depends on -- the

8    vendor pool varies from site to site, but -- how many

9    people accept it and reject it, but --

10     Q     You say how many people accept or -- you don't

11   know how many outside people?  You would have nothing to do

12   with that?

13     A     No.

14     Q     You just know an order comes in, you accept it

15   that you would try to place someone, and then you try to do

16   that?

17     A     Correct.

18     Q     Okay.  And you accept it.  And how many positions

19   was that for?

20     A     This one is just one.

21     Q     So it's one position.  And what was that based

22   on?  Looking at that, are you able to tell what the term

23   was that they were seeking?

24     A     Yes.  Start date was Monday the 2nd of April '07,

25   and the end date was Saturday the 15th of March 2008.

Brandon Smith Reporting Service

Adams v. National Engineering

Page 14

1      Q    April what?

2      A    '07?

3      Q    April 2, 2007.  Okay.  Now, what was the wage to

4   be?

5      A    It was 21.

6      Q    $21 an hour?

7      A    Correct.  I'm sorry.

8      Q    Did it include any other benefits?

9      A    Not explicitly, no.  Each staffing company has

10   their own access to insurance and things of that nature, so

11   that's -- the order itself does not come with anything like

12   that.

13      Q    So you knew you were placing it with -- you were

14   going to try to place -- this person would be placed with

15   Guidant.  Now, have you placed other people with Guidant in

16   the past?

17      A    Yes.

18      Q    And typically, what is Guidant's benefits that

19   they give to their people that they put into contracts like

20   this?  Is there health benefits?  Any other benefits?

21      A    Nothing explicit.  Each firm handles it a little

22   different depending on their access, but there's nothing

23   built in other than the rate.

24      Q    So the rate is the only -- now, when it says $21

25   per hour, is that -- how many hours per week?

Adams v. National Engineering

Page 15

1       A     They've got an estimated hours 40 a week.

2       Q     That comes out to approximately 821 an hour --

3    821 a week?  No, let's see.  That's why I went to law

4    school.  I'll wait for you to give a number before I offer

5    up a number.

6                    MR. MADSEN:   840.

7    BY MR. COFFEY:

8       Q     So 840 a week, does that sound about right?

9       A     Approximately, yes.

10      Q     Okay.  So approximately 840 a week.  Now, what

11   would typically happen when you would find an employee?

12   Would they then -- if you found a successful employee, did

13   they enter into a contract with you or with Guidant?

14      A     They'd enter into a contract with us.

15      Q     And so the contract would then -- the contract

16   would then also have the terms of the agreement of what the

17   wage was supposed to be?

18      A     Correct.

19      Q     Okay.  And when you said that it was $21 per

20   hour, other than that, was there any other fringe benefits

21   that were included other than the $21-salary per hour?

22      A     Not that I can see, no.  There may be -- other

23   positions have different requirements.  This one does not

24   have anything else on it other than that.

25      Q     Okay.  And then who from NESC worked on this

Adams v. National Engineering

Christopher Sullivan

1   particular one that you're aware of?  Who placed this

2   order?  Which employee?

3       A    It was Larry O'Keefe.

4       Q    What is Larry O'Keefe's position?

5       A    He is a technical recruiter.

6       Q    He is what?

7       A    A technical recruiter.

8       Q    Is he still employed by NESC?

9       A    Yes.

10      Q    And, now, did he find -- now, did he then locate

11  Ms. Adams in your database as someone who might be

12  suitable?

13      A    I don't know where exactly he found her.  I don't

14  believe it was our database.  I think it was from one of

15  the job sites, CareerBuilder, Monster, but I don't know

16  specifically.

17      Q    And when you say -- now, would this position

18  then -- typically, do you guys then advertise some of these

19  positions?

20      A    Some of them.

21      Q    Was this position you believe to be advertised on

22  Monster or --

23      A    No.  At most it would have gone onto our web

24  site.

25      Q    Onto your website?

Adams v. National Engineeri..g

Page 17

1        A    Yes, just our own.

2        Q    What would that web site be?

3        A    Natleng.com.

4        Q    Natleng.com?

5        A    Correct.

6        Q    Do you have anything that shows what the ad

7   looked like on your web site?

8        A    I'm not even positive that we actually posted it

9   on that, so I would have to check that.  I can look for it,

10  but --

11       Q    Okay.  We'll just make a note.  So at some point,

12  then, Mr. O'Keefe would have then become aware of who

13  Deborah Adams was?

14       A    Yes.

15       Q    Okay.  And then how did that process work?  If

16  you could explain it?

17       A    The next process is however they ended up

18  communicating.  It's just -- the general practice is you

19  discuss the position, you send the requirements, you

20  discuss the hourly wage, the client it's going to be with,

21  and then at that point, if it's acceptable, then you move

22  forward to submittal, and if it's not, then you continue.

23       Q    Had your company ever placed Ms. Adams in any

24  other positions?

25       A    Not that I'm aware of, no.

Adams v. National Engineering

Christopher Sullivan

1    Q    So if it became acceptable they want the

2    position, what --

3    A    Then you basically submit it on to the Guidant

4    web site.

5    Q    When you say you submit it on the Guidant web

6    site, what does that entail?

7    A    Basically, you take the person's resume minus the

8    contact information of address and phone number, e-mail

9    address, and you go on to the web site.  You go to the

10   order, and you submit the candidate in with their resume

11   attached.  And then from there it goes to -- it pops up on

12   whichever on-site rep, in this case Kathy's screen.

13   Q    So when you say Guidant, this would be Kathy --

14   A    Yes.

15   Q    -- Shapleigh.  And then what's the next step?

16   Kathy Shapleigh at some point saw this person's resume and

17   said, I'm interested in this person, or how does that

18   process work?

19   A    Basically, she gets resumes from however many

20   vendors on there.  There's no limit on how many resumes you

21   put in.  You attach that resume to an order.  So you don't

22   just send it to Kathy in general.  It's on this position or

23   whatever position you're working on at the time.  And she

24   determines whether or not the person's been submitted

25   before, whether other agencies are submitting her for the

Adams v. National Engineeri _

Christopher Sullivan

1   same job, which certainly happens, and determines if that

2   resume is to be sent to the manager himself or herself.

