# EXHIBIT D

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



----------------------------------------x

DEBORAH ADAMS,                          :

                    Plaintiff           :

          VS                            : 3:07-CV-1035(JCH)

NATIONAL ENGINEERING SERVICE            :

CORPORATION AND VERIFICATIONS, INC.,:

                    Defendants          :

----------------------------------------x


   Deposition of KATHY SHAPLEIGH, taken pursuant to the

Rules of Practice held at the Law Offices of Shipman &

Goodwin, LLP, One Constitution Plaza, Hartford, CT,

before Debra A. Chasse, LSR, License No. 00055, a Notary

Public in and for the State of Connecticut, on

Wednesday, September 17, 2008, at 10:33 a.m.


BEECHER & HORVATH REPORTING ASSOCIATES
73 Millbrook Road
North Haven, CT 06473
(203) 230-0010

2

A P P E A R A N C E S:


THE LAW OFFICES OF GOLDSTEIN AND PECK
Attorneys for the Defendant National Engineering
1087 Broad Street
Bridgeport, CT 06604
BY:  WILLIAM J. KUPINSE, JR., Esquire


THE LAW OFFICES OF SHIPMAN & GOODWIN, LLP
Attorneys for Guidant
One Constitution Plaza
Hartford, CT 06103
BY:  LESLEY N. SALAFIA, Esquire


THE LAW OFFICES OF MADSEN, PRESTLEY & PARENTEAU, LLC
Attorneys for the Plaintiff
44 Capitol Avenue, 2nd Floor, Suite 201
Hartford, CT 06106
BY:  WILLIAM G. MADSEN, Esquire


THE LAW OFFICES OF WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP
Attorneys for the Defendant Verifications, Inc.
3 Gannett Drive
White Plains, NY 10604-3407
BY:  ALEXANDER GIZZO, Esquire

3

1                    S T I P U L A T I O N S

2

3

4

5          IT IS HEREBY STIPULATED AND AGREED BY and among

6  counsel representing the parties that all formalities in

7  connection with the taking of this deposition, including

8  time, place, sufficiency of notice, and the authority of

9  the officer before whom it is being taken may be hereby

10  waived.

11         IT IS FURTHER STIPULATED AND AGREED BY and among

12  counsel representing the parties that objections other

13  than as to form are reserved to the time of trial.

14         IT IS FURTHER STIPULATED AND AGREED BY and among

15  counsel representing the parties that the reading and

16  signing of the deposition is hereby waived.

17         IT IS FURTHER STIPULATED AND AGREED BY and among

18  counsel representing the parties that proof of the

19  qualification of the Notary Public before whom the

20  deposition is being taken is hereby waived.

21

22

23

24

4

1       (Whereupon, KATHY SHAPLEIGH, having first

2   been duly sworn, was examined and testified as follows:)

3       THE COURT REPORTER:  Could you state your

4   name and address for the record, please.

5       THE WITNESS:  Kathleen, with a K, Shapleigh

6   is S-h-a-p-l-e-i-g-h, 222 Williams Street East in

7   Glastonbury, CT 06033.

8   Whereupon,

9              DIRECT EXAMINATION

10  BY MR. KUPINSE:

11     Q.   Good morning, I'm Bill Kupinse and I represent

12  National Engineering Service Cooperation.  With me is

13  Andrew McPherson who also represents National

14  Engineering and Mr. Madsen is representing the

15  plaintiff, Deborah Adams, and Mr. Gizzo is representing

16  Verifications, Inc., and there has been an action

17  commenced by Miss Adams against National Engineering and

18  Verifications, and we'd like to ask you a few questions

19  about what you know about that.

20          A few quick ground rules.  The court reporter

21  will take down everything that anyone says.  You cannot

22  answer with nods because she can't get that on to her

23  machine.  It's also helpful if you don't use uh-huhs and

24  mm-hmms because they sometimes don't come out right on

─────────────── BEECHER & HORVATH ───────────────

5

1   the transcript.  If I ask you a question that you don't

2   understand, please ask me to rephrase it.  If you

3   answer, I'll assume that you understood what I was

4   asking.  We can take a break at any time.  You can

5   confer with your attorney if you would like but not just

6   in between question and answer, if you would.

7        Is there any reason why you cannot have your

8   deposition taken today?  Are you feeling okay,

9   everything fine?

10   A.   Yes.

11   Q.   Can you give me a brief statement of your

12   educational background?

13   A.   I graduated from high school and I took college

14   courses after that but did not graduate from college.

15   Q.   Did you take any special training in connection

16   with the Fair Credit Reporting Act at any time?

17   A.   No.

18   Q.   And can you give me a brief background on your

19   work experience?

20   A.   I have been in the employment industry since

21   1983, by and large working for staffing companies,

22   director of temporary services for a staffing company

23   for approximately nine years, and by and large I've been

24   a contractor in the ING Major Corporation and HR, so by

BEECHER & HORVATH

6

1  and large it's been HR related.

2     Q.  For whom do you work now?

3     A.  Guidant Group.

4     Q.  How long have you worked for them?

5     A.  I started in April of 2003.

6     Q.  And did Guidant Group have another name before

7  they were called Guidant Group?

8     A.  Yes.

9     Q.  What was that?

10    A.  Comensura.

11    Q.  Are they the same organization?

12    A.  Yes.

13    Q.  I'll refer to them as Guidant, even though at

14 times they may have been known as Comensura.  Does

15 Guidant have a relationship with Northeast Utilities of

16 any kind?

17    A.  Yes.

18    Q.  Can you explain what that is?

19    A.  We have been contracted by Northeast Utilities to

20 oversee their contingent hiring.

21    Q.  When you say contingent hiring, what do you mean

22 by that?

23    A.  Temporary, contractual.

24    Q.  And does Guidant have a relationship with

BEECHER & HORVATH

7

1   National Engineering?

2       A.   Yes.

3       Q.   What is that?

4       A.   National Engineering is a staffing company who

5   fills orders, temporary order requests, for Northeast

6   Utilities.

7       Q.   And can you explain the process, not necessarily

8   with respect to Miss Adams, but generally the process of

9   how you work with National Engineering and Northeast

10  when a temporary employee is requested?

11      A.   There are three components, Northeast Utilities

12  managers who we shepherd through the process of order

13  approval.  This is all done electronically.  Then the

14  orders are submitted to Guidant Group, so we oversee

15  that piece, and then Guidant Group submits the orders

16  simultaneously and electronically to all of the staffing

17  coordinators who are in our program.  The staffing

18  companies then submit resumes to the orders, Guidant

19  Group reviews those resumes and forwards them to the

20  hiring managers for their review.

21      Q.   And after you forwarded them, what happens next?

22      A.   The hiring manager will make a determination to

23  interview a candidate or not.

24      Q.   And after the interview who makes the decision

─ BEECHER & HORVATH ─

8

1   whether to hire that particular candidate or not?

2      A.   The hiring manager.

3      Q.   At Northeast Utilities?

4      A.   That's correct.

5      Q.   Whose employee is the temporary employee?  Who do

6   they work for?

7      A.   The staffing company.

8      Q.   For example, if you were using National

9   Engineering, they would be an employee of National

10  Engineering; is that correct?

11     A.   That's correct.

12     Q.   And not an employee of Guidant?

13     A.   Correct, not an employee of Guidant.

14     Q.   And not an employee of Northeast Utilities?

15     A.   Not an employee of Northeast Utilities.

16     Q.   Who decides in that process whether to hire

17  somebody or not?

18     A.   The NU hiring manager will contact Guidant to

19  make an offer to the staffing company of temporary

20  employment for their candidate.

