# **EXHIBIT E**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DEBORAH ADAMS,                          :       CIVIL ACTION NO.

        Plaintiff                       3:07CV01035

vs.                                     :

NATIONAL ENGINEERING SERVICE            :

CORPORATION and VERIFICATIONS, INC.

        Defendants                      :       SEPTEMBER 26, 2008


DEPOSITION OF:   DEBORAH ADAMS


APPEARANCES:

    MADSEN, PRESTLEY & PARENTEAU, LLC
        Attorneys for the Plaintiff
        44 Capitol Avenue - Suite 201
        Hartford, CT 06106
    BY:   WILLIAM MADSEN, ESQ.


    WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
        Attorneys for the Defendant Verifications, Inc.
        3 Gannett Drive
        White Plains, NY 10604
    BY:   MICHAEL W. COFFEY, ESQ.


    GOLDSTEIN & PECK, P.C.
        Attorney for the Defendant National Engineering
        1087 Broad Street
        Bridgeport, CT 06604
    BY:   ANDREW M. McPHERSON, ESQ.


Christine E. Borrelli

Connecticut License No. 117

Registered Merit Reporter


NIZIANKIEWICZ & MILLER REPORTING SERVICES

Page 2

1  ......Deposition of DEBORAH ADAMS, a Plaintiff, taken
2  on behalf of the Defendant, in the herein before entitled
3  action, pursuant to the Federal Rules of Civil Procedure,
4  before Christine E. Borrelli, duly qualified Notary Public
5  in and for the State of Connecticut, held at the Law Offices
6  of Madsen, Prestley & Parenteau, LLC, 44 Capitol Avenue,
7  Hartford Connecticut, commencing at 10:15 a.m. on Friday,
8  September 26, 2008.
9
10        S T I P U L A T I O N S
11
12        It is hereby stipulated and agreed by and among counsel
13  for the respective parties that all formalities in
14  connection with the taking of this deposition, including
15  time, place, sufficiency of notice, and the authority of the
16  officer before whom it is being taken may be and are hereby
17  waived.
18        It is further stipulated and agreed that objections
19  other than as to form are reserved to the time of trial.
20        It is further stipulated and agreed that the reading
21  and signing of the deposition transcript by the deponent is
22  hereby not waived.
23        It is further stipulated and agreed that the proof of
24  the qualifications of the Notary Public before whom the
25  deposition is being taken is hereby waived.

Page 3

1              I N D E X
2  WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
3  Deborah Adams
4  By Mr. Coffey              4
   By Mr. McPherson          112
5
6  EXHIBIT                              PAGE:
7  Defendant's Exhibit 1, E-mail, 4/13/07 .............. 121
8  Defendant's Exhibit 2, Packet of Documents .......... 125
9  Defendant's Exhibit 3, Drug Test Release Form ....... 137
10  Defendant's Exhibit 4, Authorization ................ 139
11  Defendant's Exhibit 5, Temporary Work Agreement ...... 142
12  Defendant's Exhibit 6, Fax Document, 5/8/07 ......... 148
13  Defendant's Exhibit 7, Letter with attachments ...... 154
14  Defendant's Exhibit 8, Three-Page Document .......... 159
15  Defendant's Exhibit 9, Background/Investigation Report 161
16  Defendant's Exhibit 10, E-mails, Four Pages ......... 163
17  Defendant's Exhibit 11, Notice with attachments ...... 165
18  Defendant's Exhibit 12, Resume ...................... 171
19  Defendant's Exhibit 13, Complaint Form .............. 176
20  Defendant's Exhibit 14, Letter, 5/9/07 .............. 177
21  Defendant's Exhibit 15, Consumer Statement .......... 178
22  Defendant's Exhibit 16, Letter, 5/14 ................ 179
23  Defendant's Exhibit 17, Letter, 5/11 ................ 186
24  Defendant's Exhibit 18, Packet of Documents ......... 186
25  Defendant's Exhibit 19, Document .................... 189

Page 4

1        DEBORAH ADAMS, called as a witness by the
2  Defendant, having first been duly sworn by the Notary, was
3  examined and testified on her oath as follows:
4
5        DIRECT EXAMINATION BY MR. COFFEY:
6
7        Q.  I'm going to ask you some questions.  My name is
8  Mike Coffey.  I represent Verifications in this matter.  If
9  you don't understand what I'm saying, please tell me.  If
10  you need to take a break, tell me.  If you need to speak
11  with your attorney, please tell me.  Okay?
12        A.  Okay.
13        Q.  What is your name?
14        A.  Deborah Adams.
15        Q.  And your date of birth?
16        A.  7/29/59.
17        Q.  As we sit here today, are you currently on any
18  prescription medications?
19        A.  I'm not.
20        Q.  Are you currently employed?
21        A.  I am as a contractor, temporary employee, for The
22  Hartford through Kelly Law Registry.  That's the badge
23  you're looking at.  I have to go in after, so that's why I
24  just keep the badge with me at all times so I don't forget
25  it, and then I can't get in the building.

Page 5

1        Q.  So what type of position do you have with The
2  Hartford.
3        A.  My title is paralegal.  I'm with the corporate --
4  I'm in the Corporate Law Office or Law Department, I think
5  they have referred to it as.
6        Q.  How long have you been there?
7        A.  I've been there -- started in July, yeah, between
8  June and July because there was a delay in start.  That's
9  why I'm like -- the start date was pushed back a little bit.
10  So --
11        Q.  And that's --
12        A.  -- I've been there what that's like three months.
13        Q.  And that's June or July of '08?
14        A.  Oh, sorry.  Of this year.
15        Q.  No.  I just --
16        A.  Sorry about that.
17        Q.  And one of the other things, you and I would be
18  able to have a conversation.  I understand and recognize --
19        A.  I understand.
20        Q.  -- if you nod.  I can read, sort of, body
21  language --
22        A.  I'll be verbal.
23        Q.  Yeah, be verbal, because the court reporter can't
24  take down any of those intimations.
25        A.  I understand.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 6

1  Q. And what experience do you have as a paralegal?
2  Do you have training? A certificate?
3  A. I have a certificate. I also have work
4  experience.
5  Q. And when did you get your paralegal certificate?
6  A. From -- well, you didn't ask me from where.
7  Q. From where. Okay. We'll go through that. From
8  where and when?
9  A. St. Joseph's College in West Hartford,
10  Connecticut, in -- around October '07, fall of -- or excuse
11  me, March of '07.
12  Q. March, '07. Okay.
13  A. And the dates, they're not sounding right as I'm
14  giving them to you. It's like (witness making noise), but
15  it was within the last year or so. Twelve months or so,
16  something like that. But I can give you the exact dates if
17  you have -- I have it on my certificate when it was.
18  Q. I don't need that.
19  A. Okay. I don't want to miscommunicate any dates or
20  anything like that.
21  Q. No, no. I'm not trying to get that. Tell us a
22  little bit about your educational background.
23  A. I have an Associate's in Office Management, and
24  then I just, you know, told you about the paralegal
25  certificate. I'm taking like a sabbatical now, but I'm

Page 7

1  studying for my psychology degree at St. Joseph's College in
2  West Hartford as well, but that's been like on and off. So
3  right now I'm off.
4  Q. So you have your AA in office management; where
5  did you get that from?
6  A. I got that from Berkshire Community College.
7  Q. And where is that?
8  A. And that's located in Pittsfield, Massachusetts.
9  Q. What year would that have been about?
10  A. That I remember, 1993. It was like January, 1993.
11  Q. And now you said that you -- so you went and you
12  got the paralegal certificate. Is that different from
13  credits towards your psych. degree?
14  A. Yeah. It's a separate program, so I can't
15  transfer any of the credits from the certificate to the
16  psych. degree. I did that as, you know, like a marketing
17  tool because I had been working in law and I've been looking
18  for work. So, you know, I just thought that it would be
19  good to have, in addition to my experience, my work
20  experience, to have that certificate because a lot of places
21  they want to see the formal training in addition to -- yeah,
22  you work here, here, here. So that's why I did that.
23  Q. Now, towards your psych. degree, how many credits
24  approximately do you have towards your Bachelor's?
25  A. I'm not certain. I can tell you in terms of like

Page 8

1  semesters. I'm even not familiar with how many credits, but
2  I can get the information for you.
3  Q. How long have you been -- when is the last
4  semester that you have taken class work at St. Joe's towards
5  the psych. degree?
6  A. It was a little -- when I started the paralegal
7  certificate, that was like in the spring of -- the last
8  class that I took, a psychology class at St. Joseph's, I'm
9  going to say was in 2006.
10  Q. Okay.
11  A. And I can get you the exact date and all that, if
12  needed.
13  Q. Now, do you have any children?
14  A. Yes. I have a son.
15  Q. And what is your son's name?
16  A. Trevor Adams.
17  Q. What is his date of birth?
18  A. 6/4/90.
19  Q. Where do you currently reside?
20  A. Well, I stay at the Motel 6 in Windsor Locks,
21  Connecticut. I have been staying there since I took this
22  job with The Hartford. And what I do is I stay there during
23  the week, and sometimes I go home like for the weekend. But
24  a lot of times I'll stay like throughout the whole week.
25  You know what I mean? So it really depends on my schedule

Page 9

1  at work. So if I miss a day, I'll try to make that time up.
2  Q. Okay.
3  A. So that means I have to stay -- you know, I'll
4  stay longer here. And then by the end of that time period,
5  I'm tired and I don't feel like going back up there, but I
6  might shoot back because I only bring enough clothes to last
7  a week.
8  Q. When you say "home," what is home? When you have
9  referred to home, what address is that? Where is that where
10  you shoot back up, you were saying?
11  A. Oh, where do I go to?
12  Q. Yeah.
13  A. Because if you're asking me where I feel my home
14  is, I don't feel I have a home.
15  Q. Right, but --
16  A. But where I go to get my clothes and --
17  Q. Yes.
18  A. -- things like that, I go to my relative's house,
19  actually, my mom's house, and that's in the Berkshires;
20  Pittsfield, Massachusetts. I go there.
21  Q. And what is her address?
22  A. Her address is 20 Curtis Terrace.
23  Q. And what is your mom's name?
24  A. Magdalene Adams.
25  Q. M-A-G-D-A-L-E-N-E?

3 (Pages 6 to 9)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 10

1      A.  M-A-G-D-A-L-E-N-E.  Is that what you said?
2      Q.  Yes.
3      A.  Okay.  I'm sorry.  Sometimes it's better for me to
4  just say it.
5      Q.  So you go up there typically on weekends or when
6  you have free time or --
7      A.  Pretty much.
8      Q.  Okay.
9      A.  There are times where I was stayed, like, the
10  entire week where I just like went and bought some, you
11  know, extra things to wear and change my tops over or
12  something like that; or I would just drive up there for the
13  day and just, you know, do the laundry, get some more
14  clothes and come back, that type of thing.  Sometimes I
15  spend the night.  Sometimes I just shoot, like, back.  It
16  depends.
17      Q.  Where does your son live?
18      A.  He's with my mom.
19      Q.  Is he currently going to school?
20      A.  Yes.
21      Q.  Where is he going to school?
22      A.  Pittsfield High School.
23      Q.  So what is he, a senior?
24      A.  Yes.
25      Q.  And how many years has he been going to Pittsfield

Page 11

1  High School?
2      A.  He left around the summer of 2007 when I got
3  evicted from my apartment; so he's been going -- he's been
4  there for two years; for junior and this year here.  So this
5  is his second year.
6      Q.  And where did you live before being at the --
7  when you say you were evicted, what was the address?
8      A.  That was at Newington Road, 160 Newington Road, in
9  West Hartford, Connecticut.
10      Q.  And what was that, an apartment, a house?
11      A.  Yes.  It was an apartment, yes.
12      Q.  And how long had you lived there?
13      A.  I had been there approximately several months.
14      Q.  And do you know when you were evicted from there,
15  approximately?
16      A.  I don't know the date, but I know the date that I
17  moved out, so the eviction probably would have been --
18      Q.  What date was that?
19      A.  -- around that time.  And I moved out September
20  1st.  So it was like the end of August, the beginning of
21  September.  I was out of there by September 1, 2007.
22      Q.  And when you say you lived there for a few months,
23  when do you think you moved in there, approximately?
24      A.  I moved in around January.  Yeah, it was like
25  after Christmas.  It was right around January.

Page 12

1      Q.  Where did you live before that, if you remember?
2      A.  No, I don't.  Hold on.  No.  I can get that for
3  you, though.
4      Q.  Okay.  How --
5      A.  It was an apartment, but now the name of it -- of
6  course, I can't think of the name of it, of the street.
7      Q.  And how long had you lived at that apartment?
8      A.  I had been at that apartment a few months when
9  they sold it.  They put it on the market.
10      Q.  And where did you live before that?
11      A.  Before that, I moved from and I had lived at 17
12  Foley Street.
13      Q.  And how long were you at 17 Foley Street?
14      A.  I was there for a couple of years.
15      Q.  And that was an apartment?
16      A.  Yep.
17      Q.  Where is that, in West Hartford?
18      A.  Oh, sorry.  All of my residences have been in West
19  Hartford, Connecticut.
20      Q.  West Hartford.  Okay.  And going how far back had
21  you been in West Hartford, Connecticut?
22      A.  When I moved -- well, when I first moved into the
23  state, I moved into West Hartford.  So when I first moved
24  into the state, 2000-ish, it was just before -- a little bit
25  before 9/11 when I had moved into the state.  I can give you

Page 13

1  the exact date, though.  So ever since then, I have been
2  living in West Hartford.
3      Q.  Do you have a car?
4      A.  Now currently, yes.
5      Q.  What kind of car do you have?
6      A.  It's a Ford Taurus.
7      Q.  What year?
8      A.  It's 2004.
9      Q.  And you own it?
10      A.  No.
11      Q.  Do you lease it?
12      A.  Well, when you say "own it," do you mean do I pay
13  payments?
14      Q.  Yes.  Do you make payments on it?
15      A.  Yeah.  I don't own it outright.  No, I don't.
16      Q.  And it's registered to you in Connecticut?
17      A.  It's mine, yes.
18      Q.  And when did you get that vehicle?
19      A.  2004.  I think I have had that car for like two
20  years.  So it's a 2004, but I didn't get it brand new.  It's
21  used.  I got it in like 2005 or something like that.
22      Q.  And now this current position you're at with
23  Kelly --
24      A.  Through Kelly Law Registry.
25      Q.  Yes.  You started there approximately June to July

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 14

1  of 2008?
2      A.  Right.
3      Q.  And how much are you making an hour now?
4      A.  It's $19 an hour.  That's the hourly rate.
5      Q.  And how long is this assignment for?
6      A.  Well, initially when I started the assignment,
7  they said it could go through -- they stated two things; six
8  months, it could last up until December.  It's a litigation
9  matter.  So, at this point, it's not going -- I don't
10 believe it would end before December, but it could last
11 longer.  It's just up in the air at this point.
12     Q.  And so is it an open-ended one, or it's not for a
13 term, then?  It just says it will be for a period of time?
14     A.  Well, how they communicated it -- I can just
15 communicate to you what they communicate to me --
16     Q.  Okay.
17     A.  -- and then a little sidebar communication that we
18 get from our supervisor.
19     Q.  Right.  Okay.
20     A.  From Kelly, initially, it was six months.  It was
21 a six-month assignment.  It will probably end on or about,
22 you know, December.  Now as we're getting into it, it's been
23 stated that it may be extended through January.
24     Q.  Okay.
25     A.  The bottom line is, it's going to end when all of

Page 15

1  the work is done, pretty much.  So depending on how fast we
2  get the work done, or if there's other things we have to do,
3  because it's a project, that's when it's going to end.  And
4  they can't really pinpoint it.  They just try to give you an
5  idea of, you know -- because they know you're looking for
6  other work, so they just try to give you an idea of when it
7  could probably end.
8      Q.  Now, are you currently -- for this lawsuit what's
9  relevant is are you currently seeing any psychiatric or
10 medical doctors as a result of the injuries you're claiming
11 in this lawsuit?
12     A.  Right today, no.  No, I'm not.
13     Q.  Are there any medical or psychiatric doctors that
14 you have seen prior to today but since this lawsuit when
15 this -- the matters that are contained in this lawsuit
16 occurred that you have seen?
17     A.  When -- and I'm going to answer this based on what
18 I understand you to be asking me.
19     Q.  Right.
20     A.  When this first happened, I did -- I spoke to
21 my -- you know, first, of course, I shared with my family.
22 And then I was advised to or told to, you know, contact my
23 primary care physician.  I contacted my primary care
24 physician.  I went into the office, spoke with them.
25     Q.  Who is your primary care physician?

Page 16

1      A.  Stacie.  S-T-A-C-I-E is how she spells her first
2  name.  Zibel, Z-I-B-E-L.
3      Q.  Z-I-B-E-L?
4      A.  Z-I-B-E-L.
5      Q.  Right.  And she's in West Hartford?
6      A.  No.  Stacie is part of like a group.  I can get
7  you the name of it.  It's Newington or something or other.
8      Q.  In Newington?
9      A.  It's in Newington, Connecticut.  So I spoke to
10 Stacie, and she referred me to a therapist.
11     Q.  And who is the therapist?
12     A.  Susan LaClaire.  And Susan LaClaire is in West
13 Hartford, so I spoke to her for a while.
14     Q.  And she's in West Hartford?
15     A.  Susan is in West Hartford.
16     Q.  How many times did you see Stacie Zibel for this,
17 one time?
18     A.  I had seen her for a couple of times because I go
19 to her anyway for my -- she's my primary.  So I go for my
20 annuals anyway.  So it was around the time of the annual, so
21 I went in, had my physical, spoke to her about the
22 situation.  She says, you know, I'm going to refer you to a
23 therapist, you know.  You need to, you know, talk to
24 someone.  Do you have someone to talk to about this?  And,
25 basically, I said no, and that I really didn't, you know,

Page 17

1  have anyone that I felt comfortable with, you know, telling
2  my personal business to and what have you.  So she referred
3  me to Susan.  And then I saw Susan.  I mean, I didn't see
4  Stacie ongoing and talk to her on the phone.  She would call
5  as a courtesy to find out how I was doing, that type of
6  thing.
7      Q.  And how many times did you go see Susan LaClaire
8  about?
9      A.  Oh --
10     Q.  Approximately when did you start seeing Stacie --
11 withdrawn.  When was the -- this visit that you went to
12 Stacie and she referred you to Susan LaClaire, when was
13 that?
14     A.  On or about, I'm going to say, around May.  It's
15 going to be -- when I found out that this job was not -- it
16 definitely wasn't going to happen, and I was totally -- I
17 was out of employment with my -- you know, my last ditch
18 efforts were, that was it.  I'm not going to get this job.
19 Here I am, type of thing.  So I'm going to say it was like
20 around May because that's when I found out that, no, this
21 job is not going to happen.
22     Q.  Okay.
23     A.  And then I saw Susan, I'm going to say, soon
24 thereafter.  We had time after -- we had issues with
25 scheduling because of -- she only works like in the evenings

5 (Pages 14 to 17)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 18

1  or something like that. She doesn't work like nine to five,
2  you know. So by the time I actually saw her, it was, I
3  would say, mid-May or end of May. And I saw her for, I'm
4  going to say, a couple of months not consistently, not -- on
5  and off. At first it was maybe like, you know, every week
6  or every other week for about an hour I would talk to her.
7     Q.  And then how long a period -- so it was about a
8  couple of months that you saw her?
9     A.  I would say.
10    Q.  Okay.
11    A.  That's kind of accurate, a couple of months.
12    Q.  Did you have health insurance back then?
13    A.  No, because I just had -- what is it called. The
14  state health.
15    Q.  HUSKY?
16    A.  Right.
17    Q.  Now, did HUSKY pay Dr. Zibel, or did you have to
18  pay --
19    A.  Yeah. Because she is my PCP, yes. So I had --
20    MR. MADSEN: I was just going to say, I think --
21  I'm not sure if he finished asking his question.
22    THE WITNESS: Oh, I'm sorry.
23    Q.  (By Mr. Coffey) No, no. My question only was, so
24  you had HUSKY. So you believe you had HUSKY?
25    A.  Yes.

Page 19

1     Q.  So the HUSKY insurance would have paid Stacie
2  Zibel?
3     A.  Uh-huh.
4     Q.  And then the next question would be with Susan
5  LaClaire. Did your HUSKY insurance pay Susan LaClaire?
6     A.  Uh-huh.
7     MR. MADSEN: You have to avoid saying uh-huh.
8     THE WITNESS: Oh, I'm sorry.
9     Q.  (By Mr. Coffey) Yes, no.
10    A.  You told me that.
11    Q.  I know what you mean, but --
12    A.  Yes.
13    Q.  -- she doesn't know whether -- how to record that.
14    A.  You want to ask me again. I'll be good.
15    Q.  So HUSKY paid both Stacie Zibel and Susan
16  LeClaire, as far as you're aware?
17    A.  Yes, they did, to my knowledge.
18    Q.  And you had HUSKY. You had the HUSKY insurance.
19  That was the insurance that you had?
20    A.  Yes.
21    Q.  And do you still have the HUSKY insurance?
22    A.  Yes.
23    Q.  And so was HUSKY only for you? Did it provide
24  coverage for you or to you and your son or something else?
25    A.  No, I have it. I don't know what they term it as,

Page 20

1  but it's like family coverage or --
2     Q.  Okay.
3     A.  Do you know what I mean?
4     Q.  Yeah. When was -- did Stacy Zibel or Susan
5  LaClaire give you any prescriptive medicines as a result of
6  this accident -- not accident -- this incident? Sorry.
7     A.  Stacie prescribed. Susan is not --
8     Q.  Susan is not a prescriber?
9     A.  Yeah, yeah. She's not authorized or she doesn't
10  have the licensing to prescribe medicine, that was my
11  understanding. But, however, Stacie did.
12    Q.  What did Stacie prescribe for you?
13    A.  I can get it, but -- get the name of it, but I
14  don't know what it is.
15    Q.  Okay.
16    A.  Basically, it was something to do with anxiety.
17  I'm not familiar with, you know, medical terms and stuff
18  like that. I don't take medicines --
19    Q.  Okay.
20    A.  -- or prescriptions regularly.
21    Q.  Did you take the prescription that he gave you?
22    A.  When she first gave it to me, I did follow
23  doctor's order, yes, I did.
24    Q.  Where did you get it filled? What pharmacy?
25    A.  CVS Pharmacy on

Page 21

1     Q.  It's in
2     A.  It's in West Hartford, but it's the one that's on
3  New Britain Avenue.
4     Q.  And did you also have -- as part of your HUSKY
5  coverage, do you have prescription medicine coverage, or did
6  you have --
7     A.  Yes.
8     Q.  Now, have you been married?
9     A.  No.
10    Q.  Have you ever been married?
11    A.  No.
12    Q.  And when you say your name is Deborah Adams, what
13  is your middle name?
14    A.  I don't have a middle name.
15    Q.  Okay.
16    MR. McPHERSON: Can we take a break?
17    (Off record conference)
18
19
20    Q.  (By Mr. Coffey) Back to -- did you ever go by
21  the -- in one of your -- in the Equifax report, it refers to
22  you by the name Debra Jeans Adams. Have you ever gone by
23  that, Debra --
24    A.  No. I have disputed that. That's been disputed
25  as well several times with Equifax to take that off my

Page 22

1   report. And I was told by them, basically -- this is my
2   understanding of what they said -- anyone can just, like,
3   check or give things to the Equifax, the credit reporting
4   agencies. They don't verify. They just take whatever
5   information is reported to them and they put it on your
6   report. And it's up to you to, like, review it and to
7   dispute if there's anything that is inaccurate.
8   Q. Okay.
9   A. That's what I have done.
10   Q. So you have disputed that?
11   A. Yes, I have.
12   Q. Have they taken it off your report?
13   A. Well, there's like three of them, and it showed up
14   on one and then it didn't show up on the others. Now, I had
15   just seen recently where it showed up on Equifax. So now I
16   have to go back and I have to dispute that again.
17   Q. Do you know where they would have gotten that
18   from, that name, Jeans?
19   A. You would have to ask them.
20   Q. Okay.
21   A. It's not on -- it's not my name. It's not my
22   legal name. It's not on my legal certificate, my Social
23   Security card, my license. It's not my name. I believe
24   Debra Jeans Adams is like a spelling -- I don't think
25   there's anyone by that name, but I don't know. I don't

Page 23

1   know.
2   Q. What is your Social Security number?
3   A. 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.
4   Q. 68, what?
5   A. 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.
6   Q. And do you have a driver's license?
7   A. Yes, I do.
8   Q. What state is that in?
9   A. Connecticut.
10   Q. And how long have you had that?
11   A. I don't know. A couple of years. About two to
12   three years.
13   Q. And before that, did you have no driver's license?
14   A. No. I was licensed in Massachusetts.
15   Q. Have you ever been convicted of a crime?
16   A. No, I have not.
17   Q. Okay.
18   A. I have -- should I --
19   MR. MADSEN: It was in your discovery responses.
20   Q. (By Mr. Coffey) Go ahead.
21   A. I mean, I just wanted to make sure that I'm
22   accurate, answering accurately, based on, you know, what
23   I'm -- because I had issues, like, in the past, but they
24   were expunged. So I don't know if that's supposed to be --
25   is that considered part of --

Page 24

1   Q. Why don't you talk about that so we have an
2   understanding. Tell me what it was because it wasn't in
3   your discovery responses.
4   A. I just want to make sure that I'm answering --
5   that's I'm not -- you know, I don't want you to think I'm
6   not being truthful.
7   Q. Right.
8   A. I have had -- it was back been when I was younger.
9   I couldn't even tell you. I know it's like twenty, thirty
10   years ago. I had issues, and it was expunged from my
11   record. And the exact issues or the exact charges, I
12   couldn't even tell you what they were --
13   Q. Okay.
14   A. -- but that's how long ago it was. And the
15   lawyer -- one of the lawyers that was on the matter, he is
16   deceased, so it was like --
17   Q. As a result of that, did you -- were you on
18   probation or anything like that?
19   A. I believe -- this is to the best of my knowledge,
20   because we're going way, way, way back.
21   Q. Right.
22   A. The matter was -- like I said, I did have a
23   lawyer, and the matter was handled through, like, the
24   courts. And I can't -- I think the last thing that I
25   remember was you had to be -- you know, I had to be good. I

Page 25

1   had to show that you're going to school, you're not getting
2   into any more trouble. As long as you're not getting in any
3   more trouble and you're on the right track, then this matter
4   will go away. But if you're going to continue along this
5   path, then you're going to get into further trouble, that
6   type of thing. And that's what I recall.
7   Q. Do you remember what the underlying incident was
8   that caused that? What did you -- what was it that you had
9   done that caused that -- that you had to go in front of the
10   court for?
11   A. No, not the exact incidents. I can recall why
12   these things occurred.
13   Q. Right. Why?
14   A. I can tell you that.
15   Q. Right.
16   A. Basically, you know, I was young. I was partying,
17   pretty much. One of the incidents I can recall was, like,
18   going out with friends and, you know, drinking, and then an
19   altercation happened between us as we're going out and we're
20   partying, that type of thing. That's one that I recall. So
21   it was those types of things that, like, got me into trouble
22   that just, pretty much, amounted to foolish behavior of a
23   young person that's not really taking life seriously, you
24   know. You're doing more partying and what have you than you
25   are focusing on, you know, things that you should be

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 26

1  focusing on.
2      Q.  And when did you graduate from high school?
3      A.  I graduated -- I believe it's June of 1977.  I
4  always get confused if it's '76 or '77.  I have my diploma,
5  so I can verify that as well.
6      Q.  And then did you live in Pittsfield for many years
7  after that, or where did you reside?
8      A.  Well, right after -- are we talking right after I
9  graduated from high school?
10     Q.  Yes.
11     A.  Actually, I went to college.
12     Q.  And where was that?
13     A.  I went to college -- now it's called Johnson &
14  Whales University, but at the time it was Johnson & Whales
15  College.  That's in Providence, Rhode Island.
16     Q.  And how long did you attend there?
17     A.  I went there -- I didn't receive a degree from
18  Johnson & Whales.  I went there for about two years, yep.
19     Q.  And then what did you -- where did you move after
20  that, if you recall?
21     A.  Right after I left school or --
22     Q.  After you left Johnson & Whales.
23     A.  Well, after I left Johnson & Whales, I stayed on
24  to, like, work.  I stayed around for a little while.
25     Q.  Were you in Rhode Island?

