1          A     That is one situation under which

2     they might order a background, yes.

3          Q     Another situation might be where

4     National Engineering is going to employ that

5     person, but place them in a third-party

6     location, such as Northeast Utilities?

7          A     Correct.

8          Q     Is there a third possibility that

9     National Engineering is going to order an

10    investigation, a background check, on a person

11    that National Engineering is not going to

12    employ at all, but they're going to act, as you

13    said, as a headhunter, and place them at a

14    third-party location?

15         A     Would you rephrase, please.

16         Q     Sure.

17              MR. COFFEY:  I think he's just

18         trying to get to, how about the

19         situation where National Engineering

20         might be getting someone who is going to

21         then be directly hired by the other

22         company.

23              THE WITNESS:  I see.

24

BEECHER & HORVATH

```
 1                    MR. COFFEY:  I think that's
 2           what you're --
 3                    MR. KUPINSE:  That's what I'm
 4           trying to --
 5           A    Yes, that is a third situation.
 6           Q    Do you know whether or not that
 7    occurs with respect to National Engineering?
 8           A    No, I do not.
 9           Q    Okay.  And just to complete the loop,
10    with respect to Deborah Adams, did you know
11    whether or not Deborah Adams was to be employed
12    by National Engineering as part of its own
13    staff, or whether Deborah Adams was to be
14    employed by National Engineering and placed
15    with a third party?
16           A    I did not know from the order itself.
17    I knew when Deborah Adams told me.
18           Q    Okay.  And if I can show you another
19    document, and ask you if you can identify that?
20           A    Um-hum.  This is the letter we
21    received from Deborah Adams.
22           Q    Okay.
23                    MR. KUPINSE:  Can we mark this
24           as Defendant's Exhibit 7.
```

                         BEECHER & HORVATH

```
 1

 2                 (Received and marked Defendant's

 3                  Exhibit 7 for Identification.)

 4                   (LETTER FROM DEBORAH ADAMS)

 5

 6        Q    I notice this is addressed,

 7   Defendant's Exhibit 7 is addressed to

 8   Watertown, South Dakota, is that --

 9        A    That is correct.

10        Q    And you have an office out there?

11        A    Yes, we do.

12        Q    You weren't stationed in Watertown,

13   were you?

14        A    No, I was not.

15        Q    So did this get eventually --

16

17              (Off the record discussion.)

18

19        Q    In any event -- back on the record --

20   did this letter eventually find its way to you?

21        A    Yes, it did.

22        Q    I notice Ms. Adams indicated, toward

23   the bottom of the letter indicates, if the data

24   is not removed or reinvestigated by three
```

```
 1        o'clock on Friday, May 11th, a civil action
 2        will be filed.
 3               Do you know, from your records,
 4        whether the data was taken care of by three
 5        o'clock on Friday May 11th?
 6        A    Yes, according to my records, the
 7        removal of the criminal information occurred on
 8        May 10th, at 4:16.
 9                    MR. COFFEY:  Which time,
10               Eastern or --
11                    THE WITNESS:  This would have
12               been South Dakota time.
13                    MR. COFFEY:  So what are you
14               guys in?
15                    THE WITNESS:  Central.
16        A    That occurred on May 10th.
17        Q    I notice in the first paragraph, Ms.
18        Adams refers to telephone calls to you by
19        National Engineering.  Do you know who at
20        National Engineering called someone at
21        Verifications?
22        A    No, I do not.  It may have been -- it
23        may have been me.
24        Q    Okay.  And I'm going to give you
```

BEECHER & HORVATH

1       another document and ask you if you can

2       identify that document?

3           A    Um-hum.  Yes.

4           Q.   And that has several pages to it.

5           A    Um-hum.

6           Q    Can you identify --

7               MR. KUPINSE:  First of all,

8       let's mark it as an Exhibit, Defendant's

9       Exhibit 8.

10

11       (Received and marked Defendant's

12        Exhibit 8 for Identification.)

13           (GROUP OF DOCUMENTS)

14

15           Q    Taking a look at -- there's several

16       pages attached to this, can you identify the

17       first page?

18           A    The first page is an e-mail from

19       Julie Kemp, who was our public records manager.

20       The e-mail was sent to the compliance

21       department, and I printed this.

22           Q    Now, was all of the -- the e-mail

23       says, "The applicant forwarded this

24       documentation to Amy Vikander."

                    BEECHER & HORVATH

1       A    Um-hum.

2       Q    And was all of the information which
3    is attached to this the information that's
4    referred to in that sentence?  Can you take a
5    look at the information and tell me if it is.

6       A    Yes.

7       Q    Okay.  Who is Robin Mack, as referred
8    to on the first page of this information?

9       A    Robin Mack is a public records team
10   leader.

11      Q    And looking at the second page, this
12   appears to be a fax to you; is that correct?

13      A    That is correct.

14      Q    And who is it from?

15      A    Karen Stalkey, our general manager of
16   data verification.

17      Q    And turning to the third page, again,
18   can you -- is this a cover sheet -- I shouldn't
19   ask that.  Can you tell me what it is?

20      A    It appears to be a fax cover sheet
21   from Deborah Adams to Verifications.  This fax
22   number is a fax number in our Watertown, South
23   Dakota office.

24      Q    Okay.  And turning to the next page,

1     can you tell me what that is?

2        A    This is, it appears to be a letter

3     from Deborah Adams to the Federal Trade

4     Commission, with a copy to Verifications and

5     National Engineering.

6        Q    And the next page, which has a

7     heading on it which says, amongst other things,

8     clerk of court.

9        A    This appears to be a letter from

10    Deborah Adams to the circuit court in Chatham,

11    Virginia, regarding a certain case number, and

12    she is asking for -- it appears she's asking

13    for confirmation of a phone conversation.

14       Q    Okay.  And turning to the next page,

15    can you tell me what that is?

16       A    Okay.  This appears to be a letter

17    from Choice Point to Deborah Adams from April

18    of 2006, addressing some information that

19    Choice Point had recorded, and then later had

20    to retract.

21       Q    Do you know who Choice Point is?

22       A    Yes, I do.

23       Q    And who are they?

24       A    Choice Point is a consumer reporting

BEECHER & HORVATH

1    agency.

2    Q    Okay.  And turning to the next page.

3    A    This is another -- this appears to be

4    another letter from Choice Point to Deborah

5    Adams, stating that they have revised their

6    background report.  Again, this is from April

7    of 2006.

