# EXHIBIT F

FROM : DEBORAH ADAMS          FAX NO. : 866-823-45330          May. 02 2007 09:18PM P1

Employer and Applicant:   *Do not attach this page to Employment Application.*   FAX
603·427-0573

## Consumer Report / Investigative Consumer Report
### Disclosure and Release of Information Authorization

I authorize __NESC__ and **Verifications, Inc.**, a consumer-reporting agency, to retrieve information from all personnel, educational institutions, government agencies, companies, corporations, credit reporting agencies, law enforcement agencies at the federal, state or county level, relating to my past activities, to supply any and all information concerning my background. The information received may include, but is not limited to, academic, residential, achievement, job performance, attendance, litigation, personal history, credit reports, driving records, and criminal history records. I understand that this information may be transmitted electronically and authorize such transmission.
If currently employed:   My current employer may be contacted.
✓ YES ____ NO ____ N/A ____ Post Hire Only  _DA._ Applicant's Initials

I understand that a Consumer Report or Investigative Consumer Report ("Consumer Report") may be prepared summarizing this information. If my prior employers and/or references are contacted, the report may include information obtained through personal interviews regarding my character, general reputation, personal characteristics and/or mode of living. I may request a copy of any report that is prepared regarding me and may also request the nature and substance of all information about me contained in the files of the consumer-reporting agency. I understand that I have the right to inspect those files with reasonable notice during regular business hours and that I may be accompanied by one other person. The consumer-reporting agency is required to provide someone to explain the contents of my file. I understand that proper identification will be required and that I should direct my request to: Verifications, Inc., 1425 Mickelson Drive, Watertown, SD 57201. Phone 1-877-414-7060 / 1-800-735-3002 / 605-884-1200

Are you applying for employment in the state of California?   ____ YES  ✓ NO
If you are applying for employment in the State of California please note that a new Disclosure and Release of Information Authorization is required for any subsequent Consumer Report/Investigative Consumer Report.

Are you applying for employment in California, Minnesota or Oklahoma?   ____ YES  ✓ NO
If so, would you like a copy of any Consumer Report prepared on you?   ____ YES ____ NO

I hereby certify that all the statements and answers set forth on the application form and/or my resume are true and complete to the best of my knowledge, and I understand that if subsequent to employment any such statements and/or answers are found false or that information has been omitted, such false statements or omissions will be just cause for the termination of my employment. Further, I understand that by requesting this information, no promise of employment is made. I am willing that a photocopy of this authorization be accepted with the same authority as the original; and that if employed by the above-named company (except if employed in the state of California), this authorization will remain in effect throughout such employment.

_(signature)_                    015 68 3162                5/2/07
Signature                        Social Security Number      Date

NOTE: The following information is provided voluntarily and IS NOT considered as part of your application. It is used only for identification purposes in verifying information on your Employment Application.  **PLEASE PRINT CLEARLY.**

Adams                            Deborah
Last Name                        First Name                   Middle Name

160 Newington Rd B106   West Hartford   CT   06127
Street Address                   City            State   ZIP

078309110            CT              2013         7/29/59
Driver's License Number   State of License   Expires On   Date of Birth

Springfield  MA
List any other CITIES AND STATES in which you have lived during the previous 7 years.

N/A
List any other LAST NAMES you have used during the previous 7 years.

N/A
List any other LAST NAMES under which you received your GED, high school diploma, or other degrees.          Revision 122302

NOTARY (IF REQUIRED)
State _____              County of _____
                                    My Commission Expires on _____
Signature _____

DEFENDANT'S EXHIBIT NO. FOR IDENTIFICATION

FAX NO. :866-823-45330    May. 02 2007 09:18PM  P2

FROM :DEBORAH ADAMS



# comensura

## Consumer Report/Drug Test Release

I, _Deborah Adams_, understand that by signing this form I am acknowledging that for this assignment I need to be willing to take and pass a drug test and background check. I also understand that the results will be released to both my Staffing Partner and Comensura for my assignment with the client, Northeast Utilities.

By signing this form, I acknowledge and agree to the above.

_Deborah Adams_    5/2/07
Employee's name    Date

_Deborah Adams_
Employee's signature



DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION

5

O./Comensura/AccoutTeam/Drug Test Release

# EXHIBIT G

ADAMS, DEBORAH
Entered: 05/03/07
SS#: 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
DOB: 7/29/59
ONL 40136



**2597285**

...tion Services, LLC
...O Box 3185
...ester, VA 22604

Voice: (888) 525-4576  Fax: (888) 525-4479

DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE

---

## COURT SEARCH RECORD

---

**Client:** Verifications, Inc
**Reference:** 14773

**Request Date:** 05/04/07
**Returned:** 05/07/07

**Court Search Record Requested On:**

**Name:** ADAMS, DEBORAH

**SSN:** 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  **Date of Birth:** July 29, 1959

---

| State: VA | County: PITTSYLVANIA | Felony and Misdemeanor, 7 Years |

```
COURT:               Circuit Court
CASE NUMBER:         CR98000228-02      Felony
DATE OF OFFENSE:     09/25/01
CHARGE(S):           Revocation
DISPOSITION DATE:    09/23/03
DISPOSITION:         Sentence/ Probation Revoked
                     2 Years Jail
                     Cost $549

IDENTIFIERS ON
    RECORD FILE:     Adams, Debra Jean (Similar Name)
                     DOB: 07/29/1959
                     Danville, VA 24540
                     Female Black
```

```
COURT:               Circuit Court
CASE NUMBER:         CR98000228-01      Felony
DATE OF OFFENSE:     11/09/00
CHARGE(S):           Show Cause
DISPOSITION DATE:    12/12/00
DISPOSITION:         Guilty
                     2 Years Jail/2 Years Suspended
                     Cost $231

IDENTIFIERS ON
    RECORD FILE:     Adams, Debra Jean (Similar Name)
                     DOB: 07/29/1959
                     Danville, VA 24540
                     Female Black
```

```
COURT:               General District
CASE NUMBER:         GT99003696-00      Misdemeanor
DATE OF OFFENSE:     04/21/99
CHARGE(S):           Driving Under Revocation/Suspended Operator's License
DISPOSITION DATE:    05/18/99
DISPOSITION:         Guilty
                     10 Days Jail/10 Days Suspended
                     Operator's License Suspended 30 Days
                     Fine $100 Cost $30

IDENTIFIERS ON
```

FROM: Mohr Information Services, LLC
NAME: ADAMS, DEBORAH

Court Search Record Page #-2
CLIENT: Verifications, Inc

| State: VA | County: PITTSYLVANIA | Felony and Misdemeanor, 7 Years |
|---|---|---|

RECORD FILE:   Adams, Debra (Similar Name)
               DOB: 07/29/1959
               Danville, VA 24540
               Female Black

COURT:                  Circuit Court
CASE NUMBER:            CR98000228-00      Felony
DATE OF OFFENSE:        10/01/97
CHARGE(S):              Welfare Fraud
DISPOSITION DATE:       09/20/99
DISPOSITION:            Guilty
                        2 Years Jail/2 Years Suspended
                        Supervised Probation 2 Years
                        Cost $558

IDENTIFIERS ON
    RECORD FILE:        Adams, Debra Jean (Similar Name)
                        DOB: 07/29/1959
                        Danville, VA 24540
                        Female Black

## END OF REPORT

# EXHIBIT H

2165318.1



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

10740 Farralone Avenue
Chatsworth, CA 91311
www.nadellinvestigations.com
CA Private Investigator License # 23883

barry@nadellinvestigations.com
Tel (818) 886-6257
Cell (310) 701-4473
Fax (818) 886-8440

July 12, 2008

Kevin Zimmerman, Esq.
Michael Coffey, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604

RE: Deborah Adams, Plaintiff v. National Engineering Service Corporation and Verifications Inc., Defendants: U.S. District Court, District of Connecticut Civil Action dated July 6, 2007; Civil Action No. 3:07 CV 01035 AVC.

Gentlemen:

As attorneys representing the Defendant Verifications, Inc. ("VI") in the above referenced action, your firm has requested that I render my expert opinion whether this co-defendant in the above matter was (1) excercised adequate and reasonable care in the pre-employment screening services which it provided to National Engineering Service Corporation ("NESC") regarding the preemployment background search for criminal convictions VI conducted at the request of NESC on Deborah Adams ("Ms. Adams") who had applied for a position with NESC who sought to employ with their client Northeast Utilities ("NU"); (2) did VI comply with the federal Fair Credit Reporting Act 15 U.S.C. §1681 et. seq. and particularly section §1681(o) in the performance of their duties relating to Ms. Adams; and, (3) were the services performed for NESC by VI consistent with industry standards and practices.

My opinions herein are based upon my personal knowledge and expertise. If called as a witness in this action, I could and would competently testify to the following statements, opinions and analysis.

## I.   INTRODUCTION

This report will review all the events pertaining to the background screening of Ms. Deborah Adams and will find that Verifications, Inc. (VI) followed federal law to the letter along with conforming to the highest standards practiced within the background screening industry in providing its services to NCRL in regard to the background check on Ms. Deborah Adams. I will review the laws surrounding the background screening industry, industry standards and practices, issues of identifiers in court records and other pertanent information. I will reveal how VI acted in a professional, responsive, and appropriate manner and that when analyzing the actions of VI and the timeline of events, VI should not be held responsible for Ms. Adams not obtaing the job position in question.

## II.   BACKGROUND

 **Nadell Investigations**

*The expert in the legal issues surrounding background screening*

I have expertise in the laws relating to preemployment background screening and the accepted standards and practices relative to the pre-employment screening industry. In addition I have expertise relating to the conduct, services offered, and use of pre-employment screening products by national background screening organizations, including such firms recommended screening protocols for employers.

