## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DEBORAH ADAMS | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO: |
| v. | : | 07-cv-1035 (JCH) |
| | : | |
| NATIONAL ENGINEERING SERVICE | : | |
| CORPORATION, ET AL. | : | MAY 27, 2009 |
| Defendants. | : | |

### RULING RE: DEFENDANTS'
### MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 51 & 65)

**I.    INTRODUCTION**

This suit revolves around an action brought by plaintiff Deborah Adams against

defendants National Engineering Service Corporation ("NESC") and Verifications, Inc.

("Verifications") for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq.,

(the "FCRA") and violations of Connecticut common law.  Adams is a resident of West

Hartford, Connecticut.  NESC is a staffing agency with its principal place of business in

Portsmouth, New Hampshire.  Verifications, which has its principal place of business in

Minneapolis, Minnesota, is a company that provides background checks and other

employment screening services.

Adams alleges that NESC and Verifications caused Northeast Utilities Service

Company ("NU"), her potential employer, to believe that she has a criminal history when

she does not, thereby causing her various injuries.  Adams brings 14 causes of action

in the present suit: nine against NESC and five against Verifications.  Additionally,

NESC and Verifications assert cross-claims against one another, each alleging that

Adams' injuries, if any, are the result of the other's misconduct.

-1-

Both NESC (Doc. No. 51) and Verifications (Doc. No. 65) have moved for summary judgment as to all of Adams' claims, as well as to the cross-claims filed by Verifications against NESC.  For the reasons stated below, the defendants' Motions for Summary Judgment are granted in part and denied in part.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### III.    BACKGROUND[1]

A.    The Contract/Temporary Hiring Process at Northeast Utilities

The factual background of this suit is largely undisputed.  Northeast Utilities

Service Company ("NU") contracted with The Guidant Group, Inc., f/k/a Comensura,

("Guidant") to oversee its temporary contractual hiring.  See NESC's Local Rule

56(a)(1) Statement, Doc. No. 51-2, at ¶ 2.  Under the contract, Guidant received orders

for contract employees from NU and submitted the orders to one of 40 or more staffing

agencies that were a part of Guidant's program.  See Verifications L. R. 56(a)(1) Stmt.,

Doc. No. 65-2, at ¶ 5.  Defendant NESC – a staffing agency that provides engineers,

information technology specialists, and other professional support personnel on a

contract/temporary basis to its client companies – was one of the staffing agencies in

the Guidant program.  See id. at ¶ 6; NESC's L.R. 56(a)(1) Stmt. at ¶ 1.

At all times relevant to this action, when a staffing agency received an order from

NU through Guidant, the agency submitted candidate resumes to Guidant, which

reviewed the resumes and forwarded them to hiring managers at NU.  See id. at ¶ 4.

The hiring managers at NU decided which candidates to interview and which, if any, to

hire.  See id. at ¶¶ 5, 6.  Once NU hiring managers selected a candidate, NU informed

Guidant and Guidant informed the relevant staffing agency.    See Verifications' L.R.

56(a)(1) Stmt. at ¶ 9.  The staffing agency then made an offer of temporary employment

to the candidate, contingent upon the results of a background check and drug

---

[1] For the purposes of the instant motion, the court accepts facts undisputed by the parties and supported by evidence as true, and resolves disputed facts in favor of the nonmoving party where there is evidence to support her allegations.

screening test.  <u>See</u> Verifications' L.R. 56(a)(1) Stmt. at ¶¶ 9, 10.

       B.    <u>Adams' Application Process</u>

Adams applied for a contract analyst position at NU through the employment

website www.careerbuilder.com.  <u>See</u> Deposition Testimony of Deborah Adams

("Adams Depo."), Exhibit A to NESC's Memorandum in Support of its Motion to Dismiss

("Mem. in Supp.") and Exhibit E to Verifications' Mem. in Supp., at 47-48.  On March

29, 2007, Larry O'Keefe of NESC submitted Adams' resume to Guidant.  <u>See</u> Affidavit

of Larry O'Keefe ("O'Keefe Affidavit"), Exhibit B to NESC's Mem. in Supp., at ¶ 3.

Subsequently, Kathy Shapleigh, a Senior Contingent Resource Consultant at Guidant,

forwarded Adams' resume to NU.  <u>See</u> Deposition Testimony of Kathy Shapleigh

("Shapleigh Depo."), Exhibit C to NESC's Mem. in Supp., at 10.  A hiring manager at

NU reviewed Adams' resume and contacted Shapleigh to set up an interview.  <u>See id.</u>

at 10-11.

On April 13, 2007, O'Keefe informed Adams by e-mail that she was to interview

with NU's Byron Maddox at 9:00 a.m. on April 19, 2007.  <u>See</u> E-mail, Exhibit 1 to

NESC's Mem. in Supp.  Following Adams' interview with Maddox, NU contacted

Guidant to offer Adams the position.  <u>See</u> Verifications L.R. 56(a)(1) Stmt. at ¶ 16.

After receiving instruction from NU, Guidant contacted NESC and advised NESC to

make the offer.  <u>See id.</u> at ¶ 17.  O'Keefe called Adams and offered her the NU job,

contingent upon Adam's passing a background check and drug screening test.  <u>See id.</u>

at ¶ 18.  Adams orally accepted the offer.  <u>See id.</u> at ¶ 19.

Throughout this application process, Adams was working as a 30-day contract

employee for C.B. Richard Ellis through the staffing agency Legal Now.  <u>See</u> NESC's

L.R. 56(a)(1) Stmt. at ¶¶ 23, 24.  After accepting the offer from NU, Adams gave C.B. Richard Ellis notice that she would be leaving the company before her 30-day position ended.  <u>See id.</u> at ¶ 25.  Adams was scheduled to start at NU on May 14, 2007.  <u>See</u> Adams Depo. at 114.

