```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3      _____
        DEBORAH ADAMS                )
 4                    Plaintiff.     ) NO: 3:07cv1035(WWE)
                                     )
 5      vs.                          ) December 15, 2009
                                     )  9:00 a.m.
 6                                   )
        NATIONAL ENGINEERING         )
 7      SERVICE CORP, ET AL          )
                      Defendants.    )
 8      _____
                                     915 Lafayette Boulevard
 9                                   Bridgeport, Connecticut

10                 DAY ONE OF TRIAL

11      B E F O R E :
                    THE HONORABLE WARREN W. EGINTON, U.S.D.J.
12                  AND JURY OF TEN

13      A P P E A R A N C E S :

14

15      For the Plaintiff   :        William G. Madsen
                                     Todd Steigman
16                                   Madsen, Prestley &
                                     Parenteau, LLC
17                                   44 Capitol Ave, 2nd Fl E.
                                     Hartford , CT 06106

18      For the Defendant   :        William J. Kupinse , Jr.
        NATIONAL ENGINEERING         Andrew McPherson
19      SERVICE CORP.                Goldstein & Peck
                                     1087 Broad St., PO Box 1538
20                                   Bridgeport , CT 06604

21      VERIFICATIONS, INC:          Michael William Coffey
                                     Wilson, Elser, Moskowitz,
22                                   Edelman & Dicker-NY
                                     3 Gannett Dr.
23                                   White Plains , NY 10604

24      Court Reporter      :        Terri Fidanza, RPR
        Proceedings recorded by mechanical stenography,
25      transcript produced by computer.
```

1    THE COURT:  Good morning.  We have a real Court

2    Reporter today.  Terri Fidanza will be the Court

3    Reporter.  It is nice to have a Court Reporter.  I think

4    Susan is taking over tomorrow.  I will make a couple of

5    quick rulings and will be very definitive rulings so

6    counsel should be guided accordingly.  The rules of the

7    case were laid down very succinctly by Judge Hall in her

8    excellent ruling on the motion for summary judgment, and

9    there are two of those that apply very strictly

10   throughout this trial, and that will change the report of

11   Anne Fortney.  Her report is a pretty good report.  Her

12   initial report is obviously going to be of some

13   importance to the jury, and the problem with the

14   supplemental report is that it violates the rule of

15   the -- one of the two rules of the case, so that will

16   have to be changed.  She still has arguments that deal

17   with the factual issues that Judge Hall pointed out.  Her

18   four factual issues once you accept that NESC is not a

19   joint user, there's no joint user exception to the

20   statute.  It is a consumer agency.  That is, it is a

21   consumer reporting agency.  She so holds very

22   emphatically, very affirmly in her ruling on the motion

23   for summary judgment, and that's what will have to come

24   out of Anne Fortney's report.  I'll be contradicting that

25   in my charge on the law to the jury.  You start with

1    those two assumptions, there's no joint user exception,

2    and it is a consumer reporting agency.  Then you get into

3    the area where her report is obviously very important to

4    NESC.  That's trying to shift the burden over to

5    Verifications, and she's certainly entitled to do that.

6    We probably are going to have to get to that phase of the

7    case at some point, so her supplement report is okay with

8    the exception of the time she spends trying to show that

9    it is not a consumer reporting agency.

10           If you look at Judge Hall's analysis of the FCRA

11    claim, which starts at page 10, she says that the FCRA

12    regulates consumer reporting agency.  Imposes civil

13    liability if the statute is violated.  Then she says at

14    page 11 that the court must address three preliminary

15    issues raised by NESC.  It's motion for summary judgment,

16    and she does deal with those three issues.  First, NESC

17    argues it is not a consumer reporting agency but a joint

18    user; therefore, it is exempt, so she first deals with

19    that, and she says only one federal court in the United

20    States, a trial court in Pennsylvania, had ever adopted

21    that theory that NESC advanced, and she rejects that, and

22    I reject that, and the rule of the case is that Congress

23    did not intend to authorize the FTC to create a joint

24    user exception to the FCRA definition of consumer

25    reporting agency so that's the rule of the case.  I made

1    that clear quite awhile ago.  That's why the supplemental

2    report is to be filed to take out the joint user

3    exception, which was rejected by Judge Hall, and it is

4    rejected by me.

5          Turning to Adams' argument on page 13 of her

6    summary judgment.  NESC is a consumer reporting agency.

7    The court begins by first taking a look at what FCRA does

8    in defining a consumer reporting agency.  She quotes from

9    the statute, and she concludes on page 14 based on the

10   record before this court and the statutory definition,

11   NESC is a consumer reporting agency.  NESC is bound by

12   the requirements of the FCRA.

13         Now having done that, she then deals with a

14   couple of other arguments made by NESC and disposes of

15   those.  I won't bother going over those because they

16   haven't caused a problem for us, but what happens is

17   page 17 of her ruling, she quite properly says that in

18   the present case, Adams has shown as a general issue of

19   material fact exists as to each of the four elements in

20   the Adams claim that the 1681AB claim against the NESC,

21   and those are the four elements that I would allow the

22   expert, any expert offered by the parties to give

23   testimony if it will help the jury.  That's up to the

24   jury, of course, as to whether it needs that help or not,

25   and we'll leave that to the jury, but we will allow that

```
1    testimony.

2          All right.  I think that takes care of how I

3    want to guide the attorneys on the issues that have been

4    decided in this case by Judge Hall and now by me.  We

5    don't have joint user.  We do have a consumer reporting

6    agency, NESC.  Thereafter you are all on your own.

7          MR. KUPINSE:  If I may be heard on a couple of

8    matters with respect to that.  First of all, I understand

9    Judge Hall's ruling, and I understand your rulings.  I

10   would point out a couple of facts, first of all, we have

11   in our exhibit book, which you have, produced a copy of

12   the initial reports from our expert taking out the

13   information related to the joint user, so if you look at

14   the actual exhibit, we would not be handing anything to

15   the jury with respect to the joint user on the first

16   report.  I don't believe there was anything in the second

17   report that specifically spoke to joint user.

18         THE COURT:  No.  There's a mention.  It doesn't

19   bother me.  There's a lot of on consumer report.

20         MR. KUPINSE:  We'll make sure that the second

21   report is also redacted.  We do reserve the right, as we

22   have indicated, your Honor, to make an offer of proof

23   outside of the jury because we believe this is an issue

24   which may warrant an appeal.

25         THE COURT:  I think that's important that you do
```

1    that.  Why don't we hold that off until the conclusion,

2    and then I will permit any offers of proof that counsel

3    need to protect the record.

4            MR. KUPINSE:  That's fine, your Honor.

5            May I say one more thing which I think is going

6    to come up.  I suspect your Honor has not had an

7    opportunity to examine the expert reports other than our

8    expert report.

9            THE COURT:  You know.  I can't remember.  I

10   looked at other expert reports.  I don't remember now.  I

11   think I probably looked at all of them.  I remember

12   names.

13           MR. KUPINSE:  I would point out that

14   Mr. Nadell's report and Mr. Hendricks' report both

15   indicate that we are a user and not a consumer reporting

16   agency.

17           THE COURT:  She notes that in her report that

18   they agree with her.

19           MR. KUPINSE:  If your Honor is ruling out our

20   use of joint user, in fairness, it has to come out of the

21   other reports, too.

22           THE COURT:  I agree.  I'm interested in

23   Fortney's bootstrapping, which is a legitimate bootstrap

24   that the other experts agree with her, but the court did

25   not agree with the experts.  Let's keep the experts away

1    from the jury on that issue.

2              MR. KUPINSE:  I would raise one other issue.  I

3    will object at appropriate times concerning that.  I will

4    raise one other, too.  That's the plaintiff has by grace

5    of Judge Hall a count 14 in their complaint, if you read

6    her opinion carefully, and that count 14 is based on a

7    user argument, so I would suggest that the court needs to

8    strike that.

9              THE COURT:  That bothered me.  Let's hear

10   counsel on that.  I think he's correct.

11             MR. STEIGMAN:  With respect to which issue?

12             THE COURT:  Fourteen.

13             MR. STEIGMAN:  I'm a little bit confused what

14   you want to hear about count 14.

15             THE COURT:  Let's take a look at it.  I hope I

16   have everything on the bench.  We do.  I don't have the

17   amended complaint.  The original complaint did not have

18   paragraph 14.

19             MR. STEIGMAN:  There was no amended complaint.

20             THE COURT:  Where is paragraph 14?

21             MR. STEIGMAN:  The joint trial memorandum lists

22   count 14.  I think I can answer the question as long as I

23   know which issue the court wants to hear about.  Is the

24   court questioning how NESC can be a user and consumer

25   reporting agency?

1              THE COURT:  I can't find count 14.

2              MR. STEIGMAN:  On the joint trial memorandum.

3              MR. KUPINSE:  I think your Honor needs to refer

4       to page 21 of the decision.

5              MR. STEIGMAN:  Page 6 of the joint trial

6       memorandum.

7              THE COURT:  Where do we find count 14?

8              MR. STEIGMAN:  In a supplemental opposition to

9       the defendant's motion for summary judgment, plaintiff

10      made an additional argument that summary judgment was

11      inappropriate against National Engineering Service

12      Corporation because it violates this particular section

13      of the statute.

14             THE COURT:  Where is the claim?  That's what I'm

15      trying to figure out.

16             MR. STEIGMAN:  Judge Hall interpreted it as a

17      separate count.

18             THE COURT:  It's never been in a pleading filed

19      by the plaintiff?

20             MR. STEIGMAN:  The specific statute section was

21      not specifically identified in the complaint.  At oral

22      argument before Judge Hall on the summary judgment

23      motion, we argued that the factual underpinning of that

24      claim was in the complaint.  We just failed to identify

25      the specific statutory section.

1          THE COURT:  That causes all kinds of confusion,

2    but the jury doesn't get the complaint anyway.  Let me

3    see what she did with that.  I recall what Mr. Kupinse

4    was talking about.

5          MR. KUPINSE:  On page 21 of her decision, your

6    Honor.

7          THE COURT:  Interesting, she must have been

8    referring to something that said count 14.

9          MR. KUPINSE:  That's why I used the words by the

10   grace of Judge Hall.  I don't believe there's a count 14

11   anywhere except in Judge Hall's decision.

12         MR. STEIGMAN:  Footnote 3 of Judge Hall's

13   opinion, page 11.

14         THE COURT:  Adams' original complaint contains

15   13 causes of action.  In the supplemental opposition,

16   they asserted a fourteenth cause of action.  You did that

17   orally?

18         MR. STEIGMAN:  We made the argument in support

19   of the violation of that section in a supplemental

20   opposition memorandum filed with the court in opposition

21   to Defendant National's motion for summary judgment at

22   oral argument on the motion for summary judgment.

23         THE COURT:  She said NESC did not raise the

24   issue of Adams' failure to plead the claim.  Therefore,

25   the court construes the complaint containing such a cause

1    of action.  Okay.  There it is.  The cause of action is

2    apparently --

3              MR. KUPINSE:  Based on argument, we're a user.

4              THE COURT:  Section 1681BB3.  She denied summary

5    judgment on count 14.  I don't see that it has to do with

6    the user situation because she has already ruled on that.

7    She ruled it was a consumer reporting agency, and so I

8    don't see why there's anything inconsistent with her

9    ruling on 14, but I guess I will permit argument.

10             MR. KUPINSE:  If your Honor, please, you need to

11   take a look at the statute 1681 B, sub B, sub 3, which

12   she cites.

13             THE COURT:  I'm looking at.

14             MR. KUPINSE:  And B itself, sub B, provides

15   conditions for furnishing and using consumer reports for

16   employment purposes, then if you drop down to 3,

17   conditions on use for adverse actions.  Adverse actions

18   occur by users, not by consumer reporting agencies, as I

19   think your Honor will find if you look through, and it

20   says, it makes specific requirements regarding the use of

21   a consumer report for an adverse purpose.  It's

22   specifically a user-oriented section of the statute, and

23   if we're not a user by virtue of Judge Hall's ruling, by

24   virtue of your continuation of that ruling, then I would

25   claim count 14 is gone.

1          MR. STEIGMAN:  We clearly disagree with that.

2    Judge Hall order notified nothing inconsistent with

3    National.  One time a consumer reporting agency.

4          THE COURT:  Consumer reporting agency could use

5    documents, and I think it probably does use documents, so

6    I don't see any problem with her ruling on this.  It goes

7    in, throws in question of what they did.  We're going to

8    the envelope.  We're not talking about joint user.  We're

9    talking about consumer reporting agency.  She identified

10   four issues that she felt were very important and then

11   along came this issue.  She ruled for that, also.  So I

12   will rule against Mr. Kupinse, against it.  If you want

13   to do this, you can give me a definitive piece of paper

14   that will deal with this issue and let them reply.  Let

15   me rule in due course on it.

16         MR. KUPINSE:  We will brief on it.

17         THE COURT:  I will need more than I have here.

18   Nobody was really concentrating on that issue here at

19   all.

20         All right.  Okay.  I'm ready for the jury now.

21   I have to give them some orientation, which I will do.

22         THE COURT:  Let's follow a procedure here that

23   will shorten things up a little bit.  I talked to you, I

24   think, earlier about exhibits.  Just put the exhibits in,

25   and Debbie will deem them marked as full exhibits.  You

1    don't have to offer them and go through all of that.  If

2    there's no objection, they are automatically in once the

3    witness' attention is directed to a document.

4         The second thing, you don't have to ask me for

5    permission to approach your own witness.  I do want you

6    to ask permission to approach a hostile witness obviously

7    at least once, then I can make a blanket ruling.  If I

8    see the witness is not scared by the attorney, I will

9    automatically grant that permission.  I think it wastes

10   time to keep asking the court for permission every time

11   you want to offer a document to a witness on the stand so

12   don't bother with that when it is your own witness.

13        MR. MADSEN:  Your Honor, may I have a point of

14   protocol?  I understand based on my prior trial

15   experience would be providing the original exhibit with

16   the original stickers to the clerk, and then we would be

17   handing those originals to the witnesses?  Is that

18   correct, opposed to the copies?

19        THE COURT:  If you want to.  I don't care.  As

20   long as the originals don't get destroyed or mutilated or

21   marked upon.  Advise each witness, if necessary, not to

22   make any markings on any of those original exhibits.

23        MR. KUPINSE:  As I understand your ruling, we

24   were generally planning on using copies.

25        THE COURT:  I find counsel use copies and give

13

```
1    the original to Debbie.  I don't care.  It is not that
2    important.
3              MR. KUPINSE:  Thank you, your Honor.
4              THE COURT:  What is important, that the exhibits
5    are kept in order by Debbie.  At the end of the case,
6    make sure you review them with her and they all go to the
7    jury.
8              MR. MADSEN:  One other item of protocol, your
9    Honor.  Our first witness is going to be Deborah Adams.
10   We have subpoenaed a witness who is showing up at 2:00.
11   She's asked us out of courtesy to be able to put her
12   on.
13             THE COURT:  Interrupt and put the witness on.
14             MR. MADSEN:  So we will suspend Deborah's.
15             THE COURT:  Yes.
16             (In the presence of the jury at 9:28 a.m.)
17             THE COURT:  Good morning.  We have 10 faces
18   there, okay.  All right.  We are about to start the
19   evidence, but I think I will have you sworn again even
20   though you were sworn yesterday, so you want to swear the
21   jury.
22             THE CLERK:  Raise your right hand.
23             (Whereupon, the jury was sworn.)
24             THE COURT:  Okay, now, have they got notebook
25   pad?
```

1          THE CLERK:  Yes.

2          THE COURT:  What I want you to do for me is take

3     the pads, put them on the floor at the moment.  I don't

4     want them near your fingers where you can write because

5     all you are going to do with those pads are take notes on

6     the evidence.  That's all I want you to take.  I want

7     nothing in those books except the evidence.  I will be

8     telling you, among several other things, about how you

9     try the case.  You don't pay any attention to the lawyers

10    in this sense:  The lawyers will make opening arguments

11    to you.  Those opening arguments are not evidence.  I

12    don't want you to take any notes on those opening

13    arguments but file them in back of your mind because you

14    may hear about them later.  The opening arguments usually

15    are presentation about what the attorneys expect to prove

16    by their evidence, and very often if they, in the opinion

17    of opposing counsel, don't do that, opposing counsel will

18    probably comment on that in the closing arguments, but on

19    the other hand, for the most part, you will find that the

20    attorneys, who are very experienced attorneys here, will

21    be very careful in how they present and approach to you

22    as to how the evidence will come in, and you will find it

23    probably will be borne out, at least so far as their

24    contentions are concerned, they will offer that type of

25    evidence.  But it is not evidence, so you don't take

1    notes on it.

2         Then at the close of the evidence, they will be

3    allowed to sum up to you.  Again, you won't take notes on

4    that.  Their arguments, I think, will be helpful to you,

5    especially when you have a fairly long trial with more

6    than one defendant involved, so your notes are designed,

7    as I told you briefly yesterday, to help you keep the

8    defendants separate.  Keep in mind there are two cases

9    that you are dealing with on some of the evidence.  You

10   may differ.

11        Now, your job as jurors is to concentrate on the

12   witnesses and, accordingly, you don't take as evidence

13   anything that the attorneys say in their questions

14   directed to the witness unless the witness adopts it.  If

15   the witness accepts it and says, yes, that's so or agrees

16   with counsel, then that becomes the witness' testimony,

17   you can mark it down as such.

18        There are changes in procedures in our court

19   under the rules that we have that govern examination and

20   cross-examination.  On direct examination, what we call

21   friendly examination, where the witness called by the

22   attorney is a witness who the attorney either represents

23   or is called by the client whom the attorney represents,

24   and that's called direct evidence.  Sometimes you will

25   find an attorney will call an opposing witness on the

1      attorney's case, and when that happens, the ground rules

2      are just reversed, but ordinarily, when the witness is on

3      the stand and the attorney who called the witness is

4      examining the witness, the questions can be very general.

5      They can call for narrative, and the witness may narrate,

6      and there may not be any precise question which has to be

7      answered yes or no.  So that will happen on direct

8      examination.

9              When you get on the cross-examination, the

10     opposing attorney is entitled under our rules to ask

11     leading questions.  The friendly attorney may never ask a

12     leading question and suggest the answer.  The opposing

13     attorney can ask a leading question, hoping to get an

14     answer that will be an admission, and if he or she asks a

15     leading question, the witness must answer that question

16     yes or no and cannot elaborate until his or her own

17     attorney comes back and permits elaboration, so that may

18     change the demeanor of the witness on the stand from what

19     the witness' demeanor was on friendly examination to what

20     the witness' demeanor becomes on cross-examination if the

21     attorney wants to rein in the witness, but basically what

22     you are doing is taking a look at every aspect of the

23     witness on the stand, the demeanor of the witness.  Does

24     the witness appear to be forthcoming, does the witness

25     appear to be evasive and trying to duck answering.  Is

1    the witness in need of memory fresh.

2          What you do in a case is two things.  First you

3    are judging the ability of the witness to have been a

4    witness when the events that the witness are talking

5    about occurred.  The witness may have been a participant

6    in what occurred.  The witness may not have been a

7    participant, they may have been a witness, so you have to

8    judge the ability of that witness to have been a witness

9    when things occur, was there a lot going on, would it

10   have been hard to keep track of what was being said by

11   one person at a different time or was it a simple

12   transaction that was uncomplicated and was one on one so

13   the witness could observe or could hear and see

14   everything that was going on, so that's something you

15   take into account, the ability of the witness to have

16   been a witness at the time.

17          Then you must consider the ability of the

18   witness to remember accurately and fairly what it was

19   that happened back in time.  Memories do become warped by

20   the passage of time, and very often they have to be

21   refreshed.  You all remember what you were doing on 9-11,

22   but you probably don't remember what you were doing on

23   the 10th of September of 2001 because it was just another

24   day in your life, so you tend to remember the things that

25   are important to you as compared to something that's not

1    so important to you at the time, but memories do need

2    refreshing.  Very often over the passage of time your

3    memory becomes warped without realizing it and all the

4    sudden are brought up short by being shown some document

5    that was written at the time or something that was said

6    at the time by you that refreshes your memory that it has

7    become warped and you change your testimony.  If that

8    happens in the case, you have to decide whether the

9    refreshing of the witness was understandable.  You don't

10   regard as a matter of credibility or whether you do

11   regard as a matter of credibility, you feel the witness

12   was deliberately trying to avoid telling the truth until

13   forced to do by presentation of other evidence, forced a

14   change in the testimony.

15          You can consider whether a witness testifying in

16   the case has some interest in the outcome of the case.

17   Obviously the plaintiff has an interest in the outcome of

18   the case.  The officials representing the corporate

19   defendant have an interest in the outcome of the case.

20   It can be pecuniary, it can be monetary, it doesn't have

21   to be.  It can be emotional, just an interest in having

22   their position vindicated.  Some people are better able

23   than others to give you a complete and straightforward

24   narrative of what happened even though they have an

25   interest.  Other people aren't so capable of doing that.

1       That's a factor that you take into account.  You don't

2       make it a numbers case.  You don't sit there and say

3       three people testified one way, one person testified

4       another way, I will automatically believe the three

5       people.  That would be dangerous.  The three people may

6       have their information from the common source.  You don't

7       sit there and count numbers, either the numbers produced

8       by a particular party or the number of witnesses who

9       testified in accordance with one way and another witness

10      testifies another way.  Even though you don't count

11      numbers, you do count weight.  It is always a matter of

12      weight so if evidence that you are considering, given to

13      you by a witness is supported by other evidence in this

14      case, given by other witnesses or by documents in the

15      case, any other evidence in the case that supports it

16      that adds to the weight.  If other evidence contradicts,

17      that may decrease the weight in your mind.

18              I want to emphasize it is your, entirely your

19      decision how you are going to judge these witnesses.

20      What I'm saying to you is merely helpful hints, not

21      binding upon you.  You can use any method that you find

22      that you have used in life because you are judging

23      credibility of people all the time, every day in your

24      life.  Use whatever test you use then to judge them and

25      judge them here the same way.  I think that covers pretty

1    much what I want to say about how you judge credibility.

2    It is matter of common sense.  It is not a specialty for

3    judges or lawyers.  That's why we have you in the jury

4    box to judge the witnesses, judge their credibility,

5    determine the relevant evidence in the case on the facts

6    and decide the facts for us that will apply the law based

7    upon the law as I give it to you.  Reach your verdict

8    that way.  That covers your responsibilities.  Remember

9    that the plaintiff has the burden of proof by a

10   preponderance of the evidence.  That's evidence of

11   persuasion that something more likely than not happened

12   or was said or was done.  You can take the scales.  I

13   will be doing this later on.  You put all the evidence in

14   favor of a particular point on one side, the other

15   opposed to the point on the other side of the scale.  If

16   the scale tips ever so slightly in favor of the point

17   that the person bearing that, the burden of proof has

18   prevailed on the preponderance of the evidence standard.

19   If the scales tip every so slightly, ever so slightly

20   against the proposition, then obviously that proposition

21   has not prevailed against that burden of proof.  The key

22   to the test is what happens if you put the pro evidence

23   in and the con evidence in, and the scales don't move,

24   the scales stay balanced, that's speculation, and the

25   plaintiff or whoever bears the burden of proof on a

1    particular issue cannot prevail on speculation.  That's

2    what the burden of proof is all about.

3            All right.  Now, we have three parties here, so

4    we'll open with the plaintiff's attorney, William Madsen.

5    He's assisted by Attorney Todd Steigman.  They sit at the

6    table with their client closer to you.  Mr. Madsen will

7    open for the plaintiff.  Then I will believe Mr. Kupinse

8    will open for Defendant NESC, and Mr. Coffey will open

9    for Defendant Verifications.  I don't put a time limit on

10   these things.  I find the attorneys are pretty good about

11   not unduly being repetitive, pretty well organized on

12   their presentations.

13           All right, Mr. Madsen.

14           MR. MADSEN:  Thank you, your Honor.  Ladies and

15   gentlemen of the jury, your Honor, may it please the

16   court, my name is Will Madsen, and I'm honored to

17   represent Deborah Adams at this trial.  Trying this case

18   with me is Todd Steigman, and seated next to him is

19   Deborah Adams.

20           Now, an opening statement provides a preview of

21   the evidence that you will hear at this trial.  This

22   opening statement will highlight a tragic sequence of

23   events which took place during April and May of 2007 and

24   which turned Deborah Adams' life upside down.  This is a

25   case about a significant dereliction of duties by two

1    companies, National Engineering Service Corporation and

2    the Verifications, Incorporated.  It is a case about the

3    harm suffered by Ms. Adams both emotionally and

4    financially as a result of the unlawful actions of these

5    two corporations.  And, ultimately, it is a case about

6    two companies which refused and which continue to refuse

7    to take responsibility for their own actions.

8            In March of 2007, Deborah Adams was living in

9    the West Hartford, Connecticut.  A single mother raising

10   a teenage boy and doing her best to make ends meet.  In

11   March of 2007, Deborah was working in a temporary

12   position at a company called CB Richard Ellis.  Knowing

13   the job would be coming to an end in a few weeks,

14   Deborah, endeavoring to secure appointment in order to

15   get something lined up when this assignment at the

16   CB Richard Ellis came to an end, she found a job by way

17   of Internet posting.  It was a 50-week assignment in the

18   position of contract assistant.  The position was at

19   Northeast Utilities in Berlin, Connecticut.  Now,

20   Northeast Utilities was not advertising this position

21   directly.  Nor was it hiring directly for this position.

22   Northeast Utilities or NU, as it is sometimes called, had

23   entered into on arrangement with a company known as

24   Comensura, and later known as the Guidant Group, that

25   took care of filling all of the temporary and contract

1    positions at Northeast Utilities.  During this

2    litigation, we'll refer to the company as the Guidant

3    Group.  You may see documents that say Comensura.  Bear

4    in mind that Guidant and Comensura are one in the same.

5    Guidant was the gatekeeper, if you will, for

6    administering the orders for NU's temporary contract

7    workers, sometime referred to as contingent workers or

8    contingent employees.  These are workers who are hired

9    for a certain period of time or for a certain project but

10   are not what you would commonly think of as permanent

11   full-time employees.  The Guidant Group employed a woman

12   by the name of Kathy Shapleigh.  Ms. Shapleigh was

13   stationed on-site at Northeast Utilities at their Berlin,

14   Connecticut, facility.  And she was the one responsible

15   for administering the orders that Northeast Utilities,

16   through their hiring managers, made for contract

17   employees.  Ms. Shapleigh herself handled the contract

18   assistant position that caught the eye of Deborah Adams

19   in March of 2007.  The process worked like this.

