UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

DEBORAH ADAMS                    :  No. 3:07CV-1035 (WWE)
                                 :  915 Lafayette Boulevard
          vs.                    :  Bridgeport, Connecticut
                                 :
                                 :  December 16, 2009
NATIONAL ENGINEERING SVC CORP,   :
ET AL                            :

- - - - - - - - - - - - - - - - x

JURY TRIAL

B E F O R E:

   THE HONORABLE WARREN W. EGINTON, SENIOR U. S. D. J.

A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          MADSEN, PRESTLEY & PARENTEAU, LLC
               44 Capitol Avenue, Suite 201
               Hartford, Connecticut  06106
          BY:  WILLIAM G. MADSEN, ESQ.

     FOR THE DEFENDANTS:

          GOLDSTEIN & PECK
               1087 Main Street
               Bridgeport, Connecticut  06604
          BY:  WILLIAM J. KUPINSE, JR., ESQ.
               ANDREW M. MCPHERSON, ESQ.

          WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
               3 Gannett Drive
               White Plains, New York  10604
          BY:  MICHAEL WILLIAM COFFEY, ESQ.

               Susan E. Catucci, RMR
               Official Court Reporter
               915 Lafayette Boulevard
             Bridgeport, Connecticut  06604
                  Tel: (917)703-0761

I N D E X

WITNESSES:

DEBORAH ADAMS
Continued Cross Examination by Mr. Kupinse........220
Recross Examination...............................305
Cross Examination by Mr. Coffey...................275
Recross Examination...............................307
Redirect Examination by Mr. Madsen................296


MAURA DEMARS
Direct Examination by Mr. Kapinse.................316
Cross Examination by Mr. Madsen...................318
Cross Examination by Mr. Coffey...................319

CHRISTOPHER SULLIVAN
Direct Examination by Mr. Madsen..................319

EVAN HENDRICKS
Direct Examination by Mr. Steigman................367
Redirect Examination......................... 452/468
Cross Examination by Mr. Kupinse..................402
Recross Examination.......................... 461
Cross Examination by Mr. Coffey...................415
Recross Examination...............................463


EXHIBITS:

Plaintiff's
                Exhibit 28......(Full) 358
                Exhibit 48......(Full) 400
                Exhibit 1......(Full) 448
                Exhibit 33......(Full) 457

1                    (9:00 O'CLOCK, A. M.)

2           THE COURT:  Okay, you had something you wanted

3    to bring up before we bring the jury in?

4           MR. MADSEN:  Yes, Your Honor, actually two

5    things that I'd like to bring up.  First of all, I would

6    like to, since Your Honor now has substantial context for

7    the case and the claims --

8           THE COURT:  You know what you can do, observe my

9    ground rule in this courtroom.  You know the acoustics are

10   very good now in this courtroom; sit down down and just

11   speak right into the mic.

12          MR. MADSEN:  Okay.  Thank you, Your Honor.

13          Now that Your Honor has substantial context

14   regarding the claims and the evidence in this case, I

15   think it's an appropriate time to revisit the subject

16   matter of one of our motions in limine, and that arises

17   now because the defendants are in the process of

18   cross-examining the plaintiff.  That has to do with the

19   supplemental disclosure.  This is Exhibit 533 for National

20   Engineering.  They are alleged pictures that were down

21   loaded off of the Internet regarding the plaintiff's son

22   and I'm not exactly sure what purpose and what reason why

23   National Engineering, and I believe Verifications also

24   identified this as an exhibit, I don't know why they

25   intend to introduce pictures of the plaintiff's son in the

1    course of this proceeding, but I believe that they are

2    irrelevant and inadmissible under 401.  I also believe

3    that they are prejudicial and --

4              THE COURT:  Well, they certainly would need some

5    background on the picture.  I've seen the picture.  You'd

6    have to know what the circumstances were.  Probably been a

7    wild birthday party; you never know.

8              MR. MADSEN:  Well, not only that, but I'm not

9    sure that the defendants will be able to authenticate

10   these documents and I would, you know, I think that would

11   be necessary in a case like this.

12             THE COURT:  Well, it seems to me though it's a

13   definitely a very sanguine issue and I should be careful

14   about allowing anything like that in.  Let me hear the

15   defense.

16             MR. KUPINSE:  If your Honor please, we are

17   intending to offer the pictures and I don't think until

18   we've made a record with the defendant that Your Honor

19   can -- with the plaintiff, excuse me -- that Your Honor

20   can rule on the issue.  I think once we've asked some

21   questions of the plaintiff and if you would like me to

22   break at that point and exclude the jury --

23             THE COURT:  Yes, I agree with you that on the

24   basis of what we have at the moment, I wouldn't allow it

25   in, so we have to lay a foundation.  You just tell me when

```
 1    you're ready to do that and we'll dismiss the jury and

 2    have an offer of proof before we allow that in.

 3              MR. KUPINSE:  Thank you, Your Honor.

 4              MR. MADSEN:  Your Honor, the other issue that

 5    I'd like to bring to your attention, the other matter I'd

 6    like to raise is the series of questions that the defense

 7    counsel have asked of the plaintiff during cross

 8    examination regarding whether she bothered to report to

 9    individuals the fact that she had had a problem in the

10    past with another credit bureau, credit reporting agency.

11    I believe that those questions are irrelevant and I

12    believe that they are misleading and I base that on Judge

13    Hall's ruling, beginning at page 24 of her -- I'll find it

14    here.

15              Beginning at page 24 and continuing onto page

16    25, and I'm looking at the, this is actually the -- yes,

17    this is the ruling, not at the Westlaw version.  Judge

18    Hall concludes that, in the middle of page 24, "The court

19    is not aware of any binding authority which exempts

20    consumer reporting agency from complying with the

21    applicable requirements of the FCRA merely because the

22    consumer in question may be in, quote, 'the best position

23    to alert the agency as to the existence of public records

24    pertaining to other individuals with similar names and

25    dates of birth,' nor does Verifications cite any."
```

1          And then she goes on and concludes on the next

2     page, "Consequently the court rejects Verifications'

3     argument and does not shift the burden onto Adams."

4          So I would assert that the questions that are

5     presented to the plaintiff regarding, well, you had this

6     problem in the past with Choice Point.  You didn't -- you

7     know, why didn't you bring it to the attention of National

8     Engineering or Verifications?  I believe those are

9     misleading questions and, you know, to the extent that we

10    would need a curative instruction from Your Honor before

11    the case goes to the jury, you know, what I'm suggesting

12    is that curative instruction could be avoided by granting

13    our motion in limine to prevent further questioning along

14    those lines.

15          THE COURT:  Well, what she says is that it is up

16    to the consumer reporting agency, in this case they were

17    talking about Verifications, cannot shift the burden over

18    to Adams for disclosing this, some problem with the

19    records.  They've got to determine whether records

20    correctly report the outcome of the action and that may be

21    too much to ask but it requires the consumer reporting

22    agency to correctly determine which public records belong

23    to which individual consumers and that's the line she

24    drew.  So to the extent we go beyond that situation, I

25    would agree with you.  I haven't detected the questions

1    but you're on -- Mr. Kupinse, I think we're on your

2    examination, Mr. Kupinse, aren't we?

3            MR. KUPINSE:  We are, Your Honor, and with

4    respect to Judge Hall's opinion, I do not believe that

5    that prohibits us from inquiring into that area.  Even

6    though Verifications, which, of course, is not my client,

7    but Verifications' argument doesn't shift the burden to

8    Adams, it still goes to the reasonableness that should be

9    a jury question.

10           THE COURT:  Yes, just as to burden, not what

11   evidence can be offered.  Let me hear from Verifications.

12           MR. COFFEY:  Good morning.

13           THE COURT:  I see you need a couple mics at that

14   table.  We ought to see if we can add another mic.

15           MR. COFFEY:  You know, our position,

16   Verifications' position is, Your Honor, that Attorney

17   Madsen has opened the door on that issue because he

18   actually, it was his intention to make it look like, with

19   the Choice Point issue, that Ms. Adams was almost heroic

20   in her efforts to get that change, so I believe he opened

21   the door.  He introduced the letters as evidence.  He

22   didn't read the entirety of the letter but only piecemeal,

23   pieces he thought would be most favorable to Ms. Adams.

24   So I believe he's opened the door to make that a very

25   relevant discussion.

1          Attorney Madsen could have chosen not to put

2     that into the equation, could have chosen not to introduce

3     that evidence that are already in the binders of the jury,

4     so I believe that he's opened the door that we -- it is a

5     fair line of inquiry and it is not any of our intentions

6     to say it was her obligation.  Judge Hall's decision is

7     different from the scope of what's fair questioning and I

8     believe Attorney Madsen has opened that door.  Thank you.

9          MR. MADSEN:  Your Honor, I would disagree with

10    that.  The question that the documents came in on, the

11    question of whether or not Deborah Adams, if she had been

12    alerted as the law required her to be alerted, if she

13    would have been able to help them clear up the background

14    record and the answer is yes, she would have been able to

15    clear it up.  That was the context in which it came in.

16    The questions that they are asking are different.  The

17    questions they are asking is why didn't you alert National

18    or Verifications.  That can only be relevant if there's a

19    contributory negligence element and there is none.

20         THE COURT:  I understand that.  The question,

21    Judge Hall was asked to describe the burden of proof and I

22    agreed with her ruling but I don't think I should exempt

23    them from, restrict them from asking questions which she

24    should be able to answer.

25         MR. MADSEN:  We will be asking for an

1    instruction that, you know, that there is no, there was no

2    obligation by Deborah Adams under the law because that's

3    made very clear, there is --

4         THE COURT:  There may have been no obligation

5    but it may go to a question of, again, not the burden of

6    proof but a question of what she did and whether that was

7    proved to do it.  Whether she had obligation to do it or

8    not is something else.  You can say she had no obligation

9    but I think they are entitled to ask the questions they

10   are asking.  So I'll allow that.  What else have you got?

11        MR. KUPINSE:  If your Honor please, I do have a

12   couple things I'd like to bring up.  One is that I believe

13   that Mr. Madsen is going to put Mr. Sullivan on as one of

14   his witnesses today and, again, to save time for the

15   court, Mr. McPherson will be doing the cross examination

16   and if we can have a little latitude so we don't have to

17   call him back again, we would appreciate it, Your Honor.

18        MR. MADSEN:  Yeah, my only comment on that would

19   be as long as the protocols regarding nonleading questions

20   are observed, I have no problem with that.

21        MR. KUPINSE:  Absolutely.

22        And the second thing is, Your Honor, we have, as

23   you know, we've had somewhat of a struggle as to what

24   we're doing with respect to our expert and we do have her

25   coming in and we'll have her here tommorow morning and I

1    wonder if it would be possible to start a little early,

2    have her do the nonjury part of her testimony before we

3    bring the jury in, and then I would like to put her on in

4    the morning, if it's all the possible.  Because I don't

5    know she'll be a very long witness and we have, as you

6    know, redacted the first report which she made to take out

7    any references to user and we are not going to offer to

8    the jury the second report.  We'll just offer that as part

9    of our offer of proof.

10           THE COURT:  Well, what I'm confused about, you

11   say you want to do something outside the presence of the

12   jury.  I thought we were going to only have an offer of

13   proof at the end.

14           MR. KUPINSE:  Well, she is available --

15           THE COURT:  You didn't want to call her --

16           MR. KUPINSE:  Tomorrow morning, yes.  Can we do

17   it in the morning?

18           THE COURT:  You want to preserve her testimony

19   as part of the offer of proof.

20           MR. KUPINSE:  It won't be very long, Your Honor.

21           THE COURT:  All right, I guess we'll do that at

22   8:30.  The jury is considering whether they want to come

23   in at 8:30 to start testimony.  So we'll tell them they

24   can't do that tomorrow.  We'll come in at 8:30 tomorrow.

25           MR. KUPINSE:  Thank you, Your Honor.

1              And if your Honor please, there is one more

2    matter of housekeeping and that's that, if I may approach

3    with the original and courtesy copy of a brief on the

4    issue of Count 14.

5              (Hands Court.)

6              MR. KUPINSE:  And we have electronically filed

7    that also, Your Honor.

8              THE COURT:  Yes, well, I'm not going to permit

9    evidence that National's a user of the FCRA so -- and I

10   doubt that I'm going to grant this, but I gather the

11   plaintiff wants time to reply to it anyway.  You've seen

12   this thing?

13             MS. STEIGMAN:  Just this morning, but we do want

14   time to respond, Your Honor.

15             THE COURT:  Use the mic.

16             MS. STEIGMAN:  We do want time to respond.  We

17   just received it this morning.

18             THE COURT:  All right, yes.  Let's see, get a

19   response to me as soon as you can usefully do that.

20   Meanwhile I'll read it.  I don't think I'll be grant it

21   but let's take a look at it.

22             All right, I guess we're ready for the jury.

23             MR. MADSEN:  Deborah, if you want to take the

24   stand?

25

```
 1    D E B O R A H       A D A M S,     called as a witness,

 2    the Plaintiff, having been previously duly sworn by the

 3    Clerk, testified as follows:

 4              THE COURT:  Yes, put her on the stand.

 5              (Whereupon the jury entered the courtroom at

 6    9:10 o'clock, a. m.)

 7              (Pause)

 8              THE COURT:  Okay, good morning.  Say, Craig,

 9    keep checking for me, as soon as Talbot comes in, I have

10    to talk to her.  I don't know when she's coming in so keep

11    checking back there.  Okay.

12              All right, we're ready to resume.  Mr. Kupinse?

13              MR. KUPINSE:  May I request that the --

14              THE COURT:  You're still on cross.

15              MR. KUPINSE:  If I request that the plaintiff's

16    exhibits be placed over with the witness?  Are they there

17    now?

18              MR. MADSEN:  No, they are not.

19              THE COURT:  She has the original exhibits?

20              THE CLERK:  I have the actual originals.

21              THE COURT:  Because I don't want her to make any

22    marks --

23              THE CLERK:  No, I have the originals, Your

24    Honor.

25              THE COURT:  Okay.
```

```
 1              (Hands witness.)

 2   CONTINUED CROSS EXAMINATION

 3   BY MR. KUPINSE:

 4   Q.   Ms. Adams, this was not the first time you worked

 5   through this agency, was it?

 6   A.   No, it was not.

 7   Q.   You knew you were an employee of National Engineering

 8   and not of NU?

 9   A.   I understood that, yes.

10   Q.   And you knew you were being placed as an assignment

11   at NU?

12   A.   Yes.

13   Q.   And you knew that it was an employment at will?

14   A.   No, I was not aware of that.  I thought --

15   Q.   If you would take a look at Exhibit 14, please?

16   A.   I have it.

17   Q.   Ms. Adams, did you sign that exhibit?

18   A.   Yes, I did.

19   Q.   And would you take a look at paragraph two, the

20   second sentence and would you read that?

21   A.   "I shall work the same hours as observed --"

22   Q.   No, paragraph two, number two, the second sentence.

23   I realize --

24   A.   The second sentence or the second paragraph?

25   Q.   Second sentence.
```

1    A.    In the second paragraph?

2    Q.    In --

3    A.    The number two starts.

4    Q.    Starting with "I realize that although --"

5    A.    Okay.  So that, the third sentence in the second

6    paragraph reads "I realize that although NESC is an

7    employer at will and is not obligated to offer me

8    employment or to continue to employ me for any reason,

9    that poor attendance will have a negative impact on my

10   continued employment and/or future assignment

11   opportunities and may lead to my termination."

12   Q.    So, you were aware that you were an employee at will

13   at NESC?

14   A.    My understanding of this paragraph or this sentence

15   that I just read is that NESC is an employer at will and

16   that my signing a contract with them, I have a contract to

17   work for a period of 50 weeks.

18   Q.    You did.  How about paragraph three then, where it

19   starts "I understand that the length of my assignment is

20   subject to the will of the client"?

21   A.    Would you like me to read that or --

22   Q.    No.

23   A.    You want --

24   Q.    You can take a look at it for yourself.  Did that

25   give you any hint that your assignment might not last any

1    time at all?

2    A.   My understanding is being a contractor for previous

3    years is that the contract could end at any time.

4    However, an employee at will, as my understanding of it is

5    in previous assignments and previous jobs, there's a

6    separate document that clearly states, like a sexual

7    harassment document and other like documents, it simply

8    states employee at will and there's a whole page that

9    speaks to the employee at will.

10    Q.   Thank you for your understanding, Ms. Adams.  Could I

11    ask you if you read this document before you signed it?

12    A.   Yes, I did.

13    Q.   And it does say that you're an employee at will and

14    your employment can terminate at any time, does it not?

15    That's a yes or no question.

16    A.   No.  It says that NESC is an employer at will.  It

17    does -- I don't see where it says that I'm an employee at

18    will.

19    Q.   Okay.  Does that mean NESC can terminate your

20    employment at any time?

21    A.   I don't know what them being an employer at will

22    means.

23    Q.   Now, take a look at the second page of Exhibit 14.

24    A.   Okay.

25    Q.   Was it ever signed by NESC?

1    A.    I believe these are my documents so --

2    Q.    I understand that.  Did you ever receive the signed

3    copy by NESC?

4    A.    No, I did not.

5    Q.    Thank you.

6          Take a look, please, at Exhibit 53.

7    A.    Okay, I have that.

8    Q.    Did you sign that document?

9    A.    Yes, I did.

10   Q.    Did you read it before signing it?

11   A.    Yes, I did.

12   Q.    I direct your attention to the final paragraph before

13   the lines where your signature is, and the third line up

14   where it says no promise of employment is being made.  Did

15   you read that?

16   A.    Where is that located?

17   Q.    Third line --

18   A.    After my, the following information is provided

19   voluntarily?

20   Q.    Yes.

21   A.    And it's not considered as part of your application,

22   is that --

23   Q.    Do you see that?

24   A.    I don't see where no promise is being made in that

25   sentence.

1    Q.   Okay.  Down a little further where it says further, I
2    understand that by requesting this information no promise
3    of employment is being made?
4    A.   I don't think I'm looking in the right place.  Is it
5    above my --
6    Q.   Above your signature?
7    A.   Above my signature.  I'm looking below my signature.
8    I understand that requesting this information, no promise
9    of employment is being made.  This is --
10   Q.   Did you read that, Ms. Adams?
11   A.   On this disclosure and release of information
12   authorization, yes, I did.
13   Q.   And did you understand that no promise of employment
14   was being made?
15   A.   As the rights to the disclosure of, release of
16   information and authorization form, yes.
17   Q.   So you only count it for this form, you didn't count
18   it for the whole course of employment?
19   A.   Because each document pertains to different things.
20   A contract states a different language.  The employee at
21   will states different language.
22   Q.   And again, take a look at that document.  Did you
23   ever receive a copy signed in any way by NESC?
24   A.   It has to be notarized, my understanding is, by them
25   and I didn't receive that back.

1    Q.   Okay.  Thank you.

2    A.   Okay.

3    Q.   Take a look at Exhibit eight, if you would.

4         THE COURT:  Is that eight?

5         MR. KUPINSE:  Eight.

6         THE COURT:  Eight.

7    A.   I have it.

8    Q.   Thank you.  Notice just above your signature it says

9    if you held an active security agreement within the past

10   two years, please notify.  Did you hold an active security

11   clearance?

12   A.   Where are you reading?

13   Q.   Two lines above your signature.  Under Security.  "If

14   you have held an active security clearance within the past

15   two years, please notify NESC."  My question is did you

16   hold an active security clearance?

17   A.   Not within the two years.  The clearance that I had

18   with the federal government was in 2003.

19   Q.   Thank you.  Ms. Adams, I don't mean to be difficult

20   but it will really go a lot faster if we just do a

21   question and answer, you don't volunteer information.

22   Your attorney will have plenty of time to come up and ask

23   you to explain things.

24   A.   I'm sorry, I just wanted to make things clear.

25   Q.   I understand.  Take a look on that piece of paper too

1   where it says Representative.  Did you ever receive copies

2   signed by NESC?

3   A.   No, I did not.

4   Q.   Take a look at Exhibit nine.

5   A.   I have it.

6   Q.   Did you ever receive a copy of that signed by NESC?

7   A.   No, I did not.

8   Q.   Take a look at Exhibit ten.

9   A.   I have that.

10  Q.   The last full paragraph on there where it says

11  "Remember, you must contact us for reassignment prior to

12  filing a claim for unemployment insurance."  After you did

13  not get the job, did you file a claim for unemployment

14  insurance?