3        Q    Now, typically, what is the -- how does NESC get

4   remunerated for candidates they submit or for successful

5   placements or something else?

6        A    For successful placement and then hours worked

7   beyond that.  So the person has to physically work for us

8   to be compensated at all.

9        Q    So successful placement plus hours worked?

10       A    Well, on a contract assignment, if the candidate

11  or the person who ends up being hired works 40 hours, it's

12  our additional charge per hour.  If the person works

13  10 hours, you get 10 times whatever the difference is,

14  basically each week.

15       Q    So how would that -- like on this type of

16  position, what would the payment be?

17       A    It would be -- the pay rate would have been 21,

18  40 hours a week.  Our charge rate is 27.30.  So charge rate

19  times 40 minus the pay.

20       Q    So the charge rate would have been 27.40?

21                 MR. MADSEN:   30.

22  BY MR. COFFEY:

23       Q    27.30?

24       A    Yes.

25       Q    Minus the 21?

A\_\_ns v. National Engineering

Christopher Sullivan

1      A     Yeah.

2      Q     So approximately 6.30 an hour for the time

3   worked?

4      A     Correct.

5      Q     Okay.  So it's not like for placement, when you

6   place someone you get like several thousand dollars.  It's

7   only --

8      A     That's only if it's a direct position.  It's

9   basically they're going directly to the client without you.

10     Q     Now, then what happened -- so at some point,

11   then, Ms. Adams' resume was placed up to Guidant, and then

12   at some point was she accepted by Guidant as someone they

13   wanted to place -- they wanted Northeast Utilities to

14   see?

15     A     Then next step is it goes submitted to the

16   manager.  Kathy doesn't determine if the person's selected

17   or not.

18     Q     So submitted to the manager.  Who is the manager

19   in this case?

20     A     In this case -- on the outset, we never know.  I

21   mean, in hindsight I can see the order owner, because it's

22   her page, but it's Byron Maddox.

23     Q     Byron who?

24     A     Maddox.  It looks like there's a supervisor

25   listed as well.

Adams v. National Engineering

1       Q     Who would that be?

2       A     Patricia Angelo-Park.

3       Q     That would have been the supervisor?

4       A     Yes.

5       Q     What department was this position for?

6       A     The only -- they don't even -- on the outside you

7    don't get any of that information.  Basically, it's

8    North Utilities, and it's the NU system headquarters.  I

9    think it says -- it says you're supporting the transmission

10   contract administrator, but they don't specifically tell

11   you who the hiring manager is, any of that.  It's all

12   blind.

13      Q     So then it was submitted then up the line to

14   Northeast Utilities, and then what happened?

15      A     In this case the manager wanted to interview

16   Ms. Adams.

17      Q     That would have been Byron Maddox?

18      A     I believe so.  I think that's who actually

19   performed the interview.

20      Q     Now, did Mr. Maddox then interview Ms. Adams?

21      A     Yes.

22      Q     And from what you understand, how did that

23   interview go?

24      A     From what I was told, it went well.  And I

25   believe the manager was -- I think Ms. Adams was one of the

Adams v. National Engineering

Christopher Sullivan

1    first people interviewed.  He ended up interviewing at

2    least one other candidate, but I don't know the total

3    number.  They generally interview two to three people per

4    position.

5         Q    So the manager interviewed at least two people?

6         A    Yes, from what I've been told.

7         Q    Okay.  When you say from what you were told, who

8    had told you that?

9         A    That was strictly, I believe, in feedback from

10   Kathy at some point saying that Byron liked Ms. Adams but

11   had to talk to someone else.  And on a typical basis, if

12   she doesn't tell me that, I don't know how many people are

13   interviewed.

14        Q    Now, do you guys still do work with Guidant?

15        A    Yes.

16        Q    And you still do work placing people at Northeast

17   Utilities?

18        A    Correct.

19        Q    Now, Byron liked Ms. Adams.  When you heard that,

20   what was the next step?  What happened next from your

21   standpoint?

22        A    From us, we basically waited -- I don't remember

23   the exact number of days -- but after the interview to --

24   basically, we get a note that's automatically generated

25   from Guidant saying, "Candidate approved for her per

Adams v. National Engineeri_ _

Christopher Sullivan

1    client.  Please extend the offer to Ms. Adams for Order

2    Number 109642."

3         Q    What was the number again?

4         A    109642.

5         Q    So once you got that and she was approved for

6    hire under that order number, what did you do next?

7         A    Next step is in this case you call Ms. Adams and

8    offer her the position, tell her the manager would like her

9    to come on board per, you know, background check, drug

10   screening, standard paperwork process.  And then in some

11   cases they give you a start date.  Other times they ask if

12   the person has put in notice, any number of things.

13        Q    So, now, this position wasn't filled until after

14   the start date.  So it still didn't extend on the back end

15   how long the contract would go for; is that correct?

16             MR. MADSEN:   Objection.

17   BY MR. COFFEY:

18        Q    Do you know if it was -- it was a 50-week period.

19   What did she --

20        A    That I don't know how they handle that.  And as

21   far as I know, they didn't physically fill the position, so

22   after we're out, we really don't get told anything.