21     Q.   So if the staffing company sent over an employee,

22  the decision of whether to hire that employee or not

23  would ultimately rest with Northeast Utilities?

24     A.   Yes.

—————— BEECHER & HORVATH ——————

9

1    Q.   Is it true that Northeast Utilities also decides

2  if they do not want to hire an employee if National

3  Engineering sends over an employee, for example, and

4  Guidant sends the information to Northeast Utilities and

5  Northeast Utilities interviews them and says I just

6  don't want this person, is that their decision or is it

7  somebody else's?

8    A.   It would be Northeast Utilities' decision.

9    Q.   Can you tell me what your job title is at

10 Guidant?

11   A.   Senior contingent resource consultant.

12   Q.   What are your duties generally?

13   A.   Shepherding the NU managers through the order

14 process and filling their temporary requests.

15   Q.   And how many hiring -- is that the term hiring

16 managers?

17   A.   At Northeast Utilities.

18   Q.   How many hiring managers do you work with

19 approximately?

20   A.   I don't honestly know.

21   Q.   And how many staffing agencies do you work with?

22   A.   There are over 40 agencies that are a part of our

23 program, the Guidant Group's program.

24   Q.   Now, turning to the plaintiff in this case,

—10

1   Deborah Adams, were you involved in her contact with

2   Northeast Utilities?

3       A.   Yes.

4       Q.   What was your involvement?

5       A.   I submitted her resume and scheduled an interview

6   for her.

7       Q.   Was this for a single position at Northeast

8   Utilities?

9       A.   Yes.

10      Q.   Was Northeast Utilities interviewing more than

11  just Deborah Adams?

12      A.   I don't honestly remember.

13      Q.   Is Guidant the only entity that supplies contract

14  employees to Northeast?

15      A.   Yes.  I'm sorry, would you please repeat that

16  question?

17      Q.   Sure.  Is Guidant the only entity that supplies

18  contract employees to Northeast?

19      A.   Yes.

20      Q.   Do you know who scheduled Deborah Adams'

21  interview with Northeast?

22      A.   I did.

23      Q.   Do you remember with who at Northeast the

24  interview was scheduled?

—————— BEECHER & HORVATH ——————

11

1    A.   I remember a contact that I spoke to.  I don't

2  honestly remember if it was the same, if there was more

3  than one.  It happened so long ago, but I do remember

4  speaking to a hiring manager with regard to her.

5    Q.   Where did the interview take place?

6    A.   At Northeast Utilities.

7    Q.   Do you recollect when it was?

8    A.   I don't.

9    Q.   Who decided when the interview and place of the

10  interview would take place?

11    A.   The hiring manager -- the process is the hiring

12  manager gives Guidant Group dates and times to schedule

13  interviews with the temporary staffing company.

14    Q.   Specifically, did Northeast Utilities have the

15  power to decide whether or not to hire Deborah Adams?

16    A.   The NU manager -- the process is that the NU

17  managers make the offer to Guidant.

18    Q.   Once they make the offer to Guidant, does Guidant

19  have any authority to hire or not hire the employee?

20    A.   Guidant then contacts the agency to make the

21  offer of temporary employment.

22    Q.   Once the agency makes the offer of temporary

23  employment, does the agency have any ability not to

24  utilize that particular employee?

BEECHER & HORVATH

12

1    A.   I don't know.  That would be an agency decision.

2    Q.   Well, would Northeast Utilities accept a

3  substitute, for example?

4    A.   I don't understand the question.

5    Q.   Let's say the hiring manager selects Deborah

6  Adams and Deborah Adams is lined up for a temporary

7  position, could National Agency substitute Jane Jones

8  for it?

9    A.   No.

10   Q.   Do you know who decided to offer the contract

11  position to Deborah Adams?

12   A.   Are you looking for a name?  I don't understand

13  the question.

14   Q.   It would be the hiring manager again, but do you

15  know who -- I assume it would be the hiring manager; is

16  that correct?

17   A.   That's correct.

18   Q.   You don't remember the name of the hiring

19  manager?

20   A.   I remember the name of the manager that I spoke

21  to.  There are two or three different managers in that

22  area.  I don't remember who that directive came from, to

23  be honest with you.

24   Q.   Do you remember when you became aware that an

13

1    offer could be made to Deborah Adams?

2         A.   If I may refer to the order, that might help.

3         Q.   Please do.

4         A.   I can't give an exact date of when the offer was

5    extended.  I don't know.  I don't remember.

6         Q.   Can you approximate it in terms of month and

7    year?

8         A.   I would say maybe the beginning of May 2007.

9         Q.   Now, you're looking at a document.  Did you bring

10   some documents with you this morning in response to a

11   subpoena?

12        A.   Yes.

13        Q.   May I see them?

14             MS. SALAFIA:  Gentlemen, I have the copies

15   that were from Miss Shapleigh's file.  Guidant has other

16   documents responsive to the subpoena that Miss Shapleigh

17   has never seen.  I have copies of them, as well.  Miss

18   Shapleigh still has not seen them.  I will hand those

19   over, but obviously she cannot answer questions on them

20   because she's never seen them before.  The exception to

21   that is an e-mail that she was CC'd on.  That would be

22   the only one.

23             MR. KUPINSE:  Why don't we have this first

24   document, which is Guidant Powered by Staff Enabler,

BEECHER & HORVATH

14

1    page 1 of 4, and there are two pages we have been given,

2    as National Engineering Exhibit 1.

3                    (Whereupon, the Guidant Powered by Staff

4        Enabler referred to was marked as Defendants'

5        Exhibit Number 1 for Identification by the court

6        reporter.)

7        Q.   I think you have a copy of what's been marked as

8    Defendants' Exhibit 1 for identification in front of

9    you, and was this the document that you were referring

10   to when you were searching for the date?

11       A.   Yes.

12       Q.   And can you tell us what this document is?

13       A.   This is the order and all the information

14   pertaining to that order, the agencies that the order

15   was submitted to and then the candidate activity.

16       Q.   I noticed up at the top there is a designation,

17   page 1 of 4, but there are only -- I'm sorry, they're

18   double-sided.  And can you explain how this order gets

19   placed?

20       A.   Yes, the NU manager contacts Guidant Group and

21   goes over the particulars of the order which is done,

22   placed in the Staff Enabler, the software that is used,

23   and sent through an approval process and then is

24   submitted to Guidant Group for acceptance and is then

—————— BEECHER & HORVATH ——————

15

1   submitted to the staffing companies simultaneously.

2   It's all done electronically.

3       Q.   Over the internet?

4       A.   Correct.

5       Q.   Now, looking at the document which is Defendants'

6   Exhibit 1, I notice up at the top there is a creation

7   date of 13 March '07.  Would that be the date that you

8   posted it?

9       A.   The date that the order was created.

10      Q.   When you say created, do you mean that's the date

11  at which you sent it to the staffing companies?

12      A.   No, that's the date that the order was created in

13  the Staff Enabler, the software system, to be sent out

14  for approval to the NU managers.

15      Q.   So it would have gone out at some later date,

16  then?

17      A.   It could have gone out on that date.

18           MS. SALAFIA:   Could you clarify, gone out to

19  whom?

20      A.   Gone out to the staffing for approval.

21           MS. SALAFIA:   Are those from NU?

22      A.   Yes.

23      Q.   I notice in the next line it says, "status

24  canceled."  When was that added, if you know?

BEECHER & HORVATH

16

1    A.  I don't.  I don't remember.

2    Q.  Is this a document which was not posted at the

3    time you posted it with everything on it?  In other

4    words, was it canceled, for example, added at a later

5    date after you posted it?

6    A.  Yes.

7    Q.  And do you keep track of the document as it's

8    developing, or do you just have the final document?