Page 27

1      A.  Uh-huh, in Providence.  In Providence, Rhode
2  Island.  And then after I left Johnson & Whales, or I'll say
3  Providence, then I went back home.
4      Q.  For how many years?
5      A.  Stayed there for a while, about -- I don't know,
6  three to four years.  I didn't say there very long.  Work
7  wasn't really in that area.  Work wasn't really all that
8  great.
9      Q.  And then so you lived with your mom then?
10     A.  I've always -- when I live in that area, I've
11  always -- I stay in the family house, if you will.
12     Q.  And then going back, what did you -- how long had
13  you been doing temporary assignments in your career?
14     A.  In my life?
15     Q.  Yeah.  Has that been going back a while, or is
16  it --
17     A.  Well, on and off.  I started -- actually, I first
18  started doing temporary when I graduated from Berkshire
19  Community College.  There was -- Manpower came in and did a
20  presentation about temporary work, and it gave us, you know,
21  the inside of how temporary could bridge the gap into
22  employment.  You know, when you first get out of school, you
23  don't have a lot of experience, and this is the way to get
24  experience.  So that's how I was first introduced to
25  temping, if you will, there.  And, actually, when I got out

Page 28

1  of Berkshire Community College, I worked for Manpower in
2  their office as a recruiter, if you will, you know, placing
3  persons in jobs.  So that's when I first was introduced to
4  it.  And then I worked, you know, like I said, on and off
5  while I was between temps and permanent jobs.  Usually, I
6  work temp jobs when the economy gets bad or I can't find a
7  permanent job in a timely fashion, I'll work for a temporary
8  agency because you can get placed for a couple of weeks, a
9  couple of months, and you could still look for permanent
10  work, but still, you know, have some money coming in while
11  you're looking for a permanent job.
12     Q.  So then when was the first job you remember up in
13  Connecticut that you took on permanent, who was that with?
14     A.  This is how I came to Connecticut.  It was because
15  of a job that I already had with General Electric.  And the
16  short of it is General Electric had purchased a segment of
17  Phoenix in Enfield.  And I got the job permanent at GE, and
18  we were working at Phoenix.  And then -- well, the Phoenix
19  building at the time.  It was the Phoenix building.  And
20  then we were told that we're moving to Hartford because we
21  own property in Hartford, so that's how I moved here.  I
22  commuted for a while, and, you know, made the decision that,
23  you know, I got tired.  Bottom line is I got tired of
24  commuting.  So that's how I ended up in Connecticut was
25  through the job at General Electric.  And then General

Page 29

1  Electric went out of business and they sold that business.
2  And pretty much what they disclosed to us was that they were
3  exiting the insurance business.  It wasn't their core
4  business, and they were exiting insurance.
5      Q.  And when you worked at The Phoenix, what unit did
6  you work in there?
7      A.  It was in the Phoenix building.
8      Q.  In the Phoenix building, but GE?
9      A.  It was General Electric, yes.  It's reinsurance.
10     Q.  Okay.
11     A.  So it was General -- what was it?  GE Reinsurance
12  was the name of it.  And at the time when I first worked
13  there, they still had the Phoenix sign up, and it was in
14  reinsurance.  That's the department.
15     Q.  And what field -- in the reinsurance industry,
16  what were you -- what department were you in?
17     A.  Contracts.  So I was in the legal department,
18  contracts.  My title was Contract Administrator.
19     Q.  And how long did you work for them?
20     A.  Until GE -- just before -- because people were
21  leaving in phases when GE announced they were exiting the
22  business.  So I left in the fall of 2001, something like
23  that, 2001 to 2002.  It was like post 9/11.  And then they
24  ended up closing the business and stopped writing the U.S.
25  business a couple months later.  I was told the final people

8 (Pages 26 to 29)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 30

1   that were there, like, three or four people that were there,
2   they left as well.
3       MR. MADSEN:  I'm sorry.  The name of the job was
4   Contract Assistant or Administrator?
5       THE WITNESS:  My title?
6       MR. MADSEN:  Yeah.
7       THE WITNESS:  Was Contract Administrator.
8   Q.  (By Mr. Coffey)  And how many years had you worked
9   for GE, about?
10  A.  Two years.
11  Q.  Two years?
12  A.  Uh-huh.
13  Q.  I think I went off track a few minutes ago.
14  A.  Sorry.
15  Q.  When was the last time that you saw Dr. -- not
16  doctor -- Ms. LeClaire as a result of this, about?
17  A.  I only saw her for the three months.  So I started
18  seeing her around -- I'm going to say around May or June or
19  something like that.  I only saw her for the three
20  months, and it was inconsistent when I saw her.  It was like
21  on and off.  So the last time I would have seen her was
22  probably around -- I don't know -- back in 2007.
23  Q.  Okay.
24  A.  I can get you the exact dates though, but that's
25  just to the best of my recollection.

Page 31

1   Q.  And did she recommend that you go see any other
2   type of provider, or no?
3   A.  No.
4   Q.  Did Stacie Zibel recommend you see anyone else?
5   A.  No.
6   Q.  And how many times -- how many prescriptions do
7   you believe that Stacie Zibel gave to you?  You said -- was
8   there more than one?
9   A.  Well, she gave me two.
10  Q.  Okay.
11  A.  And after about -- it wasn't even -- because they
12  were thirty-day prescriptions, and it wasn't even the full
13  thirty days that I had taken them when I experienced side
14  effects.  We decided that, you know, the prescriptions that
15  she had given me weren't for me.
16  Q.  Back at that time, were you on any other
17  medications?
18  A.  No.
19  Q.  Other than seeing Stacie Zibel or Susan LaClaire,
20  at any time have you ever seen a psychiatrist or any other
21  type of mental health professional in your life?
22  A.  I've taken advantage of -- I forget what they're
23  called, but they're through the -- they're through your
24  employers where you can call -- what's it called?
25  Q.  Like hotlines?

Page 32

1   A.  Exactly.  I've taken advantage of those when I --
2   especially when I was faced with layoff, or what have you,
3   you know, pending layoff and stress on the job.  It had been
4   recommended that, you know, from talking to co-workers and
5   what have you -- you know, they'll say, Well, call the
6   hotline if you have that option available to you.  So, yes,
7   I have utilized those types of services provided by
8   employers in the past, yes.
9   Q.  Have you ever seen any other professional, though,
10  any other doctors or psychiatrists or psychologists ever?
11  A.  Therapist, yes, I have.
12  Q.  Where have you seen other therapists?
13  A.  I've seen -- during a layoff, again, at CHUBB, I
14  had seen a therapist.  Vivian Haas is her name, in West
15  Hartford, Connecticut.
16  Q.  And when were you laid off from CHUBB?
17  A.  That was from July of 2005.
18  Q.  And how many times did you see her, about?
19  A.  I saw her a few times.  I would say several times.
20  At the time when I was seeing her, I had insurance through
21  my employer, but then I couldn't continue seeing her because
22  when I was laid off, you know, my insurance didn't cover it,
23  and I didn't have any -- I wasn't able to afford to see her
24  after that.
25  Q.  Did she give you any medications?

Page 33

1   A.  No.  She wasn't -- no, if I can remember
2   correctly.
3   Q.  And other than Vivian Haas, any others that you
4   can remember?
5   A.  No.  Those are the only two that I have -- in my
6   life that I recall.
7   Q.  Now, other than this lawsuit that you have
8   brought, have you brought any other lawsuits in your life?
9   A.  In my life?  No.  I mean, I've had, like, car
10  accidents and things of that nature, if that counts.  We're
11  going, like, way back.  I'm just going over everything in my
12  life.
13  Q.  Okay.
14  A.  But I've never been to, like, you know, court like
15  suing a person or something like that.
16  Q.  Had you ever filed -- had you ever settled any
17  matters?  Had you ever sent letters and settled matters
18  before lawsuits were filed in your life?
19  A.  Regarding this matter?
20  Q.  No.  Like any type of claim.
21  MR. MADSEN:  Including car accidents?
22  Q.  (By Mr. Coffey)  Including car accidents.  Like
23  have you ever sent letters and settled claims?
24  A.  Yeah.  I have settled matters before, yes.
25  Q.  Like what type of matters?  How many,

9 (Pages 30 to 33)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 34

1 approximately?
2   A.  I wouldn't know approximately, but like -- I
3 haven't had that many car accidents, so it's not like, you
4 know.
5   Q.  Okay.
6   A.  But for car accidents, I would say a couple of
7 those because I remember two pretty serious car accidents.
8 And then when the buyout, merger, acquisition, or whatever
9 it's considered in the business industry occurred, when they
10 are laying you off, ushering you to the door you're trying
11 to get a package.  So that's something that you're engaged
12 in, in a battle there.  They'll offer you -- you know,
13 you're going to get this package, and you're like, no.  I
14 want that package like she has, or something like that.  So,
15 yeah, I was involved in negotiations, they call them, or,
16 you know, settlements, if that's what you call them.
17   Q.  Now, which places have you had those types of
18 settlements from where you've left?
19   A.  General Electric and CHUBB.
20   Q.  And in both times, what, you'd send them letters
21 and stuff asking for a better settlement package or a
22 better --
23   A.  I really don't recall how the communication -- I
24 think there's like a protocol, how you have to initiate --
25 strike up the conversation.  And I think they communicate to

Page 35

1 you first, and then it's within your right, if you will, to
2 respond to, you know, state, you know, why you disagree or
3 if you accept.  So it's basically pretty much I respond to
4 what they have initially communicated to me.  And that's
5 usually done either verbally or -- and then you, you know,
6 back it up in writing type of thing.  That's usually how I
7 always communicate anyway.
8   Q.  And then when you left GE, did they give you a
9 package?
10   A.  Yes, yes.
11   Q.  Okay.
12   A.  There were a lot of -- I wasn't the only one.
13 There was a lot of people when they were going through their
14 merger acquisition, so I was one of many.
15   Q.  How about CHUBB, did they give you a package also
16 when you left CHUBB?
17   A.  Yes.
18   Q.  And like what type -- what was the severance
19 package that you got from GE?
20   MR. MADSEN:  Actually, I want to -- sometimes
21 these things contain confidentiality provisions.  I
22 just want to make sure that she's not inadvertently
23 running afoul of that.
24   MR. COFFEY:  Well, we'll just -- I mean, here's --
25   MR. MADSEN:  Can we table that until I figure that

Page 36

1 out.
2   MR. COFFEY:  We can table that until we figure it
3 out, but I will say this, I will -- I mean, some of
4 this stuff, I will be -- I'll serve a supplemental
5 request after today for some of the documents that I
6 think she's mentioning that I didn't know about and any
7 other discovery.  So I'll follow up in writing after
8 today.  I mean, but I do reserve my right on that.
9   MR. MADSEN:  And we reserve all of our rights.
10   MR. COFFEY:  I'm not saying you don't.  Of course
11 you do.  I'm not -- I'll have to ask you the
12 responsibility question later.
13   MR. McPHERSON:  You're aware the deadline is in
14 four days?
15   MR. COFFEY:  We are aware of the deadlines, but I
16 know we have all agreed that if we have deadlines, we
17 still have to -- we're not backing into the deadlines
18 on that.
19   THE WITNESS:  I can --
20   MR. MADSEN:  I don't know what you're saying,
21 but --
22   MR. COFFEY:  Here's what I'm saying.  If I have a
23 supplemental --
24   MR. MADSEN:  Do you want this on the record?
25   MR. COFFEY:  Let's go off the record.

Page 37

1
2   (Off record conference)
3
4   MR. COFFEY:  Back on the record.
5   Q.  (By Mr. Coffey) Could you tell me what the terms
6 were of the package of settlement that you received from GE?
7   MR. MADSEN:  I'm going to direct my client not to
8 answer based on my client's representation to me that
9 there was a confidentiality provision which had
10 penalties associated with it, and she's under a legal
11 obligation not to disclose the terms and conditions of
12 the severance agreement.  So I am going to direct her
13 at this time not to answer the question.
14   MR. COFFEY:  Okay.  Just so we're clear, under the
15 Federal Rules, you are directing her not to answer.
16 Correct?
17   MR. MADSEN:  That's pretty clear, yes.
18   MR. COFFEY:  I'm just -- okay.
19   Q.  (By Mr. Coffey) As to CHUBB, you got a package
20 from -- a settlement package from CHUBB.  What was that
21 settlement package?
22   MR. MADSEN:  I'm going to ask my client to confer
23 with me so I can ensure that she is under no legal
24 obligation not to disclose.  So we will go off the
25 record for now.

10 (Pages 34 to 37)

NIZIANKIEWICZ & MILLER REPORTING SERVICES

Page 38

1
2      (Off record conference)
3
4      MR. MADSEN: Can you repeat the question?
5      Q. (By Mr. Coffey) Did you receive a settlement
6  package from CHUBB Insurance?
7      MR. MADSEN: You can answer that question just yes
8  or no.
9      THE WITNESS: Yes.
10      Q. (By Mr. Coffey) What was it?
11      MR. MADSEN: Okay. I'm going to make the same
12  objection. My client's best recollection is that there
13  was a confidentiality provision which prevents her from
14  disclosing, and there are penalties associated with
15  that. So I'm going to direct my client not to answer
16  that question until I have had a chance to review the
17  underlying documents.
18      MR. COFFEY: So you're saying also that you will
19  now also make your client available for another
20  deposition?
21      MR. MADSEN: No. I'm not saying that at all.
22      MR. COFFEY: But you are directing her not to
23  answer my direct question?
24      MR. MADSEN: Correct.
25      MR. COFFEY: Okay.

Page 39

1      Q. (By Mr. Coffey) Are there any other employers
2  that you have received settlement packages from when you
3  left them?
4      A. No.
5      Q. When you received these, you talked about a
6  process of negotiation. Did you send GE letters where you
7  asked for a differing settlement package than what was
8  originally offered to you?
9      A. I don't think that that's how it went. My
10  recollection was they communicated to me, and then I, you
11  know, communicated back; probably would have been verbal.
12  And then as I stated before, follow-up, you know, letter
13  just reiterating what we discussed --
14      Q. Okay.
15      A. -- type of thing.
16      Q. Do you still have those letters in your
17  possession?
18      A. I really don't have anything in my possession
19  right now because I have two storages. I have my items, my
20  personal belongings and paperwork, divided in three
21  different locations. So if I had to put my hands on
22  anything right now, I probably couldn't even -- I couldn't.
23  even find it. It's in, like, one of my storages. And I
24  only try to take with me the things that I need right now.
25      Q. So the terms of these settlements -- do you have

Page 40

1  materials that talk about the terms of these settlements?
2      A. It was given to me, yeah.
3      Q. Do you still have them?
4      A. Yeah. I would think I would have them. I didn't
5  throw them away. I did not throw them away. Where they're
6  at -- I know they're not at my mom's. I didn't take them.
7  I didn't take them. Like books and school books and things
8  like that, those things are like in storages.
9      Q. I'll call for the production of them. I'll follow
10  up in writing afterwards. Now, when you left GE, who did
11  you go to work for right after GE?
12      A. The next job was CHUBB.
13      Q. Okay.
14      A. That's all listed on my resume as well. I can
15  provide you that chronological.
16      Q. How long in between those jobs was there, or did
17  you leave GE and then have a job immediately at CHUBB?
18      A. Oh, no. Because when I left GE, it was post 9/11,
19  and those are two insurance companies. So it was some
20  months before insurance companies were, like, hiring and
21  taking on new people. So I left GE around the fall of -- it
22  was 2002 or something like that. And I didn't start with
23  CHUBB until -- it was like almost a year. It was like nine
24  months or something like that, to the best of my knowledge.
25      Q. Okay.

Page 41

1      A. But it's accurately listed on my resume, so I can
2  provide that to you.
3      Q. When you left GE, did you receive unemployment
4  insurance?
5      A. Yes.
6      Q. And how long did you receive unemployment
7  insurance for?
8      A. Until I started the job at CHUBB.
9      Q. And approximately --
10      A. Because you have to --
11      Q. -- approximately how long was that?
12      A. Nine months.
13      Q. And how much were you receiving while you were on
14  unemployment?
15      A. I don't remember that.
16      Q. Now, in the last -- after leaving GE and before
17  going to CHUBB and you received the unemployment insurance,
18  are there any other times in your employment history that
19  you have received unemployment insurance?
20      A. In my life?
21      Q. Yes.
22      A. Oh, yeah.
23      Q. In the last few years? In the last five years?
24      A. That would include GE?
25      Q. Yes. Other than GE, have you received?

11 (Pages 38 to 41)

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 42

1    A. Uh-huh, because I work as a -- excuse me. Yes.
2    Q. So you work -- okay. Now, when you -- back in
3  2007, before this job you were going to receive with
4  National Engineering, what job did you leave?
5    A. I had a position as a paralegal through Legal Now,
6  that was the agency, for C.B. Richard Ellis.
7    Q. And where was that located?
8    A. It was located in St. Paul/Travelers in Downtown
9  Hartford.
10   Q. And when did you leave that position?
11   A. I had given them two weeks notice advising them
12  that I had accepted a position with NU --
13   Q. Okay.
14   A. -- which I had applied for prior to accepting the
15  position with C.B. Richard Ellis, and the last date was May
16  11th, I believe.
17   Q. At C.B.?
18   A. Yeah. I have the actual document that shows
19  the -- you know, the notice that I gave them informing them
20  of the last date at CBRE, at C.B. Richard Ellis.
21   Q. Now, when you left C.B. Richard Ellis, did you
22  receive unemployment insurance?
23   A. I don't believe I was able to, and I can confirm
24  this. I don't think I was able to collect unemployment due
25  to the fact that I voluntarily left. I wasn't like laid

Page 43

1  off. I left that job. I gave them notice, so --
2    Q. Other than unemployment insurance since you have
3  been in the State of Connecticut, have you received any type
4  of benefits from any other agency?
5    A. Like my insurance?
6    Q. Yes.
7    A. You want to speak to the insurance? I have
8  received food stamps as well. I went to -- and you can tell
9  me if this is what you're asking me. I've gone to the Town
10  Hall to get groceries at times.
11   Q. Now, when you got the food stamps, did you get
12  that from the time that you left C.B. Richard Ellis until
13  today? In the past year-and-a-half or so, have you
14  received --
15   A. I believe I was eligible and did receive food
16  stamps during that time, yes.
17   Q. And how much was that, approximately?
18   A. That I can't recall, but I can get that
19  information for you. It's based on some guidelines, so I
20  don't want to miscommunicate what that is because I honestly
21  don't know what it is off the top of my head. So if I give
22  you a figure, I'll be making it up, and I don't want to.
23   Q. And it was for you and your son as well?
24   A. Oh, yes, definitely. For two people; for myself
25  and my son.

Page 44

1    Q. And your son, though, moved back with your mom
2  when, approximately?
3    A. The summer of 2007.
4    Q. And does your son still receive the HUSKY
5  Insurance?
6    A. No. He has insurance there. When he moved back
7  with my mom, it wasn't like -- he wasn't, like, moving there
8  at the time. He had always gone back there for the summers,
9  so that was just like standard, you know. He always went
10  back to stay with her for the summer. So at the time when
11  he went there, it wasn't like he was moving back.
12   Q. Does your son receive any benefits from any agency
13  in the State of Massachusetts?
14   A. He has his own insurance.
15   Q. Back in 2006, at some point, did you happen to
16  have an occasion to speak with people at Choice Point?
17   A. Yes.
18   Q. Okay.
19   A. Yes, I did.
20   Q. Now, where were you looking to get a job that
21  Choice Point was running a search on you?
22   A. Where did I get a job from? It was through
23  Adecco; the agency, Adecco.
24   Q. What is Adecco?
25   A. It's an agency. So it's a like -- it's similar to

Page 45

1  Kelly Law Registry.
2    Q. Okay.
3    A. It's a staffing agency.
4    Q. And you were going to --
5    A. Staffing. So Adecco, which is an international
6  staffing agency, communicated to me about a position that
7  they had available with one of their clients. I had a
8  background check, and their background check company is
9  Choice Point. That's who they used at the time. I don't
10  know if that's their background check company now, but
11  that's who I went through at the time.
12   Q. And what happened there? Did it show up that you
13  had any convictions on your record?
14   A. What happened there was I was communicated to by
15  Adecco, the international staffing agency, that a background
16  report showed that there were felonies in another state, in
17  Pennsylvania or something like that, and wherever that's
18  located. I think that's like West Virginia, North Carolina,
19  or something like that. I disputed it with Adecco, and they
20  gave me information or -- initially, she stated she would
21  communicate to their background check company. So during
22  this conversation, I don't know who Choice Point -- I didn't
23  know who Choice Point was, but she said she would
24  communicate back to them. I asked for a copy, and I asked
25  to be given that copy right away. So the procedure was, as

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 46

1  I was communicated to by Adecco, is I would have -- you
2  know, they would have to call their company first, their
3  background check company, and then she would get back to me
4      Q.  And was that the first time ever that this popped
5  up in a background search?
6      A.  Yes.
7      Q.  And then what?  Did you ultimately get that job?
8      A.  Yes.
9      Q.  And that was a job with whom, with which company?
10     A.  That was a job with Bank of America.  So it was
11  through Adecco with Bank of America.
12     Q.  And so what, at some point did Choice Point look
13  into what -- when you said it wasn't you, did they look into
14  that, as far as you recall?
15     A.  Well, the scenario with Choice Point, after I
16  stopped talking to Adecco, when they released Choice Point's
17  information to me -- because initially I didn't know who
18  their company was, and I was directed to communicate to
19  Choice Point directly and to inform them of my dispute.  So
20  I communicated to them in writing.  I had to put it in
21  writing that I disputed the information.  And my question to
22  them was, you know, are you checking Social Security numbers
23  and, you know, all of the specific criteria that I'm
24  providing to Adecco.  How did you make this discovery, you
25  know, based on what information, that type of thing was our

Page 47

1  communication.  And Choice Point had stated that there's
2  some type of -- there's a system or the system that they use
3  has limited fields.  I recall her saying that.  I don't know
4  what that means, but that's what she said.  There's limited
5  fields.  They only put in a certain amount of information.
6  I thought -- I did some research on Choice Point after we
7  were going back and forth and trying to get this all cleared
8  up because I was told by my placement agency, the recruiter,
9  that they did not communicate to Bank of America.  They were
10  waiting for this to be resolved since I disputed it.  So she
11  says, Don't worry about it, Deb.  We'll get it all sorted
12  out.  So I did some research on Choice Point, and it turned
13  out that Choice Point was in some hot water, if you will.
14  They had been fined by the FTC multi millions of dollars for
15  not safeguarding data relative to identity theft, and it was
16  just a big blow up between the FTC and Choice Point.  And I
17  communicated with Adecco's home office at that time, and
18  they disclosed, yeah, Choice Point is in some hot water.  I
19  just assume -- I attribute it to, well, since they're
20  already in trouble with the FTC, this is like the blow out
21  of that, that they're known for not doing certain things
22  like they're supposed to do, So I just thought -- and it
23  never happened before because I have had background checks
24  before and I have had background checks after.  So I just
25  thought it's Choice Point.  I never thought that, you know,

Page 48

1  there was another company that -- like I said, I still don't
2  know how they do the background check, but, apparently, it
3  wasn't done on the Social Security number.  That's what I
4  found out, but she told me this over the phone.
5      Q.  Are you aware of any requirement that they have
6  to -- the that companies must use a Social Security number?
7      A.  My understanding --
8          MR. MADSEN:  Just an objection to the extent it
9      calls for a legal conclusion.  You can answer.
10         THE WITNESS:  Yeah, because I really don't -- I
11     don't remember the requirements per law.  All I know is
12     what they -- they, the agency, my employer, when I
13     release information, there's usually like a form, and I
14     gave them information.  I tell them my name, my
15     address, my Social Security number.  So in a layman's,
16     you know, perspective of it, I just assumed that they
17     check everything that is on the list.
18     Q.  (By Mr. Coffey)  Okay.
19     A.  And I would think that, yeah, a Social Security
20  number would be right up there with the name.
21     Q.  But I'm just -- the way you said it, I'm just
22  trying to find out, but you have no expertise.
23     A.  No, I have none.
24     Q.  You're not proffering saying you know this like an
25  expert or something?

Page 49

1      A.  No.  Just because I'm a paralegal, I'm not
2  claiming to be an expert in what a background check company
3  is supposed to do.
4      Q.  Now, with Choice Point, did you ever consult an
5  attorney to see if they had broken the law with what they
6  did?
7      A.  What I did was -- well, at that point, I didn't
8  really lose anything because I started my job.
9      Q.  Right.  So did you ever consult anyone?
10     A.  So it was most important to start the job.  What I
11  did was I went to -- because at first I thought it was
12  identity theft.  So initially what happened was I thought it
13  was identity theft, and this is before I found out they
14  didn't check the Social Security number.  I called the
15  Social Security Administration.  I put like a freeze on
16  the -- on my Social Security -- not my Social Security, but
17  my credit reportings where you report to the three credit
18  bureaus.  I go and I dig out paperwork showing that I'm
19  working and this is where I was and, you know, proving who I
20  am.  And then in conversations, like, with the Social
21  Security Administration and other persons, I find out that,
22  no, they just didn't check on the Social Security numbers.
23     Q.  Right.
24     A.  So this is not you.  So you don't have to go
25  through all of that.  And I just figured --

13 (Pages 46 to 49)

Page 50

1    Q. But the person they identified in Choice Point had
2  the name of Debra Jeans Adams. Correct?
3    A. That's her name, yes.
4    Q. And she had the same date of birth?
5    A. That's what I have been told, yes.
6    Q. Now, do you have any idea of why the Equifax
7  report that was done last year had the name Debra Jeans
8  Adams for you? They're kind of similar. Are you aware of
9  where they got that name from?
10    MR. MADSEN: Objection. Asked and answered.
11    THE WITNESS: No, because --
12    Q. (By Mr. Coffey) No? Are you aware -- do you have
13  any idea where they got that name from?
14    A. Number one, I don't recall receiving an Equifax
15  report from last year, and --
16    Q. Did you see the Equifax report that your attorney
17  disclosed to us?
18    A. I gave that to him.
19    Q. Right. So you have seen that one?
20    A. But that wasn't last year.
21    Q. Oh, that was this year. Okay. I'm sorry.
22    A. That was just a couple of months ago.
23    Q. Okay.
24    A. And I just -- when I gave it to him to give to you
25  guys, I had just opened that because the case -- they were

Page 51

1  just following up on something that they had already
2  communicated to Kelly through an electronic E-mail. So
3  communications with Kelly and Verifications are done
4  electronically. She had already provided that information
5  electronically, and I had been already told, you know, what
6  I was told verbally over the phone. And they just sent that
7  as a, I guess, follow-up.
8    Q. Okay.
9    A. And that was just -- that was just a couple of
10  months ago.
11    Q. So did anyone ever tell you that in the -- when
12  you had this with Choice Point, did anyone talk to you about
13  in the future that you should tell people about this?
14    A. No. Choice Point -- I was just basically trying
15  to find out -- because this is the first time it happened, I
16  was just basically trying to find out what did you do. How
17  did you -- what would make you think that that person could
18  be me. I've never lived in the South. I'm -- you know, how
19  could you even think that we were the same person, just
20  based on names that are not the same, or they're not spelled
21  the same, and date of birth alone without even checking the
22  Social Security number. I mean, pretty much they just said
23  they were sorry. And, like I said, I received a job, and I
24  wasn't really trying -- I needed the work. I need to work,
25  so I wasn't really trying to make a big stink out of it.

Page 52

1    Q. How long was the Bank of America job?
2    A. That job?
3    Q. How long was it? Yeah.
4    A. How it worked, I worked there for like two months,
5  because I had applied for a position through Adecco's
6  subsidiary for The Hartford. That's the first time I worked
7  at The Hartford, but I hadn't heard from The Hartford. So
8  when the job came up for Bank of America, I took that job.
9  And then subsequently, The Hartford called me and they said,
10  okay, we're all set. We're ready for you to start. So I
11  gave the two week's notice to the Bank of America, but, you
12  know, I would give it through Adecco.
13    Q. And then you went over to The Hartford?
14    A. Yes. That's the first time I worked at The
15  Hartford.
16    Q. And what was your wage at The Hartford?
17    A. There, I believe, I was $20. No, I think it was
18  like $19.50. I can confirm that. I think it was between
19  like $19.50 and $20 an hour because that's pretty much my
20  range, if you will.
21    Q. So a lot of these other temporary jobs -- and when
22  I say that, part of the discovery that was given to us at
23  some point states you were eligible for health insurance at
24  the National Engineering position. Is that correct?
25    A. Uh-huh.

Page 53

1    MR. MADSEN: Wait a minute. You need to say yes
2  or no.
3    THE WITNESS: Yes.
4    Q. (By Mr. Coffey) At many of these other positions
5  you had been at, were you eligible for their type of
6  insurance programs much like the National Engineering one?
7    A. Yes.
8    Q. And in all of those other ones, you have taken --
9  you have opted to keep the HUSKY Insurance. Is that
10  correct?
11    A. Not in all of them, no.
12    Q. Okay.
13    A. Because they are -- no.
14    Q. At some of them, have you opted to keep the HUSKY
15  plan instead?
16    A. In some of them, yes. It would depend on the
17  benefits.
18    Q. Right. Now, how much does the HUSKY Insurance
19  cost you, if you're aware?
20    A. I'm not aware of that, I'm sorry.
21    Q. So you don't pay anything for that coverage?
22    A. I don't believe so. This is what I understand --
23    Q. Okay.
24    A. -- that you pay -- and this is what was
25  communicated to me. You pay based on -- there's, like, a

14 (Pages 50 to 53)

NIZIANKIEWICZ & MILLER REPORTING SERVICES

Page 54

1  threshold. So for persons below a certain annual amount,
2  and it depends on your family size, the composition of your
3  family, there's a lot of different factors, but it's all
4  based on how much you make annually --
5      Q. And --
6      A. -- whether or not you pay.
7      Q. -- so it's number of family members and income?
8      A. That's my understanding. There's just, like, this
9  very intricate formula, which I do not know if you -- all I
10  have to do is communicate to them when I'm working within a
11  certain time frame, and then if you have to pay, then they
12  communicate to you.
13      Q. And through all of the years that you have been
14  working and have had that coverage, have they ever
15  communicated to you that you need to pay them?
16      A. No.
17      Q. So it's your understanding, then, that whatever
18  their threshold is, you're under it because you haven't had
19  to pay?
20      A. That's my understanding.
21      Q. Okay.
22      A. And, like I said, I communicate any changes to --
23  I guess you call her a social worker or what have you,
24  whatever her formal title is -- or communicate directly to
25  HUSKY within a certain time frame. Whatever their criteria

Page 55

1  is, I communicate that to them; whatever they're asking for,
2  and then they make the determination.
3      Q. Now, when did you first hear about National
4  Engineering as a company that you wanted to go find a job
5  through?
6      A. Well, I don't really know them. How I was
7  introduced to the -- to this position at NU, which, I guess,
8  led me to National Engineering, is Career Builder. I
9  applied for a position on the website at Career Builder, and
10  that's how I -- at the time, I don't recall them listing --
11  and it may have been listed, but I don't recall seeing the
12  agency's name.
13      Q. Now, why were you looking for a new position? Was
14  the position you were at going to end?
15      A. Yeah, because I was just working as a contractor,
16  so there's usually, you know, an end date. I was always
17  looking for, you know, a better position, something with a
18  little bit more permanency, stability.
19      Q. Now, the job you were at when you applied for this
20  job on Career Builder, when was that position to have ended?
21      A. My C.B. Richard Ellis position?
22      Q. Yes.
23      A. That position I was told, when I took it, was
24  going to be for thirty days.
25      Q. So you were in a thirty-day job?