8    Q    Okay.  And the next page in headed

9    Deborah Adams, P.O. Box.

10    A    Right.  This is a -- appears to be a

11    duplicate of the previous cover page.

12    Q    Okay.  And the next page?

13    A    This appears to be a duplicate of the

14    letter sent to the Federal Trade Commission.

15    Q    Next page?

16    A    Another duplicate.

17    Q    And then the final page?

18    A    The final page is identified as the

19    sentencing order from Virginia Circuit Court of

20    Pennsylvania County.

21    Q    While we're on those e-mails, it

22    appears that Deborah Adams may have had some

23    difficulty back in 2006 with respect to

24    criminal records in Virginia; is that correct?

BEECHER & HORVATH

1          A     Yes, it appears that way.

2          Q     Was Verifications, to the best of

3    your knowledge, ever notified of that before

4    you began your search?

5          A     No, we were not.

6          Q     Do you know whether or not National

7    Engineering Services Corporation was notified

8    of that?

9          A     I do not know.

10         Q     Showing you another document, can you

11   identify that?

12         A     This is a Verifications final updated

13   report on Deborah Adams.

14               MR. KUPINSE:  Can we mark that

15         as Defendant's Exhibit 9.

16

17         (Received and marked Defendant's

18          Exhibit 9 for Identification.)

19               (FINAL UPDATED REPORT)

20

21         Q     And when you say it's a final updated

22   report, is that the last report that

23   Verifications prepared with respect to Ms.

24   Adams in this particular sequence of events?

                         BEECHER & HORVATH

1          A    Yes, it would be.

2          Q    Okay.  And does it indicate that

3     there are any concerns with respect to Ms.

4     Adams' criminal background?

5          A    There are no concerns that are

6     marked.

7          Q    And do you know when this was

8     prepared?

9          A    This was printed on May 15th.  I

10    don't -- I cannot tell from this -- just one

11    moment, please.

12              It was prepared on May 10th.

13         Q    And you tell that by looking at the

14    second page, which indicates 5-10-07,

15    verification completed?

16         A    Yes.

17         Q    Okay.

18         A    It was -- yes.

19         Q    Okay.  Do you know what happened to

20    this final report?  Do you know whether it was

21    sent to National Engineering?

22         A    Yes, it was.

23         Q    Do you know when it was sent to them?

24         A    This indicates May 10th at 4:21,

                              BEECHER & HORVATH

1    Central Time.

2          Q    And was it sent to Deborah Adams?

3          A    I don't know.

4          Q    Other than sending it to National

5    Engineering, do you know if it was sent to

6    anyone else?

7          A    The only other person that this

8    report would be sent to would be Deborah Adams.

9          Q    Okay.  Showing you another document,

10   can you identify that?

11         A    It is a letter from Melissa Sorenson,

12   who is a compliance officer at Verifications.

13         Q    Okay.

14              MR. KUPINSE:  And if we can

15         mark that as Defendant's Exhibit 10.

16

17         (Received and marked Defendant's

18          Exhibit 10 for Identification.)

19            (LETTER FROM MELISSA SORENSON)

20

21         Q    What was the purpose of Defendant's

22   Exhibit 11, if you know?

23              MR. COFFEY:  Number 10.

24         Q    Ten, excuse me.

                    BEECHER & HORVATH

1          MR. KUPINSE:  Thank you.

2     A   It appears to be -- the purpose

3  appears to be to advise Deborah Adams that her

4  background report had been changed, and the

5  original criminal information that had been

6  reported was removed.

7     Q   And that was dated May 17th?

8     A   Um-hum.

9     Q   Do you know if Deborah Adams was

10  advised that the report had been corrected

11  prior to May 17th?

12     A   Yes, I advised her myself.

13     Q   And what date did you advise her?

14     A   Let's see, May 11th at 4:14 Central

15  time.

16     Q   Thank you.  And can you identify this

17  document?

18     A   This is an e-mail -- this e-mail was

19  initiated by Robin Mack, sent to the compliance

20  department, regarding an applicant dispute.  I

21  responded to Robin and the compliance

22  department saying that I was calling her now.

23  And then Robin responded back and said,

24  "Thanks."

                 BEECHER & HORVATH

1         Q    Okay.

2              MR. KUPINSE:  Mark that as 11.

3

4        (Received and marked Defendant's

5        Exhibit 11 for Identification.)

6          (E-MAIL FROM ROBIN MACK)

7

8         Q    Do you have any knowledge as to the

9      time that Verifications has, under the law, to

10     correct an erroneous report?

11        A    Yes.

12        Q    And what is that knowledge that you

13     have?

14        A    We have five days in which to

15     initiate the reinvestigation and thirty days to

16     complete it.

17        Q    Referring you back to Defendant's

18     Exhibit 10, other than looking at that letter,

19     do you know whether or not Melissa Sorenson did

20     contact Comensura, now known as Guidant?

21        A    I do not know.

22        Q    Looking at Defendant's Exhibit 10, in

23     the paragraph which starts out, "Your revised

24     background investigation report," it says, "On

1    May 11th, I" -- I assume that means Melissa

2    Sorenson, since she wrote the letter -- "spoke

3    with our contact at Comensura," do you know who

4    Melissa spoke to?

5         A    I do not.

6         Q    Do you know whether or not -- do you

7    want to take a look and see if you can tell?

8         A    Yes, please.

9              If it is in here, I am not seeing it.

10        Q    Okay.  Is Comensura, now Guidant, a

11   client of Verifications, do you know?

12        A    I do not know.  I believe they are.

13        Q    Other than Defendant's Exhibit 10,

14   which I have shown you, do you have any

15   knowledge whatsoever of any contact Ms.

16   Sorenson may have had with Verifications --

17   with Comensura?

18        A    Well, it says in the letter, on May

19   11th, that she contacted Comensura.

20        Q    Yes.  I was wondering, other than the

21   letter, do you have any knowledge of that?  Did

22   Melissa say, "I'm going to call Comensura and

23   tell them everything is okay," did she have any

24   conversations with you about it, that you

                         BEECHER & HORVATH

1    recall?

2         A    No.

3         Q    Okay.  I think you told me earlier

4    that you made your first investigation using

5    National Background Data?

6         A    Um-hum.

7         Q    And then you did a second further

8    verification, or further investigation, using

9    Accurant.  Why didn't you use Accurant in the

10   first instance?