I was the founder and owner of InfoLink Screening Services, Inc., a national background screening firm which performed hundred's of thousands of background searches from 1994 until I sold the company in 2006. In 2006, I acted as the senior vice president of the background screening division of Kroll (Kroll is one of the largest background screening firms in the nation (www.kroll.com) until my retirement December 31, 2007. I was a founding member and served on the board of directors for four years until April 2008, including serving as co-chairman in 2006, of the National Association of Professional Background Screeners. I have written several articles, been interviewed on both television and radio, have spoken at many national conventions for the human resource and security industry including SHRM and ASIS, and have authored a book on the legal issues surrounding background screening. Finally, I have been an expert witness in other actions relating to the preemployment screening industry. Complete information regarding my education, training and experience are contained in my curriculum vitae previously provided and may also be found at www.nadellinvestigations.com.

## III.   SCOPE OF THIS REPORT

Within this report I shall refer to National Engineering Service Corporation as NESC; Verifications, Inc. as VI; Northeast Utilities as NU; National Background Data as NBD; Deborah Adams as Ms. Adams, and Mohr Information Services as Mohr.

Based upon my expertise in the field of employment background screening, the federal Fair Credit Reporting Act 15 U.S.C. §1681 et seq., accepted Federal Trade Commision opinion letters, and industry accepted standards and practices, this report shall expound upon (1) whether VI was Negligent in complying with the requirements of the The federal Fair Credit Reporting Act 15 U.S.C. §1681 et seq. (FCRA), [COUNT 6]; (2) whether VI as Negligent [COUNT ELEVEN and COUNT THIRTEEN] in its actions relative to its client NESC or Ms. Adams; (3) whether VI was guilty of defamation (libel) [COUNT TWELVE]; (4) preemployment background screening industry standards and practices; and, (5) whether NESC was, in fact, responsible for Ms. Adams not obtaining employment with NU due to its lack of complying with federal law.

The scope of this report is to analyze and expound my expert opinion upon the actions and services of VI regarding the service offering, account set up and activation, documentation provided VI's client NESC, and performance of VI relating solely to the background search performed on Ms. Adams; including my expert opinion as to whether VI performed according to industry practices and whether VI was responsible in the final analysis to the subsequent not hiring by NESC and placing of Ms. Adams at NU after receiving a background screening report issued by VI.

Finally, I will provide my opinion in rebuttal of the allegations contained in the Expert Witness Report rendered by Evan Hendricks for Madsen, Prestley & Parenteau, LLC and provided to your office on June 2, 2008.

# Nadell Investigations

*The expert in the legal issues surrounding background screening*

## IV.   MATERIAL REVIEWED

In connection with my analysis and preparation of my opinions in this matter, I have reviewed the following items:

1.  Complaint filed by Plaintiff,

2.  Response of Defendant, Verifications, Inc. to Plaintiff's First Set of Interrogatories and corresponding Exhibits,

3.  Response to Interrrogatories and Requests for Production dated February 18, 2008,

4.  Defendant NESC Responses and Objections to Plaintiff Deborah Adam's First Set of Interrogatories and Requests for Production,

5.  Expert Witness Report rendered by Evan Hendricks to William G. Madsen of Madsen, Prestley & Parenteau, LLC – see cover letter dated June 2, 2008,

6.  VI website and other VI documents,

7.  User Certification and Client Services Agreement of VI,

8.  NESC employee sign-up package of forms, including Government documents for employment eligibility and other contract forms,

9.  Consumer Report/Drug Test Release Form signed by Employee Deborah Adams on May 2, 2007,

10. Consumer Report / Investigative Consumer Report Disclosure and Release of Information, Authorization dated May 2, 2007 and signed by Ms. Adams,

11. Internal Background search screens by VI,

12. Internal Notes regarding background check on Ms. Adams by VI,

13. Criminal Background Check report issued to NESC,

14. NCRL Source Information issued by VI which details the sources of information searched by National Background Data (NBD) in the initial database search performed by VI on Ms. Adams (Exhibit 4),

15. Exhibits pertaining to the background screen performed by Choicepoint at the request of Adecco USA on Ms. Adams in early April 2006, along with various letters, emails and supporting documents regarding the identity of Debra Jean Adams,

16. Ms. Adams page information on LinkedIN, her resume, information at Careerbuilder.com,

 **Nadell Investigations**

*The expert in the legal issues surrounding background screening*

17. Website page for Guidant dated March 19, 2008 indicating that in regard to the open position at NU, Ms. Adams had failed the background check (noted to file 5/8/20007),

18. The federal Fair Credit Reporting act 15 U.S.C. §1681 et seq. (FCRA) (Exhibit 3),

19. Federal Trade Commission Fair Credit Reporting Act – Staff Opinion Letters (1997-2001)(Exhibit 5),

20. Notice to Users of Consumer Reports: Obligations of Users Under the FCRA; appendix C to Part 601, (Exhibit 1)

21. Chart "Re-investigation Requirements of Background Screeners" (Exhibit 7),

22. Background Screening Guideline published by ASIS International (Exhibit 6),

23. Wikipedia, the free encyclopedia (Exhibit 2),

24. Various books written on the subject of background screening which shall be identified within this report.

25. VI information on their National Criminal Record Locator (Exhibit 4& 10)

26. Forth Committee Draft on the Court System in Virginia (Exhibit 11)

27. NAPBS letter to Duane Delaney, Clerk of Court, Washington DC (Exhibit 8)

28. National Criminal Record Locator Service Datasheet Version 7/24/2006 (Exhibit 10)

## V.   STATEMENT OF FACTS

1. NESC negotiated a program for background checks and substance abuse testing with VI in July of 2004, upon agreeing to VI's User Certification and Client Services Agreement.  Such program included but was not limited to the following services: (1) Credit Report which included a social security verification search, hawk alert; (2) Criminal database searches; (3) Criminal "County" Felony and Misdemeanor Search; (4) Sex Offender Search through the "state" database; and (5) Motor Vehicle Reports.  Clients of VI had the choice as to what services they wished to subscribe to when ordering a report.
   a.   NESC was provided VI's User Certification and Client Services Agreement which clearly noted under Section 2(D) NESC's responsibilities under the FCRA relating to Adverse Action.
   b.   NESC was provided documents by VI (referred under 2(E)) of the User Certification and Client Services Agreement, which notified users of consumer reports of their obligations under the FCRA (See Appendix C to Part 601 "Prescribed Notice of User Responsibilities" (Exhibit 1)
   c.   NESC had performed several background searches with VI prior to the background search they requested for Ms. Adams.
   d.   NESC was very well acquainted with the procedures VI required in order to order a criminal background search.
   e.   NESC personnel used VI's log in procedures on their website in ordering background searches. Such website contained information regarding client's responsibilities when ordering criminal reports.



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

2. NESC provided Ms. Adams documents which included language saying: "We are happy to have you working with our team of professional contract/temporary employees. NESC can offer a variety of assignments in virtually every area and industry, locally, regionally and nationally. As an employee of NESC, you will have the opportunity to receive information regarding health insurance plan referral(s), a 401(k) retirement plan and other benefits offered to our qualified contract employees." "Enclosed is an employee sign-up package, which includes required Government documents for employment eligibility, and other important contract forms. Please be sure to complete and return the following forms before reporting to your assignment. Failure to do so will delay your start date or even result in loss of assignment."

Among the forms included were forms with the NESC logo indicating that they were for the exclusive benefit of NESC. Such forms clearly indicate that NESC. was the employer and included: Pre-Employment Registration Form, Direct Deposit Form, Authorized Agreement for Preauthorized Credits and Correcting Debits, Employee Patent-License-Copyright Agreement, Payroll and Security Information, Right to Know-Certification, Notification of Unemployment Insurance Eligibility Requirement, Payroll and Security Information, and the Employee Hourly Contract and Obligations form.

3. Ms. Adams completed all forms and supplied them to NESC for consideration. Such forms included required forms under the FCRA in order to perform a background check. In completing such forms, Ms. Adams provided the following information to NESC.
   a. Name: Deborah Adams
   b. Date of Birth: 7/29/1959
   c. Social Security Number: 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
   d. Address: 160 N Washington Rd., b106, West Hartford, CT 06127
            P.O. Box 27010 West Hartford, CT 06127
   e. Driver's License Number: CT RMV - #078309110 Exp. 07/29/2013

4. NESC requested a criminal background check using the VI login procedures over the VI website along with a substance abuse test from VI on May 3, 2007. In requesting such search, NESC supplied VI the following:
   a. Name: Deborah Adams
   b. Date of Birth: 7/29/1959
   c. Social Security Number: 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
   d. Address Ms. Adams (including street, city, state, and zip)
   NESC did not provide a middle name or initial.

5. Prior to Deborah Adams initiating the dispute, VI had no information from Ms. Adams directly. Specifically, VI did not have a copy of her employment application, the signed disclosure/authorization and release form, or other documents which NESC had in their file.

6. The order was placed online by NESC and consisted of one check only, which was a criminal database check.

 ## Nadell Investigations

*The expert in the legal issues surrounding background screening*

7. Upon applying at NESC and learning that a criminal background check was to be ordered from VI, Ms. Adams <u>DID NOT</u> volunteer to either NESC or VI of her previous issue of mistaken identity upon Choicepoint performing a criminal background check approximately one year prior.

8. In reviewing some of the correspondence between Ms. Adams and NESC, it is interesting to note that Mr. Sullivan at NESC referrs to Ms. Adams as "Deb" Adams.