       C.    <u>Adams' Background Check</u>

In late April 2007, NESC sent Adams an "employee sign-up package" which contained an array of pre-employment paperwork including, <u>inter alia</u>, a form titled "Consumer Report/Investigative Consumer Report Disclosure and Release of Information Authorization" and a form titled "Consumer Report/Drug Test Release." <u>See</u> Exhibits F, G, H to NESC's Mem. in Supp.  Adams signed both forms on May 2, 2007, thereby: (1) acknowledging that she needed to take and pass a drug test and background check in order to be eligible for the NU assignment; and (2) authorizing NESC and Verifications to perform a background investigation, prepare a report summarizing the information collected, and transmit the information electronically.  <u>See id.</u>

After receiving the signed forms from Adams, Maura Demars, a NESC employee, entered Adams' information into Verifications' online system.  <u>See</u> Verifications' L.R. 56(a)(1) Stmt. at ¶ 28.  Demars supplied Verifications with Adams' first name, last name, social security number, home address, and date of birth.  <u>See</u> NESC's L.R. 56(a)(1) Stmt. at ¶ 38.

Upon receiving Adams' information from NESC, Verifications searched a database of criminal records collected and maintained by a third-party, National

Background Data, using Adams' name and date of birth.  See Verifications' L.R. 56(a)(1) Stmt. at ¶ 29.  Based on the results of this search, Verifications identified several possible criminal records which, it believed, could belong to Adams.  See id. at ¶ 30.

Verifications subsequently contacted a field researcher in order to obtain additional research on the possible records matches.  See id. at ¶ 31.  The field researcher searched court records in Pittsylvania County, Virginia and produced a report based on those records.  See id. at 32.  The report, which the field researcher sent to Verifications, indicated that "Debra Adams" and "Debra Jean Adams," both sharing the plaintiff's date of birth, had felony and misdemeanor convictions in Pittsylvania County.  See id. at 33; see also Court Search Record, Exhibit L to NESC's Memo in Supp.

On Tuesday, May 8, 2007, Verifications provided a summarized version of the field researcher's report to NESC.  See Verifications' L.R. 56(a)(1) Stmt. at ¶ 34.  At approximately 3:49 p.m. that day, Chris Sullivan, an NESC employee, e-mailed Kathy Shapleigh at Guidant concerning Adams' background check.  In the e-mail, Sullivan stated that, "[t]he item below explains why the background has been dragging on.  This is not good at all."  See E-mail, Exhibit M to NESC's Mem. in Supp.  The e-mail also included the following information:

Applicant CONCERN for Deborah Adams.

. . .

Please note that the following criminal background search has rendered a FELONY record.  The following has a CONCERN.

APPLICANT NAME: ADAMS, DEBORAH.
ORDER NO: 2597285.
SOURCE: VIRGINIA/PITTSYLVANIA.

. . .

COMMENTS: A criminal record search must be conducted by a researcher or court clerk at this location.   The information was requested on 05/04/07 and will be forwarded upon receipt.

. . .

05/08/07 Verification Completed.

***NOTE: The following case is located under: Debra Adams with a matching date of birth.
Case number: #GT99003696-00
04/21/99 Driving under revocation/suspended operator license (Misdemeanor)
05/18/99 Guilty
Sentence: 10 days jail suspended, 30 days operator license suspended, $100.00 fine and $30.00 costs

. . .

***NOTE: The following case is located under Debra Jean Adams with a matching date of birth.
Case number: #CR90000228-00-01-02
10/1/97 Welfare fraud (felony)
09/20/99 Guilty
Sentence: 2 years jail suspended 2 years supervised probation and $558.00 costs.
12/12/00 Failure to comply; 2 Years jail suspended and $231.00 costs.
09/23/03 Sentence/probation revoked; 2 Years jail and $549.00 costs.

Id.  After receiving this e-mail, at some point between 3:49 p.m. and 6:21 p.m. on May 8, 2007, Shapleigh contacted the relevant hiring manager at NU and stated that Adams was ineligible for the contract analyst position because she failed the background investigation.  See NESC's L.R. 56(a)(1) Stmt. at ¶ 54.  Shapleigh also noted in Guidant's computer system that Adams had failed the background check and that NU's

order for a contract analyst was still active and needed to be filled.  See Verifications
L.R. 56(a)(1) Stmt. at ¶ 42.

Unaware of these events, Adams called Sullivan at approximately 6 p.m. on May
8, 2007.  See id. at ¶ 36.  During this call, Sullivan told Adams for the first time that
there was an issue with her background check and asked Adams whether she thought
something would "come up" during the check.  See id. at ¶ 37; Deposition Testimony of
Christopher Sullivan ("Sullivan Depo."), Exhibit D to NESC's Mem. in Supp. at 12-13.
Adams then told Sullivan for the first time that she had had an employment background
investigation approximately one year earlier in which a number of criminal convictions
were falsely attributed to her.  See NESC's L.R. 56(a)(1) Stmt. at ¶ 50.  Adams also
indicated to Sullivan that she possessed proof that the convictions in question did not
belong to her.  See id.