20         Ms. Shapleigh would get the orders from the NU

21   hiring managers, take care of the appropriate paperwork

22   and would send out the orders to the staffing agencies

23   that specialized in matching people with job

24   opportunities.  In 2007, Ms. Shapleigh and the Guidant

25   Group worked with about 40 or so staffing agencies,

1     National Engineering Services Corporation, which will be

2     referred to as National Engineering Service Corporation

3     or NESC in this case, was one of those staffing agencies.

4     So Deborah Adams saw this position of contract assistant.

5     Sometimes it is referred to as contract administer.  She

6     saw this position of contract assistant through a posting

7     on the Internet and she applied by submitting her resume.

8     A short time later she heard from a gentleman by the name

9     of Lary O'Keefe, a recruiter who was employed by National

10    Engineering.  Lary called Deborah indicating that he was

11    in receipt of her resume and asked Deborah if she was

12    still interested in the contract assistant position.

13    Deborah was pleased to hear from Mr. O'Keefe, confirmed

14    to him that she was indeed still interested in the

15    position, and the two of them spent time talking about

16    the job and her background.  At the end of the

17    conversation, Mr. O'Keefe stated that he would submit her

18    for the position.  Mr. O'Keefe did submit Deborah for the

19    position by forwarding her information on to Kathy

20    Shapleigh at Guidant Group.  Kathy Shapleigh in turn

21    forwarded Deborah Adams' application on to the hiring

22    manager at Northeast Utilities.  Deborah didn't hear

23    anything about the job for a couple of weeks.  Then on

24    April 13, 2007, Deborah received an e-mail from

25    Mr. O'Keefe of National Engineering stating that

1    Northeast Utilities wanted to interview her.  The

2    evidence will show that Deborah attended the interview on

3    April 19, 2007, and not long thereafter she was happy to

4    learn that she had gotten the job.  National Engineering

5    sent a new employee packet to Deborah, including a

6    contract of employment for the position.  Deborah filled

7    out the paperwork, sent it back and breathed a sigh of

8    relief.  The way it was arranged, Deborah would

9    technically be an employee of National Engineering on

10   assignment through a contract at Northeast Utilities, so

11   Deborah would be an employee of National Engineering at

12   NU.  The position was due to start on May 14, 2007 and

13   had a duration of 50 weeks.  The offer was contingent on

14   Deborah's successfully passing a drug test as well as

15   successfully passing a criminal background check.  She

16   was requested to sign an authorization form for both of

17   those tests.

18           During this case, you will be provided with a

19   copy of the authorization form which Deborah signed in

20   connection with the criminal background check.  She

21   provided identifying information so that the background

22   check would be done properly.  In particular, Deborah

23   provided her name, her Social Security number as well as

24   the towns and states of the residence for the past seven

25   years.  At about this time Deborah gave notice to her

1    employer, CB Richard Ellis, she would be leaving her job

2    on May 11, 2007 so she could start in the position at NU

3    on Monday, May 14.  National Engineering hired

4    Verifications, Incorporated, the other defendant in this

5    case, to run the criminal background check.  During this

6    trial, you will hear much testimony about the way the

7    background check was conducted by Verifications, how and

8    when the information was communicated by both

9    Verifications as well as National Engineering and what

10   happened as a result of the criminal background check.

11   There will be expert witnesses taking the stand to opine

12   about whether the actions undertook and those which were

13   never taken violated the provisions of the Fair Credit

14   Reporting Act.  One thing, however, will be tragically

15   clear by the end of this trial; Deborah Adams lost her

16   job at Northeast Utilities because an erroneous

17   background report was issued that attributed to her the

18   criminal background of a different person also by the

19   name of Deborah Adams.  And unlike our other Deborah

20   Adams, the other one had a felony conviction on her

21   record.  The evidence will show that this error did not

22   need to happen because the information on hand and

23   available conclusively showed that the other Debra Adams

24   with a felony conviction was easily distinguished from

25   our Deborah Adams for a number of reasons.  First, their

```
 1    names were spelled differently.  Second, they lived in

 2    different states, and third, they had different Social

 3    Security numbers.  Unfortunately and tragically this

 4    erroneously criminal background report was passed on to

 5    Northeast Utilities before Deborah had a chance to clear

 6    things up, and ladies and gentlemen, Deborah Adams would

 7    have been quickly able to clear things up because a

 8    similar situation arose sometime before this incident in

 9    connection with a different company.  The evidence will

10    also show that by the time the new background report was

11    generated which cleared Deborah Adams' criminal

12    background check, it was too late because Northeast

13    Utilities decided to give the job to someone else.  The

14    hardships that Deborah was forced to endure as a result

15    of losing this position were severe.  Deborah became

16    unable to meet her financial commitments resulting in

17    being evicted, losing possessions, and becoming separated

18    from her son.  It is truly a heart-wrenching story.

19           As I said at the beginning, either of the

20    corporate defendants in this case refuses to take

21    responsibility for their actions.  They do this by

22    pointing fingers at each other and strangely enough,

23    pointing fingers at Deborah Adams as if somehow this is

24    all her fault.

25           Ladies and gentlemen, your job will be to hear
```

1     and determine whether these defendants met their

2     respective legal obligations.  I'm confident when you

3     hear the evidence in this case you will be appalled by

4     what has happened to Deborah Adams in violation of

5     federal and state law.  I will speak to you more about

6     the claims for the economic and noneconomic damages as

7     well as the punitive damages in my closing remarks.

8     Until then, please give the evidence your close

9     attention.  Thank you.

10              THE COURT:  Mr. Kupinse.

11              MR. KUPINSE:  Thank you, your Honor.  Good

12    morning, members of the jury, your Honor, may it please

13    the court, in Shakespeare's Hamlet, there was a play

14    within a play in which Hamlet is trying to discover what

15    his mother knows about the death of his father, and he

16    prompts her by turning to her and asking her how she

17    likes the play within a play.  In some ways, a trial is

18    very much like a play.  You will have a parade of

19    witnesses.  You will have a number of documents.  You

20    will write the ending to the play, and everybody is very

21    concerned that that ending be the correct ending to this

22    drama.  I won't go into challenging everything that the

23    plaintiff's attorney said which will ultimately, I think,

24    not turn out to be quite the same way he said it.  As you

25    may suspect, attorneys have different views of different

1    things, but I would suggest that there's a few simple

2    points of reference to keep in mind.  What is the

3    plaintiff's claim that the defendants did?  The plaintiff

4    is claiming that the defendants caused her to lose a

5    position.  Well, I think the evidence is going to show

6    that the Defendant Verifications, our co-defendant, did

7    produce a report which contained incorrect information as

8    to an arrest record.  We won't get into the details at

9    this point as to how that occurred and what the reasons

10   were for it, but it did, and that report was submitted to

11   my client, National Engineering Service Corporation, and

12   my client in turn submitted it to the Guidant, Comensura,

13   which was the intermediary for Northeast Utilities, NU.

14   Guidant, through Kathy Shapleigh, passed that information

15   along to NU.  All of that occurred, as you will find out,

16   late on Tuesday, May 8 of 2007, toward the end of the

17   day.  When Chris Sullivan of National Engineering spoke

18   to the plaintiff that evening, he learned that the same

19   thing had happened to her in April of 2006.  Now, I don't

20   want to blame the plaintiff, but you would think if she

21   had a problem with, like that, she might have called it

22   to the attention of National, Verifications, Guidant or

23   NU.  She didn't.  She had not alerted anybody to the

24   possibility of mixup with someone with the same last name

25   and the same date of birth.

```
1              Mr. Sullivan advised Kathy Shapleigh of Guidant
2    immediately that night, on Tuesday, the 8th, that in
3    fact, Kathy -- in fact, the plaintiff was disputing the
4    report.  On Wednesday morning, May 9, my client advised
5    the Defendant Verifications, who with the information
6    from the plaintiff began a recheck and cleared the false
7    report and issued a corrected report on Thursday, May 10,
8    2007, which was sent to Guidant and shared with NU on
9    Thursday, the 11th, May 11.  At that time, the position
10   the plaintiff was seeking had not been filled.
11   Importantly, neither -- in fact into the 14th, which is
12   the Monday after all these events occurred during the
13   week, the position still had not been filled.  More
14   importantly, neither the plaintiff nor the defendants nor
15   Guidant ever knew why NU did not fill the position with
16   the plaintiff, but we all do know that the final decision
17   rested with the hiring person at NU.  It was not Kathy
18   Shapleigh's decision at Guidant.  It was not National's
19   decision, it was not Verifications' decision.  Again, you
20   are going to see a lot of evidence.  I think when you
21   have seen all of the evidence, you will come to the
22   conclusion that there's really not a great dispute in the
23   facts.  I think what you are going to see, I think there
24   is a dispute and the effect of the facts.  I think one
25   thing you will know or you will note is that once again
```

1    there is no evidence as to the fact that NU filled the

2    position because of the false report because at the time

3    they filled the position, they had the corrected report.

4            The final piece of information that I can share

5    with you at this point or should share with you at this

6    point is by May 14, which was the start date before my

7    client knew that Kathy -- the plaintiff would not be

8    offered the position, the plaintiff had filed complaint

9    with both of the defendants, National and Verifications.

10   This is, of course, before the position is filled with

11   somebody else, with the Connecticut Consumer Protection

12   Agency, the attorney general for South Dakota,

13   New Hampshire and Connecticut and told my client she

14   intended to take suit against both my client and

15   Verifications.

16           And, again, as this play, as this drama unfolds

17   before you, I would ask that you keep the central

18   evidence right around that May 8 through May 14 date in

19   focus because that's the important interest.

20           Oh, I probably should also tell you that before

21   the position was filled at NU, we learned that the

22   plaintiff was behind in her electrical bills to the NU.

23   We don't know, of course, whether that had anything to do

24   with the fact that NU didn't hire her.

25           Thank you for your attention.  Thank you for

1   your service in this case.  We all appreciate the

2   willingness to do your duty and serve as jurors in this

3   case.  We ask you to please pay careful attention to the

4   witnesses and evidence, and we thank you.

5          THE COURT:  Mr. Coffey.

6          MR. COFFEY:  Yes.  Good morning.  Good morning.

7   Counsel, your Honor, ladies and gentlemen, my client

8   thanks you for being here.  I have sitting next to me

9   Mary Poquette, who is the chief compliance and security

10  officer for Verifications, Incorporated.  What we do is

11  background investigations, and every one of you on this

12  jury works.  You all know in this day and age that the

13  background investigations do occur.

14         Now, what happened here?  That's one of the

15  questions.  We were given an order to do a background

16  search for Deborah Adams.  We were given a date of birth,

17  and we were given a Social Security number.  Now, we went

18  out there.  We did a database search at that time using

19  the name Deborah, D-E-B-O-R-A-H, Adams.  We did a search.

20  A D-E-B-R-A Adams with the same date of birth came up

21  with criminal conviction.  So the thing is, as you will

22  find out from expert testimony, also from hearing from

23  Mary Poquette, searches, this is different from a credit

24  search where you go by Social Security numbers.  The

25  criminal -- We have people who have been in law

1    enforcement on this jury.  The criminal system is not run

2    by Social Security Numbers.  There's over several

3    thousand counties in the United States of America, and

4    they all have different filing systems.  So what did we

5    do?  You are going to be asked whether our actions were

6    reasonable and whether we violated the Fair Credit

7    Reporting Act.  One of the things we did do after getting

8    the Deborah Adams with the same, with the exact same last

9    name, exact date of birth and similar spelling on the

10   first name.  You will hear about identifiers, all the

11   experts are going to talk about what identifiers are.  We

12   sent out field researches to go and pull the criminal

13   court records, and when the criminal court records came

14   back, they said D-e-b-r-a Adams, Debra Jean Adams with

15   the same date of birth had a criminal conviction.  What

16   we did, we pass that information on in a final report and

17   noted it was a similar first name.  That's what we did.

18   That's what criminal background investigations are meant

19   to do.  They are meant -- This is a utility company.

20   They want to know that the people they hire like

21   everywhere we work, that the people you are hiring do not

22   have criminal backgrounds.  You are going to hear about

23   that's the information we pass along to the co-defendant.

24          Now, you are also going to hear about if

25   someone -- you are going to hear Ms. Adams talk that she

1    had a very similar experience the year before.  You are

2    going to hear under the Fair Credit Reporting Act there's

3    a total of 35 days if someone is going to do an adverse,

4    take adverse action where it can be used in an employment

5    decision, you are going to hear they have five days, a

6    company has five days to initiate an investigation and 30

7    days to the complete the investigation.  You are going to

8    hear Ms. Adams had all of this information so readily

9    available that she had letters from the clerk's office,

10   we were able to turn it around, initiate the

11   investigation and complete the investigation in less than

12   three days of our actions.  It is our position we were

13   not negligent, we were reasonable.  We would have been

14   negligent if we did not report on someone with the exact

15   same last name, exact date of birth, similar name,

16   similar first name.  We pass it on a similar match on the

17   first name.  That's what happened here.

18          Now, it's our position we did follow the Fair

19   Credit Reporting Act.  You are going to hear from I will

20   put on the stand Barry Nadell, who is an expert in the

21   Fair Credit Reporting Act.  You are going to hear what we

22   did.  You are going to hear from Mary Poquette, who is

23   going to tell you what we did do, what procedures we

24   follow and what strict procedures we follow and also in

25   the investigation, in also the reinvestigation phase what

```
1    we did and that we weren't negligent, we adhered to very
2    strict protocols.  You are going to hear, as counsel,
3    Mr. Kupinse, spoke about, you are going to hear what
4    Ms. Adams is talking about.  She was already in
5    arrears months before this occurred.  You are also going
6    to hear that she's very familiar with the temporary job
7    process.  She had many through the years.  Hear this is
8    something, not blaming her, but it is information she
9    already dealt with, all these clerk's offices she was
10   looking to get a position in a secured location.  You
11   would use common sense if you have letters from all these
12   clerks that would say it is not you and this happened in
13   the past.  When you dealt with ChoicePoint, you would
14   have thought she would have told Mr. Sullivan or someone
15   else this happened.  Just be on the lookout.  This might
16   hold the job up.  It is our position after you hear all
17   of the evidence, you are going to come to the conclusion
18   that we were not negligent.  We followed the Fair Credit
19   Reporting Act and that our actions in no way were the
20   proximate cause of any of the damages that the plaintiff
21   is alleging.  I know it is close to the holidays.  I
22   would like to say my client and I both thank you for
23   being here.  I know it is probably a place everyone else
24   would not be here this week with everything else going
25   on, but thank you very much.
```

1          THE COURT:  We're going to start the evidence,

2    ladies and gentlemen, so you can grab your pads and get

3    ready to start writing down.  There are two problems with

4    note taking.  And I will guard against both of them.  One

5    is some people take better notes than others.  Some

6    people even take shorthand.  This is not a contest over

7    which juror has the best notes.  The notes are the

8    individual helps to you.  Each one of you keep your own

9    notes, use them as you see fit to refresh your

10   recollections.  Don't ever let the notes override the

11   actual testimony but use them to refresh your memory, if

12   you need to, as to what the testimony was based upon the

13   notes you took at the time.

14          Now, the second aspect of note taking is that

15   you sort of have to take your brain and divide it into

16   two halves.  One-half of your brain has to concentrate on

17   taking the note.  The other half of your brain has to

18   concentrate on what's going on on the witness stand while

19   you are taking your note.  Obviously the attorneys are

20   continuing examination, the witness is continuing to

21   answer, and you don't want to miss an answer while you

22   are concentrating on taking a note.  The way to avoid

23   that problem is to make the notes as briefly as possible

24   and as quickly as possible so that your mind is not taken

25   away from the testimony.  But the notes may be essential

1    to help you keep everything straight, and the trial will

2    go on for several days.

3           All right.  I think we're ready now for

4    Mr. Madsen to present his first witness.

5           MR. MADSEN:  Your Honor.

6           A JUROR:  I have a question.  I understand we

7    may be handed copies of evidence.  May we take notes on

8    that?

9           THE COURT:  That's a good point.  Your notebooks

10   are empty.  They are empty deliberately so you won't have

11   your mind distracted by starting to look at documents in

12   the notebook in an evidence book that hasn't been

13   introduced yet.  You will get copies of the exhibits as

14   they are offered through the witness.  When the witness

15   is asked to look at a certain exhibit, you will be given

16   copies of those documents.  It is helpful, I have often

17   encouraged to write your comments directly on that copy

18   of the exhibit.  You may never alter original exhibits,

19   but you won't have the original exhibit, you will have

20   only copies, so you can mark them up as you see fit.  Use

21   them to help you interpret the documents and so forth, so

22   you may do that by all means.

23          We will, as I said, go along and take recess

24   probably today about 11:00 for 10 minutes, and then we'll

25   break for lunch at 1:00 until 1:45.  If you need a break,

1    just step forward, give us a break for any purpose in the

2    meantime.

3              All right.  Goes ahead, Mr. Madsen.

4              MR. MADSEN:  Thank you, your Honor.  At this

5    time I would like to hand the plaintiff original exhibits

6    to the clerk.  (Handing.)

7              Your Honor, at this time I would like to call

8    Deborah Adams to the witness stand.

9              DEBORAH ADAMS, having been called as a

10   witness, was first duly sworn and testified on her oath

11   as follows:

12             THE CLERK:  You may be seated.

13             Please state your residence or business

14   residence for the record.

15             THE WITNESS:  Currently I stay with my mother in

16   Pittsfield, Massachusetts.

17             THE CLERK:  Your name for the record, please.

18             THE WITNESS:  My name is Deborah Adams.  My last

19   name is spelled A-D-A-M-S.  Adams.

20                         DIRECT EXAMINATION

21   BY MR. MADSEN:

22        Q.  Good morning, Deborah.

23        A.  Good morning.

24        Q.  I would like to start off by asking you to spell

25   your first name.

1        A.   My first name is D-E-B-O-R-A-H.

2        Q.   Deborah, you just testified that you're staying

3    with your mother.  How long have you been staying with

4    your mother?

5        A.   I moved back in with my mother the end of

6    October in 2008.

7        Q.   Deborah, when were you born?

8        A.   I was born on July 29, 1959.

9        Q.   Where were you born?

10       A.   I was born in Hackensack, New Jersey.

11       Q.   Now, you spelled your name D-E-B-O-R-A-H.  Have

12   you ever spelled your first name as anything other than

13   that way?

14       A.   No, I have not.

15       Q.   Do you have a Social Security number?

16       A.   Yes, I do.

17       Q.   For the purposes of this trial, we are not going

18   to have you identify your full Social Security number,

19   but I would ask you to identify the last four digits of

20   your Social Security number.

21       A.   3162.

22       Q.   And do you have a Social Security card?

23       A.   Yes, I do.

24       Q.   And do you know what the name is as it appears

25   on your Social Security card?

```
1          A.  Deborah, D-E-B-O-R-A-H, Adams.

2          Q.  Is there any middle name?

3          A.  I don't have a middle name.  There's no middle

4     name.

5          Q.  When you were born, did your parents give you a

6     middle name?

7          A.  No.

8          Q.  Have you ever had a middle name in your life?

9          A.  No.

10         Q.  Did you graduate in high school?

11         A.  Yes.

12         Q.  What year was that?

13         A.  1978.

14         Q.  What did you do after high school?

15         A.  After high school, I want to college.

16         Q.  Where was that?

17         A.  In Providence, Rhode Island at Johnson and Wales

18    University.

19         Q.  Do you have -- Did you graduate from that

20    college?

21         A.  I didn't graduate from that college.  I didn't

22    graduate at that time, no.

23         Q.  Do you have any degrees or certifications?

24         A.  Yes, I do.

25         Q.  Can you identify those, please?
```

1          A.   I have a paralegal certificate.   I also have an

2     associate's degree in office management.

3          Q.   Where did you obtain your associate's degree in

4     office management?

5          A.   At Berkshire Community College.

6          Q.   Where is that located?

7          A.   It is in Pittsfield, Massachusetts.

8          Q.   Where did you obtain your paralegal certificate?

9          A.   At St. Joseph's College.

10          Q.   Where is that?

11          A.   In West Hartford, Connecticut.

12          Q.   Are you married?

13          A.   No, I am not.

14          Q.   Do you have any children?

15          A.   Yes, I do.

16          Q.   How many?

17          A.   I have one son.

18          Q.   And how old is your son?

19          A.   Currently he's 19.

20          Q.   What is his name?

21          A.   Trevor.   Trevor Adams.   He has a middle name.

22     His name is Trevor Devon Adams.   Devon.

23          Q.   How do you spell that?

24          A.   D-E-V-O-N.

25          Q.   And where is Trevor, what's Trevor do

1    currently?

2         A.  I beg your pardon?

3         Q.  What does Trevor do currently?

4         A.  Currently he's in school.  He's a freshman in

5    college studying culinary arts.

6         Q.  You testified that you have been living with

7    your mother since 2008.  Where did you live or stay

8    before your mother's, before you moved in with your

9    mother?

10        A.  I was staying at a hotel.

11        Q.  Where was that hotel located?

12        A.  It was by Bradley International Airport.  That's

13   either South Windsor or considered Windsor or South

14   Windsor, but it is near the airport, Bradley

15   International Airport.

16        Q.  Where did you live before?  What hotel is

17   that?

18        A.  Motel 6.

19        Q.  Where did you live before Motel 6?

20        A.  I lived in West Hartford.

21        Q.  I would like to go back to ask you when you

22   first -- You testified that you lived in West Hartford.

23   When did you first move to the State of Connecticut?

24        A.  I moved to Connecticut on or around 2001, the

25   end of 2002.  It was after 9-11.

1          Q.   What brought you to Connecticut?

2          A.   Work.   I had been working in Connecticut since

3     1997.

4          Q.   And commuting?

5          A.   I had been commuting.   It got to be too much.

6          Q.   Which employer were you working for at that

7     time?

8          A.   When I moved to Connecticut, I was working at

9     General Electric.

10         Q.   When did you first start working for General

11    Electric?

12         A.   I started working for General Electric around

13    2000.   The actual date --

14         Q.   If you don't recall, that's fine.   Feel free to

15    state that you don't recall.

16         A.   I feel more comfortable stating that I don't

17    actually recall.   It was around 1999, 2000 but --

18         Q.   Are you nervous today?

19         A.   I'm extremely nervous.

20         Q.   We'll try to make this as painless as possible

21    for you.

22              I would like to now direct your attention to

23    March of 2007.   Deborah, in March of 2007, were you

24    employed?

25         A.   Yes, I was.

44

1    Q.   And where were you employed?

2    A.   I was employed at CB Richard Ellis.

3    Q.   And where physically was that job located?

4    A.   CB Richard Ellis had an office space in

5    The Travelers, so we were physically in The Travelers

6    Insurance Company.

7    Q.   What city is that in?

8    A.   In Hartford, Connecticut.

9    Q.   What was your job there with CB Richard Ellis?

10   A.   I was a contract administer.

11   Q.   Do you recall approximately when you started in

12   that job?

13   A.   I started in that job around March, March

14   2007.

15   Q.   Was CB Richard Ellis your actual employer?

16   A.   No, they were not.

17   Q.   What was the name of the company which was your

18   actual employer?

19   A.   Legal Now.

20   Q.   Legal Now?

21   A.   That's their name.

22   Q.   Was that the name of the company where your

23   paychecks came from?

24   A.   Yes.

25   Q.   And what kind of company is Legal Now?

45

1      A.   They are a staffing agency.

2      Q.   Do they specialize in any particular type of

3  employees and staff?

4      A.   That particular division specializes in legal

5  personnel, legal secretaries, paralegals.  That's the

6  legal division of a larger group that I can't remember

7  the name of the larger group because I was employed by

8  Legal Now, so I remember that part of the company.

9      Q.   Now, in March of 2007, did you become aware of a

10  contract administer's job with Northeast Utilities

11  becoming available?

12      A.   Yes.

13      Q.   How did you become aware of that?

14      A.   Through an Internet posting.  I received

15  notification through an Internet posting cite.

16      Q.   Was it common for you to review to look at the

17  Internet for job opportunities?

18      A.   Yes.

19      Q.   How would you go about doing that?  Were there

20  certain sites that you looked at?

21      A.   Yes.  I registered with certain sites.  I

22  prepare job notifications at certain sites, so if there's

23  a match to my skill sets and the job description, I will

24  receive an e-mail which will allow me to review it, then

25  I can post for the job or apply for the job.

1      Q.   Which sites are you registered with?

2      A.   Monster.com and CareerBuilder.

3      Q.   If you recall, how did you find this particular

4  posting for the position with Northeast Utilities?

5      A.   A notification through that process that I just

6  explained where they sent me a notification to let me

7  know there's a list of jobs that meet your criteria, I

8  look through them, and I decide which ones I want to

9  apply to.

10      Q.   Do you recall whether it was through Monster or

11  CareerBuilder?

12      A.   The job for Northeast Utilities was through

13  CareerBuilder.

14      Q.   Now, after you became aware of the position at

15  Northeast Utilities, what did you do?

16      A.   I reviewed the job description, and I applied --

17  I consider that to be a job that was closely matched to

18  my skill sets, and I applied to that position on-line.

19      Q.   How did you go about applying for the job?

20      A.   For that particular job, you had to apply

21  through CareerBuilders.  Sometimes you can apply directly

22  to the hiring company.  That position didn't offer that

23  option.  You had to apply through CareerBuilder by

24  submitting the resume that CareerBuilder has that I

25  set up.  That's how I applied to CareerBuilder.

1       Q.  Did you hear from anyone in response to your

2  application for that position at Northeast Utilities?

3       A.  Yes, I did.

4       Q.  Who did you hear from?

5       A.  I heard from Mr. O'Keefe, Mr. Lary O'Keefe

6  from --

7       Q.  Go ahead.  Can you identify Mr. Lary O'Keefe?

8       A.  Mr. O'Keefe I learned was from a temporary

9  agency who was advertising for the position at Northeast

10  Utilities.

11       Q.  Which temporary agency was he affiliated with?

12       A.  NESC.  National -- Sorry.

13       Q.  National Engineering --

14       A.  Thank you.

15       Q.  -- Service Corporation?

16       A.  Yes.

17       Q.  And how did you hear from Mr. O'Keefe?

18       A.  I heard from him initially by telephone.  He

19  gave me a call.

20       Q.  Do you recall what month and year you received

21  this initial telephone call from Mr. O'Keefe?

22       A.  In the month of March.  It was around that time

23  because I was still working at CB Richard Ellis.