15  A.   Yes, I did.

16  Q.   Did you contact NESC before so doing?

17  A.   I was suing them at the time so I didn't think it

18  would be appropriate to do so.  And nor was I told -- I'm

19  not answering the question?

20          MR. KUPINSE:  Your Honor, could I request that

21  the witness answer with yes's and no's?

22          THE COURT:  Well, I'm not sure I understand what

23  that sentence means, so if she doesn't understand it, I

24  would sympathize with that.  You haven't asked her if she

25  knows what reassignment means under these circumstances.

1   I don't know what it means under these circumstances.

2          MR. KUPINSE:  Okay.

3   BY MR. KUPINSE:

4   Q.   Do you know what reassignment means?

5   A.   My understanding when I read this was that if I

6   wanted to be placed in another position, that I would

7   contact -- am I correct --

8   Q.   That is correct.  How soon after you did not get the

9   job at NU did you bring an action against NESC, NESC?

10  A.   I attempted almost immediately so I had contacted

11  attorneys almost immediately.

12  Q.   Okay.  And did you ever go back to National and

13  request another assignment?

14  A.   No, I had not worked with National for --

15  Q.   Thank you.

16          Take a look, please, at Plaintiff's Exhibit 11.

17  Second page.  Your signature again?

18  A.   I haven't --

19  Q.   I'm sorry?

20  A.   -- gotten there yet.  They are not in order here.

21  Q.   I'm sorry?

22  A.   You gave them to me.  I'll get them in order later.

23  All right, I have it now.

24  Q.   Okay.  Second page of that exhibit, down at the very

25  bottom just above your signature.

1   A.   This is the pre-employment registration form,

2   correct?

3   Q.   Yes, ma'am.

4   A.   Okay.  Second page, I have that.

5   Q.   Now, on the second page, just above your signature,

6   first of all, you did read and sign this agreement, didn't

7   you?

8   A.   Yes, I did.

9   Q.   And on the second page just above your signature, it

10  says "I understand and agree that if hired, my employment

11  is at will and not for a definite period and may,

12  regardless of the date and payment of wages or salary, be

13  terminated at any time without prior notice.  I understand

14  and agree that neither this pre-employment registration

15  form or any other personnel forms constitute a contract,

16  constitute an employment contract."

17       Did you read that?

18  A.   The copy that I have, I don't see where it says at

19  will.  That's copied out.  But, again, I did read this but

20  this is for the pre-employment application, not the

21  contract.

22  Q.   I'm going to show you a document now which is marked

23  Defendant's Exhibit 509.

24       MR. KUPINSE:  Your Honor, may I approach the

25  witness to hand her a copy?

1              THE COURT:  Yes.

2    Q.    (Hands witness.)

3    A.    Thank you.

4    Q.    I'll give the jury an opportunity to get their

5    copies.

6         (Pause)

7    BY MR. KUPINSE:

8    Q.    Ms. Adams, you have Exhibit 509 in front of you;

9    would you kindly read it?

10   A.    It reads Consumer Report slash Drug Test Release.

11   "I, Deborah Adams, understand that by signing this form I

12   am acknowledging that for this assignment I will be

13   willing to take and pass a drug test and background check.

14   I also understand that the results will be released to

15   both my staffing partner and Comensura for my assignment

16   with the client, Northeast Utilities.  By signing this

17   form I acknowledge and agree to the above."  And --

18   Q.    So I take it, is that your signature on that form?

19   A.    Yes, it is.

20   Q.    And I take it you read the form before you signed it?

21   A.    Yes, I did.

22   Q.    And by that form you agree that the background

23   information could be released to both NESC and to

24   Comensura?

25   A.    My background.

1    Q.   Yes, your background.

2    A.   My background, not someone else's.

3    Q.   Oh, not anyone else's?

4    A.   No.

5    Q.   So if they came up with a background check that you

6    didn't like, they couldn't release it?

7              MR. MADSEN:  Objection.

8    A.   No.  My background -- I'm Deborah Adams, so if they

9    came up with a background check for someone else, I'm not

10   authorizing for someone else's information to be released.

11   Q.   Was the background check that Verifications provided

12   for you -- I recognize it had incorrect information on it

13   but it was for you, it wasn't for anyone else, was it?

14   A.   It was supposed to be for me but it came back --

15   Q.   It had background check information on it?

16   A.   But it came back with someone else's information and

17   not my social security number on it.

18   Q.   So it was, the information, the background

19   information check that Verifications did was for you, is

20   that correct?  Even though it contained wrong information?

21   A.   It was supposed to be for me so I guess in answer to

22   your question -- yes, it was supposed to be for me.

23   Q.   It was your background check.  Even though you said,

24   and we don't disagree, that it was wrong, the first one,

25   is that correct?

1    A.    Yes.

2    Q.    Okay.  And you did authorize by that form that

3    background information to be shared both with NESC and

4    with Comensura, Guidant?

5    A.    Again, no, I didn't authorize them to do a background

6    to submit information from someone else onto my report,

7    just to report information that was verified that belonged

8    to me.

9    Q.    Now, Ms. Adams -- we'll let the document speak for

10   itself.  Ms. Adams, did you testify that you held a number

11   of positions and that no other incidents occurred except

12   for the one in 199 -- in 2006, the prior one.  You

13   testified, I believe, that you had held a number of

14   positions, is that correct?

15   A.    I believe that you're correct, that we did discuss

16   something like that.

17   Q.    And you testified that background checks were done in

18   connection with those positions, is that correct?

19   A.    Yes.

20   Q.    And you testified that the only times that the wrong

21   information was given was in this case and in the prior

22   case involving the report to Bank of America?

23   A.    That is right.

24   Q.    Okay.  Now, when you applied for a number of jobs and

25   got the background checks, each time did you get the job

1   you applied for?

2   A.   Yes.

3   Q.   Everytime you applied for a job you got it?

4   A.   Each time that -- I think we're talking about my

5   resume and the jobs that are on my resume?

6   Q.   No, ma'am, I'm talking about every single time that

7   you applied for a job, whether you got it or not.  Did you

8   get every single job you applied for?

9   A.   Of course not.

10  Q.   Of course not.  And, in fact, did those jobs you

11  didn't get do background checks?

12  A.   Some of them may have and some of them may not have.

13  Q.   Okay, and my question is did you see the background

14  checks on those jobs that you didn't get?

15  A.   No, I did not.

16  Q.   Okay.  So you don't really know that there has not

17  been information incorrectly reported in the past, is that

18  correct?

19  A.   No, that's something I wouldn't know.

20          THE COURT:  All right, let me just take a minute

21  here and I'll be right back on the bench.

22          MR. KUPINSE:  Thank you, Your Honor.

23          (Pause.)

24          THE COURT:  Okay.

25

```
 1              MR. KUPINSE:  Thank you, Your Honor.

 2          If I may, I might take a moment to just mention

 3     to the jury that we did give them two binders but

 4     obviously the plaintiffs have put in a number of the

 5     exhibits we would have used so I would just suggest they

 6     take the first binder and add the exhibits just in

 7     accordance with the first binder, just one, two, three,

 8     four, et cetera.

 9     BY MR. KUPINSE:

10     Q.   Ms. Adams, you testified that you knew about your

11     rights under the Fair Credit Reporting Act?

12     A.   Testified -- I believe that I was familiar with my

13     rights.

14     Q.   Okay.  And are you familiar with the fact that after

15     a credit reporting agency requests a request from a

16     subject, that there is five days to start an

17     investigation?

18     A.   In addition to other things, I was familiar with that

19     and also --

20     Q.   Thank you, Ms. Adams.

21          Now, in this case did the credit reporting agency

22     start an investigation within five days?

23     A.   I don't know when they started it.  I'm assuming they

24     started, I know when I disputed and I know when I received

25     a corrected copy.
```

1    Q.   And are you familiar with the fact that they have 30

2    days to complete the investigation?

3    A.   That sounds correct.

4    Q.   And just to refresh your recollection, I think the

5    report which contained the inaccurate information was

6    given on May 8 of 2007 and was corrected on May 11th of

7    2007.  Would that be within the five days and within the

8    30 days?

9    A.   May 11th when I received it, if that is correct, that

10   sounds familiar, yes.

11   Q.   Would that be within the five to 30 days?

12   A.   Yes.

13   Q.   Thank you.  Take a look please at Exhibit 54.

14        (Pause)

15        Ms. Adams, you filed a complaint with the Federal

16   Trade Commission?

17   A.   Yes.

18   Q.   And you did that on May 9, the day after the report

19   with the erroneous information was received or came into

20   National?

21   A.   The letter is dated May 9th.  The complaint is on

22   line.  It's not -- this letter is following up on the on

23   line complaint.

24   Q.   Incidentally, did the FTC take any action on this

25   complaint?

1    A.   I haven't been notified.

2    Q.   And by the way, that complaint was filed before the

3    five days and before the 30 days that the credit reporting

4    agency had an opportunity to correct the report, is that

5    not correct?

6    A.   I beg your pardon?

7    Q.   Yes.  Exhibit 54 was filed before the five days that

8    the consumer reporting agency had a chance to start an

9    investigation and certainly before the 30 days in which

10    they had an opportunity to complete the investigation?

11    A.   This is a letter, this is not the complaint.  The

12    complaint is an on line form.

13    Q.   Take a look at Plaintiff's Exhibit 60, if you would,

14    six-oh?

15    A.   I have that.

16    Q.   Thank you.  And on May 11th at 8:34 in the morning

17    you filed or sent a complaint to the South Dakota Attorney

18    General, is that correct?

19    A.   A letter.

20    Q.   A letter.  Did you -- well, when you say they are

21    letters, were they asking for anything to be done, were

22    they complaining about anything?

23    A.   Some of the agencies that I contacted, they have

24    on-line forms that you have to complete and so the

25    purposes of the letter are to just reiterate what I filed

```
1   because I can't make a copy of what I sent on line.

2   There's no way to do that or print it out so I sent a

3   letter.

4   Q.   Were these letters, which I've called complaints,

5   were these letters letters of approval of what National

6   and Verifications were doing?

7   A.   They were letters to document the experiences and to

8   dispute things that took place, yes.

9   Q.   To complain about what happened, weren't they?

10  A.   Yes.

11  Q.   Thank you.

12       Now, why did you file with the South Dakota Attorney

13  General?

14  A.   It's my understanding that one of the defendants,

15  their national office or their corporate office was listed

16  in South Dakota and I had been informed through

17  conversations with the FTC that --

18  Q.   Let's not repeat the conversations with the FTC

19  because that's called hearsay.

20  A.   Okay.

21  Q.   But you did file in South Dakota because the

22  corporate office of one of the defendants was there?

23  A.   It was my understanding, yes, that that was the

24  proper place.

25  Q.   Did you also file a complaint against the, with the
```

1    Connecticut Attorney General?

2    A.   Yes.

3    Q.   And did you also file a complaint with the New

4    Hampshire Attorney General?

5    A.   Yes.

6    Q.   And did you also file a compliant with the

7    Connecticut Department of Consumer Protection?

8    A.   Yes.

9    Q.   And were any of these complaints so far as you know

10   acted upon in any fashion; have you heard anything?

11   A.   I received letters from some of them, yes.

12   Q.   Okay.  Did they say -- did you produce those letters

13   at any time?

14   A.   I gave them to my attorney.

15   Q.   Okay.  Take a look at Exhibit 29, if you would.

16   A.   I have that.

17   Q.   Thank you.  Now, this is a series of emails which

18   read in timing from the back to the front, is that

19   correct?

20   A.   From the last page -- yes.

21   Q.   And that was from, between you and Chris -- Chris

22   Sullivan or Lary O'Keefe or both, is that correct?

23   A.   That's accurate.

24   Q.   Okay.  Now, at some point, let's see  -- on page two,

25   the emails on page two, your email says "I see" and I

1    think you explained what that meant before, you see -- why

2    don't you tell us because I'm not sure I remember exactly

3    what did "I see" mean when you sent that?

4    A.   Now we're talking about the email that's dated

5    May 14th, 2007 at 1:03?

6    Q.   That is correct.

7    A.   And it begins, I see?

8    Q.   Yes.

9    A.   When did you receive the report from Verifications

10   Inc.   I see, dot dot dot, means that I understand what he

11   just, what he said.

12   Q.   Okay.  And then on the next page, on the first page

13   of Exhibit 29, you write to Mr. Sullivan that you filed a

14   complaint against Verifications with the FTC, a complaint

15   against National Engineering and Verifications with

16   Connecticut State Protection and have contacted a law firm

17   for claims against National Engineering and Verifications

18   Inc.  This was sent at 2:48 p. m. and then what do you say

19   to Mr. Sullivan?

20   A.   What do you mean, the next email?

21   Q.   Yes, what's the next line?

22   A.   "Enjoy your afternoon."

23   Q.   Did you really mean that or were you being a little

24   sarcastic?

25   A.   I was being courteous, sir.

1    Q.   You were being what?

2    A.   Courteous.

3    Q.   Courteous?

4    A.   Like saying good day, good morning, good night.

5    Q.   Okay.

6    A.   There was no need to be sarcastic at this point.

7    Q.   Did National Engineering and Mr. Sullivan always

8    treat you courteously and professionally?

9    A.   The next email, he states "I'm a little confused as

10   to how this falls on us as we do not run the background

11   check, but whatever you feel is necessary."  I suppose

12   that might be interpreted as not professional and not

13   courteous.

14   Q.   Okay.  Now, Ms. Adams, you believe that you were

15   denied the job at Northeast Utilities because, based on

16   the erroneous information on the first background check

17   National reported to Guidant which reported to NU on

18   May 8, 2007 that were you not qualified, is that correct?

19   A.   That is correct.

20   Q.   Did you try to speak to Guidant?

21   A.   Yes, I did.

22   Q.   Were you successful?

23   A.   Not really.  I attempted to contact them, sent them

24   letters, communicate with them, but really to no avail.

25   No, couldn't really.

1    Q.    They wouldn't speak with you, is that correct?

2    Respond to you?

3    A.    They did speak to me.  It's not like they didn't, you

4    know, like they hung up on me, but -- they wouldn't --

5    Q.    Same thing with respect to Northeast Utilities; did

6    you attempt to speak to them?

7    A.    Yes, I did.

8    Q.    And were you successful?

9    A.    I did receive an email reply from Mr. Maddox.

10    Q.    And what did that email reply say; didn't it refer

11    you back to National?

12    A.    It stated -- I should read it so I wouldn't

13    miscommunicate anything that's stated in there, but

14    basically it states that he sympathizes with my situation

15    but he has to refer me back to my staffing company but he

16    also feels that a resolve will be met.  If I can remember

17    correctly, that's basically what I remember.

18    Q.    In other words, he didn't do anything to solve your

19    problem; he referred you back to National?

20    A.    In other words.

21    Q.    Yes?

22    A.    Yes, you're right.

23    Q.    Thank you.  Did anyone from National ever tell you

24    why you were not given the job?

25    A.    No.

1    Q.   Did anyone from Northeast Utilities ever tell you why

2    you were not given the job?

3    A.   I wouldn't have been in communication with Northeast

4    Utilities.

5    Q.   Okay.  Did anyone from Guidant ever tell you why you

6    were not given the job?

7    A.   I wouldn't have been in communication with them.

8    Q.   Okay.  You mention that a number of jobs, the number

9    of jobs which you had were sometimes of concern to

10   prospective employers, is that correct?

11   A.   I don't recall stating that.

12   Q.   Okay.

13   A.   If I can remember, you asked the question relative to

14   my resume and asked me if, or asked me based on what you

15   were looking at my resume that I've held a number of jobs

16   and I think that conversation revolved around that,

17   because I worked as a contractor for many, many years.

18   Q.   Do you know whether or not the number of jobs which

19   you had were ever of concern to a prospective employer?

20   A.   Most jobs that I worked at and most prospective

21   employers, they found the fact that I've had all these

22   experiences as a positive, not a negative.  They

23   understood that I'm a contractor so I work for certain

24   periods of time and then I move onto the next project.

25   It's more project oriented, as it would have been in

1    Northeast Utilities to help them with a project.

2    Q.    I guess that's a no to my question, that you didn't

3    have any discussions with any prior employers in which

4    they expressed concern over the number of jobs you had?

5    A.    Concern?

6    Q.    Yes.

7    A.    No.

8    Q.    And how about in discussions with prospective

9    employers, did they ever speak to you about being

10   over-qualified?

11   A.    No.

12   Q.    Okay.

13   A.    I don't think they would be allowed to say that.  I

14   don't know.

15   Q.    Okay, let me ask -- you've answered the question.

16            MR. KUPINSE:  Now, at this time I'm going to

17   offer Exhibit 505.

18            MR. MADSEN:  I object to this.

19            MR. KUPINSE:  If your Honor please, there's an

20   objection.

21            THE COURT:  Now, let's take a look at how these

22   books work.  NESC is the 500 series.  Okay.

23            MR. KUPINSE:  Unfortunately, Your Honor, I would

24   point out that the numbering system is not with fives but

25   if you just look at the bottom of each or the top of each

1    page, the exhibits are in order.  So 505 is five in --

2            THE COURT:  No, unfortunately they are fouled up

3    in my book.

4            MR. KUPINSE:  Shall I show you a copy of this

5    one, Your Honor, to save you time?

6            THE COURT:  Yes, they are fouled up in my book.

7    Okay, so they've got to all be changed.  Why don't I give

8    this book back to NESC and let them fix it up.  You can

9    see right away it's misfiled.

10           MR. KUPINSE:  Thank you, Your Honor.  May I show

11   you this to expedite the matter?

12           THE COURT:  Yes, why don't you give them the

13   binder to get it squared away.

14           MR. KUPINSE:  Might I approach?

15           THE COURT:  Yes.

16           (Hands Court.)

17           THE COURT:  Every tab page is wrong.

18           (Hands Counsel.)

19           THE COURT:  Yes, well, I can understand the

20   objection.  Why don't we wait until the proper witness is

21   on the stand for these.

22           MR. KUPINSE:  Well, I understand that, Your

23   Honor.  I would ask the court's indulgence.  I do, if you

24   recollect, have Ms. Shapleigh under subpoena and I can

25   bring her back down but it would only be to identify that

1    document.

2              THE COURT:  Well, it's not that.  It's just that

3    the plaintiff is not part of these documents.  There's no

4    evidence that the plaintiff ever saw these documents.  So

5    if you can't use Shapleigh, I suppose you've got to use

6    Patricia Angelo Park.

7              MR. KUPINSE:  Well, I can in fact bring

8    Ms. Shapleigh back down if that's the ruling.

9              THE COURT:  Yes, this could have been done while

10   she was here, and you may have to bring in somebody unless

11   counsel want to stipulate, but obviously this is not the

12   proper witness for these documents.

13             MR. KUPINSE:  May I have the copy back, Your

14   Honor?

15             (Court confering with Clerk.)