23        Q    Okay.  Now, who offered a position?  Who spoke to

24   Ms. Adams?

25        A    That was, I believe, Larry.

Adams v. National Engineering

9/19/2008                                                    Christopher Sullivan

Page 24

```
 1      Q    So Larry called Ms. Adams?

 2      A    Yes.

 3      Q    And extended an offer?

 4      A    Correct.

 5      Q    Did he extend it orally and then follow-up with

 6   writing -- in writing?

 7      A    No.  In that case, if it's orally accepted, we

 8   send the standard paperwork that goes out.

 9      Q    Okay.  And that was contingent upon what, no

10   drugs and a background check?

11      A    Yeah.  I mean, that's all part of the packet that

12   goes out.

13      Q    And then was the packet sent out to Ms. Adams?

14      A    Yes.

15      Q    Who sent that letter out to Ms. Adams?

16      A    Maura Demars, our office manager.

17      Q    Maura what?  How do you spell that?

18      A    D-e-m-a-r-s.

19      Q    Do you have a copy of that letter that was sent

20   out to her?

21      A    Not in my hands, no.

22      Q    Have you seen a copy of the letter?

23      A    Yes.  It's a standard form, so it's -- there's a

24   cover page telling you what the contents are.  Each client

25   we have has different paperwork, so it varies a little bit.
```

Adams v. National Engineering

Christopher Sullivan

Page 25

1    In this particular case, it was employee hourly

2    obligations.  There's an I-9 form.  There's the drug

3    testing release form, the background release form, things

4    like direct deposit and things of that nature.

5        Q    Did she sign a form and did it come back that she

6    accepted the position?

7        A    Yes, she signed everything.

8        Q    Okay.  So upon receiving, did you then wait

9    until -- when did you send out for a background check?

10   When does that happen?

11       A    As soon as we get the form returned.  Some

12   people, if you e-mail it to them, they scan it, send it

13   back that day.  Others it's when it comes back to you in

14   the mail.  And I don't remember in this case the format

15   that it came back in.  I believe it was mail.

16       Q    And then at some point did you send for a

17   background check, and who did you use for that?

18       A    That was Verifications.  I don't physically send

19   the form.  That would be Maura, the office manager.  She

20   handles the entry work of all that.

21       Q    So Maura Demars sends for the background check?

22       A    Yes.

23       Q    Okay.  And have you guys worked with

24   Verifications in the past?

25       A    Yes.

Adams v. National Engineering

Christopher Sullivan

1      Q     Do you still work with Verifications?

2      A     Yes.

3      Q     Did you ever see the forms that were sent for the

4   transmittal that requested the background check?

5      A     I probably -- it usually comes in the mail to me,

6   because I'm usually the contact person.  I usually scan

7   through to make sure the I-9 has been filled out properly,

8   things of that nature, make sure nothing's missing that I

9   noticed immediately.

10     Q     So in this one, when you sent it to

11  Verifications, at some point did they get back to you?

12     A     Yes, we did receive results.

13     Q     What were the results from what you recall?

14     A     That there was an applicant concern for --

15  the way it's worded is not -- I'm not entirely sure off the

16  top of my mind, but it was an applicant concern for at

17  least two reasons.

18     Q     In your experience, approximately how many

19  background searches have you reviewed in your career?

20     A     The whole part, I want to say maybe 200.

21     Q     Had you ever had any come back before that had

22  areas of applicant concern?

23     A     Yes.

24     Q     Typically, what is the procedure at your company

25  when an applicant concern comes back?

Adams v. National Engineering

Christopher Sullivan

1      A     Contractually, this account requires us that when

2   we receive the results, where to forward them on to the

3   on-site so they can know the status of the search.

4      Q     When you say this contract, is that the agreement

5   you gave me today?

6      A     Yes, the Comensura contract.

7      Q     Now, is that a typical contract to have that type

8   of provision, or is that -- not every contract has that?

9      A     A lot of the companies that have an on-site

10   program do have a stipulation of that nature, that it's

11   almost like they're one in the same in terms of viewing and

12   the update, because they're the ones that have to tell the

13   manager.

14      Q     Now, did you have -- what did you do with regards

15   to telling the candidate about this?

16      A     When I received the results, I called Ms. Adams.

17   I believe I left her a voice mail, and she returned my call

18   around six-ish, ballpark of six.

19      Q     So you received the results?

20             MR. MADSEN:   I'm sorry, can we have a date?

21             THE WITNESS:   That was -- was that the 8th?

22   I'd have to look to guarantee the date, but I believe it's

23   the 8th.

24   BY MR. COFFEY:

25      Q     These are the exhibits we looked at the other

Page 28

1    day, if you want to take a look, if that helps you.

2         A    Thank you.  It does.  It was May 8.

3         Q    So that would have been the day that you received

4    the results?

5         A    Correct.

6         Q    So the same day that you received the results,

7    you also contacted Ms. Adams?

8         A    Yes.

9         Q    Okay.  And you also passed the results along to

10   Guidant or --

11        A    Just to Kathy, and I forwarded the results to

12   her.

13              MR. MADSEN:  I'm sorry.  Is that the same

14   date?

15              THE WITNESS:  It was the same date, yes.

16   BY MR. COFFEY:

17        Q    Now, at some point that same day, did Ms. Adams

18   get back to you?

19        A    Yes.  She called me.  It was around six o'clock.

20   I actually sent an e-mail during the time we were talking,

21   so it was -- and that was at 6:21.  So it was somewhere

22   right before there.

23        Q    And then upon Ms. Adams -- what did she say to

24   you?

25        A    She was telling me -- as we went through the

Adams v. National Engineering

1    results, I asked her, without giving her the results right

2    away, if she thought for any reason something would come

3    up.   Generally people -- that's the policy I go with.   I

4    just ask them what they would expect to hear.   And then

5    after a moment she told me that something similar had

6    happened to her, and then she gave me a pretty good

7    assessment of the search and what information isn't

8    included, and that's what I had e-mailed to Kathy during my

9    phone call with Ms. Adams.

10        Q    At some point, did you also -- did you then

11   convey this back to Verifications?

12        A    Yes, we did the next morning.

13        Q    When you say we did, did you or --

14        A    That would be Maura, so the exact time that

15   occurred, I do not know.

16        Q    So the next day Maura would have -- did she call

17   or send e-mail?