9    That's a double question.  Let me rephrase it.  When you

10   post the document originally, send it out to the

11   staffing agencies, there is not a statement on it

12   canceled, for example, or you wouldn't be sending it

13   out?

14   A.  Correct.

15   Q.  Do you keep a record of the document as it

16   develops, as various things are added to it?

17   A.  For example, what things?

18   Q.  Well, for example, you posted -- you sent this to

19   the staffing agencies perhaps sometime on or after March

20   13, 2007.  I assume at the time you sent it to the

21   staffing agencies the word "canceled" was not on it; is

22   that correct?

23   A.  Correct.

24   Q.  So that was added at some later time?

BEECHER & HORVATH

17

1    A.   Yes.

2    Q.   Do you have a series of documents that show how

3  it developed over a period of time?  For example, do you

4  have a document that does not have the word "canceled"

5  on it, or do you have only the final version?

6    A.   Just the final version.

7    Q.   Can you tell me, other than the word "canceled,"

8  if there was anything else added after the initial

9  transmittal to the staffing agencies to this document?

10   A.   Added?

11   Q.   When you originally sent it to the staffing

12 agencies, for example, the word "canceled" was not on

13 it.

14   A.   Correct.

15   Q.   That occurred later.  At some point the status of

16 the order was canceled?

17   A.   Correct.

18   Q.   Are there other things on here that changed after

19 you initially sent it to the staffing agencies?

20   A.   The only other thing that would have changed is

21 when an order is closed out, they are automatically

22 rejected so that would have shown up as a final.  That's

23 done within the system.

24   Q.   For example, take a look again at the first page.

————— BEECHER & HORVATH —————

—18

1    If you can go down sort of about 60 percent of the way,

2    there's a line that starts out, "KS - 5/8/07."  Was that

3    on there when it was originally sent to the staffing

4    agencies?

5        A.   No.

6        Q.   That was added at some later time?

7        A.   Yes, on the 8th.

8        Q.   And the rest of the information, "background

9    check failed," was added at some later time?

10       A.   That was added on the 8th of May, '07.

11       Q.   What does "KS" stand for?

12       A.   Those are my initials.

13       Q.   And are you the person that added that?

14       A.   Yes.

15       Q.   And tell me how you would add something like

16   that.

17       A.   If I may refer to an e-mail that I received from

18   Chris Sullivan on the 8th of May stating that Deborah

19   Adams had failed, according to this information, the

20   background check.

21       Q.   Okay, that may be sort of why.  I was more

22   fundamental on that.  How would you add the information?

23   Would you go to your computer once you got some

24   information, for example, that the order was canceled

19

1    and type it into the form?  When you got an e-mail from

2    somebody saying the background check had failed, you

3    would type it into the form?

4        A.  Yes.

5        Q.  Now, you referred to an e-mail by Chris Sullivan?

6        A.  Yes.

7        Q.  And we have several e-mails here.  Can you refer

8    me to the one you were just speaking about?

9        A.  It's dated May 8, 2007, 3:49 p.m.

10       Q.  Okay.  Is this the e-mail that you're referring

11   to?

12       A.  Yes.

13              MR. KUPINSE:  Can you this Defendants'

14   Exhibit 2.

15              (Whereupon, the E-mail referred to was

16       marked as Defendants' Exhibit Number 2 for

17       Identification by the court reporter.)

18       Q.  Referring to --

19              MS. SALAFIA:  Can we make a clarification of

20   a prior answer?

21       Q.  Sure.

22       A.  When you asked me if anything was added to the

23   order, I now understand what you were asking is did I

24   add anything to the order, and electronically I have two

──────── BEECHER & HORVATH ────────

20

1    notes on the order.

2        Q.   Okay.  And which notes are those?

3        A.   5/8/07 and then 4/25/07.

4        Q.   Now, if I may, going to Defendants' Exhibit 2,

5    just so I understand, this e-mail was sent to you by

6    Chris Sullivan from National Engineering; correct?

7        A.   Correct.

8        Q.   Was the attachment, which is at the bottom from

9    Maura Demars, also sent to you at the same time?

10       A.   Yes.

11       Q.   Who is Maura Demars?

12       A.   She's an employee of National Engineering.

13       Q.   And looking down below to the original message,

14   do you know who Amy Vickender is?

15       A.   An employee of Verifications.

16       Q.   Was all of this information on the next pages

17   also sent to you?

18       A.   Yes.

19       Q.   Now, prior to receiving this e-mail had you

20   received any information about the background check on

21   Deborah Adams?

22       A.   No.

23       Q.   Prior to receiving this e-mail -- withdrawn.

24            Do you have the ability to go into the

—21

1    Verifications site yourself?

2        A.   No.

3        Q.   Does anyone at Guidant that you know?

4             MS. SALAFIA:   Can you please repeat the

5    question.

6        Q.   Sure.   Does anyone employed at Guidant

7    Corporation have the ability to access the verification

8    site to get information?

9        A.   Not to my knowledge.

10       Q.   Did you have a conversation with Chris Sullivan

11   on May 8th concerning the background check on Deborah

12   Adams?

13       A.   I don't remember.

14       Q.   Do you remember whether at any time you learned

15   that the background check had a problem before this

16   e-mail?

17       A.   No.

18       Q.   Is that no, you don't remember or no, you did not

19   learn?

20       A.   I did not learn about the failed background check

21   until --

22       Q.   So this was your first indication that the

23   background check had failed?

24       A.   Yes.

22

1      Q.   After you received this e-mail, which is marked

2    Defendants' Exhibit 2, what did you do?

3      A.   I would contact the -- the process is contacting

4    the hiring manager at NU and telling them that the

5    candidate is ineligible to work at Northeast Utilities.

6      Q.   Did you do that?

7      A.   Yes.

8      Q.   And what -- when you say ineligible to work, was

9    that a decision you made or was that a decision that the

10   NU person, hiring manager, made?

11     A.   As part of our contract with the staffing

12   companies, before a contractor is eligible to work at

13   Northeast Utilities or can start a temporary assignment,

14   they must be background checked and drug screened.  If

15   they fail either of these, they're ineligible to work at

16   Northeast Utilities.

17     Q.   So as part of your contract -- when you learned

18   someone has failed, as part of the Guidant contract when

19   you learn somebody has failed one of these tests, you

20   would immediately disqualify them from working?

21     A.   Yes.

22     Q.   And you wouldn't have to call up Northeast

23   Utilities and say can this person work there?

24     A.   No, it's their mandate.  It's Northeast

BEECHER & HORVATH

23

1   Utilities' mandate.

2       Q.   Okay.   Now, going back to Defendants' Exhibit 1

3   and with respect to the note that you mentioned,

4   "KS - 5/8/07," can you explain was that put on after you

5   received the e-mail?

6       A.   Yes.

7       Q.   And it seems obvious but what does that mean?

8       A.   The candidate failed the background check.

9       Q.   What does the word "order avail" mean?

10      A.   The order is alive and needs to be filled.   It's

11  still active.

12      Q.   So there's still an active order out.   Now, going

13  down a little further in that there's an entry 4/25/07,

14  and did you also make that entry?

15      A.   Yes.

16      Q.   And why was that entry made?

17      A.   That was the day that the order was offered, the

18  temporary order was offered to the candidate.

19      Q.   And I note --

20      A.   Via the agency.

21      Q.   And I note that you have added or you've included

22  in that, "offer of temp employment has been extended and

23  contingent on background check results."

24      A.   Correct.

24

1      Q.   How did you know that it was contingent on

2   background check results?

3      A.   It's part of our contract with Northeast

4   Utilities and the staffing companies.  It's a

5   prerequisite to starting a temporary assignment.