Page 56

1      A. That's what I was told, that it would last for
2  thirty days. I think it extended beyond that after I left,
3  but I don't really -- that's what I was told.
4      Q. That's what you were told?
5      A. Yes.
6      Q. Did you have a contract for that job?
7      A. No. No, I did not.
8      Q. So you were -- so when did you start at C.B.
9  Richard Ellis?
10      A. I started -- and I'm a little fuzzy on my date
11  here. I had only worked there, like, thirty days before
12  leaving in May. I have to, like, do it backwards. Before
13  issuing my two-week notice for May 11th, I believe, that
14  two-week notice ended. So like thirty days prior to that.
15  So it would have been, like, sometime in April, on or about,
16  you know.
17      Q. Okay.
18      A. The end of March, beginning of April, something
19  like that.
20      Q. And then before that job, you had been -- so you
21  went to Bank of America. And then when you left Bank of
22  America, what job did you go to before C.B. Richard Ellis?
23      A. As I told you, The Hartford.
24      Q. At The Hartford?
25      A. Yes.

Page 57

1      Q. Why did you leave The Hartford? That job ended?
2      A. Yes, because there's usually like, you know, time
3  frames.
4      Q. The Hartford job ended. Now, after you left The
5  Hartford job, did you get unemployment insurance, or did you
6  immediately go to C.B. Richard Ellis?
7      A. No. There was -- I was unemployed for a few
8  months.
9      Q. Did you receive unemployment in that time?
10      A. I can't recall, but if I was eligible for it, I
11  would have applied because that would be the only way that I
12  would, you know, get some money in.
13      Q. Now, typically, what is your understanding of what
14  you had -- what criteria you would have to have fulfilled to
15  be eligible for unemployment? Do you have to work at a
16  place for so many weeks or something?
17      A. Basically -- and this has been across the board
18  every time I apply. I call them and I tell them I am
19  unemployed, and they, basically, guide me and I disclose
20  whatever they ask of me, I give them the information. So I
21  really don't have any clear understanding of how
22  unemployment or the Department of Labor works. All I know
23  is I'm a given a number. I contact them, and then they tell
24  me what to do from there, and I just disclose everything
25  that they ask of me.

15 (Pages 54 to 57)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

**Page 58**

1  Q. Now, in your records that you have -- not if
2  they're in one of your storage facilities or somewhere
3  else -- do you have any correspondence with the Department
4  of Labor or Unemployment that you have received over the
5  years?
6  A. I don't recall if that -- I'll just clarify your
7  question. You're asking me where my unemployment benefits
8  documentation is located?
9  Q. Right.
10  A. I don't know.
11  Q. Typically, what would your unemployment benefits
12  have been? Like in between -- if you recall, from the time
13  that you were at The Hartford to C.B. Richard Ellis, about
14  how much a week was one getting?
15  A. It depends. That I can answer to the best of my
16  knowledge. It varies, because my understanding, again, is
17  they have, like, this complicated formula. So I would have
18  to communicate to them. I don't know. I think it's like
19  three -- my most recent paychecks, three, I believe;
20  paychecks, most recent. They would do some calculation, and
21  then they would tell you what you were eligible for.
22  Q. Now, when you put -- when you put in for the job
23  from Career Builder, at some point did someone get back to
24  you and say we're interested in you?
25  A. Yeah. How that worked was I'm registered with

**Page 59**

1  Career Builder, as I am with Monster and a lot of different
2  job sites on-line.
3  Q. Right.
4  A. And so, you know, I keep my resume updated. And
5  periodically I go in there and I see a job or sometimes I
6  have job alerts sent to me.
7  Q. Right.
8  A. This job was contract. I believe it was listed as
9  administrative, but administrative assistant. It doesn't
10  matter. So I got an alert, or I applied. And when I apply,
11  I just went on working because it takes a little time
12  sometimes for them to get back to you. So I went on and it
13  might have been like thirty days later I heard back on the
14  job from them.
15  Q. What did you hear? Who contacted you?
16  A. Larry O'Keefe contacted me. And he says, you
17  know, I'm calling you about your application, you know, on
18  Career Builder. Are you still interested? And that's
19  pretty much standard protocol.
20  Q. What was Larry O'Keefe from? What company?
21  A. He worked for National Engineering.
22  Q. Okay.
23  A. NESC.
24  Q. Did he explain the job to you?
25  A. Well, I had that -- well, yeah. Basically, yes,

**Page 60**

1  he did, because we went over -- since it had just been such
2  a lapse in time, he basically called to see if you're still
3  interested. You talk about -- remember the job that you
4  applied for on Career Builder, and he gives you the
5  description and he asks you if this is something that you're
6  interested in, just to confirm my application on Career
7  Builder.
8  Q. And what did you believe the job to be, for a
9  period of time; and if so, what was that period?
10  A. Well, my understanding was that it was a contract
11  position, so similar --
12  Q. How long was it to be?
13  A. A year.
14  Q. And what was the wage to be? How much was the
15  hourly?
16  A. Up front it wasn't clear as to what the wage would
17  be, that wasn't disclosed until later on once we got to the
18  contract phase and the acceptance phase. Prior to that, I
19  can't recall if Career Builder -- sometimes they do list the
20  salary --
21  Q. Right.
22  A. -- and sometimes they don't. I can't recall if
23  that posting did list the salary. And up front -- as a
24  protocol for my job search, I don't always talk about salary
25  up front. I, more or less, try to hone in on if I'm

**Page 61**

1  qualified, more about the company, the description, and get
2  past that, that initial interview, and then I don't talk
3  about the salary in the interview. These are just coaching
4  things that I've learned. So up front, I don't know if
5  Larry, on that first conversation before we booked the
6  actual -- before he submitted, I should say, my resume, I
7  don't know if we would have discussed salary.
8  Q. Then what was the next step after you had that
9  initial conversation? Did you hear back from him or someone
10  else?
11  A. I heard back from him.
12  Q. Okay.
13  A. The first step was, in short, Are you still
14  available? Remember the job you posted for. Go over the
15  job description. Are you still available? Can I submit
16  you? That was the point.
17  Q. And what did you say to him?
18  A. Yes.
19  Q. So he was --
20  A. He was asking for permission to submit my resume
21  to NU, that was the whole point.
22  Q. Did he submit it, then?
23  A. Well, yes. I would assume that he would, or that
24  he did. He was asking me could he, so I would assume that
25  he --

Page 62

1   Q. He did?

2   A. -- communicated to NU.

3   Q. Who did you hear from next?

4   A. I believe it was Larry O'Keefe.

5   Q. And then what did Larry O'Keefe say to you the

6   next time you spoke?

7   A. That was to schedule the interview.

8   Q. And that interview was to be with him or with

9   them?

10   A. I had never met with anyone at NESC. So the

11   interview that he was speaking of was scheduled at NU --

12   Q. And when was that?

13   A. -- the hiring manager.

14   Q. Approximately what date?

15   A. I don't know the date, but it was sometime in

16   March, between March and April. I don't have the exact

17   date. I mean, I can get it for you, but I don't know the

18   exact date of my interview.

19   Q. Who did you meet with there?

20   A. I met with Byron, Byron Maddox and another young

21   lady, Patricia. I can't remember her last name. She had

22   like a hyphenated last name.

23   Q. Schaffer?

24   A. I believe that was it. She introduced herself to

25   me.

Page 63

1       MR. MADSEN: No. It's Ms. Schapley, and she is

2   from Comensura.

3   Q. (By Mr. Coffey) Who is Patricia then? Who is she

4   referring to?

5   A. She was a supervisor, I was told.

6       MR. COFFEY: She just said Patricia, so that's why

7   I'm --

8       MR. MADSEN: No. That's right. Kathy Schapley.

9       MR. COFFEY: Kathy Schapley?

10      MR. MADSEN: But there was a Patricia, you're

11   right.

12      THE WITNESS: No. I don't think it was Kathy. It

13   was Byron who was the --

14   Q. (By Mr. Coffey) Byron and --

15   A. He was the manager of the department, and this

16   Patricia woman was the supervisor.

17   Q. So you met with them?

18   A. Two persons that I knew.

19   Q. And what did they say to you?

20   A. During the interview?

21   Q. Yes.

22   A. Well, we discussed general interviewing questions

23   He was going over my resume, asking me about my

24   qualifications. So I elaborated a little bit on each one of

25   the jobs that he might be inquiring about, telling him a

Page 64

1   little bit about my background. Usually I think that's how

2   it really started out, and tell me a little bit about

3   yourself type of thing and what are your -- you know, your

4   good points and, you know, what skills would you bring to

5   the position. So, basically, we discussed that. Then he

6   went on to communicate that -- because he had, like, a stack

7   of papers on the desk in the conference room, and he

8   stated at the end of the interview after we went back and

9   forth and so on and so forth, he stated that he had other

10   persons to interview. He had numerous interviews that day.

11   The turnaround time would be a couple of weeks before they

12   would -- you know, that I would hear back from him. He also

13   stated, you know, the position as to the opportunities with

14   NU. This was based on my query of him of tell me more about

15   the department and so on and so forth and if I was replacing

16   anyone. And then he elaborated that they had won, I believe

17   he said, a contract or something like that, some type of

18   federal contract, and you had a project to do, something

19   with the lines in Connecticut or whatever. But my

20   understanding was this was a very, very large project that

21   NU was involved in, the scope would be years for them to

22   complete this, and that the project that I was accepted for

23   could be extended. It has been -- in the past, he has

24   known -- I don't know if he stated that -- I can't recall if

25   he stated he has done it personally or if it was just he was

Page 65

1   aware that the company has the capability to extend a

2   contract up to three years. He also elaborated that his

3   understanding is you can work up to certain amount of time,

4   then you have to take a break off for so many months and

5   then you can come back. And I believe he indicated there

6   were some other persons that had done similar things where,

7   you know, you have to take a break in service after a

8   certain amount of time. So that's pretty much how it ended.

9   He walked me back outside and --

10   Q. But he -- but just to bring you back, this was for

11   a one-year position?

12   A. My contract.

13   Q. Your contract was for one year?

14   A. My contract with NESC.

15   Q. Was one year?

16   A. Was for one year.

17   Q. So and when you finished up, did he say you would

18   hear back from us, or did he say anything else about the

19   position?

20   A. No. When we finished, we had already talked about

21   the position at length.

22   Q. So --

23   A. We were going back and forth. So then it was

24   pretty much small talk and the weather and things of -- we

25   were just -- you know, as he was walking me back, we weren't

Page 66

1  talking any — because he had stated, you know, when we
2  ended the conversation he had other people to interview,
3  that he would be doing that throughout the day. I think
4  this was in answer to my question when I inquired how long
5  it would take before they made a decision, and he responded,
6  you know, a couple of weeks or so.
7      Q.  Now, what did you hear back next?
8      A.  The next thing I heard — I believe it was from
9  Larry O'Keefe — is that I had been accepted. And he wanted
10  to offer me the position and they wanted to find out did I
11  want to accept the position.
12     Q.  And what date was that?
13     A.  I don't recall the exact date, but I would have it
14  in the paperwork because they overnighted — after I
15  accepted —
16     Q.  Right.
17     A.  — then they had to overnight their packet.
18     Q.  And then you received the packet?
19     A.  I believe that's the chain of events; how it went.
20     Q.  Did you sign the packet and then send it back?
21     A.  Uh-huh.
22     MR. MADSEN:  Wait a minute. You said uh-huh.
23     THE WITNESS: Oh, I'm sorry.
24     Q.  (By Mr. Coffey)  Yes?
25     A.  Because I'm looking right at him and I forget the

Page 67

1  lady is here and this is all a formal thing.
2      Q.  Did you mail it back?
3      A.  Yes, I did. Yes, I did.
4      Q.  So you mailed it back. Were there two
5  contingencies on it, that you had needed to pass a criminal
6  background test and a drug test, was that two of the
7  conditions?
8      A.  The forms — they were forms. They were release
9  forms —
10     Q.  Okay.
11     A.  — and it had NESC's name and Verifications,
12  Incorporated, name. The contingency, as you're speaking to
13  it, states that I release — I authorize these two companies
14  to supply background information or information relative to
15  my background.
16     Q.  And you read that? You had read those forms?
17     A.  That's what I had said.
18     Q.  Right. And you signed them after reading them?
19     A.  Yes. You have to be eligible. You have to agree
20  to this.
21     Q.  And you agreed?
22     A.  And it's similar to other forms that I have —
23  they are release forms. I have signed many others before,
24  so it's standard.
25     Q.  And you agreed to those conditions?

Page 68

1      A.  To provide my background information, yes, my
2  background information.
3      Q.  Right. So at some point, then, when did you give
4  notice to C.B. Richard Ellis?
5      A.  I believe it was at that time because Larry was
6  aware that — Larry O'Keefe was aware that I was working at
7  another job from the first day that I communicated to him.
8  So I don't believe I communicated it, and I have the exact
9  date, but I don't know it off the top of my head right now,
10  but I didn't communicate to my then employer that I was
11  leaving until it was pretty much solidified that I was
12  actually going to get the position.
13     Q.  And then how did you communicate it to C.B.
14  Richard Ellis, in writing or orally, or how did that work?
15     A.  It wouldn't have been to C.B. Richard Ellis
16  directly. It would have been through my agency, which is
17  Legal Now.
18     Q.  Okay.
19     A.  So I have to communicate to them. And then as a
20  courtesy because I did work — my supervisor, I just
21  happened to mention it to her. I believe she came over and
22  asked me, but the protocol is I have to communicate to the
23  agency first, and they are responsible for communicating to
24  the employer.
25     Q.  Now, who is the person at Legal Now that you

Page 69

1  communicated it to?
2      A.  Mary Max.
3      Q.  Mary — how do you spell her name?
4      A.  It's I believe it's M-A-X.
5      Q.  Oh, Mary Max?
6      A.  No. Did I say Max. I apologize. Hax is her last
7  name, H-A-X.
8      Q.  Oh, Hax?
9      A.  I apologize.
10     Q.  So where is Legal Now located?
11     A.  Legal Now is in West Hartford. They are on South
12  Main Street. It's like Legal Now and another subsidiary.
13  There's like three different companies. They are all part
14  of one. They are all under the umbrella of one company.
15     Q.  What is the name?
16     A.  South Main Street in West Hartford. I apologize.
17     Q.  And what is the umbrella, what company?
18     A.  I can't remember name of that other company,
19  because I worked directly in the area with Legal Now, so
20  that's all I retain is the —
21     Q.  Has Mary Hax placed you in other jobs through the
22  years?
23     A.  Yes, she has.
24     Q.  Which jobs has she placed you at?
25     A.  She had placed me — when I first was placed by

18 (Pages 66 to 69)

Page 70

1  Mary Hax through Legal Now, it was for a position, a
2  paralegal position, at a law firm. So, you know --
3
4      (Court reporter goes off record)
5
6      THE WITNESS: I was placed in a law firm.
7  Q. (By Mr. Coffey) What law firm, if you know?
8  A. I think it's Peter Borman. The Law Firm of Peter
9  Borman, Law Offices of Peter Borman. They're in Newington.
10 She also placed me -- she placed me in a couple of places,
11 not a lot, because I hadn't been registered with them for a
12 long period of time. So it wasn't, you know, several
13 months. It was pretty much like a couple of weeks here.
14 Actually the thirty days with C.B. Richard Ellis was the
15 longest tenure at any of the places that she placed me with.
16 Their company, more or less, it's my understanding, was kind
17 of short periods.
18 Q. Sure.
19 A. Yeah. They're not like a year and two years and
20 things of that nature.
21 Q. Now, so you filled out the authorization. You
22 sent it back. You had to go for the drug test. Did you go
23 for that, the drug test?
24 A. Yeah. You have to go for that.
25 Q. So you did that. And then at some point, did you

Page 71

1  hear that there were concerns about your background search,
2  and how did you hear about that first?
3  A. I communicated, because we're getting close to my
4  start time, which was May 14th, I believe, was my start
5  date, and I had given notice for May 11th, which would have
6  been the Friday before I was to start at NU. So on the 8th,
7  I believe May 8th, I communicated to NESC to find out --
8  just to confirm, you know, are we still on point, you know.
9  Is everything okay, making sure that the drug test -- that
10 they received the information because I had to -- you have
11 to bring this slip to this company, and then they have to
12 give this -- that slip has to be communicated back to NESC.
13 So I'm just following up to make sure, did you receive that.
14 I'm just following up to make sure we're okay for the date.
15 Q. And who did you speak with?
16 A. I spoke to Chris O'Sullivan on that evening when I
17 called.
18 Q. And what did she say?
19 A. He had stated that, oh, I was just getting ready
20 to call you. Something came up, and there was something
21 that came up on your background check. He was pretty, kind
22 of, ambiguous, if you will, as to what exactly he was
23 talking about and what exactly came up on what -- because I
24 had two things done. I had a drug test done and I had, you
25 know, had a background check done. So it was pretty much --

Page 72

1  I don't know if you want to call it query necessarily, but
2  it just wasn't direct, I would say, in all fairness to him.
3  It wasn't direct. And later after discussing it with him,
4  he states that that's how he communicates, you know, to
5  persons in the past. It's like part of, you know, what he
6  does. He tries to get the person to be forthcoming with
7  anything that they know of, type of thing. So I was like,
8  okay.
9  Q. Now, did you say anything to him? Had you advised
10 him before they did the search about what Choice Point had
11 picked up before?
12 A. No.
13 Q. And why didn't you?
14 A. Because I have had background checks prior to
15 Choice Point and after Choice Point. And when I was at C.B.
16 Richard Ellis, I had a background check as a contractor and
17 doing the type of work that I've done, on the sensitive
18 nature of work that I have performed. I worked for the
19 Federal Government. Everybody is doing background checks.
20 No one has come up with somebody else's data and cut and
21 pasted it on my background report giving the appearance that
22 this person is me. Only Choice Point has done that. And as
23 I explained to you, Choice Point was in hot water with the
24 FTC, so I just thought they were a bad company that wasn't
25 doing their job, and it was known to the FTC and everybody

Page 73

1  that that's what they do. And I just never thought any more
2  of it because it never happened before and it didn't happen
3  again until he -- the only thing that made me think of it is
4  when he said some of the things that he was -- because he
5  started reading from the report, and I was like, No. It's
6  that lady again, and he was like --
7  Q. So then did you say it to him?
8  A. I said exactly the way that I -- the way I just
9  explained it to you.
10 Q. "It's that lady"?
11 A. He started, and I was like, It's that's lady
12 again. And then I, you know, elaborated and started telling
13 him that -- you know, pretty much the scenario that I had
14 went through. It was like almost a year to the date that I
15 went through that.
16 Q. And then on May 8th, you believe, you spoke to
17 Chris Sullivan about this?
18 A. Yeah. It was on the 8th because I followed up as
19 I normally do with important communications. I followed up
20 the next day via E-mail because on that date I requested the
21 background report. I wanted things in writing, a copy of
22 it. He seemed to be a little unclear as to whether or not
23 he could release that information, and he had to -- he
24 stated he had to go back to the background company,
25 Verifications, to find out if he could disclose that

19 (Pages 70 to 73)

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 74

1  information to me.
2      Q.  So did you then start calling Verifications up?
3      A.  Well, at the time I didn't know who Verifications
4  was, because in our communication he didn't disclose to me
5  who gave him the background report.  That evening he was
6  just disclosing what he had.  He didn't disclose to me who
7  did the background check or anything like that.  So we were
8  just talking about what he had.  He also stated, you know,
9  don't worry about it.
10     Q.  Were you aware -- at that time, were you aware of
11 any of your rights under the Fair Credit Reporting Act?
12     A.  Yeah, because I had went through it with Choice
13 Point.
14     Q.  Right.  So were you aware of what needs to be done
15 to clear up your record?
16     A.  What I stated to him is I was aware that I was
17 entitled to a copy --
18     Q.  Okay.
19     A.  -- of the report.
20     Q.  Were you aware that they had a certain amount
21 of time to initiate an investigation and a certain --
22     A.  I was just aware of my rights.  I'm not aware of
23 their rights.  So my right that I was aware of is that I
24 could request a copy of a report.
25     Q.  Right.

Page 75

1      A.  And I could challenge any adverse information or
2  data that was contained in any report about me.
3      Q.  And you did challenge it?
4      A.  Yes, I did.
5      Q.  And then at some point did Verifications -- as we
6  sit here today, at some point did Verifications start to
7  investigate it?
8      A.  What they did -- well, I can't really answer to
9  what they did, if they investigated or what they did.
10     Q.  I'll withdraw that.  Do you know if they, at some
11 point, changed it?
12     A.  They did change it.  Yes, they did.
13     Q.  And what date was your report changed by?
14     A.  It was in 2007, that's when they first reported it
15 to NESC.
16     Q.  Right.  And it was --
17     A.  Then they changed it again because they reported
18 this same erroneous information on two separate occasions.
19 They reported it initially to NESC back in -- I don't know.
20 The date would be between April and in May of 2007, and then
21 they reported the same data to Kelly Law Registry just a few
22 months ago back.
23     MR. MADSEN:  Objection.  That's not part of this.
24     Q.  (By Mr. Coffey)  That's not part of this
25 litigation, so I'm not --

Page 76

1      A.  No.  I'm just trying to answer your question.  I'm
2  sorry if I'm giving you too much.
3      Q.  We're only dealing with the National Engineering
4  Service Corporation job that you believe you have -- that's
5  given rise to this lawsuit.  So what I'm saying is, at some
6  point, Verifications became aware that you disputed this.
7  You're aware of this because you spoke with Mary Poquette
8  and other people at Verifications, did you not?
9      A.  Yes.
10     Q.  Have you, yes or no?
11     A.  I disputed the background check report that they
12 provided to NESC.
13     Q.  And as far as you're aware, back in May for the
14 National Engineering Service Corporation job, upon your
15 raising concerns to them, they changed your report.  They
16 did further investigation and your report was changed.  Is
17 that correct?
18     A.  Yes.
19     Q.  And from the time that you raised your initial
20 concern and the time that your report was changed was within
21 thirty days.  Is that not correct?
22     A.  I would say so.  It was, because everything was
23 done in a relatively short period of time.  So I don't know
24 the exact dates, but I would believe that, yes, it was in
25 thirty days because I didn't wait thirty days to find out

Page 77

1  that I was not going to receive the job at NU.  So I would
2  say that that would probably be accurate.
3      Q.  So then at some point -- and I believe it's May
4  11th -- at some point, the concern that you had raised was
5  addressed.  The record was changed to show that that was not
6  you, the Deborah Adams from Pennsylvania was not you, and
7  you were cleared to start the employment with National
8  Engineering Service Corporation.  Is that correct from your
9  understanding?
10     A.  From my understanding, you're correct.
11     Q.  And your drug test had also come back negative for
12 any drugs in your system.  Correct?
13     A.  To my knowledge.  I wasn't communicated --
14     Q.  So you were then told at some point that you were
15 cleared to start?
16     A.  They didn't use words like that to me.
17     Q.  What did they say?
18     A.  After?
19     Q.  Right.
20     A.  After they corrected the report?
21     Q.  Yes.  Then what was said to you?
22     A.  By Verifications, Inc., I was told that they
23 corrected the background check, that's what I was told.
24     Q.  Okay.
25     A.  The term cleared or what have you, that wasn't --

20 (Pages 74 to 77)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 78

1   Q.   So they addressed the background check?
2       MR. MADSEN:   "They" meaning Verifications?
3   Q.   (By Mr. Coffey)   Verifications had addressed it,
4   and you believed --
5   A.   They responded to me.
6   Q.   Right.
7   A.   They did answer, and they responded to my -- I
8   don't know, my complaint, if you will, or my dispute of the
9   accuracy of the initial report, yes, they did.
10  Q.   Do you believe they were not timely in responding
11  to it, or was it -- you said it was in rather short order.
12  Did you believe they acted promptly or not promptly?
13  A.   I don't believe that they delayed --
14  Q.   Okay.
15  A.   -- the process.   Is that a -- I think.
16  Q.   Yeah.   That's fine because I'm just trying to --
17  A.   Because I don't know the time frame of how long
18  they have, but I just know I was -- because we were trying
19  to get everything done before the 14th.
20  Q.   As far as you were aware, everything was done
21  before the 14th?
22  A.   "Everything" like what?
23  Q.   Was done.   Like the drug test was done?
24  A.   Oh, yeah.   I had performed all of that, yes.
25  Q.   And then, as far as you're aware before the 14th,

Page 79

1   Verifications had got back to you and responded to your
2   complaint and said that the report had been changed.
3   A.   To my -- yes, to my knowledge.
4   Q.   Right.
5   A.   Yes.
6   Q.   But also it didn't -- we took a deposition.   You
7   were there last week for Mr. Sullivan.
8   A.   Uh-huh.
9   Q.   He said that he had already conveyed that
10  information back up to Northeast Utilities at some point.
11  Were you aware -- did they ever tell you that you had been
12  cleared to start that job?
13      MR. MADSEN:   I'm just going to -- I don't believe
14  that was his testimony, but go ahead.
15      THE WITNESS:   See, I don't know.   My communication
16  with him -- and this has been my experience from
17  working with other agencies -- the relationship is
18  between myself and National Engineering.   So what
19  National Engineering communicates to their contacts,
20  I'm not privy to that conversation.   And I don't recall
21  him telling me anything about his communication with
22  Comensura at the time or Northeast Utilities, other
23  than the fact that that night, the 8th, he stated that
24  it would work out okay and he was just getting ready to
25  call me and he would have to make some phone calls.

Page 80

1   But as far as what phone calls he made and to whom and
2   what they discussed, I am not privy to that.
3   Q.   (By Mr. Coffey)   Okay.
4   A.   I can't answer.   I can just tell you what I said
5   to people and what we have discussed.
6   Q.   Right.   So when the 14th came, were you still
7   expecting to go to work on that day?   Had anyone said
8   anything to you one way or the other?
9   A.   I was pretty much just waiting to hear back on
10  what decision -- at that point, I didn't know who was making
11  the decision.   I had communicated via E-mail to Byron Maddox
12  and communicated to him my situation.   He replied that he
13  was aware of my predicament and that communication would
14  be -- or should be forthcoming.   I think he said something
15  like that, would be or should be, from Comensura.
16  Q.   Now, who did you speak with that you recall
17  speaking with at Verifications, which people?
18  A.   I spoke to a lot of different people initially.
19  The only reason why I don't remember their names, other than
20  Mary, is because each time you call, you go through, you
21  know, the whole scenario why your -- because you're in a
22  switchboard.
23  Q.   Right.
24  A.   And they tell you -- you know, they refer you to
25  whoever, you know, you're speaking to, and then they refer

Page 81

1   you to someone else, and then refer you to someone else.   So
2   it was just very confusing initially until I finally got
3   referred and transferred to Mary and then --
4   Q.   How many times did you speak to Mary, about?
5   A.   I spoke to her several times.
6   Q.   And what was said in those conversations that you
7   recall?
8   A.   We were just trying to clear up -- we were trying
9   to get to the bottom of it; communicate to her the reason
10  for the call, who I was, reported to her what was reported
11  to me, requested a copy of my report, asked questions like
12  how did you do -- how did you perform your background check?
13  Was it done on Social Security number initially, things of
14  that nature.   We were just trying to get to the bottom of
15  it, you know.
16  Q.   Was she responsive?
17  A.   I thought she was.
18  Q.   And at some point, then, she had communicated with
19  you that she had -- that the report had changed and she had
20  notified everyone of that.   Is that correct?
21  A.   Well, after our conversation, pretty much, yes.
22  Because, you know, like I said, our conversations were going
23  back and forth.   Some things, you know, you have to put in
24  writing if you're disputing it.   So, you know, I put it in
25  writing.   I followed it, I faxed it or mailed it or however.

21 (Pages 78 to 81)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 82

1  I followed up to see if you received it. She's going to
2  look into it. I'm pretty much just calling to confirm. Are
3  you looking into it? Did you look into it? I'm not privy
4  to the conversations that she has with, you know, I don't
5  know, Comensura or NESC. Basically, I'm just trying to find
6  out, Did you check? You know, did you change the report.
7  And, you know, were you sending out an amended report.
8  That's basically where I'm at with her.
9      Q.  When did you first know that you were not going to
10  get that job? Who conveyed that to you?
11     A.  Well, I was kind of formally -- I would say it was
12  communicated in an E-mail. I don't know the date. It was
13  like on or after the 14th. Prior to that, I wasn't feeling
14  very hopeful. It was sort of --
15     Q.  Were you told why? What did they say to you? Do
16  you recall anyone saying to you why you didn't get that
17  specific job?
18     A.  It was in response to an E-mail that I was just,
19  like, following up because initially I was just told that --
20  the term was used, a holding pattern.
21     Q.  Right.
22     A.  So I would just follow up. And when it was
23  communicated that it was over, pretty much, my hopes were
24  over, that they had hired someone else.
25     Q.  And who told you? So who do you recall telling

Page 83

1  you that?
2      A.  That was in an E-mail, and I believe that was from
3  Chris O'Sullivan.
4      Q.  Had you ever talked to anyone from Northeast
5  Utilities?
6      A.  No. Because I only met with them for the
7  interview, and then sent the -- I sent the E-mail, as I had
8  stated, to Byron send some letters.
9      Q.  Now, after that, did you have any other -- after
10  that date, did you have any other job interviews or any
11  other position that any of the other employment agencies
12  tried to set up for you?
13     A.  Yes, I did. I had an interview. It was like a
14  couple of days after. I don't know the exact date, but it
15  was a short period of time. I'm going say like a week or
16  so. It wasn't too long after I found out that I wasn't
17  going to receive the job at NU, I had called -- I had been
18  called in for sort of like a second interview for a
19  position, but --
20     Q.  And that was with what company?
21     A.  Because that was -- that was for a state agency in
22  and around Storrs, Connecticut. But because that was like
23  the day that my car was repossessed, I wasn't able to make
24  the interview. So I tried to, like, postpone it or
25  reschedule it, and I wasn't able to do that.