11        A    Because -- because based upon -- we

12   had enough information from the record provided

13   from Pennsylvania County, we had enough

14   information, with two identifiers, to report

15   it.  There was no need -- there was no apparent

16   need to do any further research at that point.

17        Q    When you used Accurant, did you ask

18   them to use additional reporters?

19        A    Accurant is an online investigation

20   tool.  So we would have searched, using all of

21   the identifiers that we had, name, date of

22   birth, social security number.  We would have

23   looked at home addresses.  When we are doing a

24   reinvestigation, because of a dispute, our

                      BEECHER & HORVATH

1   objective is to determine, obviously, whether

2   it is the same person.

3        Q    Do you know what a social security

4   trace is?

5        A    Yes, I do.

6        Q    Can you tell me?

7        A    A social security number trace is a

8   search that is done using credit bureau header

9   records, not actual credit information.  And

10  what the social security number trace does is,

11  it will provide residential history, meaning

12  addresses that the person has used when they

13  were applying for some type of credit.  It will

14  compare the social security number to some

15  logic rules, to see if it is a valid number,

16  because some numbers are not valid.  It will

17  also compare the number to a database of

18  individuals who are deceased and, therefore,

19  the number, the social security number, should

20  no longer be used.  But it is done through a

21  credit bureau, not the Social Security

22  Administration.

23       Q    Does Verifications use social

24  security traces in some instances?

BEECHER & HORVATH

```
1          A     In most instances, yes.  In most
2     instances, it is part of the order that's sent
3     in by our client.
4          Q     Was that done in the case of Deborah
5     Adams?
6          A     No, it was not.  That was not part of
7     the order as provided by National Engineering.
8          Q     Can you tell me what National
9     Engineering did order?
10         A     They ordered two things; they ordered
11    this national database search, and they also
12    ordered a drug test.
13               The national data base search
14    automatically includes follow-up research in
15    the originating jurisdiction, if a possible
16    criminal record is found.  But National
17    Engineering ordered only two things.
18         Q     In addition to social security number
19    traces, can you also do name traces?
20         A     I suppose we could.  We do not.
21         Q     Okay.
22         A     Actually, I'm not sure what that is.
23         Q     Okay.  I guess you don't do it then.
24               MR. MADSEN:  At some point, I
```

BEECHER & HORVATH

1         need a break.

2                  MR. KUPINSE:  Sure.  I'm not

3         going much longer, but if we want to

4         break for about ten minutes now, that's

5         fine.

6

7         (There was a recess at this time.)

8

9                  MR. KUPINSE:  Back on the

10        record, if everybody is ready.

11      Q    One final set of documents, if I may.

12   And can you identify those documents?

13      A   Well, this appears to be a letter

14   from Deborah Adams to Verifications' compliance

15   department regarding a background check.

16      Q   Okay.  And how about the second and

17   third pages?

18      A   This appears to be -- appears to be

19   an e-mail, including part of a background

20   check, that has an unfavorable result.

21      Q   Okay.

22      A   -- per the --

23      Q   Did you want to say more?

24      A   No.  Unfavorable per the definition

BEECHER & HORVATH

1     in there.

2              Q     Okay.

3                    MR. KUPINSE:   Mark that as

4         Defendant's Exhibit 12.

5

6              (Received and marked Defendant's

7              Exhibit 12 for Identification.)

8                    (LETTER AND E-MAIL)

9

10             Q     Now, do you know whether or not

11        Verifications performed a background check on

12        Deborah Adams after the May 2007 incident?

13             A     Yes, we did.

14             Q     And can you tell me how that came

15        about, that you performed that background

16        check?

17             A     A different client submitted an order

18        for a background check on Deborah Adams.

19             Q     And as a result of that order, did it

20        turn up that Deborah Adams had a criminal

21        record in Virginia?

22             A     We reported that there was criminal

23        information found under the name Deborah Jean

24        Adams, with a matching date of birth.

                         BEECHER & HORVATH

1        Q       And did Ms. Deborah Adams dispute

2    that report?

3        A       Yes, she did.

4        Q       And what did Verifications do?

5        A       We changed the report.

6        Q       Do you have a procedure for how you

7    handle something, when you get a false

8    positive, to ensure that there won't be future

9    false positives?

10       A       I don't -- I don't know how such a

11   procedure would work.

12       Q       I take it then the answer is that you

13   do not have such a procedure?

14       A       When an order is placed and the

15   social security number is entered, we can see

16   if a background check has been done on that

17   person before.  Whether we look at those

18   previous results, I don't know.  I know that it

19   is our procedure to look at the previous

20   result, if the client placing the order has

21   sceened this person in the past.  And let me

22   try to clarify that.

23               Let's say, for example, a client with

24   multiple locations, let's say, one location

1     would send in a background request order on a

2     person today, and maybe we had screened that

3     same person for a different location three

4     weeks ago.  That is one of the reasons that we

5     look at the heading, if you will, of prior

6     orders.

7         Q    But I take it there is no procedure

8     to look at further than the heading?

9         A    I don't know.

10         Q    I'm going to reask my question.

11         A    Okay.

12         Q    Do you have a procedure to determine

13     whether or not an applicant has had a false

14     positive on a prior investigation?

15         A    My expectation is that within our

16     work constructions, there is a process defined,

17     by which a researcher should look at prior

18     results, particularly if there was --

19     withdrawn.  I -- see -- how can I explain this?

20         Once a report is changed -- in the

21     case of Deborah Adams, once the report had been

22     changed and the concern removed, it no longer

23     comes up in our system with a concern flag on

24     it.  And, therefore, I don't believe there

BEECHER & HORVATH

1    would have been any reason to look at it.

2                    MR. COFFEY:  Bill, if I could

3            just ask one question.  As far as you're

4            aware of, the FCRA, does that talk about

5            this type of scenario, or are you aware

6            of any requirements that it imposes on

7            you?

8                    THE WITNESS:  There are -- I

9            am not aware of any special requirements

10           that are imposed.  We, of course, have

11           the requirement in terms of reporting

12           accurately.

13   BY MR. KUPINSE:

14           Q   So that as I understand it, once

15   there has been a false positive, and that false

16   positive is cleared, Verifications' records

17   show a clean report, not the false positive

18   report?

19           A   At a summary level, at the highest

20   level of the report, it would show clear.  It

21   would only be at a detail level that the whole

22   history would become apparent, but it is not

23   part of -- it's not part of the, kind of,

24   header of the record that comes up.