9. Based upon the information provided, the following is a timeline of events:

| | |
|---|---|
| Thursday May 3, 2007 | Search requested by NESC of Deborah Adams. |
| Thursday May 3, 2007 | VI sent request along with the following identifiers to National Background Data (NBD). Name: Deborah Adams, "Deb" Adams, DOB: 07/29/1959. |
| Thursday May 3, 2007 | NBD reported criminal conviction to VI. |
| Friday May 4, 2007 | VI reported to NESC that additional research at the jurisdictional level is required. |
| Friday May 4, 2007 | VI requested that Mohr Investigations directly research court records using the following identifiers: Name: Deborah Adams, DOB: 07/29/1959, SSN: xxx-xx-3162. |
| Monday May 7, 2007 | Mohr reported confirmation of criminal conviction under Debra Jean Adams (similar name) with DOB: 07/29/1959. |
| Tuesday May 8, 2007 | VI notified NESC with report of criminal conviction. |
| Tuesday May 8, 2007 | Ms. Adams speaks to Chris Sullivan, Account Manager at NESC the evening of May 8th and learns of VI report. She advises NESC of her dispute. |
| Wednesday May 9, 2007 | NESC provides Ms. Adams with a copy of the VI report. NESC advises Ms. Adams to contact VI directly with her dispute. Ms. Adams disputes with VI the issued VI report. |
| Thursday May 10, 2007 | VI researches through Accurint[1] (a national database reporting company) Debra Jean Adams, DOB-07/29/1959, SSN-227-31-xxxx, and address-Danville, VA. File confirms different SSN than Deborah Adams and that Debra Adams is deceased. |
| Thursday May 10, 2007 | VI corrects report in their file. |
| Thursday May 10, 2007 | VI notifies NESC of new updated report. |
| Friday May 11, 2007 | 6:04 A.M., Ms. Adams contacts Christopher Sullivan at NESC for update. |
| Friday May 11, 2007 | VI notified Ms. Adams indicating original report was in error and that they corrected the report with NESC. |
| Saturday May 12, 2007 | 7:29 A.M., Ms. Adams asks about NESC corporate office location. At 10:23 A.M., Mr. Sullivan responds with answer. |
| Sunday May 13 and Monday May 14 | Ms. Adams continues to correspond with Mr. Sullivan via email. |
| Monday May 14 | Ms. Adams corresponds with VI. |
| Monday May 14 | NESC confirms that they had provided the initial VI report to NU and NU had offered the position to another candidate. |
| Tuesday May 15 | Ms. Adams corresponds with VI. |

10. NESC requested a criminal search from VI:
   a.  No Social Security Trace or Name verification was ordered by NESC.

---

[1] Accurint is one of the Lexis Nexis family of companies



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

b.  No county court search was ordered by NESC.
c.  The only criminal search ordered was a Database search.
d.  Should a database search reveal a criminal "hit", VI's normal policies and precedures require that they follow up such database search with a search at the jurisdiction where the criminal conviction was identified in order to research more accurately any criminal convictions found on the database search.

11. VI's source for database searches is National Background Data (NBD) of Ocala, FL using the NBD/VI "automated" method. VI's product name for the database search is "National Criminal Record Locator" (NCRL). The NBD search is automated within the VI system.
   a.  NBD auto entered: last name "Adams", first three letters of first name "Deb", and full Date of Birth.
   b.  National Database search screen reveals search performed on Deborah Adams.
   c.  VI was notified by NBD of a criminal convictions under a "similar name" Debra Jean Adams, with a matching date of birth.
   d.  NBD reported 5 cases under the search name "Deb Adams". Under the name Debra Jean Adams, 5 cases were identified. One case was the "hit" in Pittsylvania, VA for welfare fraud (F).

12. VI notified NESC the following on 05/04/07 as indicated on VI screen: "Additional research at the jurisdictional level is required to complete this check. This information was requested on 05/04/2007, and, upon receipt, will be included in the applicable jurisdiction contained in this report."

13. VI requested an "at court" search of Deborah Adams in the county of Pittsylvaina, Virginia through Mohr Information Services, LLC (Mohr), a court researcher regularly used by VI for at court searches. Such searches at the jurisdiction level provide the latest and most accurate information available. VI provided Mohr with:
   a.  Applicant's name as originally provided to VI: Deborah Adams
   b.  Full date of birth
   c.  Last four digits of SSN.
      Therefore, VI provided 'ADAMS, DEBORAH, 07/29/59, XXX-XX-3162

14. Mohr issued a report to VI indicating that Debra Jean Adams (name similar to Deborah Adams) with an exact matching date of birth had convictions in Pittsylvania, VA.

15. VI issued their report to NESC on May 8, 2007. Upon learning of the report after contacting NESC by telephone on May 9, 2007, Ms. Adams was advised to contact VI directly by NESC and dispute the findings within the report.

16. On May 8, 2007, NESC contacted NU and advised NU that Ms. Adams did not pass the criminal background check. NU offered the position which Ms. Adams was applying for to another person.

17. On May 9, 2007, Ms. Adams contacts VI and disputes the findings in the report. Upon receiving the dispute, VI proceeds to verify their findings. On May 10, 2007, VI researches Debra Jean Adams through Accurint, a national database company, and learns that Debra Jean Adams and Deborah Adams had different social security numbers and Debra Jean Adams is deceased.

18. On May 10, 2007, VI corrects its report and contacts NESC and Ms. Adams.

## VI. VERIFICATION'S INC. STANDARD PRACTICES AND REQUIREMENTS



## Nadell Investigations
*The expert in the legal issues surrounding background screening*

1. VI follows standard practices in setting up a client, having them sign proper forms and supplying them documents including Release and Disclosure forms to perform background checks.

2. VI follows standard practices, providing clients wishing to use their services for background checks documents including disclosure and release forms along with other documents. VI clearly outlines the client's requirements when performing background checks as perscribed by the FCRA. VI does not require copies of disclosure or release documents unless audited by third parties or government entities which is mentioned in their sign up procedures.

3. VI offers various services which clients may choose from in order to background check potential job applicants. Services may be ordered in a package or individually.

4. VI allows clients who wish to request criminal background checks to only order a database search without ordering other services. VI's database search is named: "National Criminal Record Locator" (NCRL). VI uses National Background Data for its NCRL searches.

5. VI has specific requirments if a NCRL (database) is ordered. Such requirements attached herein as: Version 2006-07-24 (Exhibit 10) specifically notes:
   a. "Offenses Requiring Additional Research in Originating Jurisdiction": All felony and misdemeanor records found in an NCRL search will automatically generate a search in the originating jurisdiction.
   b. Based upon the Adams report, should VI obtain a felony or misdemeanor "hit" from an NCRL search, VI is to advise the client the following: "Additional research at the jurisdictional level is required to complete this check. This information was requested and, upon receipt, will be included in the applicable jurisdiction contained in this report". Further, VI's report indicates the following: "A criminal record search must be conducted by an investigator or court clerk at this location. The information was requested on ___(date)___ and will be forwarded upon receipt."
   c. VI's work instructions apparently require that if at any time there is a record, the appropriate county is to be added to the applicant search order and a county criminal search is to be conducted if such county search was not previously requested.

## VII. REQUIREMENTS UNDER THE FCRA
**Opinion regarding Count Six: Negligent Failure to Comply with Requirements of 15 U.S.C. §1681(k) in Violation of 15 U.S.C. § 1681(o) as to Defendant Verifications.**

Regarding Count 6, based upon my professional opinion, I disagree with the allegation that Defendant Verification failed to comply with the requirements of 15 U.S.C. §1681(k) in (1) failing to notify Plaintiff at the time the report was being posted and to whom it was being reported; **AND,** (2) failing to maintain the strictest procedures to ensure that the information being posted was complete and up to date.

Section § 606(d)(3). Disclosure of investigative consumer reports [15 U.S.C. § 1681d] of the FCRA specifically indicates that "Except as otherwise provided in section 613 [§ 1681k], a consumer reporting agency shall not furnish an investigative consumer report that includes information that is a

 ## Nadell Investigations

*The expert in the legal issues surrounding background screening*

matter of public record and that relates to an arrest, indictment, conviction, civil judicial action, tax lien, or outstanding judgment, unless the agency has verified the accuracy of the information during the 30-day period ending on the date on which the report is furnished."

Section § 613. Public record information for employment purposes [15 U.S.C. § 1681k] clearly indicates two options for CRA's when reporting what might be deemed negative information to an employer as clearly indicated by the word "or" between section (1) and section (2).

(a) In general. A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall

(1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; **or**

(2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

In my expert opinion and based upon my expertise in the field of employment background screening, after review of the federal Fair Credit Reporting Act 15 U.S.C. §1681 et seq., accepted Federal Trade Commision opinion letters, and industry accepted standards and practices; it is clear from the language in the FCRA that a CRA is not required to notify the consumer AND maintain strict procedures; it may do one or the other.

In this particular case, VI had strict procedures in force designed to insure that when a criminal record was reported using their NCRL database program, further research must be conducted at the local county jurisdiction to confirm or dispute the findings within the database search. In this case, upon learning of a possible criminal conviction, VI reported to NESC that additional research at the jurisdictional level was required, and the next day Friday May 4, 2007, they asked Mohr to research Pittsylvania, Virginia County.

Mohr was hired by VI and reported, after reviewing records at Pittsylvania, Virginia, that the record revealed criminal convictions under the name Debra Jean Adams with a matching date of birth.

## VIII.   INDUSTRY STANDARDS AND PRACTICES

### A.   Opinion regarding Count Six: Negligent Failure to Comply with Requirements of 15 U.S.C. §1681(k) in Violation of 15 U.S.C. § 1681(o) as to Defendant Verifications.

## BACKGROND INFORMATION



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

"Notice" is defined by the Merriam Webster Dictionary as: (1): warning or intimation of something : ANNOUNCEMENT (2): the announcement of a party's intention to quit an agreement or relation at a specified time (3): the condition of being warned or notified —usually used in the phrase *on notice.*

"Contemporaneous" is defined according to the Merriam Webster Dictionary as that which is existing, occurring, or originating during the same time.

The Background Screening Industry refers to Section § 613(a)(1) of the FCRA as "Contemporaneous Notice"

The federal FCRA clearly indicates that CRA's have a choice to follow §613(a)(1) or §613(a)(2)

As an expert on the practice of the background screening industry, I am prepared and would testify that Section § 613(a)(2) is practiced by most firms in the industry as an alternative to contemporaneous notice wherein, should public record information be found using sources from database information which may be deemed negative information to an employer; CRA's follow strict procedures designed to insure that the record to be reported is "up to date". In so doing, CRA's adhearing to Section § 613(a)(2) refer back to Section § 606(d)(3) and verify the accuracy of the information during the 30-day period ending on the date on which the report is furnished by researching the "source" of the report which is the county court.