During this conversation with Adams, at approximately 6:21 p.m., Sullivan sent
Shapleigh an e-mail notifying her that Adams was disputing the results of her
background investigation.  See id. at ¶ 52.  At approximately 6:25 p.m., Sullivan sent
Shapleigh another e-mail, this time indicating in bold typeface the portions of the 3:49
p.m. e-mail which might show that the criminal convictions reported did not belong to
Adams.  See id. at ¶ 53.  After receiving these communications, Shapleigh did not
inform NU that Adams was disputing the results of the background check because she
believed that Adams had already failed the background check, and further that she had
no ability to delay the termination of Adams' offer until a second background check
could be completed.  See id. at ¶ 55.

On Wednesday, May 9, 2007, NESC notified Verifications that Adams disputed

the results of her background check and sent Adams a copy of her background investigation report.  See id. at ¶¶ 56, 58.  The same day, Adams called and faxed Verifications directly, informing the company that she was disputing the results of the background investigation.  See Verifications L.R. 56(a)(1) Stmt. at ¶¶ 46, 47.  In response to the communications from NESC and Adams, on May 9, 2007, Verifications began further investigation of Adams' disputed background check.  See id, ¶¶ 48, 49.  Following this additional investigation, on Thursday, May 10, 2007, Verifications sent NESC a revised report on Adams, removing the criminal information contained in the earlier report.  See id. at ¶ 50.

On Friday, May 11, 2007, Verifications called Adams and advised her that it had corrected her background investigation report and informed NESC of the revised report.  See id. at ¶ 51.  On the same day, Chris Sullivan of NESC contacted Kathy Shapleigh at Guidant and advised her that Adams' background check had been corrected.  See id. at ¶ 52.  Shapleigh, in turn, e-mailed her contact at NU and informed NU that Adams' background check had been corrected and that Adams was eligible for employment.  See id. at 53.  As of the evening of May 11, 2007, the contract analyst position was still listed as open and had not been filled by another candidate.  See id. at 54.  Sometime after May 15, 2007, however, an NU hiring manager told Shapleigh that NU was pursuing an intern for the contract analyst position.  See id. at ¶¶ 55; Shapleigh Depo. at 32-36.  NU eventually cancelled the contract and never hired Adams.  See id. at ¶¶ 56.  Adams was not able to find steady work in the following months.  See Adams Depo. at 74-97, 102-105.  She lost her apartment, was separated from her son, and

suffered from anxiety and depression.  See id.

**IV.    ANALYSIS**

A.    FCRA Claims

The purpose of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. is to require that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. . . ."  15 U.S.C. § 1681(b).  In enacting the FCRA, Congress recognized "the crucial role that consumer reporting agencies play in collecting and transmitting consumer credit information, and the detrimental effects inaccurate information can visit upon both the individual consumer and the nation's economy as a whole."  Philbin v. Trans Union Corp., 101 F.3d 957, 962 (3rd Cir. 1996).  Accordingly, the FCRA regulates "consumer reporting agencies" in their preparation and dissemination of "consumer reports," and imposes civil liability upon consumer reporting agencies that willfully or negligently violate the statute.  See 15 U.S.C. § 1681, et seq.

In Counts One through Six of her Complaint, Adams alleges that NESC and Verifications violated sections 1681e(b) and 1681k of the FCRA.[2]  In Count Fourteen,

---

[2] Section 1681e(b) provides that, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).

Section 1681k states, in relevant part: "A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall: (1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such

Adams alleges that NESC violated section 1681b(b)(3).[3]  Both NESC and Verifications have moved for summary judgment as to these claims.  Accordingly, the court must determine whether a genuine issue of material fact exists as to the defendants' alleged violations of sections 1681e(b), 1681k, and 1681b(b)(3).  The claims against each defendant are addressed separately.

<ol style="list-style:none"><li>1.   FCRA Claims Against NESC</li></ol>

Before turning to Adams' specific FCRA claims against NESC, the court must address three preliminary issues raised by NESC in its Motion for Summary Judgment. First, NESC argues that it is not a "consumer reporting agency" as defined by the FCRA but rather a "joint user" of candidate background checks; therefore it is exempt from the requirements of the FCRA.  See NESC's Mem. in Supp. at 5-7.  Adams, on the other hand, contends that NESC fits the statutory definition of a consumer reporting agency and as a result must comply with FCRA requirements.

Under the Federal Trade Commission's Commentary on the FCRA (the "FTC Commentary"), "[e]ntities that share consumer reports with others that are jointly involved in decisions for which there are permissible purposes to obtain the reports may be 'joint users' rather than consumer reporting agencies."  Appendix, FTC Commentary,

---

information is being reported; or (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date.

[3] Adams' original Complaint contains only 13 causes of action.  See Complaint, Doc. No. 1, at 7-18.  In her Supplemental Opposition to NESC's Motion for Summary Judgment (Doc. No. 83), however, Adams asserted, for the first time, a fourteenth cause of action based on NESC's alleged violation of 15 U.S.C. § 1681b(b)(3).  NESC had the opportunity to address this new claim in its Reply (Doc. No. 84), but did not raise the issue of Adams' failure to actually plead this claim.  Therefore, the court construes the Complaint as containing such cause of action and addresses NESC's Motion for Summary Judgment on the newly-added claim.

16 C.F.R. 600, sec. 603(f)(8).  NESC argues that it was jointly involved in the decision

to hire Adams with NU and Guidant and therefore it is a "joint user" rather than a

consumer reporting agency.  <u>See</u> NESC's Mem. in Supp. at 17.  The court disagrees.

As far as this court is aware, only one federal court has adopted the theory upon

which NESC's argument rests.  In <u>Weidman v. Fed. Home Loan Mortg. Corp.</u>, 338 F.