24       Q.  In March of what year?

25       A.  I'm sorry.  2007.

1      Q.  And what did Mr. O'Keefe say to you during that

2   conversation?

3      A.  That conversation, the initial conversation

4   consisted of my application, that he had received the

5   application, he wanted to the discuss with me my resume

6   and what the job entailed.  The initial conversation was

7   to see what my skill sets were based on the resume that I

8   presented and also the job description and if I was still

9   interested in the position after I heard what the job

10  entailed.

11     Q.  And I want to break that down.  First of all,

12  what do you recall him, Mr. O'Keefe, telling you about

13  the job during that initial phone call in March of

14  2007?

15     A.  I recall him introducing himself, introducing

16  his company, going over the job description or going over

17  first the job posting, asking me if I remember that

18  posting, had I applied to that position, if I was still

19  interested in that position, and from there we went on.

20  He stated he wanted to ask a few questions about my

21  resume, also discuss what he had as a job description for

22  that position and that, again, at the end of the

23  conversation to find out if, if it was something I was

24  still interested in when I heard what the job would

25  entail.

1    Q.  Did he talk about what the -- You just mentioned

2    job description.  Did he talk about what the job was

3    about?

4    A.  Briefly, yes.

5    Q.  Do you recall what he said?

6    A.  He basically stated some of which was on the

7    on-line posting as well.  I don't recall him saying the

8    hours, but the daily, what I would be required to do as

9    far as contracts and handling contracts, administrative

10   work, those types of things, where it was pertinent to

11   see if my skill and background would match up to what the

12   client was looking for and it was something I felt

13   comfortable, capable of doing.

14   Q.  Had you ever performed that type of work before

15   for other employers?

16   A.  I was in a similar role at CB Richard Ellis

17   where I'm reviewing contracts.  They are contracts.

18   Their documents.

19   Q.  Did he during that conversation in March of 2007

20   indicate any way how long the job was supposed to last?

21   A.  At that time he might have, but I honestly don't

22   recall if that was part of the initial conversation.

23   What I recall from the initial conversation was reviewing

24   my resume, reviewing the job qualifications to see if I

25   was interested and if I wanted to be submitted for the

1    position.  At that time I had not been submitted to

2    Northeast Utilities.  I was just submitted to the

3    temporary agency for consideration.

4        Q.  When he asked if you were still interested, what

5    was your answer?

6        A.  Yes.

7        Q.  What was the outcome of the conversation with

8    Mr. O'Keefe?

9        A.  The outcome was that I stated I was interested

10   in the position and that he did have permission to submit

11   my application to Northeast Utilities.

12       Q.  Is it your -- is it your understanding that they

13   subsequently submitted you for the position?

14       A.  Yes.

15       Q.  And did he ever communicate to you when he

16   submitted you for the position?

17       A.  After that day?

18       Q.  Yes.  The day, the actual date that your

19   application was submitted to Northeast Utilities.

20       A.  I recall receiving an e-mail after -- In answer

21   to your question, yes.  After the initial communication

22   where I agreed and requested by application to be

23   submitted, he did follow up and confirm that it was

24   sent.

25           MR. MADSEN:  May I approach the witness.

1          THE COURT:  Yes.  It is your witness, just go

2     ahead.

3          MR. MADSEN:  By agreement of the parties, this

4     is a full exhibit, so we would like to distribute

5     Plaintiff's Exhibit 49 to the jury at this time.

6          THE COURT:  49, okay.  49 may be distributed.

7          MR. MADSEN:  I want to assure that all the

8     jurors have a copy of the exhibit.  Okay.

9      Q.  Deborah, can you -- You have Exhibit 49 in front

10    of you.  Can you identify that exhibit?

11     A.  This is an e-mail that I received from

12    Mr. O'Keefe.

13     Q.  And did Mr. O'Keefe indicate in this e-mail --

14    Is this the e-mail you were referring to earlier when you

15    said he informed you when he submitted you for the

16    position?

17     A.  Yes.  The date that they submitted.  Yes.

18     Q.  What date was that?

19     A.  The date of this e-mail is April 13, 2007.

20     Q.  Can you -- Okay, can you read the first

21    sentence.

22     A.  I hope you are doing well and are still

23    interested in the contract administration job.  I

24    submitted you for on March 29.

25     Q.  My next question is had Mr. O'Keefe called you

1   prior to sending you this e-mail to alert you to this?

2       A.  Yes.  This e-mail is subsequent to a

3   conversation.  Initially he called and discussed it.  As

4   I recall, I asked him for documentation because in this

5   e-mail, it states the interview date.

6       Q.  Can you tell us about that prior conversation

7   with Mr. O'Keefe?

8       A.  The call was to advise me that he had sent the

9   resume or my application to Northeast Utilities and that

10  I had been selected as a candidate for interview.

11      Q.  I'd like you to read the second sentence of

12  Plaintiff's Exhibit 49, please.

13      A.  The second sentence reads, I got a call from

14  them just now, and they would like to interview on

15  Thursday, April 19, at 9:00 a.m. at their facility.

16      Q.  Had he communicated that information to you

17  during the telephone call?

18      A.  Yes, that was part of our discussion.

19      Q.  Read the entire remainder of the e-mail, please.

20      A.  You will be meeting with Byron Maddox, and he's

21  at extension 2086.  They will ask you the extension when

22  you check in.  I left you a phone message, but I believe

23  I said Tuesday on the message.  It is on Thursday.

24  Please call me to confirm or drop me an e-mail.

25      Q.  And do you know who Byron Maddox is?

1          A.  Mr. Maddox, when I was introduced to him as a

2     manager.  He's a team leader at Northeast Utilities in a

3     contract area of the transmission contracts area of

4     Northeast Utilities.

5          Q.  Did you in fact attend and interview at

6     Northeast Utilities on April 19, 2007?

7          A.  Yes, I did.

8          Q.  Where did that meeting occur?

9          A.  At their facility in Berlin, Connecticut.

10         Q.  Who was present at that interview?

11         A.  Mr. Maddox and another woman that I can't

12    remember her name.  I believe her name was Jennifer

13    but -- I can't remember her name, so, so I don't feel

14    comfortable.  It was another woman that was present.

15         Q.  That's fine.  Can you describe what occurred

16    during that meeting?

17         A.  It was an interview.

18         Q.  During the interview.

19         A.  And the interview consisted of him reviewing my

20    resume.  Him reviewing my experiences.  Him telling me

21    who I would report to the daily operation of the job.

22    Giving me pretty much the overview of the position, what

23    they would be looking for in a candidate.  Things of that

24    nature.

25         Q.  Do you recall approximately how long the

1    interview lasted?

2         A.  It lasted approximately 45 minutes.

3         Q.  And were you told anything about how long the

4    job would last?

5         A.  Not specifically.  As a matter of course, I just

6    asked how long would it take for them to make a decision.

7    He stated relatively quickly.

8         Q.  My question was a little different.

9         A.  I'm sorry.

10        Q.  Did Mr. Maddox indicate how long the position,

11   if you were hired for the position, how long the position

12   would last?

13        A.  I don't recall that being part of the

14   conversation with Northeast Utilities.  The length of the

15   position.  I don't recall that.  He may have, but I don't

16   recall us discussing how long they would need someone.  I

17   do recall relative to the time frame.  I do recall him

18   stating how contract positions work with Northeast

19   Utilities where if you work with them for a period of

20   time, then sometimes they are extended over into other

21   years, that by matter of fact, they can hold a contractor

22   for three years either last beyond your initial contract

23   or it could go on up to three years, and we discussed,

24   you know, daily requirements as far as, you know, the

25   eight to five, when I'd possibly be needed for overtime.

1    That's part of the position as well.  I do recall that

2    being communicated.

3         Q.  During that interview on April 19, 2007, was

4    there any discussion about the rate of pay you would be

5    receiving if you were hired for the job?

6         A.  We didn't discuss pay during the interview.

7         Q.  And did he indicate during the interview how

8    long it would take before the decision would be made on

9    filling the position?

10        A.  Yes, that's the question I answered mistakenly

11   before.  I apologize.  He stated that it would be

12   relatively soon.

13        Q.  Did he indicate whether he had any other

14   individuals to interview?

15        A.  Initially when I came into the office, there

16   were stacks of files, which he stated were resumes that

17   they had to go through for candidates they had to

18   consider for the position.

19        Q.  Did there come a time when Northeast Utilities

20   made a decision on your application for employment?

21        A.  I was informed through the temporary agency that

22   they had selected me.  I had been selected as the

23   candidate for hire.

24        Q.  When were you informed that you were selected as

25   the candidate?

1        A.  It was in several days after the interview on

2    the 19th.  It was relatively quickly just as he had

3    said.

4        Q.  Who communicated to you that you received an

5    offer of employment?

6        A.  Mr. O'Keefe.

7        Q.  And how did he communicate that information to

8    you, through what means?

9        A.  He called me.  We spoke on the telephone.

10       Q.  What did he say about the offer?

11       A.  He stated that he heard back or he heard from

12   Northeast Utilities, they would like to offer me the

13   position.  He asked me if I was still interested.  How I

14   felt about that.  If I was excited or if I was interested

15   in, still interested in accepting a position.

16       Q.  What did you say in the response to those

17   inquiries?

18       A.  I was ecstatic.  I told him yes.  That I

19   definitely would like to pursue that position and accept

20   it.

21       Q.  Did you accept the offer of employment that was

22   made to you during that telephone conversation?

23       A.  Yes, I did.

24       Q.  Now, in being hired into the position, did you

25   have an understanding as to who would be your actual

1    employer?

2         A.  Yes.

3         Q.  Who was that?

4         A.  My employer would be the temporary agency, the

5    contract agency.  NESC.

6         Q.  And Mr. O'Keefe was a National Engineering

7    employee; is that your testimony?

8         A.  Yes, he is.

9         Q.  How did this telephone conversation conclude?

10        A.  It ended with my acceptance as I stated.  He

11   wanted to confirm that I am still interested, that I was

12   still interested.  I assured him that I was, and I would

13   be happy to come to work for them, and it concluded with

14   him that a packet of material would be sent out,

15   employment packet, that it would be overnighted.  I had

16   to read through and sign documents and turn it around,

17   send it back to them relatively quickly.

18        Q.  At this time, I will hand the witness Plaintiff

19   Exhibit 12.  Deborah, do you have before you Plaintiff's

20   Exhibit 12?

21        A.  Yes.

22        Q.  Can you identify this document?

23        A.  This is the contract cover letter that I

24   received.

25        Q.  And what is the date at the top of the

1    document?

2         A.   The handwritten date is 4-26-07.

3         Q.   And where is that date in relation to the date

4    of your interview on 4-19-07?

5         A.   It is several days after the interview.

6         Q.   Can you please read the first paragraph.

7         A.   Welcome to National Engineering Service

8    Corporation, NESC.  We were happy to have you working

9    with us, with our team of professional contracts/

10   temporary employees.

11        Would you like me to continue why?

12        Q.   Yes.

13        A.   NESC can offer a variety of assignments in

14   virtually every area and industry locally, regionally and

15   nationally.  As an employee of NESC, you will have the

16   opportunity to receive information regarding health

17   insurance plan referrals, a 401(k), retirement plan and

18   other benefits offered to our qualified contract

19   employees.

20        Q.   And do you see the list of enclosures that are

21   referenced underneath that numbered 1 through 10?

22        A.   Yes.

23        Q.   Were those enclosures included along with this

24   cover letter?

25        A.   I don't recall all of them being enclosed.  Some

1    of them, I believe, were submitted; hence, I checked the

2    documents that I received.  If I can recall this

3    correctly, and the ones I did not receive, I didn't put a

4    check mark next to them, which is the I-9 employment

5    eligibility verifications.

6         Q.  Did you ultimately receive all of these

7    documents?

8         A.  Yes, I did receive all of the documents in

9    answer to your question but not all in the same packet.

10            MR. MADSEN:  At this time I would like to give

11   the witness Plaintiff's Exhibit 14 and have them

12   distributed to the jury.

13            THE COURT:  14.

14        Q.  Ms. Adams, Deborah, you have just been handed

15   Plaintiff's Exhibit 14, and I would ask you if you can

16   identify this document?

17        A.  The title of the document is Employee Contract

18   and Obligations.

19        Q.  Did you receive this employment contract exhibit

20   together with Exhibit 12, the cover letter we had just

21   discussed?

22        A.  Yes, I believe so.

23        Q.  If you look at Exhibit 12 again, do you have a

24   check mark next to Employee Hourly Contract and

25   Obligations?

1          A.   That's the first -- Yes.

2          Q.   What did you do with Exhibit 14, the Employee

3     Hourly Contract and Obligations, when you received it?

4          A.   I read it.  Then I signed it, then I returned

5     it.

6          Q.   And can you confirm that that is your signature

7     at the bottom of the first page of Exhibit 14?

8          A.   Yes.

9          Q.   And can you please turn to the second page.  Can

10    you confirm that that is your signature at the bottom of

11    the second page?

12         A.   Yes.

13         Q.   Do you have a date next to your signature on the

14    second page?

15         A.   4-30-07.

16         Q.   Is that the date that you signed this, the

17    Employee Hourly Contract and Obligations?

18         A.   Yes.

19         Q.   Now, looking at the bottom of Exhibit 14 on the

20    second page, do you see that box there?

21         A.   Yes.

22         Q.   And if you look sort of toward the bottom of the

23    box, do you see a job title?

24         A.   Yes.

25         Q.   What is that job title?

1        A.   The position states contract assistant.

2        Q.   And is there a start date provided there?

3        A.   The start date is 4 -- 5-14-07.

4        Q.   And what time was the job supposed to start?

5        A.   Eight a.m.

6        Q.   And to whom were you to report as indicated on

7    this contract?

8        A.   Byron Maddox.

9        Q.   Do you see at the top of the box it provides

10   information regarding the hourly rate?

11       A.   Yes.

12       Q.   How much was the hourly rate for this

13   position?

14       A.   Twenty-one dollars an hour.

15       Q.   And what was the overtime rate as indicated on

16   this document?

17       A.   The overtime rate was 31.50.

18       Q.   I would like you to look at the first page of

19   the document, specifically item No. 4.  Can you please

20   review -- read that item, paragraph No. 4.

21       A.   At No. 4 reads unless otherwise agreed upon

22   between the employer and the client company to which I am

23   assigned, I shall not accept employment directly or

24   indirectly at the client company for a period of six

25   months following the termination of employment with NESC

1    unless I have written consent of NESC.

2         Q.  Had you discussed that particular term with

3    anyone prior to receiving this contract?

4         A.  No.  There had been no discussion.

5         Q.  Were you -- Had you ever confronted those types

6    of provisions in the past where after your job

7    assignment, you weren't able to continue working without

8    consent?

9         A.  It is standard in these types of contracts as a

10   contractor or temporary employer, it is standard

11   provision, from my experience anyway.

12        Q.  Now, Deborah, after accepting -- Did you by this

13   document intend to accept the offer of employment with

14   National Engineering Service Corporation?

15        A.  Yes, by signing this document I was committing,

16   I was, yes.

17        Q.  Now, after accepting the job offer with National

18   Engineering as a contract administer -- assistant at

19   Northeast Utilities, did you give notice to your employer

20   that you would be leaving?

21        A.  Yes.

22        Q.  How much notice did you give them?

23        A.  I gave the contract agency, Legal Now,

24   approximately two weeks.  The supervisor who I worked

25   with directly, I gave her a little bit more time.  I gave

1    her over -- the day after I accepted the position, I

2    spoke with her.  We had rapport, so I spoke to her and

3    explained the situation.

4         Q.  So you notified them after you verbally accepted

5    the offer?

6         A.  After I accepted and given a start date, I

7    notified everyone.

8         Q.  What day of the week was May 14?  Your start

9    date.

10        A.  The state date was to be Monday, the 14th.

11        Q.  Is your recollection is May 14, 2007 was a

12   Monday; is that your testimony?

13        A.  That's my understanding, yes.

14        Q.  So when would your last day with CB Richard

15   Ellis and Legal Now have been, bearing in mind now that

16   Monday is the 14th, if you back up, when would your last

17   day have been?

18        A.  It was the Friday of the previous week.

19        Q.  Would May 11 sound about right as your last

20   day?

21        A.  Yes.

22        Q.  Did there come a time when you signed an

23   authorization form in connection with a post-offer

24   background check?

25        A.  Yes.

1      Q.   How did you get the form?

2      A.   The form was sent from NESC, it was

3   overnighted.

4      Q.   Were you required to sign it?

5      A.   Yes.

6           MR. MADSEN:  Your Honor, at this time I would

7   like to hand the witness Plaintiff's Exhibit 53.

8           THE COURT:  53.

9           MR. MADSEN:  Correct.

10      Q.   Deborah, I have handed you Plaintiff's Exhibit

11   53.  Can you identify this document?

12      A.   It's a consumer report, investigative consumer

13   report disclosure and release form.

14      Q.   This document, is this document filled out in

15   your handwriting?

16      A.   Yes.

17      Q.   Where it says at the very top I authorize NESC,

18   did you write in NESC or did someone else?

19      A.   I wrote that in.

20      Q.   Can you please read the first sentence at the

21   top of Plaintiff's Exhibit 53.

22      A.   Where it states my name?

23      Q.   Where it begins I authorize.

24      A.   I authorize NESC and Verifications, Inc., a

25   consumer reporting agency, to retrieve information from

1      all personnel, educational institutions, government

2      agencies, companies, corporation, credit reporting

3      agency, law enforcement agency at the federal, state or

4      county level related to my past activities, to supply any

5      and also information concerning my background.

6             Shall I continue?

7        Q.  No, that's fine.

8             Do you see below that it states my current

9      employer may be contacted?  Do you see that?

10       A.  Yes.

11       Q.  What did you check off there?

12       A.  Yes.

13       Q.  And are those your initials next to that?

14       A.  Yes.

15       Q.  And looking below, did you provide your Social

16     Security number on this form?

17       A.  Yes, I did.

18       Q.  For the purposes of this trial, we have blacked

19     out a portion of your Social Security number, but was

20     that portion of your Social Security number blacked out

21     when you sent it back?

22       A.  No.

23       Q.  Did you accurately put down your Social Security

24     number?

25       A.  Yes, I did.

1      Q.  Are those four digits listed there, 3162, the

2    last four digits of you Social Security number?

3      A.  Yes, they were.

4      Q.  What is the date that you signed this

5    document?

6      A.  5-2-07.

7      Q.  I would like to look below, and do you see where

8    it says note?

9      A.  Yes.

10     Q.  Can you please read what it says after the term

11   note.

12     A.  Following information is provided voluntarily

13   and is not considered as part of your application.  It is

14   used only for identification purposes in verifying

15   information on your employment application.

16     Q.  And did you identify your last name and first

17   name accurately on this form below that?

18     A.  Yes, I did.

19     Q.  Do you see above middle name there's nothing

20   there?

21     A.  It is blank, yes.

22     Q.  Why is that?

23     A.  I don't have a middle name.

24     Q.  Did you put down your then current address

25   accurately?

1         A.  Yes, I did.

2         Q.  Did you put down your driver's license

3    information accurately?

4         A.  Yes, I did.

5         Q.  Did you put down your date of birth

6    accurately?

7         A.  Yes, I did.

8         Q.  It says Springfield, Massachusetts.  Can you

9    read what it says below that.

10        A.  List any other cities and states in which you

11   have lived in the previous seven years.

12        Q.  Did you do so?

13        A.  Yes, I did.

14        Q.  Can you go down to the next line that says NA.

15        A.  Yes.

16        Q.  What does NA stand for?

17        A.  Not applicable.

18        Q.  What does it say immediately below that line?

19        A.  Last -- any other last names you have used

20   during the previous seven years.

21        Q.  And how did you spell your first name on this

22   form?

23        A.  D-E-B-O-R-A-H.

24        Q.  Between May of 2007 -- between May of 2000 and

25   May of -- Withdrawn.

1           What did you do with this form after completing

2     it?

3           A.   I submitted it back to NESC.

4           Q.   Was there also a drug test form that came to you

5     at around the same time?

6           A.   Yes.

7           Q.   Did you fill that out?

8           A.   You have to go and get the drug test, and then

9     that documentation is sent from the company that performs

10    the drug test so that they sent me direct examinations as

11    to how the drug test would be performed.  I go and submit

12    to the test.

13          Q.   Did you do that?

14          A.   I sent all the documents back to NESC, the ones

15    that they request.

16          Q.   And did you take that drug test?

17          A.   Yes, I did.

18          Q.   Did you pass the drug test?

19          A.   Yes, I did.

20          MR. MADSEN:   Your Honor, I think now would be a

21    good time.

22          THE COURT:   Ten minutes, ladies and gentlemen.

23    Leave the books right there, your notes and everything

24    else.

25          (Whereupon, a recess was taken from 10:58 a.m.

1   to 11:18 a.m.)

2          MR. MADSEN:  I'm going to tell the jury -- they

3   haven't been putting the exhibits in the notebooks.  I

4   will ask them to do that.  That might take a little

5   time.

6          THE COURT:  You are going to ask them what?

7          MR. MADSEN:  To put the exhibits in the

8   binders.

9          THE COURT:  Aren't they doing that?

10          MR. MADSEN:  No.

11          THE COURT:  They should be doing that.  I will

12   tell them that.

13          (In in the presence of the jury at 11:20 a.m.)

14          THE COURT:  I should have told you as we go

15   along in the trial, you should put the exhibits right

16   into your books when you get them.  Otherwise they get

17   confusing.  Put them in, keep them in the order in which

18   they are numbered so that you don't have to have

19   documents all over the place.

20          MR. MADSEN:  There are tabs with numbers on

21   them, if you match up the tabs with the exhibits.

22          Your Honor, counsel have agreed on submitting to

23   the jury a number of other documents so I would like to

24   hand those out now.

25          THE COURT:  Go ahead and give us the numbers.

```
1              MR. MADSEN:  Sure.  We're going to be handing
2      out Plaintiff's Exhibits 3, 4, 5, 6, 7, 8, 11,  -- I'm
3      sorry.  9, 10, 11, 15, 16, 17, 18, 19, and 20.
4              THE COURT:  So that will be exhibits 3 through
5      11 and 15 through 20.  12 and 4 are already in.
6              A JUROR:  Can I take this in the back room when
7      we're done?  There's so much here.
8              THE COURT:  We don't want you to get confused
9      and have stuff all over the place.
10              A JUROR:  I didn't get No. 18.
11              THE COURT:  You should have 15 through 20.
12              MR. STEIGMAN:  I will get another 18.
13              THE COURT:  You should have 3 through 11 and 15
14      through 20.
15              Okay, you can proceed.
16              MR. MADSEN:  Thank you, your Honor.
17      BY MR. MADSEN:
18          Q.  Deborah, we have just handed you a number of
19      exhibits, and I would like to quickly go through them one
20      by one, and we'll go through in sequential order and make
21      it easier for everyone.
22              Could you please turn to Exhibit 3 and can you
23      identify that document?
24          A.  The title of the document is an Employment
25      Eligibility Verification.
```

1      Q.   Were you asked to fill out this document?

2      A.   Yes.

3      Q.   By whom?

4      A.   This document was part of the packet from

5   NESC.

6      Q.   Did you do so?

7      A.   Yes.

8      Q.   Did you submit it back to National

9   Engineering?

10      A.   Yes.

11      Q.   Please turn to Exhibit 4.  Can you identify that

12   document?

13      A.   This looks like -- I can't read some of the

14   things outside of my name and what have you.  As I

15   recall, this is a document that pertains to the alcohol

16   and drug testing.

17      Q.   Is that your signature near the bottom of this

18   document?

19      A.   Yes.

20      Q.   Did you submit this document?

21      A.   Yes, I did.

22      Q.   Did you do so in connection with your acceptance

23   of offer of employment?

24      A.   Actually this document, I signed this document.

25   I think it's sent from the actual company that performs

1    the testing, so I did my part as to I have to sign it

2    when I go to the guest, which was the company, and I

3    present it to them, and they submit it to NESC.   I

4    believe that's my understanding of how this document is

5    communicated.

6         Q.  Was this in connection with your post-employment

7    drug test?

8         A.  Yes.

9         Q.  Please turn to Exhibit 5.  Can you identify that

10   document.

11        A.  It is a direct deposit form.

12        Q.  Were you asked to fill this out by National

13   Engineering?

14        A.  It is an option.  They didn't ask me to fill it

15   out.  They provided it in the packet.  If I would like

16   direct deposit, I can choose it.

17        Q.  Is it an option that you chose?

18        A.  Yes, it is.

19        Q.  Is that your signature on the second page?

20        A.  Yes, it is.

21        Q.  Please turn to Exhibit 6, please.  What is this

22   document?

23        A.  It is an employee withholding allowance

24   certificate.

25        Q.  Were you asked to fill this out in connection

1    with your employment at National Engineering?

2         A.  Yes.

3         Q.  Did you do so?

4         A.  Yes.

5         Q.  Is that your signature at the bottom?

6         A.  Yes, it is.

7         Q.  What was the date that you signed this

8    document?

9         A.  This is dated 4-30-07.

10        Q.  Did you submit this to National Engineering?

11        A.  Yes, I did.

12        Q.  Please turn to the next document, Plaintiff's 7.

13   Can you identify that document.

14        A.  An employee patent license copyright

15   agreement.

16        Q.  Did you review -- Who did you receive this

17   document from?

18        A.  National Engineering.

19        Q.  Did you review it?

20        A.  Yes, I did read it.

21        Q.  Were you asked to sign it?

22        A.  Yes.

23        Q.  Did you do so?

24        A.  Yes, I did.

25        Q.  Did you submit it to National Engineering?

1          A.   Yes, I did.

2          Q.   Please turn to the next document.  Can you

3     identify Plaintiff's Exhibit 8.

4          A.   Payroll and security administration or

5     information, excuse me.

6          Q.   Were you -- Where did you obtain this

7     document?

8          A.   Part of the packet that I received from National

9     Engineering.

10         Q.   Were you asked to fill it out?

11         A.   Yes.

12         Q.   Did you sign it?

13         A.   Yes, I did.

14         Q.   Is that your signature and date?

15         A.   Yes.

16         Q.   Did you submit it back to National

17     Engineering?

18         A.   Yes, I did.

19         Q.   Please turn to Plaintiff's Exhibit 9.  Can you

20     identify this document, please.