16             THE CLERK:  This corresponds with this.

17             THE COURT:  Which is wrong.  All right, what you

18   should be doing, and we ought to -- I don't know how

19   you're going to do this for the jury, but what's marked as

20   one should be 501, and so on.  They should have started

21   with 501.  They started with 500 and that's what threw

22   everything off, so you need a zero for that, I suppose,

23   but it's going to be very confusing if these numbers don't

24   coincide with just a five-oh in front of them.  So it

25   should be -- number three should be 503, four should be

```
1     504 and so on.

2            MR. KUPINSE:  If your Honor please, maybe I

3     could -- we're not going to put in many of our exhibits

4     because the plaintiff has already put in the bulk of them.

5     I wonder if I could ask perhaps the indulgence of the jury

6     just to mark on each of the tabs, as they put them in, the

7     number of exhibits.

8            THE COURT:  Yes, really what's wrong is with the

9     tabs, I guess there was nothing wrong with the exhibits

10    themselves.  It's just the tabs are wrong.

11           MR. KUPINSE:  That is correct, Your Honor.

12           THE COURT:  All right.  I don't want the jury to

13    get confused because there are a lot of exhibits here.

14    Okay.

15    BY MR. KUPINSE:

16    Q.   I'm going to offer 524, Your Honor.

17           THE COURT:  Okay.  Have we seen 524 as

18    plaintiff's number?

19           MR. KUPINSE:  We've seen a portion of it as the

20    plaintiff's number, Your Honor.

21           MR. MADSEN:  I have no objection.

22           MR. KUPINSE:  I'll try to locate the plaintiff's

23    number for you.

24           THE COURT:  I think I can do that.

25           (Pause)
```

```
 1              THE COURT:  It may be 26 or 27.  Twenty-seven.
 2    Yeah, I think it's probably 27.
 3              MR. KUPINSE:  It's 27, Your Honor.
 4              THE COURT:  Twenty-seven, yes.
 5              THE COURT:  So you really don't need 524.  It's
 6    the same as 27.  Let's got get duplicates if we don't need
 7    them.  Let's deal with 27.
 8    BY MR. KUPINSE:
 9    Q.   Showing you what's been marked as Defendant's
10    Exhibit 504, it was the same as Plaintiff's 27, and I
11    apologize, I thought part of it had not been put in.
12         Did you receive that in any event, Ms. Adams?
13    A.   You want me to look at the one you just gave me or
14    27?
15    Q.   Either or both, they are the same.
16    A.   Okay.  Let me look at 27.  Yes, I did receive it.
17    Q.   Okay, and when you received it, did you receive the
18    notification of rights that was attached to it?
19    A.   I don't recall that.  What was that document?  What
20    is that?  A notification --
21    Q.   Well, attached to the credit report on the back there
22    appears to be a series of notification to you of the
23    rights you have under the Fair Credit Reporting Act.  Do
24    you see that?
25    A.   On page four?
```

1    Q.   Well, it starts on -- page three.  It says a summary

2    of your rights under the Fair Credit Reporting Act?

3    A.   Yes, I received all of these pages.  I thought you

4    were speaking to a different document, I apologize.  Yes,

5    I received this page.  Page three, right?  Summary of your

6    rights under the Fair Credit Reporting Act?

7    Q.   Yes, on page three?

8    A.   I received this.

9    Q.   Okay.

10   A.   I did.

11   Q.   Did you receive that?

12   A.   Excuse me?

13   Q.   Did you receive that notice of your right under the

14   Fair Credit Reporting Act?

15   A.   Yes.

16   Q.   Okay, thank you.

17   A.   You're welcome.

18   Q.   Did you review it when you received it?

19   A.   Yes, this is where I received a lot of my information

20   from as what my rights were.

21        MR. KUPINSE:  I'm going to offer Defendant's

22   Exhibit 526.  If I may just have a moment with --

23   plaintiff's counsel has inquired as to whether you put

24   that in.

25        MR. MADSEN:  No, we didn't.

```
 1              MR. KUPINSE:  I didn't think he had.

 2              THE COURT:  No, it hasn't come in.

 3              MR. KUPINSE:  May I approach again, Your Honor?

 4              THE COURT:  Yes.

 5     BY MR. KUPINSE:

 6     Q.   Ms. Adams, did you receive a copy of what's been

 7     marked as Plaintiff's Exhibit -- Defendant's Exhibit 526,

 8     which is a letter from Verifications to you?

 9     A.   It's addressed to me.  I may have received this --

10     Q.   Okay.

11     A.   -- since I received everything else.  I mean I may

12     have received this.

13     Q.   Ms. Adams, did you understand that you were

14     interviewing for an assignment to a position with

15     Northeast Utilities and that Northeast had the authority

16     to make the final decision as to whether or not you would

17     be hired?

18     A.    I understood Northeast Utilities to be the hiring

19     company.

20     Q.   Let me try it again.  Did you understand that they

21     had the final authority to make the final decision as to

22     whether you would be hired?

23     A.   Yes.

24     Q.   Thank you.

25          And we've gone over this to some extent before but
```

1    did you also understand that NU could have ended your

2    employment at any time?

3    A.    Yes, that's my understanding.

4    Q.    Okay.  And, finally, is it true that during the

5    application process you were probably late in your payment

6    of your electric bill to NU, and prior to May of 2007 you

7    had failed to pay your electric bill to NU in full?

8    A.    I had been late on a lot of utilities and a lot of

9    payments, as I testified to earlier.

10   Q.    I was thinking in particular of NU and in particular,

11   prior to May when the report with the incorrect

12   information came in, is it true that you failed to pay

13   your electric bill to NU in full?

14   A.    It's true that I had an arrangement with them.  I was

15   under an arrangement, payment plan with them.

16   Q.    Okay.  What was your gross salary in the year 2007?

17   A.    I'd have to look at my tax forms.  Did I send in that

18   information?  I think I may have perhaps submitted it to

19   my attorney.  Off the top of my head I don't remember.

20   Q.    Let me see if I can help refresh your recollection.

21   A.    Thank you.

22   Q.    Do you recall that prior to the commencement of this

23   case your deposition was taken?

24   A.    Yes.

25   Q.    And showing you a copy of that, on page 97 at line

1    seven, eight, nine, can you take a look at that and see if

2    it helps refresh your recollection as to what your income

3    was in 2007?

4    A.   What line would you like me to read?

5    Q.   Well, just read it to yourself.  I don't want you to

6    read it because that's not the way.  Just see if it

7    reminds you what your income was in 2007.

8    A.   Which line -- I'm sorry?

9    Q.   Around seven, eight, nine?

10   A.   (Pause)

11       Okay.

12   Q.   Does that help to refresh your recollection as to

13   what your income was in the year 2007?

14   A.   This helps to --

15   Q.   Can you tell us approximately what your income was in

16   2007?

17           MR. MADSEN:  Well, objection, Your Honor.  I

18   think we need an answer first as to whether it refreshes

19   her recollection.

20           MR. KUPINSE:  I thought she said yes.

21           THE WITNESS:  No, I didn't finish my statement.

22           MR. KUPINSE:  Oh.

23   BY THE WITNESS:

24   A.   I was going to say that this refreshes my memory as

25   to what I said in my deposition.  As to what my statement

```
1    was, I didn't have pay stubs or anything at that time so I
2    stated off the top of my head and I stated that I'm going
3    to say, like, 30,000-dollars or something like that.
4    Q.   Okay.  Thank you, Ms. Adams.  May I approach again,
5    Your Honor?
6    A.   Close it?
7    Q.   Thank you.
8         (Hands Counsel.)
9    Q.   So, your best recollection at the time of your
10   deposition was your income for 2007 was about
11   30,000-dollars?
12   A.   Approximately 30,000-dollars, that is correct.
13   Q.   Okay.  And do you recall the approximate amount of
14   your income, gross income, in the year 2006, the year
15   before all of these events occurred?
16   A.   No, I'm sorry.
17        MR. KUPINSE:  Okay, I'd offer this as an
18   Exhibit, 532.
19        (Conferring with counsel)
20        MR. KUPINSE:  If your Honor please, there was a
21   redactable item on here and rather than doing that, maybe
22   I can refresh her recollection with this document instead
23   May I approach?
24        THE COURT:  Yes, you can approach without asking
25   my permission.
```

1        MR. KUPINSE:   Thank you, Your Honor.

2   BY MR. KUPINSE:

3   Q.   Ms. Adams, taking a look at what we've marked as

4   Plaintiff's Exhibit 536 but won't be put in, does that

5   refresh your recollection as to whether your income was,

6   your gross income in --

7   A.   Yes.

8   Q.   In 2006, the year before this?

9   A.   Right, I provided this, yes, that is correct.

10  Q.   And what was your gross income in 2006?

11  A.   Want me to read from the line?

12  Q.   Sure.

13  A.   Line 37 reads 24,853, 27,853.

14  Q.   I think to be fair to you, Ms. Adams, you really need

15  to look a little lower on that form and see what the

16  total --

17       THE COURT:   What's the exhibit number?   What's

18  the exhibit number?

19       MR. KUPINSE:   536 is it?   532.

20       THE COURT:   532.   I was looking at the wrong

21  one.

22  A.   I read the adjusted gross; is that what you wanted me

23  to read?

24  Q.   No, I wanted you to read your total gross.

25  A.   I beg your pardon.   You're right, it's the wrong

1    line.  It's 22.  It's 31,853.

2    Q.   Okay.  So that if I'm correct, the year before all of

3    this happened, your income was about $31,800 and the year

4    all of this happened, your income was about

5    31,000-dollars, is that correct?

6    A.   Yes.

7    Q.   Now, you testified yesterday that you at some point

8    stopped working because you were emotionally not fit to

9    continue, is that correct?

10   A.   I don't recall saying that I stopped working.  I lost

11   my job and then I stated, if I can recall correctly, that

12   I wasn't emotionally fit to reenter, to start seeking

13   employment right away.

14   Q.   I think the precise answer, and correct me if this

15   wasn't what you intended, was that you didn't stop

16   looking, "It stopped for a while because I wasn't

17   emotionally fit."  Is that correct?

18   A.   It?  Is that what I said?

19   Q.   When -- you say "Yes, I worked whenever I could.  I

20   didn't stop looking.  It stopped for a while because I

21   wasn't emotionally fit"?

22   A.   Correct, right after I lost the job, I didn't

23   continue to look, like, you know, during the time of the

24   emails and the fourth and the 15th all that, the time of

25   the claim, for that period and the time I saw my doctor.

1    So it stopped, my making calls and checking my emails and

2    applying for positions, that stopped for a period.

3    Q.   And I think you said that, you also said that you

4    sought treatment for distress which was caused as a result

5    of the losing of your job, this job, is that correct?

6    A.   Yes, that is correct.

7    Q.   And I think you also testified that you had to send

8    your son to your mother's house, is that correct?

9    A.   We were separated.

10   Q.   You were separated?

11   A.   So I lost my apartment and yes, he went to my Mom's

12   as it was custom for him to go during the summer but it

13   was only supposed to be for the summer at that point.

14   Q.   And did the fact that you had to send your son to

15   your mother's cause you some emotional distress?

16   A.   We were separated, yes, that --

17   Q.   Was that the first time you had ever been separated?

18   A.   It was the first time that the plan was I was going

19   to have to downsize and move into a smaller apartment and

20   that he would be away from me longer than the summer,

21   because he goes away for the summer but it was going to be

22   longer than that.

23   Q.   Now, with all the stress, anxiety -- incidentally,

24   did you ever -- were you ever diagnosed for anxiety?

25   A.   I don't know.  I was prescribed medicines.  What was

1    actually written -- by diagnose, you mean did my doctor

2    write something in my file to say that I was --

3    Q.    Let me again show you your deposition.

4    A.    Okay.

5    Q.    I've underlined a line in your deposition and ask you

6    to take a look at it, see if that refreshes your

7    recollection as to whether you were ever diagnosed as

8    having anxiety.

9    A.    Okay.

10   Q.    Does that refresh your recollection?

11   A.    You've underlined -- did you want me to read that?

12   Q.    No, don't read it.  I'm just asking you if it

13   refreshes your recollection as to whether you ever had a

14   diagnosis of anxiety?

15   A.    I've never been told.

16   Q.    Thank you.

17   A.    But I've been treated for it.

18   Q.    And during this time after you lost your job and you

19   had these problems and you sent your son to your mother's,

20   did you have other health problems?

21   A.    Yes, I did.

22   Q.    Now, did all of these events, the problem with losing

23   your house, the problem with sending your son away, the

24   problem with your other health problems, did all of these

25   cause you some distress at that time?

1    A.    The problems with losing my house and the problems

2    with being separated from my son and the anxiety, yes.

3    The other health problems that you're referring to, quite

4    honestly I wasn't even paying attention to my health too

5    much, maybe as much as I should have been.

6    Q.    So is it fair to say that the only reason that you --

7    the losing of this particular job was not the only reason

8    that you were anxious, stressed and so on?

9    A.    No, that's not true.

10   Q.    Oh, this was the only reason?

11   A.    It was the primary reason why I was anxious.

12   Q.    Okay, I'll grant you that.

13   A.    Because I didn't have a job and then the other

14   things, natural course of life, that just added to the

15   issue.

16   Q.    The primary reason were -- were there other reasons

17   also as I mentioned?

18   A.    Secondary reasons, like being separated and losing

19   the apartment?  Yes, you're absolutely right.

20           MR. KUPINSE:  If your Honor please, I'm going to

21   start going into some issues that we discussed before we

22   brought the jury in and perhaps it would be a good time to

23   excuse the jury at this point.

24           THE COURT:  All right.  We'll give you a recess

25   and I'll call you back in as soon as we solve whatever the

1    problem is.  You can leave everything on your seats.

2              (Whereupon the jury left the courtroom at

3    10:15 o'clock a. m.)

4              MR. KUPINSE:  At this point, Your Honor, I would

5    ask a series of questions relating to Defendant's Exhibit

6    533 which are the pictures and that I would offer the

7    pictures.

8              THE COURT:  Why don't we deal with 533.  Do you

9    remember, Deb, we had 533.  I don't know if it is where it

10   ended up.

11             THE CLERK:  I have it.

12             THE COURT:  It's in here?

13             THE CLERK:  Right here.

14             THE COURT:  Oh, yes, I saw this.

15             THE CLERK:  Okay?

16             THE COURT:  I didn't see anymore than the one

17   but I want to take a look at this.

18             (Pause)

19             THE COURT:  Okay, well, I guess the best thing

20   for me to do is let you ask questions and see what the

21   answers are.

22             MR. KUPINSE:  Okay.

23   BY MR. KUPINSE:

24   Q.   Showing you Defendant's Exhibit 533?

25   A.   Okay.

```
 1            (Hands witness.)
 2       Q.   Are those pictures of your son?
 3       A.   It appears -- kind of dark -- appears to look like
 4       his face.
 5       Q.   Okay.  Look at them all.
 6       A.   (Pause)
 7            I'm sorry.
 8       Q.   Does he have a vehicle like the vehicle that is shown
 9       in the picture?
10       A.   He doesn't have a drivers license, no, and he doesn't
11       own a vehicle.  I'm on the second one, now.
12       Q.   Have you ever seen this entry before?
13       A.   No.
14       Q.   Has your, has your son's conduct in any way added to
15       the stress that you experienced after you did not get the
16       job at NU?
17       A.   His conduct?
18       Q.   Yes.
19       A.   My son is not a problem in my life.  He's a teenager
20       so we were away from each other for a period of time.  I
21       haven't seen these pictures before.  In and of themselves,
22       they wouldn't be a cause of stress to me because I have
23       other things going on that are more important.  I would
24       speak to him about something like this and remind him of
25       the appropriate behavior.  Prior to him leaving
```

1    Connecticut, we attended church every Sunday.  He was part

2    of the youth ministry.  He asked to be baptized.  So his

3    conduct isn't perfect.  In my opinion, it's teenager-like

4    but it wasn't a source of stress.

5    Q.   When did you first see these pictures?

6    A.   Just now, you just give them to me.

7    Q.   You did not see these before when we disclosed them

8    to your attorney?

9    A.   No.  The first that I learned that there were

10   pictures was approximately a couple weeks ago when we were

11   confirming the trial dates and things of that nature.

12   There was a conversation that I had with the paralegal.

13   I'm sorry.  So in answer to your question, this is the

14   first time that I've actually seen the pictures.

15   Q.   Your son's name is Trevor?

16   A.   That is correct.

17   Q.   Does he have a nickname?

18   A.   Not to my knowledge.  His name is --

19   Q.   Has he ever referred to himself as Tupac RIP?

20   A.   I wouldn't know that.

21   Q.   Okay.

22           MR. KUPINSE:  I would offer them, Your Honor.  I

23   think they go to the question of the stress that was in

24   the plaintiff's life.

25           THE COURT:  All right.  Objection?

1          MR. MADSEN:  We object for the reasons we stated

2     in our motion in limine.

3          THE COURT:  Well, I'm going to make a 403 ruling

4     on this.  The prejudice of this would exceed any probative

5     value.  This is not the witness obviously to use these

6     pictures, based upon her testimony.  Somebody would have

7     to explain a lot more than the pictures looking at them

8     would tell you.  You have a lot of questions when you look

9     at them as to what they are all about and she can't answer

10    those questions.  So I'll sustain the objection and you

11    have an exception, but I won't allow -- it's 533 is what

12    this is?

13         MR. COFFEY:  Your Honor, if I may, for

14    Verifications could I ask a few questions so we don't have

15    to go through the same thing, because I have some

16    different questions.

17         THE COURT:  Yes.  I want to know what the number

18    is on this.  I have to go back to the first page.  It's

19    533.  Would be for identification.  The objection is

20    sustained.  Go ahead, on Verifications.

21    VOIR DIRE EXAMINATION

22    BY MR. COFFEY:

23    Q.   Thank you, Your Honor.

24         Ms. Adams, part of the reason you said that your son

25    had been separated from you, had your son ever been

1    separated from you before for periods of incarceration?

2    A.    No, he has not.

3    Q.    Okay.  Before -- when you talk about that he was

4    separated from you, does he have a youthful offender

5    record?

6    A.    A record?

7    Q.    Yes, has he been arrested ever?

8    A.    He's had incidents, yes, he has.

9    Q.    So is an incident an arrest?

10   Q.    Arrest?

11   A.    He's never been brought to the police station to my

12   knowledge.

13   Q.    Well, you say incidents; what is an incident?

14   A.    An incident where at school, those types of incidents

15   where they reported the behavior to the police so that's

16   what I'm referring to.

17   Q.    Was he suspended from the high school of West

18   Hartford?

19   A.    He has been suspended, yes.

20   Q.    Was he ever put in any alternative high schools?

21   A.    He has been observed because he has a diagnosis,

22   diagnosis of ADHT so that's part of the special education

23   program where if anyone who is diagnosed with ADHT and

24   receives special education, they have to be evaluated and

25   it has to be determined through due process if their

1    diagnosis is part of the reason, if it contributes to

2    whatever the incident is.  So that was part of that whole

3    process.

4    Q.   Okay.  So was, when was it that he had these

5    incidents at school?  Was it from the years -- was it in

6    2006, 2007, 2008?

7    A.   He was diagnosed in fifth grade and going forward.

8    His incidents as it pertains to Connecticut was when he

9    was in middle school, so he was in eighth grade.

10   Q.   Okay.

11   A.   Eight through nineth grade.

12   Q.   So what you're saying, he moved up to Pittsfield

13   then?

14   A.   When he -- he left West Hartford in the spring or

15   May, beginning of June, 2007.

16   Q.   So was that, was that -- was he planning to move up

17   there unrelated to this or are you saying it's only

18   related to this?

19   A.   It's only related to this.  Normally if I had a job

20   and I kept my apartment he would have gone for the summer

21   as he's done before, worked.  That was the plan or that

22   was our history, where he has going up to stay with my

23   mother for the summer, worked at summer jobs and then come

24   back to Connecticut to go back to school.  But because I

25   was losing my apartment, I had hoped that he would still

```
 1    come back to go to school but that never, that never
 2    transpired.
 3    Q.   Okay.  It says though on his My Space page, he last
 4    logged in and this was September of 2008, 9/26/2008, it
 5    put down that he resides in West Hartford.  Are you saying
 6    in fact he was back in West Hartford then?  Are you saying
 7    he did not live there then?
 8    A.   No, I'm not saying that.  That is what this is
 9    saying?
10    Q.   That is what it has on there.
11    A.   Where does it say that at?
12    Q.   On the last page of the documents.  I'm sorry, the
13    second from last page of the documents, where it has his
14    male, 18 year old, West Hartford, Connecticut, United
15    States.  He identified himself there.  So if you're saying
16    he lived in Pittsfield, why would he identify himself as
17    residing in West Hartford?
18    A.   I couldn't answer that.  I haven't even seen these
19    documents before this date.  I can't answer as to why he
20    would make this statement.
21    Q.   He also has down his mood, it says high?
22    A.   Where does it say that?
23    Q.   If you go down underneath last log-in, it says
24    September 26, 2008?
25    A.   Okay.
```

1    Q.    It says mood and it says high?

2    A.    Yes.

3    Q.    And some of these other pictures also have what

4    appears to be marijuana and large amounts of cash?

5    A.    Where is that?

6    Q.    Page before that.  The third from, page four, going

7    in or three from the back?

8    A.    Okay.  I see page three and page --

9    Q.    Page three.  Three, it says Identified on the top?

10   A.    Page three and page two, and I understand your

11   question as it relates to these pages.

12   Q.    Okay.  On page three of three, it seems to have a

13   large quantity of marijuana and United States currency?

14   A.    Yes.

15   Q.    Okay.  Do you see that?

16   A.    Yes, I do see that.

17   Q.    Okay.  Has your son been known to have any problems

18   with smoking marijuana?