18        A    I believe she called.

19        Q    So the next day Maura called Verifications and

20   explained what your guys' investigation had --

21        A    That the concerns were being disputed, basically.

22        Q    Did that also get conveyed to Kathy Shapleigh?

23        A    Yes, and that was -- I had e-mailed her the

24   initial e-mail at 6:21, and then I believe I sent over

25   another e-mail 6:25, and I also sent her -- Ms. Adams faxed

Ad__s v. National Engineering

9/19/2008                                          Christopher Sullivan

Page 30

1    me over copies of her previous issue on this front, and

2    those items were conveyed to them as well.

3        Q    What did Kathy Shapleigh say to you, if

4    anything?

5        A    At that point, Kathy was -- and this is something

6    I cannot recall for the life of me.  She was not in the

7    office that morning, so I actually spoke to John Walicki,

8    her partner, if you will, her coworker who handles the

9    other side of things.

10       Q    You spoke to -- what's his name?

11       A    John Walicki, W-a-l-i-c-k-i.

12       Q    And what did you say to John Walicki, if you

13   remember?

14       A    I forwarded the information that I had sent to

15   Kathy, because I -- I believe I either got her

16   out-of-office on voice mail or on her e-mail that she was

17   out that day.  So I called John immediately, conveyed the

18   information to him, and that was --

19       Q    And what did he say?

20       A    He told me that they had gone through -- first he

21   said, you know, what kind of documentation, make sure it's

22   accurate.  And I said it looks pretty accurate to me, but

23   that's all he could tell me at that point.  He mentioned

24   having gone through a similar issue with another staffing

25   partner on another order in the past two to three months

Brandon Smith Reporting Service

Page 31

1    and that it was quite an ordeal.

2         Q    And when he meant it was some ordeal, did he go

3    into any depth about what the ordeal was?

4         A    He just said it took a while to clear up.  He did

5    not share any reasoning for it or what the issue was.

6         Q    Did he say anything about the job, that it

7    would -- did he talk at all, anything about Ms. Adams'

8    candidacy for the job in particular?

9         A    He did not at that point.  He said it would have

10   to be corrected if anything were to change, and that's when

11   he said -- you know, we discussed basically the process of

12   just making sure we file for review, I believe, with

13   Verifications and go on from there.

14        Q    It would have to be corrected if anything were to

15   change, what did he mean by that?

16        A    To work in Northeast Utilities, you have to be

17   able to receive a security badge, because it's a utility

18   firm.  So to do that you have to have a clear background

19   check or clear on -- you know, speeding tickets okay, but

20   other things aren't.

21        Q    No convictions?

22        A    Correct.

23        Q    Okay.  But part of the process, he did say that

24   it would have to be corrected if anything were to change.

25   By that, did you take that to mean that he would mean if

Adams v. National Engineering

Christopher Sullivan

Page 32

1    she were to be employed then, because that would fulfill

2    the requirement of having no conviction?  Is that how he

3    explained it to you?

4         A    He didn't really get into it any more than

5    Verifications would have to overturn it for anything to

6    transpire, and that if that wouldn't happen, then --

7         Q    Now, did you talk to anyone at Verifications?

8         A    I physically did not.  Maura communicated the

9    issue to -- at that time our representative was

10   Amy Vikander.

11        Q    At some point did Verifications look into this as

12   far as you were aware?

13        A    Yes.

14        Q    And what did they do, as far as you were aware?

15        A    They told us that they would directly communicate

16   with Ms. Adams and that they would -- I believe in that

17   area, had to send a clerk to the court.  I'm not -- at that

18   point it's beyond my knowledge how it gets corrected.

19        Q    At some point did you become aware that it did

20   become corrected?

21        A    Yes.

22        Q    And when would that have been?  If you need to

23   refresh on any e-mails that you --

24        A    That would have been on the 11th.

25        Q    Did they clear it up and did you then become

Adams v. National Engineering

1    aware that that was not Ms. Adams who had had any criminal

2    convictions?

3         A    Yes, that's what we had been told, that her

4    background check was then complete and clear of issue.

5         Q    Typically, are you aware if there's any period

6    that they have -- that people have to clear up if there is

7    a discrepancy or a concern?

8         A    This is the first and only time I've gone through

9    the dispute process, so I don't know the timing.

10        Q    So once you found out that she was cleared, did

11   you then talk to Kathy Shapleigh again?

12        A    Yes.

13        Q    What happened when you spoke with Kathy

14   Shapleigh?  What did you say to her and what did she say to

15   you?

16        A    The exact details of the conversation, I don't

17   recall, but I do remember telling her that we received the

18   updated report and that she was cleared.  And then at that

19   point, there's a little bit of a gap, because I have yet to

20   find where I sent the results to Kathy that they were

21   corrected, but she mentions having them, so I don't know if

22   Verifications sent that directly to her or if I sent it to

23   her.

24        Q    So at some point --

25        A    She had the results on the 11th that they were

Adams v. National Engineering

Page 34

1    corrected.

2        Q    Now, was that position filled in any way between

3    the date the offer was extended and there was a belief that

4    Ms. Adams had a conviction until it was cleared up?

5        A    It was not filled.  At some point during the

6    process, Kathy -- and it may have been the 11th or -- I

7    don't know the exact day, but apparently the manager

8    offered the position to someone else they interviewed, but

9    the position was not filled.

10       Q    So the position had not been filled as of the

11   11th?

12       A    Correct.

13       Q    Did either -- did -- were you aware of the Fair

14   Credit Reporting Act in any ways?

15       A    I was aware of it in terms of the basics

16   contained in it.  I also knew that contractually that we're

17   supposed to send the results when we get them as directly

18   to the on-site.

19       Q    And what was your belief on what you were

20   supposed to do upon a positive under the Fair Credit

21   Reporting Act?

22                MR. KUPINSE:  Objection.  You can answer.

23   BY MR. COFFEY:

24       Q    If you know.

25       A    At that point, I thought contractually my

9/19/2008                                          Christopher Sullivan

Page 35

1    obligation was to obviously inform Ms. Adams, but also

2    inform the client, and that was my knowledge at that

3    point.

4        Q    Did you know if you had to wait any time period

5    for her dispute to be handled?