6      Q.   And then there's another note in there,

7   "KS - 3/27/06."  Can you tell us what that means?

8      A.   That means that is the day that I actually

9   received the approved order from the staffing company --

10   I'm sorry, from the Northeast Utilities managers.

11      Q.   You received the order back in March of '06, and

12   it didn't get filled until --

13      A.   That's a typo.  It should have been March 27,

14   '07.

15      Q.   And the position which you were trying to fill

16   was a temporary position; is that correct?

17      A.   Yes.

18      Q.   And how long was it -- was the employment going

19   to be for?

20      A.   The start date was April 2, 2007 to the end date,

21   March 15, 2008.

22      Q.   And is there any provision or extended beyond the

23   end date?

24      A.   There's a 50-week tenure policy, which means

────────────────── BEECHER & HORVATH ──────────────────

25

1 after the 50 weeks the contractor needs to take a

2 100-day break in service before returning to Northeast

3 Utilities.   There are exceptions if the contractor is

4 earning over a certain amount of money they can be --

5 and that's a $40 pay rate, they can be considered for a

6 6-month -- two 6-month extensions.

7    Q.   But this position was not high enough to be

8 considered for an extension; is that correct?

9    A.   Correct.

10    Q.   So that the maximum employment would have been

11 through March 15, 2008?

12    A.   Yes.   The hiring managers are always at choice to

13 make that -- to make an extension request.   They

14 generally are frowned upon if they are not a

15 professional, technical position, and it has to go

16 through a process to be approved.

17    Q.   When you say it's generally frowned upon, are

18 they ever approved?

19    A.   On occasion.

20    Q.   For people under the $40 an hour classification?

21    A.   Yes.

22    Q.   Are temporary employees ever converted to

23 permanent employees at Northeast?

24    A.   On occasion.

1      Q.   Does that occur below the $40 level?

2      A.   It can, yes.  It's rare.  By and large, they're

3   contract employees, but it does happen.

4      Q.   And I think you said then once they reach the

5   maximum employment date, assuming there's no extension

6   of any kind or any hiring as a permanent employee, how

7   long do they have to be out of Northeast?

8      A.   100 consecutive days.

9      Q.   Is that out of Northeast at any position or just

10  the position they were in?

11     A.   Any position.

12     Q.   Looking again at Defendants' Exhibit 1, would

13  that refresh your recollection as to who you dealt with

14  at Northeast?

15     A.   Yes, Pat Angelo-Park.

16     Q.   Now, going back again to Defendants' Exhibit 2,

17  after you received this e-mail you would have advised

18  who that the employee could not be hired?

19     A.   Are you looking for a name?

20     Q.   Yes, if you have it.

21     A.   Pat Angelo-Park.

22     Q.   Did she have any input at that point as to

23  whether the employee could or could not be hired,

24  notwithstanding the failure of the background check?

27

1      A.   I'm sorry?

2      Q.   Did she have the ability to override the fact

3   that there was a background check failure?

4      A.   No.

5      Q.   Was there any discussion between you and Pat

6   Angelo-Park as to whether or not there would be any time

7   to see whether the background check was correct?

8      A.   No.

9      Q.   Why not?

10     A.   We deal in facts, and if a background or a drug

11  screen result is -- does not clear, it's an automatic.

12     Q.   Did you have any discussion with Mr. Sullivan as

13  to the fact that Miss Adams was disputing the background

14  check?

15     A.   After -- yes.

16     Q.   And when did that occur?

17     A.   After I received his second e-mail on May 8, 2007

18  at 6:21 p.m.

19          MR. KUPINSE:   Mark that as Defendants' 3.

20          (Whereupon, the E-mail referred to was

21     marked as Defendants' Exhibit Number 3 for

22     Identification by the court reporter.)

23     Q.   And looking at Defendants' Exhibit 3, is that the

24  first time that you learned that Miss Adams might be

BEECHER & HORVATH

28

1    disputing the background check?

2        A.   Yes.

3        Q.   What action did you take after you received this

4    e-mail, Defendants' Exhibit 3?

5        A.   What action with regard to?

6        Q.   With regard to the hiring of Miss Adams.  Did you

7    do anything further?

8        A.   Discussed it with Chris Sullivan.

9        Q.   What was the nature of that discussion?

10       A.   What I remember asking is if this had been an

11   issue, he told me this has been an issue on previous

12   occasions, why it was not brought to his attention

13   sooner, and then until the final results of the second

14   background screening were in, there was no more

15   discussion.

16       Q.   Did Mr. Sullivan tell you anything about whether

17   it had or had not been brought to his attention?

18       A.   It had not been brought to his attention.

19       Q.   Now, at this point you knew that there was some

20   question on the part of Miss Adams as to the check.  Was

21   there any abilities at this point to delay the

22   termination of the contingent offer to her?

23       A.   Not until the results were in of the second

24   background screening.

29

1    Q.   Did you communicate that there was a dispute to

2    Northeast Utilities?

3    A.   No.

4    Q.   Why not?

5    A.   We deal in facts, we deliver the facts.

6    Q.   Given the fact that there was a disputed failed

7    background check, is there any ability to proceed with

8    the hiring on your part?

9    A.   No.

10   Q.   And why is that?

11   A.   We are under contract, both Northeast Utilities

12   and the staffing companies.  The contractors are only

13   allowed to start once the background screenings and the

14   drug screenings are cleared.

15   Q.   What happened next in this sequence of events, if

16   you remember?

17   A.   I received subsequent e-mails from Chris

18   Sullivan, one on May 8, 2007 at 6:25.

19          MR. KUPINSE:  Mark that as Defendants'

20   Exhibit 4.

21          (Whereupon, the E-mail referred to was

22      marked as Defendants' Exhibit Number 4 for

23      Identification by the court reporter.)

24   Q.   And you received Defendants' Exhibit 4 with all

BEECHER & HORVATH

-30

1    of the forwarded messages that are contained in it?

2        A.   Yes.

3        Q.   And did you take any action after you received

4    Defendants' Exhibit 4?

5        A.   No.

6        Q.   Did you still consider that there was a failed

7    background check and you had no authority to proceed?

8        A.   Yes.

9        Q.   I notice -- what happened next?

10       A.   Another e-mail was received on May 9, 2007 at

11   8:39 a.m.

12            MR. KUPINSE:   Mark that as Defendants'

13   Exhibit 5.

14            (Whereupon, the E-mail referred to was

15       marked as Defendants' Exhibit Number 5 for

16       Identification by the court reporter.)

17       Q.   After you received Defendants' Exhibit 5, did you

18   take any further action?

19       A.   No.

20       Q.   What happened after Defendants' Exhibit 5?

21       A.   I received another e-mail from Chris Sullivan on

22   May 11, 2007 at 2:04 p.m.

23            MR. KUPINSE:   Let's mark that as Defendants'

24   6.

31

1            (Whereupon, the E-mail referred to was

2      marked as Defendants' Exhibit Number 6 for

3      Identification by the court reporter.)

4      Q.   Looking at Defendants' Exhibit 6, there seems to

5   have been an attachment at the bottom; is that correct?

6      A.   Yes.

7      Q.   And was that attachment the Verifications report?

8      A.   Yes.

9      Q.   And is this the report that was the attachment?

10     A.   Yes.

11            MR. KUPINSE:   Let's mark that Defendants'

12   Exhibit 7.

13            (Whereupon, the Report referred to was

14      marked as Defendants' Exhibit Number 7 for

15      Identification by the court reporter.)

16            MR. MADSEN:   I want a clarification of what

17   is Defendants' Exhibit 7 because it says page 1 of 5 at

18   the top, and I don't know what that is.