Page 84

1      Q.  Okay.
2      A.  So I wasn't able to go to that interview.
3      Q.  And other than having that, when was the next time
4  that you had a job or that you had an interview or
5  employment that you secured?
6      A.  That was with Mary Haas at -- wait a minute. I'm
7  going backwards. I'm sorry. Going forward, the next job
8  that I had -- I started working for Resource Group Staffing.
9      Q.  And when did you start?
10     A.  And that's for the Connecticut Treasury Office.
11  I'm kind of fuzzy on the date. It was fall.
12     Q.  Fall of '07?
13     A.  In the fall. I can give you the exact date
14  because it's on my resume when I worked at the Treasury's
15  Office. That was for like a three-month assignment, I was
16  told. So that was the next position.
17     Q.  And what did you get paid at that job?
18     A.  That job I was paid $16 an hour.
19     Q.  And that lasted about three months?
20     A.  Yes. They were right on time with their --
21     Q.  And that was the fall of '07?
22     A.  Yeah. On or around the fall of '07. I can give
23  you the exact dates. It's listed on my resume.
24     Q.  And that lasted about three months?
25     A.  Uh-huh, yes.

Page 85

1      Q.  And you were paid about $16 an hour.
2      A.  Yes. I was paid exactly $16. That was the hourly
3  rate, $16 an hour. I remember that one.
4      Q.  And how many hours a week was that?
5      A.  That was a forty-hour week. However, you work --
6  for example, if they have holidays, you don't get paid for
7  those days, but when you accept the assignment, it's, you
8  know, supposed to be a forty-hour week.
9      Q.  So that would come out -- that would come to $640
10  a week, about?
11     A.  But there was weeks that I was, like I said, I
12  work --
13     Q.  So $640, approximately, a week?
14     MR. MADSEN:  That's gross?
15     THE WITNESS:  Well, he's probably doing it because
16  he can't calculate the taxes.
17     Q.  (By Mr. Coffey)  No, yeah, I understand.
18     A.  I don't think he's that good.
19     Q.  I wish I was, but okay. Now, the job that you
20  were supposed to get at National Engineering, what was that
21  wage rate?
22     A.  That wage, if I can remember correctly from my
23  contract, was 21 hours -- or $21, you know an hour; hourly
24  rate, $21. Forty-hour week. And then there was another
25  rate for overtime because my understanding was at times it

Page 86

1  could get into overtime, and I think that overtime rate was
2  like $31.80 or something like that.
3      Q.  So after leaving C.B. Richard Ellis, the next job
4  that you recall having was the State Treasurer's Office?
5      A.  Correct, through Resource Group.
6      Q.  Through Resource Group?
7      A.  Uh-huh.
8      Q.  After that, when you left that position, where did
9  you go to?
10     A.  I worked for another agency, Community
11  Enterprises. They're located in Windsor, Connecticut. And
12  it's for another state agency.
13     Q.  Community Enterprises?
14     A.  Uh-huh.
15     Q.  Now, between the State Treasurer and Community
16  Enterprises, did you receive unemployment?
17     A.  I may or may not have because the time of the
18  downtime, if you will, or the time of unemployment wasn't
19  very long, so I can't recall if I collected unemployment.
20  If I did, it would have been for, you know, a short period
21  of time because I was working when the job ended at the
22  State Treasurer's Office, within — it was a short period of
23  time.
24     Q.  Okay.
25     A.  I started working again.

Page 87

1      Q.  So community enterprises was with which state
2  agency? What agency did you work for?
3      A.  No. That is the agency.
4      Q.  Oh, okay.
5      A.  Community Enterprises is the agency, the
6  recruiter, the staffing agency. And the employer that I
7  worked for through Community Enterprises was the State of
8  Connecticut, Department of Children & Families.
9      Q.  Okay.
10     A.  I worked for them next.
11     Q.  And how long did you work for them?
12     A.  I worked for them for like three months, a couple
13  of months. And then I worked — moved on to work for the
14  Department of Social Services.
15     Q.  So approximately three months there. And how much
16  were you being paid there?
17     A.  I was making like $12, $12.50.
18     Q.  And how many hour weeks?
19     A.  They always disclosed that it's forty hours, but
20  you don't really work forty.
21     Q.  So it's forty hours less the lunch?
22     A.  Yeah. It's forty hours less the lunch, and not
23  only that, it's less holidays.
24     Q.  That was probably three months. And what was
25  that, would that have been the beginning of '08?

Page 88

1      A.  For?
2      Q.  The beginning of '08.
3      A.  Yes, because the Connecticut Treasury position
4  ended in December of 2007. So then I started working in
5  2008 for Department of Children & Families through Community
6  Enterprises, and then I had some other jobs through
7  Community Enterprises; City of Hartford.
8      Q.  So then after you left the Department of Children
9  & Families, then where did you go?
10     A.  City of Hartford. It was still through Community
11  Enterprises.
12         MR. MADSEN:  I just want to get one thing straight
13  for the record. Was your employer Community
14  Enterprises —
15         THE WITNESS:  Yes.
16         MR. MADSEN:  — or was it the State?
17         THE WITNESS:  Yes.
18     Q.  (By Mr. Coffey)  And then you went to the City of
19  Hartford. What did you do with the City of Hartford? Which
20  unit? What department?
21     A.  Well, it was Town Hall, City Hall.
22     Q.  Okay.
23     A.  And what I did, my position, I took notes, I was
24  like a paralegal. And during their city budget or their,
25  you know, town budget, I transcribed. I was like a court

Page 89

1  reporter. So I dictated — I didn't dictate, but it was
2  while they were having their meetings, I would take a
3  transcription of the meeting, then I would type them up and
4  then give it back to them, so that was the project.
5      Q.  And then how many hours a week did you work doing
6  that?
7      A.  I worked on that an average — it was like 45
8  hours because it was from, like, two weeks they were having
9  their budget.
10     Q.  How much was that?
11     A.  The hourly rate was like $16.
12     Q.  Sixteen?
13     A.  Yep.
14     Q.  And then where did you go from there?
15     A.  Then the next — I was back at the State for the
16  Department of Social Services, DSS, in their administrative
17  offices.
18     Q.  And how much was the wage there?
19     A.  It was back down again, back down to like — I
20  think at this time she was able to give me fifty cents more.
21  So I think I was at $13 an hour as opposed to the $12.50.
22     Q.  And how long was that position?
23     A.  That was only a couple of weeks.
24         MR. COFFEY:  I have to take a break for two
25  minutes.

23 (Pages 86 to 89)

Page 90

```
 1
 2          (A recess was taken)
 3
 4      Q.  (By Mr. Coffey)  Then you went back to the
 5  Connecticut DSS through Community Enterprises at
 6  approximately $13 an hour?
 7      A.  But I didn't go back to them.  That was the first
 8  time I had worked for them.
 9      Q.  And when was that?  That was for a couple of
10  weeks?
11      A.  Yeah.  It was, yes.
12      Q.  And then where did you go?
13      A.  That's when I lost my apartment because I couldn't
14  keep up making the twelve and the thirteen.  I had only made
15  the $16 an hour for, like, a couple of weeks, so that's when
16  I left the -- you know, I had to leave.
17      Q.  So which place was this that you were at?  This
18  was which apartment?
19      A.  This was -- because I had left my apartment at 160
20  Newington Road.
21      Q.  So you left 160 Newington Road?
22      A.  Back in September, as I had stated, yes.  And then
23  from there, I don't think we discussed --
24      Q.  Right.  We didn't.  Where did you go from there?
25      A.  We didn't discuss where I went after that.  We
```

Page 91

```
 1  just -- you know, I left there.  And so when I left there, I
 2  moved to Concord Street in West Hartford.
 3      Q.  What number?
 4      A.  It was 8 Concord Street --
 5      Q.  Eight Concord Street?
 6      A.  -- in West Hartford.  Essentially, what I did, I
 7  downsized.  I tried to find a more, you know, affordable
 8  place.
 9      Q.  And how long did you live at 8 Concord Street then
10  from September until when, approximately?
11      A.  Around May, the end of -- you know, the end of
12  May, and that's when --
13      Q.  And that would have been May?
14      A.  2008.  I apologize.
15      Q.  And then May of 2008, you moved to where?  Where
16  did you go from there?
17      A.  That's when I put my things in storage, in another
18  storage; things that I hadn't already had in storage from a
19  previous move.  I put these things in another storage and
20  grabbed up some clothes and went to my mom's house.
21      Q.  And you went to your mom's house for how long?
22      A.  I stayed there until I finalized the job with
23  Kelly.  So I was there for a couple of -- you know, maybe
24  thirty days or so, a couple of months.  It was like the end
25  of May, June, something.  Like thirty days.
```

Page 92

```
 1      Q.  Did you work in those thirty days?
 2      A.  No.
 3      Q.  Were you receiving any benefits during those days?
 4      A.  Yes, I was.  Yes, I was.
 5      Q.  What were you receiving then?
 6      A.  The amount of money?
 7      Q.  No.  You were receiving unemployment benefits
 8  during those days?
 9      A.  I was receiving -- oh, you did say benefits.  I
10  apologize.  I was receiving unemployment.
11      Q.  And that would have been which, May to June,
12  approximately?
13      A.  Yeah.  It was just for the short time that --
14  short time before I started the job at Kelly.  When I
15  started the job at Kelly, then I, you know, report that I'm
16  working and I'm no longer eligible for unemployment.
17      Q.  And then you went to work with Kelly when, in June
18  of '08?
19      A.  Correct.
20      Q.  And how much per hour is that now?
21      A.  Nineteen.
22      Q.  Sorry.
23      A.  That's okay.
24      Q.  Nineteen per hour.  And that's how many hours per
25  week?
```