                        BEECHER & HORVATH

1          Q    Okay.

2                    MR. KUPINSE:  Thank you, Ms.

3          Poquette.  I have no further questions.

4                    THE WITNESS:  Okay.

5                    MR. MADSEN:  I am going to

6          have probably about an hour.

7

8               (Whereupon a luncheon recess was

9          Taken at 12:20 P.M.)

10

11                   MR. MADSEN:  Back on the

12         record.

13

14    CROSS EXAMINATION

15    BY MR. MADSEN:

16         Q    And Ms. Poquette, you understand you

17    are still under oath?

18         A    Yes.

19         Q    Okay.  I believe you testified you

20    have never been deposed before?

21         A    That is correct.

22         Q    How long have you held the position

23    of chief compliance officer?

24         A    By title, I would say three or

                         BEECHER & HORVATH

1     four -- probably five years, by title.  But

2     compliance has always been my responsibility.

3          Q.    Okay.  How long have you been with

4     the company, Verifications Inc.?

5          A     This is my 14th year.  I was hired in

6     August of 1995.

7          Q     How big was the company when you were

8     hired, in terms of numbers of employees?

9          A     I believe I was the 10th employee.

10         Q     The company has grown since then?

11         A     Yes.

12         Q     How many employees does the company

13    have now?

14         A     Over 600.

15         Q     Okay.  Is it publicly traded or a

16    publicly-held company?

17         A     No, it is not.

18         Q     Who owns it?

19         A     Curtis Marks, M-A-R-K-S.

20         Q     Where does Mr. Marks reside?

21         A     In Minnesota, in Minnetonka.

22         Q     Is he active in the management or

23    running of the company?

24         A     Yes, he is.

1    Q What is his title?

2    A CEO and President.

3    Q Were you hired by Mr. Marks?

4    A Yes, I was.

5    Q Okay.  Are you an officer of the

6 company?

7    A No, I am not.

8    Q Have you ever been an officer of the

9 company?

10    A No.

11    Q How many employees fall under your

12 span of control?

13    A I have six direct reports.

14    Q Okay.  Do you know how many

15 individuals report to those six direct reports,

16 in total?

17    A Only one.

18    Q Okay.  Now, this litigation, my

19 understanding, is being covered by an insurance

20 policy; is that your understanding?

21    A Yes.

22    Q And do you know the name of the

23 insurance company that provides the coverage

24 for this litigation?

          BEECHER & HORVATH

1      A      No, I do not.  It is part of the
2   record, but --
3      Q      I understand.  I'm just asking you
4   based on your knowledge.
5             And do you know what the monetary
6   levels of coverage are under the policy, as you
7   sit here now?
8      A      No, I do not.
9      Q      Do you know whether there is a
10   deductible or a retention under the policy?
11      A      There is a deductible.
12      Q      Do you know how much that is?
13      A      I'm not sure.
14      Q      Okay.  Are you aware of any other
15   lawsuits that have been brought against
16   Verifications Inc. by a consumer under the Fair
17   Credit Reporting Act?
18      A      Yes.
19      Q      Okay.  And have any lawsuits been
20   brought against Verifications Inc. in
21   conjunction with a false positive having been
22   issued, to your knowledge?
23      A      I would have to go back into the
24   discovery documents to be sure.

                         BEECHER & HORVATH

1       Q    So as you sit here now, you're not

2    certain; is that correct?

3       A    Correct.

4       Q    Now, have you received training into

5    the Fair Credit Reporting Act?

6       A    Not specifically, no.

7       Q    Have you, in general, received

8    training into the Fair Credit Reporting Act?

9       A    I have received clarification and

10    opinions, but, no, I have not received training

11    per se.

12       Q    Does Verifications Inc. have a law

13    department?

14       A    We do not have internal legal

15    counsel.

16       Q    Okay.  There's no general counsel of

17    the company?

18       A    There is not.

19       Q    Is there a law firm on retainer which

20    provides advice and guidance with respect to

21    the requirements and obligations under the Fair

22    Credit Reporting Act, to your knowledge?

23       A    I don't believe they're on retainer,

24    but there are several law firms with which we

BEECHER & HORVATH

1    work.

2         Q    Okay.  Do you know whether Wilson,

3    Elser, the law firm of which Attorney Coffey is

4    a member, was selected by the insurance

5    company, or directly by Verifications Inc. for

6    representation?

7         A    By the insurance company.

8         Q    Okay.  What, if anything, did you do

9    to prepare for today's deposition?

10        A    I reviewed the documents that had

11   been provided as part of discovery.  I went

12   back and looked at the original complaint.  I

13   looked at expert opinions.

14        Q    Okay.  Anything else that you can

15   think of?

16        A    I asked a former colleague, who is an

17   attorney, kind of what to expect.

18        Q    Okay.  Was that -- you said former

19   colleague?

20        A    Yes.

21        Q    And in what way is he a former

22   colleague?

23        A    He used to -- he was my boss.  He

24   was -- he was our chief operating officer.

                         BEECHER & HORVATH

1    Q  What is his name?

2    A  Terri Bartz, B-A-R-T-Z.

3    Q  And Mr. Bartz is an attorney?

4    A  Yes, he is.

5    Q  In Minnesota?

6    A  Yes.

7    Q  Where in Minnesota are his law

8 offices, to your knowledge?

9    A  I don't believe he has an office, a

10 law office.

11    Q  Does he practice law currently?

12    A  Well, can you further define that.  I

13 mean --

14      MR. COFFEY:  If you know if

15 he's licensed or not.

16    A  Oh, yes.

17    Q  Okay.  Is he employed?

18    A  He is on retainer through the end of

19 September.  He was our chief operating officer,

20 to whom I reported.

21    Q  When you say he is on retainer, can

22 you be more specific?

23    A  He is leaving the company, and as

24 part of that transition, he has been kept on

BEECHER & HORVATH

1    retainer through the end of September to assist

2    with the transition.

3         Q     Did he have a severance agreement

4    with the company?

5         A     I have no knowledge.

6         Q     Okay.  And does he provide services,

7    on retainer, in the nature of his -- the duties

8    he formerly provided as COO?

9         A     What?  I'm sorry.

10        Q     I'm sorry.

11        A     I'm sorry.

12        Q     Yes, What was Terri Bartz's former

13   title?

14        A     Chief operating officer.

15        Q     Okay.  And he had duties and

16   responsibilities as chief operating officer?

17        A     I would assume so.

18        Q     Okay.  Does he provide those same

19   types of duties, services, in conjunction with

20   those same duties and responsibilities in his

21   role as being on retainer right now for the

22   company?