In a FTC staff opinion letter written to Mr. John Allan (Exhibit 5(b)) on May 5, 1999, FTC attorney Helen Foster clearly discusses that should a CRA identify negative information from "stored data public records", they have an option to follow their "strict procedures" and comply with Section § 613(a)(2) and obtain further research for the most up to date and accurate information.

In criminal conviction research, the most accurate and up to date source of any criminal report is the criminal court files within the jurisdiction of the reported conviction. Except for federal crimes which are found in the federal District Court system, all other crimes are found by researching the state and county courts. Les Rosen who writes in his "Safe Hiring Manual", Facts on Demand © 2004, p189: "Since the most accurate and least complicated search is at the courthouse....". Further, the National Association of Professional Background Screeners ("NAPBS")[2] published a white paper titled "Criminal Background Checks For Employment Purposes" wherein the industry association opines "County Courthouses: Counties are the source of criminal information and, as such, generally have the most complete criminal history information." Consequently, the background screening industry researches the state and county court houses to obtain the most accurate information available during the 30-day period ending on the date on which the report is furnished.

Identifiers: According to Mr. Rosen, "The key concept is that a researcher needs to locate an identifier in order to match the court record to the applicant. Examples of commonly used identifiers are: Date of birth, Driver's license number, Social Security Number." Race and Address are other identifiers which would be helpful to match. Again, according to Mr. Rosen in his book p 192: "In some jurisdictions, court clerks have taken the position that identifiers should be masked or not be made public in order to

---

[2] the National Association of Professional Background Screeners (NAPBS). The NAPBS is an association of over 400 firms ranging from small to national multi-office companies, providing background screening on behalf of employers.

Matter Cause No. Civil Action No. 3:07 CV 01035 AVC.　　　　Page 10 of 21
July 12, 2008



## Nadell Investigations
*The expert in the legal issues surrounding background screening*

protect privacy and to guard against identity theft." It has been the experience of CRA's who are members of the NAPBS that identifiers other than Date of Birth have been removed from court records. Further, it has been a major fight of the industry to keep at least Date of Birth within court records (see http://napbs.com/content.php?id=294 and also one of the sample letters issued by NAPBS on June 11, 2008 (Exhibit 8), pleading to keep date of birth as an identifier in court records attached herein).

When researching court records, CRA's will typically inquire using all identifiers provided to them by the employer requesting the search. With advanced technology many courts have adopted programming whereby the repositories will regurgitate all like names with matching identifiers (see Soundex[3] along with the definition and use from the attached Exhibit 2). For example, the name Bob and Robert; Bill or William; or Deborah, Debbie, Deb, Debi or Debra will be reported if any of those first names are searched. It is obvious that this is what occurred in this case. VI went to the repositories with the name Deb or Deborah Adams and her date of birth and social security number. As the social security number was not available in the court file, the repository regurgitated all first names which were like Deborah and matched the last name Adams and the date of birth.

It is interesting to note that in Virginia, attempts have been made to remove identifiers from court records. Taken from the Forth Committee Draft by the Virginia legislature (Exhibit 11):

### Proposed Legislation Carried Over to 2007 Session

#### SB 383 Posting of information on Internet.

This bill was carried over to the 2007 session. It would broaden the restrictions set out for personal information posted on a court website to apply to records within a secure remote access system established for land records. Such restrictions include prohibiting the posting of any document that contains (i) an actual signature, (ii) a social security number, (iii) a date of birth identified with a particular person, (iv) the maiden name of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child.

## DID VI FOLLOW INDUSTRY STANDARDS AND PRACTICES?

NESC soley requested a database criminal search. For database searches, VI uses one of the largest companies in the nation who maintains millions of records which they purchase from various sources including courts. National Background Data ("NBD"), the company used, is a wholey owned division of First Advantage Corporation. First Advantage is publicly traded on the NASDAQ National Market System under the symbol FADV and is a member of the First American family of companies (NYSE: FAF). This very reputable database repository is used by many companies in the background screening industry.

VI received the report from NBD that a person under the name Debra Jean Adams with a matching date of birth had a criminal conviction in Pittsylvania County, Virginia.

This information, if reported without further investigation, may have had a negative impact on the employability of Ms. Adams.

---

[3] Soundex was adopted by several courts including the Los Angeles County Court system several years ago.



## Nadell Investigations
*The expert in the legal issues surrounding background screening*

As NESC did not supply a middle name for Deborah Adams, and the repository searched did not report a match or mismatched social security number, VI's procedures required them to complete further research before reporting anything to NESC.

Note that their report of 5/4/2007, indicated: "Additional research at the jurisdictional level is required to complete this check." Further, VI suggested NESC review the following website to show how complete the database search was: http://www.verificationsinc.com/pdf/ncrlsource.pdf. (See Exhibit 4)

VI researched further by accessing the county court records in Pittsylvania, Virginia, as reported on the NBD report, on Thursday May 3, 2007, directly to confirm or dispute the findings within the NBD report. Without delay, VI contacted Mohr Investigations the very next day May 4th. Mohr reported to VI confirmation of the criminal case on Monday May 7, 2007.

In my expert opinion based upon my expertise in the field of employment background screening, the federal Fair Credit Reporting Act 15 U.S.C. §1681 et seq., accepted Federal Trade Commision opinion letters, and industry accepted standards and practices, VI followed industry standard practices by following the FCRA Section §613(a)(2) and followed its strict procedures to verify the information.

### B. Opinion regarding Count Eleven: Negligent Infliction of Emotional Distress as to Defendant Verifications.

100. Plaintiff believes that Defendant Verifications, Inc. (VI) negligently attributed the criminal history of another individual with a different name and a different social security number to Plaintiff, and published that inaccurate information to third parties responsible for determining Plaintiff's eligibility for employment.

101. Defendant's conduct created an unreasonable risk of causing emotional distress to Plaintiff

102. VI posted the report with total disregard for the well being of Ms. Adams, completely ignoring the risk of possible error in the report.

102 (b) Because Plaintiff was never informed at the time of posting, there was no opportunity to rescind resignation with Plaintiff's previous employer

103 No comment

In my expert opinion, all the allegations in Count Eleven should be dismissed for the various reasons as outlined heren and further:

1. Due to the fact that Deborah Adams could be considered a common name, and the common use of Soundex or like systems, the lack of social security number or address identifiers in criminal case files; VI was required to report findings that convictions were found under the similar name Debra Jean Adams with a matching date of birth. Although Debra Jean Adams and Deborah Adams were not the same individuals in the final analyisis, VI followed all required procedures before reporting to their client NESC.

2. In my expert opinion, if VI had not reported the like name conviction, they could have been easily found negligent by NESC should Debra and Deborah had been one in the same persons.

3. Finally regarding 102 above, it is important to note that the VI report did not specifically indicate that Deborah Adams had a conviction! The actual report simply indicated that a conviction was found under a similar name Debra Jean Adams with a matching date of birth, thus leaving it up to



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

the employer to follow FCRA required procedures should NESC consider taking adverse action using the VI report.

4. Specifically, it is important at this time to address allegations that VI caused Ms. Adams emotional distress and was negligent in that VI never informed Ms. Adams of the report giving her time to dispute its findings.

In regard to number 4 above addressing 101 and 102(b) above, the court needs to be aware that it was not the Defendant VI's obligation to inform the Plaintiff Ms. Adams of the report as previously discussed herein. However it *was* NESC, the employer's, responsibility to do so prior to taking adverse action and advising NU of information that would cause them to conclude that they should hire a different person other than Ms. Adams.

In Section IV of this report, the facts clearly indicate that NESC acted as the employer of Ms. Adams. The language included in the documents and the forms make it very clear that Ms. Adams was to be hired as an employee of NESC and that NESC was acting as an employer. The fact that NESC hires individuals on a contract basis to work on the premises of other organizations, as in this case whereby Ms. Adams was to be hired to work on the premises at Northeast Utilities ("NU") a question may arise if NESC was acting an employment agency. In my opinion the documents do not indicate such.

Notwithstanding, Section 603(f) of the FCRA defines a consumer reporting agency (CRA) as any person which, for monetary fees, "assembles or evaluates" credit information or other information on consumers for the purpose of regularly furnishing "consumer reports" to third parties using any means or facility of interstate commerce. A "consumer report" is, in turn, defined in Section 603(d)(1) as a report containing information bearing on an individual's "character, general reputation, personal characteristics, or mode of living" that is used or expected to be used for the purpose of serving as a factor in establishing the consumer's eligibility for, among other things, employment."

There is no evidence that NESC ever provided the report obtained from VI to NU; but, used VI to perform it's own screening to establish if NESC would hire Ms. Adams. In this regard NESC was not "assembling" or "furnishing" a consumer report to third parties, but using such consumer report to make their own evaluation for hire.

Finally, notwithstanding my opinion, if the court finds that NESC acted as an employment agency the FCRA specifically exempts employment agencies who procure employment of consumers on behalf of employers from being CRA's. I refer to Section 603(o) of the FCRA which is easily interpreted in a Federal Trade Commission (FTC) staff opinion letter (Basting (06-11-98)), which is attached as an Exhibit 5(a) which says: "Section 603(o) provides an exemption from coverage by the FCRA for certain communi-cations if specified procedures are followed (including notice, consent by affected consumers, and the disclosure of information upon request). Section 603(o)(2) limits the exemption to reports "made to a prospective employer for the purpose of (A) procuring an employee for the employer; or (B) procuring an opportunity for a natural person to work for the employer." "In our view, the language of this subsection limits the application of the provision to the activities of employment agencies, and not employment screening services. Aside from the language of Section 603(o)(2), the fact that Section 2402(f) of the Consumer Credit Reporting Reform Act of 1996 -- the portion of the bill that added Section 603(o) of the FCRA -- is titled "Exclusion of Certain



## Nadell Investigations

*The expert in the legal issues surrounding background screening*

Communications by Employment Agencies From Definition of Consumer Report" makes it clear that Congress intended for the exemption to be limited to such agencies. In addition, the discussions of the scope of this section that we have found in the legislative history contain explicit statements that the provision applies to employment agencies. S. Rep. 104-185, 104th Cong., 1st Sess., at 34 (1995); H.R. Rep. No 103-486, 103rd Cong., 2nd Sess., at 29 (1994)."