Supp. 2d 571, 574 (E.D. Pa. 2004), the court relied on the FTC Commentary in holding

that the defendant, the Federal Home Loan Mortgage Corporation ("Freddie Mac"), was

not a consumer reporting agency because it "is not in the business of collecting and

storing . . . consumer credit information for distribution to a variety of users," but rather

shares consumer reports with a lender, its principal, and assists the principal by

evaluating the consumer's credit information.  <u>See id.</u>  This court, however, finds both

the <u>Weidman</u> decision and the FTC's Commentary on "joint users" unpersuasive.  <u>See</u>

<u>De La Mota v. United States Dep't of Educ.</u>, 412 F.3d 71, 80 (2d Cir. 2005) ("In contrast

to <u>Chevron</u> deference, <u>Skidmore</u> respect may be available to informal agency

interpretations, but the weight accorded to such interpretations depends on their

'thoroughness,' 'validity,' 'consistency,' and 'power to persuade'").

To begin, the FTC Commentary states that it is a "guideline" which "does not

have the force or effect of regulations or statutory provisions," and that "its contents

may be revised and updated as the Commission considers necessary or appropriate."

FTC Commentary, 16 C.F.R. 600, Intro 1.  Moreover, the court knows of nothing in the

FCRA or elsewhere which indicates that Congress intended to authorize the FTC to

create a "joint user" exception to the FCRA's definition of a consumer reporting agency.

In fact, such an exception strikes this court as contrary to the "ambitious objective"

Congress set out in the Act's statement of purpose.  See 15 U.S.C. § 1681(b); Safeco

Ins. Co. of Am. v. Burr, 551 U.S. 47, 62 (2007).  As a result, the court declines to follow

the FTC's Commentary, and rejects NESC's argument that it is merely a "joint user."

See Heintz v. Jenkins, 514 U.S. 291, 297 (1995) (declining to follow FTC Commentary

which created an exception to the Fair Debt Collection Practices Act ("FDCPA")

because "[t]he Commentary of which [the FTC statement creating the exception] is a

part says that it 'is not binding on the Commission or the public,'" and because the

Court could "find nothing either in the [FDCPA] or elsewhere indicating that Congress

intended to authorize the FTC to create . . . an exception that . . . falls outside the range

of reasonable interpretations of the Act's express language").

        Turning to Adams' argument that NESC is a consumer reporting agency, the

court begins by noting that the FCRA defines a "consumer reporting agency" as:

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit
> basis, regularly engages in whole or in part in the practice of assembling or
> evaluating consumer credit information or other information on consumers
> for the purpose of furnishing consumer reports to third parties, and which
> uses any means or facility of interstate commerce for the purpose of
> preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).  "Person," as used in the statute, is defined as "any individual,

partnership, corporation, trust, estate, cooperative, association, government or

governmental subdivision or agency, or other entity," and "consumer" is defined as "an

individual."  15 U.S.C. §§ 1681a(b) and (c).  The FCRA generally defines a "consumer

report" as:

> [A]ny written, oral, or other communication of any information by a consumer
> reporting agency bearing on a consumer's credit worthiness, credit standing,
> credit capacity, character, general reputation, personal characteristics, or
> mode of living which is used or expected to be used or collected in whole or

in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . (B) employment purposes . . . .

15 U.S.C. § 1681a(d)(1).

Based on the record before the court and these statutory definitions, NESC is a consumer reporting agency.  NESC is a staffing agency which, in exchange for a monetary fee, assembles and evaluates consumer reports relating to its job candidates (e.g., background investigation reports) for the purpose of furnishing these reports to third parties (e.g., Guidant) by means of interstate commerce (e.g., sending or receiving the reports electronically).  Therefore, NESC is bound by the requirements of the FCRA.

The second preliminary issue the court must address is NESC's argument that it is entitled to summary judgment on Adams' FCRA claims because, under 15 U.S.C. § 1681a(o)(1), NESC's communications with Guidant are exempt from the definition of a consumer report.  This argument is without merit.  Section 1681a(o)(1) of the FCRA excludes only certain "investigative consumer reports" from the definition of a "consumer report."  An "investigative consumer report," as defined by 15 U.S.C. § 1681a(e), is "a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews."  15 U.S.C. § 1681a(e) (emphasis added).  There is nothing in the record suggesting that either NESC or Verifications obtained any information on Adams through personal interviews.  Therefore, NESC's communications with Guidant do not constitute an "investigative consumer report" and do not fall under the exemption set out in 15 U.S.C. § 1681a(o)(1).

Finally, NESC argues that it is entitled to summary judgment on Counts One and Three of Adam's Complaint because it did not prepare Adams' background investigation.  <u>See</u> NESC's Mem. in Supp. at 24-26, 28-29.[4]  Rather, NESC contends that Verifications was wholly responsible for preparing the report NESC provided to Guidant.  The court disagrees.

The court knows of no binding authority interpreting section 1681e(b)'s use of the word "prepare," and thus turns first to the plain language of the statute.  <u>See United States v. Delis</u>, 558 F.3d 177, 180 (2d Cir. 2009) (in the statutory interpretation context, the court's analysis begins with the plain language of the statute).  The term "prepare" often indicates a combining of various elements.  <u>See</u> American Heritage Dictionary of the English Language (4th ed. 2000) ("<u>Prepare</u>: 1. To make ready beforehand for a specific purpose, as for an event or occasion: The teacher prepared the students for the exams. 2. <u>To put together or make by combining various elements or ingredients</u>; manufacture or compound: prepared a meal; prepared the lecture . . .") (emphasis added).  In this case, the record indicates that NESC's Chris Sullivan sent Guidant's Kathy Shapleigh the information collected by Verifications combined with his own evaluation of that information.  <u>See</u> E-mail, Exhibit M to NESC's Mem. in Supp. ("The item below explains why the background has been dragging on.  This is not good at all").  By combining his evaluation of Adams' purported criminal history with Verifications' report, Sullivan "prepared" the consumer report that Guidant would