21         A.   Entitled Right To Know Certification.

22         Q.   How did you obtain this document?

23         A.   Part of the packet from the NESC.

24         Q.   Were you asked to sign it?

25         A.   Yes.

1   Q. Did you do so?

2   A. Yes, I did.

3   Q. Is that your signature at the bottom?

4   A. Yes.

5   Q. Did you submit it back to National

6 Engineering?

7   A. Yes, I did.

8   Q. Please turn to Exhibit 10.  How did you

9 obtain -- Can you identify Exhibit 10.

10   A. This is the Commonwealth of Massachusetts

11 notification of unemployment insurance eligibility

12 requirement.

13   Q. How did you obtain this document?

14   A. Part of the employment packet from National

15 Engineering.

16   Q. Were you asked to sign it?

17   A. Yes, I was.

18   Q. Did you do so?

19   A. Yes, I did.

20   Q. Is that your signature at the bottom?

21   A. Yes.

22   Q. Did you submit it back to National?

23   A. Yes.

24   Q. Please turn to the next exhibit, which is 11.

25 Can you identify this document.

1          A.   Yes.   Pre-employment registration form.

2          Q.   How did you obtain this document?

3          A.   I obtained it in the packet, the employment

4     packet from National Engineering.

5          Q.   Were you asked to sign it?

6          A.   Yes.

7          Q.   And fill it out?

8          A.   Yes.

9          Q.   Did you do so?

10         A.   Yes.

11         Q.   Is that your signature at the bottom?

12         A.   Yes.

13         Q.   And on the second page, is that your signature

14    at the bottom?

15         A.   Yes.

16         Q.   Did you send it back to National?

17         A.   Yes, I did.

18         Q.   I would like to turn to Exhibit 15 now.   Do you

19    have that document in front of you?

20         A.   Yes.

21         Q.   Can you identify this document.

22         A.   Sexual harassment policy.

23         Q.   How did you obtain it?

24         A.   I obtained it from National.

25         Q.   Did you read it?

1      A.  Yes.

2      Q.  Can you identify Exhibit 16, please.

3      A.  Plan highlights 401(k) plan.

4      Q.  Now I would like you to identify Exhibit 17 and

5  keep 16 in front of you.

6      A.  EEO and ADA statement, temporary contract,

7  employee employment information.

8      Q.  Now I would like you to identify Plaintiff's

9  Exhibit 18.

10      A.  NESC Section 125 plan benefit dependent care.

11      Q.  I would like you to identify Exhibits 19 and 20,

12  please.

13      A.  19 is alcohol and drug-free workplace policy,

14  and 20 is a defined benefit medical plan packet.

15      Q.  How did you obtain these documents?

16      A.  Excuse me?

17      Q.  How did you obtain these documents?

18      A.  I received all of them from National.

19      Q.  Now, during the week preceding your start day at

20  Northeast Utilities as a contract employee employed at

21  National Engineering, did you have occasion to call

22  anyone from National Engineering?

23      A.  Yes.

24      Q.  I want to direct your attention to Tuesday,

25  May 8, 2007.  Did you place a call to anyone at National

1    Engineering?

2         A.  Yes, I did.

3         Q.  Who did you call?

4         A.  I contacted Mr. Sullivan.

5         Q.  Do you know Mr. Sullivan's first name?

6         A.  Chris.

7         Q.  Do you know what position he occupies at

8    National Engineering?

9         A.  To my knowledge, he's an account manager.

10        Q.  And do you remember what time of the day you

11   called him?

12        A.  After work.  Approximately 6:00, 6, 6:30.

13        Q.  This is on May 8, 2007, correct?

14        A.  Yes.

15        Q.  Did you work at CB Richard Ellis that day?

16        A.  Yes, I did.

17        Q.  Was this the week prior to your scheduled start

18   date at Northeast Utilities on May 14?

19        A.  Yes, it was.

20        Q.  Why were you calling Chris Sullivan shortly

21   after 6:00 or around 6:00 on May 8, 2007?

22        A.  I was confirming my start date.  CB Richard

23   Ellis had notified me they had already replaced me.  They

24   had hired someone to fill my spot once I left, so I was

25   calling to make sure that the job that I was going to was

```
 1    there.

 2         Q.  Do you recall the conversation that you had with

 3    Chris Sullivan that evening?

 4         A.  Yes, I do.

 5         Q.  Can you please describe that conversation.

 6         A.  As I stated, I called him just to confirm that

 7    the start date was still the same.  And at that time he

 8    stated something, the fact that either he had called me

 9    and left a message or he was going to contact me

10    regarding my start date.  I asked him, you know, what did

11    he mean by that, or why was he going to call me, or what

12    message was it that he had left.  He stated they received

13    some type of information on me.  I asked him to elaborate

14    what type of information that he was referring, and he

15    seemed a little indirect, stating that there was a

16    criminal background report that they received, and when I

17    sort of pressured him to be a little bit more forthcoming

18    as to exactly what he received and what it said, then he

19    went on to say and read what the report is that was, that

20    he had -- Shall I continue?

21         Q.  Sure.

22         A.  After he pieces -- gave me part of the document

23    that he stated that they received, I contested that as I

24    asked more questions as to -- My first objection was when

25    he stated that they received a report back on me, I asked
```

1    was that done on a Social Security number.  How was that

2    performed, how was that check performed, was it done with

3    my name and Social Security number.  He stated that he

4    assumed that it was.  I asked further information as to

5    what did it say.  Where did it come from.  Can I have a

6    copy of it.  Could you send it to me, those types of

7    questions.  At that time he stated something that was on

8    the report that I responded saying, no, not again,

9    something like that.  I disclosed to him that that type

10   of report was reported to me almost a year ago by another

11   company and that that information was not mine and had

12   the background check been done on my Social Security

13   number, it would have revealed that that was not my

14   report.  At that time he stated that he had to look into

15   it.  He had to make calls.  We had conversations like I

16   asked him do you have my resume, don't you see where I

17   have lived and where I have been in the past few years.

18   I questioned how it would be reasonable for him or anyone

19   to think that that report belonged to me when I stated

20   where I was and been confirmed where I was at the time of

21   these alleged things that they had on their report and

22   sort of, at one point sort of laughed and said something,

23   I thought it was kind of odd or something to that effect

24   where I thought you would have to be pretty good to be,

25   you know, in the roles that you have been in in

1    Connecticut and then also be in Virginia and doing these

2    other things at the same time.

3        Q.   You testified that you mentioned that something

4    had happened earlier; is that right?

5        A.   That is correct.

6        Q.   I would like you now to explain to the jury what

7    had happened earlier.

8        A.   Approximately a year prior to this incident,

9    there was a similar incident when I applied for a

10   position at the Bank of America through Adecco, which is

11   a national temporary agency, and at that time the

12   recruiter from Adecco contacted me and stated that they

13   received a report back, and I asked her what was the

14   report, and I contested it.  At that time she looked at

15   it and goes, I will make a call.  I asked for the name of

16   the reporting agency, a copy of the report, I wanted to

17   be communicated to what the report was.  I wanted to

18   receive a copy of it.  I wanted them to show me how they

19   made this check and how they received this document.  I

20   wanted to dispute it as being accurate.  How that ended

21   up was once I disputed it, I had the dispute in writing

22   to the company who performed the background check that

23   was ChoicePoint once I did that.  It took a little doing.

24   I had to get that information from Adecco, the address,

25   the contact person name at ChoicePoint.  I had to write

1    them a document.  I had to call them.  They looked into

2    it.  I guess they call a reinvestigation, and then they

3    submitted a revised or corrected copy of the report.  My

4    recruiter at the time indicated to me that she had not

5    communicated the report, the findings of the first report

6    to Bank of America, allowing us time.  Don't worry.  Her

7    statement was, don't worry, Deborah.  I did not tell Bank

8    of America about this report, so once I disputed it,

9    they, within 24 hours, came back and said they apologize.

10   They sent a letter of apology, stated that they had

11   corrected it.  They apologized at that time.  Since I was

12   due to start the job at Bank of America, it was very next

13   week, I just started the job and I let it go.

14        Q.  So in that case, you didn't lose the job as a

15   result of the erroneous background report?

16        A.  At this point it was the matter the first time I

17   heard of anything like this.  It was a mixup as they

18   stated.  I accepted their apology.  I didn't lose the

19   time or any time from the job.  I had to go through

20   contacting different people and getting it straight, but

21   it was about the job, so I didn't loss the job.  They

22   corrected it.  And so I didn't pursue anything any

23   further once I started the job.  Then I let it go.

24        Q.  Now, during the course of your professional

25   career, have you held a number of positions with

1       different companies?

2            A.   Yes, I have.

3            Q.   And have a number of background checks been

4       conducted on you over the years?

5            A.   As far as I can remember back, every position I

6       ever held because of the type of positions I have held.

7       They all have a requirement of background checks.

8            Q.   Was that situation with ChoicePoint the only

9       situation out of all those other backgrounds that the

10      false positive came up?

11           A.   That was the first time.  At that time in 2006

12      that was the first and only time that it came up.

13           Q.   So did you have a -- did you have several

14      background checks that had been done prior to 2007 in

15      which the criminal background check came back negative,

16      meaning there was no criminal conviction listed on their

17      record?

18           A.   After 2006, the incident with ChoicePoint, I had

19      other background checks, but there were no issues, so

20      this other person did not come onto my background check.

21      It was the first time is ChoicePoint, then I worked at

22      other companies, The Hartford, where they did their

23      background check.  It never occurred again until the

24      incident with Northeast Utilities where that same exact

25      data came back through another credit reporting agency.

1    Q.  I want to turn back to your telephone

2  conversation with Chris Sullivan on May 8, 2007.  When he

3  mentioned to you that the background report came back

4  with criminal conviction record, did he indicate to you

5  one way or the other as to whether that background report

6  had already been forwarded to Northeast Utilities?

7    A.  No.

8    Q.  What happened after that conversation with Chris

9  Sullivan on May 8, 2007?

10   A.  The conversation ended where he was going to

11  look into it.  He was going to get me the information

12  that I requested, was the company that performed the

13  background check, their address, telephone number, copy

14  of the report, and he was going to get back to me.

15  That's how it ended.  I sent an e-mail to confirm our

16  conversation disputing what he stated to me over the

17  telephone and also asking for additional information as

18  we discussed over the phone.

19   Q.  Now, I will ask you something.  Prior to -- With

20  that prior situation involving ChoicePoint in 2006,

21  during that whole incident, did you learn anything about

22  your rights under the Fair Credit Reporting Act?

23   A.  That's when I first learned of my rights having

24  worked in companies where I perform these not so much

25  background checks, but anything like, but doing research,

1    looking at contracts and analyzing documents, I had the

2    presence of mind to know where to look to find out what

3    my rights were.  Initially when I asked for a copy of the

4    report, I was told by the recruiter that they didn't know

5    if they could provide that document to me, and that's

6    when I started to research to find out what my rights

7    were.  Then I learned that I did have a right to receive

8    from the employer any documents that they received that

9    would adversely affect my eligibility for employment.  I

10   had a right to review those documents and to contest

11   them.

12          MR. MADSEN:  Your Honor, at this time I would

13   like to present the witness with Plaintiff's Exhibit 51.

14          THE COURT:  5, 1.

15      Q.  Ms. Adams, I handed you Plaintiff's Exhibit 51.

16   Can you identify this document.

17      A.  It is an e-mail to Mr. Sullivan at National from

18   me.

19      Q.  Can you read your e-mail beginning with hello,

20   Chris.  Before you do that, what's the date and time that

21   you sent this e-mail to Mr. Sullivan?

22      A.  It's date stamped May 9, 2007.  At 8:03 a.m.

23      Q.  Was this the morning following, your

24   conversation with Mr. Sullivan?

25      A.  Yes.

1     Q.  And did you send this prior to going to work on

2   that day?

3     A.  I sent it early in the morning before I left for

4   work.

5     Q.  Please read the e-mail beginning with hello,

6   Chris.

7     A.  Pursuant to our discussion last night of

8   inaccurate data on my National background report, please

9   provide me with a copy of the report via fax,

10  866-823-4533.  It is imperative that I dispute data

11  reported with Verifications, Inc. directly for their

12  reinvestigation and issuance of an accurate report based

13  on full name, date of birth and Social Security.  These

14  occurrences of incorrect reporting must be monitored and

15  immediately addressed with all agencies.  If I do not

16  address each issue of incorrect reporting with the

17  reporting companies, my identity, potential employment

18  and credit will be negatively affected.  Your

19  understanding in this matter is greatly appreciated.  If

20  you have additional questions, please contact me.

21  Deborah Adams.

22    Q.  Deborah, did you get a response to that

23  e-mail?

24    A.  Not -- I don't have a reply on this day.

25         MR. MADSEN:  Your Honor, at this point I would

1   like to hand Plaintiff's Exhibit 52 to the witness.

2        Q.   Deborah, can you identify Plaintiff's Exhibit

3   52.

4        A.   It is a string of e-mails.

5        Q.   And can you -- Are these e-mails in

6   chronological or reverse chronological order?

7        A.   Reverse.

8        Q.   So the earliest e-mail is the last two pages of

9   the document?

10       A.   Yes.

11       Q.   And can you identify -- Withdrawn.

12            Do you see the first e-mail, which is beginning

13   on the second to the last page going over, is that the

14   same e-mail that you just read from?

15       A.   Yes.

16       Q.   And do you -- did you get a response to that

17   e-mail from Chris Sullivan?

18       A.   His reply is --

19       Q.   Go ahead.

20       A.   There was a reply.

21       Q.   What is the date and time of the reply?

22       A.   The reply is dated May 9, 2007 at 8:59 a.m.

23       Q.   And was there an -- Withdrawn.

24            Can you please read the text in that e-mail.

25       A.   It reads, Deborah, attached is your verification

1      background report.  They have asked that you bring all

2      issues directly to them to expedite this process.

3          Q.  And was there in fact an attachment?

4          A.  It doesn't show on this document, but I believe

5      I did receive an attachment.

6          Q.  Okay.  What was that attachment?

7          A.  A report, a copy of the report, the background

8      report.

9              MR. MADSEN:  Your Honor, at this time we would

10     like to hand the witness Exhibit 27.

11             THE COURT:  27.

12         Q.  Ms. Adams, you have been handed Exhibit 27.  Can

13     you identify that document.

14         A.  Verifications background investigation report.

15         Q.  And is this an erroneous background report?

16         A.  Yes.

17         Q.  I would like you to -- And did you receive this

18     report initially from Chris Sullivan?

19         A.  Yes.

20         Q.  And did you receive it on or about May 9?

21         A.  Yes.

22         Q.  First of all, I would like you to read the name

23     of applicant on the first page near the top.

24         A.  Deborah Adams.

25         Q.  And far over on the right side of the page it

1    says what?  What is that date?

2         A.  The date is 5-3-07.

3         Q.  What does it say below that for the completed

4    date?

5         A.  5-8-07.

6         Q.  Then if you look below, there is something that

7    states investigation summary.  Do you see that?

8         A.  Yes.

9         Q.  And then going down below, I would like you

10   to -- It says under county, criminal.  Do you see that?

11   There is something that says Virginia Pittsylvania.  Do

12   you see that?

13        A.  Yes.

14        Q.  Do you see where it says note, the three

15   asterisks next to it?

16        A.  Yes.

17        Q.  Can you read what it says?

18        A.  Note.  The following case is located under

19   Deborah Adams with a matching date of birth.

20        Q.  How is Deborah spelled in that sentence?

21        A.  D-E-B-R-A.

22        Q.  How is Deborah spelled under the applicant?

23        A.  D-E-B-O-R-A-H.

24        Q.  Can you read that first case number.  You don't

25   have to read the actual number itself, but underneath

1       what does it say?

2            A.   The case number begins with --

3            Q.   042199.  Can you start there?

4            A.   I'm sorry, I'm lost.  Where do you want me to

5       read from again?  I see the case number.  Is that what

6       you wanted me to read?

7            Q.   No.  Right below that.

8            A.   I understand now.  4-21-99, driving under

9       revocation, suspended operator's license, misdemeanor.

10      The next line is dated 05-18-99.

11           Q.   And does that criminal conviction belong to

12      you?

13           A.   No.  It is not mine.

14           Q.   Can you read what it says for sentence?

15           A.   Sentence reads 10 days jail, suspended, 30 days

16      operator license suspended, $100 fine and $30 cost.

17           Q.   I would like you to turn to the second page.

18      And do you see the three asterisks and note?

19           A.   Yes.

20           Q.   Can you read that sentence.

21           A.   Note.  The following case is located under Debra

22      Jean Adams with a matching date of birth.

23           Q.   Is that how you spell your name, Deborah?

24           A.   No.

25           Q.   Do you have a middle name of Jean?

1        A.   No, I do not.

2        Q.   Can you please read the conviction that's listed

3   under the case number.

4        A.   It is dated 10-1-97, welfare fraud.  Felon,

5   09-20-99, guilty.

6        Q.   Does that conviction belong to you?

7        A.   No, it does not.

8        Q.   Can you read the three sentences below that.

9   The next one that starts with steps.

10       A.   Sentenced two years jail suspended, two years

11   supervised probation and $555 cost.

12            Shall I continue?

13       Q.   Okay.  Yes.  Can you read the next line.

14       A.   12-12-00, failure to comply, two years jail

15   suspended and $231 cost.

16       Q.   There's another entry.  Can you read that.

17       A.   09-23-03.  Sentence, probation revoked, two

18   years jail and $549 cost.

19       Q.   Had you provided information to National

20   indicating and Verifications indicating your states of

21   residence for the last seven years?

22       A.   The communication or the information that I

23   provided was to National, which is my resume, also the

24   document that lists where I lived in the past seven

25   years.

1       Q.  Did you list Virginia on those documents?

2       A.  No.

3       Q.  Have you ever lived in Virginia?

4       A.  No, I have not.

5       Q.  Did you ever communicate to anyone at National

6 Engineering or Verifications, Guidant and Northeast

7 Utilities that you lived in Virginia?

8       A.  No.  I have not.

9       Q.  I would like you to turn back to No. 52.  Do you

10 still have that in front of you?

11      A.  Yes, I do.

12      Q.  And do you see above that e-mail communication

13 on the second page from Chris Sullivan to you, May 11,

14 2007, do you see that you responded to him?

15      A.  Yes.

16      Q.  What was the date and time of your response?

17      A.  May 12, 2007.  At 7:29 a.m.

18      Q.  When was that date in connection with your

19 anticipated start date at --

20      A.  It was the Saturday before the Monday that I was

21 to start.

22      Q.  Can you please read your e-mail communication.

23      A.  It begins thank you.  Where is the corporate

24 office of National Engineering?

25      Q.  And does he respond to that e-mail?

1          A.   On the next page on the next day, he does.

2          Q.   Was it on the next day or the same day, if you

3     look at the very bottom of the first page?

4          A.   On the next page, there's an e-mail.  I jumped

5     up to after that he replied.  In answer to your question,

6     he did respond on the same day at 10:23 a.m.

7          Q.   If you turn to the second page, what does he

8     write?

9          A.   His response is Portsmouth, NH, is our corporate

10    office.  We have offices in Massachusetts, Houston and

11    California as well.  I apologize for this whole process.

12    My first go through with this situation, so I really

13    can't account for the timing or process.  You know a lot

14    more than me on how this goes.

15         Q.   Then did you respond -- Turning to the first

16    page, did you respond to Mr. Sullivan on Sunday,

17    May 13?

18         A.   Yes.

19         Q.   Can you please read your response.

20         A.   I respond I'm learning as well.  This is only

21    the second time this has happened.  I must take proactive

22    measures to ensure this does not happen against, protect

23    my identity/personal information.  What I'm learning is

24    that some companies perform a more comprehensive check

25    initially than others.  Checking name/DOB is

1    inadequate.

2        Q.   What does DOB stand for?

3        A.   Date of birth.  I would request a question from

4    Verifications, I think, how they originally, I have in

5    parentheses what steps were taken, obtain the National

6    background report.  Apparently checking the Social

7    Security number was not the procedure in their initial

8    reporting and there lies the problem.  Can you provide me

9    with the corporate offices address and telephone number.

10   Thank you so much for all your help.  Enjoy your

11   weekend.

12       Q.   Can you please read the next e-mail at the top

13   of the first page of 52.

14       A.   Absolutely.  Our corporate address is 72 Mirona

15   Road, Portsmouth, NH, 03801.  Our number is 800-562-3463.

16   Verifications' corporate address is 1425 Mickelson Drive,

17   Suite 100, Watertown, SD, 57201.

18       Q.   What was the date of that e-mail?

19       A.   This date is Monday, May 14, at 8:30 a.m.

20       Q.   Deborah, did there come a time when you had

21   communications with Verifications regarding this

22   erroneous background report?

23       A.   Yes.  After I received their contact

24   information, I contacted them directly.

25       Q.   And do you recall what day that was, bearing in

1    mind that you received the report on the 9th?

2        A.   I don't recall what date it was, but it was, I

3    believe it was the same date that I was informed by

4    National Engineering of Verifications' communications, so

5    once they sent me the e-mail address or e-mail -- once

6    they e-mailed me the contact information for

7    Verifications, I contacted them.  I didn't wait a day or

8    anything like that.  I contacted them.

9            MR. MADSEN:  Your Honor, at this time I would

10   like to hand out Plaintiff's Exhibit 54 to the jury.

11           THE COURT:  54.

12       Q.   Deborah, you have been handed Plaintiff's

13   Exhibit 54.  Can you identify that document, please.

14       A.   Cover letter of a fax transmission that I

15   sent.

16       Q.   And I want to apologize that that -- this is the

17   cleanest copy that we seem to have here.  I would like to

18   turn your page -- turn your attention to the second page

19   of Plaintiff's Exhibit 54.  Do you see that page?

20       A.   Yes.

21       Q.   Can you identify what that document is?

22       A.   It is a letter addressed to Federal Trade

23   Commission.

24       Q.   What is the date?

25       A.   The date on it is May 9, 2007.

1     Q.  Was that the day after you first learned about

2     the erroneous background report?

3         A.  Yes.

4         Q.  Can you please read, if you can, I know you have

5     a magnifying glass with you, could you please read the

6     contents of this letter.

7         A.  It reads background investigation report

8     performed by Verifications, Inc., for National

9     Engineering, order No. 2597285 on 5-8-07.  Someone else's

10    criminal record was included on my report.

11    Verifications, Inc., failed to perform the complete check

12    on full name, date of birth and Social Security Number

13    but led the client, National Engineering, 72 Mirona Road,

14    Portsmouth, NH, 03801, to believe that they had performed

15    a thorough search.  Date of supply to National

16    Engineering has jeopardized my employment offer.

17    Tentative start date of May 14, 2007 may be delayed or

18    offer rescinded due to negligence of Verifications, Inc.,

19    1425 Mickelson Drive, Suite 100, Watertown, SD.  I have

20    provided proof of mistaken identity to National

21    Engineering.  Included is copy of letter/sentencing order

22    which proves I'm not the same physical person.  Had

23    Verifications, Inc., performed a complete background

24    check inclusive of first name, date of birth and Social

25    Security, they would have discovered their mistake.  I

1    may lose income due to the Verifications, Inc.,

2    negligence/unlawful practices.  Your thorough

3    investigation and restoration to the integrity of my

4    identity is urgently requested.  Sincerely, Deborah

5    Adams.

6        Q.  Did you have an enclosure with this document as

7    indicated below?

8        A.  Three enclosures.

9        Q.  What are they?

10       A.  The first is the sentencing order, previous

11   background check, Verifications, Inc., and National

12   Engineering.

13       Q.  Did you send a copy of this letter to both of

14   those companies at the time you sent this to the Federal

15   Trade Commission?

16       A.  Yes.  The copies are to Verifications, Inc., and

17   National Engineering.

18       Q.  Please turn to the next page.  Do you see

19   there's a letter dated April 7, 2006 to Clerk of Circuit

20   Court?

21       A.  Yes.

22       Q.  Was this letter that you had sent to the court

23   in connection with the erroneous background report in

24   connection with ChoicePoint?

25       A.  Yes.

1      Q.  And I would like you to turn to the next page.

2   What is that document?

3      A.  This is a letter received from ChoicePoint

4   addressed to me.

5      Q.  On what date?

6      A.  On April 25, 2006.

7      Q.  I would like you to read the third full

8   paragraph.

9      A.  It reads informatively with regard to a national

10  criminal file search, the search takes first and last

11  name, Social Security Number and date of birth into

12  consideration.

13     Q.  Actually the next paragraph that says our

14  records.

15     A.  The third paragraph?

16     Q.  Yes.

17     A.  Our records indicate that you initiated a

18  dispute with regard to the reported -- the reported

19  records on April 6, 2006.  After contacting the

20  Pittsylvania County Clerk and the Caswell Community

21  Clerk, it was determined that the records in question did

22  not belong to you.  The records were removed from the

23  report on April 7, 2006.  A revised report was provided

24  to Adecco and was also mailed to you.

25     Q.  Can you read the next paragraph?

1    A.   We sincerely apologize for any inconvenience you

2    may have experienced.  However, the Federal Fair Credit

3    Reporting Act allows the consumer reporting agency up to

4    30 days to resolve a dispute.  This dispute was handled

5    extremely quickly as it was resolved in one business

6    day.

7    Q.   Okay.  I would like you to turn to the next

8    page.  Can you identify that document.

9    A.   A sentencing order.

10   Q.   And can you identify the name and spelling of

11   the defendant.

12   A.   Debra, D-E-B-R-A, Jean, J-E-A-N, Adams,

13   A-D-A-M-S.

14   Q.   To your knowledge, is that the criminal record

15   for the welfare fraud felony that was falsely attributed

16   to you?

17   A.   Yes.

18        MR. MADSEN:  Your Honor, we're going to give to

19   the witness Exhibit 60 and distribute right to the

20   jury.

21   Q.   Deborah, you have been handed Plaintiff's

22   Exhibit 60.  That's a two-page document.  Can you

23   identify this document.

24   A.   The first is a fax cover sheet.  The second is a

25   letter from me to Verifications, Inc.

1          Q.  And when did you send this document to

2     Verifications?

3          A.  Fax cover sheet indicates on May 11, 2007.

4          Q.  What time?

5          A.  8:34 a.m.

6          Q.  Was that the Friday before your anticipated

7     start date at Northeast Utilities?

8          A.  Yes.

9          Q.  Did you go to work at CB Richard Ellis on this

10    day, on May 11, 2007?

11         A.  Yes, I did.

12         Q.  Was this sent before you went to work?

13         A.  Yes.

14         Q.  Can you describe your state of mind when you

15    sent this?