19   A.    Not my knowledge.

20   Q.    Okay.  Has any of the reasons that you had to leave

21   any of the places you live because he was dealing

22   marijuana?

23   A.    My son is not a dealer.

24   Q.    Well, I mean large amounts of cash with that type of

25   picture, what do you believe that that is meant to lead

1    one to believe?

2    A.    I would argue that the source of these pictures is

3    questionable at least.  You're stating that you received

4    these from My Space?  Is that where --

5    Q.    Yes.  Have you ever seen him wear that shirt with the

6    name Trevor on it?

7    A.    I'm aware that he owns a shirt like this, but back to

8    your question about what it would lead a person to believe

9    about pictures of what appears to be marijuana and cash

10   and a car, I could say that it would be questionable at

11   best.  I would like to know, questions to be answered of

12   where was this obtained from, who put this in.  My

13   understanding of those types of cites like Facebook and My

14   Space, that anyone can add to someone else's profile or

15   add to their area with permission, so you have people, a

16   group of people that share information, so I can't speak

17   to this.  I haven't seen this before today.

18   Q.    Well how about the first --

19   A.    To me, if you're asking me how I feel about looking

20   at this, I can speak to that right now, what I feel about

21   seeing this.

22   Q.    And looking at the first picture, the first one with

23   him with stacks full of money, do you give them him large

24   amounts of money, your son?

25   A.    My son works, so he's worked since he was 15 year old

1    at minimum wage salary, so -- but he has worked full-time.

2    He doesn't even have access to all of that money because I

3    manage his bank account, so what he could do, and I've

4    known him to do is take a 50 dollar bill or a hundred

5    dollar bill and get 100 ones or fify ones.

6    Q.    Okay.

7    A.    I can't see, are these ones?  You can't see if these

8    are real or if --

9    Q.    Well, you're not saying then that the bags that have

10   bags that look like marijuana are parsley, are you saying

11   that?

12   A.    I'm not saying anything to that picture because I

13   don't know where this picture comes from.  I don't know if

14   that's real.  I don't know if he put that on his site.  I

15   don't know if they are sharing pictures.  I didn't even

16   know -- I asked him after I spoke to someone did he have a

17   My Space account, he said he didn't.  So I don't know what

18   to believe or make out of this.  All I know is that

19   picture, that shirt, the Trevor shirt, that I know is

20   real.

21   Q.    So, none of the incidents that he has had has given

22   you any emotional distress in the last few years, is that

23   what you're saying?

24   A.    No, that's not what I'm saying.

25   Q.    But part of your claim is that you have emotional

1    distress as related to this, has -- what we're trying to

2    get to the truth of is did your son cause you a large

3    amount of emotional distress?

4    A.   These pictures were just presented to me today so I

5    wouldn't be knowledgeable or I was not knowledgeable of

6    these pictures at the time that I lost my job and at the

7    time I had to move.  So they couldn't have caused me

8    emotional distress then because I wasn't aware of them.

9        If you're asking me does raising a son as a single

10   parent where I'm struggling to survive and put him in a

11   good school and then deal with the issues of his attention

12   deficit and things of that nature, if that causes stress,

13   that does.  There's stress of being a single parent more

14   than I ever knew that there would be.

15          MR. COFFEY:  Your Honor, I would join in

16   Attorney Kupinse's application.  I think there's enough

17   good faith basis and that the probative value to the

18   emotional distress claim would be outweighed to the

19   prejudicial value.  Thank you.

20          THE COURT:  Your exam just convinced me that my

21   ruling is quite correct.  The stress she's had over the

22   son, she said exactly what I would conclude.  She said

23   she's had a tough time bringing this kid up.  That stress

24   is not directly related to what happened to her when she

25   lost this job.  That's a different type of anguish.  Any

1    anguish she had from the son, she had plenty of time to

2    adjust to and deal with.

3            So I'm going to adhere to my ruling, it would be

4    highly prejudicial and I can't find any probative value

5    with it with respect to why it's being offered on the

6    emotional distress, so I'll keep it out.

7            Now, before we get back to the jury here, let me

8    find out something that's bothering me and it -- I don't

9    want to get mixed up in counsel trying their case but I am

10   concerned about one aspect of this that could mislead the

11   jury because it certainly puzzles me.  So let's get back

12   in and see if we can clear it up.

13           Mr. Kupinse asked her some questions about

14   exhibits, Plaintiff's Exhibits ten and 11, so I looked at

15   these very carefully to find out what the deuce this is

16   all about and the questions he asked seem to be designed

17   to put a burden on her in the minds of the jury to contact

18   NESC for reassignment before she filed a claim for

19   unemployment insurance, which of course she did file, but

20   this is all Massachusetts.  This document is very clearly

21   that if she were to work in Massachusetts and failed to

22   ask for reassignment from NESC before filing a claim in

23   Massachusetts she would be entitled to benefits, but

24   Massachusetts is not involved here.  She was going to go

25   to Berlin, Connecticut, to work for Northeast Utilities,

1    if she ever went to work at all.  So I don't understand

2    the relevance of Exhibit ten at all unless in the future

3    sometime it might have become relevant, it was part of a

4    package deal, but I don't want the jury to draw any wrong

5    inferences from the questioning, on Exhibit ten

6    especially.  I'll leave that to plaintiff's counsel to

7    worry about but it certainly bothered me.

8           And Exhibit 11, I looked at that pretty

9    carefully.  On page two, again it's very unclear as to

10   what it is.  It seems to be a document that would be

11   required of Massachusetts because the only reference it

12   makes to any jurisdiction is of, on page two it says it's

13   unlawful in Massachusetts to administer a lie detector

14   test.  Massachusetts is not involved in this case and I

15   don't want the jury to get confused about what these

16   documents really mean.  And these were two documents she

17   was asked about.  I don't want any unfair inferences drawn

18   here so I'll leave it to plaintiff's counsel to worry

19   about, but it certainly bothers me.

20          MR. KUPINSE:  Okay.  If I may just briefly

21   address that.  Before I do, before I forget, may I just

22   ask and I think it was done, that the pictures be marked

23   as exhibit for identification purposes?

24          THE COURT:  They are identification and the

25   objection is sustained.  You have an exception, of course.

1          MR. KUPINSE:  Thank you, Your Honor.

2          And with respect to Exhibits ten and 11 -- 10, I

3     believe does refer only to Massachusetts, 11 does not

4     refer only to Massachusetts.  But what I was offering them

5     for was not necessarily their force under Massachusetts

6     law but whether or not the plaintiff was aware that she

7     had a right to apply for reassignment and whether or not

8     she had read the information that was on the bottom part

9     of the form which, again, goes to the at will issue.  So I

10    think her knowledge of at will and her knowledge of having

11    signed the document that says that she can contact for

12    reassignment are relevant, and I don't claim that

13    Massachusetts law applies in this situation at all.

14          THE COURT:  Well, the at will is a different

15    issue.  I'm not concerned about the at will.  That's a

16    proper issue to ask her about and then that's proper

17    evidence on cross, but I was concerned about the idea that

18    she should have applied for reassignment with NESC.  Under

19    the circumstances of this case I don't see she had any

20    obligation at all to do that.  So I'll let plaintiff's

21    counsel worry about that.

22          All right.  That's why I didn't say anything

23    before the jury about it, just as it's my own concern

24    about it.

25          Okay.  Are we ready for the jury or do you want

```
 1    some time off?
 2            MR. COFFEY:  I need to be excused for a minute
 3    before we start back.
 4            THE COURT:  Well, it's better if you sit down
 5    and speak into the mic, then I can hear you.  I know we
 6    only have one mic over there.
 7            MR. COFFEY:  Before we start back, I need to be
 8    excused for a minute.
 9            THE COURT:  I'm going to take a break for
10    counsel, that's what I'm about to do.  It's about time for
11    a recess for all of us anyway, it's 11:35.  We will all
12    take a break for about ten minutes.
13            MR. KUPINSE:  Thank you, Your Honor.
14            (Whereupon a recess was taken from 10:35
15        o'clock, a. m. to 10:55 o'clock, a. m.)
16            THE COURT:  Okay, the jury says we're taking too
17    long on breaks.  We may have to bring them down to about
18    five minutes.  All right, want to bring them in?
19            (Jury enters)
20            THE COURT:  Okay.  Every once in in a while we
21    have to make a ruling that I can't make in your presence
22    so that's what took sometime.  We'll try to keep those to
23    a minimum.  I think they will be.  You can let Debbie know
24    when you go out for your lunch break what you want to do
25    about timing.  We can go until 5:30 instead of five if
```

1    you'd like to do that.  And we can start early in the

2    morning, 8:30 if you want to do that.  Although tomorrow I

3    have to -- is it tomorrow I have to --

4              MR. KUPINSE:  Yes, Your Honor.

5              THE COURT:  I have to take evidence which is

6    deciding whether a witness can go before you, so we won't

7    be able to start with you before 9:00 o'clock tomorrow

8    because we'll be starting ourselves earlier than that to

9    let me hear this testimony.  Other than that, we can start

10   at 8:30.  We can go until 5:30 if you'd like to do that.

11   All right.  Ready to go, Mr. Kupinse?

12             MR. KUPINSE:  Thank you, Your Honor.

13   BY MR. KUPINSE:

14   Q.   Ms. Adams, I think you testified that the failure to

15   get the NU job caused you a great deal of financial

16   difficult, is that correct?

17   A.   Yes.

18   Q.   Now, just to get your employment straight in my mind,

19   you had worked up until February with Webster Bank,

20   February of 2007?

21   A.   I don't have my resume in front of me but that sounds

22   right.  Are you reading from my resume?

23   Q.   (Pause)

24   A.   That sounds correct, that sounds correct.

25   Q.   And then you told us, I think you had that job that

1   was about 30 days or so at CB Ellis (ph), is that correct?

2   A.   Yes.

3   Q.   And that was sort of coming to an end about the

4   beginning of May, end of April, beginning of May?

5   A.   Yes.

6   Q.   Okay.

7   A.   Thirty day period was about coming to an end.

8   Q.   And then after the events in May, you got another job

9   in September of 2007 at the Connecticut State Treasurers

10  office?

11  A.   Yes, I did.

12  Q.   And I think we heard that you earned about

13  30,000-dollars in 2007 and about $31,800 in 2006, is that

14  correct?

15  A.   That sounds correct.

16  Q.   Okay.  Now, before May when this problem occurred,

17  were you also having financial difficulties?

18  A.   Yes.

19  Q.   And, in fact, were you behind on your rent at that

20  point?

21  A.   Yes, I testified to that.

22  Q.   And were you behind the April and May rent?

23  A.   Yes.

24  Q.   And how much did that amount to?

25  A.   I can't recall but I was behind.

1    Q.    Was it $1,100 a month?

2    A.    Well, my rent is; is that what you're asking me, what

3    my rent is?

4    Q.    Yes.

5    A.    My rent was $1,100 a month.

6    Q.    Okay, and you were also behind on your car payments?

7    A.    Yes, I was.

8    Q.    And, in fact, shortly after the events in May of

9    2007, was your car repossessed?

10   A.    Yes, it was.

11   Q.    Okay.  So even before the not getting the job at NU,

12   you were having severe financial difficulties, weren't

13   you?

14   A.    That's what I testified to, yes.

15   Q.    Okay.  And, by the way, during the period from the

16   time that you ended the CB Ellis job until the time in

17   September of 2007, about four months, did you collect

18   unemployment?

19   A.    Yes, I filed for unemployment and I was eligible to

20   collect, so -- when I first received my check I can't, I

21   don't know that, but --

22   Q.    Anyway you worked up until about just before, maybe

23   about the beginning of May, end of April, you were working

24   and then you picked up working again in September of that

25   year, and in between you collected unemployment

1    compensation?

2    A.   Yes.

3    Q.   Okay.

4          MR. KUPINSE:  I have no further questions, thank

5    you.

6          THE COURT:  Okay.  Mr. Coffey?

7          MR. COFFEY:  Yes, Your Honor.

8    CROSS EXAMINATION

9    BY MR. COFFEY:

10   Q.   Good morning, Ms. Adams.

11   A.   Good morning.

12   Q.   Good morning.  Just wanted to go back to one of the

13   documents, Plaintiff's Exhibit 54.

14   A.   I have that in front of me.

15   Q.   Okay.  I'll wait until the jury -- and I draw your

16   attention to actually the fourth page which would be the

17   Choice Points letter and the only reason I bring it up is

18   I just wanted to, for clarification to the jury, didn't

19   Choice Point advise you in that letter the procedure that

20   they went through in the search, is that fair to say,

21   Ms. Adams?  And I draw your attention now --

22   A.   What paragraph?

23   Q.   That would be the second paragraph.

24   Q.   Starting with Informatively, that was the only

25   paragraph we didn't read to the jury.  I just wanted to --

1    A.    Would you like me to read that?

2    Q.    Sure.

3    A.    Starting at informatively?

4    Q.    Yes, please.

5    A.    "Informatively, with regard to a national criminal

6    file search, this, the search takes first and last names,

7    social security number and date of birth into

8    consideration.  Common nicknames are also considered.  A

9    search of the national criminal file data base is

10   conducted and if a criminal record matches the subject of

11   the report by at least two identifiers, either first and

12   last name and date of birth or first and last name and

13   social security number, the record is reported.  And in

14   this case the report collect -- reflected that two records

15   matched by first nickname and last name and date of

16   birth."

17   Q.    Okay.  So that was pretty much that you were informed

18   of the procedure that Choice Point had followed at that

19   time, is that correct?

20   A.    That was my understanding.

21   Q.    And just like here, you had asked them in some of

22   your correspondence what procedures they followed?

23   A.    Yes.

24   Q.    Okay.  And they told you?

25   A.    No, I don't have a letter from them as I do from

1   Choice Point that identifies that.  Maybe it was given to

2   my attorney.

3   Q.   Okay.  Now, one of the other things, who are the two

4   doctors that you said had treated you for conditions

5   relating to your claim made here?

6   A.   The two doctors, actually there's three because

7   there's one that I'm seeing currently.  But the two at the

8   time that I began in and around May of 2007 is Stacy

9   Zybell (ph), she's an APRN but she's my primary care

10  physician, and she referred to me to a therapist and

11  that's the person's name that I couldn't remember

12  yesterday, but I have the documentation for her name and

13  her practice.

14  Q.   And neither, none of those doctors or your therapist

15  are coming in here to testify for the jury, is that

16  correct?

17  A.   I don't have any knowledge of that.  Did I ask them

18  to come?

19  Q.   Or your attorney?

20  A.   I don't know.  I don't know if my attorney asked

21  them.  I didn't ask them to appear on my behalf.

22  Q.   You have none of these medical records to back up

23  these claims that you submitted for the jury, is that

24  correct?

25  A.   That I submitted to the jury?

1    Q.    Or your attorney; there's no medical records to back
2    up this claim that you've made, is that correct?
3    A.    There are medical records that I'm sure my PCP and
4    the therapist have but I haven't submitted any things to
5    the jury.  Am I understanding your question?
6    Q.    You are understanding.  You have a lot of other
7    documents that you submitted to the jury and I'm asking,
8    you haven't submitted those medical records that make up
9    the basis of this claim, isn't that correct?
10   A.    I submitted all documents that were asked of me.
11   Q.    Okay.  None of them are being submitted, you have
12   none of them here with you, correct?  That's a yes or no.
13   A.    My medical records?  Do I have them here with me
14   today?  No, I do not.
15   Q.    Okay.  Now, also, you subpoenaed, you sought Kathy
16   Shapleigh; she was subpoenaed on your behalf.  You did not
17   subpoena Patricia Angelo Park here to testify, did you?
18   A.    I don't make the decisions on subpoena.  That's my
19   attorney's decision so I have no, no knowledge as to who
20   you're subpoenaing or they're subpoenaing.  I don't know
21   about that.
22   Q.    Okay.  Now, the last job that you were at, the
23   Department of Children and Families, I think you in your
24   deposition, it's fair to say you filed a complaint with
25   the EEO versus that agency, is that correct?

1    A.    That is correct.

2    Q.    Okay.  And you also filed a complaint with the state

3    against the Department of Children and Families, is that

4    correct?

5    A.    Not the state, CHRO, Human Rights.

6    Q.    Okay.

7    A.    Commission on Human Rights.

8    Q.    Okay, so that -- and what's the status of those two

9    complaints that you filed?

10   A.    We have a scheduled settlement conference.

11   Q.    Okay, so you're also trying to get money at the, out

12   of the State of Connecticut, the Department of Children

13   and Families, is that correct?

14   A.    That is uncorrect.  I'm not trying to get money out

15   of them.

16   Q.    Okay.  Now, one of the other things you talked about

17   at your deposition when you left General Electric, the

18   deposition, you did not speak about it, you were unable to

19   speak about the terms of your departure; you had a

20   confidentiality agreement with them, is that correct?

21   A.    Yes.

22   Q.    Okay.  Then one, and that was one of the full-time

23   jobs that you had had, is that correct?

24   A.    That is correct.

25   Q.    And the other thing that was discussed at the

1    deposition when you left your employment with Chubb, you

2    had also had a confidentiality agreement with them and a

3    settlement that you could not discuss at the deposition,

4    is that also correct?

5    A.   I was directed not to discuss it, yes, that is

6    correct.

7    Q.   Directed not to discuss by who?

8    A.   In the deposition, my attorney objected to me

9    disclosing the terms of the settlement because I was bound

10   by the settlement not to discuss it outside of the parties

11   that were privy to that.

12   Q.   Okay.  Now, based upon all the complaints that you

13   filed versus my -- my client, Verifications in this

14   matter, there was never any action taken by the FTC, any

15   of the State Attorney Generals or any agency that you

16   filed a complaint against Verifications for their actions

17   in this matter, isn't that correct?

18   A.   I am not aware.

19   Q.   You have no knowledge of any, is that correct?

20   A.   I have no knowledge of any actions that they have

21   taken.

22   Q.   And they have never sent you any letters saying they

23   did take any actions, isn't that correct?

24   A.   They sent letters but -- in answer to your question,

25   I don't know what they've done.

```
 1    Q.   Well, what did the letters say that you have received

 2    in response, because you have only the complaints that you

 3    filed and the letters you filed but none of the responses

 4    have been provided.  Do you have responses that say some

 5    action has been taken against Verifications?  Yes or no.

 6    A.   Any documents that I have received, I forwarded them

 7    along to my attorney, so --

 8    Q.   Well, did you believe from your review of any of

 9    these letters that you received in response that there was

10    any ever any actions taken against Verifications, that

11    they were fined, that they were disciplined, reprimanded

12    by any agency in any way that you made complaints to?  Yes

13    or no.

14    A.   At the time the letters to which I'm referring to

15    were responses to my initial letters, so those would have

16    been to acknowledge my complaint.  It wouldn't have spoken

17    to, to acknowledge that they would look into the matter.

18    Those were the letters I had in my records.

19    Q.   Well, as we sit here now, and it is December of 2009,

20    almost two and-a-half years later, have you received any

21    response from any of the Attorney Generals, the FTC or any

22    of the numerous places that you filed complaints asking

23    for action, because you said you filed complaints on line

24    that you don't have what the complaint was that was filed;

25    did anyone respond to you in a letter that said any action
```

1    was being taken against Verifications, and that's a yes or

2    no, that you have?  Yes or no.

3    A.   There's been no additional letters received by me.

4    Q.   So would that be a no?

5    A.   That is correct.

6    Q.   Now, for the period of time that you were out of work

7    in between jobs back in 2007 that you received

8    unemployment, what period of time did you receive

9    unemployment for?

10    A.   I can't recall.  I can provide unemployment records.

11    Q.   Okay.  Well --

12    A.   It would be, well, it could have only been for the

13    time that I was out of work, and they also allow you to

14    make a certain amount of money if you work a part-time

15    job.

16    Q.   So, while you were on unemployment were you also

17    working some of the occasional day jobs for employment

18    agencies?

19    A.   During what period?

20    Q.   During the period from -- well, I'm looking at your

21    resume or your linked-in account and both of them put a

22    gap between I guess May and September.

23          MR. MADSEN:  Your Honor, I would just object.  I

24    think he's referring to a document that's not in evidence.

25          THE COURT:  We have -- well, we've had a lot of

1    testimony it was May to September.  That's --

2              MR. MADSEN:  Oh, I understand that but he just

3    made reference to a document and cited information from a

4    document that's not in evidence.