6        A    I did not know of anything like that.

7        Q    Did Kathy Shapleigh ever talk about the Fair

8    Credit Reporting Act with you?

9        A    No.

10       Q    Now, at some point did -- you spoke with

11   Kathy Shapleigh.  Did she ever discuss whether the position

12   was going to be left open pending the outcome of the -- of

13   Verifications looking into this?

14       A    She didn't tell me one way or the other.  She

15   also told me after that there had been another candidate

16   that was being considered.

17       Q    Well, would it be typical for them to have more

18   than one offer outstanding simultaneously for one

19   position?

20       A    I wouldn't think so, but how often they do that,

21   I couldn't tell you.

22       Q    So when did you first become aware that they

23   had -- that they had filled that position?

24       A    I don't believe they ever did fill the position

25   itself.  No one ever told me that it had been filled, so to

Adams v. National Engineering

Christopher Sullivan

Page 36

1    speak.

2        Q     And at some point with regards to Ms. Adams, what

3    did you say to Ms. Adams?  Did there come a time when you

4    knew she was not going to be hired?

5        A     Not until very late in the process.  At that

6    point, the dispute had already been begun on -- you know,

7    there were letters and things of that nature, so I just

8    stayed out of it.

9        Q     When you say late in the process, is there

10   anything in your e-mails that indicate when you first were

11   aware that they were not -- Northeast Utilities was not

12   going to hire her?

13       A     There was nothing that showed me -- I mean, as of

14   the 15th I was still e-mailing Kathy asking for an update,

15   so they really didn't tell us much of anything.  It was my

16   first encounter with this, so --

17       Q     And so when they made a decision, though, they

18   had already known that the criminal -- the criminal

19   background had been changed and cleared?

20       A     As far as I can tell.  I mean, they really didn't

21   tell us much of anything.

22       Q     But at some point you did discuss this with

23   Kathy Shapleigh?  She did know -- I mean, from Comensura's

24   standpoint, she knew that there was a clear background

25   search?

9/19/2008                                        Christopher Sullivan

Page 37

1        A    Yes, she knew on the 11th.

2        Q    Did she discuss that with you ever on the

3   telephone other than e-mails, if you are aware?

4        A    Perhaps on the telephone that she'd -- she told

5   me she was going to inform the manager that the results had

6   been overturned, corrected, whatever the proper term would

7   be for that.  And then that was the end of it.  I didn't

8   know she had any -- like any conversation with the manager

9   about -- it looks like question about the resume or

10  anything like that.

11       Q    Other than that, did they -- did she ever discuss

12  any other -- other things with you about Ms. Adams's

13  candidacy?

14       A    No.

15       Q    And did, in fact -- did it come that they were --

16  did they change their opinion and go with an internal

17  candidate at some point that you became aware of?

18       A    I think on the 21st they ended up selecting a

19  Northeast Utilities intern.

20       Q    And then how did you communicate with Ms. Adams

21  that she was not going to receive this position?

22       A    At that point, we had basically -- her

23  communications had been more to Northeast Utilities than

24  they had been to us, so we stayed out of it as per our

25  counsel.

Adams v. National Engineering

Christopher Sullivan

1    Q   And so at some point -- who is your counsel?  Do

2  you have in-house counsel or is it outside counsel?

3    A   At that point it was an in-house representative

4  when we first received some the documentation, and it

5  was just that the situation basically be communicated

6  between Northeast and Ms. Adams, what we had been led to

7  believe.

8    Q   And who is your in-house counsel?

9    A   That is Michael Pappas, and I believe there's

10  another gentleman, and I'm not familiar with his name.

11  I've heard it once, and I don't know him personally.

12    Q   Does Mr. Pappas still work for your company?

13    A   I don't believe he works for the company.  I

14  think he's more of a consultant to the owners than

15  anything.

16    Q   So he's --

17    A   He's --

18    Q   -- counsel to the company?

19    A   Yeah, he's not in communication with me ever.

20    Q   But the contract for employment then was between

21  your company and Ms. Adams; is that correct?

22    A   Correct.

23    Q   Did you ever place Ms. Adams in another job?

24    A   No, we did not.

25    Q   Did your company attempt to place Ms. Adams in

Adams v. National Engineering

1   another job?

2        A    No, we -- I personally did not.  I don't know

3   that anyone else did, but --

4        Q    Okay.  Now, did you ever speak about -- with

5   Mr. Maddox?  Did you ever have any discussions with

6   Byron Maddox?

7        A    No.  That's -- part of our contract is we're

8   not supposed to have any contact with managers or

9   Northeast Utilities' employees.  It's all relayed through

10  the on-site.

11       Q    Did you ever have any discussions with

12  Kathy Shapleigh about what happened during this hiring

13  process?

14       A    I did, and the outcome was -- always kind of left

15  me kind of with no answers.

16       Q    What would she say?  She just --

17       A    It was just that the manager's looking at

18  options; it's they're not sure how they're going to

19  proceed, things of that nature.  It was never --

20       Q    Was it ever placed to her, though, you had a

21  signed employment contract with her, what happened,

22  because -- withdraw that.

23            Is it unusual for a company to back out of a

24  signed employment contract?

25       A    Yes, but it's also -- the contract is with this

Adams v. National Engineering

Christopher Sullivan

1    person to perform work for this client, so it's

2    not becoming an employee of National Engineering.  You're

3    an employee of National Engineering's on-site for, in this

4    case, Northeast Utilities.

5        Q    Right.  But under your -- from your contingent

6    offer, did Ms. Adams fulfill all her obligations under the

7    contingent offer for employment to your company?

8        A    Once her background check was corrected or

9    basically set correct, it was -- yes, she had met our

10   requirements per the paperwork that we initialed.  It was

11   weighing on the manager at that point.

12       Q    So as we sit here now, though, you're not sure

13   why, then, Northeast Utilities did not hire her?

14       A    I really don't.

15       Q    And the background check did get changed within a

16   couple days?