19            MR. KUPINSE:   I'll ask.

20     Q.   Following up, with respect to Defendants' Exhibit

21   7, it does say page 1 of 5.  Are there more pages that I

22   don't have?

23     A.   Yes.

24     Q.   Do we have copies of those, by any chance?

— BEECHER & HORVATH —

32

1    A.  No.

2    Q.  Why not?

3    A.  I just have the bottom line results.

4    Q.  Okay.  So there were -- this has page 1 and page

5  2 and there were pages 3, 4, 5, but you did not retain

6  those?

7    A.  No.

8    Q.  If we wanted to see them, could they be retrieved

9  from your computer?

10    A.  Yes.

11    Q.  And can you tell us generally what was on the

12  pages that we don't have?

13    A.  I don't know.

14    Q.  Looking at the Defendants' Exhibit 7, which as

15  you say contains the bottom line information, was that

16  the first time you had actually seen the Verifications

17  report?

18    A.  Yes.

19    Q.  And having seen it did you take any further

20  action?

21    A.  Yes.

22    Q.  What did you do then?

23    A.  I sent an e-mail to Pat Angelo-Park on May 11,

24  2007 at 5:55 p.m.

—33

1     Q.  And is this that e-mail?

2     A.  Yes.

3             MR. KUPINSE:  Can we mark that as

4  Defendants' Exhibit 8.

5            (Whereupon, the E-mail referred to was

6     marked as Defendants' Exhibit Number 8 for

7     Identification by the court reporter.)

8     Q.  On Defendants' Exhibit 8 when you sent that to

9  Northeast Utilities, do you know whether or not the

10  position was still open?

11     A.  Yes.

12     Q.  Was it open?

13     A.  It was open.

14     Q.  It was open.  And did this result in any action

15  with respect to the hiring of Deborah Adams?

16     A.  No, the hiring manager had started to pursue

17  other avenues.

18     Q.  Did you at any time have a discussion with the

19  hiring manager that the hiring manager should pursue

20  other options?

21     A.  No.

22     Q.  Was that done on the decision of the hiring

23  manager?

24     A.  It was done on the background check failure, and

34

1    when that happens then you go on to the next option.

2       Q.   Before you sent Defendants' Exhibit 8, did you

3    have any discussion with anybody over at Northeast that

4    the background check had been cleared?

5       A.   No, because I found out on the 11th at 5:55.

6       Q.   Do you know whether or not -- you said the

7    position was -- withdrawn.

8            You said the position was still open when you

9    sent this e-mail?

10      A.   Yes.

11      Q.   Do you know when the position was filled?

12      A.   The order was canceled -- I have the cancellation

13   date.  I don't remember the exact date.  I don't

14   remember the exact date, and I don't see it here.

15      Q.   Do you remember whether it was before or after

16   you sent the e-mail?

17      A.   Which e-mail?

18      Q.   This, Defendants' Exhibit 8.

19      A.   The order was canceled after.

20      Q.   How do you learn when an order is canceled?

21      A.   The hiring manager will contact me and tell me

22   they've made other arrangements.

23      Q.   Would they contact you by e-mail or by phone?

24      A.   Phone.

BEECHER & HORVATH

35

1    Q.   And do you recall whether or not that happened in

2  this case?

3    A.   Yes.

4    Q.   And did it happen?

5    A.   Yes.

6    Q.   And you don't recall, however, when it happened?

7    A.   I don't have an actual date, no.  However, I

8  received an e-mail from Chris Sullivan on May 15, 2007

9  at 9:34 a.m., so it was after that date that a decision

10  was made based on his question in the e-mail.

11            MR. KUPINSE:   Let's mark that Defendants'

12  Exhibit 9, the e-mail from Chris Sullivan of May 15th at

13  9:34 a.m.

14            (Whereupon, the E-mail referred to was

15     marked as Defendants' Exhibit Number 9 for

16     Identification by the court reporter.)

17    Q.   Referring to Defendants' Exhibit 9, Mr. Sullivan

18  inquires of you as to whether there was any decision on

19  Miss Adams.  Do you know whether or not on that date

20  there had been any decision on Miss Adams?

21    A.   There had not been a decision or he would have

22  known about it.

23    Q.   As of May 15th at the time that a decision had

24  not been made, was there any possibility that she might

───────── BEECHER & HORVATH ─────────

36

1    still be hired?

2        A.   I know that the hiring manager was pursuing

3    bringing in an intern, and that's really all the

4    information that I had.

5        Q.   Have you ever run into this situation before

6    where a background check came in failed and then later

7    on was corrected?

8        A.   No.

9        Q.   Was this the first time this occurred, to your

10   knowledge?

11       A.   Yes.  To me, for me.

12       Q.   After Mr. Sullivan's e-mail, which is Defendants'

13   Exhibit 9, do you have any idea as to how long after

14   that the position was filled or canceled?

15       A.   I don't remember the exact date, but the process

16   would lend itself for another week or two, probably.

17       Q.   Do you know whether the offer -- the position was

18   canceled or whether it was filled?

19       A.   I remember that, or to the best of my

20   recollection it was filled with an intern.

21       Q.   Would an intern have also been a temporary

22   contract employee?

23       A.   Not through Guidant Group, no.

24       Q.   Would that have been a direct hire by Northeast

37

1    Utilities?

2        A.   Yes.

3        Q.   And Guidant Group would not have been involved in

4    that?

5        A.   No.

6        Q.   And the staffing agencies would not have been

7    involved in that?

8        A.   No.

9            MR. KUPINSE:   You've given me some other

10   e-mails.  There's one from Chris Sullivan dated May 11th

11   at 3:20 p.m., and can we mark that Defendants' Exhibit

12   10.

13           (Whereupon, the E-mail referred to was

14       marked as Defendants' Exhibit Number 10 for

15       Identification by the court reporter.)

16       Q.   After you received what's been marked as

17   Defendants' Exhibit 10, did you take any particular

18   action with respect to that e-mail?

19       A.   I e-mailed the hiring manager on the 11th at

20   5:55.  That was the direct action.

21           MR. KUPINSE:   And you've given me an e-mail

22   from Chris Sullivan dated May 14 at 10:30 a.m.  We'll

23   mark that as Exhibit 11.

24           MS. SALAFIA:   Can the record reflect that

38

1   Guidant has redacted the names to the attachment of

2   personal information of other possible candidates.

3                MR. KUPINSE:   I noticed that.   Thank you.

4                (Whereupon, the E-mail referred to was

5        marked as Defendants' Exhibit Number 11 for

6        Identification by the court reporter.)

7     Q.   And did you take any action with respect to

8   Defendants' Exhibit 11?

9     A.   I e-mailed the manager on the 11th at 5:55 p.m.,

10  Exhibit 8.

11    .Q.   And, again, there appears to be an attachment to

12  that e-mail.  Do you know what was attached to it?

13    A.   Exhibit 11?

14    Q.   Yes.

15    A.   That would be the attached information

16  underneath.

17                MS. SALAFIA:   It's double-sided.

18    Q.   Showing you a document which has at the top of

19  it, order No. 2630505, would that have been the

20  attachment?

21    A.   Yes.

22                MR. KUPINSE:   Let's mark that Defendants'

23  Exhibit 12.

24                (Whereupon, the Attachment referred to

————— BEECHER & HORVATH —————

39

1      was marked as Defendants' Exhibit Number 12 for

2      Identification by the court reporter.)

3          Q.   And with respect to Defendants' Exhibit 12,

4      again, there's pages 1 of 4 but we only have two.  Is

5      that because you only retained that much?

6          A.   Yes.

7          Q.   And showing you another document, which has up at

8      the top, "Verifications, Inc.," was that an attachment

9      also?