Page 93

```
 1      A.  Again, it's $19, but it's less lunch, and it's
 2  less any time off like holidays or anything like that.
 3      Q.  And that's forty hours a week?
 4      A.  That's how, you know, it was communicated to me,
 5  that it would be a forty-hour week.  So it's full-time.
 6  It's not a part-time position.
 7      Q.  And at any point in time when you were faced with
 8  any of the evictions or anything, did you receive any aid or
 9  any benefits from any agency or any source to help pay your
10  rent?
11      A.  I did everything I could.  I communicated to my
12  church.  I communicated -- they have a program called
13  eviction prevention.  I communicated to them.  I
14  communicated to the Department of Social Services.  They
15  have a program.  I communicated to my mom, but she wasn't
16  really able to help me.  That's why I had to move because I
17  couldn't really get anything.  At the time it was -- I was
18  told that, you know, a lot of these agencies were backed up,
19  and it was just -- you know, it was a mess, and I was tired
20  of trying to hold on.  And I just thought it would be best
21  to just throw in the towel, but I did -- in answer to your
22  question, yes, I did -- those are the agencies or the
23  persons, entities, if you will, that I remember
24  communicating to.  Basically, I would make the call and they
25  would give me a list of where I could go to get help.  So I
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES

Page 94

1    just called all of these places to try to get help.
2        Q.   And now, you're back at the -- you're at Motel 6.
3    So you're living there several days a week depending on the
4    week, you said?
5        A.   Well, I wouldn't call myself a resident there
6    because -- and I don't know if this is accurate or not, but
7    my understanding is Connecticut has laws against that.
8    That's what the lady said.  I don't know.  But in answer to
9    your question, I just stay there when I'm working.  So I
10   just stay there.  I can't afford to stay there like all of
11   the time, so I stay there.  I go to work and then I go home
12   when I can.  If I work later or if I have something
13   scheduled down here for the weekend, then I'll stay on.
14   Sometimes it doesn't make sense to drive.  With the gas, it
15   doesn't make sense for me to drive all of the way up there
16   and then pay the gas.  It's cheaper to stay down here and
17   just pay one day and a room because I would next -- I would
18   double it in gas, if you understand, if I'm being clear.  So
19   sometimes I stay later than seven days.  But when I reserve
20   the room, it's only for four days.  It's like Monday through
21   Thursday.  And if I have to make up hours, then I'll just go
22   back to them and say I'm going to stay over another day or
23   something like that, but --
24       Q.   And what days a week are you currently working?
25       A.   The schedule is Monday through Friday.

Page 95

1        Q.   Okay.
2        A.   But if there's a holiday, I'll try to make up
3    the -- the supervisor is really flexible as far as making up
4    time.  Like when I leave here, I'm going to go back and try
5    and make up as much as I can.  So it's Monday through
6    Friday, but you have the flexibility of trying to make up
7    the time.  So what you will have to do -- what you have the
8    option of doing is working later.  So you work -- as opposed
9    to working the eight hours or the ten hours, you're working
10   twelve hours or the fourteen hours and try to get it as
11   close to forty as possible if you can.  Her feeling is, I
12   don't care when you work, as long as it's Monday through
13   Friday and it's forty hours a week, because they have a
14   project that they have to finish.  So that's all -- that's
15   what I try to do.  I try to give them forty hours a week
16   whatever days I can that I am admitted into the building.
17       Q.   Now, when you left the 160 Newington Road address,
18   what was your rent per month there?
19       A.   Rent was -- I believe it was $1,100.  And there
20   may have been another, like, service fee for trash hauling
21   or something like that that was in addition to the $1,100.
22   But, for the most part, the rent was $1,100 a month.
23       Q.   And then how about the 8 Concord Street?
24       A.   That was eight -- it was $800 and something.  I
25   can confirm it.

Page 96

1        Q.   And where you're staying now, how do you work that
2    out?
3        A.   How I pay that is I go on-line and I reserve the
4    room from Monday -- excuse me.  Sunday through Thursday, and
5    the on-line rate is a little cheaper.  So I go -- when I
6    check in, sometimes I pay just the two days whatever I have
7    the money for, and then -- because I get paid on Thursday.
8    And then I'll get the money in and I'll pay for -- when I
9    first started, you know, I didn't have the money for the
10   whole week, so that's how I did it.  Now that I'm working, I
11   try to pay, like, in advance.  So when I came in on Sunday,
12   I pay through Thursday, which is my pay date.  And then I
13   figure, you know, if I have to stay on, stay over another
14   night, then, you know, I get paid and I can pay another
15   night.
16       Q.   How much is that typically a night?
17       A.   Typically, it's like $41 dollars or something like
18   that.  They just changed their rates because it was a little
19   bit -- it was a little bit cheaper.  But on the weekends,
20   the rate changes, and I don't recall what that rate is.  So
21   it's like five dollars more.
22       Q.   Now, in 2007, did you file income tax returns?
23       A.   Yes.  I always file, yes.
24       Q.   And do you recall how much income you made in
25   2007?

Page 97

1        MR. MADSEN:  You mean -- you said in 2007 did she
2    file tax returns?
3        Q.   (By Mr. Coffey)  Okay.  I'll go like this.  Do you
4    remember how much you earned for the year 2007?
5        A.   Not off the top of my head.  I can get that
6    information for you.  I know my earnings have declined in
7    the last couple of years or so.  But off the top of my head,
8    I'm going say like $30,000 or something like that, you know.
9    I don't want to give you any incorrect information.
10       Q.   When you say in the last couple of years your
11   income has declined, why has it declined?
12       A.   Inconsistency of working.  Since the time that I
13   worked at General Electric when I was consistently employed,
14   because, you know, I wasn't working full-time -- I shouldn't
15   say full-time, but I wasn't working consistent.  There have
16   been like little gaps of employment.  That's the reason for
17   it, you know.  Sometimes I'm making $12 an hour, then I'm
18   making $16 an hour, then I'm making $20 an hour, you know,
19   those types of gaps.
20       Q.   And so is it your experience in the temporary
21   marketplace that there are ebbs and flows, that they are
22   gaps at times?
23       A.   In my experience, it goes with the market as well
24   and the industry that you're in.  A lot of people have
25   communicated that I should get out of insurance.  I work

**Page 98**

1 primarily in insurance, primarily. And because of the --
2 you know, the economy post 9/11 and then now with the
3 economy being what it is and insurance is doing a lot of
4 mergers and acquisitions, the climate is a little volatile
5 to get into positions that I normally used to get into
6 pretty relatively quickly.
7 Q. When you work in the insurance industry, where is
8 your experience? What types of insurance?
9 A. I have specialty insurance that is business
10 insurance which it's known in the community as business
11 insurance. This are insurance like crime, fiduciary,
12 directors and officers, employment practices. Those types
13 of lines. Health insurance, life insurance, I have, just
14 through this position, gained a little experience in
15 property and casualty.
16 Q. Do you ever deal with any errors and omissions,
17 like E&O policies?
18 A. Yes.
19 Q. In your experience, had you ever seen any claims
20 on like Fair Credit Reporting Act claims?
21 A. No, not in my job.
22 Q. Okay.
23 A. The only experience that I have with Fair Credit
24 Reporting is my own research from my own personal issues
25 that I have gone through personally. I've never dealt with

**Page 99**

1 it as a matter of fact of like a researcher as part of my
2 job to be knowledgeable of this regulation, you know, for my
3 job performance. It was just all of my own personal
4 research.
5 Q. And then where would you -- in which companies or
6 carriers did you deal with like E&O policies?
7 A. That was at CHUBB. CHUBB is a specialty in -- you
8 know, in addition to whatever else they do. They're called
9 specialty lines. That's their little market nitch.
10 Q. And which specialty lines did you work with that
11 you recall?
12 A. Crime, fiduciary, employment practices, directors
13 and officers, kidnap and ransom, Internet liability. I
14 underwrote all of those lines. In claims, when I worked in
15 their claims department, I was in the errors and omissions
16 unit of the claims department as a paralegal.
17 Q. Now, when did you first retain an attorney in this
18 matter?
19 A. I communicated -- once I found out that, you know,
20 I wasn't going to get the job and pretty much felt like the
21 finger was, like, being pointed at me, it was like, well,
22 why didn't you tell us, and, you know, going forward, we're
23 really sorry this happened. Going forward, you know, you
24 should do this, this, and this. And that's when I was,
25 like, that's unacceptable. And I communicated -- I called a

**Page 100**

1 couple of people before I retained Will. I think I had
2 called him a couple of times before, and finally retained
3 him -- I don't know -- it must have been like in June or
4 July. So I would say like three -- within a couple of
5 months after, you know, May; after my -- the start date, the
6 14th. That would be pretty accurate.
7 Q. And how did you come to find him?
8 A. Research, you know. I'm pretty good with, you
9 know, research. I go on-line. I Google. Since I worked
10 with attorneys in my previous positions, I call attorneys
11 at -- we worked with, and they give you referrals, because
12 one particular law firm -- I can't remember their name --
13 but I remember working with them at CHUBB, but they only
14 represent businesses. And then they gave me Will's name as,
15 you know, a person -- as a firm that works with individuals.
16 I think it's how it's classified.
17 Q. And then that was -- so you have, in the past
18 year, then -- so the job you were to have taken with
19 National Engineering Service Corporation, that was to be
20 fifty weeks. That would have ended, then, in 2000 --
21 sometime in May, 2008?
22 A. I don't know when it would have ended, but the
23 contract states that it was from April 14th -- I believe
24 this is on my contract -- through April something, 2008. So
25 2007 to 2008, that's what was on the contract. When it

**Page 101**

1 actually would have ended -- you know, it's been my
2 experience who knows because they gave you some type of
3 framework when you get in there just to give you some idea
4 of the scope of the job, but sometimes it ends sooner.
5 Sometimes it extends out longer, and you only find that
6 from -- sometimes you get hired permanently. That's been my
7 experience.
8 Q. And that's with any job?
9 A. That's with contract jobs or permanent jobs, you
10 know, that you're an employee at will. So they sign you --
11 you sign that, and you come in and they don't have any
12 obligation to keep you and you don't have any obligation to
13 stay.
14 Q. That's when you were full-time, not a contract?
15 A. Yeah. That's when you've signed that form,
16 employee at will. So they're making it clear you're not a
17 -- we're not signing a contract with you. But mostly with
18 the long-term assignments, the assignments that last a
19 little bit more than a year, they usually put a contract.
20 That's my understanding. That's just the market.
21 Q. Okay.
22 A. They want to make sure that you're going to be
23 available that you're going to stay around, that you're not
24 going to, like, take off in the middle of the assignment and
25 try to go find another -- you know, hop from assignment to

Page 102

1   assignment.
2       Q.  Now, approximately -- in that year, then, if you
3   said that it was fifty weeks, approximately?
4       A.  I didn't say that.  You said that.
5       Q.  That contract was fifty weeks?
6       A.  If it was a year, yeah.
7       Q.  Which it was, or it was fifty weeks.  Right?  So
8   if you had a fifty-week contract and it was supposed to go
9   from April '07 to April '08, in the period in your career
10  from April '07 to April '08, how much money did you earn
11  approximately during that period of time?
12      MR. MADSEN:  I just want to -- I believe it's May
13  14th.
14      MR. COFFEY:  Well, she said April.  I'll go with
15  May.  I don't care.
16      THE WITNESS:  Did I?  I'm sorry.
17      MR. MADSEN:  Whatever.
18      Q.  (By Mr. Coffey)  I'm not looking to --
19      A.  I'm sorry.
20      Q.  If you say you were supposed to start May 14th and
21  it was a fifty-week contract --
22      A.  I'm sorry.
23      Q.  -- right?  So in the period from May 14th of 2007
24  for the fifty weeks after that until 2008, so until the
25  beginning of May 2008, how much money did you earn during

Page 103

1   that time?
2       A.  I don't know.  If I had to guess, and this is what
3   I would do, I would be calculating all of the hourly wages
4   that I disclosed to you by the hours that I worked and give
5   you, like, a gross amount for all of the income that I got
6   in.  And so if I had to guess, I'm going say like $18,000 or
7   so, but I can do a more calculated -- because I'm just
8   talking off the top of my head.
9       Q.  Right.  I'm just --
10      A.  But I can actually crunch the numbers --
11      MR. MADSEN:  We can do that.
12      THE WITNESS:  -- and give you an accounting, you
13  know.  I'm just going off the top of my head.
14      Q.  (By Mr. Coffey)  So it could have been
15  approximately $18,000, give or take some money?
16      A.  That's what I'm saying.  And I'll crunch the
17  actual numbers based on, like I said, how I would calculate
18  it, where I was working, how long I worked there, how many
19  hours I actually worked by the hourly wage.
20      Q.  And you had anticipated -- under that contract,
21  then, how much had you anticipated to make under the terms
22  of that contract, approximately?
23      A.  I believe it was disclosed.  I think there was
24  like a figure, if I can remember correctly, in the contract
25  where it stated the dollar amount.

Page 104

1       Q.  And what do you believe?
2       A.  I believe that number was like $41,000, $42,000.
3   That's to the best of my knowledge from, you know, recall of
4   looking at that contract.  I don't know if that was the
5   cover page or whatever, but whatever page that spoke to the
6   wages.
7       Q.  So we talked about what the earnings were.  Now,
8   other than earnings, what other damages, monetary damages,
9   do you have or are you claiming as a result of this lawsuit?
10      MR. MADSEN:  Just an objection to the extent that,
11  you know, it draws upon legal knowledge and
12  information, but you can answer.
13      THE WITNESS:  Did he say I could answer?
14      MR. MADSEN:  Yes.
15      THE WITNESS:  When you say "damages," I could just
16  tell you what happened to me, and then this is what I
17  would --
18      Q.  (By Mr. Coffey)  Other than what you've said
19  already?
20      A.  This is what I call damages, other than what I
21  have already told you.
22      Q.  Other than what we have talked about since --
23  right, since 10:15.
24      A.  Right.  I would say the fact that my credit has
25  gone down because of the -- you know, the repossession and

Page 105

1   the evictions.  We talked about that.  The emotional, we
2   talked about that.  Me being separated from my son.  It was
3   the first time where we had to like split up.  Those types
4   of damages.  Is that an answer to your question, or do you
5   want me to elaborate?
6       Q.  I think that's good.  The emotional distress is
7   what you outlined that you saw Ms. LeClaire and Dr. Zibel?
8       A.  Yeah.  The despair and the anxiety that I felt,
9   you know, or experienced trying to clear it up, and then
10  having had a job and then lost the job and those types of
11  things; and subsequently having to move.  And, you know, all
12  of these happened in -- surrounding this employment
13  opportunity, failed employment opportunity, with NU.
14      Q.  Now, you spoke earlier that at another time in
15  this past year that you had another occasion to have another
16  report done by Verifications and you said that came back
17  with some concerns on the report.  At that time, did you
18  then immediately communicate with Verifications about your
19  concerns?
20      A.  You mean talking about with Kelly Law?
21      Q.  Yes.
22      A.  Yes.
23      Q.  And did they get that cleared up?
24      A.  Yeah.  I had to communicate with Kelly Law, and,
25  you know, they communicated to me.

Page 106

1    Q.  Did it get cleared up that time?  Did the report
2  change at some point?
3    A.  It changed as it changed before.  Do you know what
4  I mean?  Basically, it was the same thing happening again.
5  For example, with NESC, they reported the erroneous data.  I
6  disputed it.  They corrected it.  Same thing with Kelly Law.
7  They reported it, the erroneous information, the same
8  information that they reported to NESC.  I disputed it.
9  They corrected it.  The only difference is I had worked for
10  Kelly Law Registry before, and they knew me personally.  She
11  knew that -- she goes, Well, the name is not even spelled
12  the same and she's down there in some down south, you know,
13  county and you've been up here all of this time.  I'm not
14  paying any attention to it.
15    Q.  Right.  So it was corrected.  Like how long from
16  when it was reported until when it was corrected, that would
17  have been within a week to two weeks?
18    A.  No, I don't know.  I don't know.  I can -- off the
19  top of my head, I don't know.  The only reason why I don't
20  know is because I started my job.
21    Q.  Okay.
22    A.  You know what I mean?  When I start my job -- as
23  long as I am -- it's all about the work.  If I work, then --
24    Q.  So you got back to work?
25    A.  Okay, you know.  Kelly didn't report it to The

Page 107

1  Hartford.  She knew who I was.  She believed, you know, me.
2  She told me that -- actually, she told me not even to worry
3  about it.  So how long it took for them to like correct it,
4  I really didn't pay attention.  The report that I received
5  that I passed onto Will, I just opened that.  They sent that
6  to me back in June.  I didn't even open it at the time
7  because it was all about the work.
8    Q.  Other than the credit, the emotional distress,
9  being separated from your son, is there any other monetary
10  damages that you're claiming other than that you weren't
11  employed during that period of time as a result of this
12  incident?
13    A.  Did I include -- or is this part of everything
14  that I discussed when I talked about losing my apartment and
15  all of that other stuff which is, hence, the credit and all
16  of that.  That pretty much sums it up.  I mean, it is what
17  it is.
18    Q.  Now, other than leaving at the end of terms, were
19  you ever let go in the middle of any other terms on any of
20  the temporary places you were working?  Did they all end
21  because the date had been reached?  Have you ever been let
22  go during one of your assignments?
23    A.  In my life?
24    Q.  Yes.
25    A.  Yes.

Page 108

1    Q.  Oh, okay.  Most recently in the last ten years.
2    A.  No, not in -- there have been times when, in my
3  life, through the scope of my employment, they run out of
4  money.  Companies run out of money.  You finish the job
5  before, you know -- in a time frame that they anticipate.
6  It was going to take five months, you completed everything
7  in three months.  There's different varying feedback that
8  you get when jobs end.  But most recently, I have worked to
9  term.  And sometimes -- actually, I was extended more than
10  I've been -- in the scope of my temporary work, I have
11  worked more than less, you know, as far as the terms of the
12  agreement.  They say three months.  Most times it ends up to
13  be four or five or something like that.
14    Q.  And since the facts that give rise to this
15  lawsuit, is there any other lawsuits that you have started
16  or commenced?
17    A.  No.  Not lawsuits, no.
18    Q.  Any other complaints that you have filed?
19    A.  I have filed a complaint, yes.
20    Q.  With whom?
21    A.  I filed a complaint when I applied for permanent
22  positions with the state.  I applied -- I filed a complaint
23  internally.  I don't know the name of their department, but
24  they have some internal thing.  I don't know if you call it
25  a complaint.  It's just like I disputed something, so --

Page 109

1    Q.  You filed a complaint with whom?  Which
2  department?
3    A.  It's with an internal -- I don't know the name of
4  the -- it's like an HR, I guess, because it is part of HR.
5    Q.  With HR for the state?
6    A.  Uh-huh, yes.
7    Q.  Did you have counsel when you did that, an
8  attorney?
9    A.  No.  It was just -- it was basically a letter.
10    Q.  Do you have a copy of that?
11    A.  I don't know if you want to call it a complaint.
12    Q.  Copy of that letter?
13    A.  I'm sure I do.
14    Q.  What is the basis of the complaint?
15    A.  I disagreed with the application process.
16    Q.  How did you disagree with the application process?
17    A.  Pretty much the selection and why I wasn't chosen
18  and things of that nature.  They ended up -- my
19  understanding is -- selecting someone from another state
20  agency, so they took another state employee over me.
21    Q.  And this was --
22    MR. MADSEN:  I just have to take a quick break.
23    MR. COFFEY:  I'm almost done.
24    Q.  (By Mr. Coffey)  So which department was this for
25  with the state?

28 (Pages 106 to 109)

NIZIANKIEWICZ & MILLER REPORTING SERVICES

Page 110

1    A. D.C.F.
2    Q. And when was this that you filed the complaint?
3    A. Excuse me?
4    Q. When did you file a complaint?
5    A. I don't even know. It was back in the spring of
6  2008. I can give you -- I can provide the exact date, but I
7  don't want to miscommunicate or misstate a correct date or
8  month when it was April or May or something. I can give you
9  an exact date.
10   Q. And is that still pending that complaint?
11   A. I don't know. I never heard anything back from
12  them. It's sort of like when I reported to the FTC. They
13  tell you that they were going to look into it, and then they
14  never get back to you and I move on with my life because I'm
15  working and I don't even know.
16   Q. Do you have a copy of that complaint?
17   A. Yeah. You asked me that. I told you.
18   Q. You do?
19   A. I don't have it -- well, in my pocketbook --
20   Q. No, no. I don't expect you have to have anything
21  in your pocketbook.
22   A. I'm sure I made a copy of what I complained about.
23  It's like a letter or whatever. I'm sure I do.
24       MR. COFFEY: We didn't get that in discovery.
25       MR. MADSEN: Okay.

Page 111

1        MR. COFFEY: That's something we don't have, and I
2    know I would have asked about any other lawsuits or
3    complaints.
4        MR. MADSEN: Okay.
5        MR. COFFEY: We will follow up.
6        MR. MADSEN: Sure.
7        THE WITNESS: Maybe I wouldn't --
8    Q. (By Mr. Coffey) Now, did you appear in front of a
9  board or anything with that?
10   A. No.
11   Q. And now how did you know that someone else had
12  gotten the job and not you? Who told you that?
13   A. Office scuttlebutt.
14   Q. And then did you ever -- so did they ever respond
15  to you formally in writing, the state?
16   A. I don't have any -- in answer to your question, I
17  don't even know if they took me seriously. I have not heard
18  from them since I -- you know. I don't know if you want to
19  call it a complaint when I raised an objection. I did it,
20  and that was it.
21   Q. And that was with D.C.F. then?
22   A. Uh-huh.
23   Q. And where was D.C.F. located?
24   A. It's in Hartford.
25   Q. And which unit in D.C.F.? Is there only one unit

Page 112

1  there, or was it a special unit?
2        A. No. With D.C.F. you have to go to their human
3    resources. So they have, I guess -- I don't know how many
4    offices the state has for D.C.F. That I don't know. But I
5    just know it's human resources, and --
6        Q. Okay.
7        A. -- that's where you're told to direct.
8        MR. COFFEY: Thank you. I'm done.
9        MR. MADSEN: Let's take a break.
10
11       (A luncheon recess was taken)
12
13       CROSS-EXAMINATION BY MR. McPHERSON:
14
15   Q. Hello, Ms. Adams. I am Andrew McPherson. I
16  represent National Engineering in this matter.
17   A. Hello.
18   Q. Is there any reason for you not to be able to
19  answer truthfully to us today?
20   A. No. I've already sworn to do so.
21   Q. During the break, you haven't taken any medication
22  or drank any alcohol?
23   A. I was asked initially was I under prescriptions or
24  was I taking medication, and I stated no. So I didn't take
25  any medications over the break, if that's what you're asking

Page 113

1  me.
2    Q. Thank you. Now, you stated that you filed a
3  complaint with the Department of Children & Families with
4  the State of Connecticut?
5    A. Yes, I did. Their internal watchdog service or
6  whatever. I can get you the name of it.
7    Q. Was that with the EEOC?
8    A. No. EEOC is not part of the Department of
9  Children & Families. They're federal.
10   Q. So after you filed the complaint --
11   A. They are federal.
12   Q. -- after you filed the complaint, did you file --
13   A. Follow up with them, yes, I did.
14   Q. What did you do when you followed up?
15   A. I just sent the letter. Sent out the
16  communication.
17   Q. A letter to who?
18   A. To the internal -- I communicated internally in
19  the meeting, and then I followed up in writing, as I do with
20  everything. And then I copied the federal agency.
21   Q. And what federal agency?
22   A. EEOC. Isn't that what you just asked me?
23   Q. So you did send something to EEOC?
24   A. I'm confused on your question. Could you -- what
25  was the question again, your initial question?

Page 114

1    Q.  You filed -- am I correct in stating that you
2  filed a complaint internally through human resources with
3  the Department of Children & Families for the State of
4  Connecticut?
5    A.  That's correct.
6    Q.  What did you do after that --
7    A.  After that?
8    Q.  -- related to that claim?
9    A.  After that, I notified EEOC as well of my claim as
10  I was told it was in my rights to do so.  They call it like
11  notifying all agencies.  They disclose that to you.  You
12  have the right to file or to make your claim known to other
13  external agencies, I think, based on the fact that they were
14  a state agency.  They have to disclose that to you and
15  advise you of your rights and not try to keep you in the,
16  you know, internal complaint system.  So I think that's why
17  they disclosed it to me, that it was in my rights to notify
18  them as well.
19    Q.  Besides the EEOC, did you file anything with any
20  other agency related to that claim?
21    A.  The persons that are notified, to my knowledge, of
22  this incident with D.C.F. are the internal human resources,
23  or whatever the watchdog agency is within D.C.F., the state,
24  the EEOC.  And in the area of complaints where you go
25  on-line to file for EEOC, it asks you if you want to file it

Page 115

1  actually with another state agency, Commission of Human
2  Rights and Affirmative Action or something like that, and I
3  said yes.  So I wanted it known to all agencies that govern
4  the state and there's like another state agency above that
5  governs D.C.F., which I believe is the Commission of Human
6  Rights or the claims department or something like that.  So
7  I notified everyone I possibly could, yes.
8    Q.  Besides the EEOC, and the other agency that you
9  believe you sent it to, are there any other agencies that
10  you sent anything to regarding that claim?
11    A.  No.  That's all they give you -- you have like an
12  option, would you like to file, you know, with the -- this
13  one, this one, this one.  I was, like, yes.  Whichever ones
14  that have governance over the state or the Department of
15  Children & Families.
16    Q.  Now, you said they give you options.  Are you on
17  the Internet?
18    A.  Yes.  This is on -- this is where I got my
19  information.  I go to the website.  There is a www.gov or
20  something like that.
21    Q.  Do you remember exactly what the website was?
22    A.  It was like a government website.
23    Q.  State run?
24    A.  It might have -- actually, I might have typed in
25  like EEOC.  I don't know how I -- should I continue?

Page 116

1    MR. McPHERSON:  Off the record.
2    (Off record conference)
3
4    MR. McPHERSON:  On the record.
5    Q.  (By Mr. McPherson)  Now, besides notifying the
6  EEOC and the other government agencies, you stated that you
7  checked yes sent it to all of the other related entities on
8  the website.  Correct?
9    A.  Uh-huh.  Yes, I did.
10    Q.  Now, what website was that?
11    A.  It was a government website for EEOC.  The
12  address -- I had to Google to get to it, so it's not -- I
13  don't recall.  I didn't get it the first time that I tried
14  by just typing in www.eeoc.  I think I went through, like,
15  the National or United States Governmental agencies, and
16  then trickled down and found it that way.
17    Q.  Do you have any documents related to this?
18    A.  Have it written down?  Do I have the website
19  written down?
20    Q.  No.  Do you have any documents related to this?
21    A.  Yes.
22    Q.  Now, any of those documents, would they jog your
23  memory on what the website was?
24    A.  If you're asking me do I have the website written
25  down, yes, I do.

Page 117

1    Q.  Did you file a request under the Freedom of
2  Information Act related this claim?
3    MR. MADSEN:  Which claim?
4    Q.  (By Mr. McPherson)  To this claim involving the
5  Department of Children & Families?
6    A.  Yes, I did.  They were one of the agencies.
7    Q.  So they were one of the agencies listed on the
8  website that you checked yes to send to?
9    A.  No.  They were one of the agencies that are listed
10  that you can notify to get additional information.
11    Q.  What information --
12    A.  So if you --
13    Q.  -- did you request under them?
14    A.  Information about the state, information about the
15  state procedures and policies, their governing policies,
16  which I wasn't given that information.  It wasn't disclosed
17  to me.  And I was told that this state agency had governing
18  authority, and could get that -- get any questions that I
19  asked of the state and if the state wasn't forthcoming or if
20  they stated that because they were a state agency, they did
21  not have to disclose information, I could get it through --
22  I can get it through another agency, or I can make the
23  request known through another agency.
24    Q.  When you say this agency can make sure you get all
25  of the documents, which agency are you referring to?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 118

1    A.  The agency that you just spoke to, the Fair Credit
2  Reporting.
3    Q.  That's not what I said.
4    A.  Am I confused on your questioning?
5    Q.  Yeah.  I asked, did you make a request under the
6  Freedom of Information Act?
7    A.  Yes.
8    Q.  What did you request?
9    A.  I requested documents of policies and procedures
10  for the D.C.F., Department of Children & Families, specific
11  documents.  I asked for -- actually, it was procedures that
12  I asked for.  And this agency, Freedom of Federal Credit
13  Reporting, or whatever its acronym is, is listed under state
14  agencies.  So if you go to Connecticut.gov, it gives you a
15  list of agencies, and that's how I troubleshooted and that's
16  how I research.  I went to the State of Connecticut website,
17  found out what agencies have jurisdiction or authority over
18  what I feel is my issue, and then I contact them.  I
19  contacted them either by E-mail, fax, telephone, and then
20  they would refer me to another agency, whether it's state or
21  governmental, as far as Federal Government, and then I would
22  contact them.
23    Q.  Besides the procedures of the state, did you
24  request any other information?
25    A.  That was pretty much it.  The information that I

Page 119

1  requested through them was requested in my internal
2  complaint when I first, you know, met with them internally.
3  That's what I asked.  I asked for certain information, and
4  it wasn't forthcoming, and that's when I did research to
5  find out that, number one, can I ask for this information
6  and can it be disclosed, or do they -- you know, because
7  they are the state, do they have to give me this
8  information.
9    Q.  Now, what information did you originally ask for
10  that was not disclosed?
11    A.  Procedures.  I wanted to know procedures and
12  policy regarding hiring, the methods of hiring, how
13  applications are processed, particularly D.C.F. procedures,
14  not, you know, throughout the state because my understanding
15  is each state agency has their own governing regulations, if
16  you will.
17    Q.  Did you ask for your personnel records?
18    A.  Yes, I did.
19    Q.  Anything else you requested?
20    A.  Actually, I requested for every document that they
21  had related to me and their procedures and regulations.  I
22  wanted everything.  I wanted information -- so I made a
23  statement like not limited to something like that.  I wanted
24  everything relative to myself and their procedures as much
25  as they could possibly disclose.  They couldn't disclose

Page 120

1  other applicants or anything like that.
2    Q.  And did you also request your personnel records
3  under the Freedom of Information Act after it was initially
4  turned down from the internal HR?
5    A.  I wasn't actually turned down.  It wasn't
6  forthcoming.  They said that they would look into it, but I
7  never received it.  And that's when I was told that I could
8  go to another state agency that has governance or -- I don't
9  know if they have governance, but I could get the
10  information that I requested through another agency.
11    Q.  Okay.
12    A.  So everything that I asked of them directly, I
13  asked through this other agency.  My understanding is they
14  work together, and they could get whatever information you
15  feel is not coming in a timely fashion or if you were
16  rejected or something to that effect.
17    Q.  Did you threaten to take legal action against
18  them?
19    A.  Did I?  I don't threaten.
20    Q.  Did you state --
21    A.  I told them what I intended to do.  It's my --
22  because I haven't taken legal action against them.  I just
23  wanted information.  I just filed a complaint to which I
24  felt they were in violation of certain things.  So as far as
25  threatening or stating that I'm going to -- excuse me.  Did

Page 121

1  I answer the question?  Am I answering the question?
2    Q.  Yes.  I'm listening.
3    A.  Oh, you were talking to him.  I didn't know.
4    Q.  I didn't say anything.
5    A.  Do you want me to stop?
6    Q.  No.  I want you to finish answering.
7    A.  Did I answer?  I mean --
8    MR. MADSEN:  No.  If you're done just --
9    THE WITNESS:  I don't want to talk too long.  If
10  I'm answering the questions too long-winded, please
11  stop me.
12    MR. McPHERSON:  Now, I'd like to mark this
13  Defendant's 1 for identification.
14    MR. MADSEN:  The whole thing?
15    MR. McPHERSON:  No.  The very first page is E-mail
16  Friday, the 13th, April, 2007, 2:20 p.m.
17
18    (Defendant's Exhibit 1, E-mail, 4/13/07, marked
19    for identification)
20
21    MR. MADSEN:  Well, actually, it goes back to him
22  and then he gives it to you when he's ready.
23    THE WITNESS:  I thought you were giving it to this
24  lady.
25    Q.  (By Mr. McPherson)  Do you remember receiving this

31 (Pages 118 to 121)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 122

1  E-mail?
2      A.  Is it addressed to me?  (Witness reading).  Would
3  you like for me to read it out loud?
4      MR. MADSEN:  No.  He's just asking -- why don't
5  you review it, and then just tell him if you remember
6  receiving it.
7      THE WITNESS:  This looks like one -- isn't this --
8  this is my handwriting.
9      Q.  (By Mr. McPherson)  This was produced by your
10  attorney.
11      A.  Right, but this is my E-mail.  So I would had to
12  have received it because this is my E-mail that I gave to
13  him that he produced to you because this is my handwriting
14      Q.  So you remember receiving it?
15      A.  I'm sorry, yes.
16      Q.  Now, looking at the E-mail, how did you find out
17  about who you were going to interview with related to the
18  contract position at Northeast Utilities?
19      A.  NESC.  I had to be given the name of the person
20  that I was to ask for on the interview date.  They have to
21  give you the time.  Is that the question that you're asking
22  me?
23      Q.  Who interviewed you at Northeast Utilities, and
24  where did the interview take place and the time of the
25  interview, if you remember?

Page 123

1      MR. MADSEN:  Objection.
2      Q.  (By Mr. McPherson)  Where did you interview at
3  Northeast Utilities?
4      A.  They have a Burlington facility.  I don't know the
5  name of the building, but they have a large facility in
6  Burlington, Connecticut.  A campus, actually.  I don't know
7  what the name of the building is, but there I was directed
8  on my interview date, and I can confirm that with you
9  because I'm sure I must have that; where I go, and I ask for
10  Byron and then he was expecting me.  And that's how I was
11  directed to go there.  They told me where to park.  They
12  told me what time I should be there, and they told me how to
13  announce myself when I went in and to sign in, and then they
14  would give me a badge.  And then I waited and Byron came to
15  pick me up and then bring me to the actual department.
16      Q.  Now, you said at their facility, was that
17  Northeast Utilities' facility?
18      A.  Northeast Utilities, yes.  This is my interview
19  with -- the only interview that I ever had -- because I
20  never met with anyone at NESC.  I only had an interview with
21  NU, directly with NU.  So I was given, you know, the date of
22  the interview, the time, this is where you're supposed to
23  go.  This is where you park, as I have already stated.
24      Q.  And just to clarify, that was at National or
25  Northeast Utility campus?

Page 124

1      A.  Northeast Utilities.
2      Q.  Their campus?
3      A.  In Burlington, but I don't know the name of the
4  building.
5      Q.  Now, during this interview, did Byron Maddox or
6  the other person you interviewed with -- I believe you said
7  her first name was Patricia and you can't remember her last
8  name?
9      A.  That's who the -- yeah.  She has a hyphenated
10  name.
11      Q.  Did either Byron or Patricia state to you who
12  would make the decision as to whether you would be accepted
13  as a contract employee?
14      A.  No.  That wasn't discussed.  I didn't -- no, they
15  did not.
16      Q.  From your interview with them, did you believe you
17  were interviewing in a position where Northeast Utilities
18  had decision to say whether you were accepted as not as an
19  employee?
20      A.  Yes.
21      Q.  So it was your understanding that Northeast
22  Utilities had the final decision, the power to make the
23  final decision?
24      A.  Yes.
25      Q.  Now, I have a packet here.  I would like it

Page 125

1  identified as Defendant's Exhibit 2.  Can you please look
2  this over for me?
3
4      (Defendant's Exhibit 2, Packet of Documents,
5      marked for identification)
6
7      THE WITNESS:  Certainly.
8      Q.  (By Mr. McPherson)  Can you look it over, please?
9      A.  I am familiar with this.  Do you want me to read
10  it?
11      Q.  No.  I don't need you to read it, but you're
12  already familiar with it?
13      A.  Yes.  This is my --
14      Q.  Do you remember receiving this from National
15  Engineering?
16      A.  Yes, I did.
17      Q.  About when did you receive it?
18      A.  I don't know the date that I received it, but I do
19  remember receiving it.  If I can remember correctly, this
20  was sent through carrier, like an overnight.  It wasn't like
21  regular U.S. Mail.
22      Q.  Okay.
23      A.  So not too far from this date of the 26th, but I
24  can't remember the exact date.  But everything was done
25  pretty -- relatively quickly.

32 (Pages 122 to 125)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 126

1    Q. Now, if you turn to the second page of it, please,
2  what is the title of the second page?
3    A. The hourly contract. Actually, it states,
4  "Employee hourly contract and obligations."
5    Q. Now, if you focus on paragraph two, can you read
6  that, please, to yourself?
7    A. It states I shall work --
8    Q. Just read it to yourself.
9    A. I'm sorry. (Witness reading) Okay. I have read
10  it. I have read it again.
11    Q. What does the line, "I realize that although NESC
12  is an employer at-will and not obligated to offer me
13  employment and/or to continue to employ me for any reason,"
14  what does that mean to you?
15    A. That means after I have started working, become an
16  employee -- because that's really the only time that you're
17  an employee is after you have begun work and after you have
18  been paid, then you're an employee at-will. That's standard
19  language in all employee at-will contracts with all
20  employees. Basically, that's saying that they're not
21  obligated to -- after I start and I work for them, at any
22  time they can dissolve the relationship. I could be wrong
23  in my layman's understanding, but that's my understanding
24  about employee at-will contracts. It's basically saying,
25  yeah, you're working for us now, but things could change.

Page 127

1    Q. So it's your understanding if you did accept the
2  position, that you could be -- it could have ended at any
3  time?
4    A. If I had started -- my understanding of employee
5  at-will, this is when -- after you have worked, when you
6  worked.
7    Q. So if you accepted the position at Northeast
8  Utilities and started working, it could have ended at any
9  time, according to what you thought. Correct?
10    A. Oh, yeah. I understand that. That's the
11  temporary -- yes. That's understandable.
12    Q. Now, the second part of that sentence says, "NESC
13  is an employee in-will and is not obligated to offer me
14  employment." What was your understanding of that part of
15  the sentence?
16    A. NESC is not -- my understanding of that is NESC is
17  not, in my definition, an employer. They offer staffing
18  services, so I provide services to their client. I actually
19  work for their client, and "they," NESC, bills their client
20  for services that I perform. I don't perform anything
21  directly to NESC. They just manage the HR functions. This
22  is my understanding of all recruiters and staffing agencies.
23  They manage all of the HR functions that the client, in this
24  case NU, would normally have to manage in their own internal
25  HR department, because a lot of companies don't want to do

Page 128

1  that anymore as far as benefits and all that. They contract
2  with an outside agency to handle all of those issues of
3  payroll and benefits and all of that other good stuff, and
4  then hence, I become NESC's, you know, employee, but I'm
5  actually working for Northeast Utilities.
6    Q. So it was your understanding that Northeast
7  Utilities was also an employer of yours if you started the
8  position?
9    A. My understanding -- and this is from working in
10  contracts, you know, for a while and it might be faulty, but
11  this is my understanding -- is that NU is the ultimate
12  employer. They are the employer because I am providing the
13  services directly to them; and that NESC is just the HR
14  Department, if you will, the third-party HR Department on
15  behalf of NU. So if I have any kind of issues, if I'm sick,
16  I communicate to NESC, not NU. If I decide I don't like the
17  job any longer or if I'm having whatever issues, I don't go
18  to NU. Any HR function I direct it to NESC and not NU. I
19  just work -- actually show up for work at NU and provide the
20  direct services for NU. That's my understanding.
21    Q. So did you consider National Engineering an
22  employer?
23    A. No. I never -- even though you're using this term
24  as an employer, I never look at -- I look an employer as a
25  company that I actually provide the direct services to. I

Page 129

1  look at an agency like NESC, Kelly law Registry, Adecco and
2  Community Enterprises -- way, way back you used to call them
3  headhunters and what have you. I look at them as recruiters
4  and they either place you -- direct placement permanently
5  with a company, or they place you to perform work with one
6  of their companies. So they provide a service. And the
7  service is army going to work at one of their client companies
8  and they just manage all of the HR functions. That's always
9  been my understanding of the term "employer" for a
10  recruiter, unless in the incidents, as I explained before
11  way, way back when I worked for Manpower, I worked for
12  Manpower. By that I mean I worked for Manpower as a
13  temporary and then I also worked as a recruiter for
14  Manpower. So in that incident, you know, that incident, I
15  was an employee of Manpower and I considered Manpower my
16  employer.
17    Q. Now, on the bottom of page two, is that your
18  signature?
19    A. Yes, it is.
20    Q. If you turn to the third page, can you read the
21  top of the page, please?
22    MR. MADSEN: Third page of this exhibit for me is
23  the one that you just asked her about. You mean the
24  fourth page?
25    THE WITNESS: This is one of two.

33 (Pages 126 to 129)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 130

1    Q.  (By Mr. McPherson)  It says two of two here,
2   but --
3    A.  Yes.
4    Q.  -- this is the packet that you received, and there
5   was more than -- is yours different than mine?  The first
6   page is --
7    A.  I have the original contract in my car.
8    MR. MADSEN:  Oh, I see what you're saying.
9    MR. McPHERSON:  It's the third page in this
10   packet, although it does say page two of two, but she
11   received more than one document in the packet.
12   Q.  (By Mr. McPherson)  Can you just read the top of
13   the page for me?
14   A.  This one, okay.  It's the hourly -- the employee
15   hourly contract and obligation.  Actually, it's the same --
16   it's the second page of the first document or the document
17   of the page we were just talking about.
18   Q.  It's the second page of the employee hourly
19   contract and obligations.  Correct?
20   A.  Exactly.
21   Q.  Exactly.  Now, can you look at the signature.  Is
22   that your signature?
23   A.  Yes, it is.
24   Q.  What date did you sign it?
25   A.  On 4/30 --

Page 131

1    Q.  Now
2    A.  -- of '07.
3    Q.  4/30/07.  There's a box two-thirds of the way
4   down
5    A.  Uh-huh.
6    Q.  -- and the fourth line states, "Your assignment is
7   at," what does that state?
8    A.  Northeast Utilities.
9    Q.  And is that the address of Northeast Utilities?
10   A.  That's one of their addresses.  Apparently, this
11   was the address of where I would actually be performing
12   my -- you know, where I would report to work.  This is where
13   I was going to be working at in Burlington, Connecticut,
14   because Northeast Utilities had a lot of -- this was a
15   campus.  They had a lot of different sites.  So this, from
16   my understanding, is where I'm actually going to be working.
17   MR. MADSEN:  Just so there's no further confusion,
18   you keep on saying Burlington and it says Berlin.
19   THE WITNESS:  I'm sorry.
20   MR. MADSEN:  Which is it?
21   THE WITNESS:  It's Berlin.
22   Q.  (By Mr. McPherson)  And what does the start date
23   state there?
24   A.  5/14/07.
25   Q.  5/14/07.  And you signed this on the 30th of

Page 132

1   April?
2    A.  Yes, I did.
3    Q.  Now, if you go to the next page, it states,
4   "Payroll and security information."
5    A.  Yes.
6    Q.  Is that your signature on that page?
7    A.  Yes.
8    Q.  And what is the date of that?
9    A.  The same date, 4/30/07.
10   Q.  Now, the next page, "Employee Patent License
11   Copyright Agreement."
12   A.  Yes.
13   Q.  Is that your signature at the bottom of the page?
14   A.  Yes, it is.
15   Q.  And is that also signed on the April 30th of '07?
16   A.  That's the date that it's signed and sealed, yes,
17   that's correct.
18   Q.  Now, the next page entitled, "Right to know
19   certification."
20   A.  Yes.
21   Q.  Is that your signature on the bottom of that page?
22   A.  Yes, it is.
23   Q.  And the date, again, is April 30th of '07?
24   A.  That is.
25   Q.  Now, the next page is "Pre-employment Registration

Page 133

1   Form."
2    A.  Yes.
3    Q.  And the next page after that, is that your
4   signature?
5    A.  I have a signature on this page, the
6   Pre-employment Registration Form at the very bottom I have a
7   signature dated 4/30/07, and then the next page, which is a
8   continuation of that application.  And in the area of
9   applicant statement, I signed, again, but the difference is
10   I included my Social Security number, and then it's on the
11   same date, 4/30/07.
12   Q.  And the next page, the W-4 --
13   A.  Yes.
14   Q.  -- is that your signature?
15   A.  Yes, it is.
16   Q.  And you dated it 4/30/07?
17   A.  Correct.
18   Q.  And the next page, is that your signature?
19   A.  Yes, it is.
20   Q.  It's the employment eligibility verification.
21   Correct?
22   A.  Yes.
23   Q.  And that's actually dated May 3rd, '07.
24   A.  Yes, this form.
25   Q.  Did you --

34 (Pages 130 to 133)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 134

1    A.  Well, this form has to be notarized.
2    Q.  Okay.
3    A.  See in the bottom of the certification because
4  you're -- NESC, your client's company, they're not local, so
5  I can't just -- normally when I go into an office, they are
6  witnessing the documents that I give.  Well, in this case,
7  they couldn't do that because they are in New Hampshire and
8  I'm in Connecticut.  And they have to, by law, see the
9  documents, and that's why the notary has to see the
10  documents.  I have to provide the documents that I normally
11  would to your client, and then they have to attest that,
12  yes, I have seen this.  So that's the reason for the
13  inconsistency in the date.  I had to go to a notary and give
14  all of my documentation and include it.
15    Q.  But you received this form at the same time as the
16  other forms.
17    A.  The form was all together.  It was intact.  The
18  only difference was -- and I don't even know if I sent it
19  all back at the same time.  Maybe I sent back what I could,
20  and then I was told to get that notarized and send it back
21  later.  They might have accepted it that way.  I can't
22  really recall.  But, yes, in answer to your question, the
23  form was intact.  There was nothing missing in the documents
24  that I received from your client.
25    Q.  And same with the next one, that's your signature,

Page 135

1  and it's dated 5/3/07?  It's the affidavit by notary public
2  in executional form?
3    A.  Yes.  This one is -- this is part of that I-9 that
4  I had to have -- these two forms I had to have notarized.
5  That's why they have the different dates.
6    Q.  Now, the next one, two, three, four forms, you
7  recognize those and the signature on them?
8    A.  Well, the very next one, there's no signature.
9  That's my name.  And the one after that, that's just -- you
10  can opt out of this one.  It's direct deposit.  So I'm
11  basically just telling them I would prefer direct deposit.
12  There's no signature on this one either, and the last one is
13  part of that.
14    MR. MADSEN:  There's two more.
15    THE WITNESS:  Authorizing them to debit my
16  account, that I did sign.
17    Q.  (By Mr. McPherson)  The one you're talking about,
18  what is the title of it?
19    A.  The one that I'm speaking to, it's an authorized
20  agreement for pre-authorized credits and correcting debits.
21  So it's part of -- this is the second page of -- authorizing
22  your company to deposit my payroll into my account.
23  "My company" you mean National Engineering?
24    A.  I'm sorry.  I didn't mean your law firm.  I did
25  mean National -- I feel like I'm talking to a representative

Page 136

1  or someone --
2    MR. MADSEN:  You are.
3    THE WITNESS:  Well, you know, I mean, it's like
4  you're an employee of National, a direct employee.
5  But, yes, my signature is on this page.  This is
6  authorizing them to deposit my payroll into my account.
7    Q.  (By Mr. McPherson)  On the very last page it says,
8  "Commonwealth of Massachusetts notification of unemployment
9  insurance."
10    A.  Yes.
11    Q.  Is that your signature?
12    A.  That's my signature.
13    Q.  And it's dated 4/30/07.  Correct?
14    A.  Yes.
15    Q.  Now, is it true that the majority of these forms
16  that did not require a notary you sent back after you signed
17  them?
18    A.  Only two -- my understanding was only two.  The
19  I-9 forms had to be.
20    Q.  The I what?
21    A.  The I-9 had to be notarized.  Anything else like
22  the contract and my application and giving them
23  authorization to deposit monies into my account, those did
24  not have to be notarized.
25    Q.  Can I have this back, please?

Page 137

1    A.  Sure you can.
2    MR. McPHERSON:  The next form I would like to mark
3  as Defendant's Number 3.
4
5    (Defendant's Exhibit 3, Drug Test Release Form,
6    marked for identification)
7
8    Q.  (By Mr. McPherson)  Now, can I get you to look at
9  this form, please.  Do you recognize this form?
10    A.  I signed it, yes.
11    Q.  What the title of it?
12    A.  The title is "Consumer Report Drug Test Release,"
13  but this is the complete form.
14    Q.  Did you sign this form?  You said that's your
15  signature?
16    A.  Yes, I did.
17    Q.  What is the date on it?
18    A.  The date is 5/2/07.
19    Q.  Now, by reading the paragraph, the only paragraph
20  on this form, is it your understanding that you needed to
21  pass the background and drug test for this assignment?
22    A.  Yes.  Again, this is not the complete form.  This
23  is just the signature page.  There is another page --
24    Q.  Okay.
25    A.  -- of this.  It's like one of two.  Like the other

35 (Pages 134 to 137)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

## Page 138

1  ones, there's another page to this.  So this is only the

2  signature page, and this last little paragraph relates --

3  Q.  What was in the other page?

4  A.  That first page was that page he has in his hand.

5  Q.  Okay.  We will get to that, then.

6  A.  It's the Consumer Reports/Investigative Consumer

7  Report Disclosure and Release Information Authorization.  So

8  that's like the first page, and it's basically authorizing

9  NESC and Verifications, Inc., to -- first of all, saying

10  yes, they can perform a background check on me and provide

11  my background information to their subsequent -- you know,

12  the subsequent employer, NU.  That's my understanding, and

13  that's what I agreed to, yes, I did.

14  Q.  Now, this Comensura Consumer Report Drug Test, you

15  understood it that National Engineering was permitted to

16  send their results to Comensura?

17  A.  I understood that they would send the information

18  that they obtained on my background report, you know,

19  information received about me, for both the background check

20  and drugs, yes.

21  Q.  To Comensura.  Correct?

22  A.  To Comensura.  Actually, I thought it was

23  Northeast Utilities, but I understand the role that

24  Comensura has with Northeast Utilities, so that's -- yeah.

25  Q.  Could I have that form back, please?  Let's mark

## Page 139

1  this as Defendant's Number 4.

2

3         (Defendant's Exhibit 4, Authorization, marked for

4         identification)

5

6  Q.  (By Mr. McPherson)  Can you please look at this

7  form?  Can you state what the title is on this form?

8  A.  This is the form that I was referring to which is

9  the first page, and it is entitled Consumer Report,

10  Investigative Consumer Report, Disclosure and Release of

11  Information Authorization.

12  Q.  When did you receive this?

13  A.  This is all in the package, to my knowledge.

14  Q.  So you received this with other documents that you

15  signed April 30th?

16  A.  I can't really recall if all of this information

17  came together under the same packet, but if it didn't come,

18  like, the same day, it came soon thereafter.  Because it was

19  communicated by Larry that -- I think the way it went was

20  initially, they send out -- you have to fill out an

21  application.  So you fill out the application.  You have to

22  do the I-9.  You do the human resources thing.  Then upon

23  that, they may have sent this separately.  That part I don't

24  recall, but I know I received it all, and all of it had to

25  be completed and approved and, you know, everything checked

## Page 140

1  out okay before I start work.  So if it came in two separate

2  mailings, that I don't recall or if it was just like one big

3  packet where everything came out together.

4  Q.  Is that your signature on this?

5  A.  Yes, it is.

6  Q.  And what is the date of it?

7  A.  The date on this one is 5/2/07.

8  Q.  Now, when you signed this, did you realize that

9  you were authorizing Verifications and National Engineering

10  to transmit the report electronically of your background

11  check?

12  A.  Electronically?  Maybe not electronically, but

13  however they communicate.  I was just aware that my -- I'm

14  releasing them or authorizing them to perform a background

15  check of me.  I am releasing them.  I'm saying, yes, I will

16  submit to a drug test of myself.  So how they are going to

17  communicate that their client, I'm not privy to that.  I

18  just know they have to communicate to Northeast Utilities,

19  you know, Comensura, however.  Maybe they're going to send

20  it by mail.  They communicated this information to me by

21  mail.  I didn't get it any -- you know, so maybe they were

22  going to communicate by mail.  I really don't know how they

23  were going to communicate it, but I knew they were going to

24  communicate it.

25  Q.  If you look in the last sentence of the first

## Page 141

1  paragraph, it states, "I understand that this information

2  may be transmitted electronically and authorize such

3  transmission."

4  A.  Okay.  Yes.

5  Q.  You didn't understand that sentence to mean that

6  it could be transmitted electronically?

7  A.  That has no bearing.  What I needed to understand,

8  and which I fully understand, was that in the first

9  paragraph that NESC and Verifications, Inc., they were going

10  to retrieve information relative to me and then communicate

11  it to Comensura and Northeast Utilities, whether they sent

12  them an E-mail or they sent them a fax or they sent them an

13  overnight, I didn't really have a problem.  I mean, they

14  communicated it to them however they communicated it to

15  them.  I didn't -- I don't know if I knew that they had,

16  like, a database where they're sending things through a

17  database.  I'm not familiar with how those background checks

18  are really communicated.  So I thought they had the option

19  to send it electronically, or they could send it overnight.

20  I just knew that they were going to send it, and I didn't

21  really have an issue with them, you know, the mode of

22  communication, whether it be electronic, fax.  I didn't have

23  a problem with that.

24  Q.  Could I have that back, please.  May I have this

25  marked Defendant's Number 5.

Page 142

1    (Defendant's Exhibit 5, Temporary Work Agreement,
2    marked for identification)
3
4    Q. (By Mr. McPherson) Can you take a look at this,
5    please. Do you recognize this document?
6    A. It's part of the packet I received.
7    Q. What is the title of it?
8    A. Temporary worker agreement.
9    Q. So you did receive this from National Engineering?
10   A. I have received something similar to this before
11   through other agencies and, again, with National
12   Engineering. It was pretty much a standard packet for
13   temporary workers.
14   Q. You didn't sign this document. Correct?
15   A. Is there a signature page for this?
16   MR. MADSEN: Yes, at the very end.
17   Q. (By Mr. McPherson) The last page.
18   A. No. This one here -- is this the one that is from
19   me? Because it didn't even have -- I think there's
20   something suspicious about this.
21   Q. This was provided by your counsel.
22   A. I think there's something that's missing from this
23   because it was my understanding -- I mean, if this is mine,
24   it's mine. But I think they would have gotten back to me.
25   NESC would have gotten back to me if I didn't complete any

Page 143

1    forms or if I sent any forms back that were missing because
2    normally you would have the date -- I would have the date
3    here, and then I would have my name. And I thought I did
4    have a document that had that information that had my -- I
5    would have to look in my personal documentation. I'm just
6    going by what you're giving me here, but -- and Larry never
7    got back to me and said that any of my documents that I sent
8    to him were incomplete. So I would have to look at what I
9    actually sent in my personal -- in my records.
10   Q. So, to your knowledge, did you ever sign a
11   document like this --
12   A. I think -- I have seen this.
13   Q. -- or this document?
14   A. I have seen this, but I think this was filled out,
15   only by -- the top part here, the first page where it says
16   "Temporary worker agreement" is made on this date. I think
17   I put in that date. It looks like someone handwrote seven
18   there because it's 2007. And then so that top part would
19   have been filled out. And then the last page in "witness
20   whereof," so this would have to be signed by NESC and then
21   also by myself, but I can confirm what I actually have.
22   This I can't speak to because this seems a little odd.
23   Q. A signed copy was not produced to us. Can you
24   produce a signed copy?
25   A. If I have that, which I probably would have, I

Page 144

1    can, yes, because that's all part of the information that
2    they gave me that I have given back. And this is how you
3    received it just like this? There was no redact.
4    Q. Yes. Now, looking at this agreement, when -- do
5    you consider yourself to fall under the term "temporary
6    worker" according to this agreement?
7    A. Yes.
8    Q. Now, looking at paragraph 1(A) on the first page,
9    can you please read that to yourself?
10   A. (Witness reading). Yes.
11   Q. What is your understanding over who has authority
12   to determine whether you actually engage in the contract
13   position at Northeast Utilities?
14   A. This document states that Comensura has the
15   discretion which differs from -- as I stated before, my
16   understanding about temping and contracts and what have you,
17   it's been always my understanding, having worked with The
18   Hartford in a similar situations where they had a Comensura
19   type middleman, that it was the company's discretion to --
20   like it was Byron's discretion not to accept me for an
21   interview. It was his at his discretion, not Comensura's.
22   discretion. But if they said it was Comensura's discretion,
23   that's, I guess, what it is then.
24   Q. Okay.
25   A. It's just a little different than what I always

Page 145

1    understood it to be.
2    Q. Now, if you turn to page two of the Temporary Work
3    Agreement, section 2, paragraph A --
4    A. Yes.
5    Q. -- can you please read that?
6    MR. MADSEN: Out loud or?
7    Q. (By Mr. McPherson) No. To yourself. Sorry.
8    A. That's okay. (Witness reading).
9    MR. MADSEN: Did you say 2(A)?
10   THE WITNESS: Yes. I'm reading that. I'm
11   finished with reading that again.
12   Q. (By Mr. McPherson) Now, when you read this, whose
13   work policies and manuals did you believe you had to follow
14   if you engaged in the contract employment at Northeast
15   Utilities?
16   A. NU.
17   Q. And by "NU," who do you mean?
18   A. Northeast Utilities.
19   Q. Could I have that back, please. Now, on May 8th
20   of 2007, did Chris Sullivan from National Engineering
21   attempt to contact you?
22   A. I don't recall that being how the communication
23   was initiated by him contacting me. I know he stated that
24   in his deposition. He stated that he left a voice message
25   for me. I'll just say that I did not receive a voice

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 146

1　message from NESC on May 8th. I called in the evening after
2　I got out of work. I called them to follow up on, you know,
3　how the job was progressing, Are we still on for the date?
4　My last day with C.B. Richard Ellis was nearing, and I
5　wanted to make sure that I'm going to, you know, be starting
6　somewhere on the 14th, so I initiated the contact.
7　　Q.　So you were worried about when the position would
8　start?
9　　A.　No. I'm confirming. What I'm worried about is,
10　number one, I didn't know this company. And this is the
11　first time that I have taken assignments with a company that
12　is not in my state. Future assignments have always been
13　with people who I have met. I've always come into the
14　office. I know where they're located. They are in state.
15　I know these people. This is the first time I've ever done
16　this long distance -- I mean, I know NU, but I didn't know
17　NESC. So I pretty much gave notice to a company without
18　really knowing whether or not the company that I agreed to
19　work with -- if it could fall through. I was just last
20　minute. I just wanted to make sure -- pretty much just
21　confirming to make sure that everything ties up. The only
22　time I've ever done this before -- I knew that -- I mean,
23　I've left Bank of America to go to The Hartford. I knew,
24　you know, it was going to happen, that type of thing. But
25　with them, only because -- if they were in state, maybe I

Page 147

1　would have been more familiar with them, I would have felt
2　more comfortable. But since I didn't really know them, and
3　I never met anyone from NESC, I just wanted to make sure
4　that it wasn't a sham or just concern, last minute jitters.
5　That's all. I wanted to make sure that, okay, I'm going to
6　start. Right?
7　　Q.　Now, prior to you finding out that your background
8　result came up with criminal convictions, did you have any
9　information in your possession that would have cleared you
10　of any false criminal convictions that came under your name?
11　　　MR. MADSEN: Objection.
12　　　THE WITNESS: The background report that was
13　received was not my -- was not information that was
14　relative to me. It was someone else's, another
15　individual. It wasn't me.
16　　Q.　(By Mr. McPherson) Now --
17　　A.　If it was me, that's one thing, but it wasn't me.
18　And that could have been easily confirmed if the check was
19　done on the Social Security number that -- just because we
20　share things in common, we are not the same person.
21　　Q.　Now, since you went through approximately a year
22　prior, in 2006, that criminal convictions were revealed
23　which were later determined not to belong to you, did you
24　have paperwork that proved that in your possession?
25　　A.　A report?

Page 148

1　　Q.　Yes, in May of 2007.
2　　A.　A report, yeah. After that background check with
3　Choice Point, I started keeping copies. Prior to that, I
4　have never requested. In most of my employment experiences,
5　I go through background checks. I have never asked for a
6　copy of it because, you know, nothing -- you know,
7　everything was okay. Only with Choice Point I started
8　keeping, like, just for my information. As a matter of
9　fact, I went back to The Hartford to get theirs -- for the
10　ones that I could remember, I went back to those companies
11　and got the report. But that was the only time where I had
12　to, like, acquaint myself with laws and, you know, what
13　exactly are they doing with background checks. You know,
14　where are they getting this information from, and how are
15　they checking it, and could I have a copy of that. The only
16　thing I've been following up on prior to that was my credit
17　report, Equifax and, you know, TransUnion and stuff like
18　that. I know that from just like a regular consumer, but
19　background checks, no. I just do that as a -- because as a
20　contingency of employment, I would sign the form, and it's
21　like, yeah, fine, check me.
22　　　MR. McPHERSON: I would like to label this
23　Defendant's Exhibit Number 6.
24　　　(Defendant's Exhibit 6, Fax Document, 5/8/07,
25　　　(Defendant's Exhibit 6, Fax Document, 5/8/07,

Page 149

1　marked for identification)
2
3　　Q.　(By Mr. McPherson) Can you please look at this
4　and tell me what the title of the document is?
5　　A.　This looks like a -- that I sent to you guys.
6　　Q.　By "you guys," who do you mean?
7　　A.　I sent to someone. I either sent it to my
8　attorney, Will Madsen, who forwarded it along to you because
9　that's my -- this is from my fax machine.
10　　Q.　And what is the date?
11　　A.　Or whoever I sent it to. It's dated May 8, 2007.
12　I could have sent this also to National Engineering proving
13　who I was or proving that this had happened to me before,
14　and the person was ultimately found not to be, you know, one
15　in the same. So -- well, this is before I knew that Chris
16　Sullivan had already communicated to Comensura prior to
17　communicating to me and giving me the right to dispute what
18　was on the background check.
19　　Q.　So why did you send this to Chris Sullivan?
20　　A.　When I spoke to Chris Sullivan on the 8th when I
21　initiated the contact, he stated that something had come up.
22　In our conversation, we discussed -- he read through what he
23　received on the report. I was disclosing to him what I went
24　through previously. He asked did I have any documents or
25　something like that to alert or to confirm that this had

38 (Pages 146 to 149)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 150