23        A     That is being phased out as part of

24   the transition.

                    BEECHER & HORVATH

```
 1          Q     Okay.  I guess what I'm getting at --

 2

 3              (Off the record discussion.)

 4

 5          A     No.  He told me to tell the truth,

 6     and I bought him a cup of coffee.

 7          Q     So there was compensation?

 8          A     Yes, there was.

 9          Q     Okay.  Did you talk to anyone else,

10     besides Terri Bartz and your counsel, in

11     preparation for today's deposition?

12          A     No.

13          Q     Okay.  Now, do you have general

14     knowledge regarding the duties and

15     responsibilities imposed on Verifications Inc.

16     under the Fair Credit Reporting Act?

17          A     Absolutely.

18          Q     And how did you go about obtaining

19     that knowledge?

20          A     A variety of ways.  First of all,

21     reading the Fair Credit Reporting Act.

22          Q     Okay.

23          A     When the Fair Credit Reporting Act

24     was first significantly amended in 1996, as the
```

1    person in charge of Verifications' day-to-day

2    operations, I was responsible for ensuring that

3    we fully implemented it, and were fully

4    compliant with its requirements.

5         And as the Fair Credit Reporting Act

6    has been further amended, that has always been

7    my responsibility.  So it has been a -- it has

8    been a lot of self study.  It has also been

9    consultation with employment law firms, like

10   Littler, Mendelson; Seyfarth, Shaw; Baker,

11   McKenzie.

12        I have also discussed various points

13   of the Fair Credit Reporting Act with staff

14   attorneys at the Federal Trade Commission.

15        Q    Okay.  And as part of the

16   requirements for the position you hold, to be

17   well versed in the Fair Credit Reporting Act?

18        A    Yes.

19        Q    Okay.  Is that an important part of

20   your job duty and function?

21        A    Yes.

22        Q    And does the company rely upon your

23   expertise in running its operations to ensure

24   that they're in compliance with the Fair Credit

BEECHER & HORVATH

1      Reporting Act?

2           A    Yes.

3           Q    Have you attended seminars on the

4      Fair Credit Reporting Act?

5           A    Oh, certainly.

6           Q    So you have received that level of

7      training; is that correct?

8           A    Yes.

9           Q    Okay.  And let me ask you this:  The

10     Fair -- what is your understanding as to who

11     the Fair Credit Reporting Act applies to?

12          A    It applies to consumer reporting

13     agencies.

14          Q    Okay.  And what is your understanding

15     as to what constitutes a consumer reporting

16     agency?

17          A    Consumer reporting agency is a entity

18     that collects, evaluates -- strike evaluates,

19     I'm not sure about that one.

20               Collects information and provides it

21     to another party.  Doing so -- doing so, with a

22     permissible purpose under the Fair Credit

23     Reporting Act.

24          Q    Okay.  Anything else?

                    BEECHER & HORVATH

```
 1         A    It is done for a fee.  The consumer

 2    reporting agency is providing information for a

 3    fee.

 4         Q    Okay.  Is it your understanding that

 5    if --

 6         A    I can look it up.

 7         Q    No, actually, my questions are

 8    regarding the information and knowledge that

 9    you presently possess.

10         A    Okay.

11         Q    Unless I ask you to look at a

12    document, there's no need to do so.

13         A    All right.

14         Q    And in conjunction with the services

15    that you provided to National Engineering

16    Services Corporation, was Verifications Inc.,

17    in fact, acting as a consumer reporting agency,

18    to your knowledge?

19         A    Yes.

20         Q    And do you -- you mentioned that you

21    sometimes utilize entities in conducting your

22    own background checks; is that correct?

23         A    I'm sorry, I don't understand the

24    question.
```

1       Q    Well, for instance, there was

2   testimony earlier that you used Mohr

3   Investigations.

4       A    Yes.

5       Q    Okay.  Is it your understanding that

6   Mohr Investigations is, likewise, a consumer

7   reporting agency?

8       A    I'm not sure.

9       Q    Okay.  Do you ever utilize or do you

10   ever subcontract out information gathering

11   services to entities which are consumer

12   reporting agencies?

13       A    For example, National Background Data

14   would be classified as a consumer reporting

15   agency.

16       Q    And sometimes you utilize their

17   services?

18       A    We utilize their data.

19       Q    Okay.  For a fee?

20       A    Yes.

21       Q    Okay.  And so National Background

22   Data would similarly, based on your

23   understanding of the FCRA, for short --

24       A    Um-hum.

BEECHER & HORVATH.

```
1          Q     -- they would be a consumer reporting

2    agency?

3          A     Yes.

4          Q     And likewise, does Verifications Inc.

5    ever provide information to entities which you

6    understand to be consumer reporting agencies?

7          A     No, we do not.

8          Q     Okay.  Not that you're aware of?

9          A     Correct.

10         Q     Now, are the -- do individuals have

11   privacy rights under the Fair Credit Reporting

12   Act?  And when I say individuals, I mean,

13   consumers.

14         A     Certainly.

15         Q     Okay.  And can you describe for me,

16   in general, what your understanding is of those

17   privacy rights?

18         A     They have the right to have their

19   information handled confidentially, in that a

20   background -- a background investigation should

21   not be ordered without them knowing about it,

22   in terms of disclosure, authorization.  They

23   should know that up front.

24               There should be a permissible purpose
```

BEECHER & HORVATH

1    under the Fair Credit Reporting Act.  And the

2    consumer reporting agency is going to report

3    that information only under three

4    circumstances; one would be to the client that

5    ordered it, the second would be to the consumer

6    who's the subject of the report, and the third

7    would be under legal action.

8        Q    Okay.  And your understanding is that

9    failure to comply with these privacy ensurance

10   obligations could give rise to civil liability?

11       A    The civil liability within the Fair

12   Credit Reporting Act deals more with negligence

13   and willful negligence and so on.  I do not

14   recall -- I do not believe that it speaks to,

15   for example, privacy in terms of like a data

16   breach, that we hear so much about.

17       Q    Now, there was a bit of testimony

18   earlier regarding the procedures that you

19   utilized in performing background checks, do

20   you recall that testimony?

21       A    Yes.

22       Q    Okay.  And I guess my initial

23   question is, who established those procedures

24   in the first instance?

                          BEECHER & HORVATH

1      A    The procedures were established by,

2    typically, a group of people that would have

3    included operations leadership, quality

4    managers, compliance representation.  Our

5    procedures support our ISO 9001, 2000

6    certification.