Consequently, in my professional opinion, NESC was the employer of record and as such was required to follow the FCRA guidelines designed for employers who seek consumer reports or investigative consumer reports for employment purposes.

As the employer, NESC has specific obligations under the FCRA which were identified to NESC by VI. I specifically refer to NESC's obligation that prior to their considering taking adverse action either due to information in whole or in part from the VI report, NESC was under the obligation to first give a copy of the report to Ms. Adams; and, second, wait a reasonable amount of time for Ms. Adams to dispute any of the findings within the report. This information can be easily understood by reading section §603(b)(3)(A) of the FCRA which states that: "the person intending to take such adverse action shall provide to the consumer…"

VI as a CRA is not in a position to take adverse action; and, was not intending to take adverse action. Under §603(b)(3)(B)(i)(III) the employer is required to advise the consumer "that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide to the consumer the specific reasons why the adverse action was taken".

Further, review of FTC Opinion Letters (Exhibit 5) along with the published guidelines for employers by ASIS (Exhibit 6), further proves that the burdon on advising Ms. Adams of the negative information contained in the VI report was NESC and NESC should have followed adverse action procedures prior to allowing NU to offer the position to another candidate.

## TAKEN FROM THE ASIS GUIDELINES (Exhibit 6):

**Adverse Action Notice:** This notice is necessary when using the services of a consumer reporting agency. A letter or other document informing the job applicant he or she has been denied employment. This document must contain the name, address, and phone number of the employment screening company, a statement that the employer, not the background screening company, is responsible for making the adverse decision, and a notice that the individual has the right to dispute the accuracy or completeness of any of the information in the report.

**Pre-Adverse Action Notice:** A letter or other document informing the job applicant that the employer intends to take an adverse action against the applicant based upon information contained in a consumer report. The notice will provide the applicant with a copy of the consumer report, a summary of the applicant's rights under the FCRA, and is intended to provide the applicant a meaningful opportunity to review, reflect, and respond to the consumer report if the applicant believes it is inaccurate or incomplete.

## Section 13.3 of the ASIS Guidelines: EMPLOYER REQUIREMENTS UNDER THE FCRA

(1) Prior to receiving a consumer report, an employer must certify to the CRA in writing that it will do the following:
    a) Use the information for employment purposes only,
    b) Not use the information in violation of any federal or state equal
        employment opportunity law,

 **Nadell Investigations**

*The expert in the legal issues surrounding background screening*

c) Obtain all the necessary disclosures and consents as required by the FCRA,
d) Give the appropriate notices in the event an adverse action is taken against an applicant based in whole or in part on the contents of the Consumer Report, and
e) Give the additional information required by law if an Investigative Consumer Report is needed.

(4) The adverse action rules apply to decisions not to hire, suspend, or terminate an individual <u>based in whole or in part on a consumer report</u>. If adverse action is intended and before it is taken, an employer must provide the applicant with a copy of the report and the FTC document, "A Summary of Your Rights Under the Fair Credit Reporting Act" (15 U.S.C. §1681b(b)(3)). This is the first notice, also called the Notice of Pre-Adverse Action.

(5) If, after sending out the first notice and related documents, the employer intends to make a final decision not to hire, then the employer must send the applicant a second notice, also called the Notice of Adverse Action. This Notice will inform the applicant of the employer's final decisions and will provide a copy of the FTC's form "A Summary of Your Rights Under the Fair Credit Reporting Act." Additionally, the notice must provide the CRA's contact information (name, address, and phone number), must advise the individual that (1) the CRA did not take the action and cannot provide specific reasons why it was taken, (2) the individual has a right to dispute the accuracy or completeness of the information, and (3) the individual has a right to another free copy of his or her consumer report within 60 days (15 U.S.C. §1681m).

The FCRA does not indicate how long an employer must wait after sending the pre-adverse action notice before taking adverse action. However, according to the FTC, employers should, "keep in mind the clear purpose of the provision to allow consumers to discuss reports with employers or otherwise respond before adverse action is taken." (See FTC Opinion letter, from William Haynes, FTC Staff Attorney, to Harold Hawkey, December 18, 1997) (Exhibit 5(d). Thus, the applicant must have a meaningful opportunity to review the material and to respond.

Note: The FTC has stated that CRA's may fulfill an employer's ministerial duties under the FCRA, and a CRA may send the adverse action letters for an employer. However, the employer remains responsible for any duty imposed by the FCRA and may be subject to liability if the duties are not performed by the CRA. (See FTC Opinion letter, from William Haynes, FTC Staff Attorney, to Michael Rosen, June 9, 1998.)

NOTE: VI had not contract with NESC to perform the ministerial duties of following adverse action procedures on behalf of NESC.

## EEOC CONSIDERATIONS WITH CRIMINAL RECORDS:

The EEOC has published specific guidelines related to the use of criminal records in the employment screening process. According to Title VII of the Civil Rights Act and the EEOC, a blanket practice of excluding applicants from employment based on criminal records has an adverse impact on African Americans and Hispanics in light of statistical evidence that shows these groups are arrested and convicted at disproportionately higher rates that their representation in the overall population. Exclusion of applicants based on criminal behavior is permissible if the employer can demonstrate business necessity. To establish business necessity, an employer must be able to show that it considered: (1) the nature and gravity of the offense or offenses; (2) the time that has passed since the offense; and (3) the nature of the job held or sought. (See EEOC Notice N-915, February 2, 1987.)

With respect to arrest records, the EEOC states that it is acceptable to consider an arrest record as evidence of conduct upon which the employer makes a decision. An arrest record may raise a suspicion that an applicant has committed a crime. However, when considering an arrest, the EEOC directs an employer to take an additional step to consider "whether the applicant is likely to have committed the alleged conduct." To do so, employers should examine the circumstances, offer the applicant an opportunity to explain, and make follow-up inquiries if necessary. Likewise, the EEOC does not prohibit

 **Nadell Investigations**

*The expert in the legal issues surrounding background screening*

the use of misdemeanor information in the hiring process. The gravity and nature of the offense should be considered in the context of the job sought. (See EEOC Notice 915.061, September 7, 1990.)

<u>In summary</u>, because of the known possibility of errors or mistaken identities that might occur within a background report; the FCRA, the ASIS Guidelines, and even the EEOC places the burdon on the employer to confirm any negative findings within a background report by first giving a copy of that report to the consumer, providing them a copy of their rights as prescribed by the FCRA (a copy of the consumer's rights was provided to NESC by VI, and time to dispute the findings in the report.

Consequently any negligence identified in Count Eleven can not be deemed caused by VI!

### C.   Opinion regarding Count Twelve: Defamation (Libel) as to Defendant Verifications.

| | |
|---|---|
| 105 | On May 8, 2007, Defendant VI published a false employment background report to a third person. |
| 106 | Inaccurate report published by VI falsely states that Plaintiff was previously convicted of several crimes in Virginia |
| 107 | No Comment |
| 108 | The aforesaid actions on the part of the Defendant VI were intentional in that they were willful, wanton, and or were taken in reckless disregard to the Plaintiff's rights. |
| 109 | No Comment |

In my expert opinion, although VI clearly identified that they found a conviction record under a person with a similar name and matching date of birth of the Plaintiff Ms. Adams, the reporting of this was necessary and within industry standards because of the like common name and the protections afforded under the FCRA that should have been followed by the employer NESC to allow Ms. Adams time to dispute the findings within the report. Publishing the report was not in reckless disregard to the Plaintiff's rights nor were wanton as VI did not publish such reports without further investigation at the source county courthouse, and further did not specifically accuse Deborah Adams of being a criminal as the report simply indicated that a conviction was found under a similar name Debra Jean Adams with a matching date of birth. Finally, as no other identifiers were available at the court records, VI had a duty to report such findings to NESC.

### D.   Opinion regarding Count Thirteen: Negligence as to Defendant Verifications.

| | |
|---|---|
| 110 | Was Defendant VI Negligent with its dealings with Plaintiff |
| 111 | No comment |
| 112 | No comment |
| 113 | Defendant VI had a duty of care to Plaintiff when it accepted a signed authorization from the Plaintiff to conduct a background check for employment purposes. Further, the Defendant owed a duty that information it was gathering and subsequently posting was accurate and complete |
| 114 | Defendant VI breached its duty when it willfully and negligently posted a false report on Ms. Adams without taking reasonable steps to ensure the accuracy of the background check. |
| 115 | No Comment |
| 116 | No Comment |
| 117 | The damages sustained by Plaintiff were a foreseeable consequence of Defendant's negligence. |

In my expert opinion, I believe that Defendant VI was not negligent in its dealings with Plaintiff Ms. Adams. As a matter of record, when one reviews the timeline within this report, one can easily agree that VI acted promptly and professionally in this matter.



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

1. On Tuesday, May 8, 2007 VI reported the conviction only after sending an investigator to the source courthouse to review records.
2. On Wednesday, May 9, 2007, Ms. Adams disputed the findings within the report directly to VI.
3. OnThursday May 10, 2007, VI at their own expense conducts further research and concludes that Debra Jean Adams and Deborah Adams were not one in the same persons.
4. On Thursday may 10, 2007, VI corrects their report and notifiesNESC of the correction.
5. On Friday May 11, 2007, VI notified Ms. Adams that the original report was in error and that they have corrected and reported the correction to NESC on May 10th.

Under Section § 611 of the FCRA (also see FTC Opinion Letter (Exhibit 5(c)), a CRA has a duty to reinvestigate disputed information. Such reinvestigation must commence within 5 business days and should the report issued be found to be in error, the CRA has 30 days to issue a new amended report (See Exhibit 7). Based upon the timeline of in this case, VI acted the very next day to reinvestigate the dispute; and, upon learning that the original finding was not accurate, VI issued a new report in one business day and contacted both the employer NESC and the Plaintiff Ms. Adams of their corrected report.

In summary, VI acted responsibly, quickly, and professionally. VI went above and beyond both legal requirements and industry standards in being responsible in this situation.