_____

[4] Counts One and Three allege that NESC violated 15 U.S.C. § 1681e(b), which provides that, "[w]henever a consumer reporting agency <u>prepares</u> a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b) (emphasis added).

receive.  Thus, the court finds that, for the purposes of section 1681e(b), NESC

prepared the consumer report it furnished to Guidant.  See Wilson v. Prudential Fin.,

2009 U.S. Dist. LEXIS 26483 (D.D.C. 2009) (denying defendant's motion for summary

judgment on a section 1681e(b) claim where defendant provided plaintiff's potential

employer with an inaccurate criminal background report, despite the fact that a third-

party subcontractor, and not the defendant, investigated the report).

a.    Section 1681e(b) Claim

In Counts One and Three of her Complaint, Adams alleges that NESC violated

section 1681e(b) of the FCRA.  Specifically, in Count One, Adams alleges that NESC

willfully failed to comply with the requirements of section 1681e(b) and is therefore

civilly liable under section 1681n;[5] and in Count Three, Adams alleges that NESC

negligently failed to comply with the requirements of section 1681e(b) and is therefore

civilly liable under section 1681o.[6]

"In order to succeed on a claim under section 1681e(b), a plaintiff must show

that: (1) the consumer reporting agency was negligent or willful in that it failed to follow

reasonable procedures to assure the accuracy of its credit report; (2) the consumer

---

[5] Section 1681n states, in relevant part: "Any person who willfully fails to comply with any requirement imposed under [the FCRA] with respect to any consumer is liable to that consumer in an amount equal to the sum of (1) any actual damages sustained by the consumer as a result of the failure or damages of not less than $ 100 and not more than $ 1,000; . . . (2) such amount of punitive damages as the court may allow; and (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court."  15 U.S.C. § 1681n.

[6] Section 1681o states, in relevant part: "Any person who is negligent in failing to comply with any requirement imposed under this title [15 U.S.C. §§ 1681 et seq.] with respect to any consumer is liable to that consumer in an amount equal to the sum of (1) any actual damages sustained by the consumer as a result of the failure; and (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court."  15 U.S.C. § 1681o.

reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury." Gorman v. Experian Info. Solutions, Inc., 2008 U.S. Dist. LEXIS 94083, 12-13 (S.D.N.Y. Nov. 18, 2008) (quotation omitted). "[T]he threshold question is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." Houston v. TRW Info. Servs., Inc., 707 F. Supp. 689, 691 (S.D.N.Y. 1989); see also Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001). "If the information is inaccurate, plaintiff must then present some evidence that the credit reporting agency failed to follow reasonable procedures, as mandated by the statute in section[ ] 1681e(b) . . . ." Gorman, 2008 U.S. Dist. LEXIS 94083, 12-13. Whether the credit reporting agency followed reasonable procedures "will be a jury question in the overwhelming majority of cases." Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir. 1991).

In the present case, Adams has shown that a general issue of material fact exists as to each of the four elements her section 1681e(b) claims against NESC. First, a reasonable jury could conclude from the undisputed facts that NESC willfully or negligently failed to follow reasonable procedures to assure the accuracy of its credit report.[7] Specifically, a reasonable jury could find that NESC failed to follow reasonable

---

[7] It bears noting that, while the record contains no indication that NESC intentionally reported inaccurate information – in fact, the record shows that NESC took immediate steps to remedy the inaccuracies in its report once those inaccuracies came to light – the Supreme Court recently held that a defendant may be held liable for willfully failing to comply with the FCRA under 15 U.S.C. § 1681n for actions taken in "reckless disregard" of the statutory requirements of the Act. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 71 (2007). Moreover, the Supreme Court held that, as applied to section 1681n,"reckless disregard" is defined as "action entailing an unjustifiably high risk of harm that is either

procedures because, despite the fact that Verifications' report linked Adams to
convictions attributed to a person with a different name in a different state, NESC
furnished the report to Guidant without any further investigation.  Second, it is
uncontested that the convictions which NESC reported to Guidant did not belong to
Adams.  Third, a reasonable jury could find that Adams was injured when NU revoked
its contingent offer of employment for the contract analyst position.  Fourth, a
reasonable jury could find that NU would not have revoked its contingent offer but for
NESC's inaccurate attribution of various felony and misdemeanor convictions to
Adams.  As a result, the court cannot conclude as a matter of law that NESC is entitled
to summary judgment on Counts One and Three of Adams' Complaint.

b.      Section 1681k Claim

In Counts Two and Four of her Complaint, Adams' alleges that NESC willfully
and negligently violated section 1681k of the FCRA.  Section 1681k creates heightened
standards for procedures used to collect consumer information for employment
purposes.  To fall within this section, the consumer report in question must contain
matters of public record that are likely to have an adverse effect upon a consumer's
ability to obtain employment.  15 U.S.C. § 1681k.  In this case, the threshold
requirements for the application of this section are clearly met, as the information
concerning Adams' criminal history was reported for employment purposes, was a

_____

known or so obvious that it should be known." Id. at 68 (internal quotation omitted).
        In the present case, a reasonable jury could find that, in preparing a background investigation
report for Adams which included convictions pertaining to an individual with a different first name from a
different state, NESC created "an unjustifiably high risk of harm . . . so obvious that it should [have been]
known." Id.  Consequently, because the court cannot conclude as a matter of law that NESC did not act in
reckless disregard of the FCRA, NESC is not entitled to summary judgment as to Count One.

matter of public record, and was certainly likely to have an adverse impact on her. When a consumer reporting agency furnishes such a report, it is obligated to do one of two things: the agency must either (1) at the time the report is transmitted, notify the consumer that public record information is being reported; or (2) "maintain strict procedures designed to ensure that [the information] . . . is complete and up to date." 15 U.S.C. § 1681k(a)(1), (2).