16         A.  It is hard, kind of hard to describe any state

17    of mind.  I imagine I would be as I was when I was first

18    notified on the 8th of May.  It heightened each day that

19    passed when it got closer to the 14th and closer to the

20    end of assignment I had at CB Richard Ellis, that I was

21    going to end one assignment and not have another

22    assignment to go to.  So at this point I'm kind of

23    frantic and a little like this is, you know, this is it.

24    I already gave them notice, and I was getting nowhere

25    with the response as far as whether I was going to be

1  able to start at Northeast Utilities, but it was kind of

2  clear even before the 11th that I had -- it just wasn't

3  going to happen.  I didn't feel it was going to happen.

4      Q.  Now, I would like to turn to the last paragraph

5  of this letter.  Well, the one that starts if this

6  disputed data.  Do you see that?

7      A.  Yes.

8      Q.  Actually before that, can you please read the

9  second full paragraph.  Which starts off in the above

10 noted.

11     A.  In the above noted background investigation

12 report, criminal data of the other person was provided,

13 leading the employer to believe the information was

14 accurate.  Employment which I'm scheduled to start on

15 Monday, May 14, 2007 has been placed on hold due to your

16 false reporting.

17     Q.  Deborah, how did you first learn that your

18 employment was placed on hold?

19     A.  Through Chris Sullivan.

20     Q.  What did you understand your employment being

21 placed on hold, what did you understand that to mean?

22     A.  I understand it to mean that it wasn't going to

23 take place.  That's my interpretation of the being placed

24 on hold.

25     Q.  I would like you now to turn to the second to

1    the last paragraph that starts off if this disputed data.

2        A.   If this disputed data is not removed and

3    reinvestigated, report issued by 3 p.m. Eastern Standard

4    Time on Friday May 11, 2007, a civil action against your

5    company for lost wages will be filed on this day.

6        Q.   Was it your hope that if the data was

7    immediately corrected, that maybe you could salvage your

8    job offer at Northeast Utilities?

9        MR. KUPINSE:  Objection.  I think that's one of

10   the leading questions that you talked about.

11       THE COURT:  Well, yes, it is.  The problem with

12   leading questions, sometimes it is impossible to get to

13   the subject without leading into the subject, so we do

14   provide some leeway there, but why don't you rephrase the

15   question and ask what her hope was.

16       Q.   Why did you want a response by 3:00 on Friday,

17   May 11?

18       A.   Holding out that I could start on the 14th.  It

19   was -- Friday, the 11th, was my last day at CB Richard

20   Ellis, so I was trying to get some type of response to

21   start at Northeast Utilities on Monday.

22       MR. MADSEN:  Your Honor, at this time I would

23   like to give the witness Plaintiff's Exhibit 56.

24       THE COURT:  56.

25       Q.   Ms. Adams, you have been handed Exhibit 56.  Can

1    you identify this document.

2        A.  It is a fax cover letter and a letter,

3    subsequent letter.

4        Q.  What is the date of this document?

5        A.  The letter is dated May 14, 2007.

6        Q.  What is the date of the fax cover sheet?

7        A.  May 14, 2007.

8        Q.  Was that the day you were supposed to start work

9    at Northeast Utilities?

10       A.  Yes.

11       Q.  And who is the letter beginning on the second

12   page addressed to?

13       A.  It's addressed to Ms. Poquette of

14   Verifications.

15       Q.  I would like you to read the body of the letter,

16   please.

17       A.  Dear, Ms. Poquette.  In the follow-up to

18   conversations last week concerning above-noted matter, I

19   request a copy of cleared background report and have yet

20   to receive report.  I have lost wages today due to a

21   pending background clearance stated on Friday, May 11,

22   2007 that clearance was provided to the National

23   Engineering.  Please confirm date said clearance was

24   provided and to whom.  Additionally, I'm requesting the

25   method used for verifying my background and method used

1    for reinvestigating my dispute.  Lost wages are due to

2    my -- no fault of my own but a direct result of

3    inaccurate reporting by your company.  There were -- I'm

4    requesting reimbursement plus damages be paid by

5    Verifications, the 218 per day.  In parentheses, it reads

6    pay per day plus $50/damages.  Civil claim will be filed

7    this week if above-noted requests are not met.  I left

8    employment on May 11, 2007, whereas I was cleared on a

9    background check to accept a position through National

10   Engineering, who relied on the integrity of your company

11   to produce an accurate and timely investigation/report.

12   Your written response is requested.  Thank you for your

13   urgent attention to this matter.

14        Q.  Did you send copies of this letter to anyone?

15        A.  Both Mr. O'Keefe and Sullivan at National

16   Engineering.

17        Q.  What was your state of mind when you wrote this

18   letter?

19        A.  I had already missed a day, and it further sort

20   of confirmed my feeling, inclination that I received on

21   the 8th.  I was speaking to person that this job at

22   Northeast Utilities was not going to happen.  I was not

23   going to start.

24        Q.  Now, at this time you were living with your son,

25   correct?

1       A.  Yes.

2       Q.  Were you at this time in your life living

3   paycheck to paycheck?

4       A.  Yes.

5       Q.  Were finances tight for you?

6       A.  I'm not a rich person.  I have, never have been.

7   I have been working class, so yes.

8       Q.  Now, the letter indicates that you spoke with

9   Ms. Poquette on May 11; is that right?

10      A.  Yes.

11      Q.  Was that before or after you faxed the letter

12  that is Exhibit 60, if you still have that in front of

13  you?

14      A.  I would have to rely on the date stamp of

15  whatever the documents.  If they are fax transmission,

16  then I would rely on the date stamps.  It was fast and

17  furious where I was sending out documents.  In what order

18  I sent them out, is that what you are looking for?  Is

19  that your question?

20      Q.  You spoke with Ms. Poquette on the phone; is

21  that correct?

22      A.  Yes.

23      Q.  You did so on May 11; is that right?

24      A.  Yes.

25      Q.  You also faxed a letter on May 11, which is

1     Exhibit 60?

2          A.   Yes.

3          Q.   Do you recall the conversation that you had with

4     Ms. Poquette on May 11?

5               MR. COFFEY:   Ms. Poquette.   Her name is Mary

6     Poquette.

7               THE COURT:   Why don't you sit down and use the

8     mic.   Make sure you have a mic in front of you.

9               MR. COFFEY:   I apologize.   I wanted to point out

10    my client's name is Poquette.   Not Poquette. I wanted

11    counsel to refer to her with her correct name.   Thank

12    you.

13              THE WITNESS:   I apologize for mispronouncing

14    your name.

15              MR. MADSEN:   I apologize, also.

16              THE COURT:   If you can remember your question

17    and answer it.

18         A.   You are asking me what time I spoke to Mary.

19         Q.   Poquette.

20         A.   This date of the fax is at 11:34 a.m. so I would

21    have spoken to her after.   Am I understanding your

22    question correctly?

23         Q.   Yes.   Do you recall the conversation you had

24    with Ms. Poquette?

25         A.   The conversation was in follow-up to the letter

1    to discuss basically the same thing that I put in the

2    letter to urgently appeal to get the corrected background

3    report, find out if it had been done; if so, where was it

4    sent, when was it sent.  That was the extent of the

5    conversation to my recollection.

6        Q.  Going back to Exhibit 56, I would like to draw

7    your attention to the sentence which states, I'm

8    requesting the methods used for verifying my background

9    and methods used for reinvestigating my dispute.  Do you

10   see that?

11       A.  Yes.

12       Q.  Did Verifications ever provide that to you other

13   than in the course of this lawsuit?

14       A.  No.  No.

15       Q.  Then the next sentence reads, lost wages are due

16   to no fault of my own.  Do you see that?

17       A.  Yes.

18       Q.  Did they ever pay you for your lost wages?

19       A.  No.

20       Q.  Now, at the time you sent this letter out on

21   May 14, 2007, did you know one way or the other whether

22   National Engineering had sent the erroneous background

23   report to Comensura at Northeast Utilities?

24       A.  No.

25           MR. MADSEN:  Now, at this time I would like to

1    hand the Plaintiff Exhibit 57.

2            THE COURT:  57.

3        Q.  Deborah, you have been handed Plaintiff's

4    Exhibit 57.  Can you identify this document, please.

5        A.  Cover sheet and a letter.

6        Q.  And what is the date of the letter which is on

7    the second page?

8        A.  The letter is dated May 15, 2007.

9        Q.  To whom is it addressed?

10        A.  It's addressed to Leanne Johanson.

11        Q.  Or Johanson?

12        A.  Johanson.

13        Q.  At what company?

14        A.  At Verifications, Inc.

15        Q.  And why did you send this letter?

16        A.  This is well after the time that I would have

17    started at Northeast Utilities, and this letter was to

18    inform persons, executive personnel at Verifications,

19    Verifications, Inc., of my experience.

20        Q.  And if you turn to the first page, what was the

21    date that you sent this letter?

22        A.  The fax cover sheet is dated 5-16-07.

23        Q.  At this point in time, did you have concerns

24    about whether or not you would be able to meet financial

25    commitments?

1           A.   Yes.

2                MR. MADSEN:   Your Honor, I would like to, like

3      to present to the witness Plaintiff's Exhibit 29.

4                THE COURT:   29.

5           Q.   Deborah, can you identify Plaintiff's Exhibit

6      29.

7           A.   It's a string of e-mails.

8           Q.   What is the date of the first e-mail?

9           A.   The first e-mail is dated on Monday, May 14,

10     2007.

11          Q.   And what is the date of the last e-mail?

12          A.   I'm reading in reverse chronological order, so

13     the first one is May 14, and the last one is May 15,

14     2007.  So I'm reading from the last page to the front

15     page; is that right?

16          Q.   Yeah.  That was my question.

17               On May 14, 2007, you send an e-mail at 9:26.  Do

18     you see that?

19          A.   Yes.

20          Q.   It says, please see attached letter of

21     Verifications.  Do you see that?

22          A.   Yes.

23          Q.   Now, looking at the exhibits that you have in

24     front of you, the one to Mary Poquette dated on May 14.

25     Do you see that exhibit?

1      A.  Yes.

2      Q.  Is that what you attached to this e-mail?

3      A.  Yes.

4      Q.  Did Mr. Sullivan respond to you, to that

5  e-mail?

6      A.  The next e-mail reads at 9:44.

7      Q.  That was a response to your earlier e-mail?

8      A.  Yes.

9      Q.  Can you please read Mr. Sullivan's e-mail

10  message.

11      A.  Deb, thank you for keeping us up to speed on

12  this issue.  At this point we are in a holding pattern as

13  the initial report provided to NU had you failing your

14  background check.  They have issued an offer to another

15  candidate, and we are forced to wait until at least

16  tomorrow to see where things stand.  Unfortunately,

17  because we didn't know about this potential issue

18  beforehand, the report came back negative.  We were

19  ultimately stuck waiting on the client and have no

20  authority whatsoever in this situation.  My apologies on

21  this issue.

22      Q.  Was that the first time that you learned an

23  offer had been given to another candidate?

24      A.  Yes.

25      Q.  How did that make you feel?

1        A.   At that point, I was pretty much distraught.

2   That sort of confirmed my feelings and beliefs that I was

3   not going to get this job.  This pretty much confirmed

4   that I was out of work without any income.

5        Q.   Did you respond to Mr. Sullivan later on that

6   day, on May 14?

7        A.   E-mail of 1:03 p.m.

8        Q.   I want you to read the first two words of your

9   e-mail.

10       A.   I see.

11       Q.   Just those words.  When you said I see, what did

12   you mean to indicate by that?

13       A.   What I meant was I understand now you are

14   telling me that another offer has been made to another

15   candidate, and now at this late date you are pretty much

16   informing me that my chances of working for Northeast

17   Utilities in this assignment will not occur.  Will not

18   happen.

19       Q.   Can you please read the rest of that e-mail to

20   Mr. Sullivan on May 14.

21       A.   When did you receive the report from

22   Verifications, Inc., and report to Northeast Utilities

23   that I had failed the background check?

24       Q.   Was that the first time that you had any inkling

25   that the erroneous background report had been sent to

1    Northeast Utilities?

2         A.  Yes.

3         Q.  And then can you please read your response on

4    Monday, May 14.  I'm sorry, Mr. Sullivan's response.

5         A.  His response was on May 14 at 1:09 p.m., and it

6    reads, the initial report came to us and was posted on

7    their on-line database last Tuesday.  They posted the

8    results as complete adverse.  If there's other letters or

9    other words --

10        Q.  We will confirm that the sticker is not hiding

11   any text.  We'll certainly confirm that.  Mr. Sullivan

12   indicates that the report was forwarded on to Northeast

13   Utilities Tuesday afternoon, correct?

14        A.  Yes.

15        Q.  What were you doing on Tuesday afternoon?

16        A.  I was working at CB Richard Ellis.

17        Q.  And did he forward the report to Northeast

18   Utilities based on this -- to Northeast Utilities before

19   you were apprised of this report?

20        A.  That's my understanding.

21        Q.  Can you please read your response.

22        A.  My response on May 15?

23        Q.  May 14.

24        A.  Yes.  My response on May 14 at 2:48 p.m., please

25   be advised that I have filed a complaint against

1    Verifications with the FTC, a complaint against National

2    Engineering and Verifications, Inc., with Connecticut

3    State Protection and have contacted a law firm for claims

4    against National Engineering and Verifications, Inc.

5    Enjoy your afternoon.  Deborah Adams.

6         Q.  What was your state of mind when you sent that

7    e-mail?

8         A.  Distraught.

9         Q.  What is Mr. Sullivan's response at the top of

10   Plaintiff's Exhibit 29?

11        A.  May 15 at 9:23 a.m.  I'm a little confused as to

12   how this falls on us as we do not -- as we do not run the

13   background check, but whatever you feel is necessary, I

14   suppose.

15             MR. MADSEN:  Your Honor, this is a perfect time

16   for us to take our lunch.

17             THE COURT:  Ladies and gentlemen, we'll go until

18   quarter of two, if you can get back.  If you can't get

19   back at quarter two, we'll resume when you get back.  I

20   don't want to go over an hour.  Forty-five minutes are

21   fine.  The restaurants, there's one across diagonally

22   from the courthouse at 1000 Lafayette.  That's Grand Deli

23   on the ground floor.  There's Take Time that's good, fast

24   setup at Broad Street and state and Roberto's on State

25   Street and Main.  Those are pretty good.  Pretty fast.

1    Other than that, I leave you to your own devices.

2    There's also a place downstairs in our building that has

3    some food, also.  Don't talk about the case during lunch,

4    and we'll see you at quarter to 2.

5              (Whereupon, a luncheon recess was taken from

6    12:50 p.m. to 2:00 p.m.)

7              THE COURT:  Are we putting another witness on

8    the stand?

9              MR. MADSEN:  We are.

10             THE COURT:  Go ahead and put them on the stand.

11             (In the presence of the jury)

12             THE COURT:  We're going to interrupt the

13   plaintiff's testimony to put on a witness to convenience

14   the witness.

15             KATHLEEN SHAPLEIGH, having been called as a

16   witness, was first duly sworn and testified on her oath

17   as follows:

18             THE CLERK:  You may be seated.

19             Please state your name and spell your last name

20   and residence town.

21             THE WITNESS:  Okay.  Kathleen, with a K,

22   Shapleigh.  S-H-A-P-L-E-I-G-H.  Glastonbury, Connecticut.

23             THE COURT:  Do you want to repeat that for me?

24   So I can get the spelling right.

25             MR. MADSEN:  Just to confirm, your name is

```
1        Kathleen Shapleigh, K-A-T-H --
2              THE COURT:  I know how to spell it.
3                      DIRECT EXAMINATION
4     BY MR. MADSEN:
5         Q.  Good afternoon, Ms. Shapleigh.
6         A.  Good afternoon.
7         Q.  Are you here today pursuant to a subpoena?
8         A.  Yes.
9         Q.  Are you currently employed?
10        A.  Yes.
11        Q.  Who is your employer?
12        A.  Guidant Group.
13        Q.  What is your position?
14        A.  I'm a senior contingent resource consultant.
15        Q.  How long have you held that position?
16        A.  I started in April of 2003.
17        Q.  Where do you physically work?
18        A.  At Northeast Utilities, Berlin, Connecticut.
19        Q.  Were you also employed by a company named
20    Comensura?
21        A.  Yes.
22        Q.  And did that company go on to become the Guidant
23    Group?
24        A.  Yes.  There was a name change in July of 2007.
25        Q.  So did you initially work for Comensura?
```

1        A.  Yes.

2        Q.  We'll for today just refer to both Comensura and

3    Guidant as Guidant; is that okay?

4        A.  Yes.

5        Q.  In 2007, did you become involved in a situation

6    involving Deborah Adams, the plaintiff in this case?

7        A.  Yes.

8        Q.  Were you an employee of Guidant at that time?

9        A.  Yes.

10       Q.  You were stationed up at Northeast Utilities?

11       A.  Yes.

12       Q.  What were your job duties and responsibilities

13    at that point in time?  Just for your reference, we're

14    talking March, April and May of 2007.

15       A.  Guidant Group is hired by the Northeast

16    Utilities to oversee all the contingent hiring.  So we

17    all, see all the contractual or temporary requests for

18    Northeast Utilities.

19       Q.  What role did you play in connection with

20    Guidant's provision of those services to Northeast

21    Utilities?

22       A.  We first work with NU, Northeast Utilities,

23    hiring managers to formulate the order.  We send it

24    through for approval.  This is all done electronically

25    through a staff enabler system so we can track the order

1    and all of the information.  The order comes to me, and I

2    release it simultaneously to approximately 40 agencies

3    with whom we work, staffing companies who partner with

4    the Guidant Group to fill that order.  To that order, the

5    staffing companies submit resumes.

6         Q.  And how do the staffing agencies submit the

7    resume?

8         A.  They submit it electronically to the order and

9    staffing.

10        Q.  You refer to the contingent employees or

11   contingent work force, do you call that?

12        A.  Temporary, yes.

13        Q.  Are all of those individuals who are hired as

14   contingent employees, are they employed as a contractual

15   basis to your knowledge?

16        A.  Yes.

17        Q.  They are.  Are they all employed on a temporary

18   basis to your knowledge?

19        A.  Yes.

20        Q.  Was there anyone else in March, April, May of

21   2007 from the Guidant Group working out at Northeast

22   Utilities other than you?

23        A.  Yes, there were three of us on-site, a manager

24   and another CRC.

25        Q.  Does Guidant have a relationship with National

1    Engineering Service Corporation?

2          A.   Yes.

3          Q.   Can you describe that relationship?

4          A.   They are one of the staffing companies who

5    joined our program and in partnering with filling or to

6    filling orders for the Northeast Utilities.

7          Q.   You testified earlier there were about 40

8    staffing agencies you work with?

9          A.   Approximately, yes.

10         Q.   So National Engineering was one of those 40?

11         A.   Yes.

12         Q.   Is it fair to say that National Engineering

13   provides a service to Guidant?

14         A.   Yes.

15         Q.   Do they get a fee in connection with that

16   service?

17         A.   There's a markup on each order of 30 percent for

18   all staffing companies.

19         Q.   So the answer is yes, they do get a fee?

20         A.   Yes.

21         Q.   Does National Engineering have a contractual

22   relationship with Guidant whereby National Engineering

23   has certain obligations to fulfill in connection with

24   providing those services to Guidant?

25         A.   Yes.

1    Q.  Does one of those obligations, to your

2  knowledge, require National Engineering to oversee or

3  conduct background checks, ensure that prospective

4  employees meet the eligibility criteria for contingent

5  employment at Northeast Utilities?

6    A.  Yes.

7    Q.  So Guidant, it does not get personally involved

8  in ordering background checks on candidates that are

9  presented to Northeast Utilities as applicants?

10    A.  We do not.  We're not involved in that

11  process.

12    Q.  Are all of these services that are provided by

13  the staffing agencies done so in consideration of the fee

14  that they collect?

15    A.  I'm not certain I understand the question.

16    Q.  It was a terrible question.  I will turn

17  elsewhere.

18        Did you act -- Does the Guidant Group in effect

19  act as a gatekeeper for NU's contingent work force?

20    A.  Yes.

21    Q.  Is it the case that the staffing agencies must

22  go through the Guidant Group in order to place temporary

23  employees at Northeast Utilities?

24    A.  Yes.

25    Q.  Does the process for hiring contingent

1   employees at NU work the same way today as it did in

2   2007?

3       A.  Yes.

4       Q.  Now, I think to go through the process so we

5   understand it completely, does the process begin with

6   Northeast Utilities' managers making a decision to hire

7   someone?

8       A.  The process begins with Northeast Utilities

9   contacting Guidant Group to create an order.

10      Q.  And do the orders have to be approved internally

11  by NU management?

12      A.  Yes.

13      Q.  How is that done?

14      A.  Electronically.  Once the order is created and

15  sent out to the managers for approval.

16      Q.  Does the hiring manager check off boxes or do

17  you put some indication into the system that the order is

18  approved?

19      A.  Yes.

20      Q.  When they approve the order, are they approving

21  the description of the job duties?

22      A.  Yes.

23      Q.  Are they approving the job title?

24      A.  Yes.

25      Q.  Are they approving the pay rate?

1    A.  Yes.

2    Q.  Are they approving whether or not there's

3    full-time, 40 hours a week, versus part time?

4    A.  Yes.

5    Q.  What other sorts of things are they approving?

6    A.  The hourly rate and estimated spend for that

7    position.

8    Q.  In the context of this process, who actually

9    makes the decision to hire the contingent worker?

10   A.  The Northeast Utilities manager makes the

11   decision to extend an offer of temporary employment via

12   Guidant Group to the staffing company.

13   Q.  Does Guidant Group act as an agent for Northeast

14   Utilities to the staffing agencies with respect to

15   employment of contingent workers?

16   A.  Protocol mandates that the staffing company deal

17   directly with Guidant Group, and the managers deal

18   greatly with Guidant Group.

19   Q.  If staffing companies wish to communicate to

20   Northeast Utilities, they must communicate to you?

21   A.  Yes.

22   Q.  So in communicating with you, they are in effect

23   communicating with the Northeast Utilities?

24   A.  Yes.

25   Q.  And does Guidant Group in turn have an

1    obligation to transmit unfiltered -- Withdrawn.

2          Does Guidant Group have an obligation to

3    transmit information from staffing agencies to the hiring

4    managers?

5          A.  Yes.

6          Q.  And do you have an obligation as a

7    representative of Guidant Group to transmit information

8    accurately, completely, and completely to Northeast

9    Utilities?

10          A.  Yes.

11          MR. MADSEN:  Your Honor, the next exhibit, one

12    of the defendants has indicated an intention to object,

13    so maybe I can just confer with counsel right now and see

14    how they want to handle it.

15          THE COURT:  We'll have a sidebar if we need to.

16          MR. MADSEN:  Your Honor, I'm going to ask the

17    witness just a preliminary question without asking her to

18    divulge the contents of this document.  May I approach

19    the witness, your Honor?

20          THE COURT:  Yes, it is your witness.

21          Q.  Ms. Shapleigh, I would ask you not to read out

22    loud that document, but could you just look at that

23    document and tell us whether or not you recognize that

24    document.

25          A.  Yes.

1    Q.  Is it a document that you are familiar with?

2    A.  Yes.

3        MR. MADSEN:  Your Honor, at this time we would

4    like to enter Exhibit 2, Plaintiff's Exhibit 2 as a full

5    exhibit.

6    Q.  Ms. Shapleigh, I would like to turn your

7    attention to Plaintiff's Exhibit 2 and specifically can

8    you tell us whether this -- the first page of this

9    document is a printout from that electronic system you

10   referred to earlier in your testimony.

11   A.  Yes.

12   Q.  That system is called the staff enabler

13   system?

14   A.  Yes.

15   Q.  Is that a system that's proprietary to

16   Guidant?

17   A.  Yes.

18   Q.  Is it a system that the Northeast Utilities and

19   Guidant use in conjunction with each other?

20   A.  Yes.

21   Q.  And is this the job order that was offered to

22   Deborah Adams?

23   A.  This appears to be.  The first page appears to

24   be an interview.  Record of an interview.

25   Q.  We'll get to another document later on.  Is this

1    that -- I'm going to rephrase the question.

2            Is this the job order relating to the position

3    for which Deborah Adams interviewed at Northeast

4    Utilities?

5        A.  Yes.

6        Q.  Can you tell me what is the title of this

7    position that Deborah Adams applied for?

8        A.  Contract assistant.

9        Q.  And if you look down below, do you see there's a

10   section entitled Candidate Resumes, CVs?  Do you see

11   that?

12       A.  Yes.

13       Q.  Do you see that there is a file identified there

14   as Adams, Deborah, and says full?  Do you see that?

15       A.  Yes.

16       Q.  I would like you to turn to the next three

17   pages.  How many pages is your document?

18       A.  Seven.

19       Q.  If you could turn to the next two pages.  Which

20   are Bates stamped at that bottom 36 and 37.  Does that

21   appear to be the resume that was attached to Deborah

22   Adams' application?

23       A.  Yes.

24       Q.  And if you could then go down to candidate

25   activity history.  Do you see that?

1      A.   Yes.

2      Q.   And there's four items listed there?

3      A.   Yes.

4      Q.   Can you, starting with No. 1, go through all

5   four and explain what they refer to.

6      A.   The candidate resume was submitted to me on the

7   29th of the March at 3:54 p.m. by Chris Sullivan.

8      Q.   It says submitted to OM?

9      A.   Yes.

10      Q.   What's that?

11      A.   That's the Guidant Group.

12      Q.   That would have been you?

13      A.   Yes.  On-site manager.  But it is Guidant Group.

14      Q.   Please continue with No. 2.

15      A.   I submitted Deborah Adams' resume on March 29 at

16   5:48.  There was an interview request on the 16th of

17   April, '07, at 9:54.  The interview was scheduled on the

18   16th of April at 9:56 a.m.

19      Q.   Did you say the 16?

20      A.   It was scheduled on the 16th for the 19th.

21      Q.   Did you do those entries?

22      A.   Yes.

23      Q.   Now, No. 1, where it says candidate submitted to

24   OM, it says created by Sullivan, Chris.  Do you see

25   that?

1          A.   Yes.

2          Q.   Who is Chris Sullivan?

3          A.   He is an employee of National Engineering.

4          Q.   I would like you now to sort of move up the

5    document under selected candidate, and do you see where

6    it lists the pay rate and the bill rate?

7          A.   Yes.

8          Q.   What is the pay rate for this position of

9    contract assistant?

10         A.   Twenty-one dollars.

11         Q.   What is the bill rate?

12         A.   27.30.

13         Q.   Does one of those represent the hourly rate that

14   Deborah Adams would be receiving if she was employed in

15   this position?