5              MR. COFFEY:  I'll rephrase the question.  I'll

6    rephrase the question.

7              THE COURT:  Okay.

8    BY MR. COFFEY:

9    Q.    There's been testimony that you were not employed

10   between May, I guess the middle of May when you left CB

11   Richard Ellis and September when you went to work for the

12   State Treasury Office?

13   A.    Okay.

14   Q.    Is that fair to say?

15   A.    That is correct.

16   Q.    Okay.  So during that time you received unemployment?

17   A.    That is correct.

18   Q.    Okay.  And during there time also, you said you

19   could -- one can occasionally work a part time job.  Did

20   you work in any of those part-time jobs between May and

21   September of 2007?

22   A.    I was totally unemployed between that time.

23   Q.    Okay, but you also said though that there's gaps in

24   some instances when you do your resume, you were told not

25   to put in your resume if there's a job of a duration less

1    than three months?

2    A.    That would be the resume but reporting to the

3    unemployment is a different matter, which I think you're

4    asking about did I receive unemployment.

5    Q.    So, what was the way -- how much was the rate you

6    were receiving from unemployment per week back then,

7    approximately?

8    A.    It's not a rate.  It's a calculation and they send

9    you a document telling you what you will, your benefits

10   that you can receive for a period of time.

11   Q.    So, it's fair to say that the loss of earnings that

12   you are claiming for that period from May 15th until

13   September 1st and less the unemployment that you received,

14   is that correct?

15   A.    No, I don't understand that question.

16   Q.    Well, you were out of work -- June, July, August and

17   part of May, is that correct?

18   A.    That sounds correct.

19   Q.    So that would be the at most 14 weeks?

20   A.    But I don't understand your question.

21   Q.    Okay, so you were out of work 14 weeks, is that fair

22   to say?  Yes or no.

23   A.    That sounds correct.

24   Q.    And you were also receiving unemployment during those

25   weeks?

1    A.   I received unemployment for the time that I was out

2    of work, that is correct.

3    Q.   Okay.  So your loss of earnings would have been what

4    your wages would have been if you had received that job

5    less the unemployment, is that correct?

6    A.   No, that's a -- that's a calculation.

7              MR. MADSEN:  Excuse me I need to make an

8    objection, Your Honor.  I think I need a, I would request

9    a sidebar right now.

10             THE COURT:  Well, let's try it out.

11             MR. MADSEN:  Really?

12             THE COURT:  Can we --

13             MR. MADSEN:  I think maybe we can just --

14             THE COURT:  Why don't you confer.

15             MR. MADSEN:  Okay, sure.

16             THE COURT:  Try to straighten this out.

17             (Pause)

18             MR. MADSEN:  Your Honor, we were able to work

19   things out.

20             THE COURT:  Okay.  Thank you.

21   BY MR. COFFEY:

22   Q.   So, are you scheduled to receive your bachelors in

23   science degree in psychology from Saint Joseph's College

24   in 2010?

25   A.   I discontinued that pursuit when I was evicted from

1    my apartment and I was no longer staying in West Hartford,

2    so I'm not pursuing that.  Instead, as I testified to

3    yesterday, I'm pursuing another degree in business

4    software systems for an associate.  I do have the

5    opportunity to go back to Saint Joseph's College but I'm

6    not considering that at this time.

7    Q.   And when did you change that, that plan of action?

8    A.   The plan of action was just recently changed.  It

9    started in February or January of this, of -- 2008.

10   Q.   Okay.  And at the time of your deposition, did you

11   give us any documents that indicated that you were still

12   at Saint Joseph's College anticipated a bachelors of

13   science in psychology in 2010?

14   A.   I had a current resume which stated the anticipated

15   date, that's the only document that I'm aware of, a resume

16   that stated the anticipated date for the psychology degree

17   as 2010.  At that time I hadn't updated my resume so it

18   was still a consideration of going back.

19   Q.   Okay, and you don't recall advising us or saying that

20   at the deposition, is that correct?

21   A.   I don't recall, because I had gotten a certificate as

22   well in the Spring of 2007 from Saint Joseph's College so

23   the psychology degree was on pause.

24   Q.   So you're currently working at the Department of

25   Children's and Family, Children and Families?

```
1    A.    No, I am not.

2    Q.    And where are you currently working?

3    A.    I am currently unemployed.

4    Q.    Okay.  And when did you leave the Department of

5    Children and Families?

6    A.    I left approximately in April 2007.

7    Q.    And is that the basis of the complaint you have

8    versus the Department of Children and Families?

9    A.    The basis of the complaint?

10   Q.    Yes.

11   A.    That I left in April of 2007?

12   Q.    So you're contesting that you are no longer employed

13   by the Department of Children and Families?

14   A.    No, as I stated, it's an equal opportunity

15   employment, EEO and human rights issue.

16   Q.    Okay.

17   Q.    And what is that issue?

18         MR. MADSEN:  Your Honor, I'm going to object to

19   this and --

20         THE COURT:  Overruled.

21   A.    The human rights issue?

22   Q.    Yes.

23   A.    I'm claiming that they violated statutes, Connecticut

24   statutes as it pertains to a protected class, of which I

25   am a part of, and also, for example, age, race, things of
```

1    that nature.

2    Q.    Okay.  And do you have an attorney on that matter?

3    A.    There is a civil rights attorney, there was a

4    reasonable cause finding by the CHRO when they

5    investigated the matter and at this point now we're in the

6    process of talking it out and there's a settlement

7    conference scheduled, so now it's a matter of the civil

8    rights, the CHRO, civil rights attorney managing this

9    case.

10   Q.    Okay.  Now, back in, back in the 2006, with the

11   similar situation you had with Choice Point, you dealt

12   with, back then that report from Choice Point has similar

13   name and a similar date of birth as yours?

14   A.    Yes, it did.

15   Q.    Okay, and you dealt with the clerk in the criminal

16   court back then?

17   A.    I didn't deal --

18   Q.    Did you speak, correspond with her at some point,

19   didn't you?

20   A.    At that time I sent letters.

21   Q.    And they sent letters back to you?

22   A.    They sent a document back, yes.

23   Q.    Okay.  And you kept letters for your records of this?

24   A.    I kept the documents that they sent back, some of

25   them I discarded.

1   Q.   Okay.  Now, you didn't forward any of these letters

2   to NESC originally, is that correct?

3   A.   No, because they did not belong, they did not contain

4   information that belonged to me.  They were part of my

5   research that I did to clarify what procedures were taken

6   by Choice Point and who was this other person, this other

7   information that they received.

8   Q.   Well, at that point you became aware that person

9   existed with the similar name and exact date of birth and

10  with, unfortunately with the criminal record, is that

11  correct?

12  A.   I wanted to know more information other than what the

13  background check provided.  I wanted to know additional

14  information that, at that time my argument was to Choice

15  Point why didn't you check or did you check on the social

16  security number, so that was the whole basis of the

17  argument of the social security number and it was -- I was

18  led to believe that the check was done on the social

19  security number and that's when I contacted the state of

20  Virginia to find out did they provide the social security

21  number or what this other person had as far as identifying

22  information that was similar to mine.

23       My concern was did they have the same social security

24  number as mine.  That was the whole point.  I was really

25  concerned about that, not so much the name and, you know,

1    how it was spelled.

2    Q.   Well, the letter from Choice Point also indicates

3    that it does not indicate that there was a match of your

4    social security number, isn't that correct?

5    A.   That was received after I did my own research at or

6    around the same time because I'm talking to them and I'm

7    sending letters, so all the letters and the communications

8    are getting, you know, they might be passing each other or

9    what have you.

10    Q.   Okay.

11    A.   I wanted my own information from the source that they

12    get their information from.

13    Q.   And that would be Choice Point?

14    A.   I wanted my own information from the source that

15    Choice Point, I wanted to know from Choice Point as I

16    asked of Verifications Inc., where did you get your

17    information.  That's my, that was my question.

18    Q.   Okay.

19    A.   So once I found out where they got their information,

20    I directly contacted the source myself as an interested

21    party.

22    Q.   Okay.  When you were dealing with Choice Point, at

23    some point you became aware of the Fair Credit Reporting

24    Act and your rights under it, correct?

25    A.   There's -- yes, yes.

1    Q.   And at that point you also became aware of the

2    adverse action procedures?

3    A.   Yes.

4    Q.   And at that time though the report -- withdrawn.

5         So at that point you knew what you needed to do with

6    regards to Choice Point in order to get that report

7    changed, is that correct?

8    A.   I was advised as what steps that I could take, you

9    know, under my rights.  So they direct you to the website,

10   the workers' comp FTC website and I contacted the FTC and

11   they give you information as to what your rights are and

12   what you can do.  It's also described in, in the report on

13   the back of Verifications Inc., it was a similar type of,

14   you know, your rights.

15   Q.   Okay.  Now, why didn't you tell NESC about this?

16   A.   Because it only occurred once.  Initially when that

17   occurred, as I --

18   Q.   Sorry.

19   A.   That's quite all right.  As I did research on Choice

20   Point, Choice Point was found to be in violation of and

21   fined heavily by the FTC for one time millions of dollars

22   for identity theft, breaches of identity or something

23   similar, something to that extent, so it was my impression

24   since it never occurred before there was a match on a name

25   like mine, or after, except for Verifications, I thought

1     or I was under the impression that because Choice Point

2     was under scrutiny by the FTC that it was, this was part

3     of the fall out, I was one of the many victims of this

4     miscommunication or of that nature.  So I didn't bring

5     that up, because I just thought it was the way that they

6     handled their background check.  I had other background

7     checks and it never showed up, it was always my social

8     security number, my address, it was all my information.

9     Q.   Are you aware that most criminal checks do not

10    utilize social security numbers; are you aware of that

11    now?

12    A.   I'm -- now I am.  I had always been under the

13    impression that since they ask me to provide my social

14    security number that that was one of the main identifying

15    facts.  Prior to this whole thing happening I thought that

16    was the only thing that they verified.  I thought that was

17    like the number one thing they put in the system.

18    Q.   And now you know that they do not --

19          MR. MADSEN:   Objection.

20    Q.   Is that correct?  Is that your knowledge?  Is that

21    your understanding?

22    A.   Now I know otherwise, you're right.

23    Q.   Okay, and one of the other things I just want to

24    clear up, you're talking about Choice Point, if they were

25    fined, I just want the record to be clear you're not

1   inferring in any way that Verifications was fined one

2   dollar for any of their actions in this matter, correct?

3   A.   We were talking about Choice Point.

4   Q.   I just wanted the record to be clear.

5        Now, at some point then you did get a copy of the

6   report that was done on you in this matter.  When did you

7   first receive that?  That was on the eighth?

8   A.   Are we talking about Verifications?

9   Q.   Verifications.

10  A.   Or Choice Point?

11  Q.   No, Verifications.

12  A.   I received the original document or report that I

13  disputed and then they sent out a revised document.

14  Q.   Okay.  And at some point did you have numerous

15  conversations with Verifications?

16  A.   Yes, I did.

17  Q.   And did you speak with Mary Poquette?

18  A.   Eventually, yes, I did.

19  Q.   Okay, and now you were aware that Verifications had a

20  total of 35 days to reinvestigate and also to give a new

21  report; are you aware of that?

22  A.   Yes, I was made aware of that.

23  Q.   And they were able to get you that, do the

24  investigation and get you the revised report in three

25  days, is that correct?

1  A.   They responded to my complaint and my request for

2  looking into the matter, yes, she did state that.

3  Q.   Well, the thing is, the process is you asked for a

4  reinvestigation?

5  A.   And they did that, yes, they did.

6  Q.   And they started that investigation within the next

7  day and you had a result within another three days,

8  correct?

9  A.   I don't know when they started it but I know when I

10  received it.

11  Q.   Well, it couldn't have started occurring before May 8

12  when you first said there was a problem; is that fair to

13  say?

14  A.   But I know when I received it and it was -- in answer

15  to your question, it was in a timely fashion, yes.

16  Q.   Okay, so that was -- and you believe, your

17  understanding was under the Fair Credit Reporting Act they

18  had 35 days in total to do that?

19  A.   They had a certain amount of time and it's my

20  understanding that they met their responsibilities in

21  reinvestigating the matter.

22  Q.   Okay.

23  A.   As pertains to --

24  Q.   But you also assisted them at that point because you

25  did send over all the work you had done, all the work that

1    you had done in the year before with Choice Point; at that

2    point you sent that over to Verifications and it made

3    their job easier to get it done quickly, is that correct?

4    A.   Well, I don't want to take any credit for assisting

5    them.  I think, I don't know if they relied on any of the

6    documents that I sent.  I think that they are obligated to

7    do their own investigation so I don't know if they took

8    any of the documents that I sent into consideration when

9    they, you know, performed their own reinvestigation.  I

10   don't want to take credit for that.

11   Q.   Now, and then that Monday the 14th, that's the first

12   time you went to see an attorney to talk about this or had

13   you talked with an attorney back when Choice Point

14   occurred?

15   A.   When Choice Point occurred -- Choice Point, is that

16   correct, occurred, there was no need to talk to an

17   attorney because, as I stated before, I didn't lose any

18   employment.  The agency at Decco (ph)at  the time never

19   reported to Bank of America that there was a report that

20   was received that was questionable.  So there was no need

21   to talk to an attorney.  There was no, there was nothing

22   violated.  You know, they did the reinvestigation, they

23   submitted it back to me.  There was no basis, no need for

24   speaking to an attorney.  I did receive the job and I did

25   start when I was supposed to start.

1    Q.   I don't have any further questions.  All the other

2    attorneys asked a lot of questions so thank you very much.

3    A.   Thank you.

4              THE COURT:  All right, Mr. Madsen?

5              MR. MADSEN:  Thank you, Your Honor.

6    REDIRECT EXAMINATION

7    BY MR. MADSEN:

8    Q.   Good morning, Deborah.

9    A.   Good morning.

10   Q.   Now, do you recall Mr. Kupinse asking you about the

11   fact that you were asked on the consumer authorization

12   form to list your residence back only seven years from --

13   back to 2000.  Do you recall that testimony?

14   A.   I remember that being asked of me.

15   Q.   Okay.

16   A.   Yes.

17   Q.   And he also asked you to look at the erroneous

18   background report which indicated that there were some

19   convictions and in 1997, '98 timeframe, do you recall that

20   as well?

21   A.   I remember that question, yes.

22   Q.   Okay.  I'd like you to turn to Exhibit two.

23   A.   I have that.

24   Q.   Okay.  Now I have to find it.

25             THE COURT:  That's a plaintiff's exhibit?

1          MR. MADSEN:  Yes, this is -- Choice Point.

2          THE COURT:  What's the exhibit number?

3          MR. MADSEN:  It's Exhibit two, Plaintiff's

4   Exhibit 2.

5          THE COURT:  Two.

6   BY MR. MADSEN:

7   Q.   Do you have that in front of you?

8   A.   I do, yes.

9   Q.   Okay.  Now, at the time that the erroneous criminal

10   background report was issued, was National Engineering in

11   possession of your resume?

12   A.   Yes, the resume was submitted when I applied for the

13   position.  That was the initial communication that was

14   part of the application process was to submit a resume and

15   I believe a cover letter indicating to which position I

16   was applying for and my interest in it, in the position.

17   Q.   Okay, I'd like you to turn to the third page of

18   Plaintiff's Exhibit two.

19   A.   I have that.

20   Q.   Is there an entry in your resume which was in

21   possession by National Engineering which indicates where

22   you were working from February of '98 until June of 2000?

23   A.   Yes.

24   Q.   Where were you working?

25   A.   I was working at Command Aerospace for the Royal

1   Australian Navy.

2   Q.   Incidentally, when you worked for the Royal

3   Australian Navy, do you know whether or not a background

4   check was conducted on you?

5   A.   It was mandatory.  I had to be bonded and I had to

6   have a, can't recall how many years, I believe it was ten

7   years background check.  But -- I'm not certain but yes,

8   in answer to your question, background check and bonding

9   was part of the process.

10  Q.   Did you pass that background check?

11  A.   Yes.

12  Q.   Were you living in Virginia from 1998 to June of 2000

13  and commuting up to Connecticut for that job?

14  A.   No --

15  Q.   Where were you living?

16  A.   In 1998, I was living in Springfield, Massachusetts.

17  Q.   Okay.  Now, do you recall testifying that you earned

18  30,000-dollars in 2007?

19  A.   Yes.

20  Q.   Okay.  And did that 30,000-dollars that you earned,

21  gross, in 2007, include monies that you had earned from

22  January 1 up until May 11 of 2007?

23  A.   In my reporting of the 30,000-dollars, that was

24  before I filed for my taxes, so to be accurate, I would

25  look at my taxes and what I submitted to tell you exactly

1    how much I earned but at the time when I answered the

2    question, it included all of the monies that I would have

3    earned up to the date of the question.  Am I understanding

4    this correctly?

5    Q.   Yes.  So the 30,000-dollars included monies you had

6    earned throughout the entire course of 2007?

7    A.   To the point of that question, that would be my

8    approximation of what I believed that I had earned up to

9    that point.

10   Q.   Thank you.  I'd like you -- do you recall that you

11   were asked about Plaintiff's Exhibit ten, which is the

12   unemployment insurance form?

13   A.   This looks familiar, yes.

14   Q.   Were you required by National Engineering to sign

15   this document?

16   A.   I was required to sign all documents submitted to me,

17   yes.

18   Q.   Okay.  And can you please read the bolded sentence?

19   A.   Failure to contact NESC for a reassignment before

20   filing a claim for unemployment insurance benefits in the

21   State of Massachusetts may result in the denial of those

22   benefits.

23   Q.   Did you ever apply for unemployment insurance in the

24   state of Massachusetts?

25   A.   No.

1    Q.   Do you recall being asked questions about whether or

2    not you were behind in your rent and car payments as of

3    May 2007?

4    A.   Yes, I believe there were discussions of that.

5    Q.   Okay.  And I believe you testified that you were a

6    single mother raising a teen-age son on her own and living

7    paycheck to paycheck, is that correct?

8    A.   That is correct.

9    Q.   Had you gotten the job at Northeast Utilities, do you

10   recall what your rate of pay would have been?

11   A.   It would have increased.

12   Q.   Okay, do you recall what the hourly rate was?

13   A.   The hourly rate was $21.

14   Q.   Okay, and you were anticipating working how many

15   hours a week?

16   A.   Forty hours a week.

17   Q.   And did anyone ever advise you that you would be

18   eligible from time to time to work overtime compensation?

19   A.   It was --

20   Q.   Overtime rather?

21   A.   It was communicated in the, during the interview it

22   was communicated as part of the overview of the position

23   overtime was discussed, yes.

24   Q.   Okay.  So was it your understanding that you would

25   have earned a minimum of $21 per hour times 40 hours per

1    week?

2    A.   Yes.

3    Q.   That comes out to $820 per week; does that sound

4    right to you?

5    A.   Yes.

6           THE COURT:  $840.

7    A.   Do you have a calculator with you?

8    Q.   I'm sorry, the judge corrected me.  840.

9    A.   Thank you.

10   Q.   $840.  Do you believe if you had gotten employed and

11   began earning $840 a week with occasional overtime

12   compensation that you have been able to catch up on your

13   bills?

14   A.   Yes.

15   Q.   Now, do you recall there being some questions about

16   confidentiality agreements that you signed with Chubb and

17   General Electric?

18   A.   Yes.

19   Q.   You didn't sue either Chubb or General Electric, did

20   you?

21   A.   No.

22   Q.   As part of being let go from those companies, were

23   you offered what's referred to as severance packages?

24   A.   Yes.

25   Q.   Were those --

1   A.   I was not the only one.  That was the process that we

2   went through with all the employees, they all went through

3   it.

4   Q.   Okay.  Do you recall there were some testimony about

5   a pending action at the commission on human rights?

6   A.   Yes.

7   Q.   You say there was some merit assessment review?

8   A.   Yes.

9   Q.   Was that in your -- and was that merit assessment

10  review issued by a Connecticut state agency?

11  A.   Yes.

12  Q.   Was that merit assessment review in your favor or

13  against you?

14  A.   The merit assessment review was retained by the CHRO

15  citing reasonable cause finding which means that they find

16  that there is reasonable cause to believe that

17  discrimination has occurred.

18  Q.   So -- to answer my question, was that in your favor?

19  A.   That would be in my favor.

20  Q.   Do you recall being asked questions about why you

21  didn't inform Mr. Sullivan about the Choice Point issue

22  that had arisen in 2006?