17       A    Yes.

18       Q    So the background check, it was cleared up?  It

19   was presented to the potential employer, so that would not

20   have been the reason that they chose not to hire Ms. Adams

21   as far as you're aware, is that correct?

22       A    Correct.

23       Q    I'll show you -- this is -- which would you

24   consider the contract?

25       A    That would be the form.

9/19/2008                                        Christopher Sullivan

1        Q    Now, is there anything -- what letter would you

2    have -- is there a letter in there also that was sent from

3    National over to her outlining what the offer was to her?

4        A    It's essentially this form.  It's a list of the

5    obligations of the assignments, some pretty basic -- the

6    obligations and then the hourly rate fee assignment, who

7    the assignment is with, the manager, start date,

8    background.

9        Q    That box --

10       A    That technically is --

11       Q     -- your offer?

12       A    Yes.

13       Q    Okay.  So this was, then, from what you were

14   aware of, the start date for this -- the potential start

15   date for Ms. Adams was to have been May 14?

16       A    Correct.

17       Q    And prior to that start date, all her paperwork

18   had cleared, so there was -- from your standpoint, there

19   was no holdup on why she could not have started?

20       A    Correct.

21       Q    And then -- okay.  And then once they sign this

22   form, how does that form get transmitted up the line?  Was

23   that then transmitted at some point up to Ms. Shapleigh?

24       A    No.  This is strictly our contract for Ms. Adams

25   between our firm and the expectations of our firm to

Adams v. National Engineering

9/19/2008                                          Christopher Sullivan

Page 42

1    Ms. Adams.  There are -- I believe -- I think it's consumer

2    drug test release -- I don't know if there's anything

3    directly for Ms. Adams to Northeast or -- not that I can

4    think of.  Some companies have employee rules and

5    regulations on site at each client they have to sign, and

6    then I have to send that to Ms. Shapleigh, but in terms of

7    this form, that's just us.

8         Q    That would be just you.  Okay.  Do you know if

9    there was any other paperwork that you had ever seen from

10   Northeast, though, or from Comensura?

11        A    On this position other than the consumer drug

12   test release, not that I can recall at this time.  I'm

13   trying to look through to see if -- I think these are just

14   our forms.  At this point, yes.

15        Q    And then on that date, did Ms. Adams -- had she

16   ever indicated to you that she -- at some point on the 14th

17   when she was supposed to start, did you make a call up

18   there that day and ask why she wasn't going to start?

19        A    At that point we had presented all the

20   information we could, and not being able to talk to anyone

21   directly at Northeast Utilities, they're left reliant upon

22   the information you're given back up.

23        Q    So if you had -- but if you had the contract with

24   a start date that said, okay, on the 14th she's supposed to

25   start, who then conveyed back to you, no, she's not

Adams v. National Engineering

1    starting even with this stuff being cleared up?

2         A    That would have been Kathy in some way, shape or

3    form, probably verbally, that the manager is making a

4    decision or they didn't issue a badge for her at the gate.

5    It can be worded, I guess, a couple different ways.

6         Q    Do you have any materials that they sent back as

7    to why that start date was not being honored to you?

8         A    I don't.

9         Q    If you could look --

10        A    I mean, not that I recall ever getting anything

11   saying this is the reason why Ms. Adams can't be here.

12   Kathy acknowledged on the 11th that she was eligible to

13   work at Northeast, but that was an e-mail internally to the

14   Northeast Utilities employee that I -- this is the first

15   time I've ever seen it that I recall.  As of the 15th, I

16   had no information from them as to what the verdict was or

17   what was holding it up specifically.

18        Q    Now, is your company in any way related to

19   Guidant or Comensura?

20        A    No.

21        Q    Now, with regards to the agreement with

22   Comensura, then Guidant, did you have to put -- was your

23   company responsible for procuring insurance in any way?

24        A    We're required to maintain workers' compensation,

25   general liability, things of that nature, and we have to

Adams v. National Engineering

Christopher Sullivan

Page 44

1    basically show them that in the form of an audit once every

2    quarter.

3        Q    Does Comensura or Guidant, are they named as

4    additional insured under any of your policies?

5        A    They are.

6        Q    On which -- well, do you have a D&O policy?

7        A    I don't --

8              MR. COFFEY:  I'm just trying to find out if

9    they're an additional insured under any of the policies.

10   Counsel?

11             MR. KUPINSE:  I would not know.  I don't --

12             MR. COFFEY:  Okay.

13       A    I can only tell you what I think.

14   BY MR. COFFEY:

15       Q    Okay.  I don't want you to guess.  I'm not here

16   to get you to -- okay.  I'm just trying to figure out the

17   extent of what the -- what you have them named in things,

18   which for where we're at could have some relevance.

19             Now, under the -- at any point with regards to

20   the -- withdrawn.

21             MR. COFFEY:  I think I'm done.  Thanks.

22

23

24

25

Brandon Smith Reporting Service

Adams v. National Engineering

1              C R O S S - E X A M I N A T I O N

2

3    BY MR. MADSEN:

4         Q    I just have a few follow-up questions.  You're

5    aware that Verifications, Inc. has brought a cross-claim

6    against National Engineering?

7         A    I was not.

8         Q    Okay.  I'm going to back up a little bit.  You

9    personally had conversations with Kathy Shapleigh regarding

10   Deborah Adams; is that correct?

11        A    Correct.

12        Q    When is the first time that you had a

13   conversation with Kathy Shapleigh?

14        A    About Ms. Adams?

15        Q    Yes.

16        A    I don't know if I could tell you the exact date.

17   In all likelihood, it was when she asked for a confirmation

18   of her interview, to the best of my knowledge.  I mean, I

19   have worked with Kathy for a while, so when I actually

20   spoke about Ms. Adams, I'm not sure.

21        Q    Okay.  And so the way the process worked, someone

22   in your office identified Deborah Adams as a potential

23   candidate to fill this order; is that correct?