10         A.   To Exhibit 11?  Yes.

11               MR. KUPINSE:   Let's mark that 13.

12               (Whereupon, the Verifications Document

13      referred to was marked as Defendants' Exhibit

14      Number 13 for Identification by the court

15      reporter.)

16         Q.   Now, after you sent Defendants' Exhibit 11, which

17      had attachments Defendants' Exhibit 12 and Defendants'

18      Exhibit 13, to Northeast Utilities, did anything further

19      occur with respect to the hiring of Deborah Adams?

20         A.   I did not share the Verifications information

21      with Northeast Utilities.  It's confidential.

22         Q.   So you just sent the e-mail?

23         A.   That's correct.

24         Q.   Having sent the e-mail, which has been marked

BEECHER & HORVATH

-40

1    Defendants' Exhibit 11, did you hear anything further

2    from Northeast Utilities with respect to the hiring of

3    Deborah Adams?

4        A.   After I --

5        Q.   After you sent that Defendants' Exhibit 11.

6        A.   I did not send this document, Exhibit 11, to

7    Northeast Utilities.

8        Q.   I misunderstood you then.   After you received it,

9    did you do anything further?

10       A.   No.

11       Q.   And you produced another document, which is a

12   resume of Deborah Adams?

13       A.   Yes.

14              MR. KUPINSE:   Let's mark that as Defendants'

15   Exhibit 14.

16              (Whereupon, the Resume referred to was

17       marked as Defendants' Exhibit Number 14 for

18       Identification by the court reporter.)

19       Q.   How did you get Defendants' Exhibit 14?

20       A.   It was submitted to the order by National

21   Engineering.

22       Q.   Now, we've also been given a number of documents

23   which your attorney has advised us did not come from

24   your file but some of them you had knowledge of by

---
BEECHER & HORVATH

41

1    virtue of the fact that the e-mail was sent to you.

2    Looking at the second page, there's an e-mail from Chris

3    Sullivan, which we already marked as an exhibit to you,

4    and that's included in the other documentation; is that

5    correct?

6        A.   Which exhibit is that?

7        Q.   The exhibit number from the e-mail from Mr.

8    Sullivan is Exhibit 3?

9        A.   And what's the question?

10       Q.   The second page of the group that had been given

11   went to you, so that's an e-mail you received?

12       A.   I deleted that e-mail because it was out of my

13   hands at that juncture.  My manager, John Walicki,

14   handled it.  So I need to see it.  I don't have that.

15   Yes, I have that.

16            MS. SALAFIA:  My impression is that e-mail

17   was forwarded on to John Walicki.  That's the second

18   page that was an e-mail out of John --

19       Q.   When you say that at some point this was out of

20   your hands, your manager, John Walicki, took over.  Do

21   you know when that occurred?

22       A.   I don't remember the date.

23       Q.   Do you remember when in the process it occurred?

24   Did it occur after you had received information that the

BEECHER & HORVATH

42

1   background check had failed?

2       A.   I don't remember.

3       Q.   Do you remember why your manager became involved?

4       A.   I don't.  I don't remember.  I would assume Chris

5   Sullivan contacted him.

6       Q.   Do you recall any discussions you had with him

7   regarding the situation?

8            MS. SALAFIA:  Can you define him?

9       Q.   Mr. Walicki.

10      A.   I don't recall.

11      Q.   Did Mr. Walicki have any ability to override the

12  failed background check?

13      A.   No.

14      Q.   Now, without going through each and every

15  document, I'm going to hand you the documents which your

16  attorney has given to me which are responsive to the

17  subpoena but which did not come from your file, and you

18  have not seen these before.  Can you just take a quick

19  look at them and confirm that that's the case, that you

20  have not seen those documents before, except perhaps for

21  the one e-mail that I pulled out and showed to you.

22      A.   I was e-mailed on this.

23      Q.   And when you say you were e-mailed on this --

24           MR. KUPINSE:  Can we mark this Defendants'

43

1   Exhibit 15, and this is an e-mail to John Walicki dated

2   5, 23, 2007 at 8:38 p.m.?

3                   (Whereupon, the E-mail referred to was

4        marked as Defendants' Exhibit Number 15 for

5        Identification by the court reporter.)

6                   MR. KUPINSE:  We're adding a second page

7   that shows CC to Patricia Angelo-Park to Defendants'

8   Exhibit 15.

9   A.   I can clarify that the order was canceled

10  looking -- reviewing this document on May 21, 2007,

11  10:10 a.m.

12                  MS. SALAFIA:  When you say this document,

13  can you please clarify?

14  A.   The canceled order.  With the exception of the

15  resume, which I already have, I have not seen these

16  documents.

17                  MR. KUPINSE:  Okay.  Thank you.  And rather

18  than mark them individually, just mark this Defendants'

19  Exhibit 16 which is a package, and I won't bother

20  counting them, of a number of documents which Northeast

21  Utilities has produced in response to the subpoena.

22                  (Whereupon, the Packet referred to was

23       marked as Defendants' Exhibit Number 16 for

24       Identification by the court reporter.)

44

1    Q.   Now, referring you back to Defendants' Exhibit 15

2    on which you were copied, I note there's some discussion

3    that Miss Adams apparently tried to contact someone

4    directly; is that correct?

5    A.   Yes.

6    Q.   When a contract employee is considered for a

7    position at Northeast Utilities, does the contract

8    employee have any ability to talk directly to Northeast,

9    other than in the interview?

10   A.   No.

11   Q.   Does the prospective employee have any ability to

12   talk to Guidant?

13   A.   No.

14   Q.   Who is their sole contact?

15   A.   Staffing company.

16   Q.   And in this case staffing company for Miss Adams

17   would have been?

18   A.   National Engineering.

19   Q.   Did you learn at any point that Miss Adams had

20   commenced an action against National Engineering and

21   Verifications?

22   A.   When the federal marshal came to subpoena me.

23   Q.   That was your first knowledge of it?

24   A.   That was my first knowledge.  Chris Sullivan had

45

1  mentioned that she was threatening, but that's the only

2  conversation.  I had no idea until the marshal showed

3  up.

4     Q.   When you had contact with someone at National

5  Engineering, who was that person that you contacted?

6     A.   Christopher Sullivan.

7     Q.   Was there anyone else at National Engineering

8  that you dealt with?

9     A.   He's our main contact.

10    Q.   Does Guidant have any input into how background

11 checks are done?

12    A.   No.

13    Q.   Do you have any input into who the staffing

14 agency used?

15    A.   We can recommend, but they're free to use

16 whomever they choose.

17    Q.   So they can use any background check agency that

18 they want to?

19    A.   The criteria is a five panel drug screen and a

20 seven year national criminal background check.

21    Q.   And as long as they do that, it doesn't matter

22 who does it for them?

23    A.   Yes.

24    Q.   Do you recollect whether any recommendations were

BEECHER & HORVATH

46

1   made to National Engineering in this case?

2      A.   I don't recall.

3      Q.   I think you testified, just clarify for me, prior

4   to receiving Defendants' Exhibit 10, which is an e-mail

5   from Mr. Sullivan, did you have any knowledge that

6   Deborah Adams had failed her background check?

7      A.   I'm sorry?

8      Q.   Prior to receiving Defendants' Exhibit 10, did

9   you know or did you have any knowledge that Deborah

10   Adams failed her background check?

11      A.   Yes, that would have been via the e-mail that

12   Christopher Sullivan submitted to me on May 8, 2007 at

13   2:49 p.m.

14      Q.   And that would be --

15      A.   Exhibit 2.

16      Q.   Let me rephrase my question.   Thank you.   Prior

17   to receiving Defendants' Exhibit 2, did you have any

18   knowledge that Miss Adams had failed her background

19   check?