```
1   happened in the past. He asked, you know, well, why didn't
2   you tell us. And my understanding that I'm not allowed to
3   go to a company and bring my own background check. I just
4   didn't think that that was allowable. My understanding was
5   I had to go through an independent third-party background
6   check of the company's governance. They dictate who is
7   going to do the background check. I just can't bring in
8   previous background checks that were done from our
9   companies, especially a company that was in serious trouble
10  with the FTC. This was just for the sole purpose of
11  proving, since I never met Chris and he doesn't know me from
12  Adam, to prove to him that what I'm saying is accurate.
13  This did happen to me before. Look, this is proof. It did
14  happen to me before. This person is not me. It was found
15  that, you know, this person was not me. That was the whole
16  purpose of providing this to him.
17     Q.  Now, in the middle of the page, it says, "SSN
18  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." Is that your Social Security number?
19     A.  Yes, it is. It's on my application as well.
20     Q.  When was your Social Security number issued to
21  you?
22     A.  In the '80s, '87.
23     Q.  That's the first time you got a Social Security
24  number?
25     A.  That's my Social Security number. That's the
```

Page 151

```
1   first time, yeah.
2      Q.  Are you aware of why you never had one previously?
3      A.  That was the first time that this -- I understand
4   this to be the first card that I received, or this is my
5   first Social Security number. I really don't even know what
6   that means.
7      Q.  Do you know --
8         MR. MADSEN:  When you say "what that means" --
9         THE WITNESS:  What this statement results -- I
10  guess he's asking me about the Social Security --
11        MR. MADSEN:  Yeah, don't guess.
12        THE WITNESS:  -- validation. I don't really
13  understand, this was on the report. I don't really
14  know what that means, what this statement, the
15  results -- I don't know what that means.
16        MR. MADSEN:  I would just say don't assume what
17  he's asking about. Just listen to his question.
18        THE WITNESS:  I'm sorry could you ask me the
19  question again.
20     Q.  (By Mr. McPherson)  Now, it states your Social
21  Security number was issued between 1987 and 1988. Is that
22  correct?
23     A.  That's what it states on this form.
24     Q.  Is that true?
25     A.  I don't know when I received my Social Security
```

Page 152

```
1   card, but that's my number. If they're saying it was
2   validly issued -- is a Social Security Administration
3   stating this, or is Choice Point stating this based on
4   their --
5      Q.  I'm asking you.
6      A.  Oh, I don't know.
7      Q.  I'm asking when did you receive a Social Security
8   number?
9      A.  Initially?  I don't know. I received -- I have
10  had my Social Security number for so many years. I'm almost
11  fifty years old. When I first received my Social Security
12  number and the date that I first received it, I really don't
13  know, and I don't know.
14     Q.  Do you believe you could have been issued it
15  between 1987 and 1988?
16     A.  Could I have been?
17     Q.  Do you believe you were?
18     A.  I really don't know.
19     Q.  How old were you in 1987?
20     A.  I don't know. I would have to calculate that --
21     Q.  What year were you born?
22     A.  -- based on my date of birth because if I'm 49 --
23     Q.  What year were you born?
24     A.  -- and my date of birth is 7/29/59, you would have
25  to do a calculation. I would have to do a calculation to
```

Page 153