7      Q.   Are the procedures reviewed on a

8    periodic basis at Verifications Inc.?

9      A   On an ongoing basis, yes.

10     Q   On an ongoing basis.  And who is

11    responsible for overseeing the ongoing review

12    of the procedures?

13     A   Our quality manager.

14     Q   And who is that?

15     A   Kathy with a K, K-A-T-H-Y, Scharf

16    S-C-H-A-R-F.

17     Q   Now, there was some testimony

18    regarding the fact that in the initial run for

19    Deborah Adams, that there were three bits of

20    information -- well, actually, I'm going to

21    withdraw that and I'm going to start all over

22    again.

23       In performing a background check, in

24    conjunction with -- for a customer, what type

BEECHER & HORVATH

of consumer identifying information do you
need?

A    Typically, we need social security
number, date of birth, and full name.

Q    Is it important to -- go ahead.

A    Now, there are some situations where
we will not have all of the identifiers.

Q    And why is it important to have all
three of those bits of information, the social
security number, the date of birth, and the
full name?

A    The social security number is used to
run checks, like a social security number
trace.  If the client orders credit history, to
access a credit file by social security number,
typically schools and employers keep their
records by social security number, rather than
name.

The full name and date of birth is
typically needed to verify a high school
diploma, because those records are not kept by
social security number, but rather name and,
typically, year of graduation.

Name and date of birth, and social

BEECHER & HORVATH

1  security number, all three identifiers are

2  often -- all three identifiers used to be

3  consistently provided to field researchers for

4  research purposes.

5      Q    And in this case, all three bits of

6  information or all three identifiers, as you

7  refer to them, were, in fact, provided to

8  Verifications Inc. by National Engineering?

9      A    That's correct.

10     Q    And you and the field researcher who

11  was assigned to conduct the initial background

12  check, criminal background check, for Deborah

13  Adams, was provided with those three bits of

14  information?

15     A    Yes.

16     Q    Okay.  And I apologize if you already

17  testified to this, and I believe you did, but

18  who was the individual who conducted the

19  initial criminal background check for Deborah

20  Adams?

21     A    Do you mean the database check?

22     Q    Yes.

23     A    That would have been an automated --

24  it would have been an automated search of

BEECHER & HORVATH

1 National Background Data.  And when the results

2 came back, they would have been reviewed by a

3 public record specialist.

4   Q A public --

5   A Public record.

6   Q Employed by Verifications Inc.?

7   A Yes.

8   Q And who was that individual in the

9 case of Deborah Adams?

10   A I'm not sure.

11   Q But it would have been someone

12 employed by Verifications Inc., correct?

13   A Absolutely.

14   Q Now, is it important for the spelling

15 of the name to be accurate in conducting a

16 criminal background check?

17   A Yes.

18   Q Why?

19   A The same reason that it is important

20 to have a correct date of birth, so you get

21 back as accurate as possible a result.

22   Q Okay.  Now, earlier in your

23 testimony, when you identified Kathy Scharf,

24 you were kind enough to spell her name, and you

BEECHER & HORVATH

1   were kind enough to point out that the name
2   started with a K.
3       A    Um-hum.
4       Q    And why did you feel important to do
5   that?
6       A    Because I thought you would ask me,
7   if I didn't tell you.
8       Q    Okay.
9       A    Start with that.
10      Q    Yes.
11      A    Because -- for purposes of accuracy.
12      Q    Okay.  Accuracy is important in
13  criminal background checks, would you agree
14  with that?
15      A    Yes.
16      Q    If, in fact, there was a Kathy Scharf
17  out there whose name started with a C, she
18  could be distinguished from the Kathy Scharf
19  that you testified to, whose name starts with a
20  K, by virtue of the different spelling of the
21  first name; is that fair to say?
22      A    I don't know that it's -- it really
23  depends on the context of the question.
24      Q    Okay.

                    BEECHER & HORVATH

1          A          For example, if one is doing a

2     criminal record search, different counties have

3     different data systems.  Some counties will

4     give you a, what's called a sound dex match.

5     Some jurisdictions will give you an exact name

6     match only.  There are 3,142 counties in the

7     United States, and they're all somewhat unique.

8     Does that answer your question?

9          Q          In part.  I do appreciate that.

10              I'd like you to take a look at

11     Defendant's Exhibit 4 for identification.

12          A          Um-hum.

13          Q          Now, although it appears to be cut

14     off at the top of the document, the court

15     search record in this case was generated by

16     Mohr Investigation Services; is that correct?

17          A          Yes.

18          Q          Okay.  So underneath the, it looks

19     like a UPC code, which has Deborah Adams'

20     identifying information on it, it would read

21     Mohr Investigation Services, LLC; is that

22     correct?

23          A          Yes.

24          Q          And Mohr Investigation Services, LLC

BEECHER & HORVATH

1     is a consumer reporting agency?

2        A    I don't -- I do not know the full

3     extent of their business operations.  I do know

4     the service they provide to us is to search

5     public records.

6        Q    And do they provide that service for

7     a fee?

8        A    Yes, they do.

9        Q    And they provide the information to

10    you in conjunction with the services that you

11    provide to your customers; is that correct?

12       A    Say that again.  I'm sorry.

13       Q    They provide those services to

14    Verifications Inc. in conjunction with

15    Verifications Inc.'s provisions of services to

16    its customers?

17       A    Correct.

18       Q    Okay.  And is Mohr -- how are they

19    related, if at all, to National Background

20    Data?

21       A    I don't believe there is any

22    relationship.

23       Q    Okay.  I believe you testified that

24    the procedure with respect to Deborah Adams is

BEECHER & HORVATH

1    that initially an order was placed by National

2    Engineering Services --

3        A    Um-hum.

4        Q    -- Corporation; is that correct?

5        A    That is correct.

6        Q    Okay.  And from there, the order went

7    to someone in the field; is that correct?

8        A    Not initially.

9        Q    Okay.  What happened initially?

10        A    National Engineering ordered two

11    searches, two services from us.  They ordered a

12    database search through National Background

13    data.  I mean, they didn't know that was our

14    source, but they ordered a national database

15    search, and they also ordered a drug test.

16            The national database search is sold

17    and provided to clients, only with the

18    provision that if we have a possible match, we

19    automatically do research in the jurisdiction

20    of origination.

21        Q    Okay.

22        A    So the order got expanded to include

23    the search in Pennsylvania County.