## IX. THE ISSUE OF INACCURACY AND THE BACKGROUND SCREENING INDUSTRY STANDARDS AND PRACTICES OF THE USE OF DATABASES

Evan Hendricks in his report analyzed over several pages the issue inaccuracy within public records. Much of his report dealt with information within credit reports; although he did indicate that criminal records were particularly susceptible. I do not argue about the concern to report accurate information; and in fact, agree with him that the FCRA and other laws exist to help protect the consumer from inaccurate reporting.

Mr. Hendricks was only partially correct in his analysis regarding the FCRA's attempt to avoid the reporting of inaccurate records. In his report he mistakenly indicates that §613(a)(1) should be followed each and every time a report which might be deemed negative might be reported. He doesn't advise us that that §613(a)(2) may be followed which allows a CRA an "OR" solution whereby, instead of a CRA reporting to a consumer directly, the CRA may, and I quote: "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported."

Mr. Hendricks, in fact, refers to the FTC Staff Opinion letter from Helen Goff Foster which specifically refers to the fact that CRA's have a choice; and that they could follow Section 613 of the FCRA in considering "up to date" by going to the latest public record source which is the county court



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

house which maintains the latest up to date criminal files available. This is exactly what VI did in this case.

Further, Mr. Hendricks does not address the other protection the FCRA provides to the consumer in order to help assure accuracy. That protection is found in the defination and procedures which must be followed by every employer prior to taking adverse action. Mr. Hendricks mistakenly believes that notices should have been sent to Ms. Adams by VI; when in fact, the FCRA, FTC Opinion letters and the ASIS Employer Guidelines are specific, indicating that the burden of notifying Ms. Adams in this case was NESC the employer.

Finally, although Mr. Hendricks has an impressive background, I do not see where he has had specific experience woring in the background checking business and personally researching criminal records. He has also not participated within the background screening industry in its efforts to have the courts continue to keep identifing information in their case files when employers or their agents seek to learn if a job applicant has a criminal conviction. As an advocate for the background screening industry, I have personal knowledge that courts have and continue to redact from their files identifing information, even with attempt to remove date of birth from files (see the sample of one of several letters sent to a court by NAPBS). The further removal of identifiers would make the search for criminal history information by employers impossible as the only identifier that a court might allow to remain in a file is name only matches. It is not suprising that courts have removed addresses, social security numbers, and other identifiers. CRA's today report exact or similar name and date of birth matches.

I do not concur with Mr. Hendricks opinion that VI has a disregard for reporting accurate findings. Based upon the timeline and facts of this case, VI's commitment to accuracy is very apparent.

I very much concur with Mr. Hendricks opinion regarding NECS and their duty to follow adverse action procedures before they "put a dagger through the heart of her (Ms. Adams) chances for the NU job". I agree that "it was incumbent upon NECS to take at least one or two extra steps to verify the VI report before passing it on". Namely these one or two steps were: (1) advising Ms. Adams that NECS may take adverse action based in whole or in part on the report and giving her a copy of the report to review; and, (2) allowing her time to dispute the information within the report. According to Mr. Hendricks, this situation would have had a better result if NESC would have even called Ms. Adams first and advised her of VI's findings before contacting NU.

## Researching using Databases:

Regarding the background screening industry and it's concern for accurate reporting, evidenced by writings by me and numerous colleagues in the background screening industry over several years, it is common knowledge that professional background screening firms should never allow researching solely a database to provide comprehensive research of criminal history records without procedures in place that should negative information be found, that prior to reporting such information, the source or county court who maintains the most accurate and up to date information be researched.



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

Although the use of databases has grown steadily over the last number of years, professional background screening firms, including VI, where the head of their compliance department served on the board of the National Association of Background Screeners (NAPBS) for several years and acted as Co-Chairman of the board for one of those years, use databases. Such industry experts know that they are not necessarily national, complete, or accurate. Professional background screening firms do however recommend the use of database searches to be an initial record locator or to augment an independent research of source jurisdiction records to be performed by a researcher.

My opinion is supported by the following Analysis of Industry Published Documentation on the use of Databases:

1. Sleuthing 101, Background Checks and The Law, author Barry J. Nadell, published 2004
   Page 29: "The information derived from public record databases may be outdated and/or inaccurate. The National Criminal Database Search should be used as a "conviction locator" only as it may provide additional criminal information not found by researching the county or state of residence or all counties found on the subject's Social security Trace or Credit Report. When using the National Criminal Database Search, it is crucial to conduct county criminal searches to perform proper due diligence and comply with the law. Identification of individuals is based only upon name and limited identifiers, consequently misidentifications may occur."

2. The Safe Hiring Manual, author Lester S. Rosen, published 2004
   Page 200: "Take Caution When Using Private Databases"
   "It is critical to understand that these multi-state database searches represent a research tool only, and under no circumstances are they a substitute for a hands-on search at the county level." Conclusion Page 202: "Criminal record vendors should make clear, and employers need to understand, the exact nature and limitations of the data they are accessing. These private database searches are ancillary and can be very useful, but proceed with caution. In other words, it cannot be assumed that a search of a proprietary criminal database by itself will show that a person either is or is not a criminal, but these databases are outstanding secondary tool to do a much wider search."

3. Criminal Records Book, The Complete Guide to the Legal Use of Criminal Records, author Derek Hinton, published 2002
   Page 72: "Database Caveats" "As you can see, database searches can be a powerful tool in criminal record searches. However, they are supplemental and not a substitute."
   Page 72-3: "Shortcomings of Vendor Criminal History Databases" Excerpts from an article written by Lester S. Rosen: To summarize, Mr. Rosen in the article outlines various reasons why these searches should be ancillary and employers should proceed with caution including issues of Completeness, Name Variations, and Timeliness. He quotes on page 73: "…for reporting purposes, the records that are actually reported may be incomplete or lack sufficient detail about the offense or the subject."



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

4. <u>Criminal Records Manual, The Complete National Reference for the Legal Access and Use of Criminal Records</u>, author Derek Hinton, published 2004
   Page 87-89 addresses databases as Mr. Hinton did in his previous book

5. <u>Business Background Investigations, Tools and Techniques for Solution Driven Due Diligence</u>, author Cynthia Hetherington, published 2007
   Page 107: "There are a number of vendors who have assembled a proprietary database of criminal record data. While these database searches are low cost and quite useful, they should be only considered as supplemental."

6. <u>Ground Rules on Background Checks</u>, by Susan J. Wells, article published by HR Magazine February 2008
   The article identifies a 2004 study by criminology researcher Shawn Bushway of the University of Maryland Population Research Center whereby in a test he conducted to research 120 individuals with documented criminal records using a database; he found that only 56 names came back showing any criminal record. The article further indicates that multi-jurisdictional databases are to be considered to be backup or secondary tools.
   "…shortcomings are well-known in the background-screening industry, but employers need to be just as knowledgeable about the limitations of data they purchase."

## X. WAS VI NEGLIGENT IN ADHEARING TO INDUSTRY STANDARDS AND PRACTICES?

It is my conclusion based on the facts presented and my extensive experience in the background screening industry that VI was not negligent in this regard as it is clear that the company had procedures in place which required that if a criminal conviction was found using their NCRL (database search) program, an independent search of the COUNTY criminal records in addition to such database search was required prior to reporting the information to their client.

Further, it is clear, that should a VI report be disputed, VI would act professional and expedicially in doing everything in its power to further research and correct in the most timely manner any error within its report.

This is exactly how VI handled this situation.

## XI. SUMMARY

It is my professional opinion that Defendant VI was NOT, either directly or by and through its agents, servants, and employees, negligent or was responsible for negligent acts and/or omissions; and performed its services in accordance with the same prudence and integrity which other employment screening service providers would have provided under their ordinary and similar circumstances.

1. VI is a national background screening firm offering many services to employers. Services include many searches; however, as with all background screening companies, the final determination of what services are accessed is their client, the employer, who chooses to background check a job applicant.



## Nadell Investigations

*The expert in the legal issues surrounding background screening*

2. NESC was acting as an employer when it sought to employ Deborah Adams.

3. In my opiniion, VI was not negligent in providing criminal history information to NESC as suggested, as VI reported only that a person of similar name and matching date of birth had a criminal conviction. On an exhibit marked 22, the report specifically indicated:

"***NOTE: The following case is located under: Debra Jean Adams with a matching date of birth."

Further, it is my opinion that VI would have been negligent if they had not reported the similar name and matching date of birth information to NESC.

4. VI followed all required procedures as outlined by the FCRA under §613(a)(2); and it was up to the employer NESC to follow adverse action rules which was not done in this case.

5. VI acted responsibly and professionally when it quickly reinvestigated the allegation by Ms. Adams that the report issued was in error and well within the required time allowed, corrected their report and advised NESC and Ms. Adams.

## XII.  CONCLUSION

In conclusion, based upon my professional experience, training and knowledge, and a careful review of the material and evidence described herein, I have concluded that VI did meet it's obligation to NESC and provided a report which, if used properly on May 8th. when received NESC, should have led to NESC following adverse action procedures and allowed Ms. Adams to dispute the findings in the report before NESC notified NU. If these proper procedures were accomplished, based upon the fast, professional, and accurate followup of VI, the correct report of May 10th could have been relayed to NU and Ms. Adams could have been hired.

Should additional information be provided to me for my consideration during discovery or by some other appropriate means, I may choose to alter the conclusions and opinions stated herein and respectfully reserve my right to do so.

Respectfully,

Barry J. Nadell
Barry J. Nadell Investigation Services
CA PI: 23883
BJN/
Enclosures



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

**Addendum to this Report**

### Exerpts from the federal Fair Credit Reporting Act 15 U.S.C. § 1681 et seq

**§ 603. Definitions; rules of construction [15 U.S.C. § 1681a]**

(a) Definitions and rules of construction set forth in this section are applicable for the purposes of this title.

(b) The term "person" means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity.

(c) The term "consumer" means an individual.