NESC does not contest the fact that its report on Adams' criminal history information falls within this section.  Rather, NESC argues that it is entitled to summary judgment on Counts Two and Four because there exists no genuine issue of material fact that it both notified Adams on the same day it reported her criminal history information to Guidant and maintained strict procedures designed to ensure that the information reported was complete and up to date.  The court disagrees.

First, with respect to NESC's notification to Adams, the record is clear that NESC did not notify Adams at the time the report was transmitted.  NESC's first discussion of the alleged convictions with Adams took place hours after it had transmitted the report, and after Guidant's Kathy Shapleigh had told the NU hiring manager that Adams was ineligible for the contract analyst position because she had failed the background investigation.  See NESC's L.R. 56(a)(1) Stmt. at ¶ 54.  Moreover, NESC notified Adams only after it realized its report may be inaccurate.  See Sullivan Depo. at 12-13. What is more, there is nothing in the record which suggests that NESC would have notified Adams on May 8 if Adams had not happened to call NESC to discuss her application.

While the court knows of no binding authority directly interpreting section

-19-

1681k(a)(1)'s requirement that a consumer reporting agency notify the consumer "at the time" derogatory public record information is reported, at least one court has interpreted "at the time" to mean "at the same time."  See Poore v. Sterling Testing Sys., 410 F. Supp. 2d 557, 572 (E.D. Ky. 2006) ("There is no evidence in the record that [the consumer reporting agency] ever notified [the plaintiff] that it would be reporting the DUI conviction to [the potential employer], let alone that such communication occurred at the same time that [the consumer reporting agency] notified [the potential employer] of the DUI") (emphasis added).  In this case, however, the court need not address whether section 1681(a)(1) requires simultaneous notification and reporting because NESC's notification was clearly inadequate.

While the plain language of section 1681k(a)(1) may leave open the question of precisely when a consumer reporting agency must notify a consumer (e.g., is consumer notification within three hours of electronic transmission of a report a notification "at the time" of the transmission for purposes of section 1681k(1)?), the central purpose of the FCRA clearly indicates that, an agency which delays notification until after the agency has reason to question the accuracy of its report has not complied with the spirit of the Act.  See 15 U.S.C. § 1681(a)(4) (Congress finds that, "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy); 15 U.S.C. § 1681(b) ("It is the purpose of [the FCRA] to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer . . .").  Consequently, the court cannot conclude that, as a matter of law,

NESC has complied with the requirements of section 1681k(a)(1).

Concerning NESC's assertion that it complied with section 1681k(a)(2) by maintaining strict procedures designed to ensure that the information it reported to Guidant was complete and up to date, because the court has already found that there exists a factual dispute over whether NESC followed reasonable procedures, the court necessarily holds that there exists a genuine issue of material fact as to whether it followed strict procedures.  For these reasons, NESC is not entitled to summary judgment on Counts Two and Four of Adams' Complaint.[8]

c.      Section 1681b(b)(3) Claim

Section 1681b(b)(3) of the FCRA states, in relevant part:

[I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates: (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under [the FCRA] . . . . "

15 U.S.C. § 1681b(b)(3)(A).  In Count Fourteen, Adams alleges that NESC violated section 1681b(b)(3) because it did not provide her notice that it was taking adverse action until after it furnished its inaccurate report to Guidant.  NESC does not directly address Adams' section 1681b(b)(3) claim, but argues generally that it did not take – and could not have taken – adverse action against Adams because it did not have the ultimate authority to make the hiring decision for the NU position.  The court disagrees.

The FCRA defines an "adverse action" as, inter alia, "a denial of employment or

---

[8] Despite the lack of evidence that NESC intentionally violated section 1681k, NESC is not entitled to summary judgment on Count Two for the same reason it is not entitled to summary judgment on Count One: the court cannot conclude that, as a matter of law, NESC did not act in reckless disregard of its obligations under section 1681k.  See n. 7, supra, at 17-18.

any other decision for employment purposes that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii) (emphasis added).  The record before the court indicates that NESC made the decision to furnish a background investigation report to Guidant for employment purposes, which report contained information that was adverse to Adams' interest in securing employment with NU. Further, the record indicates that Adams was a prospective employee.  Consequently, a reasonable jury could find on the plain language of the statute that NESC took adverse action with respect to Adams.  Moreover, given the record before the court, a reasonable jury could also find that NESC failed to comply with the notice requirements of section 1681b(b)(3) before taking such adverse action.  Accordingly, NESC's Motion for Summary Judgment is denied as to Count Fourteen.

2.     FCRA Claims Against Verifications

In Counts Five and Six, Adams alleges that Verifications negligently violated sections 1681e(b) and 1681k, respectively.  Verifications argues that it is entitled to summary judgment on Count Five because Adams "has not presented any evidence to demonstrate that Verifications . . . failed to follow reasonable procedures in conducting the subject background search" and is entitled to summary judgment on Count Six because there is no genuine issue of material fact that, "Verifications had strict procedures in place with respect to criminal background searches."  Verifications' Mem. in Supp. at 9,13.  The court disagrees.