16         A.   Yes.

17         Q.   Which one?

18         A.   Pay rate.

19         Q.   And what does the bill rate stand for?

20         A.   The agency's fee.

21         Q.   So is it fair to say based on this that once

22   Deborah Adams began her employment, that every hour she

23   worked would be billed by National Engineering to

24   Northeast Utilities at the rate of 27.30 per hour,

25   Deborah herself would be paid at $21 per hour; is that

1      correct?

2           A.   That is correct.  It is not billed directly to

3      Northeast Utilities, it is billed to the Guidant Group.

4           Q.   So the markup in this particular case is

5      $6.30?

6           A.   Correct.

7           Q.   If, for instance, Deborah Adams worked 1,000

8      hours, Guidant's -- I'm sorry, National Engineering's fee

9      would be $6,300?

10          A.   The fee would be 27.30 times 1,000 hours.

11          Q.   In terms of what they needed as a fee, that

12     would be less the 21 they paid to Deborah Adams?

13          A.   Correct.

14          Q.   Thank you.

15               Did you become aware that Deborah Adams was

16     interviewed at Northeast Utilities?

17          A.   I was aware on the 16th of April when I

18     scheduled the interview.

19          Q.   Are you aware that the interview took place on

20     April 19?

21          A.   Yes.

22          Q.   What role, if any, did you play in scheduling

23     her interview?  Did you participate in actually

24     scheduling the interview?

25          A.   Yes.

1       Q.  And how did you go about doing that?

2       A.  The hiring manager, hiring managers give us the

3   dates and times they are available, and we contact the

4   agency, in the case National Engineering, to schedule

5   that time and date.

6       Q.  What, if anything, happened as a result of

7   Deborah Adams' interview at Northeast Utilities?

8       A.  The hiring manager contacted me to notify

9   National Engineering via Guidant Group to extend an offer

10  of temporary employment to Deborah Adams.

11      Q.  So which hiring manager contacted you to

12  instruct you for an offer to be extended to Deborah

13  Adams, if you recall?

14      A.  I don't remember.  There are two managers here.

15  I don't honestly remember which.

16      Q.  Who are the two managers?

17      A.  Patricia Park and Brian Maddox -- Byron

18  Maddox.

19      Q.  Are both of those individuals still employed at

20  Northeast Utilities?

21      A.  Yes.

22          MR. MADSEN:  Your Honor, I would like to hand

23  the witness Plaintiff's Exhibit 64.

24          THE COURT:  64.

25          MR. MADSEN:  I just realized the exhibits are

1    not three-hole punched.  We'll take care of that at a

2    later time.

3              THE COURT:  Okay.

4         Q.  Ms. Shapleigh, I would ask you to take a look at

5    Plaintiff's Exhibit 64 and identify this.

6         A.  It's the order.

7         Q.  And are you familiar with this document?

8         A.  Yes.

9         Q.  Did you take part in creating the contents of

10   this document?

11        A.  Yes.

12        Q.  The portions that you put in, did you create

13   those at or near the time of the events referred to in

14   them?

15        A.  Yes.

16        Q.  Can you explain, you referred to it as an order.

17   In the context of this system, what your process, what is

18   the significance of the order?

19        A.  The order is created to give the staffing

20   company the information necessary for them to submit

21   qualified candidates to fill this temporary request.

22        Q.  So is this the order that would have been sent

23   out to the staffing agencies?

24        A.  Yes.

25        Q.  Would you have been responsible for sending it

1    to the staffing agencies?

2         A.  Yes.

3         Q.  Would it have been sent out to 40 or

4    approximately 40?

5         A.  It would be sent out to those who participate in

6    this particular category.  Contract assistant would be a

7    professional category.

8         Q.  Of the 40 staffing agencies, there might be some

9    staffing agents that specialize in the nuclear scientist,

10   and you would not have sent this to them?

11        A.  Correct.

12        Q.  Is National Engineering one of the firms that

13   you sent this order to?

14        A.  Yes.

15        Q.  If you see at the top of the

16   document -- Withdrawn.

17            Is this the document that you provided at your

18   deposition in this case?

19        A.  Yes.

20        Q.  Do you see at the top of the document under

21   status it says canceled?  Do you see that?

22        A.  Yes.

23        Q.  When the order was sent to National Engineering,

24   did it say canceled on it?

25        A.  No.

1      Q.  When was that put in?  I can withdraw that

2  question.

3          Was that put in later?

4      A.  Yes, at the end of the order.

5      Q.  What was the date that this order was created?

6      A.  It was created on the 13th of March.

7      Q.  And do you see under start time and end time it

8  says start time, 8 a.m., and end time, 4:30?  Do you see

9  that?

10     A.  Yes.

11     Q.  And you see next to it hours, week 40, is that

12 right?

13     A.  Correct.

14     Q.  Does that indicate that during the duration of

15 this contract, the employee would be expected to work 40

16 hours per week?

17     A.  Yes.

18     Q.  And do you see where it says require OT?

19     A.  Yes.

20     Q.  What the does OT stand for?

21     A.  Overtime.

22     Q.  That box is not checked, is it?

23     A.  No.

24     Q.  Does that mean that overtime would never be

25 available for Deborah Adams or just that it was not

1    required?

2         A.  It was not required for this position.

3         Q.  Have there been positions at Northeast Utilities

4    that you are aware of where the requires OT box was not

5    checked and yet the candidate was offered the opportunity

6    for overtime during their contingent employment?

7         A.  Not that I'm aware of.

8         Q.  I would like to go down to order comments.  Do

9    you see that?

10        A.  Yes.

11        Q.  Do you see how the letters KS appear a few times

12   in that?

13        A.  Yes.

14        Q.  What do KS stand for?

15        A.  They are my initials.

16        Q.  If you look at sort of the end of the order

17   comments, it says KS 3-27-06.  Dollar authority verified.

18   Do you see that?

19        A.  Yes.

20        Q.  Is 2006 accurate?

21        A.  No, it is typographical error.

22        Q.  What should that have been?

23        A.  '07.

24        Q.  Are these listed in reverse chronological

25   order?

1          A.   The most current.

2          Q.   So the earliest one was the last one listed

3     there, the 3-27-06?

4          A.   That was the first listed.

5          Q.   The second listed, can you read that.

6          A.   Yes.  An offer of temporary employment has been

7     extended and is contingent upon background check

8     results.

9          Q.   Was that a true and accurate statement?

10         A.   Yes.

11         Q.   Was the offer of temporary employment extended

12    to Deborah Adams?

13         A.   It was extended to National Engineering via

14    Guidant Group for Deborah Adams.

15         Q.   Okay.  So it was extended to National

16    authorizing them to hire Deborah Adams for this offer?

17         A.   To make the offer to Deborah Adams.

18         Q.   And it was contingent -- it was all set except

19    it was contingent on background check results; is that

20    correct?

21         A.   Yes.

22         Q.   What is meant by background check results?

23         A.   Northeast Utilities requires that all

24    contractual employees pass a background and a drug

25    screening process prior to being employed as a

1    contractor.

2          Q.  So is it the case that there were two

3    contingencies in order to finalize Deborah Adams'

4    eligibility to start working physically at Northeast

5    Utilities?

6          A.  Yes.

7          Q.  One was to successfully complete a drug test?

8          A.  Yes.

9          Q.  One was to successfully complete a background

10   check?

11         A.  Yes.

12         Q.  To your knowledge, did Deborah Adams

13   successfully complete the drug test?

14         A.  Yes.

15         Q.  I would like you to, to look at the next entry.

16   And what is the date of the entry?

17         A.  May 8, 2007.

18         Q.  Can you please read what it says.

19         A.  Background check failed.  Order available.

20         Q.  Can you describe what that means.

21         A.  That means there was an e-mail sent to me by

22   Chris of National Engineering stating that there was a

23   failed background check for Deborah Adams.  It's a

24   seven-year criminal screening process and that she had

25   failed it.  Based on that fact, that information, we then

1    notified -- protocol is to notify the NU manager that the

2    candidate is ineligible to work at Northeast Utilities.

3        Q.  We'll follow up on that.  Looking at this

4    document again.  Do you see where it says the start date

5    and end date?

6        A.  Yes.

7        Q.  How many weeks was this position for?

8        A.  Fifty.

9        Q.  So is it fair to say that had Deborah Adams

10   become employed on-site on the Northeast Utilities, that

11   she should have worked at least a 40-hour workweek at $21

12   per hour and that employment would have lasted for 50

13   weeks?

14       A.  Contingent hiring is at will employment, so

15   although the dates read April 2, 2007 to March 15, 2008,

16   Northeast Utilities is at will to let that person leave

17   prior to that.  To end their assignment prior to that end

18   date.

19       Q.  Do you have -- You have no information that this

20   particular assignment would have ended had Deborah Adams

21   started working there?

22       A.  I have no information.

23       Q.  To the best of your knowledge, had Deborah Adams

24   started working there, she would have continued for 50

25   weeks?

1      A.  Yes, if the work was available.

2      Q.  Again, you have no information to indicate that

3   the work was not available?

4      A.  Correct.

5      Q.  And do you see where it says EST spend on the

6   first page?  What does that signify?

7      A.  That simply alerts the manager who is approving

8   this order that's what it is going to cost them for the

9   50 weeks, and their budget must have that available.

10      Q.  So in other words, let me get this right.  Would

11   the 54,600, would that be computed by taking the bill

12   rate of 27.30, multiplying it times 40 hours a week and

13   multiplying it times 50 weeks?

14      A.  Yes.

15      Q.  Who actually did that calculation?

16      A.  It is all done electronically.

17          MR. MADSEN:  At this time I would like to

18   present the witness with Plaintiff's Exhibit 26.

19          THE COURT:  26.

20      Q.  Ms. Shapleigh, can you identify Plaintiff's

21   Exhibit 26.

22      A.  Yes.  It is an e-mail received from Christopher

23   Sullivan.

24      Q.  And can you tell by looking at this e-mail when

25   you received it from Chris Sullivan?

1      A.  Yes.

2      Q.  When was that?

3      A.  May 8, 2007 at 3:49 p.m.

4      Q.  And can you please read the e-mail.

5      A.  Kathy, I apologize for the long delay.  Today

6  has been one issue after another.  The item below

7  explains why the background has been dragging on.  This

8  is not good at all.

9      Q.  Is something attached below that e-mail?

10      A.  Yes.

11      Q.  What is attached below that e-mail?

12      A.  The results of the background screening.

13      Q.  What do those results indicate?

14      A.  That there was a felony committed.

15      Q.  Did that automatically render Deborah Adams

16  ineligible for employment?

17      A.  Yes.

18      Q.  Now, when Chris Sullivan wrote the sentence the

19  item below explains why the background has been dragging

20  on, had there been an issue with the background dragging

21  on to your recollection?

22      A.  I don't honestly remember.  Obviously, yes, I

23  would say based on his e-mail, but I don't recall.

24      Q.  When he states this is not good at all, do you

25  know what he was referring to?

1          A.   The results.

2          Q.   Is he evaluating the results, if you will?

3          A.   Yes.

4          Q.   Did you take this is not good at all as

5     Mr. Sullivan's evaluation of the background report?

6          A.   I took it as his opinion.  I deal in facts until

7     I read the information, it's his opinion.

8          Q.   You did take it as his opinion?

9          A.   Yes.

10         Q.   And do you rely on staffing agencies to

11    communicate accurate information to you?

12         A.   Yes.

13         Q.   Does Guidant Group rely on staffing agencies to

14    do due diligence in performing their obligations for the

15    Guidant Group?

16         A.   Yes.

17         Q.   Does Guidant Group rely on staffing agencies to

18    comply with the law in providing their services to the

19    Guidant Group?

20         A.   Yes.

21         Q.   Now, did you have a telephone conversation with

22    Mr. Sullivan about this background check before it was

23    sent to you?

24         A.   No.

25         Q.   Did you have a telephone conversation with

1   Mr. Sullivan at the time, namely at around 3:49 p.m., at

2   the time that this report was sent to you?

3        A.   I don't remember.

4        Q.   At the time this report was sent to you at 3:49,

5   did he communicate to you in one way or the other this is

6   just provisional, don't rely on this, we have to do some

7   more checking?  Did he convey any information like that

8   so that when you received this report, you wouldn't treat

9   this as the definitive background report on Deborah

10  Adams?

11       A.   No, I did not receive any information other than

12  the results.

13       Q.   Do you recall what the start date was supposed

14  to be?

15       A.   April 2, 2007.

16       Q.   That was changed, wasn't it?

17       A.   They frequently run over.

18       Q.   By the way, in connection with your obligations

19  to the Northeast Utilities, do you have the discretion

20  from time to time to hold off on communicating a felony

21  conviction to NU management because something doesn't add

22  up or you think maybe another report should be run or

23  anything like that?

24       A.   We do not convey background result information

25  to NU, Northeast Utilities, it's confidential.  We simply

1   contact them and let them know that the contractor

2   candidate is ineligible to work.  They are not given the

3   reason why.

4        Q.  So are you saying that the Guidant Group

5   actually is vested with the responsibility of determining

6   employment eligibility?

7        A.  Based upon Northeast Utilities' requirements,

8   background and drug screening requirements.

9        Q.  So Northeast Utilities has contracted the

10  obligation of determining eligibility to the Guidant

11  Group?

12       A.  Yes.

13       Q.  Does National Engineering have certain

14  obligations in connection with making sure that

15  background checks and drug tests were done?

16       A.  Yes.

17       Q.  Did you rely upon National Engineering to make

18  sure they did those things properly?

19       A.  Yes.

20       Q.  Was Mr. Sullivan, to your knowledge,

21  communicating this background check result to you in his

22  capacity as a representative of National Engineering?

23       A.  Yes.

24       Q.  Was this done as part of a professional

25  communication by Mr. Sullivan to you?

1          A.  Yes.

2          Q.  Now, I want you to turn back to -- Do you still

3     have Exhibit 64 in front of you?

4          A.  Yes.

5          Q.  The most recent order comment states background

6     check failed, order available.  Do you see that?

7          A.  Yes.

8          Q.  Deborah Adams' application was not put on hold

9     once this failed background check came in, was it?

10         A.  No.

11         Q.  She lost, the offer was terminated, wasn't it?

12         A.  Based on the results of the background check.

13         Q.  Was it automatic that her offer was

14    terminated?

15         A.  Yes.

16         Q.  Did you have the ability to go into

17    Verifications' website and double check the report that

18    they ran on Deborah Adams?

19         A.  No.

20         Q.  To your knowledge, did anyone at Guidant Group

21    have the ability to go to the Verifications site in order

22    to get the information?

23         A.  No.

24         Q.  What did you do -- Turning back to Exhibit 26.

25    What did you do after receiving this e-mail?

```
 1          A.  I contacted the NU hiring manager.

 2          Q.  Did you do so immediately?

 3          A.  Yes.

 4          Q.  Is it your practice to communicate this type of

 5     information immediately to the hiring manager?

 6          A.  Yes.

 7          Q.  Are there times when the hiring manager is

 8     relying on Guidant Group to fill a position promptly so

 9     that they can have work done that needs to be done?

10          A.  Yes.

11          Q.  Did -- So is it your testimony that

12     you -- Withdrawn.

13              Do you recall whether you notified Pat

14     Angelo-Park or Byron Maddox that Deborah was not

15     available to be hired?

16          A.  I believe it was Pat Angelo-Park.  It was a

17     while ago, so it would have been either Pat Angelo-Park

18     or Byron Maddox.

19          Q.  Did either of those individuals, Pat Angelo-Park

20     or Byron Maddox, have the ability to override the fact

21     that there was a background check failure?

22          A.  No.

23          Q.  Did Guidant have a policy if an applicant failed

24     a background check conducted on behalf of the staffing

25     agency, that they are given a certain amount of time to
```

1    correct it before the offer's terminated?

2         A.  No.

3         Q.  Is it an automatic?

4         A.  It's an automatic.

5         Q.  Who was your manager?

6         A.  John Walicki.

7         Q.  Did Mr. Walicki have the authority to override

8    the failed background check of Deborah Adams?

9         A.  No.

10        Q.  If an offer's made to the staffing agency to

11   hire a certain person, and that person becomes

12   ineligible, does the staffing agency at the very last

13   minute have the authority to substitute a different

14   candidate?

15        A.  No.  They can submit additional resumes for that

16   position.  They cannot replace a candidate with another

17   candidate.

18             MR. MADSEN:  Your Honor, I will hand the witness

19   two exhibits, 65 and 66.

20             THE COURT:  65 and 66.

21        Q.  Ms. Shapleigh, I would like to hand you

22   Exhibit -- I would like you to look at Exhibit 65,

23   please.  Can you identify that document?

24        A.  Yes.

25        Q.  What is it?

1     A.  It is an e-mail that I received from Christopher

2  Sullivan.

3     Q.  When did you receive it from Mr. Sullivan?

4     A.  May 8 at 6:21 p.m.  Kathy, we need to talk about

5  this issue.  She's saying that Verifications doesn't run

6  this by Social Security number and she has documentation.

7     Q.  Now, I would imagine upon receiving this, you

8  immediately contacted the hiring manager and said hold

9  on, Deborah needs to have the job back because there

10  might be a discrepancy.  Is that what you did?

11     A.  No.

12     Q.  Why not?

13     A.  Guidant Group deals with the facts and the fact

14  was at that juncture there was a failed background

15  check.

16     Q.  So you did not contact the hiring manager and

17  say hold off on having the order available, we may need

18  to give it back to Deborah?

19     A.  That's correct.

20     Q.  I would like you to now turn to Exhibit 66.

21  What is that document?

22     A.  This is an e-mail that I received from Chris

23  Sullivan.

24     Q.  And --

25     A.  On the 8th of May at 6:25 p.m.

1          Q.  That's just a few minutes after Exhibit 65; is

2     that correct?

3          A.  Correct, yes.

4          Q.  Once you received this e-mail, did you put

5     Deborah Adams back on the hiring track?

6          A.  No.

7          Q.  Did you revive her offer of employment?

8          A.  No.

9          Q.  For the same reasons you just testified to?

10         A.  Correct.

11         MR. MADSEN:  Your Honor, I would like to hand

12    the witness Exhibit 67.

13         THE COURT:  67.  I'm running out of exhibits

14    here.  I end at 66.

15         MR. MADSEN:  We have one that we can provide to

16    you.  Computer crash, the computer crashed.

17         Q.  Ms. Shapleigh, could you look at Plaintiff's

18    Exhibit 67.

19         A.  Yes.

20         Q.  And can you identify this document.

21         A.  It is an e-mail Chris Sullivan submitted to me

22    on the 11th of May at 2:04 p.m.

23         Q.  What is attached to this e-mail?

24         A.  A second background and drug screening report on

25    Deborah Adams.

1    Q.  Could you please look at the bottom of the first

2    page, and it begins with the please disregard.  Could you

3    please read that.  Do you see it?

4    A.  I don't.

5    Q.  The second page.  Do you see where it says

6    please disregard at the bottom of the page?

7    A.  I do not.  I'm on the Verifications.

8    Q.  Could you read where it begins please disregard.

9    A.  Please disregard the initial report regarding

10   this applicant and see as indicated below.

11   Q.  Did -- was this the first time that you received

12   word that Deborah Adams' failed background check had been

13   corrected?

14   A.  Yes.

15   Q.  So that would have been on May 11, 2008?

16   A.  Yes.

17   Q.  Now at the time -- Withdrawn.

18       Did you notify Pat Angelo-Park?

19   A.  Yes.

20   Q.  And at the time that you notified Pat

21   Angelo-Park, was the position still open?

22   A.  Yes.

23   Q.  Had the hiring manager, however, started to

24   pursue other avenues?

25   A.  Yes.

1   Q. Was that done on the decision of the hiring

2 manager?

3   A. Yes.

4   Q. Was it done in part on the background check

5 failure by Deborah Adams?

6   A. Yes.

7   Q. And the hiring manager did pursue other options,

8 correct?

9   A. Yes.

10   Q. Based on the results of the failed background?

11   A. Yes.

12   Q. And what was the other option that the hiring

13 manager had decided to pursue?

14   A. She hired an intern through Northeast

15 Utilities.

16   Q. So was the offer of employment to Deborah Adams

17 terminated upon receipt of the failed background

18 report?

19   A. Yes.

20   Q. In order for that offer of employment to have

21 been revived, would a decision have to come from the

22 hiring manager?

23   A. No. A decision would come through the second

24 testing through the facts. The facts would then

25 reactivate Deborah's status.

1      Q.   As available?

2      A.   As eligible.

3      Q.   Deborah had previously had an offer of

4   employment, correct?

5      A.   Correct.

6      Q.   That offer was terminated automatically when the

7   background check failed?

8      A.   Yes.

9      Q.   And the offer of employment to Deborah was never

10   reactivated, correct?

11      A.   Correct.

12      Q.   Did you ever learn that Deborah had tried to

13   contact Northeast Utilities directly in an attempt to

14   revive her job?

15      A.   Yes.

16      Q.   And what did you learn in those regards?

17      A.   There was e-mail that my manager had sent out to

18   Pat Angelo-Park and Byron Maddox explaining protocol.

19   That protocol had been breached.  I was CC'd on that

20   e-mail.

21           MR. MADSEN:  Your Honor, I would like to hand

22   the witness Exhibit 31.

23           THE COURT:  31.

24      Q.   Ms. Shapleigh, can you identify Exhibit 31.

25      A.   Yes.

1      Q.  Is that the e-mail that you referred to

2    earlier?

3      A.  Yes.

4      Q.  And when you say it was against the protocol,

5    what was the proper protocol?

6      A.  Candidates deal directly with the staffing

7    pattern, and any managers deal directly with Guidant

8    Group.

9      Q.  Do you see where it says at the top of that she

10   should direct all future correspondence to her

11   employer?

12     A.  Yes.

13     Q.  Who would her employer have been?

14     A.  National Engineering.

15     Q.  To your knowledge, was Deborah Adams trying to

16   revive her job offer from Northeast Utilities?

17     A.  I can't honestly answer that because I had no

18   interaction with the manager.  I don't know what was said

19   in that conversation, and my manager handled the e-mail,

20   so I was out of that loop.

21     Q.  Do you have any facts to dispute that if Deborah

22   Adams initially passed her background check, that she

23   would have started her position at Northeast Utilities?

24     A.  No.

25     Q.  After you learned that the position --

1    Withdrawn.

2         I believe you testified that you learned that

3    the position was being filled by an intern; is that

4    right?

5         A.  Yes.

6         Q.  When the position was filled by the intern, what

7    significance did that have vis-a-vis the order that went

8    out to the staffing agencies?

9         A.  It was canceled.

10        Q.  And is that because a decision was made to do a

11   direct hire by Northeast Utilities as opposed to the hire

12   through the Guidant Group and the staffing agency?

13        A.  Correct.

14        Q.  So the employer became a different class?

15        A.  An intern, not a direct hire, but an intern,

16   which is also a temporary position.

17        Q.  That was a direct hire?

18        A.  That was dealt directly through Northeast

19   Utilities.

20        Q.  Did you make any efforts to place Ms. Adams in a

21   position at Northeast Utilities or anywhere else after

22   you received word that her background check had been

23   corrected?

24        A.  Guidant Group is not an agency.  We do not deal

25   with the candidates.  We do not place candidates.  That

1    would have been National Engineering's responsibility.

2          MR. MADSEN:  Thank you very much for your time.

3    No further questions.

4          THE COURT:  Mr. Kupinse.

5          MR. KUPINSE:  Thank you, your Honor.

6                    CROSS-EXAMINATION

7    BY MR. KUPINSE:

8       Q.  Mr. Shapleigh, Mr. Madsen asked if you were here

9    under subpoena by him.  Did you also receive a subpoena

10   by me?

11      A.  Yes.

12      Q.  Are we trying to get you in and out on one day

13   if possible?

14      A.  Yes.  Much appreciated.

15         MR. KUPINSE:  For the record, I do reserve my

16   right to continue, to recall Ms. Shapleigh if necessary,

17   although I will try to finish up today.

18         THE COURT:  If you want to examine her beyond

19   the scope of the examination by Mr. Madsen, by all means

20   go ahead and do that because that conveniences the

21   jury.

22         MR. KUPINSE:  Thank you.  I don't know that I

23   will be going much beyond what we asked anyway.

24      Q.  Ms. Shapleigh, had Guidant been the subject of

25   any action by the plaintiff, has she sued Guidant?

1      A.  No.

2      Q.  Has she sued Northeast Utilities?

3      A.  No.

4      Q.  Now, I think you told Mr. Madsen that there was

5   a difference between what the contract employee is paid

6   and what the staffing agency receives?

7      A.  Yes.

8      Q.  Is that correct?

9      A.  Yes.

10     Q.  Isn't that true for all staffing agency

11  temporary employees, whether they are National or whether

12  they are somebody else?

13     A.  Yes.

14     Q.  Okay.  And does Northeast Utilities pay only the

15  gross amount?

16     A.  They pay the gross amount plus Guidant Group's

17  percentage plus or percent.  Guidant Group's percent.

18     Q.  Who pays the taxes, if any, on the money that's

19  paid to the employee of National?

20     A.  You know, I don't handle that.  I don't know.

21     Q.  Do you know whether or not Northeast Utilities

22  pays it?

23     A.  I don't know.

24     Q.  Does Northeast Utilities, other than, can I call

25  it the spread between what the employee is paid and what

1     National is paid.  Other than the spread, does Northeast

2     Utilities pay anything to the staffing agency?

3          A.  No.

4          Q.  Do they pay any of the staffing agency

5     overhead?

6          A.  No.

7          Q.  Does the staffing -- You say there's about 40

8     staffing agencies with which you work?

9          A.  Approximately.

10         Q.  Okay.  When those staffing agencies place an

11    employee, they get the spread; is that correct?

12         A.  Yes.

13         Q.  If they don't place an employee, do they get

14    anything?

15         A.  No.

16         Q.  No compensation for trying to place somebody?

17         A.  No.

18         Q.  Verifications is a background checking agency?

19         A.  Yes.

20         Q.  And does Verifications -- does National use

21    Verifications because they have chosen Verifications?

22         A.  Yes.

23         Q.  Does either Northeast Utilities or Guidant give

24    any instructions on who they should use?

25         A.  No.

1    Q.   Do they pay anything towards Verifications?

2    A.   Who are they?

3    Q.   Let me correct the question.  Does Northeast

4    Utilities pay anything towards Verifications?

5    A.   They pay, Northeast Utilities will pay for the

6    background and direct screening, but they don't pay

7    Verifications.

8    Q.   They pay for the background investigation?

9    A.   On all contractors.

10   Q.   Do they pay Verifications or do they pay

11   National?

12   A.   I believe they pay National -- they actually pay

13   Guidant Group, who pays -- We're the middleman.  I should

14   clarify that.