23  A.   Yes.

24  Q.   Okay.  And just to ball park, you've worked many

25  positions during the course of your professional career,

1    is that fair to say?

2    A.    Yes.

3    Q.    Is it fair to say that you've had many criminal

4    background checks conducted on you?

5    A.    That's fair to say.

6    Q.    Did you have one conducted on you when you worked for

7    the I think you said Australian -- what was it?

8    A.    The Royal Australian Navy working at Command

9    Aerospace.

10   Q.    You had one conducted on you then?

11   A.    Yes.

12   Q.    Did you have one conducted on you when you worked for

13   the  security -- I'll get that right, the Transportation

14   Security Administration?

15   A.    TSA Homeland security, federal agency.  An agency in

16   the federal government, yes.

17   Q.    You had one conducted on you then?

18   A.    I had a slew of checks being done through that

19   position.

20   Q.    Would you say over the course of your professional

21   career that you've had more than ten background checks

22   conducted on you?

23   A.    I'm not good at accounting and I hope this is

24   acceptable, each of the employments that I've had on my

25   resume, I would say all of them had background checks

```
 1    involved, all of the employments.  Does that at up to ten?
 2    Q.   Well, it's your testimony?
 3    A.   You want me to count --
 4    Q.   No?
 5    A.   -- how many I've had?  I don't want to miscommunicate
 6    that it was ten when it might have been seven or --
 7    Q.   That's fine.  Prior to May of 2007, out of all of the
 8    criminal background checks that were conducted on you, how
 9    many false positives did you become aware of?
10    A.   To my knowledge, the one with Choice Point and the
11    one with Verifications Inc., citing the same identical
12    situations, same identical person.
13    Q.   Now, when you were employed at C B Richard Ellis,
14    immediately before the erroneous background check was
15    issued that rendered you ineligible for employment at
16    Northeast Utilities, had they conducted a background check
17    on you?
18    A.   Yes.
19    Q.   And that was after the Choice Point situation?
20    A.   After Choice Point, C B Richard Ellis did a
21    background check.  Also the Hartford which was immediately
22    after Choice Point, they did a background check as well.
23    Q.   Did you tell either of those companies as part of the
24    application process, hey, I know you're going to do a
25    criminal background check on me, I want to let you know in
```

1    advance there might be a felony that comes up on my record

2    but I want to share with you in advance that's not mine,

3    did you say that to either of those companies?

4    A.   No, I did not.

5    Q.   And you didn't say that to National Engineering

6    either, did you?

7    A.   No.

8         MR. MADSEN:  I have no further questions, Your

9    Honor.

10        THE COURT:  All right.  Mr. Kupinse?

11        MR. KUPINSE:  Just a couple, Your Honor.

12   RECROSS EXAMINATION

13   BY MR. KUPINSE:

14   Q.   I just want to make it clear for the record when

15   Mr. Coffey was examining you he asked if any of the

16   complaints, letters, issues that you filed with the FTC or

17   any of the attorney generals or anyone resulted in any

18   action against Verifications, and I think you said no, is

19   that correct?

20   A.   To my knowledge, no, I don't have any knowledge of

21   that, no.

22   Q.   Is the same same thing true with respect to National,

23   you don't have --

24   A.   That is correct, that is correct.  To my knowledge I

25   don't know anything about that.

1    Q.   Now, I think you also said that you believed as a

2    result of the conversations at the interview that you

3    might receive some overtime, is that correct?

4    A.   It was stated.

5    Q.   And you have not subpoenaed any of the people who

6    were at those conversations, have you?

7    A.   I don't know who's been subpoenaed.

8    Q.   Okay.  They are not coming as witnesses so far as you

9    know?

10   A.   I haven't -- I didn't even know the person that was

11   here yesterday was subpoenaed until she showed up so I

12   don't know.

13   Q.   And when Kathy Shapleigh did come and testify did you

14   hear her say it was not likely that you would receive any

15   overtime?

16           MR. MADSEN:  Objection, I don't believe that was

17   the testimony.

18           THE COURT:  Well, the jury's recollection of the

19   testimony is what counts.

20   A.   I'm sorry.

21   BY MR. KUPINSE:

22   Q.   Yes.  Did you hear Ms. Shapleigh indicate that there

23   wasn't overtime available, or did you, or am I remembering

24   wrong?

25   A.   I'm sorry.  I thought you were, you guys were still

1    discussing things back and forth.  Please repeat your
2    question to me.
3    Q.   Yes.  When Ms. Shapleigh was on the stand, did she
4    say that your position would not have produced overtime?
5    A.   I recall her, the question being asked of her about
6    some type of tick or some time of type of checkmark that
7    was near overtime or something to that, something to that
8    effect, and then asking for clarification of what that
9    meant and if overtime is a normal process or normally
10   given under the circumstances and her stating no or
11   something to that, something to that effect.
12   Q.   Okay, and when you signed the severance packages with
13   Chubb and GE, did you also release them from any claims by
14   you?
15   A.   Yes.
16   Q.   Nothing further.
17   RECROSS EXAMINATION
18   BY MR. COFFEY:
19   Q.   Just a couple.
20        You had said on the EEOC claim that you -- a finding
21   of reasonable cause.  As far as you're aware, finding of
22   reasonable cause only allows you to file this suit, isn't
23   that correct?
24             MR. MADSEN:  Objection.
25             THE COURT:  If she knows I'll let her answer.

1    Q.   If you know?

2    A.   I just followed the process with that.  So what

3    that -- my understanding of what that means is that the

4    CHRO now considers this reasonable -- reasonable finding

5    or reasonable cause to assume that discrimination has

6    occurred and they pick up the case, so now CHRO is

7    representing me in this matter.  It's their case.  That's

8    my understanding of reasonable cause, that they went

9    through the procedure evaluating all the documents and

10   find there's enough cause or enough reason for them to

11   retain the case.  That's, if there's more to it than that,

12   that's my understanding.

13   Q.   Okay, and you also testified, I think I was, when I

14   asked, you haven't worked since the Department of Children

15   and Families?

16   A.   No, I have worked.

17   Q.   Okay, I just would like to --

18   A.   That resume that you have, that resume I submitted

19   back in 2007.

20   Q.   Well, the resume that we have has 7/08 to present.

21   So how would you have submitted that in 2007?

22   A.   The last job is the Hartford --

23   Q.   Well --

24   A.   -- in Bloomfield.

25             MR. MADSEN:  May I see?

1          MR. COFFEY:  Yes, I'll give a copy to the jury

2     as well.

3               (Pause)

4          THE WITNESS:  The reason may be that you're

5     looking at -- the resume you and I have are two different

6     resumes.

7               (Pause)

8          MR. COFFEY:  Okay, it actually would be

9     codefendent NESC's Defendant's Exhibit 500 and I'll hand

10    ten copies over but it will be my -- I'm not going to have

11    any exhibits really so I'm handing the copies over, if

12    they can just just put it into the volume, Your Honor.

13    Beg your indulgence, and I'll hand a copy up to Ms. Adams

14    if I can approach.  Can can I approach the witness?

15             THE COURT:  Yes.  500?

16             MR. COFFEY:  Yes, it's the first exhibit.

17             (Hands Witness.)

18             THE COURT:  Yes.

19    A.   Thank you.

20    Q.   So that is -- I'm sorry, I'll let the jury --

21         (Pause)

22    Q.   Does that show that you are employed by the Hartford

23    in 2008, you put down to present on your resume?

24    A.   At the time I submitted this resume that was current

25    and that's the job that I had.  That was different, I

1    apologize, I was reading a resume that was contained in

2    Exhibit two.

3    Q.   Okay.

4    A.   Which I may have included the Department of Family

5    and -- Children and Families.  It didn't include the

6    Hartford position that I got afterward.

7    Q.   And how long did you work at the Hartford, into 2009?

8    A.   October.

9    Q.   Of 2009?

10   A.   No, in 2008.  The job at the Hartford which is listed

11   on my current resume went from July of 2008 and it ended

12   in October of 2008.

13   Q.   Okay.  And now what jobs have you worked since then?

14   A.   I've been unemployed, I've been going to school.

15   Q.   Okay.  So you, when you say you've been unemployed,

16   going to school, let me ask you this, in the fall semester

17   of 2008 were you a full-time student?

18   A.   In the fall?  When I left Connecticut in 2008, I was

19   not going to school then.  No.

20   Q.   Okay.  Then you started school in the spring

21   semester, January of 2009?

22   A.   I took one or two courses, yes, that is correct.

23   Q.   And you have chosen not to look for any work then

24   since then, is that correct?

25   A.   No, I've still been looking, I still have reached out

1    to recruiters.  I still called them and contact them to

2    find out how the job market is, if there's any -- actually

3    I was just in communication with Kelly Law Registry a

4    couple weeks ago applying for positions.  I've applied for

5    positions in the state of Connecticut, so I still do look

6    for work.

7    Q.   Now, do you have a more up to date resume than that

8    one or is that your last resume?

9    A.   For work, I have a resume that I updated but the only

10   job, the job is still going to be the same.  What's going

11   to be different is under the education, I'm going to

12   reflect the fact that I'm not pursuing a psychology degree

13   at Saint Joseph's college.  Instead I am pursuing, I'm

14   taking classes at Berkshire Community College so that's

15   the only difference on the resume, to keep it accurate.

16   Q.   What was the rate of pay you were receiving at the

17   Hartford?

18   A.   The Hartford, approximately 19 dollars an hour.

19   Q.   Okay.  And how many hours a week was that?

20   A.   That was 40 hours with the opportunity for overtime

21   as they see, they saw fit.

22   Q.   And you also received any health benefits or --

23   withdrawn.

24      You have health benefits at all at this time, were

25   they provided to you?

1    A.    I don't have health benefits.  I file for state

2    assistance, I have state assistance.

3    Q.    So you receive health care through the Husky program?

4    A.    Not in -- not Husky but through another program.

5    Husky, my understanding is it ends when my son becomes a

6    certain age.  It's only for parents or families with

7    children, after your child becomes a certain age and

8    you're put into a different type of insurance situation.

9    Q.    Now, are you receiving any benefits out of the state

10   of Massachusetts since you moved back to Massachusetts?

11   A.    Insurance, the insurance -- in the state of

12   Massachusetts, by law you have to be insured.

13   Q.    Okay, so --

14   A.    That's their law.  If you don't have insurance or if

15   you cannot provide insurance, you have to pay taxes for

16   the amount that insurance would cost you in Massachusetts.

17   That's their health care reform type of law, so I'm

18   mandated as long as I'm staying there, I have to have some

19   type of insurance.

20   Q.    Currently are you receiving any other benefits from

21   the state of Massachusetts or Connecticut at this time?

22   A.    I chose not to apply for -- well, what type of

23   benefits are you speaking?

24   Q.    Did you receive unemployment benefits after leaving

25   the Hartford?

1    A.    Yes, I did file for unemployment benefits.

2    Q.    And you received those for a year?  For one year or

3    how long did you receive the unemployment benefits for?

4    Are you currently receiving them?

5    A.    I received the unemployment benefits for, you know,

6    for the length of the term that I'm unemployed and

7    currently now they are into some type of, because of the

8    economy, they are in the accelerated benefits or something

9    like that.  So it's due to end -- actually the last

10   benefit would have been last week where my employment, my

11   unemployment benefits ended, but I received documentation

12   that I may be eligible, since Connecticut has been

13   triggered into some unemployment, they received monies

14   from the federal government, but I don't know what the

15   case is out of that.

16   Q.    So you're currently still receiving these benefits?

17   A.    My case ended last week for unemployment.  I had

18   exhausted my benefits.  However, there may be a

19   determination where I may be able to receive under this

20   new federal guidelines for accelerated benefits, tier

21   three or tier two, they notify you as that goes along, so

22   you just file and then they'll let you know if you're

23   eligible to receive any more money.  As of today I don't

24   know if I qualify.  My understanding is last week I

25   exhausted my unemployment.

1   Q.   Now, how many credits are you taking in college this

2   semester?

3   A.   This semester is over with.  They are in finals now,

4   so I took approximately ten, ten to 12.  I started off

5   with 12, 12 to 13, and then I dropped one course.

6   Q.   Okay.  Now, last semester, did you take classes over

7   the summer semester?

8   A.   The summer I took a class, I paid for that.  It was

9   golf.  So it wasn't -- it was PE is a requirement so I

10   attempted to take a course that would go towards a degree.

11   You know, should I assume or should I continue on to get

12   the degree, because it's a requirement for graduation.

13   Q.   And how many credits did you take then in the spring

14   semester of 2009 that would have been when you started?

15   A.   Approximately six.  The PE, I took one PE class,

16   that's only one credit.  It's not even six actually

17   because I took a, a psychology class which is worth three

18   credits and I took a PE class, a physical education class

19   which is for one credit, so it was less than six credits.

20   I didn't get any, any assistance with that.

21   Q.   And how many credits are you scheduled to take in the

22   spring semester of 2010?

23   A.   That's questionable and tentative at this point.  I

24   would like to be able to take it and my plan is since we

25   haven't really registered for that, but my plan is in

1    speaking with my advisor that I would be taking a full

2    load, 12 credits.

3    Q.   No further questions.  Thank you.

4                THE COURT:  Mr. Madsen?

5                MR. MADSEN:  No further questions.

6                THE COURT:  You may step down.  Thank you.

7                (Witness excused.)

8                MR. KUPINSE:  If your Honor please, we have

9    conferred among counsel and we would like to take one of

10   our witnesses who is from out of state out of order.

11               THE COURT:  Yes, go ahead.

12               Now, you should be note on your notes from the

13   plaintiff's case over to the case for the defense case for

14   NESC, they have a witness who's only available at this

15   time so we're going to interrupt the plaintiff's case and

16   have the witness for NESC.

17   M A U R A      D E M A R S,     called as a witness on

18   behalf of the Defendant, National Engineering, having been

19   duly sworn by the Clerk, testified as follows:

20               THE CLERK:  Please be seated, state your name

21   for the record and spell your last name?

22               THE WITNESS:  I'm sorry.

23               THE CLERK:  That's okay.  And the state, town

24   and state where you reside.

25               THE WITNESS:  Okay.  Maura Demars.  Last name

1    D-E-M-A-R-S, and I reside at Dover, New Hampshire.

2              THE COURT:  I don't want to tell you how to keep

3    your notes but helpful hints from Eloise, on your notes,

4    as long as it's going to be a witness for the NESC defense

5    you might go to a different page of your notes so you have

6    your plaintiff's case all in one spot, NESC's case in

7    another spot that may help you later on.  That's what I'm

8    doing anyway.  Okay.

9    DIRECT EXAMINATION

10   BY MR. KUPINSE:

11   Q.   Ms. Demars, by whom are you employed?

12   A.   National Engineering.

13   Q.   And were you so employed in March and through June of

14   2007?

15   A.   Correct.

16   Q.   And could you give us a quick idea of your duties at

17   National back in that 2007 period?

18   A.   I do office managerial duties.  I sent out contracts,

19   I run the payroll, send out FedEx's.  I do pretty much

20   everything.

21   Q.   Okay.  Do you have knowledge of what is called a safe

22   screen?

23   A.   Yes.

24   Q.   Can you tell the jury what a safe screen is?

25   A.   It's a background check, as I remember it being

1    Verifications when I enter it on line.  It's what I

2    believe it is.

3    Q.   And did you enter information onto that Verifications

4    safe screen in connection with Deborah Adams?

5    A.   I did.

6    Q.   And did you tell the jury what information you added

7    into that safe screen?

8    A.   We go on line and you enter the --

9              THE COURT:  Boy, your voice is soft.  Get

10   right --

11             THE WITNESS:  I'm sorry, I feel like I'm loud.

12             THE COURT:  You have to raise your voice.

13   A.   You go on line, put in, I put in the first name, last

14   name, and these were all required items, they are starred

15   on the website, first and last name, date of birth, social

16   security number and address, and you press enter and

17   that's it.

18   Q.   Thank you very much.  I have no further, no more

19   questions, Ms. Demars.

20   A.   Thank you.

21             THE COURT:  Verifications have any?

22             MR. COFFEY:  I have no questions.

23             THE COURT:  Okay.  Mr. Madsen?

24             MR. MADSEN:  Sure.

25

CROSS EXAMINATION

BY MR. MADSEN:

Q.   Sure.  Good afternoon.

A.   How are you?

Q.   Good, thanks.  Is there a section on that form where you are asked to put in information regarding possible false information that might inadvertently be disclosed by the credit report agency?

A.   What form are you speaking of?  Are you speaking of the line or --

Q.   Both, any of them?

A.   Not that I recall.  And not on line, at least there's nothing I can enter or anything like that stating that something may pop up.

Q.   So what information did you enter?

A.   I entered her first name, last name, her address, her social security number and her date of birth.

Q.   Do you recall how you spelled her first name?

A.   No.

Q.   Thank you.

A.   You're welcome.

        MR. MADSEN:  No further questions.

        THE COURT:  You're all through.  Thank you.

        MR. COFFEY:  Your Honor, I do have one brief --

        THE COURT:  He has one question.

1    THE WITNESS:  That's all right, I'm coming back.

2    CROSS EXAMINATION

3    BY MR. COFFEY:

4    Q.   Just a couple questions.

5         You chose what tests you wanted to order, is that

6    correct, on the system?

7    A.   Correct.

8    Q.   And what type of test did you check that you wanted

9    ordered on Deborah Adams based on the system?

10   A.   I don't know.  It's the N C R L, is the only one I

11   ever choose when I go on Verifications.  That's the one

12   I've always been told to choose.

13   Q.   Okay, thank you.

14   A.   You're welcome.

15            THE COURT:  Okay.

16            MR. KUPINSE:  No further questions, Your Honor.

17            THE COURT:  Thank you.

18            (Witness excused.)

19            MR. MADSEN:  Your Honor, at this time the

20   plaintiff would like to call Chris Sullivan to the witness

21   stand.

22   C H R I S T O P H E R    S U L L I V A N,    called as

23   a witness on behalf of the Plaintiff, having been duly

24   sworn by the Clerk, testified as follows:

25            THE CLERK:  You may be seated, please state your

```
 1   name, spell your last name and your city and state?

 2           THE WITNESS:  My name is Chris Sullivan, Dover,

 3   New Hampshire.  Last name is spelled S-U-L-L-I-V-A-N.

 4   DIRECT EXAMINATION

 5   BY MR. MADSEN:

 6   Q.   Good afternoon, Mr. Sullivan.  Are you currently

 7   employed?

 8   A.   Yes.

 9   Q.   Who is your employer?

10   A.   National Engineering.

11           THE COURT:  Okay, let me give you some ground

12   rules.  I told you this might happen.  You happen to be on

13   the plaintiff's case, he's calling an obvious adverse

14   witness.  Now, Christopher Sullivan, as you've seen in the

15   documents is, was and is, an employee of National.  Now

16   Mr. Madsen in examining him is entitle to examine him as

17   an adverse witness.  He may ask leading questions and

18   require a yes or no answer.  So the ground rules are just

19   reversed from what they were for the plaintiff's

20   testimony.  All right, go ahead, Mr. Madsen.

21           MR. MADSEN:  Thank you, Your Honor.

22   BY MR. MADSEN:

23   Q.   And what is your job title?

24   A.   I'm listed as account manager.

25   Q.   Okay.  Are you sometimes also, do you sometimes also
```

1  refer to yourself as a recruiter?

2  A.   Yes.

3  Q.   And how long have you held this position?

4  A.   I've been there for coming up to five years with

5  National.

6  Q.   What's your current salary?

7  A.   Salary, I get have a base hourly pay.

8  Q.   What is your hourly rate?

9  A.   Hourly is 13.30 an hour.

10  Q.   Okay.  Do you get overtime compensation?

11  A.   Yes.

12  Q.   Do you get bonuses?

13  A.   Only on commission.

14  Q.   Okay.  So you do receive commissions?

15  A.   Yes.

16  Q.   And are the commissions based on revenue that you

17  generate?

18  A.   Yes.

19  Q.   How much revenue did you receive commissions for last

20  year in 2008?

21  A.   Yes.

22  Q.   And how much were your commissions?

23  A.   Last year for the year I earned 78,000.

24  Q.   78,000?

25  A.   Yes.

1    Q.    In commissions?

2    A.    I never actually subtracted the two but 78 minus 27.

3    Q.    So you got to 13.30 an hour, plus the 78,000-dollars

4    in commissions for 2008?