24        A    Correct.

25        Q    And you don't recall who that individual was to

Adams v. National Engineering

Christopher Sullivan

Page 46

1   be --

2        A    That was Larry O'Keefe.

3        Q    It was Larry O'Keefe?

4        A    Yes.

5        Q    Larry O'Keefe passed that information on to

6   you?

7        A    Yes.

8        Q    And then you passed that information on to

9   Kathy Shapleigh?

10       A    Yes, through the Guidant system.  So it doesn't

11  go directly from me to Kathy.  It essentially does -- it

12  goes through the system to her.

13       Q    Electronically?

14       A    Yes.

15       Q    So it appeared on Kathy Shapleigh's computer

16  screen, to the best of your knowledge?

17       A    Yes.

18       Q    And then Kathy Shapleigh communicated back to you

19  that she was interested in following up with Deborah Adams

20  as a potential candidate to fill this order?

21       A    At that point, the way it works is basically the

22  person is submitted to the on-site manager in the system,

23  and then based on the on-site manager's determination, they

24  get submitted to the client.  And sometimes that involves a

25  phone call to tell us that.  Other times it's -- you can

Adams v. National Engineering

1    log in, and all of the sudden the person's resume is moved.

2    So there's no direct "yes, this is somebody I want to move"

3    guaranteed every single time.  Sometimes yes, but no.

4        Q    But in this case, the manager was presented with

5    Deborah Adams' resume and decided that they wanted to

6    follow up and pursue her as a potential candidate?

7        A    Yes.

8        Q    Did you take responsibility for communicating

9    that to Deborah Adams?

10       A    I believe Larry communicated that.

11       Q    Larry did.  All right.  And as a result, an

12    interview was set up; is that correct?

13       A    Yes.

14       Q    And Deborah was extended an offer?

15       A    Yes, following the interview, yes.

16       Q    And the offer was submitted to Deborah Adams by

17    way of a written packet of materials?

18       A    Yeah.  There's the verbal phone call, which that

19    occurs basically letting the candidate know they would like

20    you if you still want the position.  I mean, some folks

21    turn it down right out of the gate.  In that case, she was

22    agreeable to the terms; we sent the paperwork.

23       Q    So at that point, a contingent offer of

24    employment was made?

25       A    Correct.

Adams v. National Engineering

Christopher Sullivan

Page 48

1      Q     And the two contingencies were successful

2   completion of a criminal background check and a drug test,

3   is that correct?

4      A     Correct.

5      Q     And if both of those were successfully completed,

6   the job was hers; is that correct?

7      A     Yes, bar -- I mean, I've certainly seen positions

8   get put on hold and budgets fall through and things of that

9   nature.  So there's like the unwritten policy that they

10   have where they can push you back and tell you to wait, but

11   in this particular case it was drug background, send the

12   on-boarding form and --

13      Q     Okay.  So had -- and to your knowledge, did

14   Deborah Adams pass her drug test?

15      A     I believe so, yes.

16      Q     Okay.  So to your knowledge, had Deborah Adams

17   passed the criminal background check, she would have, in

18   fact, started at Northeast Utilities on May 14?

19      A     That's what I was --

20           MR. COFFEY:  Just note my objection.

21   BY MR. MADSEN:

22      Q     Is --

23      A     As far as I have control over, yes.

24      Q     You have no knowledge or information that would

25   suggest otherwise, that Deborah Adams would not have

9/19/2008                                    Christopher Sullivan

1    started her job on May 14 had the criminal background check

2    come out negative?

3          A    I don't.

4          Q    Okay.  And to your knowledge, was Deborah Adams a

5    candidate who was responsive to National Engineering in

6    terms of providing information?

7          A    Yes, she seemed to be, absolutely.

8          Q    Was she responsive in terms of responding to

9    phone calls?

10         A    Yes.  I believe she was working, so sometimes it

11   would be a little bit of a delay, but nothing -- I've

12   certainly had people call me back three days later, so in

13   this case, yeah.

14         Q    How many times in the past had you been involved

15   in a situation where an individual was provided with a

16   contingent offer, and then the offer was withdrawn because

17   a criminal background check came up with a problem or an

18   issue?

19         A    I can ballpark it for you.  Maybe three to four

20   times at that point.

21         Q    Okay.  And in any of those cases, were the

22   findings of the criminal check contested?

23         A    No.

24         Q    Okay.  What procedures or safeguards does

25   National Engineering have in place to deal with a situation

Brandon Smith Reporting Service

Ad___s v. National Engineering

9/19/2008

Christopher Sullivan

Page 50

1  such as Deborah Adams where a false or an erroneous report

2  comes out on a criminal background check?

3      A   We don't have anything in place that I know of to

4  speak of.

5      Q   Do you know whether National Engineering

6  considers itself to be a reporting agency for the purposes

7  of the Fair Credit Reporting Act?

8                  MR. KUPINSE:  Objection.

9  BY MR. MADSEN:

10     Q   I'm just asking if you know.

11     A   I don't know.

12     Q   Okay.  And you, yourself, have never had any

13  training in the Fair Credit Reporting Act?

14     A   Just through the past few months, but no.

15     Q   To your knowledge, what is the -- what is the

16  purpose of sending out a contract of employment to a

17  candidate?

18     A   It's to allow them to see the obligations that

19  they'll have in terms of responsiveness, behavior.  Any

20  contract has mentions of sexual harassment policies and

21  things of that nature.  It's just an overall where you

22  should theoretically be working as of this date and the

23  rates and go from there.

24     Q   To your knowledge, is it a legal document?

25     A   To my knowledge --

Page 51

1              MR. KUPINSE:  Objection.  You can answer.

2        A    To my knowledge, yes.

3   BY MR. MADSEN:

4        Q    In fact, a contract of employment was sent out to

5   Ms. Adams; is that correct?

6        A    Yes.

7        Q    And it was sent out by Ms. Demars, I believe?

8        A    Demars, yes.

9        Q    Was Ms. Demars authorized to send out the

10  contract of employment to Deborah Adams?

11       A    Yes.  She's the office manager.  She sends out

12  the contracts to each employee.