20      A.   No.

21      Q.   Did Chris Sullivan speak to you, if you remember,

22   before sending you Defendants' Exhibit 2 about the

23   failed background check?

24      A.   I don't recall, but I would say no.   That's my

────── BEECHER & HORVATH ──────

47

1    first recollection.

2        Q.   Is it accurate to say that Northeast Utilities

3    never advised Deborah Adams directly that she would not

4    be offered the job?

5        A.   Northeast Utilities --

6        Q.   Didn't have any contact with Deborah at all,

7    other than the interview?

8        A.   It was my understanding that she had contacted, I

9    believe it was Pat Angelo-Park.   I don't know if she

10   left a voice mail, I don't know if she had a

11   conversation with her, and there was no discussion, to

12   my knowledge, about -- NU cannot make those

13   recommendations.

14       Q.   Did Guidant have any direct contract with Miss

15   Adams telling her that she would not be offered the

16   position?

17       A.   I did not.

18       Q.   To the best of your knowledge, would that contact

19   have come through National Engineering?

20       A.   Yes.

21       Q.   Prior to receiving Defendants' Exhibit 2 or when

22   you received Defendants' Exhibit 2, did you have any

23   conversation with Chris Sullivan that you already knew

24   that the background check had failed?

———— BEECHER & HORVATH ————

                                                                48

1     A.   No, not that I recall.   No.

2     Q.   I think you said this is your only experience

3  with a failed background check; is that correct?

4     A.   Yes.   Not my only experience with a failed

5  background check, there have been certainly more than

6  one, but a discrepancy with a background screening that

7  has come back and it has been challenged.

8     Q.   Are there any procedures in place for handling a

9  failed background check that ultimately is cleared?

10              MR. MADSEN:   Objection.

11    Q.   You can answer.

12    A.   No.

13    Q.   Did you ever tell Chris Sullivan that the

14  position had been canceled?

15    A.   I don't recall the date or the time, but he would

16  have been advised.   It's protocol to contact the agency

17  with an outcome.

18    Q.   Did you ever tell him that the position had been

19  offered to an intern?

20    A.   I don't remember.

21    Q.   Did you ever speak with Melissa Sorenson at

22  Verifications?

23    A.   Not to my knowledge.   I don't remember.

24    Q.   To your knowledge, did you speak with anyone at

49

1  Verifications concerning Miss Adams?

2     A.   I don't remember speaking to anyone at

3  Verifications.

4     Q.   To your knowledge, do you remember e-mailing

5  anyone at Verifications?

6     A.   I don't remember e-mailing anyone at

7  Verifications.

8     Q.   And to the best of your knowledge did anyone at

9  Verifications e-mail you?

10    A.   I don't remember.   These are the documents that I

11  saved.

12    Q.   Not only with respect to this particular

13  situation involving Miss Adams, but with regard to other

14  situations do you have any occasion to speak to people

15  at Verifications?

16    A.   No.

17    Q.   To e-mail them?

18    A.   No.

19    Q.   Is all of your contact with Verifications through

20  National Engineering?

21    A.   Yes.

22         MR. KUPINSE:   I have no further questions.

23  Thank you very much.

24    A.   You're welcome.

BEECHER & HORVATH

-50

1          MR. MADSEN:  Cross-examination.

2   BY MR. MADSEN:

3      Q.  My name is Will Madsen.  I represent the

4   Plaintiff, Deborah Adams, in this case.  I'd like to

5   follow-up with a few questions.  You understand that

6   you're still under oath?

7      A.  Yes.

8      Q.  And when did Comensura become known as Guidant

9   Group?

10     A.  I don't honestly remember the date.

11     Q.  But it was sometime after the events that have

12  been the subject matter of your deposition regarding

13  Deborah Adams; isn't that correct?

14     A.  I don't remember.

15     Q.  I believe you testified that Guidant Group has a

16  relationship with Northeast Utilities in which it has a

17  contract to oversee the hiring of its contingent work

18  force; is that correct?

19     A.  Yes.

20     Q.  Is that relationship, to your knowledge,

21  memorialized in a contract between Northeast Utilities

22  and Guidant Group?

23     A.  Yes.

24     Q.  Are you aware generally of the terms of that

BEECHER & HORVATH

51

1   contract?

2      A.   I've seen it, but are you talking about something

3   in particular?

4      Q.   No.   Right now it's a very general question as to

5   whether or not you're aware of the terms of the

6   contractual relationship between Guidant Group and

7   Northeast Utilities with respect to overseeing the

8   contingent, the hiring for the contingent work?

9      A.   We have access to that.

10     Q.   Under that contract, are you aware of whether

11  Guidant Group has any obligations to perform background

12  checks or background investigations regarding candidates

13  who are provided to Northeast Utilities as part of its

14  contingent work force?

15     A.   So if you abbreviate that question, do I have any

16  knowledge that we --

17     Q.   Do you know whether Guidant Group has obligations

18  to conduct background checks on candidates that it

19  forwards to Northeast Utilities for consideration?

20     A.   We have obligations to make certain that that

21  process is followed through.

22     Q.   And in your case Guidant Group does not actually

23  perform or does not -- Guidant Group does not contract

24  with background check agencies to conduct background

—— BEECHER & HORVATH ——

52

1    checks on candidates that are forwarded to Northeast

2    Utilities for consideration?

3        A.   We do not process background and drug screening.

4        Q.   So you effectively subcontract that obligation to

5    the staffing agencies?

6        A.   It is the obligation of the staffing company.

7        Q.   Is that obligation set forth in a written

8    contract between, for instance, Guidant Group and

9    National Engineering?

10       A.   It is my understanding, yes.

11       Q.   Have you actually seen that contract?

12       A.   I don't remember.  I may have.  I don't honestly

13   remember.

14       Q.   But your understanding that the obligation to

15   conduct background checks is an obligation that does

16   exist on behalf of Guidant Group with respect to it's

17   relationship with Northeast Utilities, but that

18   obligation is something that you pass on to the staffing

19   agencies; is that correct?

20       A.   Yes.

21       Q.   And if you look at Defendants' Exhibit 1 for

22   identification, which is a printout of the order, there

23   is a notation, which I believe you put in on April 25th,

24   which says, "offer of temporary employment has been

BEECHER & HORVATH

53

1   extended and contingent on background check results."

2   Do you see that?

3       A.   Yes.

4       Q.   Is that a notation that you entered into this

5   document?

6       A.   Yes.

7       Q.   You entered it electronically?

8       A.   Yes.

9       Q.   Does that offer of temporary employment refer to

10  the offer that was provided to Deborah Adams?

11      A.   Yes.

12      Q.   And the offer of employment was contingent, it

13  says, on background check results.  Was there also a

14  contingency based on a drug test?

15      A.   Yes, background is a generic term.

16      Q.   So what is encompassed by that generic term?

17      A.   Background and drug screening results.

18      Q.   So there were two tests or two checks that had to

19  be conducted with respect to Deborah Adams before the

20  offer of employment could become actualized; is that

21  correct?

22      A.   Yes.

23      Q.   Are you aware of whether Deborah Adams did submit

24  to a drug test?

-54

1    A.   Based on Exhibit 7 I was aware.

2    Q.   Okay.  And what were the results of that drug

3    test?

4    A.   Completed.  She passed.  Cleared.

5    Q.   So at least one of the background checks, the

6    generic term that you used which encompassed both drug

7    and background checks for criminal background, at least

8    one of the tests she had passed; correct?

9    A.   Yes.

10   Q.   The one she didn't pass is the criminal

11   background check; correct?

12   A.   Correct.

13   Q.   That background check, to your knowledge, was

14   done by Verifications?