```
1   tell you exactly what date.
2      Q.  Well, I guess you were nineteen or twenty, around
3   there?
4         MR. MADSEN:  No. I think you're off by ten years.
5      Q.  (By Mr. McPherson)  You were twenty?  What year
6   were you -- you were 29 or 30?
7      A.  Do you have a calculator?
8      Q.  You were 29 or 30?
9         MR. MADSEN:  28, 29, something like that.
10        THE WITNESS:  I wouldn't -- you know how I figure
11  out what date I am or what age I am on any given date,
12  I type in the date that I'm in and I subtract out my
13  birthday, and that's how I can accurately tell you what
14  age I was back in 1987, and where this information --
15        MR. MADSEN:  We were born in the same year, so
16  that's why --
17        THE WITNESS:  That's why he knew.
18        MR. MADSEN:  -- I think it would have been 28.
19        THE WITNESS:  I was getting ready to whip out my
20  telephone with the calculator. That's how I confirm
21  everything. I go to calculations.
22        MR. MADSEN:  She's actually a little older than
23  me, although you couldn't tell.
24        THE WITNESS:  Thanks for bringing this out. Is
25  that what the whole point of this is --
```

39 (Pages 150 to 153)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 154

1    MR. MADSEN: Oh, no, no.
2    THE WITNESS: -- how old and decrepit I am?
3    MR. McPHERSON: Defendant's Number 7.
4
5    (Defendant's Exhibit 7, Letter with Attachments,
6    marked for identification)
7
8    Q. (By Mr. McPherson) Can you look at Number 7 and
9    tell me -- identify it, please?
10    A. This document --
11    MR. MADSEN: Wait a minute. Is seven the
12    three-pager?
13    THE WITNESS: Yes.
14    MR. MADSEN: So it consists of a couple of
15    documents, I think.
16    MR. McPHERSON: Yes, it does.
17    Q. (By Mr. McPherson) Can you tell me what the first
18    page is?
19    A. It's my letter. It's a letter.
20    Q. What is it dated?
21    A. April 7, 2006.
22    Q. Now, when did everything occur the first time that
23    inaccurate criminal investigations came under your name?
24    A. It had to have been around April. I can give you
25    the exact date on my resume. When you smile like that, I

Page 155

1    don't know if I'm saying something foolish or if I should
2    be --
3    MR. MADSEN: No. Don't pay attention to his
4    smiling. Just listen to the question.
5    THE WITNESS: I don't know if I'm not supposed to
6    talk or -- please tell me if I'm talking too much or
7    whatever, I'm not answering the question. Your
8    question was this letter -- go ahead. You say it
9    again. I think I understand you, though.
10    Q. (By Mr. McPherson) What was the approximate date,
11    the first time false criminal convictions showed up on your
12    background report and were eventually cleared?
13    A. It was on or around this date.
14    Q. On or around this date?
15    A. In April because -- I can give you the exact date
16    because I began the employment. That's why I stated earlier
17    that it was almost a year to the date that it first
18    happened. It was around April -- in May I applied with
19    Northeast Utilities through NESC. Back a year ago I applied
20    through Adecco and it went through Choice Point. So it was
21    turned around relatively quickly because, as I stated
22    before, Adecco did not communicate the results of the first
23    incorrect report to the client, which was Bank of America,
24    and they had a chance to -- they, Choice Point, had an
25    opportunity to amend it, but that was only after numerous

Page 156

1    telephone calls, numerous E-mails, so on and so forth.
2    Q. Now, if you look at the second paragraph --
3    A. Yes.
4    Q. -- you state you have filed a complaint with the
5    FTC and intend to pursue legal avenues regarding lost wages
6    as a result of this report.
7    A. That's correct. Yes, that's what I stated. If
8    they did not provide me with -- because my understanding,
9    when I went on the FTC website, that's what I could claim.
10    They had to disclose to me and they had to correct the
11    report or I could file a legal complaint.
12    Q. Okay.
13    A. I just wanted the job.
14    Q. Now, here you said you don't state that it's --
15    your legal actions are conditioned on a correction of the
16    report and the job. You just state that you want to pursue
17    legal affidavits.
18    A. That I didn't. Repeat what your question is.
19    Q. You just stated that you were going to pursue
20    legal avenues for lost wages. Are you claiming now that you
21    didn't have any lost wages?
22    A. I stated here -- when I sent this letter to them,
23    I hadn't started work yet. There was a likelihood that I
24    would not start in that time. This letter was intended to
25    use some of the verbiage that I found under the FTC site

Page 157

1    stating what my options were if they did not re-investigate
2    and amend my report. So I was basically just stating what I
3    had the right to do, and what I could do and what I would
4    like to do if I was able to do so had I not been offered the
5    job; or if the job fell through as a result of my employer
6    receiving this erroneous information and this background
7    check company not clearing it up with them.
8    Q. So you sent this before you lost any wages?
9    A. I sent it on the -- it's either the same day or a
10    day after. My understanding is when I dispute it, when I'm
11    talking to --
12    Q. The same day or day after what?
13    A. The same day or the day after I spoke to Adecco.
14    My understanding is when I dispute it to the background
15    check -- to the temporary agency or Adecco, that I have to
16    put it in writing. I have to, in writing, state to the
17    background check company that I dispute the findings, and
18    then, you know, this is what I would like done. That has to
19    be done in writing. That can't be second party. Adecco
20    can't communicate to Choice Point. I have to do that.
21    Q. So you sent this letter before the job that you
22    were applying for was supposed to start. Correct?
23    A. Yes, yes. I wouldn't have been able to start.
24    Q. Now, if you turn to the second page of this, there
25    is a letter dated April 6, 2006 --

40 (Pages 154 to 157)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 158

1   A. Uh-huh.
2   Q. -- to Choice Point?
3   A. Yes.
4   Q. Can you look it over, please? Are these criminal
5   convictions listed here the same as what showed up on the
6   Verifications check in May of 2007?
7   A. I don't know if they're exactly the same, but they
8   look very similar. These are the ones -- these look like
9   the same report or the same offenses that Chris Sullivan
10  read to me, and that was on the actual report that I
11  received from Choice Point. And this was -- and to back up
12  a little bit, this is dated a day before the other letter to
13  Adecco. So this letter went out requesting -- directly to
14  Choice Point requesting that they -- you know, these are the
15  reasons why I want you to redo my report or the reasons why
16  I feel or I dispute the initial report. I think that's some
17  kind of language also under the FTC you have to disclose why
18  you dispute -- the reason for your dispute of a report, not
19  just I don't agree with it.
20  Q. Now, this letter that you're looking at dated
21  April 6, 2006, did you have this in your possession at the
22  end of May beginning or beginning of May, end of April,
23  2007?
24  A. You mean at the time when I applied for or when
25  this incident occurred between NESC and NU?

Page 159

1   Q. Yes.
2   A. Yes, I provided this.
3   Q. Now, did you have --
4   A. To my -- 
5   Q. -- this in your possession when you filled out the
6   release authorization to allow Verifications and National
7   Engineering to perform a background check on you?
8   A. On me, yes.
9   Q. And if you turn to the third page --
10  A. The last page, yes.
11  Q. Yes, the last page. Now, this is the second page.
12  It's begins Reference Number 38157538. It states, "Please
13  be advised I intend to pursue this matter through a legal
14  and/or federal resources" --
15  A. Uh-huh.
16  Q. -- "to ensure accurate reporting and compensation
17  for lost wages." Again, at the time of writing this letter,
18  did you lose any wages?
19  A. No. That's if they delayed because at that point
20  they said --
21  Q. Okay. Could I have it back, please? Now, let's
22  mark this Defendant's 8 for identification.
23
24      (Defendant's Exhibit 8, Three-Page Document,
25      marked for identification)

Page 160

1   Q. (By Mr. McPherson) Can you look at this?
2   A. Certainly.
3       MR. MADSEN: Is that a three-page document?
4       MR. McPHERSON: Yes.
5   Q. (By Mr. McPherson) The first page is a fax with a
6   heading labeled, "Deborah Adams, P.O. Box 270101. Correct?
7   A. Yes.
8   Q. Do you remember sending this fax cover page?
9   A. This is my fax cover page. Yes, that's correct.
10  Q. Now, you sent this on May 9, '07. Correct?
11  A. That is the date stamp on the fax transmission,
12  yes. That's correct.
13  Q. Now, if you turn to page two, the second page --
14  A. I have that.
15  Q. -- is this a --
16      MR. MADSEN: Well, I just note that it does say
17  seven pages and there's only three pages to this
18  document. So, you know, whatever. I'm just putting
19  that on the record.
20      MR. McPHERSON: Right. This is what we received
21  in production.
22      MR. MADSEN: Okay.
23  Q. (By Mr. McPherson) On the second page, can you
24  identify what the title of this is?
25  A. It's a sentencing order for Virginia in the

Page 161

1   Circuit Court of Pennsylvania County, Pittsylvania County
2   (phonetic), I guess.
3   Q. Now, are these the criminal convictions that
4   falsely came under your background check the first time it
5   was performed in 2006 by Choice Point?
6   A. Yes, one of them, because this only states to one.
7   Q. The Welfare fraud?
8   A. This only states to one incident.
9   Q. Now, did you have this in your possession on April
10  30th?
11  A. Yes.
12  Q. Yes? 2007 you had it?
13  A. Yes. I've had this since 2006 when it was
14  provided to me.
15  Q. Could I have it back, please?
16  A. Yes, you can.
17      MR. McPHERSON: Defendant's 9.
18
19      (Defendant's Exhibit 9, Background & Investigation
20      Report, marked for identification)
21
22  Q. (By Mr. McPherson) Can you look at this, please?
23  A. Yes.
24  Q. Do you recognize this document?
25  A. Yes.

41 (Pages 158 to 161)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 162

1    Q.  What is it?
2    A.  It's a Verifications, Incorporated, background and
3    investigation report.  That's what it's entitled.
4    Q.  Did you ever receive this?
5    A.  Yes.  I believe it was addressed to me.  This is
6    what I requested from Mary Poquette.  I believe she sent
7    this directly to me.
8    Q.  Now, can you look at the date that this is
9    completed?
10   A.  It says -- oh, well, the date completed, you're
11   right, is 5/8/07.  I was looking at the date entered.  So
12   the date completed it says 5/8/07.
13   Q.  Now, did you ever receive a copy of this from
14   Chris Sullivan?
15   A.  No.  This, as I recall, the communication for my
16   background check, the report, had to go through
17   Verifications.
18   Q.  Did you remember receiving an E-mail with an
19   attachment from Chris Sullivan on the 9th of May --
20   A.  No.
21   Q.  -- that attached this?
22   A.  No.  I don't recall that.  I don't recall that.  I
23   recall receiving -- and further, I didn't think you can
24   communicate that.
25        MR. McPHERSON:  Can you mark this Defendant's 10?

Page 163

1        (Defendant's Exhibit 10, Four Pages of E-mails,
2        marked for identification)
3
4        THE WITNESS:  Would you like this back?
5    Q.  (By Mr. McPherson)  No.  Hold on to it for a
6    minute, please.  Can you look at what's been marked
7    Defendant's 10.  It's four pages of E-mail printouts.  If
8    you turn to the third page, it's an E-mail from Chris
9    Sullivan dated Wednesday, May 9, 2007, 8:59 a.m., and it
10   states, "Deborah, attached is your Verifications background
11   report.  They have asked that you bring all issues directly
12   to them to expedite the process."
13   A.  Yes.
14   Q.  Do you remember receiving that?
15   A.  Yes.  That confirms what was pretty much
16   communicated on May 8th where I was told by Chris Sullivan
17   when I initially disputed it, that he had to look into it
18   and he would get back to me.  At that time, the way the
19   conversation ended, when I disputed it, he stated he had to
20   communicate to the company, either, you know, Comensura or
21   Verifications.  I don't know.  He just simply stated that he
22   would have to get back to me in that regard, and then that's
23   when I followed up on an E-mail the next day, and then he
24   followed up with me.
25   Q.  But do you remember whether your Verifications

Page 164

1    report was attached?
2    A.  Attachments, no.
3    Q.  You don't remember or you didn't receive it?
4    A.  I don't recall receiving an -- anything from NESC
5    during our communications that had an attachment of a credit
6    report.
7        MR. MADSEN:  Credit report?
8        THE WITNESS:  I'm sorry, a background
9    investigation report from Verifications, Inc.  Thank
10   you.
11   Q.  (By Mr. McPherson)  Now, also on the third page,
12   the very first E-mail, it states -- from Chris Sullivan to
13   you.  It's dated Wednesday, May 9, 2007, 6:43 p.m.  And it
14   states, "It is held up until we get you officially cleared."
15   Is this when you first learned that the position -- that you
16   might not be able to engage in the contract employment at
17   Northeast Utilities?
18   A.  That date is the 9th.  The 8th it was my
19   understanding -- well, it was my feeling on the 8th when I
20   spoke to him that things were kind of, like, held up only
21   based on what I had signed and what I had agreed to as far
22   as a release.  It states in those agreements that the
23   company, NESC, Comensura and NU, have to receive everything
24   and it has to be, you know, approved before I start.  So if
25   there's anything, any documents that are missing, I'm

Page 165

1    internalizing that as this is going to hold me up because
2    now I'm not in compliance with what is said in the -- in my
3    packet.  So that would have been the first time that I felt
4    it or I believed that it was held up.  This is the formal
5    communication where he's stating that he's communicated to
6    various persons.  I didn't know that he had communicated to
7    Comensura prior to communicating to me.  I thought I was the
8    first point of contact.  I thought he was notifying me.  I
9    dispute it.  We clear it up.  Then you report the official
10   final draft, but I later learned that wasn't the case; that
11   they had communicated the results to Comensura first and
12   foremost from -- you know, I guess upon when they received
13   it from Verifications.  They just turned it around and sent
14   it out.  That's my understanding.
15   Q.  Could I have this back, please?
16   A.  Would you like both of the documents back that you
17   gave me?
18   Q.  Yes.  This will be Defendant's 11.
19
20        (Defendant's Exhibit 11, Notice, with attachments,
21        marked for identification)
22
23   Q.  (By Mr. McPherson)  Can you please look at this.
24   What is the first page entitled?
25   A.  It's a notice from White & Katzman.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 166

1    Q.  Is this related to your first eviction?

2    A.  Yes, it is. This might have been like the first

3  document that I communicate that I received.

4    Q.  What is the date of it?

5    A.  The date is April 12th.

6    Q.  You were behind in your rent by April 12, 2007?

7    A.  Yes, I was.

8    Q.  Were you employed at that time?

9    A.  I was with C.B. Richard Ellis, and I had made

10  arrangements with them because the amount of money that I

11  was working -- I was employed with C.B. Richard Ellis, and I

12  was delinquent and I had made arrangements with them to make

13  payments, subsequent payments, on certain dates to take care

14  of the arrears.

15    Q.  What arrangements did you make with C.B. Richard

16  Ellis?

17    MR. MADSEN: Wait a minute.

18    THE WITNESS: No, with White & Katzman because

19  C.B. Richard Ellis was my employer. White & Katzman is

20  my landlord, if you will. So I made arrangements with

21  my landlord to pay, you know, a certain amount of

22  monies a week or what have you to clear up the arrears.

23  That's the arrangement that I made with my landlord,

24  which was White & Katzman.

25    Q.  (By Mr. McPherson) Was this the first time that

Page 167

1  you were behind in rent at the 160 Newington Road?

2    A.  With White & Katzman, yes it was.

3    Q.  What happened that you became behind in rent?

4    A.  I had been unemployed before I had taken on the

5  position with C.B. Richard Ellis through the agency. I had

6  been unemployed, and the amount of money that I was

7  receiving for unemployment compensation really wasn't

8  substantial. It wasn't enough to maintain a rent of $1,100.

9  So I was paying -- you know, between that and my car note, I

10  became, you know, behind. I became delinquent. So that was

11  the reasoning for it. So when I started the position with

12  C.B. Richard Ellis, I was able to make arrangements. Prior

13  to that, it would have been like going back to them and

14  telling them -- I feared telling them that I was unemployed.

15  I thought they would say -- but that was the reasoning for

16  this notice. They were responding to a communication that I

17  had sent to them to tell them that I acknowledged that I was

18  behind, and that I would like to make arrangements.

19    Q.  Did you pay your rent on April 1, 2007?

20    A.  I can't recall. You mean May 1st?

21    Q.  No, April 1st.

22    A.  April 1st, I was already delinquent. So since

23  this date was -- and I'm trying to go total recall on that.

24  I don't believe I did. That led to me being delinquent.

25    Q.  Now, at some --

Page 168

1    A.  And then May was coming up, so --

2    Q.  So you didn't pay your rent April 1st or May 1st?

3    A.  I don't recall that I did.

4    Q.  If you turn to page four of Defendant's Exhibit

5  11.

6    A.  What page is that, or what is the title of that?

7    Q.  It's West Hart Apartments, LLC. It's a statement

8  dated May 1, 2007?

9    A.  Yes.

10    Q.  On May 1, 2007, how far were you behind in rent?

11    A.  I was a few months behind.

12    Q.  Is this total listed $3,409.91 correct?

13    A.  That would have been correct at the time that they

14  sent it out to me. They sent -- this statement was as of

15  their date on May 1st of 2007. So based on their

16  calculation, it would have been, you know, accurate. I

17  never disputed with them any amount that I owed because each

18  time when you're late on the weeks then what have you,

19  you're assessed fees, and then also I had --

20    Q.  Now, if you turn to the next page, it's a

21  statement dated May 15, '07, also from West Hart Apartments,

22  LLC.

23    A.  Uh-huh.

24    Q.  If you look at the statement, it states checks

25  were returned.

Page 169

1    A.  Yes.

2    Q.  Is that correct?

3    A.  Yes. It states that on the first one as well, on

4  the statement dated May 1st. This is just a running total.

5  And, basically, they're stating that -- and I had

6  handwritten when I had sent the check. What had happened

7  with this is I had sent a check and the person that was

8  handling the accounts held it in her drawer for months.

9  When they submitted it to the bank, more than thirty days --

10  I think it was like almost forty days after, then the check

11  bounced. And these statements are, like, fifteen days

12  apart. They just showed -- basically, they send these

13  statements out every -- I don't know, every couple of weeks

14  you get a statement because the interest accrues every so

15  often. I think it's like every couple of weeks, that's why

16  the amount on the 1st was $3,409, and then it jumped up

17  fifteen days later now it's $3,434 because I have more

18  interest that -- coupled with the fact that you have the

19  returned check fee, and I asked them why they didn't

20  re-deposit it, and they stated they couldn't do that or they

21  don't do that. So they just send it back to you and they

22  charge you a fee and then the interest.

23    Q.  What month was that check for, what rent?

24    A.  That would have been for April.

25    Q.  So you gave it to them in April when it was due,

43 (Pages 166 to 169)

1  and they held onto it for thirty days?
2  A. I gave it to them, yes. And that's -- this is
3  what was disclosed to me by the superintendent, that this
4  person that was working for them, who was fired, held onto
5  payroll checks because they were out of state. This is
6  before this White & Katzman, who is local, was managing the
7  property. Prior to that, when I signed the lease, the
8  management company was in New York, and you would send the
9  money to the management company in New York. The super, who
10  lives in the apartment building but worked with them, stated
11  that this woman who we were directed to send the monies to
12  was taking the money and she would just hold onto it and not
13  deposit it in a timely fashion. Subsequently, she was let
14  go. After that, they -- the landlord, the owner, actually,
15  hired White & Katzman. White & Katzman is a management -- a
16  real estate management firm or company here, local here in
17  Connecticut. Prior to that, it was going to the address
18  that I was given in New York.
19  Q. So you were unaware for a month that you wrote a
20  check for $1,100 that wasn't cashed?
21  A. I wasn't given the -- because I'm not balancing my
22  checkbook every month. I know you're supposed to, but quite
23  honestly, I don't do that. I balance my checks by my debit
24  statements, but I don't do it -- I don't sit down the old
25  fashioned way. I go by communications that are sent to me.

1  If something comes up that's wrong, then I look at it and
2  troubleshoot it that way. I don't look every time I get
3  paid to see -- I probably should do that. I don't see that
4  I'm deposited or the payroll is deposited and the exact
5  amount of money that I should -- you know, that I think
6  should be deposited. I don't do that. Maybe I'm naive, but
7  I don't do that.
8  
9  (Defendant's Exhibit 12, Resume, marked for
10  identification)
11  
12  Q. (By Mr. McPherson) Can you look at that, please?
13  Do you recognize that document?
14  A. Do I recognize my resume? Yes, I do.
15  Q. Is this updated?
16  A. No. This one doesn't include The Hartford. I
17  would have put that on there. And then also, it doesn't
18  include -- I had the City of Hartford. I think I put that
19  under selected accomplishments. But in answer to your
20  question, I have updated my resume to include the City of
21  Hartford. I wouldn't have put the DSS because that's only a
22  couple of weeks, and it gets too busy. I almost have a
23  two-page resume. I can't put too much clutter on my resume,
24  but I definitely have one that lists The Hartford Insurance
25  Company where I'm working at now.

1  Q. Okay.
2  A. And that one, we tried to open it. I sent it
3  electronically, but we weren't -- we are unable to open it
4  and print it out, so I have to troubleshoot that. So I have
5  to go back up, find out from my home computer how come I
6  can't transmit that resume.
7  Q. Now, I notice from looking at it, most of the jobs
8  are contractor jobs. Why is that?
9  A. Why do I work contract? After I moved to
10  Connecticut and working through -- working with General
11  Electric and I was laid off, since I work in insurance
12  primarily -- it was post 9/11 and insurance companies
13  weren't hiring too much. And I remember from working
14  through temporary agencies in the past that that's
15  another -- and I'm going to the unemployment office as well.
16  They suggest when you go through those counseling sessions
17  with unemployment, you have to actively look for work. So I
18  can't just say that I'm working or I'm looking to work at a
19  permanent job. I have to look for any type of gainful means
20  of employment. They don't even care if it's gainful. It's
21  just that I have to look for work. And then I started
22  looking at temporary agencies, so I registered with a lot of
23  different agencies. And temporary agencies call you sooner
24  than permanent jobs. And if a temporary agency would call
25  me, I'm not going to wait around for an application that I

1  placed at Aetna or AIG for permanent placement that may or
2  may not come when I have an agency contacting me with an
3  opportunity and I can start right away. I am head of
4  household, so I have to be consistently employed. And
5  that's one of the reasons why I went with temporary agencies
6  because their placement and their turnaround is quicker; not
7  only that, the opportunities that the temporary agencies are
8  giving me, in most cases, they were far better than working
9  for the company directly where I could be placed right into
10  a position with a title, you know, like contract
11  administrator or paralegal. But if I was to apply for a job
12  at one of these major insurance companies, I might come in
13  as a customer service rep or, you know, something where I'm
14  over-qualified, but I would have to fit into whatever
15  positions that they had open. So I had a lot of luck with
16  temporary agencies, and I have been hired permanently also
17  in the past with temporary agencies. So that was -- it was
18  a way of just keeping the ball rolling, as I have to work.
19  I can't wait around for a permanent job to come. And, like
20  I said, the economy was not what it used to be. Calls for
21  permanent jobs were not forthcoming as they used to be. But
22  temporary agencies were always filling projects and they
23  were filling assignments relatively quickly. So that's the
24  reason why you start working for them, they keep calling
25  you.

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 174

1    Q.  Since approximately May 14, 2007, have you applied
2    for any permanent jobs?
3    A.  I applied through — I am registered with a lot of
4    different job — you call them websites, if you will, like
5    Monster and Law Jobs and things of that nature.  So I
6    applied for a lot of different jobs, temporary and
7    permanent.  I've — since this incident with NESC, I have
8    stopped — I refrained from applying with temporary agencies
9    that are not local.  I had stopped applying to — I used to
10   use a site called Net Jobs or something, Net Temps or
11   something like that.  It's a website.  I stopped using them
12   for temporary — I tried to, like, get away from temporary
13   jobs and tried to focus mainly on permanent jobs, but again,
14   it's kind of hard, you know.  I try to apply for both
15   permanent jobs and also long-term jobs, but if I'm offered a
16   position and I don't have a job and I don't have any money,
17   I have to take what I have to take.  My standards can't be,
18   well, that's beneath me, or I can't work there and that's
19   only $12 an hour and I used to make $20 an hour.  I don't
20   have that luxury anymore.  And plus, I'm getting older and
21   I have to go where I can go.
22   Q.  Have you gone on any interviews for temporary or
23   permanent jobs after May 14th of 2007 which are not listed
24   on your resume?
25   A.  May 14, 2007?  Yes, I've gone for interviews.  Not

Page 175

1    that many.  Job interviews are few and far between.  My
2    resume is only a list of jobs that I actually held.  It
3    doesn't reflect any interviews that I went on or any jobs.
4    I have applied to so many jobs that Career Builder — forget
5    about it.  And Monster.com, between the agencies that I'm
6    registered with, I used to have these alerts, job alerts,
7    come.  I have alerts coming out.  I don't know how many
8    alerts I get directly with the companies.  I have one with
9    AIG.  I have too many to name.  And I apply to jobs.  I
10   stopped doing that because I was told by a headhunter or
11   recruiter or HR person that it doesn't look good if you
12   apply to too many jobs too close together.  It gives the
13   appearance of, you know, what, are you desperate?  Why do
14   you have, like, twenty different applications to this one
15   company.  So I try to refrain and just pick out what I'm
16   qualified for and not just apply to any job whatsoever, you
17   know, customer service, you know, just apply to anything.
18   Q.  So what headhunter told you that?
19   A.  When you go through — when you collect
20   unemployment, you have to go through training classes and
21   you have to sit in on seminars every so often.  It's a
22   mandatory program that they have in order for you to be
23   eligible for your unemployment benefits.  So I believe
24   initially I was told to — and I go on-line a lot, too.  So
25   I believe it was, like, through the unemployment office

Page 176

1    where you sit in on one of those — you know, they critique
2    your resume, how to brush up for interviewing, things of
3    that nature.  I can't recall which one in particular told me
4    that, but it's — I read a lot of trade magazines as well.
5    So it's — you know, it's someone's opinion as to what
6    you're supposed to be doing, just for you to work with.  You
7    don't have to follow it.
8
9        (Court reporter goes off record)
10
11       MR. McPHERSON:  Back on.  Defendant's Number 13.
12
13       (Defendant's Exhibit 13, Complaint Form, marked
14        for identification)
15
16   Q.  (By Mr. McPherson)  Can you look at Defendant's
17   Number 13.  What is it titled?
18   A.  Office of the Attorney General, Consumer
19   Protection, and it has the address of Concord, New
20   Hampshire, consumer complaint form.
21   Q.  Did you fill this out?
22   A.  Yes, I did.
23   Q.  Did you send this in to the Attorney General of
24   New Hampshire?
25   A.  I believe this form is an electronic form.

Page 177

1    Q.  So you sent it through the Internet?
2    A.  This form is — as you see on this second page,
3    "Document generated by on-line consumer complaint form on
4    May 14, 2007, 2:20 p.m."
5    Q.  So you sent it electronically on May 14, 2007?
6    A.  You have to — yeah, go on and that's the way they
7    lodge their complaints.
8        MR. MADSEN:  It was just a two-pager?
9        MR. McPHERSON:  Yes.  Fourteen.
10
11       (Defendant's Exhibit 14, Letter, 5/9/07, marked
12        for identification)
13
14   Q.  (By Mr. McPherson)  Can you read this and identify
15   this?
16   A.  Would you like for me to read the entire page?
17   Q.  No.
18   A.  Or the letter.
19   Q.  No.  Just identify it.  What's the date?
20   A.  It's my letter dated May 9, 2007, to the FTC,
21   regarding a complaint against Verifications, Inc., your
22   client.
23   Q.  Did you send this letter?
24   A.  This was mailed.  This is my letter that I mailed.
25   Q.  You wrote this letter?

45 (Pages 174 to 177)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 178

1    A.  Yes.
2    Q.  Did you send this letter --
3    A.  I sent this letter.
4    Q.  -- to the FTC?
5    A.  Yes, I did.
6    Q.  You did.  On what date?
7    A.  I would have sent it out on the same date.  If I
8    didn't send it out on May 9th, I would have sent it out on
9    May 10th, you know.
10   Q.  Okay.
11   A.  Because I don't know what time of day.  I might
12   have made this or generated this letter in the evening and
13   then went to the post office the next day and mailed it out
14   on the 10th.
15
16       (Defendant's Exhibit 15, Consumer Statement,
17        marked for identification)
18
19   Q.  (By Mr. McPherson)  Can you identify this, please?
20   A.  This is a consumer -- it's this document is
21   entitled a Consumer Statement, State of Connecticut,
22   Department of Consumer Protection.  It's in Hartford,
23   Connecticut.
24   Q.  Did you fill this document out?
25   A.  Yes.

Page 179

1    Q.  Did you mail this document --
2    A.  Again --
3    Q.  -- to the Department of Consumer Protection?
4    A.  I believe this letter also was an electronically
5    sent document, I believe.
6    Q.  Do you know what date you sent this?
7    A.  I signed it on the 14th, and I think I did that
8    because it was transmitted electronically.  And so I did
9    like a print screen and then I signed it.  So I think it was
10   around the 14th.
11
12       (Defendant's Exhibit 16, Letter, 5/14, marked for
13        identification)
14
15   Q.  (By Mr. McPherson)  Defendant's 16, can you
16   identify this document please?
17   A.  This is also a letter generated to -- by me to
18   Mary Poquette at Verifications, Inc.  It's dated May 14th
19   and it was copied to National Engineering, Larry O'Keefe
20   and Chris Sullivan?
21   Q.  So you sent this May 14th?
22   A.  That's the date that was dated.  Again, depending
23   on when I generated this letter -- because if it was like
24   late in the evening, I might have faxed it.  It looks like
25   I -- whenever I put a fax number down here, that means I

Page 180

1    faxed the document, and then I might have later mailed it
2    out.  So it was either on that date that I faxed it or the
3    next day.
4    Q.  Now, if you look at the second paragraph, you
5    state, "You stated on Friday, May 11, 2007."  Are you
6    referring to Mary Poquette at Verifications?
7    A.  Yes.
8    Q.  You had a conversation with her on May 11th?
9    A.  Yes.  And also I think it was in the E-mails that
10   you sent around -- I think it spoke to clearance and all of
11   that, I believe.
12   Q.  What did you she tell you on May 11th?
13   A.  She stated to me that they had communicated to
14   NESC or Verifications -- Mary Poquette stated that she had
15   communicated to NESC the amended, you know, corrected
16   report --
17   Q.  So --
18   A.  -- cleared report.
19   Q.  -- she stated she sent it to National Engineering?
20   A.  She stated.
21   Q.  Did she state whether she contacted Comensura?
22   A.  No.  I don't recall that.  I don't recall that.  I
23   just recall her stating that they had done -- they,
24   Verifications, had performed the -- because all I did was
25   ask them to double check and clear their report; that's what

Page 181

1    I was asking for.  And so in our conversation, she was
2    basically saying we did that.  She didn't tell me how, you
3    know.  I can't recall if she told me that, if she
4    communicated directly to Comensura or NU or Chris.  I don't
5    recall that.
6    Q.  Did she say anything else to you?
7    A.  On the 11th?  I talked to her so many times, I --
8    my head is spinning.  I can't remember everything that she
9    said, but --
10   Q.  When is the first time that you talked to her?
11   A.  It would have been when I requested that my
12   background report be amended, and also to follow up as to
13   how it was.  Because at this point, I want to know how --
14   how I can mitigate damages and how they, background check
15   companies, are performing their checks.  So a lot of
16   conversations are, well, what do you guys do with that
17   release form that I give you that states my name and my
18   Social Security number and my addresses and all of this
19   other information relative to who I am?  Is that going in a
20   database or where do you guys get your information from?  So
21   I'm trying to find out how it's all done, where do they go
22   to get their information, type of thing.  So a lot of our
23   conversations were back and forth relative to that.  My
24   understanding is it didn't take very long for them to
25   initiate or to re-investigate the background check.  She did

46 (Pages 178 to 181)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 182

1  state to me in one case that the initial report that you
2  should have or -- if you don't I have it. She wrote to my
3  attention that the initial report, I guess, on the bottom
4  somewhere, on one of the pages, it states that that report
5  required further investigation. So that's what she --
6  because when I was disputing with her, it's like, you know,
7  this went to the employer. She states, well, they shouldn't
8  have sent it. "They," NESC, should not have sent it to
9  Comensura or NU pending verification, like it was an
10  incomplete report. And it stated on the form that it was
11  incomplete which warranted further communication.
12     Q. I'm going to show you Defendant's Number 9. Can
13  you show me where it states it needs further inspection?
14     A. This doesn't look like the -- I don't know if this
15  is like the first one or the second one.
16     Q. What is the date of that?
17     A. What I mean by the first one is that of this same
18  report from Verifications, Inc., for the NU job, I received
19  several reports. I received multiple reports. So I
20  received the first report that has a little disclosure, and
21  then the corrected report, I received that like a couple of
22  times, so that little --
23     Q. How many times did you receive the first report?
24     A. The first report, I would have to look in my
25  records, but I might have received it like twice or

Page 183

1  something like that, the one.
2     Q. Is it on the first report where it's stated that
3  further investigation was needed?
4     A. It was definitely the initial report, the very
5  first report that they sent out to NESC where it stated that
6  it was a hit on my name and date of birth, but further check
7  had to be --
8     Q. Can you look at this?
9     A. It doesn't look like this is the report is what
10  I'm communicating. However, it does, in this report that
11  I'm looking at, but this is not the one that I'm speaking
12  of, if you -- it says additional -- there was, like, a blurb
13  on the first report that says additional research, something
14  like that. Additional research had to be done or should be
15  completed. But, again, this is not the first report. I
16  should have a copy of that very first report that I
17  received, but I received a couple of copies from
18  Verifications, Inc. Some of them are duplicates. It's the
19  same thing.
20     Q. So when it said further investigation was needed,
21  was that before or after they did the county court clerk
22  search?
23     A. See, I don't know how they do the checks. So when
24  you say a county clerk search, I don't know. I'm just --
25  all I know is it's the first report.

Page 184

1     Q. First one?
2     A. Right. So how they get their report -- and she
3  didn't disclose to me how they do their background check. I
4  don't know where they get the information from, but this is
5  one of the things that we were discussing on the 11th when
6  she was -- Mary was kind of appalled that the information
7  went forward to Comensura and you. Her statement was it
8  wasn't finalized or it wasn't -- you know, it wasn't a
9  finalized report, that type of thing, wherein she went to
10  some statement on that report. And this doesn't look to be
11  the one because it states clearly, as you read up under,
12  like, the last page, it states that this is not a finalized
13  report or something like that. So I saw -- when I was
14  talking to her on the phone, I saw what she was speaking to.
15  It's like one of those things that you read, and it's just
16  like it's okay, I think it's just like background
17  investigation language.
18     MR. McPHERSON: Can you produce that document?
19     MR. MADSEN: We would have. I mean, we have
20  produced everything. Everything that she has in her
21  possession.
22     MR. McPHERSON: We don't have that document.
23     THE WITNESS: And Mary -- this information came
24  from Mary Poquette. It's not a document that I had.
25  This is what Mary Poquette stated.

Page 185

1     Q. (By Mr. McPherson) But is it in your possession
2  now?
3     A. I don't know, but your initial question was -- I'm
4  not trying withhold anything because anything I have, I'll
5  give to you. I have no problem with that.
6     MR. MADSEN: Why don't you recheck all of your
7  documents.
8     THE WITNESS: But I think I gave him everything,
9  but because I received numerous background check
10  reports -- and to me, they look like the same thing. I
11  may have provided just one. You know how you get a
12  couple of different documents on different dates, and I
13  was like, you already sent me this so I threw the other
14  one away, not looking at the first one to see that the
15  first one says something a little different than the
16  second one. But that was -- your question was our
17  conversation on the 11th, May 11th. That's basically
18  what we were talking about, what she had did to correct
19  it. And on that date and another date, she talked
20  about what was final.
21     Q. (By Mr. McPherson) What did she tell you how they
22  corrected it?
23     A. I think she used the term re-investigate it. She
24  wasn't clear as to -- because the question that I had that I
25  still have is how do you perform these background checks

47 (Pages 182 to 185)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 186

1   Do you perform it on Social Security number initially?
2   Name, date, date of birth, Social Security number, date of
3   birth, something, mother's maiden name. How do you do that?
4   And no one -- Choice Point wasn't forthcoming. Nobody tells
5   you that. It's just like a mystery. So I really don't
6   know. All I was told is there is specified criteria and,
7   they enter it however they enter it to whomever they enter
8   it to.
9       MR. McPHERSON: This is 17.
10
11       (Defendant's Exhibit 17, Letter, 5/11, marked for
12       identification)
13
14   Q. (By Mr. McPherson) Can you identify Defendant's
15   17?
16   A. This is a letter that I generated as well, another
17   one of my letters, dated on May 11th to Verifications, Inc,
18   and I cc'd the South Dakota Attorney General's Office and
19   Office Manager at NESC.
20
21       (Defendant's Exhibit 18, Packet of Documents,
22       marked for identification)
23
24   Q. (By Mr. McPherson) Can you look at Defendant's
25   Exhibit 18. On page one, can you identify it?

Page 187

1   A. Page one looks to be the same letter that I just
2   passed back to you that -- a copy of that.
3   Q. Oh, no. The first page.
4   A. I beg your pardon. The cover sheet, it's a fax
5   cover sheet.
6   Q. So where did you send this?
7   A. It's addressed to Verifications, Inc., South
8   Dakota Attorney General's Office and National Engineering.
9   This contains the letter that I just passed back to you.
10   Q. Now, can you look through these documents.
11   There's ten pages. Is this a packet that you sent to the