24        Q    So what happened in this case is

BEECHER & HORVATH

1     that -- withdrawn.

2             Who was responsible for forwarding

3     Deborah Adams' identifying information on to

4     national database, for the national database

5     search?

6         A     It would have been -- it would have

7     been done through our public records group, but

8     the order is actually placed electronically.

9         Q     Okay.

10        A     So it's an automated order function.

11        Q     Okay.  So the order comes in from

12    National Engineering for Deborah Adams, and

13    then Verifications Inc. has an automated system

14    which, in turn, sends it out directly to

15    national database?

16        A     Right.  National Background Data is

17    the --

18        Q     National Background Data.  Okay.

19             And NESC, they place the order for

20    the national database service, but they did not

21    select the national research group to conduct

22    that national database search; is that correct?

23        A     That is correct.

24        Q     Okay.  And what is the full name of

                      BEECHER & HORVATH

1    national research?

2          A    It is National Background Data.  They

3    hold the --

4          Q    National Background Data?

5          A    They hold the database of criminal

6    records that we use when we provide a product

7    to clients, and our product name is a national

8    criminal record locater.

9          Q    Okay.  So National Background Data is

10   a consumer reporting agency?

11         A    Um-hum.

12         Q    You have to respond yes.

13         A    I'm sorry.  Yes.

14         Q    Okay.

15         A    I --

16         Q    And Verifications Inc. has a contract

17   with National Background Data to provide

18   services in conjunction with national database

19   searches, correct?

20         A    I don't know if there is a contract.

21         Q    Okay.  There is a business

22   relationship between the two?

23         A    Yes, there is.

24         Q    Okay.  And National Background Data

                    BEECHER & HORVATH

1      performs those services for Verifications Inc.,

2      for a fee?

3          A    Yes.

4          Q    And all the information, all of the

5      identifying information that National -- that

6      National Engineering forwarded regarding

7      Deborah Adams was, in turn, forwarded to

8      National Background Data?

9          A    No.

10         Q    What information was not forwarded to

11     National Background Data?

12         A    The social security number.  The name

13     and date of birth was forwarded.

14         Q    Okay.  Now, if you look at

15     Defendant's 4, which is in front of you.

16         A    Um-hum.

17         Q    This search was conducted by Mohr

18     Investigation Services, due to the fact that

19     National Background Data came up with a

20     positive hit for Deborah Adams?

21         A    Yes.

22         Q    Okay.  So National Background Data --

23     and, by the way, do we have copies of all the

24     initial report generated by National Background

                    BEECHER & HORVATH

1    Data, which found a positive match for Deborah

2    Adams in Virginia?

3        A    Yes, it was one of the discovery

4    documents provided.

5        Q    Okay.  And as a result of getting

6    that positive match from National Background

7    Data, Verifications thereupon requested Mohr

8    Investigation Services to do a follow-up

9    investigation in that jurisdiction?

10       A    That is correct.

11       Q    Okay.  And what identifying

12   information regarding Deborah Adams was

13   provided to Mohr Investigation Services?

14       A    Three identifiers were provided;

15   first and last name, full date of birth, and

16   social security number.

17       Q    Okay.  And in this case, if you'll

18   see at the top of Defendant's 4, next to the

19   UPC symbol, there is Deborah Adams' name

20   listed, do you see that?

21       A    Yes.

22       Q    And that is the correct spelling of

23   Deborah Adams' name; is that correct?

24       A    That is how it was ordered by an

BEECHER & HORVATH

1    input by National Engineering.

2        Q    Okay.  And then there's a social

3    security number listed there, that is Deborah

4    Adams' social security number?

5        A    That is how it was entered by

6    National Engineering.

7        Q    Okay.  And then there is the date of

8    birth listed, and, again, that is the date of

9    birth that National Engineering forwarded to

10   you?

11       A    That is correct.

12       Q    All right.  And those three bits of

13   information were provided to Mohr Investigation

14   Services?

15       A    Yes.

16       Q    Okay.  And Mohr Investigation

17   Services, thereafter, provided this report to

18   Verifications Inc., which has been marked as

19   Defendant's 4; is that correct?

20       A    Correct.

21       Q    Okay.  And you'll see down below,

22   where it says, court search record requested on

23   Adams, Deborah, and then it lists her social

24   security number and the date of birth; do you

1    see that?

2         A    Yes, I do.

3         Q    All right.  And down below, and this

4    is a one-page -- this is only a one page --

5         A    Two page.

6         Q    It was a two page.  Thought so.

7

8         (Off the record discussion.)

9

10        Q   Now, based on this record, does it

11    appear as though there was a match between the

12    identifying information you provided, and the

13    birth date of the individual listed here, as

14    having a criminal record history in the County

15    of Pennsylvania, State of Virginia?

16        A    Repeat the first part of that

17    question, please.

18        Q   Does there appear to be a consistency

19    in birth dates between the two individuals?

20        A    Yes.

21        Q    Okay.  Is there a consistency

22    indicated on here with regard to the social

23    security numbers of the two individuals?

24        A    No.  Social security number is not

BEECHER & HORVATH

1     provided.

2        Q   Okay.  Well, it is listed on the

3     document, do you see that?

4        A   Yes, it is -- the social security

5     number was one of three identifiers that we

6     provided to Mohr Investigation Services with

7     which to conduct the search.

8        Q   Okay.  But this report does not

9     reflect that they found a consistency between

10    Deborah Adams, the plaintiff, in this lawsuit's

11    social security number, and the individual they

12    identified as having the criminal record

13    history?

14             MR. COFFEY:  I'll just place

15        an objection to the extent, we don't

16        know that these criminal records have

17        the social security numbers in them,

18        because my understanding, and I can say

19        my belief is -- I'm just telling you --.

20             MR. MADSEN:  That's not the

21        question though.

22             MR. COFFEY:  No, it is the

23        question, though, because there's no

24        social security number on it, so --

                             BEECHER & HORVATH

```
1                    MR. MADSEN:  Then --
2                    MR. COFFEY:  You can ask her
3          if she knows if criminal records have
4          social security numbers, typically,
5          because I mean, you're inferring that
6          they don't have it, but I don't think
7          they ever have it.  That's my -- so you
8          can ask her that.
9      A    What was the question?
10                   MR. COFFEY:  I'm just telling
11         you, because you're inferring that
12         she -- off the record.
13
14         (Off the record discussion.)
15                   MR. MADSEN:  Okay.  I'm going
16         to withdraw that last question, and
17         we'll start again.
18   BY MR. MADSEN:
19        Q    Does this report reflect whether
20         there is a consistency or a match found between
21         Deborah Adams, the consumer, whose information
22         was being sought, and Deborah Adams, who was
23         identified here as having a criminal history,
24         with regard to social security number?
```

                              BEECHER & HORVATH

1        A    It does not, because the social

2       security number is not one of the identifiers

3       on the record filed.