(d) **Consumer report.**

(1) In general. The term "consumer report" means <u>any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for</u>

(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) <u>employment purposes;</u> or

(e) The term **"investigative consumer report"** means a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is <u>obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information. However, such information shall not include specific factual information on a consumer's credit record</u> obtained directly from a creditor of the consumer or from a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer.

(k) Adverse action.

(1) Actions included. The term "adverse action"

(A) has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act; and

(B) means

(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;

(ii) <u>a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;</u>

(iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D) [§ 1681b]; and

(iv) an action taken or determination that is

(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 604(a)(3)(F)(ii)[§ 1681b]; and

(II) adverse to the interests of the consumer.

(2) Applicable findings, decisions, commentary, and orders. For purposes of any determination of whether an action is an adverse action under paragraph (1)(A), all appropriate final findings, decisions, commentary, and orders issued

 **Nadell Investigations**

*The expert in the legal issues surrounding background screening*

under section 701(d)(6) of the Equal Credit Opportunity Act by the Board of Governors of the Federal Reserve System or any court shall apply.

## § 604. Permissible purposes of consumer reports [15 U.S.C. § 1681b]

(b) Conditions for furnishing and using consumer reports for employment purposes.

(3) Conditions on use for adverse actions.

(A) In general. Except as provided in subparagraph (B), in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates--

(i) a copy of the report; and
(ii) a description in writing of the rights of the consumer under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).

## § 606. Disclosure of investigative consumer reports [15 U.S.C. § 1681d]

(a) Disclosure of fact of preparation. A person may not procure or cause to be prepared an investigative consumer report on any consumer unless

(1) it is clearly and accurately disclosed to the consumer that an investigative consumer report including information as to his character, general reputation, personal characteristics and mode of living, whichever are applicable, may be made, and such disclosure

(A) is made in a writing mailed, or otherwise delivered, to the consumer, not later than three days after the date on which the report was first requested, and

(B) includes a statement informing the consumer of his right to request the additional disclosures provided for under subsection (b) of this section and the written summary of the rights of the consumer prepared pursuant to section 609(c) [§ 1681g]; and

(2) the person certifies or has certified to the consumer reporting agency that

(A) the person has made the disclosures to the consumer required by paragraph (1); and
(B) the person will comply with subsection (b).

(b) Disclosure on request of nature and scope of investigation. Any person who procures or causes to be prepared an investigative consumer report on any consumer shall, upon written request made by the consumer within a reasonable period of time after the receipt by him of the disclosure required by subsection (a)(1) of this section, make a complete and accurate disclosure of the nature and scope of the investigation requested. This disclosure shall be made in a writing mailed, or otherwise delivered, to the consumer not later than five days after the date on which the request for such disclosure was received from the consumer or such report was first requested, whichever is the later.

(c) Limitation on liability upon showing of reasonable procedures for compliance with provisions. No person may be held liable for any violation of subsection (a) or (b) of this section if he shows by a preponderance of the evidence that at the time of the violation he maintained reasonable procedures to assure compliance with subsection (a) or (b) of this section.

(d) Prohibitions.

(1) Certification. A consumer reporting agency shall not prepare or furnish investigative consumer report unless the agency has received a certification under subsection (a)(2) from the person who requested the report.
(2) Inquiries. A consumer reporting agency shall not make an inquiry for the purpose of preparing an investigative consumer report on a consumer for employment purposes if the making of the inquiry by an employer or prospective employer of the consumer would violate any applicable Federal or State equal employment opportunity law or



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

regulation.

**(3) Certain public record information.** Except as otherwise provided in section 613 [§ 1681k], a consumer reporting agency shall not furnish an investigative consumer report that includes information that is a matter of public record and that relates to an arrest, indictment, conviction, civil judicial action, tax lien, or outstanding judgment, unless the agency has verified the accuracy of the information during the 30-day period ending on the date on which the report is furnished.

(4) Certain adverse information. A consumer reporting agency shall not prepare or furnish an investigative consumer report on a consumer that contains information that is adverse to the interest of the consumer and that is obtained through a personal interview with a neighbor, friend, or associate of the consumer or with another person with whom the consumer is acquainted or who has knowledge of such item of information, unless

(A) the agency has followed reasonable procedures to obtain confirmation of the information, from an additional source that has independent and direct knowledge of the information; or

(B) the person interviewed is the best possible source of the information.

## § 611. Procedure in case of disputed accuracy [15 U.S.C. § 1681i]

(a) Reinvestigations of disputed information (also see Exhibit 7).

(1) Reinvestigation required.

(A) In general. If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

(B) Extension of period to reinvestigate. Except as provided in subparagraph (C), the 30-day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30-day period that is relevant to the reinvestigation.

(C) Limitations on extension of period to reinvestigate. Subparagraph (B) shall not apply to any reinvestigation in which, during the 30-day period described in subparagraph (A), the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.

(2) Prompt notice of dispute to furnisher of information.

(A) In general. Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer.

(B) Provision of other information from consumer. The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

(3) Determination that dispute is frivolous or irrelevant.

 **Nadell Investigations**

*The expert in the legal issues surrounding background screening*

(A) In general. Notwithstanding paragraph (1), a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.

(B) Notice of determination. Upon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the agency.

(C) Contents of notice. A notice under subparagraph (B) shall include

(i) the reasons for the determination under subparagraph (A); and

(ii) identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

(4) Consideration of consumer information. In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information.

(5) Treatment of inaccurate or unverifiable information.

(A) In general. If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation.

(B) Requirements relating to reinsertion of previously deleted material.

(i) Certification of accuracy of information. If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

(ii) Notice to consumer. If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.

(iii) Additional information. As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion

(I) a statement that the disputed information has been reinserted;
(II) the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and

(III) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

C) Procedures to prevent reappearance. A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i)).



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

D) Automated reinvestigation system. Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

(6) Notice of results of reinvestigation.

(A) In general. A consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency.

(B) Contents. As part of, or in addition to, the notice under subparagraph (A), a consumer reporting agency shall provide to a consumer in writing before the expiration of the 5-day period referred to in subparagraph (A)

(i) a statement that the reinvestigation is completed;

(ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation;

(iii) a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available;

(iv) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information; and

(v) a notice that the consumer has the right to request under subsection (d) that the consumer reporting agency furnish notifications under that subsection.

(7) Description of reinvestigation procedure. A consumer reporting agency shall provide to a consumer a description referred to in paragraph (6)(B)(iii) by not later than 15 days after receiving a request from the consumer for that description.

(8) Expedited dispute resolution. If a dispute regarding an item of information in a consumer's file at a consumer reporting agency is resolved in accordance with paragraph (5)(A) by the deletion of the disputed information by not later than 3 business days after the date on which the agency receives notice of the dispute from the consumer in accordance with paragraph (1)(A), then the agency shall not be required to comply with paragraphs (2), (6), and (7) with respect to that dispute if the agency

(A) provides prompt notice of the deletion to the consumer by telephone;
(B) includes in that notice, or in a written notice that accompanies a confirmation and consumer report provided in accordance with subparagraph (C), a statement of the consumer's right to request under subsection (d) that the agency furnish notifications under that subsection; and

(C) provides written confirmation of the deletion and a copy of a consumer report on the consumer that is based on the consumer's file after the deletion, not later than 5 business days after making the deletion.

(b) Statement of dispute. If the reinvestigation does not resolve the dispute, the consumer may file a brief statement setting forth the nature of the dispute. The consumer reporting agency may limit such statements to not more than one hundred words if it provides the consumer with assistance in writing a clear summary of the dispute.

(c) Notification of consumer dispute in subsequent consumer reports. Whenever a statement of a dispute is filed, unless there is reasonable grounds to believe that it is frivolous or irrelevant, the consumer reporting agency shall, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof.



# Nadell Investigations

*The expert in the legal issues surrounding background screening*

(d) Notification of deletion of disputed information. Following any deletion of information which is found to be inaccurate or whose accuracy can no longer be verified or any notation as to disputed information, the consumer reporting agency shall, at the request of the consumer, furnish notification that the item has been deleted or the statement, codification or summary pursuant to subsection (b) or (c) of this section to any person specifically designated by the consumer who has within two years prior thereto received a consumer report for employment purposes, or within six months prior thereto received a consumer report for any other purpose, which contained the deleted or disputed information.

### § 613. Public record information for employment purposes [15 U.S.C. § 1681k]

(a) In general. A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall

(1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or

(2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

# **EXHIBIT I**

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **DEBORAH ADAMS,** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | **3:07CV01035 (JCH)** |
| | : | |
| **V.** | : | |
| | : | |
| **NATIONAL ENGINEERING** | : | |
| **SERVICE CORPORATION and** | : | **February 29, 2008** |
| **VERIFICATIONS INC.** | : | |
| **Defendants** | : | |

## MOTION ON CONSENT FOR MODIFICATION
## OF SCHEDULING ORDER/CASE MANAGEMENT PLAN

Pursuant to the Federal Rules of Civil Procedure, and the Local Rules of this Court, the

Plaintiff, Deborah Adams, respectfully moves for modification of the current scheduling order in

this matter, which would extend the deadline for the completion of discovery and all subsequent

deadlines by three months.  In support of this motion, the Plaintiff respectfully submits that good

cause is established based on the following:

1. Pursuant to the Court's current Scheduling Order dated January 16,
   2008, the following relevant deadlines are presently in effect: (a)
   Damages Analysis due by March 1, 2008; (b) Plaintiff's expert(s)
   report due by March 1, 2008; (c) Deposition of Plaintiff's expert(s)
   completed by April 15, 2008; (d) Defendants' expert(s) report due by
   April 15, 2008; (e) Joint Status Report due by April 16, 2008;

**ORAL ARGUMENT IS NOT REQUESTED/ TESTIMONY IS NOT REQUIRED**

1

(f) Deposition of Defendants' expert(s) completed by May 30, 2008; (g)

Discovery completed by May 30, 2008; (h) Dispositive Motions due by

July 14, 2008.; and (i) Joint Trial Memorandum due by July 14, 2008

2.  Katalin Demitrus of Madsen, Prestley & Parenteau has been one of the

lead attorneys representing the Plaintiff in this matter.  Towards the end

of January, 2008, Ms. Demitrus went out on a medical leave of absence

due to a serious medical condition.  Ms. Demitrus continues on said

leave of absence and it is not known when she will be returning from

her medical leave.