With respect to Adams' 1681e(b) claim, Verifications rests its Motion for Summary Judgment on four grounds: (1) Adams has not presented any evidence to demonstrate that Verifications violated section 1681e(b) and failed to follow reasonable

procedures in conducting Adams' background search; (2) Verifications relied on a reputable database repository to perform the criminal background search and verified the convictions using a field investigator; (3) Adams has presented no evidence that the inaccurate background report was the reason she was not hired; and (4) Adams was in the best position to alert everyone as to the potential inaccurate convictions connected to her name, yet failed to do so.  The court addresses each argument in turn.

First, Verifications' assertion that Adams has not presented any evidence to demonstrate that Verifications violated section 1681e(b) and failed to follow reasonable procedures in conducting Adams' background search is without merit.  The record indicates that Verifications furnished a report to NESC which inaccurately attributed to Adams felony and misdemeanor convictions belonging to a person with a different first name.  The record also contains evidence that the convictions Verifications attributed to Adams emanated from Virginia, a state to which, based on the record before the court, Adams had no connection.  Further, the record indicates that Verifications had at its disposal the means to determine that these convictions did not belong to Adams, and that Verifications was able make such a determination within one day of being notified of the possible inaccuracy of its initial report.  Based on these facts, a reasonable jury could find that Verifications failed to follow reasonable procedures in conducting Adams' background check.

Second, Verifications' argument that it did not violate section 1681e(b) because it relied on a reputable database repository to perform the criminal background search and verified the convictions using a field investigator is likewise without merit.  As previously noted, despite Verifications' efforts, based on the record before the court, a

reasonable jury could find that Verifications failed to follow reasonable procedures in conducting Adams' background check.

Third, the court finds that Adams has presented sufficient evidence to create a genuine issue of material fact as to whether the inaccurate criminal history caused NU to withdraw its employment offer. Specifically, Adams has presented the deposition testimony of Guidant's Kathy Shapleigh, who stated that the NU hiring manager decided to pursue other options when Adams "failed" the background check. See Shapleigh Depo. at 33-34.

Finally, Verifications argues that it is entitled to summary judgment because Adams was in the best position to alert the defendants, Guidant, and NU as to the potential inaccurate convictions connected to her name, yet failed to do so. This argument is without merit. The court is not aware of any binding authority which exempts a consumer reporting agency from complying with the applicable requirements of the FCRA merely because the consumer in question may be "in the best position" to alert the agency as to the existence of public records pertaining to other individuals with similar names and dates of birth. Nor does Verifications cite any.

Verifications does, however, cite Henson v. CSC Credit Servs., 29 F.3d 280 (7th Cir. 1994) for the proposition that "the consumer is in a better position than the credit reporting agency to detect errors appearing in court documents . . . ." Henson, 29 F.3d at 286. The Henson decision, however, is inapposite.

In Henson, the plaintiff brought suit against the defendant consumer reporting agencies for erroneously reporting that the plaintiff had had a money judgment entered against him. The agencies' erroneous report was caused by a court clerk's error in a

-24-

Judgment Docket.  Faced with these facts, the Seventh Circuit held that, as a matter of law, a credit reporting agency that reports inaccurate information obtained from a court's Judgement Docket is not liable under the FCRA absent prior notice from the consumer that the information may be inaccurate.  See id. at 285.  The court based this holding on the fact that, requiring credit reporting agencies to "go beyond the face of court records to determine whether they correctly report the outcome of the underlying action" would "substantially increase the cost of their services," a cost which would eventually be passed onto consumers.  Id.

Unlike in Henson, however, there is no indication of court error in the present case.  Rather, the record shows that the defendants erred in attributing accurate court records to the wrong individual.  And while requiring a consumer reporting agency to "go beyond the face of court records to determine whether [those records] correctly report the outcome of the underlying action" may be too much to ask, requiring a consumer reporting agency to correctly determine which public records belong to which individual consumers is not.  Consequently, the court rejects Verifications' argument and does not shift the burden onto Adams.

In sum, there exist genuine issues of material fact as to whether Verifications violated section 1681e(2) and, as a result, Verifications is not entitled to summary judgment on Count Five of Adams' Complaint.

In Count Six, Adams alleges that Verifications negligently violated section 1681k because it did not "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date."  15 U.S.C. § 1681k(a)(2).

Verifications argues that it is entitled to summary judgment on Count Six because it complied with the requirements of section 1681k by having strict procedures in place for the reporting of criminal background searches.  Verifications' basis for this argument is the fact that Verifications "used the most accurate and up to date source and followed strict procedures" in compiling Adams' background investigation report.  <u>See</u> Verifications' Mem. in Supp. at 13.  The court disagrees.

Adams does not contend that the criminal conviction records Verifications obtained were themselves inaccurate or outdated.  Rather, she argues that Verifications inaccurately attributed to the records to her.  Thus, in this case, the fact that Verifications "used the most accurate and up to date source" is irrelevant.  Further, for the reasons noted above, a reasonable jury could find that, in inaccurately attributing the Virginia convictions to Adams, Verifications did not "maintain strict procedures designed to insure that . . . [the information it reported was] complete," and therefore violated section 1681k.  15 U.S.C. § 1681k.  Consequently, Verifications is not entitled to summary judgment as to Count Six.

B.    <u>State Law Claims</u>

Adams brings seven claims against defendants under Connecticut common law. Specifically, Adams' claims four counts against NESC and three counts against Verifications.  Adams' state law claims against NESC are: (1) Count Seven, negligent infliction of emotional distress ("NIED"); (2) Count Eight, intentional infliction of emotional distress ("IIED"); (3) Count Nine, defamation (libel); and (4) Count Ten, negligence.  Adams' claims against Verifications are: (1) Count Eleven, NIED; (2) Count Twelve, defamation (libel); and (3) Count Thirteen, negligence.