15   Q.   Now, just so I can understand these screen shots

16   that have been put in several exhibits.  Are they the

17   same once and forever that they are put on the screen or

18   do they change?

19   A.   They are the same.

20   Q.   Well, I'm looking, for example, in Plaintiff's

21   Exhibit 2.  Do you happen to have that before you?

22   A.   I do.

23   Q.   Now, when that first went up on your screen, did

24   it have No. 4 on it, for example, better view scheduled?

25   A.   Yes.  Well --

1      Q.  Yes, it did have it or yes, it didn't?

2      A.  Let's back it up.

3      Q.  Let me try the question.  When this first went

4    up on your screen, did it have item 4 on it at that time?

5      A.  Item 4.

6      Q.  That's yes or no.

7      A.  When the order was created, is that what you are

8    asking?

9      Q.  Yes.

10     A.  No.

11     Q.  So when the order was created, when it first

12   went up on your screen, it was different than what you

13   have here?

14     A.  Yes.

15     Q.  Okay.  Because you added things as you went

16   along?

17     A.  Yes.

18     Q.  Okay.  Do you know whether or not, for example,

19   Exhibit 2 is the final screen shot for this?

20     A.  Yes.

21     Q.  Is it --

22     A.  Canceled.

23     Q.  Okay.  Can you tell from this when it was

24   canceled?

25     A.  No, but there is an activity -- Client activity

1    isn't on here that would give that information.

2         Q.  That's not a part of this?

3         A.  Apparently not.

4         Q.  You don't have it with you?

5         A.  Let me check.  I think it was given by John

6    Walicki.

7         Q.  I recognize it was a long time ago.  If there's

8    something that would refresh your recollection as to when

9    it was canceled, please feel free to look at it.

10        A.  Canceled on May 21, 2007.

11        Q.  So May 21, 2007?

12        A.  Correct.

13        Q.  So that until -- Is it fair to say that until

14   May 21, 2007, this position was still open?

15        A.  Not necessarily, no.

16        Q.  Okay.  Well, where would you have some

17   information that would tell you when it closed before

18   May 21?

19        A.  It would have been via a phone conversation with

20   one of the NU hiring managers where they shared they had

21   pursued an intern.

22        Q.  Do you know when that occurred?

23        A.  I don't remember.

24        Q.  Do you have anything in your file that you

25   brought with you that would remind you when it

1    occurred?

2        A.  No.  It was done over the phone.  There's no

3    documentation.

4        Q.  Let me ask it this way.  Was the position filled

5    at some time after you learned that the report had been

6    corrected?

7        A.  I'm sorry, please repeat that.

8        Q.  At some point you got a bad report, let's call

9    it that.  At some point you got a report, it was

10   corrected, there wasn't a felony charge; is that

11   correct?

12       A.  Yes.

13       Q.  Do you know whether or not the position was

14   filled after you got the corrected report?

15       A.  I don't know.

16       Q.  Well, you got the corrected report on May 11,

17   didn't you?

18       A.  Correct.

19       Q.  Which was before the start date of the position,

20   correct?

21       A.  Start date was April 2.

22       Q.  Start date was May 14.  The original may have

23   been April 2.  Would you look at your documents.  I think

24   the start date was May 14.

25       A.  The start date of the position of the order.

1    Q.  The start date of the employment, wasn't

2    Ms. Adams supposed to start working for NU on May 14,

3    2007?

4    A.  No, I don't see that.

5    Q.  You don't know that?

6    A.  No.

7    Q.  You can't tell from your information that you

8    have?

9    A.  No.  There's no indication she would have

10   started on the 14th, no.

11   Q.  Can you tell us as you sit here today whether

12   the position was canceled before May 14?

13   A.  I believe that Chris Sullivan sent an e-mail to

14   me on the 11th.  I contacted the NU hiring manager

15   immediately.  Now, what I don't remember is did I speak

16   to her that day.  Did she call me a few days later.  That

17   was all via phone.  There's no documentation on that.  So

18   Deborah Adams' start date would not have been set until

19   after the minute I had spoken to the manager.

20   Q.  Is it fair to say that you don't know at the

21   point whether the position was still open after May 11?

22   A.  Until I heard from the hiring manager and closed

23   out the order.

24   Q.  You are not sure when you heard?

25   A.  No, it was telephone.  I don't remember.

1        Q.   Is National under any obligation to Guidant to

2   send information which they received concerning an

3   applicant?

4        A.   What type of information?

5        Q.   Background check.

6        A.   Yes.

7        Q.   Is Guidant required -- Excuse me.  Is National

8   required to send Guidant any information they receive on

9   an applicant, any background check information?

10       A.   They are required to give us the -- It can be

11  verbal, we don't normally receive the information.  We

12  ask to receive it in this case to prove that it, she had

13  in fact passed the second round.

14       Q.   Does National have any choice under its contract

15  with Guidant to say, well, I don't think this is quite

16  right, I will send it later?

17       A.   No.

18       Q.   They have to send it right away?

19       A.   As soon as they find the results out, they

20  contact us.

21       Q.   Once National sends it to Guidant, does Guidant,

22  do you have any authority to withhold that information

23  from NU?

24       A.   No.

25       Q.   Are you required to send it immediately?

1      A.  Yes.

2      Q.  Is that what you did in this case?

3      A.  When I received the failed background, yes, I

4  contacted the manager, the NU manager.

5      Q.  Is that what National did in this case, when

6  they received it, they sent it to you?

7      A.  Chris Sullivan e-mailed me the failed background

8  check.  I did not e-mail that failed background check to

9  the NU manager.  I simply left a message or spoke to them

10  saying that she was ineligible.

11      Q.  Let me find the exhibit that was put in, if I

12  may.  Do you still have Exhibit 26 before you,

13  Plaintiff's Exhibit 26?

14      A.  Yes.

15      Q.  Okay.  Now, that's when Chris Sullivan sent over

16  to you the report?

17      A.  The failed background.

18      Q.  The failed report?

19      A.  Yes.

20      Q.  Looking at the failed report, page 2 of the

21  exhibit, it does say applicant concern for Deborah Adams.

22  Was there any way you can look at that and withhold the

23  information from NU because it was just a concern?

24      A.  The concern is that there was a failed

25  background.

1      Q.   That's what I mean.  Could you look at it and

2  make a decision to withhold it?

3      A.   No.

4      Q.   Could National look at it and make a decision to

5  withhold it from you?

6      A.   No.

7      Q.   Now, Mr. Madsen asked you some questions about

8  the e-mail up at the top.  If you turn to page 1 of that

9  exhibit where it says policy, apologize for the delay,

10  et cetera, and I didn't quite get your answer.  Did you

11  recognize that the background check had been dragging on

12  or not?

13      A.   I don't remember now.

14      Q.   I notice he says this is not good at all.  Did

15  you ever discuss that with him?

16      A.   Chris and I had a conversation, I don't recall

17  which day, but as a follow-up to this.

18      Q.   And did you rely upon that particular this is

19  not good at all?

20      A.   No.

21      Q.   That wasn't part of the reliance, the report

22  itself is what you relied on?

23      A.   Yes.

24      Q.   If Chris Sullivan put down don't worry about

25  this report, we're going to fix it, would you have been

1    able to withhold it from NU?

2         A.   No.

3         Q.   Let's talk for a few minutes about the job

4    availability.  On your job orders, it indicated it could

5    have gone as much as a year?

6         A.   Fifty weeks.

7         Q.   Was that a guaranteed 50 weeks in any fashion?

8         A.   No.

9         Q.   I think you mentioned something before about

10   this being an at will employment?

11        A.   Yes.

12        Q.   What do you mean by that?

13        A.   That Northeast Utilities may end an assignment

14   prior to the original end date of the assignment.

15        Q.   Does that happen sometimes?

16        A.   Yes.

17        Q.   Was the plaintiff under any contract to stay for

18   any length of time?

19        A.   No.

20        Q.   So it was at will on both sides?

21        A.   Yes.

22        Q.   The plaintiff could have left immediately, and

23   you could have said we don't want you anymore

24   immediately?

25        A.   I don't understand the question.

1      Q.  Let me rephrase it.  In an at will employment,

2   if the plaintiff had come to work on May 14 and started

3   work, could the plaintiff have left on May 15 if she

4   wanted to?

5      A.  Yes.

6      Q.  Could NU have terminated her employment on

7   May 15 if it wanted to?

8      A.  Yes.

9      Q.  And I think that Mr. Madsen pointed out to you

10   that it was estimated there would be a budget of this

11   about $54,000; is that right?

12      A.  That's the estimated spend on the order.

13      Q.  Was there any requirement that NU spend all of

14   that money?

15      A.  No.

16      Q.  Can you tell from your information whether this

17   was a position that needed to be filled quickly?

18      A.  The positions are filled as quickly as NU

19   moves.

20      Q.  So that's not something that you get involved

21   in, whether it needs to be filled quickly or can take

22   some time?

23      A.  It really is contingent on how quickly Northeast

24   Utilities -- Guidant is there to fill the order to get it

25   filled on time.  However, if there are delays, then --

1          Q.  And refresh my mind again.  When was the

2     position originally posted?

3          A.  It was posted or when was it to start?

4          Q.  When was it put on the screen?

5          A.  I created it, I believe, on the 26th of March.

6          Q.  So it was put out on March 22?

7          A.  26.

8          Q.  It wasn't.  No offer wasn't extended until

9     May?

10         A.  An offer was extended on April 25, I believe.

11         Q.  29?

12         A.  25.  Is when the offer was extended.

13         Q.  So it was open about a month, although you don't

14    remember it was due to start on May 14.

15         A.  It was due April 2.  Beyond that there was not a

16    new start date selected.

17         Q.  So let me take you back to, if I may, to what I

18    thought was the crucial period.  On May 8, 2007, you got

19    the report indicating that the plaintiff had a criminal

20    record; is that correct?

21         A.  Yes.

22         Q.  And you had a conference -- You got that about

23    10 minutes to 4, 3:59.  Maybe one minute to 4.  3:49.  10

24    minutes to 4?

25         A.  Yes.

1    Q.  And after you got that, you had conferences with

2    Chris Sullivan?

3    A.  I can't say that I had them that day.  What I

4    would have done is contacted the manager and left a

5    manager that the candidate isn't eligible.  There were

6    two subsequent e-mails from Chris on the 8th.  I don't

7    know if I left work.  My hours are 8:30 to 5:30.  If I

8    was there or left work.  We probably wouldn't have had a

9    conference either that night or the next day.

10   Q.  He sent you e-mails, you may not have gotten

11   them that night?

12   A.  I received them.  I don't know that I was there

13   to open them.

14   Q.  But surely by the next morning, by May 9 --

15   A.  Absolutely.

16   Q.  -- you knew that the plaintiff was disputing the

17   results of the first background report?

18   A.  Yes.

19   Q.  And you knew that first thing in the morning?

20   A.  Yes.

21   Q.  Did you communicate that to NU?

22   A.  No.

23   Q.  Why not?

24   A.  We only present the facts.  We cannot share a

25   contract or a candidate's concern.  We need to deal with

1      the facts.  The fact at that juncture, there was a failed

2      drug screen.  I spoke to Chris.  I do remember asking

3      Chris Sullivan, National Engineering, how did this

4      concern come up now, and he said that this had happened

5      previously to Ms. Adams, and I asked him if she had

6      mentioned that prior to the screening, and he said no.

7      She had not, so this was -- we were all blindsided by

8      that information.  So until the second screening was

9      processed, there was nothing to tell the hiring manager

10     because I, quite frankly, didn't know how it was going to

11     come out.

12         Q.  Have you ever had a situation before where you

13     got a report that was failed, then the applicant said

14     wait a second, there's a problem with that failure?

15         A.  No.

16         Q.  So this was the first one?

17         A.  Yes.

18         Q.  Only one?

19         A.  Yes.

20         Q.  How long have you been with Guidant?

21         A.  Seven years in April of 2010.

22         Q.  In any event, by the 9th, you knew the plaintiff

23     was contesting it.  Is it fair to say that fairly early

24     on the 11th, you knew, or sometime on the 11th you knew

25     the report had been cleared?

1        A.   Yes.

2        Q.   Once the report was cleared, did you communicate

3    that to Northeast Utilities?

4        A.   Yes.

5        Q.   At that point what did Northeast Utilities, the

6    manager you were communicating with, tell you?

7        A.   I e-mailed.  There's an e-mail I had sent to

8    her.  I believe it was Pat Angelo-Park, that I sent to

9    Pat saying that she was not eligible.  Quite frankly, I

10   don't remember when she called me back.  I know from a

11   subsequent e-mail from Chris there hasn't been an answer

12   up to the 14th.  Then there was a weekend so --

13       Q.   Okay.  Did the manager -- I don't want you to

14   tell me what she said.  Did the manager at Northeast

15   Utilities communicate with you as to what she was doing

16   once the clearance claim through?

17       A.   Yes.

18       Q.   Did she do that by phone or an e-mail?

19       A.   Phone.

20       Q.   When she talked to you on the phone after she

21   learned that it had been cleared, did you understand that

22   the position was still open at that point?

23       A.   When she told me that she hired an intern, the

24   position was then ended.

25       Q.   Did she tell you that day that she hired an

1      intern?

2          A.   What day?

3          Q.   The day that you -- May 11 when you sent over

4      the report.

5          A.   No.  As I previously stated, I e-mailed her on

6      the 11th.  I don't remember when she responded to me.

7          Q.   Do you remember whether it was at the same

8      time?

9          A.   No, it was not.

10         Q.   It was later?

11         A.   It was later.

12         Q.   So just to get the sequence again, correct me if

13     I'm wrong, May 8 you get the report that it has failed,

14     you notify NU.  May 9 you get word that the applicant is

15     contesting it.  May 11 you get word that the application

16     has been cleared.  May 11 you advise NU it's been

17     cleared.  Sometime around May 11, you are not sure

18     exactly when you have a conversation with the manager

19     over at NU, and you think at that point she's still

20     pondering her options?

21         A.   No.

22         Q.   She's filled them at that point?

23         A.   She had hired an intern.  She was en route to

24     hiring.  She had made other arrangements.

25         Q.   By May 11?

1       A.   No.   I'm not making myself clear.  I sent the

2  e-mail to the hiring manager the day that I received

3  Chris Sullivan's e-mail that the second background

4  screening had passed.  I don't know when from May 11 to

5  the time I canceled the order, I don't remember which

6  date the hiring manager contacted me and said I have made

7  other arrangements.

8       Q.   Okay.  There's nothing that would reveal that in

9  your records?

10       A.   No, because it was done by phone.

11       Q.   I don't want to press this too far.  Sometime

12  between May 11 and the time the position was canceled,

13  the manager decided to do something else?

14       A.   No.  I'm certain she started doing something

15  else once the background screening failed.  That's the

16  protocol.

17       Q.   You think she started thinking about other

18  things on May 8?

19       A.   Once there's a failed background check or failed

20  drug screen, you go on the next option immediately.

21            MR. KUPINSE:  May I have just a moment, your

22  Honor.

23       Q.   Northeast Utilities managers can request that a

24  temporary employee be continued on past the temporary

25  date?

1      A.  Yes.

2      Q.  Does that happen with employees at the pay level

3  that the plaintiff would have been at?

4      A.  Yes.

5      Q.  Does it -- Is it granted regularly?

6      A.  The requests are few and far between at the pay

7  rate, but, yes, when they have been submitted, they have

8  been accepted.

9      Q.  The final question I have, is there any

10  procedure in Guidant for handling an application or a

11  background check that's failed and then is cleared?

12      A.  No.

13      Q.  No rules whatsoever?

14      A.  No.

15      Q.  Because this was the only time it ever

16  happened?

17      A.  Yes.

18          MR. KUPINSE:  I have no further questions.

19          THE COURT:  Ten minutes, ladies and gentlemen.

20          (Whereupon, a recess was taken.)

21          THE COURT:  We have to put the witness back on

22  the stand.

23          (In the presence of the jury at 4:04 p.m.)

24          THE COURT:  All right.  Ready to go,

25  Mr. Coffey.

1          MR. COFFEY:  Thank you, your Honor.

2          Good afternoon.

3                    DIRECT EXAMINATION

4    BY MR. COFFEY:

5          Q.  Now, if in the hiring process you talked about

6    that Northeast Utilities was thinking about going in

7    another direction.  If they were going in another

8    direction and they hired an intern, would that mean there

9    was no 30 percent fee?

10         A.  Correct.

11         Q.  So that would be a savings to them if they

12    decided to choose to hire internally, or did they have to

13    pay someone 30 percent?

14         A.  I don't know how their intern program works to

15    be honest with you.

16         Q.  They didn't have to pay the Guidant Group or a

17    temporary staffing agency?

18         A.  No.

19         Q.  That would have been a 30 percent of the $54,000

20    per year that was mentioned?

21         A.  Yes.

22         Q.  Now, why in hiring, why do you want background

23    searches?

24         A.  We are contracted with a Northeast Utilities who

25    mandates that all temporary employees be background and

1    drug screened prior to starting an assignment.

2         Q.  So, now, one of the things as you sit here

3    today, Northeast Utilities was never told that she failed

4    a background check.  They were only told she was not

5    eligible?

6         A.  Correct.

7         Q.  But all the ultimate hiring would be their

8    responsibility.  They decide ultimately who they hire?

9         A.  They make the decision to extend an offer of

10   temporary employment based on the screening results.  The

11   candidate is either hired or not.

12        Q.  Have you ever seen any document that said

13   Ms. Adams was not hired because of that report from

14   either Northeast Utilities or from Guidant?

15        A.  There would be no documentation.

16        Q.  Now, are you familiar with the Fair Credit

17   Reporting Act?

18        A.  No.

19        Q.  Do you have any familiarity with the adverse

20   action procedures?

21        A.  No.

22        Q.  As far as you are aware, who would be

23   responsible for adverse action procedures in the hiring

24   process for temporary employees?

25        A.  I don't understand what that means.  I don't

1    know what adverse action unless you explain it.

2         Q.   And your company has no access to the

3    Verifications site; is that correct?

4         A.   Correct.

5         Q.   You rely upon NESC to tell you about the

6    results?

7         A.   Yes.

8         Q.   And at no point did Verifications -- Withdrawn.

9              At some point you found out that the report was

10   corrected?

11        A.   Yes.

12        Q.   And was it fair to say that was within three

13   days from when you heard about the original report?

14        A.   The corrected report was submitted on the

15   11th.

16        Q.   The date you received the first report was on

17   the 8th, correct?

18        A.   Yes.

19        Q.   That would be three days?

20        A.   Correct.

21        Q.   So from your standpoint, the failure of a

22   background check does not take into account that the

23   report could be wrong because you are not really familiar

24   with the adverse action process?

25        A.   Correct.

1    Q.  Now, it also said the end date of the position

2    was March 15, 2008.  Was the end date extended based upon

3    the start date or is the end date still March 15?  It

4    would have been March 15, 2008.

5    A.  It would have been extended contingent on that

6    start date.

7    Q.  Whatever the start date, it would have been

8    approximately 50 weeks?

9    A.  Fifty weeks, correct.

10   Q.  You said Patricia Angelo-Park is still employed

11   at the utility company?

12   A.  Yes.

13   Q.  What is the utility company in the business of?

14   What do they do?

15   A.  Northeast Utilities, power, electric.

16   Q.  And how many employees do they have throughout

17   New England?

18   A.  Goodness.  Rough guess, three to 4,000 maybe.

19   That's a guess.

20        MR. COFFEY:  I have no further questions.  Thank

21   you.

22        MR. MADSEN:  Your Honor, I have a few follow-up

23   questions.

24                    REDIRECT EXAMINATION

25   BY MR. MADSEN:

1      Q.  Ms. Shapleigh, you testified on

2    cross-examination when Mr. Kupinse was asking you

3    questions that the employment that Deborah Adams would

4    have had, but for the failed background check, would have

5    been at will, correct?

6      A.  It would have been?

7      Q.  At will.

8      A.  Yes.

9      Q.  At will meaning Northeast Utilities reserved the

10   right to terminate her employment at any time, correct?

11     A.  Correct.

12     Q.  I believe you testified earlier you had no

13   reason or facts to indicate they would have done so; is

14   that correct?

15     A.  Correct.

16     Q.  Is it also the case that they could have

17   extended her employment?

18     A.  Yes.

19     Q.  Is it also the case on some occasions, these

20   temporary assignments lead to full-time position directly

21   employed by the company?

22     A.  Yes.

23     Q.  I believe you testified that National

24   Engineering must comply with the laws governing

25   background checks; is that correct?

1        A.   Yes.

2        Q.   You rely on them to do that; isn't that true?

3        A.   Yes.

4        Q.   You don't tell them how to conduct the

5    background check, do you?

6        A.   No.

7        Q.   You don't tell them whether or not they should

8    check the Social Security number or anything like that,

9    do you?

10       A.   Northeast Utilities requires there's a

11   five-panel direct screen and a seven year at that time.

12   They have upgraded since, but at that time they required

13   a five-panel drug and a seven-year criminal, national

14   criminal background check.

15       Q.   When you say seven years, you mean looking back

16   seven years?

17       A.   Correct.

18       Q.   In terms of the identifying information that

19   would be supplied to the criminal, the background check

20   company, you didn't say I only want you to look at the

21   first three letters of the person's name, I don't want

22   you to consider Social Security; is that right?

23       A.   Correct, we did not.

24       Q.   Did you have an expectation that they would do,

25   they would provide you with an accurate background

1    check?

2         A.   Absolutely.

3         Q.   And the background check was supposed to be sent

4    to the staffing agency before it was sent to Guidant

5    Group, correct?

6         A.   The background is sent to the staffing company.

7    Who relays the information.  They don't send us

8    Verifications or any other, do not send us the

9    information.

10        Q.   The way the background works, the staffing

11   agency is the first company to receive the background

12   check from the background check agency, correct?

13        A.   Yes.

14        Q.   Do you have -- did you ever instruct National

15   not to communicate with the results of the criminal

16   background check to Deborah Adams?

17        A.   No.

18        Q.   Did you ever tell them we want you to send it to

19   us first before you tell her about the felony

20   convictions?

21        A.   No.

22        Q.   If National had received a report from

23   Verifications on Deborah Adams, and it said results

24   listed below, name, John McCordell, address Alaska,

25   conviction incarcerated for life for murder conviction,

1    and someone at National saw that and decided to call up

2    Verifications and say, you know, I think you got the

3    wrong person here, is that something that you would have

4    expected from National to do?

5         A.  Our expectation is to get an accurate report

6    from them.

7              MR. MADSEN:  No further questions.

8                        RECROSS-EXAMINATION

9    BY MR. KUPINSE:

10        Q.  I want to make absolutely clear with respect to

11   the last testimony, is it true that once National

12   receives a background investigation report, they are

13   contractually obligated to send it to you immediately?

14        A.  No.  They don't send the report.

15        Q.  Withdrawn.

16             Once they receive it, are they contractually

17   obligated to advise you that the person is either

18   qualified or not qualified for the position?

19        A.  Yes.

20        Q.  Once you receive the information that the person

21   that is qualified or not qualified, are you contractually

22   obligated to pass that along to NU?

23        A.  Yes.

24        Q.  Is there any discretion on the part of National

25   to hold back the information from Guidant?

1          A.   Is there any discretion to hold it back, do they

2     have an option?

3          Q.   Is it an option for National not to send it to

4     Guidant?

5          A.   No.

6          Q.   Is it an option for Guidant not to send it to

7     NU?

8          A.   No.

9               MR. KUPINSE:  Nothing further.  Thank you.

10              MR. COFFEY:  No further questions.

11              THE COURT:  You can step down.  Thank you very

12     much.  You are excused from the subpoena.

13              THE WITNESS:  Thank you.

14              THE COURT:  Do you want to put the plaintiff

15     back on the stand?

16              MR. MADSEN:  Thank you, your Honor.

17              THE COURT:  You are still under oath.

18                         DEBORAH ADAMS

19      Resumed the stand, testifying further upon her oath as

20                            follows:

21              CONTINUED DIRECT EXAMINATION

22     BY MR. MADSEN:

23         Q.   Good afternoon, Ms. Adams.

24         A.   Good afternoon.

25         Q.   Now, you had received notice after the failed

1   background check that the job was ultimately -- that you

2   were disqualified from the employment with NU, correct?

3       A.   Initially was informed after some communications

4   that I was -- the job had been placed on hold, then final

5   communication was that they hired another candidate.

6       Q.   Initially were you led to believe that due to

7   the disputed background check, that your employment with

8   NU was, quote, on hold?

9       A.   Please repeat that.

10      Q.   That your employment position at Northeast

11  Utilities was on hold?

12      A.   Yes.

13      Q.   Pending the background dispute?

14      A.   Yes.

15      Q.   You were led to believe that by National

16  Engineering?

17      A.   That was my understanding.

18      Q.   Did anyone ever tell you that your employment

19  was automatically terminated upon Guidant's receipt of

20  the failed background check?

21      A.   No.

22      Q.   When did you first learn that?

23      A.   In the e-mail from Mr. Sullivan after we had

24  communicated back and fourth numerous e-mails and

25  conversations.

1      Q.  Deborah, we have already introduced a number of

2    letters and e-mail communications that you sent out to

3    various persons trying to get this situation resolved.

4    Do you recall that?

5      A.  Yes.

6      Q.  Did you try to get this situation sorted out

7    with National Engineering?

8      A.  Yes.  Tried to get it sorted out through both

9    parties.

10      Q.  You tried to get it sorted out with

11    Verifications?

12      A.  Yes.

13      Q.  Did you try to get it sorted out with

14    Comensura?

15      A.  I remember calling them to communicate to them

16    the issue that I was having with getting, you know, the

17    background check reinvestigated to make them aware.  At

18    some point it became clear to me maybe they weren't aware

19    of the confusion that was going on that I was

20    experiencing.

21      Q.  Did you try to get it sorted out -- You recall

22    the letter that you sent to Northeast Utilities?