5    A.    My total salary, my total earnings were 78.

6    Q.    Okay, got you.  And are the commissions based on

7    revenue that you generate for 2008?

8    A.    Yes.

9    Q.    How much revenue did you generate in 2008?

10   A.    I don't actually have the number.  It's based on

11   percentage of essentially a weekly revenue.

12   Q.    Okay.  Do you, do you know roughly the neighborhood

13   of revenue that you generate?

14   A.    On average, if you deal out the whole year, I would

15   say anywhere between 12 to 14,000-dollars per week on

16   hourly.

17   Q.    That's money that you bring into the firm?

18   A.    Correct.

19   Q.    Okay.  Do you know how much the overall revenues of

20   National Engineering Services Corporation are?

21   A.    No.

22   Q.    You're not privy to that information?

23   A.    No, I can guess but I couldn't tell you factually.

24   Q.    Okay.  Do you have a ball park?

25   A.    The last number I heard was somewhere in the

1    neighborhood of 30 million for revenue.

2    Q.    30 million-dollars?  Can you describe the business of

3    National Engineering?

4    A.    Yes, we are a contract staffing agency.

5    Q.    Okay.  And does National Engineering specialize in

6    placing certain types of individuals in employment?

7    A.    Traditionally it would be information technology and

8    engineering.

9    Q.    Okay.  And does National Engineering have more than

10   one facility?

11   A.    Yes.

12   Q.    How many?

13   A.    Right now we have three.

14   Q.    Where are they located?

15   A.    Portsmith, New Hampshire, which is where our

16   headquarters is, Willburn, Massachusetts and Houston,

17   Texas.

18   Q.    Okay.  Is National Engineering to your knowledge a

19   privately owned company?

20   A.    Yes.

21   Q.    Who owns it?

22   A.    Lenny Tierney (ph) and James Kline (ph) -- I think

23   that's his name.

24   Q.    Does National Engineering ever place individuals

25   internationally?

1    A.   Not to my knowledge.

2    Q.   You've never been involved with placing someone in

3    Canada?

4    A.   I have not.

5    Q.   Approximately how many placements do you make

6    annually?

7    A.   In the neighborhood 30, 40, depending on a number of

8    factors but somewhere in there.

9    Q.   And in your job what area of staffing do you work in?

10   A.   Currently I'm in pharmaceutical.  At that point it

11   was fairly open, primarily until --

12   Q.   When you say at that point, you mean --

13   A.   At the point this transpired.  It's relevant for

14   right now.

15   Q.   May of 2007?

16   A.   Yes.

17   Q.   And do you work principally in the area of contract

18   employment?

19   A.   I do.

20   Q.   Do you know Deborah Adams?

21   A.   Only through this context.

22   Q.   Did you have occasion to work with her?

23   A.   During the assignment process she and I spoke I

24   believe once, and then after the background check came

25   back again, we spoke a couple times.

1    Q.    Okay, and did she apply for a position that National

2    Engineering was recruiting for?

3    A.    Yes.

4    Q.    What was that position?

5    A.    It was a contract analyst, I believe.

6    Q.    How did that position come to National Engineering?

7    A.    That position came through Comensura which is now

8    known as Guidant.  It goes out -- it's essentially an

9    email order to their staffing partner requesting

10   assistance for resumes.

11   Q.    What state was this going to place staffer in?

12   A.    Connecticut.

13   Q.    Do you recall when you received the order?

14   A.    I believe it was April, in the 20s, 22nd, 23rd, if I

15   had to guess.

16   Q.    Do you recall giving a deposition in this case?

17   A.    Yes.

18   Q.    Do you recall giving the deposition in September of

19   2008?

20   A.    I thought it was August, but yes.

21   Q.    Do you recall, I'm just going to show you page ten of

22   the deposition transcript and ask you if that refreshes

23   your recollection as to when you received the order.

24         May I approach the witness?

25                THE COURT:  Yes, you can go ahead and approach

1    him without asking my permission.

2              MR. MADSEN:   Thank you.

3              (Hands witness.)

4    A.   At my deposition I did, I said late March, early

5    April.

6    Q.   Okay.  Was your memory fresher in September of 2008

7    regarding the events involved in this case than it is

8    today?

9    A.   I think that would be fair and I also had a piece of

10   paper that had the printed order so I could look right on

11   there, but I don't have that right now.

12   Q.   So, going back to your testimony you received an

13   order in late March or early April 2000, you received it

14   from Comensura, correct?

15   A.   Correct.

16   Q.   Contract analyst position?

17   A.   Yes.

18   Q.   And how long was the contract position for?

19   A.   I believe it was listed for 50 weeks.

20   Q.   Okay.  And who was your main contact from Guidant at

21   that point, at that point in time?

22   A.   It ended up being Kathy Shapleigh.

23   Q.   Can you identify Kathy Shapleigh?

24   A.   Yes.

25

1    Q.   Please do.

2    A.   In terms of --

3    Q.   Well, what is her, who's her employer, what was her

4    position, what was she doing?

5    A.   She's considered a contingent staffing

6    representative, I believe, or a CSR, and she is employed

7    by Comensura.

8    Q.   You said CSR; what's that?

9    A.   I always thought it was a contingent staffing

10   representative but did may be customer service

11   representative.  That's her signature.

12   Q.   Now, was Kathy Shapleigh your main point of contact

13   at Guidant Group in connection, or Comensura in connection

14   with positions from Northeast Utilities?

15   A.   It varies by discipline.  On this particular order it

16   was Kathy.

17   Q.   Did you have the authority to circumvent Kathy

18   Shapleigh and communicate directly to hiring managers?

19   A.   No.

20   Q.   Was that pretty clear to you that you couldn't do

21   that?

22   A.   You could be removed from the account if you are

23   found guilty of going around Comensura.

24   Q.   Okay.  So was it your understanding that when you

25   wanted to communicate something to Northeast Utilities,

1    you communicated that to Kathy Shapleigh as a

2    representative, Comensura's representative?

3    A.   Yes.

4    Q.   And Kathy Shapleigh in fact was a representative for

5    NU, correct?

6    A.   Correct.

7    Q.   She was an agent for them and she acted on their

8    behalf?

9    A.   Yeah, I believe her office was right in their

10   building.

11   Q.   Now, did National Engineering have a contract with

12   Guidant?

13   A.   Yes.

14   Q.   Have you ever seen this?

15   A.   I've seen it a little more closely lately but yes, I

16   have seen it.

17   Q.   Okay.  Do you know whether National is expected to

18   comply with the law in the context of its business

19   relationship with Guidant?

20   A.   I know that there are legalities in the contract.  If

21   you're asking me more specific law or just --

22   Q.   Just in general?

23   A.   In general, yes.

24   Q.   Okay.  And what did you do?  I want to go back to

25   when the order came in, what did you do when the order

1    came in from Comensura for the contract position that

2    Deborah Adams applied for?

3    A.   At that point I logged onto their system, it's an on

4    line portal, looked at the order, decided whether or not

5    it was something we could, should or would work on, and at

6    that point accepted it and sent it out to my staff.

7    Q.   Were other staffing agencies to your knowledge able

8    to accept the same order?

9    A.   Yes.

10   Q.   And do you recall what the start date was of the

11   order, the initial start date?

12   A.   If I can see the order I would probably remember

13   more.  I believe it was -- somewhere first or second week

14   of May, if I were to guess, but I'd have to see it.

15   Q.   Okay.  I'd like to show you page 13 of your

16   deposition transcript, just so see if it refreshes your

17   recollection.

18        (Hands Witness.)

19   A.   Start date was listed as the second of April.

20   Q.   Okay.  Okay, so the start date was listed as

21   April 2nd, but there were delays in filling this order,

22   weren't there?

23   A.   Yes.

24   Q.   And ultimately the start date was pushed back, wasn't

25   it?

1  A.   Yes.

2  Q.   Okay.  Ultimately it was pushed back to May 14th, is

3  that right?

4  A.   The start date was based upon, I believe Deb's start.

5  There was, I don't know if the system ever reflected a

6  change.

7  Q.   Okay.  So your understanding is when she was able to

8  start would be the start date for the position?

9  A.   Whoever they had selected was going to be as soon

10  possible.

11  Q.   Okay, and your understanding was that Deborah would

12  be available on May 14th and so that was going to be her

13  start date, correct?

14  A.   Yeah, I believe she was going to put in two weeks

15  notice.

16  Q.   What was the pay for this position?

17  A.   It was $21 per hour.

18  Q.   How much does that work out per week?

19  A.   What did we say, 840?

20  Q.   And who would have been Deborah's actual employer?

21  A.   It would have been National Engineering.

22  Q.   Were there any benefits associated with this

23  position?

24  A.   None, not in terms of health or dental or anything of

25  that nature.

1    Q.    Okay.  Now, who actually placed the order submitting

2    Deborah Adams as a candidate for this position?

3    A.    Who actually submitted her into the system?

4    Q.    Yes.

5    A.    That was me.

6    Q.    And can you tell me in general how was National

7    renumerated for placing employees?

8    A.    In terms of this particular assignment or in general?

9    Q.    Well, let's talk first in general?

10   A.    Okay, in general, if it's a contract employee, the

11   candidates who are contract receive an hourly pay which we

12   have a mark up prearranged with the client and we charge

13   whatever that difference is in addition, so we would be

14   paid the difference between our charge and the candidate's

15   pay.

16   Q.    So, for as long as the employee works with the

17   company, every hour that's billed by National includes a

18   differential that National collects as a fee, is that

19   correct?

20   A.    Correct.

21   Q.    So would it have been in -- that being the case, is

22   it in National's interest for the individuals that they

23   place into position to work the full contract rate?

24   A.    Absolutely.

25   Q.    You don't want to be in a situation where someone is

1   employed for three weeks and then someone exercises an at

2   will provision to terminate somebody, correct?

3   A.   No, financially speaking, no.

4   Q.   That would be against National's interest, wouldn't

5   it?

6   A.   Correct.

7   Q.   So, National would have every reason if it placed

8   Deborah Adams, to keep her employed and in that position

9   at Northeast Utilities during the entire 50 weeks of the

10  contract, is that correct?

11  A.   Yes.

12  Q.   And in this case, do you know how much National would

13  have collected on a hourly basis for the hours that

14  Deborah worked on the contract?

15  A.   I believe it was $27 and some change.

16  Q.   Okay.  And then the difference would have been the

17  hourly rate that Deborah was being paid, correct?

18  A.   Correct.

19       THE COURT:  So you got 27, subtract 21 so you

20  get the six?

21       THE WITNESS:  Correct.

22  BY MR. MADSEN:

23  Q.   I'd like to again just refresh your recollection by

24  turning to page 20 of your deposition.

25  A.   Is there a particular place I'm supposed to look

1    or --

2    Q.   (Indicating)  So, having looked at this deposition,

3    does it refresh your recollection as to what the hourly

4    fee, net fee collected by National would have been in

5    connection with Deborah Adams?

6    A.   The differential would have been six dollars and 30

7    cents.

8    Q.   Now, did you become aware that Deborah was selected

9    as a candidate by Northeast Utilities and Guidant as

10   someone they wanted to interview?

11   A.   It was through Guidant.

12   Q.   Okay.  And did you communicate with Deborah that NU

13   wanted to interview her or was that someone else?

14   A.   That was someone else in my office.

15   Q.   Who was it?

16   A.   I believe it was Lary O'Keefe.

17   Q.   And can you identify Lary O'Keefe?

18   A.   He's the handsome gentleman in the back of the room.

19   Q.   Okay, and what was his position at the time?

20   A.   He was a recruiter.

21   Q.   Just same position as you?

22   A.   Essentially, he didn't have any accounts but he was a

23   recruiter.

24   Q.   Okay.  And is he still employed by National

25   Engineering as a recruiter?

1    A.   Yes.

2    Q.   And do you know whether Deborah Adams was

3    interviewed?

4    A.   Yes.

5    Q.   By whom was she interviewed?

6    A.   There are two names, I believe it was Angelo-Park and

7    Byron Maddox but I'm not sure if both were present.

8    Q.   Okay.  Did you have any follow up conversations with

9    Kathy Shapleigh about the interview?

10   A.   I don't believe so.  I think the decision came back

11   before Kathy and I had a chance to talk.

12   Q.   Okay.  But didn't you talk to Kathy Shapleigh about

13   the interview that Deborah --

14   A.   That we confirmed it?

15   Q.   No, didn't you actually personally speak with Kathy

16   Shapleigh about Deborah's interview at Northeast

17   Utilities?

18   A.   I may have.  I don't recall the timing of when she

19   was accepted and when the interview wrapped up but

20   traditionally I would speak to her after the interview.

21   Q.   Okay, I'd like to show you page 22 of your

22   deposition.

23   A.   Okay, yes.

24   Q.   So again, my question, didn't you speak with Kathy

25   Shapleigh about the outcome of Deborah's interview at

1    Northeast Utilities?

2    A.   Yes, it does look like I spoke to her after and she

3    had another candidate to interview as well.

4    Q.   And what did Kathy Shapleigh tell you about NU's --

5            MR. McPHERSON:  Objection, Your Honor.

6            THE COURT:  I'll allow it.  She's testified.

7    BY MR. MADSEN:

8    Q.   What did Kathy Shapleigh tell you about NU's response

9    to the interview?

10   A.   She would be back for follow up.

11   Q.   And did she tell you specifically that Byron liked

12   Deborah based on the interview?

13   A.   Yes.

14   Q.   And he was one of the hiring managers, wasn't he?

15   A.   Correct.

16   Q.   Now, at a certain point, did Guidant receive a note

17   approving the hiring of Ms. Adams?

18   A.   Yes.

19   Q.   Okay.  And didn't the note say, quote --

20           MR. McPHERSON:  Objection, Your Honor.  He's

21   asking the witness to testify --

22           THE COURT:  Well, I suppose the operation,

23   what's what the operative fact was?  All right, I'll allow

24   it then.

25

```
1   BY MR. MADSEN:
2   Q.   Didn't the note itself state that candidate approved
3   for hire per client, please extend the offer to Ms. Adams
4   for order number 109642?
5   A.   Yes.
6   Q.   It did state that?
7   A.   I mean I don't know the order number but I believe it
8   was something to that effect, yes.
9   Q.   Okay, and did you personally call Ms. Adams to convey
10  the offer to her?
11  A.   I believe Lary called her.
12  Q.   Okay.  I'd like to show you page 23 of your
13  deposition.
14       (Hands witness.)
15  Q.   And Mr. --
16  A.   It does say that Lary offered her the position.
17  Q.   Okay.
18  Q.   Let me rephrase the question.  What is the standard
19  protocol once the, the customer authorizes the offering of
20  a position, what happens after that?
21  A.   Next step, you call the candidate, offer them the
22  position, rediscuss financials, the start date, any
23  discrepancy as to whether or not the person's changed
24  their mind, anything of that nature, and go from there.
25  Q.   Now, to your knowledge, was Ms. Adams offered the
```

```
 1    position subject to background check, drug screening --

 2    and drug screening?

 3    A.   Yes.

 4    Q.   And so, in other words, the offer was there,

 5    accepted, and all she had to do was to pass those two

 6    items, correct?

 7    A.   In terms of the reading, yes.

 8    Q.   And to your knowledge, did Maura Demars send out the

 9    standard paperwork to Deborah Adams?

10    A.   Yes.

11    Q.   And this was the paperwork send out to all successful

12    applicants, correct?

13    A.   Each client has specific paperwork but yes, in this

14    case it was, Northeast Utilities specific.

15    Q.   And to your knowledge did Deborah sign everything?

16    A.   Yes.

17    Q.   And was Maura, did Maura Demars send out the contract

18    of employment to Deborah Adams to your knowledge?

19    A.   Yes.

20    Q.   Was she authorized to send out employment -- contract

21    of employment to --

22    A.   Yes.

23    Q.   And Ms. Adams duly accepted National's offer of

24    employment, didn't she?

25    A.   Yes.
```

1 Q. Now, the two contingents were the successful

2 completion of a criminal background check and a drug

3 screen, correct?

4 A. Yes.

5 Q. And are you aware that Lary O'Keefe communicated to

6 Deborah that NU wanted to interview her and, an interview

7 was set up and Deborah was extended the offer and the

8 contingent employment was made to her?

9 A. Yes.

10 Q. Now, who handled sending out to Verifications for

11 background check?

12 A. In terms of entering the information?

13 Q. Yes.

14 A. That's Maura.

15 Q. Now, at the time this was sent out, National was in

16 possession of Deborah Adams' -- was in charge of Deborah

17 Adams' resume, correct?

18 A. In charge of it?

19 Q. Well no, I'm sorry, was in possession?

20 A. Yes.

21 Q. And did you review the documents before they were

22 sent out to Verifications?

23 A. Yes.

24 Q. And did you see any problems in the documents before

25 they went out to Verifications?

1   A.   No, they were pretty --

2   Q.   Okay.  What is your purpose for reviewing the

3   documents before she would go out to Verifications?

4   A.   For the most part it's to let Kathy know if they have

5   been returned successfully on time, if we have them.

6   Q.   Isn't it true that you also check the documents to

7   make sure that everything is submitted properly?

8   A.   I don't check her submittal process, no, but if

9   there's places where there are signature missing or

10  something to that effect, yes.

11  Q.   So, do you at least do a cursory review of the

12  documents before, and the information before it's sent out

13  to Verifications?

14  A.   Yes.

15  Q.   Okay.  And isn't the standard protocol to have an

16  applicant sign a release form authorizing Verifications

17  and National Engineering to conduct a criminal background

18  check?

19  A.   Yes.

20  Q.   Because the criminal background check is in fact

21  being done in a joint fashion, between National and

22  Verifications, isn't it?

23  A.   I believe in that sense it's joint between National

24  and Comensura because we're contractually obligated by

25  them to do the background check.  I don't do anything in

1    conjunction with Verifications.

2    Q.   Okay, but you, you do submit information to

3    Verifications, don't you?

4    A.   Correct.

5    Q.   You have to submit the authorization form, correct?

6    A.   That, I don't get into that portion of things so I

7    couldn't answer that.

8    Q.   Okay.  But you are aware that an authorization form

9    does have to be signed?

10   A.   Yes.

11   Q.   All right.  And you would agree that National

12   Engineering is required to be accurate in its transmittal

13   of an order for background check, correct?

14   A.   I'm sorry, can you repeat?

15   Q.   That National Engineering has to be accurate in the

16   information that it submits to Verifications?

17   A.   Yes.

18   Q.   I'm going to hand you Exhibit 26.

19        (Hands witness.)

20        Mr. Sullivan, can you identify Plaintiff's

21   Exhibit 26?

22   A.   Yes, again it appears to be an email I sent to Kathy.

23   Q.   Okay, and when did you send it to Kathy?

24   A.   3:49 p. m.

25   Q.   And down below is an email that was forwarded to

1   Kathy as an attachment or a pasted below attachment that

2   you sent to Kathy Shapleigh?

3   A.   Yes.

4   Q.   Was that an email from Maura Demars to you?

5   A.   Correct.

6   Q.   And was that, that email also around that same time

7   that it was sent to you --

8   A.   Yes, oddly enough, a minute later.

9   Q.   Let me ask you this.  You do recall that Maura Demars

10  first sent you the email and then you sent it onto Kathy

11  Shapleigh, correct?

12  A.   Yes.

13  Q.   And so, to the extent that there appears to be a roll

14  back in time, that may be due to the fact that your

15  computers had different time settings?

16  A.   Yes, that I couldn't tell you.

17  Q.   Because then you would be really quick in forwarding

18  this, wouldn't you?

19  A.   Yes, I would be ahead of -- yes.

20  Q.   And my question to you is did you send it on

21  immediately to Kathy Shapleigh upon receiving the email

22  from Maura Demars?

23  A.   I did.

24  Q.   Okay, and did you take the opportunity to read

25  through carefully and analyze this background report

1    before you undertook to send it onto Kathy Shapleigh?

2    A.   I did not.

3    Q.   You did have a chance to look at the results, didn't

4    you?

5    A.   I saw -- the heading, the subject is usually what we

6    are looking for when we get those.

7    Q.   Okay.  And you, in fact, did see that there were some

8    convictions on her record, didn't you?