13       Q    Did you know that the contract was being sent out

14  to Deborah Adams?

15       A    Yes.

16       Q    Had you had discussions with Ms. Demars about

17  sending out the contract to Ms. Adams?

18       A    I usually provide her with a sign-up sheet.

19  Basically, it shows the wage, the place of employment, the

20  client, etc.  Beyond that, it's usually pretty minor

21  conversation, if any.

22       Q    Okay.  But Ms. Demars was authorized to extend an

23  offer of employment to Ms. Adams; is that right?

24       A    Yes.

25       Q    And Ms. Adams duly accepted the offer of

Adams v. National Engineering

9/19/2008                                    Christopher Sullivan

Page 52

1    employment?

2         A    Correct.

3         Q    Verifications, Inc. is still providing

4    background-check services to National Engineering, to your

5    knowledge?

6         A    On this account, we're obligated to go through

7    Verifications at Northeast Utilities.  I'm not sure if we

8    use them on other clients, but I know this one, yes.

9         Q    Okay.  So -- and I haven't had a chance to review

10   the staffing contract between National Engineering and

11   Comensura, but is it your understanding that Comensura

12   requires National Engineering to utilize Verifications,

13   Inc.?

14        A    Yes.  Clarification.  Did you say Comensura and

15   Northeast Utilities or Comensura as a whole?

16        Q    Well, Comensura at Northeast Utilities.

17        A    At Northeast Utilities, yes.

18        Q    Okay.  Do you have other contracts -- does

19   National Engineering have other contracts with Comensura

20   through other vendors or employers?

21        A    Yes.

22        Q    And each one of those places of employment has a

23   separate contract, to your knowledge?

24        A    Yes.

25        Q    I believe you testified that there is a -- there

Adams v. National Engineering

Christopher Sullivan

1    are two sources of payment that go to National Engineering

2    from the successful placement of a candidate.  One of them

3    is -- and I believe you testified that there's a bridge

4    between the charge rate and the pay rate, and that

5    difference goes to National Engineering; is that correct?

6         A    Correct.

7         Q    I believe you also testified that there was a

8    successful placement fee that's provided?

9         A    That's only on a full-time, direct employee, if

10   somebody goes basically directly to Northeast Utilities

11   or -- so there's no contractual period of hourly pay and

12   hourly charge rate.  There's no additional payment.

13        Q    Okay.  Did Ms. Adams do everything that she was

14   obligated or supposed to do in order to successfully

15   fulfill the conditions in order to be employed pursuant to

16   this order?

17        A    In my opinion, yes.

18             MR. MADSEN:  I don't have any further

19   questions at this time.

20             MR. COFFEY:  Thank you.

21             MR. KUPINSE:  I have no questions.

22

23             (Deposition concluded:  1:27 p.m.)

24

25

Brandon Smith Reporting Service

Adams v. National Engineering

Christopher Sullivan

Page 54

1                            JURAT

2

3

4

5

6                    _____

7                    Christopher Sullivan

8

9

10

11          Subscribed to and sworn before me on this

12    _____ of _____ 2008.

13

14                    _____

15

16    My commission Expires:

17

18

19

20

21

22

23

24

25

Adams v. National Engineering

9/19/2008                                              Christopher Sullivan

                                                              Page 55

1                               ERRATA SHEET

2    Page  Line   From                    To              Reason

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____          _____
       Date                      Christopher Sullivan
21   Sworn to before me this _____ day
     of _____, 2008.
22                                 _____
                                      Notary Public
23
     My commission Expires:_____
24

25

Brandon Smith Reporting Service

Adams v. National Engineering

9/19/2008

Christopher Sullivan

Page 56

1                    C E R T I F I C A T I O N

2     STATE OF CONNECTICUT:
      COUNTY OF HARTFORD:

3

4          I, TIFFANY V. PRATT, a Notary Public duly commissioned
      and qualified in and for the State of Connecticut, do
5     hereby certify that pursuant to Notice there came before me
      on the 19th of September, 2008, the following named person,
6     to wit:  CHRISTOPHER SULLIVAN, who was previously duly
      sworn to testify to the truth and nothing but the truth;
7     that he was thereupon examined upon his oath; that the
      examination was reduced to writing by computer under my
8     supervision and that this transcript is a true record of
      the testimony given by said witness.

9

10         I further certify that I am neither attorney nor
      counsel for, nor related to, nor employed by any of the
11    parties to the action in which this deposition was taken,
      and further, that I am not a relative or employee of any
12    attorney or counsel employed by the parties hereto, or
      financially interested in the outcome of this action.

13

14         In witness whereof I have hereunto set my hand

15         this 23rd day of September, 2008.

16

17                           _____

18                               Tiffany V. Pratt
                                 Notary Public

19

20    My Commission expires
          July 31, 2010
21

22

23

24

25

Brandon Smith Reporting Service

Adams v. National Engineering

9/19/2008                                    Christopher Sullivan

Page 57

```
 1              BRANDON SMITH REPORTING SERVICE, LLC
                        44 Capitol Avenue
 2                  Hartford, Connecticut   06106
                        (860) 549-1850
 3

 4

 5      September 23, 2008

 6

 7      William J. Kupinse, Jr., Esq.
        Goldstein and Peck, P.C.
 8      1087 Broad Street
        Bridgeport, CT  06604
 9
        Dear Mr. Kupinse,
10
        Enclosed please find your copy of the deposition transcript
11      of Christopher Sullivan taken on September 19, 2008.

12      The original jurat and errata sheets are also enclosed.
        Please note that the witness is allowed 30 days to read and
13      sign the deposition as the rules provide.

14      Please return only the original notarized jurat and errata
        sheets to Attorney Coffey, along with a copy to all counsel
15      present.  Thank you for your prompt attention to this
        matter.
16
        If you have any questions, please feel free to call me.
17
        Sincerely yours,
18

19

        Tiffany V. Pratt, LSR 00128
20      Brandon Smith Reporting Service, LLC

21

22

23

24

25
```