15   A.   Yes.

16   Q.   If it turned out, based on the best of your

17   knowledge, that the initial positive for a criminal

18   background check turned out to be an erroneous result;

19   is that correct?

20   A.   Yes.

21   Q.   Based on your understanding of the sequence of

22   events and the contingent of that had been provided to

23   Deborah Adams with respect to this particular position

24   at Northeast Utilities, had an accurate criminal

— BEECHER & HORVATH —

-55

1    background check come through, Deborah Adams, in fact,

2    would have started that position at Northeast Utilities;

3    is that correct?

4              MR. KUPINSE:   Objection.   You may answer.

5       A.   The process is once a candidate has passed the

6    screening, background, drug screening, checks have been

7    cleared, they are then eligible to work at Northeast

8    Utilities.

9       Q.   You have no information that that would have been

10   otherwise in this particular case had Deborah Adams

11   passed the criminal background check?

12      A.   Yes, I had no information.

13      Q.   So, to the best of your knowledge, had an

14   accurate background check been conducted she, in fact,

15   would have started her position at Northeast Utilities?

16             MR. KUPINSE:   Objection.   Again, but you can

17   answer.

18      A.   Yes.

19             MR. MADSEN:   I have no further questions.

20                      CROSS-EXAMINATION

21   BY MR. GIZZO:

22      Q.   My name is Alexander Gizzo.   I represent

23   Verifications.   I have a couple of questions for you.

24   You stated earlier that this position Miss Adams was

56

1    applying for had a start date of April 2, 2007; is that

2    correct?

3        A.   That is when the order was slated to start.

4        Q.   And if the order was slated to start on that

5    date, what was the actual date they were looking to have

6    it filled by?

7        A.   They're always hopeful it will be --

8        Q.   As soon as possible?

9        A.   On that date.

10       Q.   Did you have any candidates prior to that date

11   that were available to fill that position on that date?

12       A.   The order was submitted on the 27th of March

13   2006, and that's when it goes to all the staffing

14   companies who then submit recommendations to the order.

15       Q.   Do any of these documents contain any information

16   regarding other candidates, besides Miss Adams, that

17   were eligible for that position?

18       A.   I'd like to refer to Exhibit 8 where the hiring

19   manager was looking -- had requested a resume.

20       Q.   Is that the subject of the e-mail that says,

21   "need C. Petrocelli resume"?

22       A.   Yes.

23       Q.   It was indicating he was looking for another

24   person?

-57

1    A.   Yes.

2    Q.   After learning that this position was filled by

3    an intern, did you try to place Miss Adams in another

4    position with a different company?

5    A.   Guidant Group is a contract management company.

6    We oversee the contingent hiring for corporations.   We

7    are not an agency.   We do not place candidates, we do

8    not interview, we have no contact with candidates.

9    National Engineering would have placed Deborah.   That

10   was their candidate.

11              MR. GRIZZO:   Can we mark this packet of

12   papers as Defendants' 16, and within it is an e-mail

13   dated July 23, 2008 that's addressed to you from Mr.

14   Sullivan and Mr. Walicki.

15   A.   I deleted that.   At the time that I received it I

16   was not handling.

17   Q.   Are you familiar with this e-mail that I'm

18   referencing?

19   A.   May I see it?

20   Q.   Sure.

21              MR. MADSEN:   I think we should probably have

22   it marked as an exhibit if you're asking questions.

23              (Whereupon, the E-mail referred to was

24      marked as Defendants' Exhibit Number 17 for

BEECHER & HORVATH

58

1      Identification by the court reporter.)

2      Q.   Do you recall receiving this e-mail?

3      A.   I don't.

4      Q.   The e-mail indicates that it has been replied to.

5  Do you recall replying to this e-mail?

6      A.   I did not.

7      Q.   You did not reply?

8      A.   No.

9      Q.   I'd like to take a look back again at Defendants'

10 Exhibit 3 and Defendants' No. 2.   I believe you stated

11 earlier on Defendants' 2 on May 8, 2007 at 3:49 p.m. was

12 the first time you were told -- again, if I can ask you

13 when was the first time you were told about the

14 information on the background check?

15     A.   To the best of my recollection, this is the

16 first.

17     Q.   What's been marked Defendants' 2?

18     A.   Exhibit 2 is my first.

19     Q.   And then after that who would have been the

20 person that would have reported that information to the

21 hiring manager at Northeast Utilities?

22     A.   I would be.

23     Q.   Do you recall when you did that?

24     A.   I don't remember the exact date or time.

59

1    Q.   Would it have been -- do you think it would have

2  been before or after the e-mail that's marked

3  Defendants' 3, which is that same date but at 6:21 p.m.?

4    A.   It would have been after I received the e-mail on

5  May 8, 2007 at 3:49.  It would have been after that.

6    Q.   Do you know if you did that before receiving the

7  e-mail at 6:21?

8    A.   I don't remember.  I would say yes.

9    Q.   And how would you have communicated that?

10  Through telephone, e-mail?

11    A.   Phone.

12    Q.   Would you have any records indicating that you

13  made that call?

14    A.   No.

15          MR. GRIZZO:  I don't have anything further.

16          MR. MADSEN:  No further questions from me.

17          MR. KUPINSE:  No further questions.

18          I think Miss Shapleigh would like to clarify

19  or expand upon her answer regarding e-mails, and would

20  you just state for the record what you just stated.

21          THE WITNESS:  That I would have contacted

22  the hiring manager before Exhibit 3.

23          MR. GIZZO:  What are you using to recall

24  your recollection that you made that call before 6:21

——— BEECHER & HORVATH ———

60

1    p.m.?

2              THE WITNESS:   Protocol is we take care of

3    business immediately.

4              MR. GIZZO:   Okay.   Thank you.

5              (Whereupon, the deposition concluded at

6    12:12 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

——— BEECHER & HORVATH ———

61

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| KATHY SHAPLEIGH | 4 | 50 | | |
| | | 55 | | |

## EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Guidant Powered by Staff Enabler | 14 |
| 2 | E-mail | 19 |
| 3 | E-mail | 27 |
| 4 | E-mail | 29 |
| 5 | E-mail | 30 |
| 6 | E-mail | 31 |
| 7 | Report | 31 |
| 8 | E-mail | 33 |
| 9 | E-mail | 33 |
| 10 | E-mail | 35 |
| 11 | E-mail | 37 |
| 12 | Attachment | 38 |
| 13 | Verifications Document | 39 |
| 14 | Resme | 40 |
| 15 | E-mail | 43 |
| 16 | Packet | 43 |
| 17 | E-mail | 57 |

BEECHER & HORVATH

62

STATE OF CONNECTICUT    :

                    S.S. Wallingford

COUNTY OF NEW HAVEN    :

        I, Debra A. Chasse, a Notary Public for the State

of Connecticut, do hereby certify that the deposition

of, KATHY SHAPLEIGH, a witness, was taken before me

pursuant to Section 242, et seq., of the Connecticut

Practice Book, at The Law Offices of Shipman & Goodwin,

One Constitution Plaza, Hartford, CT, commencing at

10:33 a.m., on Wednesday, September 17, 2008.

        I further certify that the witness was first

sworn by me to tell the truth, the whole truth, and

nothing but the truth, and was examined by counsel, and

her testimony stenographically reported by me and

subsequently transcribed as herebefore appears.

        I further certify that I am not related to the

parties hereto or their counsel, and that I am not in

any way interested in the event of said cause.

        Dated at New Haven, Connecticut, this 11th day of

October, 2008.

                                    Notary Public

My Commission Expires:   June 30, 2011
License No. 00055

BEECHER & HORVATH