12   South Dakota Attorney General's Office on May 11, 2007?
13   A. Yes. I sent it to -- it's listed on the fax cover
14   page. These are the three fax numbers that I sent this
15   ten-page document to.
16   Q. Could your look at the second page? Was this in
17   the packet, the May 11, 2007, letter?
18   A. Yes, because they are copied at the bottom of the
19   letter.
20   Q. Okay.
21   A. The South Dakota Attorney General's Office, they
22   are copied in the letter.
23   Q. Now, the next page, May 9th, addressed to the
24   Federal Trade Commission, was this in the packet?
25   A. Yes.

Page 188

1       Q. Now, the next was a Clerk of Court fax cover page
2   Pennsylvania County Circuit Court, was this in the packet?
3   A. I believe it was.
4       Q. Now, the next page, Clerk of Circuit Court dated
5   April 7, 2006, was this in the packet?
6   A. I believe it was, yes.
7       Q. Now, the next page is a sentencing order. Was
8   this in the packet?
9   A. I believe it was, yes.
10   Q. And the second page of the sentencing order, the
11   very next page --
12   A. It's a second page of the sentencing order.
13       MR. MADSEN: The one signed by the judge.
14       THE WITNESS: It's the second page of the
15   sentencing order.
16   Q. (By Mr. McPherson) Yeah, dated 9/23/99. Was this
17   in the packet that you sent to the South Dakota Attorney
18   General's Office?
19   A. Yes. I believe it was.
20   Q. Now, the next page dated April 10, 2006, from
21   Choice Point to you, Deborah Adams, was this in the packet?
22   A. I believe it was.
23   Q. Now, the next page, Choice Point Services,
24   national criminal file search results, was this in the
25   packet that you sent to the South Dakota's Attorney

Page 189

1   General's Office?
2   A. Yes, I believe it was.
3   Q. And the last page, Choice Point to you, Ms.
4   Deborah Adams dated April 26, 2006, was this also in the
5   packet?
6   A. I believe it was.
7       MR. McPHERSON: Let's mark this.
8
9       (Defendant's Exhibit 19, Document, marked for
10       identification)
11
12   Q. (By Mr. McPherson) Would you review this. Do you
13   recognize this document?
14   A. It's not my resume. It looks like an on-line, as
15   I told you, one of the on-line websites that I have like
16   with Monster and the like. This is one of them.
17   Q. Did you --
18   A. Create this?
19   Q. -- create this --
20   A. Yeah.
21   Q. -- on a website?
22   A. Yes.
23   Q. What website was that.
24   A. I would have had to create this. It's a linked
25   in -- this is a networking website. So, pretty much, you --

48 (Pages 186 to 189)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 190

1 it's a networking website. You go in and you communicate
2 with colleagues that you worked with. It's a good way to
3 make contacts as well. You can use this website to --
4 they're not -- it's not an employment website by any means,
5 but it's a good way to go in and communicate with people
6 that you have worked with, and people refer you to other
7 people that they have in their network. And you can sort of
8 get directed to, like, a human resource person or a company
9 that is hiring, and they will give you names of -- I know of
10 a human resources person or a manager that works at Aetna or
11 General Electric or whatever because this is a national
12 website. You know, you type that you're looking to move to
13 California or Alabama and they can give you, like,
14 direction. Oh, I know someone in Alabama that just moved
15 down there and they're working at, you know, whatever
16 company; and, you know, you can communicate to them. Here's
17 their name and number. Contact them and tell them that I
18 told you to give them a call. It's -- like I said, it's
19 strictly networking, but you can get some contacts.
20    Q. Is this something that you --
21    A. No. I haven't been into Linked In for quite some
22 time. My profile may not even be accurate.
23    Q. Did you create this resume?
24    A. I stated I did, yes, I did.
25    Q. So you worked at the Department of Children &

Page 191

1 Families Services for nine months. Is that correct?
2    A. No. It states January, 2008, and the job ended in
3 April, April, 2008.
4    Q. So you worked there for four months?
5    A. I worked there from January through April, through
6 mid-April. Actually, the 24th or something like that.
7    Q. Now, are there any jobs which were less than three
8 months that occurred after working at or after the potential
9 employment at Northeast Utilities that are not on this
10 resume?
11    A. I had the position that we discussed -- this is
12 not a resume. Pretty much this is a profile.
13    Q. Any that are not on this profile?
14    A. This is a profile.
15    MR. MADSEN: Of less than three months?
16    MR. McPHERSON: Yes.
17    THE WITNESS: I stated the one at the Department
18 of Social Services, that was a couple of weeks. This
19 profile hasn't been updated in -- since the Department
20 of Children & Families. So that wouldn't have been
21 there. I wouldn't have put in the City of Hartford
22 where I only worked, I think, like two weeks or
23 something like that. I don't normally put in
24 assignments that last less than a month. And I don't
25 use this document -- actually, I have never used it. I

Page 192

1 just update it so when people -- when they log in to
2 see who you are, they check your profile out to see who
3 they're talking to. That's all this document is used
4 for. It's not used to apply for anything. It's
5 basically the property of Linked In. And people who go
6 on the website they look at it just as -- just to see
7 who you are and what you're qualified to do. So it's
8 not like I would use this to apply for any job or
9 anything like that. I have my resume for that. This
10 is just for the purposes of being a member of that
11 Linked In portal there, that networking website.
12    Q. (By Mr. McPherson) Now, you claim that you suffer
13 anxiety, I believe, due to the incident?
14    A. That I suffered?
15    Q. Yes.
16    A. Anxiety, yes.
17    Q. How so?
18    A. A little bit, as we discussed, because I was
19 already behind in my rent, and in some of my -- you know, my
20 utilities, I was backed up in everything. And I had a job,
21 so -- first of all, I'm backed up in everything. I had a
22 job, and I tried to make arrangements based on C.B. Richard
23 Ellis that I got a better job offer for Northeast Utilities,
24 which makes me feel like, yeah, now I'm definitely going to
25 be able to meet my obligations, you know, the promises that

Page 193

1 I have made. And then when I lost that job, after I told
2 these people that I would do something on a certain date and
3 now I can't do it, I'm embarrassed to go back to them after
4 I just told them that I had been offered a job through
5 Northeast Utilities, now I have to go back to these people
6 and tell them that the job with Northeast Utilities didn't
7 happen. And in addition to that, before when I was
8 employed, now I'm not employed at all, and I don't know when
9 I'll be able to pay you. I had big time anxieties. Big
10 time.
11    Q. Now, did the medical provider -- I guess you have
12 only seen two, according to this -- diagnose you as
13 suffering from anxiety?
14    A. No. Basically, I don't know what her diagnosis
15 was. I don't think she diagnosed with me anything. I don't
16 really recall because I was so beside myself with despair.
17 I don't know what that lady said. All I know is I couldn't
18 sleep at night, and I was crying almost non-stop. I didn't
19 come out of the house, and I had my son and his friends that
20 are around. So she's -- I'm telling her my situation, if
21 you will, and she's prescribing something. I'm not a fan of
22 medicines and prescriptions. I don't like taking medicines.
23 And she's prescribing to me medicines that I don't really
24 want to take, but I don't want to go against her, you know
25 recommendations, because I'm coming to her for help. So

49 (Pages 190 to 193)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 194

1  it's a little foolish to come in here and tell my doctor my
2  situation and then reject the treatment that she's offering
3  me. So, you know, I admitted -- I was like, okay, if that's
4  what you think will make me feel better -- she did say, you
5  know, you need to calm down. I just explained to her the
6  deep despair that I was feeling. What exactly she said,
7  what medical terms she might have used to describe what I
8  was going through, I can't recall. I can just tell you how
9  I felt.
10  Q.  Have you ever seen any kind of medical
11  professional or therapist related to anxiety prior to the
12  alleged events of May, 2007?
13  A.  As I stated -- yes, I have. As I had stated to --
14  sorry. I don't know the gentleman's name, the
15  representative for Verifications, Inc., who just asked me
16  questions before you -- when I was faced with loss of job,
17  you know, when the company started restructuring, and
18  they're, sort of, like forcing you out, yeah. And I'm
19  without a job, and it's sort of clear that the writing is on
20  the wall, and it's just a matter of time. I took advantage
21  of some of the employee programs that they may have had,
22  just to talk things out and find out what my options are and
23  like calm down, you know. Calm down. This is what you can
24  do. So, in answer to your question, yes.
25  Q.  Is that the only time?

Page 195

1  A.  Job related, yes.
2  Q.  No. The GE job related, is that the only time?
3  A.  No, but I stated that there were two incidents. I
4  stated to that gentleman that it was GE and CHUBB. That's
5  what we stated.
6  Q.  Okay.
7  A.  So those were the times because those are the only
8  times in my history in the past few years, like past five
9  years or so since I have been in Connecticut, where I was
10  faced with this kind of, like, interruption of a job down
11  here, and I'm paying all of this rent and I don't have
12  family in the area, so yeah, yes.
13  Q.  So for a year prior to May of '07, were you
14  suffering from anxiety?
15  A.  No. I don't suffer from it. I've never had a
16  diagnosis of anxiety. It was situation that I was going
17  through which led to -- it's like a situational -- you know,
18  when you're depressed because your dad dies or your mom dies
19  or your child dies and you feel the impact of it and you
20  feel hopeless, and it's like, what am I going to do now.
21  And you go and you feel like you're going further and
22  further down. So it was the impact of the moment, but I
23  couldn't stay there in that state of mind. I mean, I had to
24  go to work, and I communicated this to my doctor. It's like
25  I can't take these meds because they have side effects of

Page 196

1  sleepiness, drowsiness. They have all kinds of side
2  effects; sensitivity to light. That's one of the reasons
3  she took me off of them. I explained to her, it's like, I
4  don't want to go outside. I go outside and the light is
5  just, sort of, like a -- I feel like a vampire. I can't
6  take this, and I definitely can't talk to employers and
7  present myself in a professional, educated manner on this
8  type of stuff. I don't feel like myself. So I want to
9  explore other alternative treatments to get over this. And
10  she suggested some other things, reading different
11  magazines. I spoke to some friends where before I wasn't
12  telling anybody, I was internalizing it because I was
13  embarrassed. So I did other things to help me get over it
14  and get back on track to work. Because I knew once I
15  started working, although I might still feel a little, you
16  know, uneasy or whatever, I knew it would help me feel
17  better because I would be in a professional environment.
18  And so that was my number one goal, to get back to work.
19  And I knew that the feeling that I felt would -- you know, I
20  would get over it. Just like when my dad died, I got over
21  it, you know. I was depressed for a little -- I won't say
22  depressed, but I was in mourning, but going through my life
23  mourning over the inevitable. The job was over. That was
24  it. I'm not going back to Northeast Utilities, or I'm not
25  going to be going in that capacity. I had to get over that.

Page 197

1  I had to get on with my life. I have a son that I have to
2  take care of. I have a household. I can't let this get me
3  down. So that was my mentality, and that's what I explained
4  to her.
5  Q.  So in claiming anxiety in your complaint, is that
6  a self-diagnosis, or where do you get that term anxiety
7  from?
8  A.  I probably heard her say it.
9  Q.  Okay.
10  A.  And from my classes in it. Some of it probably is
11  self-diagnosis because I'm a major in psychology. So some
12  of it would have been what I know anxiety to be, and then
13  some of it would have been, yes, what she said. And some of
14  it would have been when you prescribe the medicines --
15  because she did prescribe two different meds, they give you
16  a disclosure when you go to the CVS pharmacy and they give
17  you the side effects. It tells you what it treats. So I do
18  read those things. So that's where I would have picked it
19  up initially. I would -- you know, I went in and I
20  communicated to her what I felt, and then subsequently she
21  would have made her determination. She prescribed the meds.
22  And then in the meds, it states that, you know, this is to
23  treat anxiety, whatever. So that's where I would have
24  confirmed what I feel. And when I speak, I just, pretty
25  much, communicate what I believe or what I feel and what

50 (Pages 194 to 197)

8d1e44cca-fc6a-481d-9adf-f1504de3d63d

## Page 198

1  have you, and she puts it into medical terminology and her
2  professional opinion.
3   Q.  Were you suffering from acute depression, as you
4  claim, prior to the alleged incident in May of 2007?
5   A.  Acute depression?
6    MR. MADSEN:  You mean at any time in her life?
7   Q.  (By Mr. McPherson)  For the year prior, from May,
8  2006, to 2007.
9   A.  My understanding of acute depression is like
10  chronic depression.  That's like a disorder like bipolar and
11  all of that other stuff.  I have never been diagnosed with
12  that.  As I stated before, it's more or less situational.
13  Had I — I mean, I already had a certain amount of anxiety,
14  which is understandable because I was behind in my bills, so
15  that's anxiety in and of itself.  And then further, I lost
16  my income after I waited so long to get a job.  Now my hope
17  of advancing those dreams are crushed.  So in answer to your
18  question, no.
19   Q.  Did you suffer from acute depression at all after
20  the incident?
21   A.  Excuse me.  I need a minute.
22
23    (A recess was taken)
24
25    MR. McPHERSON:  Back on record.

## Page 199

1   Q.  (By Mr. McPherson)  Do you suffer — have you
2  suffered from acute depression because of the alleged
3  incident of not getting the contract position at Northeast
4  Utilities?
5   A.  I suffer from — and I don't know if you want to
6  call it acute depression.  That's a medical term.  I can
7  tell you what I'm going through right now.  And I believe my
8  PCP will call it acute depression, but I'm not up on medical
9  terminology.  I'm just going to tell you what it is.  I do
10  have depression.  It's not every day.  I'm living in a
11  hotel, so yeah.  My son is not with me, yeah.  I have my
12  belongings in three different places.  Yeah, I'm suffering
13  from something, I don't know what you want to call it,
14  because of the situation.  I'm not back on track.  I'm not
15  like I was before I applied for that job through Career
16  Builder and Northeast Utilities.  So if it's called acute
17  depression or whatever it's called, then, yeah, that's what
18  I — I have something.
19   Q.  Have you ever been diagnosed with depression in
20  your life?
21   A.  No.  I don't think it's in my medical records.
22  The only time I have ever had an issue was when I went to
23  see her about this job that I had lost.
24   Q.  Who is "her"?
25   A.  Stacie Ziebel.  I thought we were talking about my

## Page 200

1  primary care physician.  I'm sorry.
2   Q.  Go ahead.  Finish.
3   A.  That's the time that I communicated — that was
4  the first time that I had communicated, and she was aware
5  that it was, basically, because of — I thought she used the
6  term situational.  By that I mean — this is my
7  understanding of what she's saying is the depressing is
8  brought about — comes from a circumstances in your life.
9  So you're just not depressed for no reason, which I think
10  some of the diagnosis of depression means.  Sometimes
11  persons are depressed for just whatever.  They really can't
12  pinpoint an exact cause of the depression.  My anxiety and
13  depression was based on the fact that I didn't get the job
14  and I lost the job.  I wasn't diagnosed prior to that, and I
15  haven't been behind in my bills prior to that as well, but
16  it wasn't to the point where that was it, you know, I had to
17  throw in the towel.  I was still trying to make it.
18   Q.  Going back to your bills, when did you expect to
19  receive your first paycheck from National Engineering for
20  your position?
21   A.  National Engineering, I don't know when the first
22  paycheck would have been because I don't know — I can't
23  recall now if they're weekly or biweekly, but that wouldn't
24  have mattered to me.  What I would have been most concerned
25  about, and what most bill collectors want to hear, they want

## Page 201

1  to hear that you have a job.  So if you tell them when
2  you're going to start and, you know, when your pay date is
3  or whatever, they're willing to work with you on that.  But
4  the most that they want to hear is do you have a — the
5  first thing they ask you right off the bat is, well, when do
6  you get paid, or how are you going to make the payment.  So
7  either you're going to say my mom is going to give me a loan
8  of X amount of dollars, my husband is going to — you know,
9  you have to give them some type — they want to know what
10  your source of income is.  And they are pretty much okay
11  with that as long as you have a source of income and an
12  expectancy of income sometime in the near future, then it's
13  like okay.  We'll wait a couple of weeks or something for
14  you to get your first paycheck.  Not to mention that I would
15  get a last paycheck from the company that I was with.  So if
16  they have to wait a couple of weeks for that other check,
17  then that's fine.  Usually they work with you.  You tell
18  them how much you make, they're going to take a certain
19  amount.  They're not going to take your whole check
20  because — they know you have to buy groceries or gas or
21  what have you, but it's just — they want to know that you
22  have the ability to pay for it.  That's just been my
23  experience.
24   Q.  What bill collectors did you have — were you in
25  contact with in April or May of '07?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 202

1    A.  My major ones were my landlord because I had made
2    arrangements.  I had made arrangements with the leasing --
3    not the leasing company, my auto -- I have an auto loan.  I
4    have an auto loan.  So the company that owned my car, I made
5    arrangements with them I had previously to losing, you know,
6    the job.  Electricity, they weren't too much of a concern
7    because you can always -- you know, you always make that
8    up.  So they're willing to accept, like, partial payments.
9    So if you're behind in, you know, your electricity or cable
10   or anything like that, telephone bill or anything like that,
11   they're willing to, sort of, like work with you on that.
12   All right.  You sent us $70 today, that type of thing.  So
13   those are the types of communications that I was making to
14   try to let them know my willingness to pay.  I don't want
15   people to think that I was just disregarding and I'm not
16   trying to pay bills or I'm just like ignoring them.
17      Q.  So besides your landlord and your car --
18      A.  And all of my utilities.
19      Q.  And all of your, what?  Electric?  Gas?  What?
20      A.  Yeah.  It's the electric.  The gas is -- that's
21   not a utility that I'm responsible for.  So your phone and
22   your cable.
23      Q.  So you were behind in payments on your phone, your
24   cable, your rent, and your car.  Anything else?
25      A.  No.  I don't have a credit card, so I don't have

Page 203

1    credit card debt or anything like that.  So it's just living
2    expenses, pretty much.
3       Q.  What is the total amount that you were behind?
4       A.  I don't know.  I'd have to calculate that.
5       Q.  Was it greater than $5,000?
6       A.  I don't know, but I can provide that information
7    to you.  Basically, I would go through and the electricity
8    bill would be, you know, $100 a month or something like
9    that.  I can communicate to you what -- how far I was behind
10   on that.  I may not have been behind that much on that.  The
11   car, I might have been a month, month-and-a-half.  It might
12   have been a little bit more than that on that.  So, again,
13   off the top of my head, I don't know the exact amount, but
14   there is an easy way to calculate it.
15      Q.  Did you normally make your payments on time before
16   this May of 2007?
17      A.  I would pay because I was like in between jobs.  I
18   would pay, sort of, like late, but I would make payments
19   based on the agreement.  So it's been my experience that if
20   you lose your job, if you're in between employment, the
21   first thing you do -- because I have gone to, like, credit
22   report seminars and things like that -- the first thing you
23   do is you communicate to them what your situation is and
24   they work out arrangements.  So the bottom line is, okay,
25   yes, you're not working now.  When will you have money and

Page 204

1    when do you expect to pay again, and then you make
2    arrangements based on that.  They take a little bit off for
3    what you owe currently and then whatever back that you owe,
4    they will take a little bit off for that.  As long as you
5    make your payment arrangement, they have, like, a plan,
6    you're okay.  I've done that.
7       Q.  How many times have you done that?
8       A.  I've done that before with Northeast Utilities,
9    and it worked out where I have paid it.  So I have done that
10   successfully, and these are basically programs that are set
11   up by them where you just go and you tell them your
12   situation and they advise you of programs that they have.
13      Q.  Were you behind in your payments due to Northeast
14   Utilities in May of '07?
15      A.  Was I behind to Northeast Utilities?
16      Q.  Were you behind in the amount of money that you
17   owed Northeast Utilities in May of '07?
18      A.  You mean my electric bill?
19      Q.  Yes.
20      A.  Because I was going to work for Northeast
21   Utilities, so that I don't know.  I don't know if I was
22   behind in my electric bill.
23      Q.  Have you ever been behind in your electric bill?
24      A.  I probably -- judging by the fact that I had just
25   began that job with C.B. Richard Ellis and I had only been

Page 205

1    there for thirty days, and prior to working for C.B. Richard
2    Ellis, there was a little bit of unemployment, I doubt if I
3    was able to catch up on all of my bills in thirty days at
4    $16 an hour with C.B. Richard Ellis with one assignment.  So
5    I would say that I feel -- I probably was a little behind.
6       Q.  How many times were you behind over the last ten
7    years on any bills you held with Northeast Utilities?
8       A.  I haven't lived in this state for over ten years.
9       Q.  Well, for as long as you were in Connecticut.
10      A.  As for how many times I was in behind in a utility
11   bill to Northeast Utilities?  I couldn't answer that.
12      Q.  More than five?
13      A.  I couldn't say.
14      Q.  Now, you also claim you suffer suicidal ideations.
15      A.  That was a statement that I made to my attorney.
16   I didn't -- I was explaining to him how I felt, that I had
17   the thoughts of hopelessness at the time.  I don't know if
18   suicidal ideation -- does that mean that you have the
19   thoughts of it?  I explained that I did feel that life was
20   hopeless and what's the point.  So I was at a point of
21   despair, and I didn't see how I was going to get out of it.
22   Usually, when I suffer -- and I have suffered things in the
23   past.  I mean, everybody has.  I have always made a
24   comeback.  So if I lost a job, I hit the ground running.  I
25   would get another job.  I didn't spend a lot of time -- you

52 (Pages 202 to 205)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

Page 206

1 know, I might be in shock or whatever you want to call it.
2 Initially it's like, oh, I'm going to lose the job or
3 whatever. They're going to do a layoff or whatever. So I
4 would feel that feeling, but I didn't really have time to
5 wallow in that because the bottom line is I had to get a
6 job, and I can't go in there with the weight of the world on
7 my shoulders. That's just not my persona to stay in a
8 negative state for a long period of time. But when this
9 happened, as I explained to the gentleman, I was already
10 teetering. I was already just like -- when I felt like I
11 was coming back with C.B. Richard Ellis, that job would have
12 continued a little longer, they were looking for someone to
13 hire. I didn't know this until I actually got there, but
14 one of the contract administrators was leaving. The lady
15 favored me, and that could have been an opportunity. I'm
16 not saying it would have, you know, turned into anything,
17 but I'm just thinking that perhaps that would have turned
18 into something. I had been unemployed prior to that. So
19 when I took the job with C.B. Richard Ellis, I was thankful
20 to receive any type of income from a job that I could
21 possibly get. And then to let that go unnecessarily, I felt
22 like it was my foolishness for taking on a job with a
23 company that I didn't know, that wasn't local, based on an
24 application that I submitted through Career Builder after I
25 had heard before that these things could happen. So a lot

Page 207

1 of that was -- I was blaming myself for being foolish and
2 being maybe gullable and contracting with a company that is
3 not even in your state and people you never even met before
4 and you're going to leave a job that you know at a company
5 that is right here in your state to go to a job through two
6 companies that are not even in your state. I felt a lot of
7 that was -- I was totally sorrowful because I made that bad
8 decision where I should have stayed at C.B. Richard Ellis,
9 but who knew. Northeast Utilities is -- that's like being
10 called in to UTC for a job. These are big companies.
11 General Electric, these are major companies. You don't
12 really turn these jobs down, especially if they want to
13 interview you, and forget about it if they want to hire you.
14 You'll move a mountain to get to that job, especially -- I
15 know that I'm qualified and I'm good, you know, yeah,
16 definitely. I'm qualified to work there. It would be
17 foolish of me not to take the chance. I didn't know it was
18 going to end up like this. I thought perhaps it would
19 probably turn out like Choice Point, and probably it would
20 have. If NESC -- I really can't say, but this is my
21 thought, that if they didn't communicate to Comensura prior
22 to having the finalized report, that probably it would have
23 went through. But I only have one incident to make that
24 judgment on so, I don't know.
25     Q.   Is there anything else that you have experienced

Page 208

1 that you would say falls under suicidal ideations?
2     A.   I think that's speaks to itself. I mean, I
3 haven't committed any acts, if that's what you're getting
4 at. I didn't attempt suicide. I had -- as I've already
5 explained at length, I had feelings of anxiety, despair,
6 hopelessness. I felt like I couldn't get myself out of
7 this, and before I've always been able to, to like call on
8 someone and I saw a light at the end of the tunnel. This
9 was like I was just like (witness making noise). It was
10 just too much happening at the same time. You see, you
11 know, the finances. I was already behind; the car, you
12 know. I have a son and it's like -- and then at the time I
13 was -- I had a little health issue with you, know, my
14 Ob-Gyn. And so it was just like all of these little
15 things -- it was just timing. They all happened at one time
16 leading to like -- I was overwhelmed with all of these
17 things happening at the same time in a short period of time
18 and that.
19     Q.   So concurrently with all of this, you had other
20 health issues?
21     A.   I don't have health issues, other health issues,
22 because I haven't been diagnosed with anxiety or anything
23 like that. My PCP treated me for what she felt I was
24 experiencing at the time. My Ob-Gyn, yeah. But I didn't
25 know that until after the job had, you know, pretty much

Page 209

1 happened, like around the same time. It was after the job
2 with NU fell through. I just went in for a general checkup,
3 and it turned out to be nothing. So it's really not a
4 health issue, but it was just an added burden to now go and
5 take tests for that, and -- you know, what they thought it
6 would be, even though they said don't worry about it, but
7 just going to take tests.
8     Q.   What did they think it was going to be?
9     A.   It involved my breast and cancer, so I had to have
10 a biopsy, but it was after. Like I said, it was after
11 Northeast Utilities. So it was just, like, boom, boom,
12 boom.
13     Q.   When did this happen?
14     A.   I can't even remember. It was around the same
15 time. I didn't take it seriously, only because I know
16 everybody should take it seriously. The only reason why I
17 didn't take it seriously is because when you have those
18 tests, you have to take second films and all of that. And I
19 was told by subsequent filming professionals that it's just
20 done as a precaution, and they didn't feel like it was
21 anything serious, but it didn't negate the fact that I still
22 had to take the test.
23     Q.   When were you --
24     A.   So I can't --
25     Q.   -- told you might have cancer?

53 (Pages 206 to 209)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d

## Page 210

1   A.  They didn't say I could have cancer.
2   Q.  What did they say?
3   A.  They said there is an abnormal reading in your
4   scan or whatever.
5   Q.  When did they tell you that?
6   A.  I said, well, what does that mean.  And then I
7   would be, like, what does that mean?  He was, like, it could
8   be this.  It could be that.  It could be cancerous, but it
9   doesn't necessarily have to be so, so that's why you just
10  take another test.  So now you just have to go through these
11  tests after they think, well, it's probably just a blurb on
12  your film.  It's nothing to worry about, but still I have to
13  make the appointment and still have to go.  That's kind of
14  aggravating.  So, like I said, I went through it.  It turned
15  out to be nothing.  As they --
16  Q.  When did they tell you?
17  A.  The exact date, I don't know.  That was during my
18  Ob-Gyn, and that was around the same, but it was after.
19  Q.  Was it still in May of 2007?
20  A.  It might have been May.  It might have been June.
21  I can give you a more accurate read on it.  But at the time
22  that I was going through what I was going through with NU,
23  this was not even in the picture because I have annual
24  appointments that I make.  And so after I experienced what I
25  experienced with NU, it was suggested that, you know, go get

## Page 211

1   a checkup, make sure your overall health is good.  And it
2   just so happened that it's timing; just so happened to be
3   the time where I'm supposed to get my annual checkup with
4   the Ob-Gyn.  So it's just a matter of -- this is all, like,
5   timing.  So then when I go in to get these annual, you know,
6   the mammogram that they suggest every year, whatever, and I
7   go going to make the appointment, then all of this was
8   disclosed to me.  But, again, I was focusing more on my job.
9   I wasn't really too concerned about that because as they
10  explained to me, they felt it was just an incorrect reading
11  of the films, but I had to go through and take the test to
12  prove that that was the case.  I had to take tests to prove
13  that that was the case.  They couldn't just let it go and
14  say, Oh, we think it's nothing and then later on it turns
15  out to be something much more serious.  They have to
16  disclose to me.  They have to take all of the tests that
17  they can possibly take.
18  Q.  Did you have any other health issues during that
19  time?
20  A.  No.
21  Q.  Any other health concerns you told any other
22  medical professionals?
23  A.  No.  The only reason why I mentioned the -- I
24  didn't have a concern about the --
25  Q.  I understand that.

## Page 212

1   A.  -- mammogram.  That wasn't my concern.  That was
2   just something that -- that was just one more thing to bring
3   up that I really wanted to dismiss because I've had clear
4   reports every since then.  Just because you find a little
5   speck, come on.  Take another test.  So no, in answer to
6   your question.
7   Q.  Would you say that you suffer from suicidal
8   ideations now?
9   A.  No.
10  Q.  For how long would you say you suffered from it?
11  A.  When everything was new.  When it first -- and it
12  didn't occur like right off the bat.  It started happening
13  primarily when it was, you know, clear that my landlord was
14  going to not work with me anymore and the job was over.  I
15  didn't know when I would get another job, and then they took
16  my car, and that did it for me.  That right there was --
17  Q.  When was this?
18  A.  I think that was, like, the turning point right
19  there.  When I was going through what I was going through
20  with NU, okay, that's over with.  And I am communicating
21  with this new management company, and they're, like, you
22  don't even have a job now.  And I wake up in the morning and
23  then my car is gone.
24  Q.  When did this happen?
25  A.  The date -- I don't know the exact date, but it

## Page 213

1   was all -- it was all like within May.  So this is like all
2   within that month that those things pretty much -- they came
3   to a head.
4   Q.  Did you ever suffer from suicidal ideations prior
5   to the incident in the beginning of May of 2007?
6   A.  No.
7   Q.  Did you sell any portion of the claim you
8   would receive from your claim against Verifications and
9   National Engineering?
10  MR. MADSEN:  Sell?
11  Q.  (By Mr. McPherson)  Have you received any kind of
12  compensation or anything of monetary value based off money
13  you might receive in this action?
14  A.  Compensation?  No.  Sell it?  How could I sell?  I
15  don't know what you mean, sell.  I don't have anything from
16  you guys.
17  Q.  Right.  Has anyone taken an interest in the
18  lawsuit, an ownership interest?
19  A.  Will.  Is that what you're talking about?
20  Q.  Besides the kind of agreement you have or any
21  contingency fee with your attorney, no.  That's not what I'm
22  talking about.
23  A.  Could you be --
24  Q.  Will anyone, besides your attorney, receive money
25  out of any the settlement based off money they gave you

Page 214

1 since the initiation of --
2 　　　MR. MADSEN:  Like a loan?
3 　　　Q.  (By Mr. McPherson)  Correct.  Like a loan or
4 anything else.
5 　　　A.  Yeah.  I have received loans from friends, yeah.
6 　　　Q.  Who are they?
7 　　　A.  You may not consider it a loan.  I got
8 disbursements from my church.  I mean, it wouldn't be under
9 a loan, but basically, it's a direct result.  I went to
10 them -- they call it a benevolence fund.  So, technically,
11 they don't look for that money back, but --
12 　　　Q.  Anyone besides your church?
13 　　　A.  Church, personal friends, yes.
14 　　　Q.  How many personal friends?
15 　　　A.  Excuse me?
16 　　　Q.  How many personal friends?
17 　　　A.  I have one in particular that helped me.
18 　　　Q.  What is his or her name?
19 　　　A.  His name is Lowell Hunt.
20 　　　Q.  Lowell Hunt?
21 　　　A.  He's my -- he just gave me money.  He's a
22 childhood friend, so he disbursed money to me.
23 　　　Q.  How much money?
24 　　　A.  And when I needed him to help me out, so -- I
25 don't know.  I asked him -- I told him that I would pay him

Page 215

1 back.  He didn't even, you know, write it down.  He was,
2 like, Don't worry about it type of thing, but I consider
3 that in my mind.
4 　　　Q.  So he doesn't expect any money back from you?
5 　　　A.  I expect to pay him back.  I would like to be able
6 to pay him back.  He did not -- when I offered to, like,
7 draw something up, he never followed through with it.
8 　　　Q.  Anyone else?
9 　　　A.  Yes.  There was a company, American Lending, that
10 I went to for monies to help me stay in my -- stay at the
11 hotel and also to pay my things that are in storage.  I have
12 two different storages, and I had become behind on the
13 storage, and I had to pay those.  So I got monies to pay
14 those, pay the storages.
15 　　　Q.  How much money did they give you?
16 　　　A.  $4,000.  A little bit -- actually, it was a little
17 bit more than $4,000.
18 　　　Q.  When did American --
19 　　　A.  It's on contingency.
20 　　　Q.  When did American Lending give you this money?
21 　　　A.  It's been over thirty days ago.  I don't have the
22 exact date, but I know it's been over thirty days ago where
23 I asked for money to --
24 　　　Q.  What are the payment terms?  What is American
25 Lending receiving back from you?

Page 216

1 　　　A.  Well, it's sort of like a contingency type of
2 thing or -- to my understanding, it's based on -- I was
3 introduced -- I did a Google search on-line where if -- you
4 know, if I win, they get reimbursed type of thing.  I've had
5 a friend who --
6 　　　Q.  How much do they get reimbursed?
7 　　　A.  I have to pay them back based on -- I have to pay
8 the amount of money that I borrowed from them and whatever
9 interest or -- I'm sure they're going to get some type of
10 interest or what have you.
11 　　　Q.  Do you know what that interest is?
12 　　　A.  No, I do not.  Also, I have a friend in addition
13 to Lowell.
14 　　　Q.  Will they also get a percentage of any money you
15 get on top of the loan and interest?
16 　　　A.  No.  That's not my understanding.  That's not my
17 agreement, no.  It's just for the amount of money that they
18 disbursed to me in addition to their interest fees or what
19 have you.  Not a percentage of anything like that, no.  And
20 then you wanted to know others?
21 　　　Q.  Yes.
22 　　　A.  Another person, another friend of mine, who had
23 given my money as well.
24 　　　Q.  Who is this?
25 　　　A.  Carl Hightower, another friend, a personal friend

Page 217

1 of mine.
2 　　　Q.  How do you know him?
3 　　　A.  Life-long friend.  He's a person I have known,
4 like, all of my life.  I initially met him actually --
5 　　　Q.  How much money did Carl Hightower give you?
6 　　　A.  He gave me a couple thousand dollars to help me
7 when I had to move.
8 　　　Q.  What does he expect back?
9 　　　A.  Well, friends always tell you nothing, but I feel
10 it's like an obligation to.  I can't take money from people
11 and not give them money back.
12 　　　Q.  So there's not a set repayment on your behalf?
13 　　　A.  No, no.  But he did give it to me.
14 　　　Q.  Okay.
15 　　　A.  He did give me money, so --
16 　　　Q.  Now, besides your agreements -- I know you can't
17 talk about with CHUBB and General Electric -- have you ever
18 received any type of settlement or compensation for any
19 claims or legal rights you had against any previous
20 employers?
21 　　　A.  No.
22 　　　Q.  Besides National Engineering and besides the
23 events of this action, have you ever brought a lawsuit
24 against any of your previous employers?
25 　　　MR. MADSEN:  And the thing she talked about

Page 218

1     earlier with the EEOC?
2     Q. (By Mr. McPherson) Correct. Besides the
3 Department of Children & Families.
4     A. Besides everything that I just mentioned to you or
5 that we have --
6     Q. Besides the Department of Children & Families and
7 General Electric and CHUBB --
8     A. No.
9     Q. -- you have never brought legal action against any
10 of your other former employers?
11     A. No.
12     Q. Have you ever received a settlement from anyone
13 besides GE --
14     A. No.
15     Q. -- CHUBB or -- let me finish.
16     A. I'm sorry.
17     Q. CHUBB, GE or the Department of Children & Families
18 Services -- let me withdraw that and let me state that over
19 again. Have you ever received a settlement for any legal
20 rights or claims you had or any value whatsoever against any
21 of your former employees besides CHUBB or GE?
22     A. Are you finished?
23     Q. Yes.
24     A. No.
25     MR. McPHERSON: That's all the questions I have.

Page 219

1         MR. COFFEY: Nothing further.
2         MR. MADSEN: No questions.
3
4         (Deposition concluded at 4:30 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 220

1         C E R T I F I C A T E
2
3     I, Christine E. Borrelli, a Notary Public and Licensed
4 Court Reporter for the State of Connecticut, do hereby
5 certify that the deposition of DEBORAH ADAMS, was taken
6 before me pursuant to the Connecticut Practice Book at the
7 Law Offices of Madsen, Prestley & Parenteau, LLC, 44 Capitol
8 Avenue, Hartford, Connecticut, commencing at 10:15 a.m. on
9 Friday, September 26, 2008.
10     I further certify that the witness was first sworn by
11 me to tell the truth, the whole truth, and nothing but the
12 truth, and was examined by counsel, and her testimony was
13 stenographically reported by me and subsequently transcribed
14 as herein before appears.
15     I further certify that I am not related to the parties
16 hereto or their counsel, and that I am not in any way
17 interested in the events of said cause.
18     Witness my hand this 10th day of October, 2008.
19
20
21
              Christine E. Borrelli
22               Notary Public
              CT License No. 117
23
24 My Commission Expires:
   June 30, 2011
25

Page 221

1       CERTIFICATE OF DEPONENT
2
3
4     I, DEBORAH ADAMS, have read the foregoing transcript
5 of the testimony given at the deposition on Friday,
6 September 26, 2008, and it is true and accurate to the best
7 of my knowledge and/or with the changes as noted in the
8 attached errata sheet.
9
10
11         Deborah Adams
12
13
    Subscribed and sworn to before me this _____
14
15 day of _____, 2008.
16
17         Notary Public
18 My Commission Expires:
19
20
21 CIVIL ACTION NO: 3:07CV01035
    DEBORAH ADAMS v. NATIONAL ENGINEERING SERVICE CORPORATION
22 and VERIFICATIONS, INC.
23 DEBORAH ADAMS (AM) SEPTEMBER 26, 2008
24
25 CB

56 (Pages 218 to 221)

8d1e4cca-fc6a-481d-9adf-f1504de3d63d