4        Q    Okay.  What match is there between

5       the consumer and the, you know, obviously, it's

6       clear by now that this was a different

7       individual.  What --

8        A    Yes.

9        Q    What match is there between the two

10      people?

11        A    There is the match on the last name

12      of Adams.  There is a match on the first three

13      characters of the first name.  There is a full

14      match on the date of birth.

15        Q    Okay.  And so Mohr Investigation

16      Services forwarded this information on to

17      Verifications Inc., correct?

18        A    Yes.

19        Q    And that information was forwarded on

20      to Verifications Inc., on or about May 7th,

21      2007; is that correct?

22        A    It was -- yes, on or about May 7th.

23        Q    Okay.  Do you know whether Mohr

24      Investigation Services undertook to verify the

1    match here based on social security number?

2        A   As I was not with them when they

3    conducted this search, I do not know.  However,

4    field researchers are responsible for

5    understanding the record systems with which

6    they work.  Therefore, it was their

7    responsibility to know the identifiers that

8    could be used in searching these records.

9        Q   Okay.  But you do not know whether,

10    in fact, Mohr Investigation Services made an

11    effort to ascertain whether there was a match

12    between the social security numbers of these

13    two individuals?

14        A   When they looked at the file, the

15    identifiers on the record file, were as shown

16    here, Deborah Jean Adams, date of birth,

17    Danville, Virginia, female, black.  That is

18    what came back in their search.

19        Q   Okay.  Do you know whether Deborah

20    Adams, the plaintiff in this lawsuit, whether

21    her race was communicated to a background

22    search company as part of this -- well, was it

23    communicated to you, to Verifications Inc.?

24        A   No, it was not.

BEECHER & HORVATH

1       Q    Okay.  So you had no reason to

2    believe that the identifier provided here in

3    the court record, namely, the race of the

4    individual being black, you have no idea

5    whether that was or was not a match between the

6    consumer in this case, Deborah Adams and the

7    Deborah Adams identified here?

8       A    That is correct.

9       Q    Okay.  Nor was the gender of Deborah

10   Adams communicated, even though it may be self

11   apparent, that was not a separate identifier?

12      A    That is also correct.

13      Q    And so who made the decision --

14   withdrawn.

15        This report Mohr Investigation

16   Services sent to Verifications was sent to a

17   field researcher at Verifications Inc.?

18      A    It was returned to the public records

19   department at Verifications Inc.

20      Q    And where is that physically located?

21      A    They're a public record department in

22   Watertown, South Dakota, Aberdeen, South

23   Dakota, and I'm not sure about Mitchell, South

24   Dakota.

BEECHER & HORVATH

1          Q    Okay.  In this case, are we pretty

2     clear that the public records department

3     handling this particular order was the public

4     records department located in Watertown, South

5     Dakota?

6          A    I would have to -- I would have to

7     look up and see where these individuals work.

8     The individuals are identified by initials.  I

9     cannot tell from that in which office they

10     reside.

11          Q    Okay.  Now, it says next to

12     identifiers on record file, it says, in

13     parentheses, similar name, do you see that?

14          A    Yes, I do.

15          Q    What significance, if any, does that

16     have on this report?

17          A    It is designed -- I believe it is

18     designed to point out to us that it is not an

19     exact name match, but rather a similar name.

20          Q    Okay.  And are there any procedures

21     in place at Verifications Inc. for, in

22     processing these background checks, when a

23     report identifies a "similar name" as opposed

24     to an exact name match?

                         BEECHER & HORVATH

1          A      Yes, there are procedures in place.

2          Q      What are those procedures?

3          A.     Those procedures would involve

4     looking at the extent of the information

5     provided from the field researcher.  Typically,

6     what we are doing is looking for two

7     identifiers that match, such as name and date

8     of birth, or name and social security number.

9     But we are evaluating the information that has

10    been -- has been returned, to determine the

11    likelihood of this information belonging to the

12    consumer.

13         Q      And that's a judgment call, isn't it,

14    determining the likelihood?

15         A      In part.

16         Q      Okay.  If, for instance, the report

17    came back and the possible match was D period

18    Adams, in other words, just the first initial

19    provided, how would the public records

20    department respond to that?  Would they

21    identify this as a match, or would they go back

22    and seek additional information?

23         A      I would need to speak with one of our

24    leaders in public record.  I am not sure.  I

                    BEECHER & HORVATH

1    know that they typically look for a match on

2    the surname, and the first three letters of the

3    first name.

4        Q    First three letters of the -- okay.

5        A    In this case, D-E-B.

6        Q    Okay.  So if a name came back, and

7    the consumer who was being investigated was

8    named Mary Ann, and the name that came up on

9    the criminal background check was Marshall, the

10    first three letters in that situation match,

11    would Verifications Inc. deem that to be a

12    match?

13        A    Marshall versus Mary.

14        Q    Yes.

15        A    No, I don't believe so.

16        Q    Okay.  I thought you just testified

17    that the first three letters were sought --

18    were looked at in terms of ascertaining whether

19    there was a match.

20        A    It is part of what we look at, of

21    course.  There was -- there is nothing

22    conclusive on this record for us to use to

23    eliminate it as possibly belonging to the

24    consumer.

BEECHER & HORVATH

1       Q    Okay.

2       A    I mean --

3       Q    Do you operate with the assumption

4    that it is a match, and that you need

5    additional -- you need sufficient information

6    to eliminate it as a match, is that the

7    assumption that Verifications Inc. operates

8    with?

9       A    Would you repeat that for me, please.

10           MR. MADSEN:  Can you read it

11    back.

12

13           (The record was read by the

14           Reporter.)

15

16           MR. COFFEY:  I'm going to

17    place an objection.

18           MR. MADSEN:  That's fine.

19       A    Our public record specialists that we

20    employ directly are trained to evaluate the

21    results of the records as they come back to us.

22    We have written procedures that they use.

23           Also when it is a -- when it is a

24    questionable -- if they are uncertain,

BEECHER & HORVATH