3.  As a result of Ms. Demitrus' absence, a substantial number of files

previously handled by Ms. Demitrus have been redistributed among

other attorneys at the firm.  This in turn has stretched available

resources and necessitated the adoption of more realistic scheduling

parameters in order to attend to necessary deadlines and attention to

discovery and motion practice.

4.  Additionally, there was an unforeseen delay in the appearance of

counsel for Defendant National Engineering Services Corporation

("NESC").  Initially, in conjunction with serving NESC with the

Complaint, Plaintiff's counsel received information from NESC's

counsel in New Hampshire that NESC would be represented in this

matter by Attorney Donald Bowers of Alfred Belinkie & Associates in

Bridgeport, Connecticut.

5. Accordingly, Plaintiff's counsel contacted Attorney Bowers, who confirmed that he would be representing Defendant National Engineering Service Corporation in this matter. Plaintiff then served the complaint, pretrial orders, and Notice of Lawsuit and Request for Waiver of Service of Summons to Attorney Bowers on behalf of Defendant National Engineering Service Corporation.

6. On October 17, 2007, Plaintiff also moved the Court for an extension of time to confer and file a report pursuant to the requirements of Rule 26(f). (Doc. No. 8.) In said motion, Plaintiff reported her efforts to effect service on Defendant National Engineering Service Corporation to the Court. (Doc. No. 8, ¶¶ 5-8.)

7. As of November 9, 2007, Attorney Bowers had still not entered an appearance on behalf of Defendant National Engineering Service Corporation, or returned the signed Waiver of Service of Summons. Therefore, Plaintiff's counsel contacted Attorney Bowers on that date by telephone, and Attorney Bowers confirmed to Plaintiff's Counsel that he would be entering an appearance and answering the complaint the following week of November 12 through November 16, 2007.

8. On November 9, 2007, Plaintiff moved the Court for a second extension of time to comply with the requirements of Rule 26(f) until November 16, 2007. (Doc. No. 12.) In that motion, Plaintiff again reported to the Court the representations made by Attorney Donald

3

Bowers in connection with his intent to respond to the complaint on

behalf of Defendant National Engineering Service Corporation in this

matter. (Doc. No. 12, ¶¶ 5-7.)

9.  Plaintiff's counsel contacted Attorney Donald Bowers by telephone and

e-mail in November and December 2007 requesting that he enter his

appearance on behalf of Defendant National Engineering Service

Corporation, return the signed Waiver of Service of Summons, and

Answer the Complaint. Each time that Plaintiff's counsel was able to

speak with Attorney Bowers, he represented that he would file those

documents on behalf of Defendant National Engineering Service

Corporation within days.

10. In December 2007, in response to one of those inquiries by Plaintiff's

Counsel, Attorney Bowers advised that Attorney Alfred Belinkie was

recently deceased and that he had been busy assuming responsibility for

some of Attorney Belinkie's files. Under the circumstances, Plaintiff's

counsel felt obliged to give Attorney Bowers additional time.

11. On January 2, 2008, Plaintiff's counsel attempted to contact Attorney

Bowers again by telephone, but was unsuccessful.

12. On January 4, 2008, Plaintiff's Counsel attempted to contact Attorney

Bowers again to advise that it was necessary for him to return a signed

Waiver of Service of Summons by the end of the day. At that time,

however, Plaintiff's counsel was informed by a Paralegal ("Diana")

made several attempts to contact Defendant National Engineering

Service Corporation's lawyer in New Hampshire, Attorney Loen, but

that he had not received a response to date.

5

employed in the offices of Alfred Belinkie and Associates that Attorney

Bowers was no longer with the firm. Plaintiff's counsel advised

"Diana" of the history of communications with Attorney Bowers and

requested that another attorney in the office indicate whether the firm

was still intending to represent Defendant National Engineering Service

Corporation in this matter.

13. Later in the afternoon on January 4, 2008, Plaintiff's counsel received

a telephone call from Attorney Robert Weinstein of East Hartford, CT.

Attorney Weinstein indicated that he was representing the Belinkie

family in the wake of the passing of Alfred Belinkie. Specifically,

Attorney Weinstein stated that the law firm of Alfred Belinkie and

Associates was closing as a result of Alfred Belinkie's death and he was

14. Due to these delays, counsel for Defendant NESC did not enter an appearance until January 24, 2008 (Doc. No. 22)—a week after this Court issued a Scheduling Order in this matter. Within two weeks thereafter, Plaintiff's counsel served discovery on Defendant NESC, who recently indicated that it will be seeking an extension of time by which to respond to Plaintiff's First Set of Interrogatories and Requests for Production of Documents. As of the present date, Plaintiff has not received Defendant's responses.

15. Plaintiff was similarly diligent in serving Defendant Verifications, Inc. with discovery. Specifically, in December, 2007—prior to the entry of the Scheduling Order in this case—Plaintiff served her First Set of Interrogatories and Requests for Production of Documents, dated December 20, 2007. As of the present date, Defendant Verifications, Inc. has not served its response on Plaintiff.

16. Therefore, Plaintiff has been diligent in pursuing written discovery with both defendants, but to date has not received any responses to her discovery requests from either defendant.

17. Due to the fact that discovery responses have not yet been received, depositions have not been conducted. It is Plaintiff's intention, notwithstanding the reduced staffing at Madsen, Prestley & Parenteau due to the fact that Attorney Demitrus is out on an extended medical

6

leave of absence, to promptly schedule depositions as soon as discovery responses have been received from Defendants.

18. In light of the aforementioned circumstances, Plaintiff has been unable to compile the information and data that would be required by a liability and/or damages expert in order conduct an appropriate analysis and generate a report. Accordingly, Plaintiff needs additional time in which to produce experts(s) reports.

19. The undersigned respectfully submits that three months is a very conservative estimate by which to conclude discovery in this matter, inasmuch as there are not only the aforementioned circumstances with which the parties must contend, but there are two defendants in this matter, out-of state depositions to be conducted, and cross-claims filed in this matter between the defendants.

20. Today, February 29, 2008, the undersigned spoke with Attorney Coffey, counsel for Defendant Verifications, Inc., as well as Attorney William Kupinse, counsel for Defendant NESC, regarding this requested modification. Both counsel graciously consented to this Motion.

21. With the requested modifications, the following deadlines would apply: (a) Damages Analysis due by June 1, 2008; (b) Plaintiff's expert(s) report due by June 1, 2008; (c) Deposition of Plaintiff's expert(s) completed by July 15, 2008; (d) Defendants' expert(s) report due by

7

July 15, 2008; (e) Joint Status Report due by July 16, 2008; (f)

Deposition of Defendants' expert(s) completed by August 31, 2008; (g)

Discovery completed by August 31, 2008; (h) Dispositive Motions due

by October 14, 2008.; and (i) Joint Trial Memorandum due by October

14, 2008

   WHEREFORE, Plaintiff respectfully requests that the current

Scheduling Order be modified as requested herein.

     THE PLAINTIFF,
     Deborah Adams


     ___/s/William G. Madsen_____
     William G. Madsen, Esq. (ct09853)
     Madsen, Prestley & Parenteau, LLC
     44 Capitol Avenue, Suite 201
     Hartford, CT  06106
     Tel. No.: (860)-246-2466
     Fax No.: (860)-246-1794
     Email: wmadsen@mppjustice.com

9

**CERTIFICATION OF SERVICE**

    I hereby certify that on the 29th day of February, 2008 a copy of foregoing Consent Motion to Modify/Extend The Scheduling Order and Case Management Plan was filed electronically and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

      /s/William G. Madsen

      William G. Madsen, Esq. (ct09853)
      Madsen, Prestley & Parenteau, LLC
      44 Capitol Ave., Suite 201
      Hartford, CT 06106
      (860) 246-2466 (tel.)
      (860) 246-1794 (fax)
      **wmadsen@mppjustice.com**

# EXHIBIT J

2165318.1

**Zimmerman, Kevin**

| | |
|---|---|
| **From:** | CMECF@ctd.uscourts.gov |
| **Sent:** | Tuesday, October 28, 2008 4:58 PM |
| **To:** | CMECF@ctd.uscourts.gov |
| **Subject:** | Activity in Case 3:07-cv-01035-JCH Adams v. National Engineering Svc Corp, et al Order on Motion to Preclude |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### United States District Court for the District of Connecticut

## Notice of Electronic Filing

The following transaction was entered on 10/28/2008 at 4:57 PM EDT and filed on 10/28/2008
**Case Name:** Adams v. National Engineering Svc Corp, et al
**Case Number:** 3:07-cv-1035
**Filer:**
**Document Number:** 66(No document attached)

**Docket Text:**
**ORDER denying [57] Motion to Preclude Testimony and Report of Defendant. Plaintiff is given until 11/15/08 to depose defendant's expert and until 12/8/08 to oppose defendant's Motion for Summary Judgment. Defendant's reply is now due 12/22/08. SO ORDERED by Judge Janet C. Hall on 10/27/08. (DeRubeis, B.)**

**3:07-cv-1035 Notice has been electronically mailed to:**

William J. Kupinse, Jr kupinsew@goldsteinandpeck.com

William G. Madsen wmadsen@mppjustice.com, jparenteau@mppjustice.com, kdemitrus@mppjustice.com, mmunoz@mppjustice.com, ssinkoski@mppjustice.com

Michael William Coffey CoffeyM@wemed.com, alexander.gizzo@wilsonelser.com, kevin.zimmerman@wilsonelser.com

Todd D. Steigman tsteigman@mppjustice.com, jparenteau@mppjustice.com, mmunoz@mppjustice.com, vwilloughby@mppjustice.com

Katalin A. Demitrus kdemitrus@mppjustice.com, dgay@mppjustice.com, jparenteau@mppjustice.com

**3:07-cv-1035 Notice has been delivered by other means to:**