As a preliminary matter, both NESC and Verifications argue that Adams' state law claims are barred by section 1681h(e) of the FCRA. Section 1681h(e) provides qualified immunity to consumer reporting agencies protecting them from certain tort claims. It states, in relevant part:

> Except as provided in [15 U.S.C. §§ 1681n and 1681o], no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency . . . based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report[,] except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). The defendants' assert that, because the record contains no evidence of "malice or willful intent to injure" on the part of either Verifications or NESC, Adams' state law claims must be dismissed under section 1681h(e). The court agrees in part and disagrees in part.

To begin, by the plain language of the statute, section 1681h(e) only applies to claims of defamation, invasion of privacy, or negligence. See 15 U.S.C. § 1681h(e). Therefore, the defendants are not entitled to qualified immunity from Adams' NIED and IIED claims, regardless of whether Adams can show malice or willful intent to injure on the part of the defendants.

That said, however, the court agrees with defendants that section 1681h(e) bars Adams' negligence and defamation claims. Because the term "malice" is not defined in the FCRA, "courts have borrowed the definition used in the context of libel litigation, see New York Times v. Sullivan, 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), which establishes that a statement will be deemed to have been made with malice when [the] speaker either knew that it was false or acted in reckless disregard of

-27-

its truth or falsity." <u>Frost v. Experian</u>, 1999 U.S. Dist. LEXIS 6783 (S.D.N.Y. May 6, 1999).  Further, under <u>New York Times</u>, to show "reckless disregard," a plaintiff must put forth "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968); <u>see</u> <u>also</u> <u>Morris v. Equifax Info. Servs., LLC</u>, 457 F.3d 460, 471 (5th Cir. 2006) (applying <u>St. Amant</u> to analysis of 15 U.S.C. 1681h(e)).

In the present case, the record contains no evidence indicating that either Verifications or NESC "entertained serious doubts as to the truth" of their reports until well after the reports were furnished.  <u>St. Amant</u>, 390 U.S. at 731.  To the contrary, the fact that both defendants acted with haste in reinvestigating and correcting their reports after the inaccuracies came to light tends to show that, had they "entertained serious doubts" about the accuracy of the reports earlier, they would have undertaken further investigative measures at such time.  For the purposes of section 1681h(e), Adams has failed to present any evidence that the defendants furnished false information with malice or a willful intent to injure.  As a result, Counts Nine, Ten, Twelve, and Thirteen are barred by 15 U.S.C. 1681h(e).  Therefore, the defendants' Motions for Summary Judgment are granted as to those claims.

1.    IIED Claim Against NESC

In Count Eight of her Complaint, Adams alleges that NESC intentionally inflicted emotional distress upon her.  In her Memorandum in Opposition to NESC's Motion for Summary Judgment, however, Adams states that she "does not contest summary judgment in favor of [NESC] with respect to Count Eight of Plaintiff's Complaint."  Mem. in Opp., Doc. No. 82, at fn. 1.  Consequently, NESC's Motion for Summary Judgment is

granted as to Count Eight, Adams' IIED claim against NESC.

> 2.    NIED Claims Against NESC and Verifications

In Counts Seven and Eleven, Adams alleges that NESC and Verifications, respectively, are liable for negligent infliction of emotional distress.  NESC and Verifications have moved for summary judgment on these claims.

To prevail on a claim of negligent infliction of emotional distress under Connecticut law, a plaintiff must show that: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (Conn. 2003).  Because Adams has presented sufficient evidence to create a genuine issue of material fact as to each of these four elements, neither NESC nor Verifications are entitled to summary judgment as to Counts Seven and Eleven.  See, e.g., Adams Depo. at 104-105, 192-193, 198-201 (recounting the financial, physical, and emotional damages Adams sustained as a result of NU's rescinding its offer of employment in May 2007).

> C.    Defendants' Cross-Claims

Both NESC and Verifications have moved for summary judgment as to the cross-claims filed by Verifications against NESC.  Verifications brings two cross claims: (1) Under the principles of common law indemnity and/or contribution, NESC is obligated to indemnify Verifications, or, in the alternative, is liable for such proportion of any judgment as the relative responsibilities may warrant; and (2) Verifications is entitled to contractual contribution and/or indemnification from NESC because Verifications and

NESC entered into a User Certification and Client Services Agreement ("User Service Agreement") in which they agreed that, if adverse employment action was to be taken based either in whole or in part on information provided by Verifications, NESC would "comply with adverse action requirements as defined in the FCRA."  <u>See</u> User Service Agreement, Exhibit B to Verifications Mem. in Supp. at ¶ 2(D).  NESC asserts that Verifications' Motion for Summary Judgment as to its cross-claims should be denied because NESC did not violate the FCRA and did not take any adverse employment action against Adams.

The court need not address the merits of Verifications' cross-claims now. Because the cross-claims assume judgment against Verifications, unless and until such judgment enters, defendants' Motions for Summary Judgment as to the cross-claims are premature.  Accordingly, the defendants' Motions for Summary Judgment as to Verifications' cross-claims are denied without prejudice to renew at the appropriate time.

## V.     CONCLUSION

For the reasons stated herein, defendants' Motions for Summary Judgment (Doc. Nos. 51, 65) are **GRANTED** in part and **DENIED** in part.  Counts Eight, Nine, Ten, Twelve, and Thirteen are dismissed with prejudice.

**SO ORDERED**.

Dated this 27th day of May, 2009, at Bridgeport, Connecticut.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

-30-