23      A.  The e-mail to Mr. Maddox, yes.

24      Q.  You tried to get it sorted out with NU?

25      A.  Yes.

182

1      Q.  You filed a complaint with the Federal Trade
2   Commission?
3      A.  Yes.
4      Q.  Were there other states where you sent letters
5   complaining about what had happened to you?
6      A.  Yes.
7      Q.  Did you send a letter to the Connecticut
8   attorney general?
9      A.  Yes.
10     Q.  Did you send a letter to the New Hampshire
11  attorney general's office?
12     A.  Yes.
13     Q.  Were you ever able through any of those avenues
14  to get this sorted out and get your job back at NU?
15     A.  No.
16     Q.  Where did that leave you?
17     A.  It left me without a job.
18     Q.  Deborah, I would like to ask you about what
19  happened to your life after this job opportunity slipped
20  through your fingers.
21     A.  After it was absolutely clear that all my
22  efforts would not get me a job, I became very, very -- I
23  was hopeless at that point.  The job at that point prior
24  to accepting the position at NU, it took me some time to
25  secure that job, and because of the time it took me to

1    get that job, I was behind in my rent and other things,

2    and when --

3         Q.   Would you like some water?

4         A.   Excuse me.   When I left the job at CB Richard

5    Ellis, I made promises to all my creditors based on that

6    job, and when I had the job and I was going to switch

7    over to NU, that sort of -- that made it even more

8    positive for me financially that I could keep my

9    commitments to my landlord and my other creditors, so

10   there would be no break in employment at the end of

11   CB Richard Ellis that was expected to end shortly, then I

12   would be able to keep my commitments to my landlord and

13   other creditors.   One, it was clear that after I told

14   them that I had another job and explained to them and

15   asked them for leniency and made payment arrangements

16   with them, so I go from an income where I paid them a

17   partial payment, then I go to nothing, it sort of

18   presented me in a light that I wasn't trustworthy.   And I

19   couldn't work it out with them.   They tried to be patient

20   with me before evicting me, but I didn't have any money.

21   So I couldn't in good conscience promise them anything

22   else because I already promised them, so I had to leave.

23   It wasn't fair to them to keep me there when at that time

24   there was no hope of being able to sustain the rent.

25   Even if I was able to get enough money to pay what I

1   owed, I didn't have any hope of getting a job in a timely

2   fashion to keep the rent going, so it didn't make sense,

3   so I had to leave.  And because of the lack of income or

4   no income, I couldn't stay in the area.  I had a

5   two-bedroom with my son, so my strategy was to downsize

6   and put some things in the storage and go to a

7   one-bedroom.  Send my son up to my mom's.  That would

8   allow me more time to find another job.  Then I would get

9   back on track.  He would come back and finish his senior

10  year.  That was the initial strategy.  But that didn't

11  work out.  So I put my things in storage.  I stayed in

12  the area for a while, as long as I could, and then it

13  just didn't make sense to stay.  It didn't make sense to

14  stay anymore.  So I put the rest of the belongings I had

15  in the one-bedroom, I put them in another storage, so I

16  had two different storages going on.  I could barely keep

17  up with the storage fees on them.  If you are behind in

18  your storage fees, you can't get in to move your things,

19  so it is like pay them all or nothing.  So you are stuck

20  with storage fees.  I'm coming up with the money to pay

21  the fees not even thinking about trying to move my things

22  out.  I don't know where else to place them.  Eventually

23  I was able to close down one storage unit from the

24  initial move when I had a two-bedroom, and I was there to

25  put my things in a friend's garage up in my hometown.

1    They helped me drive back and get my things.  I had to

2    work it out with the property manager to pay a certain

3    amount and then come right away and get my things, so we

4    did that, so that helped me somewhat, but I still have

5    the majority of my belongings in storage that I haven't

6    had access to since I put my things in there around 2008.

7    Because they don't allow you to go in when you are

8    behind.  When I am caught up, I don't know if I will ever

9    been caught up.  I usually keep it out of lien.  That

10   means you pay enough for them not to sell, it but you

11   haven't really secured it, and the things are so packed

12   in there because I moved so quickly that if I did open up

13   the door, I wouldn't be able to find anything or sort

14   anything out.  I don't know what condition they are in

15   anymore, so I had to let that -- not let it go.  I

16   couldn't worry about it anymore because I did all that I

17   could do.  And I moved back with my mom because it made

18   sense to do so.  And that was devastating because I

19   didn't have a job, going back into the area where the

20   economy is not really that great on top of the national

21   economy not being good.  The area in which I grew up in,

22   their economy isn't good even when everyone else is doing

23   well.  It is not a booming, vibrant economy in that area.

24   Their tourism, there's really no jobs, so when I moved

25   back, there's no hope of me getting employment in that

1    area, so I spent a lot of time just thinking of how to

2    get out.  But it's hard to get out when you don't have

3    anyplace to go.  And the economy was bad all over, so

4    does it make sense to go someplace else.  Everybody that

5    I'm talking to, thinking of moving here, Atlanta, people

6    that I know that are living in different areas, then I

7    would be a burden like I feel I am to my mother.  That

8    doesn't make sense, so I was stuck.  And I am stuck until

9    I decided to take some classes to sort of redirect my

10   energies and my mind where I was thinking about what had

11   occurred, how could this happen to me, why did it happen

12   to me, what did I do wrong.  I should have never applied

13   for the job.  I know better dealing with the outside

14   agencies where I never met anyone.  I feel like I was

15   naive for even getting involved in that whole process.

16        Q.  Deborah, I want to ask you, you were able to

17   secure some -- since the employment with NU fell through,

18   up until today, you were able to secure some jobs here

19   and there, right?

20        A.  Yes, I worked whenever I could.  I didn't stop

21   looking.  It stopped for a while because I wasn't

22   emotionally fit.

23        Q.  I would like to stop you right there.  Did you

24   ever seek treatment for the distress that was caused as a

25   result of losing this job opportunity?

1       A.  Yes.

2       Q.  From whom did you seek treatment?

3       A.  I went to my primary care physician.

4       Q.  Who is that?

5       A.  Stacy Seibel (phonetic).

6       Q.  Where was she located?

7       A.  She's located in Newington, Connecticut.

8       Q.  What did she do for you?

9       A.  I went to her around the time for my physical,

10  and it was suggested after sharing with family and

11  friends that I should seek doctor's care, and I went to

12  her and explained my situation, and she said let's get

13  you checked out, make sure there's not other things going

14  on with you.  She prescribed medicine for depression and

15  anxiety.  Those are two that I remember.

16      Q.  Did they refer you to anyone?

17      A.  She told me that I should speak to a

18  therapist.

19          MR. COFFEY:  Objection, hearsay.

20          THE COURT:  I will allow it.

21      A.  Part of the process, it is not a process, but

22  what happened was I went to see my primary care.  I

23  explained the situation.  Part of her treatment or

24  recommendation was she prescribed medicines for

25  depression, anxiety, told me that I should speak to a

1    therapist.  Initially she asked me did I have anyone in

2    my family or did I have any friends that could help me

3    that I could talk to.  When I explained that I didn't,

4    not really, then she provided me with some names of

5    persons that I could call and speak to them.

6        Q.  Did you in fact call anyone?

7        A.  Yes, I called several persons that her office

8    recommended, and I was able to connect with one person

9    that I saw.

10       Q.  Who did you connect with?

11       A.  I can't remember her name right now.  She's

12   in -- She has a practice or an office, if you will, in

13   West Hartford.  Her name escapes me right now.  I saw

14   her.  She's a therapist.  She was my therapist for a

15   while.

16       Q.  Did -- I believe you testified earlier that you

17   are pursuing a new direction now in terms of schooling?

18       A.  Well, after, you know, assessing my options, and

19   I have this gap in my resume, it was suggested that first

20   I started taking a couple of classes.  I was going to

21   take a class to be active, and I spoke to a career

22   counselor.  It was suggested that I can get enrolled

23   because I'm an alum of that college, I can get enrolled

24   and get another degree in a relatively short period of

25   time, and that would explain the time out of work on my

1    resume.  Because that was a major concern for me for them

2    to say that once I'm in Connecticut, then I'm in

3    Massachusetts, then I'm not working in Massachusetts.

4    What would make you go to Mass when you don't have a job

5    and haven't worked for a year.  The career counselors

6    gave me some feedback and suggestions on how to explain

7    that gap of employment, if you will.

8         Q.   What courses are you currently taking?

9         A.   Business software systems.

10        Q.   Are you pursuing a degree now?

11        A.   An associate's degree.

12        Q.   I would like to go back and visit one point.

13   You recall we talked about the situation involving

14   ChoicePoint?

15        A.   Yes.

16        Q.   Did you -- And there's an exhibit in evidence

17   that's a letter that you sent down to the clerk's office

18   in Pittsylvania, Virginia.  Do you recall that letter?

19        A.   In the exhibits that I have in front of me?

20        Q.   Yes.

21        A.   I recall the letter.

22        Q.   Did you undertake at that point in time to clear

23   your name directly by contacting the clerk's office in

24   Virginia?

25        A.   No.  Based on the information that I requested

1    from them, they provided me documents and/or information.

2    I took it upon myself to expedite matters by doing my own

3    research, so all these letters that I'm sending out I'm

4    doing my own research in addition to them, what I'm

5    asking, requesting of them.

6         Q.  Have you ever been trained in conducting

7    background checks?

8         A.  Not background checks, but in my positions I

9    have done that where I have researched things as a

10   contract administer, there are times you have to research

11   documents.  You have to verify documents, so as part of

12   my training, I'm familiar with how to verify

13   information.

14        Q.  Were you able to clear up the erroneous criminal

15   background check in connection with ChoicePoint by

16   directly interfacing with a court down there?

17        A.  Yes.

18        Q.  How did you do that?

19        A.  I don't know if they will say that I did that

20   because after I disputed it, initially after I found out

21   there were regulations through the FTC, and I contacted

22   FTC and found out what the procedures were and what the

23   law were, then I contacted persons or agencies based on

24   the information that I received from ChoicePoint and/or

25   Adecco.  While Adecco and ChoicePoint did their own

1    reinvestigation that I disputed, I took it upon myself to

2    call this area and to find out, you know, could you tell

3    me more about this person because a lot of that

4    information wasn't provided to me through ChoicePoint or

5    Adecco.  Initially, at first, I was met with opposition

6    and resistance where they were under the impression that

7    I didn't have a right to receive that information, and I

8    was knowledgeable that I did.

9        Q.  My question really goes more towards were you

10    able to, on your own to demonstrate that the Debra Jean

11    Adams with the record in Virginia was not you?

12        A.  Yes.

13            MR. MADSEN:  No further questions.

14            THE COURT:  Mr. Kupinse.

15            MR. KUPINSE:  Yes, your Honor.

16                        CROSS-EXAMINATION

17    BY MR. KUPINSE:

18        Q.  Ms. Adams, maybe we could start at the back end

19    and go back later on.  You just testified that you were

20    able to clear up the fact that the Adams, Debra Adams,

21    Deb Adams in Virginia was not you.  Is that correct?

22        A.  As I stated, that I did my own research, but

23    also ChoicePoint and Adecco were doing their own research

24    as well, so I had documentation, and they did as well.

25    They did their own reinvestigation and, and provided a

1    corrected and revised report.  I had information on my

2    own to support what they found in the reinvestigation.

3    To that extent, yes, but I don't want to communicate like

4    I was the only one that was doing background checks and

5    I'm the one who cleared up the whole matter.

6        Q.  Okay.  Ms. Adams, I wasn't suggesting you were

7    the only one doing background checks.  I thought you

8    testified as a result of your research, you were able to

9    clear up the fact that somebody in Virginia came across

10   on your reports as being you.  Were you or were you not

11   able to clear it up based on your research?

12       A.  I was able to get information that supported

13   that I was not the person that they claimed that I was,

14   yes.

15       Q.  Let's go back to the beginning then.  When you

16   went to apply for a job through National Engineering,

17   about a year before that you had had a similar

18   circumstance where you had been confused with someone

19   down in Virginia and gotten a background report that said

20   you had been arrested for those crimes.  Was that

21   correct?

22       A.  We're talking about the same?

23       Q.  Back in April of 2006, didn't you get a similar

24   situation where you were accused of being the person in

25   Virginia?

1          A.   That's the same incident that we're talking

2     about that Mr. Madsen asked me about where I was able to

3     clear that up?

4          Q.   That's correct.  You got it cleared up.  Did you

5     tell anyone at National about that?

6          A.   No.

7          Q.   Did you tell anyone at Verifications about it in

8     any fashion?

9          A.   No.

10          Q.   Incidentally, when were those arrests in

11     Virginia?  What year?

12          A.   I don't know that.  The documents that you would

13     like me to look at, the exhibits.  I can't remember.

14          Q.   Sure, please.  Anything that would refresh your

15     recollection.

16          A.   Do you know which exhibit it was?  Might have

17     been the first one we have.  I think it was 97 and 99.

18          Q.   Why don't you take a look at 27, if that's still

19     in front of you.

20          A.   This is the investigation report?

21          Q.   Right.  Background investigation report,

22     Plaintiff's Exhibit 27.

23          A.   I have that and there's also --

24          Q.   Take a look at 27.  That should help you out.

25     Look at Plaintiff's Exhibit 27, the first page, isn't

1   that the background investigation report?

2       A.  Verifications it is.

3       Q.  Down at the bottom doesn't it say what crimes

4   they are looking at?

5       A.  Yes.

6       Q.  In fact, isn't the first one driving under

7   revocation, suspended operator license?  You did some

8   research.  Does that refresh your recollection as to when

9   that arrest was?

10      A.  I didn't do research on someone else's

11  information.  Their criminal history.  What I did the

12  research on is what information that ChoicePoint had

13  received.  Based on what they gave me, I verified where

14  they received that information from.

15      Q.  Let me try to get you where I'm trying to ask

16  the question, Ms. Adams.  Down at the bottom doesn't it

17  say that the driving under revocation, suspended

18  operator's license was in 1999?

19      A.  Yes.

20      Q.  On the next page, doesn't it say the welfare

21  fraud was in 1997?

22      A.  Yes.

23      Q.  You did provide information to National on where

24  you had lived; is that correct?

25      A.  Yes, I did.

1      Q.  You provided it for the seven years prior to the

2   time you made the application?

3      A.  Yes.

4      Q.  So this -- these two arrests would have -- You

5   made the application in 2007, so if you subtract seven

6   years from that, you are back to 2000, so both of these

7   arrests would have been before you supplied information

8   to National about where you were living; is that

9   correct?

10      A.  My resume states that, my employment back to

11   1998.

12      Q.  I understand, ma'am.  Does it say anything about

13   where you were living during the period from 1997 to the

14   year 2000?

15      A.  That it would state the year.

16      Q.  Can you answer my question.  Does it say

17   anything about where you were living from 1997 to 2000?

18      A.  The resume would have the current address.

19      Q.  Nothing in the back address?

20      A.  It would --

21      Q.  Going on, did you ever tell National where you

22   were living before the year 2000?

23      A.  That question was not asked of me.

24      Q.  So it is fair to say although there was some

25   testimony on direct from you that National had no reason

1    to know where you were living before the year 2000; is

2    that correct?  No ability to know that?

3        A.  I don't know what they would have the ability to

4    know.

5        Q.  But you didn't tell them?

6        A.  I can answer that I did not tell them.

7        Q.  Answer my question, please, Ms. Adams.  We'll

8    get through it faster if you listen to me and answer my

9    questions.  I don't mean to be aggressive.  I have to get

10   the answer to the questions.

11       A.  I understand.

12       Q.  You did not tell National at any time where you

13   were living prior to the year 2000?

14       A.  Again.

15       Q.  Is that a yes or no?

16       A.  No.

17       Q.  Thank you.

18           Now let's talk about the CB Ellis job.  Do you

19   recall when you started the Ellis job?

20       A.  No, I do not.  It was approximately in March.

21   The exact date I don't know.

22       Q.  Do you remember how long the CB Ellis job was to

23   be for?

24       A.  Initially I was told it would be for 30 days.

25       Q.  And if you gave them two weeks' notice before

1      May 14 of 2007, that would bring us back to around the

2      beginning of May or the end of April; is that correct?

3          A.   That sounds accurate.

4          Q.   Okay.  And how long -- Do you recollect how long

5      you had worked at CB Ellis before you gave them notice?

6          A.   My calculation was that I had approached my

7      30-day assignment date.  That was my calculation, but

8      their understanding was different.  Their understanding

9      was that initially it was 30 days, but it could have been

10     extended perhaps so --

11         Q.   Well, let me try to pin that down.  Did they

12     offer to extend your job at any time prior to the time

13     you gave them notice?

14         A.   No, they did not.

15         Q.   So your job at CB Ellis would have ended

16     probably about May 14; is that correct?

17         A.   That's my understanding.  That was my

18     understanding.

19         Q.   Now, in terms of your prior work, was a question

20     raised at any time about the fact that you had a number

21     of jobs over your working career?

22         A.   Yes, those questions come up in interviews.

23         Q.   Looking back, I don't want to go through each

24     and every one of the jobs, but were any of the jobs on

25     your resume permanent?

1      A.  Yes.

2      Q.  Which one or ones?

3      A.  The job at General Electric.  The job at Chum

4  Insurance Company started off a temporary but led to the

5  permanent position.

6      Q.  I'm looking at your resume.  On the GE job, it

7  looks like you worked there from June of 2000 through

8  September of 2002.

9      A.  Correct, approximately two years.

10      Q.  Why did you leave at that point?

11      A.  General Electric exited that business.  That was

12  after 9-11.  They no longer have that business.  They

13  stopped writing the insurance in the United States, and

14  actually they closed their doors, so we were all let

15  go.

16      Q.  Okay, then looking at you resume, the next job

17  you had was with Kaman Air Space.  Going the wrong

18  direction.  I apologize.  I see on your resume that your

19  last job appears with Webster Bank, appears to have ended

20  in February 2007.  Was that a temporary job?

21      A.  Yes, it was.  That wasn't the next job after GE,

22  though.

23      Q.  Right.  Did you say that was the next job after

24  GE?

25      A.  It was not.  I thought you were asking me what

1    was the next job after GE.

2        Q.  No.  Webster Bank ended in February 2007.  I

3    notice your next entry, the Connecticut State Treasurer

4    Office, in September of 2007?

5        A.  That's correct.

6        Q.  Did you work between February of '07 and

7    September of '07?

8        A.  No.

9        Q.  You worked at CB Ellis?

10        A.  Some initial positions that I place on resume

11    are only positions that are over three months.  If I have

12    to keep working and I take on assignments and work for

13    only work 30 days, it's been suggested by recruiters not

14    to put assignments that are three months, so I wouldn't

15    put an assignment like CB Richard Ellis.  I wouldn't put

16    an assignment I worked a Peter Borman, a lawyer in

17    Newington.  I didn't put that assignment on there that

18    was only a couple of --

19        Q.  Maybe I confused you.  I wasn't trying to get

20    your resume.  I was trying to figure out where you

21    worked, so the last job over three months apparently was

22    at Webster Bank, then you went to CB Ellis after Webster

23    Bank, or was there somebody in between there?

24        A.  I believe Peter Borman was there.  CB Richard

25    Ellis, the employment at CB Richard Ellis was through

1    Legal Now.  That's the second.  They place me on some

2    temporary assignments.  I had worked for them before.

3    Attorney Peter Borman, I only worked there for a couple

4    of weeks, so I would not have put them on the resume.  In

5    answer to your question, there are other jobs that I had

6    that are not listed on my resume.

7         Q.  We have got you up to February of 2007, then you

8    worked for a couple of weeks for Peter Borman, then you

9    worked for almost 30 day with CB Ellis prior to making

10   application to National for the job at NU.  Did you work

11   anywhere else?

12        A.  Other than working for --

13        Q.  You got the attorney, Peter Borman.  You have

14   CB Ellis.  I'm asking you between CB Ellis and the time

15   between Webster and the time you made application at

16   National, did you work for anyone other than those two

17   people?

18        A.  Not that I recall.  I can't recall all the

19   little.  Because I could take a temporary assignment.

20   They would call me the next day to fill in for someone

21   who was sick.  I don't jot all those type of day

22   assignments or week assignments down.

23        Q.  Let's go after this event at National when you

24   thought that you were going to get the job at NU and you

25   didn't get the job.  When did you come to the conclusion

1    in your own mind that you weren't going to get the job at

2    NU?

3         A.   In my own mind, when I spoke to Mr. Sullivan on

4    the 8th, I was kind of -- I had a feeling that things

5    could go very badly if they dragged it out or if they

6    communicated to NU.

7         Q.   So May 8 you had at least a suspicion that you

8    might not get the job at NU?

9         A.   I was fearful that I may not.

10        Q.   Now, after May 8 when was the next time you had

11   employment?

12        A.   After May 8, I worked through another agency at

13   the State of Connecticut at the treasurer's office.

14        Q.   Okay.  That's on your resume?

15        A.   That should be on my resume.  That was a little

16   bit of a longer time frame.

17        Q.   So I'm trying to fix the time, so you worked at

18   Webster, you worked at an attorney.  You worked at

19   CB Ellis, then you missed the time until September, so

20   from May of 2007 until September of 2007, you were

21   without employment?

22        A.   Unemployed.

23        Q.   Unemployed.  Did you collect unemployment

24   compensation during that time?

25        A.   Yes.  Any time I'm eligible to collect

```
 1    unemployment I do so.

 2         Q.  One of your claims in this case with respect to

 3    the mistaken identity was that the first name of the

 4    person in Virginia was not the same as your first name;

 5    is that correct?

 6         A.  My claim, I didn't write the claim, my attorneys

 7    did.  My claim was that the person who they reported on

 8    the report was not me.  That was my claim.  That's my

 9    claim.

10         Q.  Other than that, did you have any concern that

11    there was a different first name?

12         A.  I don't understand your question.

13         Q.  The person in Virginia -- Mr. Madsen went

14    through carefully what your name was at the beginning,

15    that you didn't have a middle name, your name was

16    D-E-B-O-R-A-H, not D-E-B-R-A; is that correct?

17         A.  That's my name, the D-E-B-O-R-A-H, that's

18    correct.

19         Q.  Was the person in Virginia, did they have the

20    same first name as you?

21         A.  Their name is Debra.  My name is Deborah.

22         Q.  Are you called by other first names other than

23    Deborah?

24         A.  Most persons, they call you Debra regardless of

25    the spelling of your name, if your name is D-E-B-R-A or
```

1    if it is spelled D-E-B-O-R-A-H.  Most persons call you

2    Deborah -- excuse me, they call you Debra.

3         Q.  Do they also call you Deb and Debbie?

4         A.  They refer to me as Debbie, yes.  And Chris

5    replied, after I introduced myself as Deborah, he sent

6    e-mails saying Deb.  They do that.  Persons do that

7    sometimes, yes.

8         Q.  Do you have Plaintiff's Exhibit 12 before you?

9         A.  I'll look.  Did you say 12?  I have 11.  It goes

10   11 to 15.  Let me check to make sure I don't have things

11   out of order.

12        Yes, I do.  It's in the order that I received

13   them, so I do have 12 in answer to your question.

14        Q.  So you have 12.  They sent you a number of

15   things with 12.  Then Mr. Madsen started going through

16   those various things.  One of the things you did receive

17   that -- and you received the items that were checked on

18   that Exhibit 12; is that correct?

19        A.  Yes.

20        Q.  Are those your checks on there?

21        A.  Yes.  This is my copy and these are my ticks.

22        Q.  Now, if you can slide down to one of the items

23   you got with 12.  It was the Employee Hourly Contract and

24   Obligations.

25        A.  Yes.

1        Q.  Do you have that, also?

2        A.  It is under a different exhibit?

3        Q.  Yes.  Exhibit 14.

4        A.  I have that.

5        Q.  Now, I noticed you signed that down at the

6   bottom?

7        A.  Yes.

8        Q.  I notice on the second page you signed again on

9   the bottom on April 30, 2007?

10       A.  Yes.

11       Q.  I don't see any signature in National.  Did you

12   ever get a copy with National's signature on it?

13       A.  No, I did not.  This is a copy I received that I

14   was informed to sign and send back.

15       Q.  As a matter of fact, I don't want to take you

16   through every one that Exhibit 12 did.  You get a letter

17   from National signing an employment contract with you?

18       A.  Other than the contract and the documents that I

19   received in the various packets that I sent back to them,

20   I didn't receive any other communication.

21       Q.  Okay.

22            THE COURT:  Okay.  We'll stop here, and we'll

23   resume at 9:00 tomorrow morning.  You can get some -- you

24   can take your notes and your books and put them back in

25   the jury selection room, which will be locked up.  Now we

1   can tend to go nine to five each day.  If the jury has

2   other thoughts about it, want to go 8:30 to 5:30 or

3   something like that, just let us know.  We'll suit your

4   convenience, if you want to put more time in each day,

5   otherwise we'll go nine to five, so see you at 9:00

6   tomorrow morning.  Don't talk about the case tonight with

7   anyone.

8           A JUROR:  Excuse me.  Is it all right we leave

9   the empty binder and bring in the one that has paper?

10          THE COURT:  I don't really care.  Some of you

11   may have written notes on the exhibit books.

12          A JUROR:  The ones that don't have anything we

13   can leave?

14          THE COURT:  Put them back in the jury

15   deliberation room.

16          (In the absence of the jury at 5:03 p.m.)

17          THE COURT:  Okay.  As you heard, we like not to

18   impose upon the jury's time for any colloquy, so if

19   there's anything you want to take up with me before when

20   the jury comes in, we have to be in at 8:30 to do that,

21   otherwise I will see you at 9:00.  Let Craig know if you

22   want us to meet earlier or nine or don't.  Otherwise I

23   will be plan accordingly.

24          MR. KUPINSE:  I know of no reason to be here

25   early tomorrow.

1           MR. MADSEN:  I have one item that I would like

2      to discuss with counsel if we feel --

3           THE COURT:  Let's come in quarter to nine just

4      to play it safe.

5           (Whereupon, the above proceedings adjourned at

6      05:04 p.m.)

7

8

9      COURT REPORTER'S TRANSCRIPT CERTIFICATE

10     I hereby certify that the within and foregoing is a true

11     and correct transcript taken from the proceedings in the

12     above-entitled matter.

13

14     /s/  Terri Fidanza

15     Terri Fidanza, RPR

16     Official Court Reporter

17

18     DATE_____

19

20

21

22

23

24

25

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| DEBORAH ADAMS | |
| Direct By MR. MADSEN | 38 |
| Direct By MR. MADSEN | 179 |
| Cross By MR. KUPINSE | 191 |
| KATHLEEN SHAPLEIGH | |
| Direct By MR. MADSEN | 115 |
| Cross By MR. KUPINSE | 151 |
| Cross By MR. COFFEY | 171 |
| Re-Direct By MR. MADSEN | 174 |
| Re-Cross By MR. KUPINSE | 178 |