9    A.   Yes.

10   Q.   Yes.  Before you sent it onto Kathy Shapleigh?

11   A.   I'm sure I did.

12   Q.   And that's what you were referring to when you said

13   this is not good at all, isn't it, in your email

14   communication to Kathy Shapleigh at the top of the first

15   page of Exhibit 26?

16   A.   Yes.

17   Q.   You had looked at it, you had realized this is a

18   problem, and you understood this was not a good thing and

19   so you added that comment when you sent it onto Kathy

20   Shapleigh, didn't you?

21   A.   Correct.

22   Q.   Okay.  It was a pretty basic evaluation of the report

23   but it was an evaluation of the report that it was not a

24   good report, wasn't it?

25   A.   Correct.

1    Q.   You also had the comment this item explains why the

2    background has been dragging on, do you see that?

3    A.   I do.

4    Q.   Do you know, what are you referring to there?

5    A.   Deb had initially been offered the position, I

6    believe -- the exact time which I could not tell you -- it

7    had been a few days before.  Kathy generally likes to have

8    the background checks entered, completed in advance of the

9    start date which we were coming up on.  It was a Tuesday

10   afternoon, we only had a couple days left to go, she had

11   called me a couple times asking for an update and I felt

12   it had been a little slower than normal.

13   Q.   Now, at the time you sent this background report to

14   her, I believe you testified that you were in possession

15   of Deborah Adams' resume, weren't you?

16   A.   Yes.

17   Q.   And you recall, don't you, that Deborah Adams' resume

18   listed a number of prior positions that she had held?

19   A.   Yes.

20   Q.   In fact, they went back to 1998, didn't they?

21   A.   I believe so, yes.

22   Q.   Okay.  And, again, you were aware of the fact that

23   Deborah had signed an authorization form for, in order for

24   this background check to take place, correct?

25   A.   Yes.

1    Q.   And you also understood that on the authorization

2    form she put her name down, right?

3    A.   Yes.

4    Q.   She put her first name and she put her last name,

5    correct?

6    A.   Yes, she must have.

7    Q.   And she put her social security number?

8    A.   Yes.

9    Q.   And are you also aware that she listed places of

10   residence for the past seven years?

11   A.   I knew that was a requirement but I had not seen the

12   actual submitted form.

13   Q.   But you certainly assumed and you knew at that time

14   that that was part of the form, that it asked for seven

15   year residential history, correct?

16   A.   Yes.

17   Q.   Now, can you ascertain by looking at the exhibit in

18   front of you, Exhibit 26, the date that you received --

19   the time and the date that you received the background

20   check?

21   A.   Looks like it was requested on -- when it was

22   requested?

23   Q.   No, when you received it.

24   A.   It looks like that, May 8 at 3:50.

25   Q.   Okay, and then you were able to circumvent the time

1    face continuum and send it out a minute earlier?

2    A.    Yes.

3    Q.    Afterwards?  When did you first speak with Deborah

4    Adams with regard to this background report?

5    A.    I first spoke with her at about 6:20 p. m., yes.

6    Q.    So that was over two hours past the time that you

7    sent this onto the Guidant Group, correct?

8    A.    Correct.

9    Q.    And the Guidant Group was the representative and

10   agent of the employer for your purposes, correct?

11   A.    Yes.

12   Q.    Okay.  And can you, do you recall the conversation

13   with Deborah Adams at around 6:20 on --

14   A.    Yes.

15   Q.    And that was on May 8, correct?

16   A.    Yes.

17   Q.    Do you recall what transpired during that

18   conversation with Deborah Adams?

19   A.    She called me.  She was actually returning our call

20   from, at some point between 3:50 and 6:20 and wanted to

21   know what, you know, what we needed her for.  We let her,

22   I let her know that I had some paperwork from her and I

23   asked her if I were to do a background check what do you

24   think I might see.

25   Q.    Okay, and why did you ask it that way?

1   A.   Just for whatever reason, that's generally how I ask

2   it.   I like a person to disclose, it's just --

3   Q.   Okay, so in other words, you didn't say to Deborah

4   off the bat, look, we got a background check, there's a

5   felony conviction on it.   There's a problem.   You didn't

6   start off by saying that.   You asked questions in order to

7   sort of draw out of her potentially forthcoming confession

8   on her part that she had this felony in her record?

9   A.   Yes.

10  Q.   Okay.   And that was part of your, wouldn't it be fair

11  to say that's part of your investigation protocol?   In

12  other words, you were asking questions and you were

13  probing of Deborah in order to really get at the bottom of

14  this, weren't you?

15  A.   I don't know if it was that thought out.   It was

16  probably more of just the uncomfortability (sic) of,

17  shucks, she's got some felonies, so --

18  Q.   And that was a major concern?

19  A.   At that point it was going to be a problem.

20  Q.   And you knew, didn't you, that that would immediately

21  disqualify her for employment at Northeast Utilities,

22  didn't you?

23  A.   I didn't know it would automatically disqualify her.

24  I knew it would make it difficult, very difficult to get a

25  security badge.

1   Q.   And can you proceed with your description of what

2   transpired during the conversation with Deborah Adams; you

3   started asking her whether she might be aware of something

4   that might come up and what did she say?

5   A.   At first I think she was a little put off by the fact

6   that I was asking her and I believe she told me I was

7   being coy.

8   Q.   She what?

9   A.   I believe she called me coy at the time or I kind of

10  was holding back information, but she was forthcoming.

11  She immediately, you know, chapter and verse about what

12  had happened to her before.

13  Q.   Okay.  Isn't it true that she provided the chapter

14  and verse of what had happened before after you told her

15  about the nature of the background report and what was on

16  it?

17  A.   After she told me what was on it, she said I've run

18  into this before, and then she told me what had happened

19  before and I said, well, it looks like we have that again

20  and then she provided the document.

21  Q.   Okay.  And you emailed Kathy Shapleigh, didn't you?

22  A.   Yes.  While I was still on the phone with Deb.

23  Q.   You e-mailed her twice?

24  A.   Yes.

25

1    Q.    Okay.  I'd like to hand you first Plaintiff's

2    Exhibit 65.  Actually I'm going to stand you two exhibits,

3    65 and 66.  And before I go onto that, at the time that

4    this transpired, you were aware that -- you were aware

5    that Guidant had contractual -- that National Engineering

6    had contractual obligations to the Guidant Group, weren't

7    you?

8    A.    Correct.

9    Q.    And to the extent that you had -- and you were aware

10   that you personally were required to adhere to these

11   contractual obligations, weren't you?

12   A.    Yes.

13   Q.    Okay.  You had significant dealings with Guidant

14   Group, didn't you?

15   A.    I had, yes.

16   Q.    And you transacted business with Guidant Group?

17   A.    Yes.

18   Q.    And you knew there was a formal agreement between

19   National Engineering and Guidant that you needed to adhere

20   to, correct?

21   A.    Yes.

22   Q.    Have you ever in the course of your employment asked

23   for any legal direction from your employer in connection

24   with how to handle a situation and your employer said no,

25   we're not going to give you any legal counsel?  Did that

1   ever happen to you?

2   A.   No.

3   Q.   Okay.  To your knowledge if you had gone to

4   management and said, you know, I've got a situation here,

5   I'm not exactly sure what to do, I need just some

6   guidance, your employer would be forthcoming, wouldn't

7   they, and help you out with that?

8   A.   Yes.

9   Q.   Okay.  And, if necessary, they might even consult

10  with a lawyer to help you out, correct?

11  A.   Yes.

12  Q.   I mean they've never said to you, no, we're going to

13  keep you in the dark, we want you to take some risks; they

14  never said that to you?

15  A.   No.

16  Q.   Now, if you can read the email at 6:21, how long

17  after you started the conversation with Deborah Adams did

18  you send out that email?

19  A.   I was on the phone with her, I believe it was about

20  two minutes in, she started talking and telling me what

21  she had run into before.  It wasn't the usual, oh no, it

22  wasn't me.  It was right there.

23  Q.   Why did you feel it incumbent to notify Kathy

24  Shapleigh immediately?

25  A.   I felt that if it was going to be reversed or

1   challenged or disputed in any way, that it was my

2   obligation to tell her.

3   Q.   Did you have concerns that she might, that Deborah

4   might lose her job and you wanted to make sure that didn't

5   happen?

6   A.   Well, of course I don't want anybody to lose their

7   job.

8   Q.   Okay.  You didn't want Deborah to lose her job, did

9   you?

10  A.   No, not at all.

11  Q.   Okay.  And, in fact, would you have collected a fee

12  if Deborah Adams was had been employed?

13  A.   On the hourly basis, yes.

14  Q.   Yeah.  And I was unclear on that, maybe you can help

15  me on it.  Would Lary O'Keefe also have collected, would

16  he have gotten credit for the revenue generated by Deborah

17  Adams' placement at Northeast Utilities?

18  A.   Yes.

19  Q.   Both of you would have?

20  A.   Yes.  It's based on a percentage of a total, a larger

21  total, but yes.

22  Q.   Okay.  Would you have to split the percentage?

23  A.   It's different.  There was the recruiter percentage

24  and the sales person percentage.

25  Q.   Okay.  And then you sent another email at 6:25,

1    didn't you?

2    A.   Yes.

3    Q.   Okay.  That's Exhibit 66, correct?

4    A.   I'm sorry?

5    Q.   That's Exhibit 66?

6    A.   Yes.

7    Q.   That's the email that you sent at 6:25 to Kathy

8    Shapleigh?

9    A.   Yes.

10   Q.   All right, and in this email, you highlighted

11   something, didn't you?

12   A.   I did.

13   Q.   And what did you highlight?

14   A.   I highlighted three stars, I believe, notes, the

15   follow case is located under Debra Jean Adams with a

16   matching date of birth.

17   Q.   Okay, and your purpose in highlighting that was to

18   point out that there's a discrepancy here.  We have a, our

19   Deborah is D-E-B-O-R-A-H, no middle name, and this Debra

20   that we got the background report is D-E-B-R-A, Jean,

21   correct?

22   A.   Correct.

23   Q.   And that was a, that was a discrepancy that you

24   thought was worthwhile to present to Kathy Shapleigh?

25   A.   Yes.

1    Q.   Again, you didn't want Deborah to lose her job?

2    A.   No.

3    Q.   And so you were, in the course of conducting your

4    business with Guidant, you undertook to make a comment on

5    this background report to bring it to the attention of

6    Kathy Shapleigh, isn't that right?

7    A.   Yes.

8    Q.   And was Deborah, you testified Deborah was

9    forthcoming during this whole process?

10   A.   Absolutely.

11   Q.   She in fact, faxed copies of the previous issues

12   regarding Choice Point onto you, correct?

13   A.   Yes, I got it within that ten minute span,

14   absolutely.

15   Q.   Within this ten minute span?

16   A.   Maybe half hour, excuse me, but before 7:00 o'clock

17   and after 6:20 she had sent over the paperwork.

18   Q.   Did you get a sense she was concerned about possibly

19   losing her job as a result of that?

20   A.   Absolutely.

21   Q.   Okay.  You didn't tell her at that time that the

22   information had been communicated to Kathy Shapleigh and

23   Northeast Utilities, did you?

24   A.   I don't believe so, no.

25   Q.   And now, to your recollection did Maura Demars

1    communicate with Verifications the next day to alert them

2    to the fact that the background report, the erroneous

3    background report was being disputed?

4    A.    Yes.

5    Q.    And you in fact placed a call to Guidant the next

6    day, didn't you?

7    A.    Correct.

8    Q.    Kathy Shapleigh wasn't in the office that day, was

9    she?

10   A.    No, I don't think she was.

11   Q.    So, I believe her boss was Chris Walicki?

12   A.    John.

13   Q.    I'm sorry, John, John Walicki, and you spoke with

14   him?

15   A.    Yes.

16   Q.    And did he make some comment he had gone through a

17   similar issue before with another staffing partner and it

18   was, quote, quite an ordeal?

19   A.    Yes.

20   Q.    Okay.  And did he also tell you that, did John

21   Walicki tell you --

22             MR. McPHERSON:  Objection, Your Honor.

23             MR. MADSEN:  I think this is relevant and I

24   think that this is an operative fact in the case and --

25             THE COURT:  Whether it's an operative fact,

1    we're dealing with defendants here so the hearsay rule

2    doesn't apply, so let's just keep going.

3    BY MR. MADSEN:

4    Q.   What did -- did John Walicki make a statement to you

5    about the report having to be changed and corrected?

6    A.   He said he would have to go through a process and I

7    believe that's when he made a comment about it being an

8    ordeal they had gone through recently.

9    Q.   Okay.  And didn't he tell you that it would have to

10   be corrected if anything were to change regarding Deborah?

11   A.   Yes.

12   Q.   Okay.  And you interpret that to mean in order to

13   work at Northeast Utilities, she would have to get a

14   corrected background report if anything was going to

15   change?

16   A.   That's how I took it, yes.

17   Q.   And you understood that Northeast Utilities was a

18   utility that required a security badge, is that right?

19   A.   Yes.

20   Q.   And they didn't want any felons, convicted felons

21   working in their facility, did they?

22   A.   Correct.

23   Q.   You knew that, right?  And to your knowledge, did

24   Maura Demars communicate with Verifications who in turn

25   said that they would directly communicate with Ms. Adams?

1    A.    Yes.

2    Q.    Now, I want to fast forward to the 11th which, bear

3    in mind that you first got the erroneous background report

4    on the eighth, the eleventh was a Friday, did you become

5    aware that the report was corrected at that time?

6    A.    Yes.

7    Q.    Okay.  And did you become aware at that time that

8    Verifications had cleared Deborah of these criminal

9    convictions that were falsely attributed to her on the

10   first form?

11   A.    Yes.

12   Q.    By the way, wasn't this the first and only time

13   you've gone through this type of process?

14   A.    Yes.

15   Q.    Okay.  And you never received any training under the

16   Fair Credit Reporting Act?

17   A.    No.

18   Q.    Of you.  That's something your employer never gave

19   you prior to this incident?

20   A.    No.  To be honest, until this incident, I was not

21   really familiar with it at all.

22   Q.    Did you even know it existed?

23   A.    I may have but certainly not to any kind of depth.

24   Q.    Okay, and after Deborah was cleared, did you have a

25   conversation with, on the 11th, did you have a

1    conversation with Kathy Shapleigh?

2    A.   I believe so.

3    Q.   Okay.  And did you talk about the fact that the, that

4    it had been cleared?

5    A.   Yes.

6    Q.   Now, at some point in the process, you became aware,

7    didn't you, that the position was offered to someone else,

8    correct?

9    A.   It was either then at the 11th or on the 14th.  That

10   I'm not --

11   Q.   And you certainly learned shortly thereafter that NU

12   selected an intern for the position, didn't you?

13   A.   I actually did not learn that until a little while

14   after, well into --

15   Q.   But you did become aware that they did put an intern

16   in the position?

17   A.   Eventually, yes.

18   Q.   And the order was canceled --

19   A.   Yes.

20   Q.   -- because NU was doing a direct hire, is that right?

21   A.   I don't know the business at that point.  All I hear

22   was potentially just kind of a passing conversation where

23   I heard they expired an intern.

24   Q.   But you certainly knew that by the time the

25   background report -- after the background, the failed

1    background report came in, you understood that the hiring

2    manager decided to pursue a different alternative,

3    correct?

4    A.   It was a couple days after before I actually heard

5    that definitively.  I think we got the report on the

6    eighth.  I didn't hear that until about the 11th or even

7    later.

8    Q.   So you had heard perhaps by the 11th that the hiring

9    manager had, had decided, past tense, to pursue an

10   alternative, correct?

11   A.   And to be fair, I believe the actual term were we're

12   considering another applicant.  It wasn't an applicant I

13   knew, so --

14   Q.   All right.  So clearly, to your knowledge, had

15   Deborah Adams passed the criminal background check she

16   would have, in fact, started on May 14th?

17   A.   In my opinion, yes.

18   Q.   And you had have no information to suggest that

19   Deborah Adams would not have started her job on May 14th

20   had the criminal background check come back negative?

21   A.   No.

22   Q.   I'd like to turn your attention to Exhibit 67.

23   (Hands witness.)

24        Mr. Sullivan, do you recognize that document?

25   A.   Yes, it's the second report for Deborah Adams'

1    background.

2    Q.    And did you forward this onto Kathy Shapleigh?

3    A.    Yes.

4    Q.    When did you forward it onto her?

5    A.    It looks like I sent it to her on the 11th at 2:04.

6    Q.    Okay.

7            MR. MADSEN:  Excuse me, Your Honor.

8            (Pause)

9            MR. MADSEN:  I found it.

10   BY MR. MADSEN:

11   Q.   I would like to now turn your attention to

12   Exhibit 28.

13           MR. MADSEN:  Actually it's not an exhibit yet,

14   Your Honor.

15           THE COURT:  Yes, you're correct, it's not, so

16   you're offering 28.  Okay.

17           MR. MADSEN:  Your Honor, there's no objection to

18   this exhibit.

19           THE COURT:  Twenty-eight is admitted.

20           (Whereupon Plaintiff's Exhibit 28 was marked

21       full.)

22   BY MR. MADSEN:

23   Q.   Mr. Sullivan, I've handed you Plaintiff's Exhibit 28,

24   I would ask you if you could identify that document?

25   A.   Yes, it was an email notification I sent to Kathy

1    Shapleigh.

2    Q.   And you sent that to her on what date?

3    A.   Looks like I sent it to her on the 11th.

4    Q.   At what time?

5    A.   3:20.

6    Q.   Okay.  And did you in fact bold some things in the

7    report below?

8    A.   Yeah, I bolded, it looks like each instance where

9    Deborah Adams or some derivation of her name was

10   mentioned.

11   Q.   Okay.  And you state in the top of the document, I

12   bolded their search results and the name we entered,

13   right?

14   A.   Yes.

15   Q.   And what you bolded was -- well, you bolded the

16   subject line and it looks like her name was definitely

17   misspelled there?

18   A.   Yes, that was definitely, yes.

19   Q.   Okay.  Who would have misspelled that name to your

20   knowledge?

21   A.   If I had to guess, it looks like an email from Amy

22   Vikander to Maura, so it looks like she just typed that

23   in.

24   Q.   So Amy Vickander of Verifications misspelled her name

25   in that subject line?

1    A.    It looks like it, yes.

2    Q.    Did you bold Applicant Dispute?

3    A.    Yes -- well, actually I'm not sure if I bolded that.

4    It is bolded but I'm not sure that I did it.

5    Q.    Did you bold "Adams, comma, Deborah" at the bottom of

6    the first page?

7    A.    Yes.

8    Q.    And did you bold on the second page, Debra Jean

9    Adams?

10   A.    Yes.

11   Q.    What was your purpose in bolding those?

12   A.    That was after I had sent the updated report.  At

13   that point it had almost become -- I was new to how this

14   was going to be an adverse result if it wasn't the same

15   person, and I believe it was actually a conversation I had

16   with Kathy and I said it looks like this may be what it

17   was.

18   Q.    Okay.

19   A.    Does that make --

20   Q.    Yes, so you looked at the report and you saw that

21   there was a discrepancy between the order that you entered

22   and the order that was processed by Verifications,

23   correct?

24   A.    Yes.

25   Q.    All right, and you intended to highlight that

1  discrepancy to Kathy Shapleigh to explain how this could

2  have happened?

3  A.   Yes, because at that point I was curious.

4  Q.   At that point --

5  A.   At that point after all this and I had talked to Deb,

6  I was curious how this was transpiring.

7  Q.   But you looked at it and saw these discrepancies,

8  didn't you?

9  A.   Yes.

10 Q.   And you --

11 A.   After.

12 Q.   And you forwarded it onto Kathy Shapleigh?

13 A.   Yes.

14 Q.   So clearly one of your reasons, I guess, is you

15 inputted the right name, correct?

16 A.   I didn't input.  I felt like the information that had

17 been inputted based on this was accurate to Maura.

18 Q.   Okay.  So you highlighted for Kathy Shapleigh --

19 after the bad background report had been forwarded to

20 Guidant Group and Northeast Utilities, you highlighted to

21 her discrepancies that you personally observed between the

22 border and the result?

23 A.   After the fact, yes.

24         MR. MADSEN:  No further questions.

25         THE COURT:  All right.  Well, we'll stop here

1    and come back at 1:45.

2            (Whereupon the luncheon recess was taken at 1:00

3    o'clock, p. m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25