```
 1                A F T E R N O O N    S E S S I O N.

 2                  (1:55 O'CLOCK P. M.)

 3            THE COURT:  All right.  I think where we got off

 4     the rails here and I think we might as well try to get

 5     back on the rails and not create an issue we'll have to

 6     deal with, there is no Count 14 in the complaint at all

 7     and it got in because of the -- grab seats and sit down --

 8     because of the papers that were filed by the plaintiff in

 9     a supplemental opposition to the motion for summary

10     judgment.  And I've looked through that very carefully.

11     And looked at the statutory background on this thing.  I

12     think I'm going to reverse Judge Hall's decision in her

13     summary judgment ruling to allow a Count.  All she was

14     really doing and all she ruled was that NESC took adverse

15     action.  That is true, it did take adverse action in a

16     sense, but not in the sense that I think the statute

17     intended, because when you look at the statute, the

18     adverse action that was taken here was by Northeast

19     Utilities and they were the employer.  Even though NESC

20     was the employer, NESC didn't take any adverse action to

21     the plaintiff other than to forward the report to the

22     employer, the person who was going to employ her and pay

23     her, even though she was still particularly an employee of

24     NESC.

25                  So I think what we've got here is a statute that
```

1    really didn't mean to get at this thing, and at no point

2    can I find that the plaintiff or Judge Hall referred to

3    NESC as a user when she took this action.  There's no

4    claim that NESC was a user in the papers filed by the

5    plaintiff and there's no ruling by Judge Hall -- in fact,

6    the ruling by Judge Hall is quite firm that it's not a

7    user, it's a consumer reporting agency.

8            So it seems to me that Count 14 ought to be --

9    just it's not in the complaint and I don't think we ought

10   to pay any attention to the fact that it's in her ruling.

11   And I invite the plaintiff to think of that seriously

12   because if I were to do what the NESC wants me to do on

13   this, they would have me reverse the decisions and decide

14   that they were a user to operate under the B 33 -- BB 3

15   section and I don't believe that that's at all what BB 3

16   was intending to get at.  BB 3 is really directed at

17   Northeast's action in deciding they were going to hire

18   somebody else and that's what the adverse action really

19   is, that this type of statute is really getting at and I

20   think we ought to consider that very carefully.

21           So, I invite the plaintiff to give that some

22   thought before we reply to defendant's request that Count

23   14 be stricken.  I'm very much inclined to grant that

24   request that it be stricken.  I think it just raises a

25   balloon that has to be shot down because it's not a

1    relevant balloon.

2         All right, are we ready for the jury?

3         MR. KUPINSE:  Yes, Your Honor.  I think

4    Mr. Madsen would like on put on his expert at this point.

5         THE COURT:  Oh, you have another witness, that's

6    right.

7         MR. MADSEN:  That's right, Your Honor.  We have

8    an expert who just flew in and we would like to put him on

9    the stand and complete him today and then we would resume

10   with the examination of Mr. Sullivan.

11        THE COURT:  Now, is that all right with

12   Mr. Sullivan?  He's got to be considered too, you know, he

13   has rights.  If he doesn't want to be interrupted I'm not

14   to give the expert a priority just because he's an

15   expert.

16        MR. KUPINSE:  We have no objection, Your Honor.

17        THE COURT:  Sullivan will stick around, huh?

18   He may enjoy watching the trial.

19        MR. SULLIVAN:  Absolutely.

20        THE COURT:  Okay.  Let's bring the jury in,

21   let's put if the witness on the stand.

22        (Whereupon the jury entered the courtroom at

23   2:00 o'clock p. m.)

24        THE COURT:  Okay, good afternoon.  Before I call

25   called you in, I should communicate with Debbie, Debbie

```
 1    wrote me a neither saying she's communicated with you but

 2    she didn't tell me what the result is.  Let me find out

 3    what the result was.

 4            (Pause)

 5            THE COURT:  Okay, so are we correct that you

 6    want to stay until 5:30 tomorrow and Friday but not today?

 7    For lunch 30 minutes if you can do it.  We don't mind.

 8            A JUROR:  And also would like to start 8:30 on

 9    Friday.  We would like to start at 8:30 on Friday.

10            THE COURT:  8:30 in the morning.  I can't do

11    that tomorrow morning because --

12            A JUROR:  On Friday.

13            THE COURT:  -- I have to meet with the attorneys

14    tomorrow morning.  On Friday we'll start at 8:30 and we'll

15    go to 5:30 tomorrow and 5:30 on Friday.  And we'll try to

16    keep everything moving along for you.  I agree with you we

17    all want to do that.  so, I've told the attorneys anyway

18    to come back quickly on lunch.  They can even bring their

19    lunch into the courtroom if they want to and don't go out

20    so we can do the 30 minutes.  And we'll resume after 30

21    minutes or when all ten of you are back, whichever occurs

22    last.  All right.

23            THE CLERK:  Would you please raise your right

24    hand?

25
```

1    E V A N   H E N D R I C K S,   called as a witness on

2    behalf of the Plaintiff, having been duly sworn by the

3    Clerk, testified as follows:

4         THE CLERK:  Please be seated, please state your

5    name, spell your last name and your city and state?

6         THE WITNESS:  My name is Evan Hendricks, last

7    name is spelled H-E-N-D-R-I-C-K-S, and I live in Cabbage

8    on Maryland.

9         THE COURT:  Okay.  Now the examination, ladies

10   and gentlemen, up until now has been conducted by Attorney

11   Madsen.  Attorney Todd Steigman is now going to take this

12   witness so he's examining the witness.

13   DIRECT EXAMINATION

14   BY MR. STEIGMAN:

15   Q.   Good afternoon, Mr. Hendricks.

16   A.   Good afternoon.

17   Q.   Can you please just give us some information about

18   your professional background?

19   A.   Yes.  I am a specialty publisher, and that means that

20   I publish a newsletter that's called Privacy Times.  I've

21   just finished my 29th year, started in 1991 and it's a

22   newsletter that focuses on the specialized area of

23   information and privacy law and this includes Fair Credit

24   Reporting Act which was the first information privacy law

25   enacted by Congress in 1970.  The newsletter covers

1    Congressional actions, court opinions, industry news,

2    consumer news, things that relate to how these laws work

3    and to the general issue of the collection use disclosure,

4    maintenance and sale of personal information which

5    includes consumer reports.  And through this I've

6    accumulated a specialized body of knowledge on this area.

7    Q.   In addition to editing and publishing Privacy Times

8    for the last couple decades, did you do any other

9    professional work involving the Fair Credit Reporting Act?

10   A.   Yes, I'm author of the book Credit Scores and Credit

11   Reports, How the System Really Works, What You Can Do.

12   It's in its third edition.  The first edition came out in

13   2004.  I also regularly serve as expert witness and in

14   cases under the Fair Credit Reporting Act that cover such

15   issues as credit reports, identity theft, mixed files,

16   inaccuracy, employment background check and other topics

17   covered by the Fair Credit Reporting Act.

18   Q.   Mr. Hendricks, have you provided congressional

19   testimony on topics related to the Fair Credit Reporting

20   Act?

21   A.   Yes, I regularly testify before Congress, usually on

22   subjects relating to either consumer reporting and OR

23   financial information, how it's used, sold, whether it's

24   being protected adequately.  And most notably, in 2008 I

25   testified in a hearing about credit scoring, which is the

1    topic of my book, 2007, same thing.  Most notably in 2003,

2    Congress had devoted the entire year to amending the Fair

3    Credit Reporting Act and I testified twice that year, both

4    in front of the Senate Banking Committee on their hearing

5    which is entitled the Accuracy of Critical Reporting, and

6    in the house banking committees hearing which was the role

7    of the FCRA, which stands for Fair Credit Reporting Act.

8    Q.   In addition to your work as a expert witness, do you

9    provide other services as a consultant in relation to Fair

10   Credit Reporting Act topics?

11   A.   Yes.  By virtue of following the writing and

12   publishing on that issue week in and week out for a couple

13   decades, you get to be a subject matter expert and so I've

14   been retained, for example, by the social security

15   administration for six years.  From 1998 to 2004, I was

16   one of three privacy experts put on a panel to advise them

17   on privacy issues relating to how they should operate

18   their electronic services in a way that would still be

19   privacy friendly and comply with another law called the

20   Privacy Act.

21       I've also done contract work for the U S Postal

22   Service.  I've been, I was one of the big three credit

23   bureaus.  The traditional credit bureaus is called

24   Experion (ph) and I served on their consumer advisory

25   council for two years from 2002 to 2004.

1    Q.   And can you tell me what responsibilities were

2    performed by that counsel?

3    A.   Experion recreated that council around that very

4    important year, 2003, when Congress was set to amend the

5    Fair Credit Reporting Act, so they wanted to get all the

6    views of experts and outsiders come in and they would have

7    meetings twice a year, they'd have an agenda and go over

8    different topics related to both credit reporting and

9    consumer reporting and also to marketing issues, because

10   half of their business is not consumer reporting but it's

11   about marketing.

12   Q.   Now, in this case you've been retained as an expert

13   witness by the plaintiff, correct?

14   A.   Yes.

15   Q.   Has there ever been a time in a previous case where

16   you were retained as an expert witness by a party other

17   than the plaintiff?

18   A.   Yes.

19   Q.   Can you tell us a little bit about that circumstance?

20   A.   Well, one case, there was, it was an employment

21   background case, and the subcontractor for the employment

22   background company was out on the west coast and it was a

23   couple years ago, it was a famous case, the subcontractor

24   retained me as an expert to basically opine that the

25   procedures they followed were reasonable in compiling the

1    employment background check in that case.  And I've also

2    done, been retained for defendants who are mortgage

3    companies.

4    Q.   Mr. Hendricks, what were you asked to do in this

5    particular case?

6    A.   In this case I was asked to review all the evidence

7    in the case that was available, to write an expert report,

8    and to opine on the both practices and procedures of the

9    defendants in this case and whether they met the standard

10   of care, and also on the plaintiff's damages.

11   Q.   Okay.  And can you identify some of the material upon

12   which you relied in forming your opinions in this case?

13   A.   I reviewed probably much of the evidence as you've

14   been looking at in opening this trial, some of the

15   correspondence, some of the internal documents, of course

16   the background employment checks that were pulled on the

17   plaintiff; in addition, deposition testimony from

18   different parties in the case.

19   Q.   Mr. Hendricks, before we get to the particular

20   actions taken by the parties in this case, can you provide

21   us with some background knowledge about the Fair Credit

22   Reporting Act and identify some of the problems that

23   Congress was trying to address in the 1999 statute?

24            THE COURT:  Let me stop it here.

25   A.   Yes --

```
 1              THE COURT:  Any voir dire by either defendant?

 2              MR. COFFEY:  I'd like to place an objection as

 3    to that.  I don't know if the witness is going to --

 4    sorry.

 5              THE COURT:  Yes, grab the mic.  Good idea.

 6              MR. COFFEY:  I'm sorry.  I'd like to voir dire a

 7    little, if I may, Your Honor, but I'd also place an

 8    objection because I don't know if he's being asked about

 9    the credit and the FCRA which is background

10    investigations, so I mean I think he's being offered for

11    background investigations and not credit context.

12              THE COURT:  Why don't you ask him the questions

13    you want to ask and then I'll rule on his qualifications.

14              MR. COFFEY:  Okay.

15    VOIR DIRE EXAMINATION

16    BY MR. COFFEY:

17    Q.   Good afternoon.

18    A.   Good afternoon.

19    Q.   Being paid for your time here?

20    A.   Yes.

21    Q.   How much?

22    A.   $250 an hour.

23    Q.   Okay.  And you were paid for the preparation of your

24    report?

25    A.   Yes.
```

1    Q.    How much?

2    A.    $250 an hour, probably in the area of 20 hours, so

3    estimate around 5,000-dollars.

4              THE COURT:  Okay, now these are questions that

5    would be proper for cross but not for qualification.

6              MR. COFFEY:  Okay, I'll just move to that.

7    BY MR. COFFEY:

8    Q.    You said you testified 33 times -- well, withdrawn.

9          Your curriculum vitae, that's your website Privacy

10   times.com, says you've testified 33 times; would that be

11   fair to say?

12   A.    That includes deposition testimony, yes.

13   Q.    Okay.  Have you ever been qualified as an expert in

14   regards to background investigations in federal court?

15   A.    No, this is the first case that's gone to trial

16   involving background employment checks, yes.

17   Q.    Okay.  What experience if any do you have in

18   conducting -- withdrawn.

19         Have you ever worked in employment in the background

20   investigation industry?

21   A.    No.

22   Q.    Okay.  Have you ever conducted personally any

23   background checks or investigations?

24   A.    No.

25   Q.    Have you ever searched any records, criminal records

```
1    at a county, at a county facility or county court site in
2    regards to any of the matters you've handled personally?
3    A.   Yes, I've searched court records, including criminal
4    court records, yes.
5    Q.   How many times?
6    A.   I -- over the 30 years, I would say maybe a dozen
7    times.
8    Q.   And what if any experience do you have in handling
9    background investigations?
10   A.   I don't conduct background investigations.  My
11   experience is in observing the process, how consumer
12   reports are compiled and the Fair Credit Reporting Act
13   defines consumer reports very broadly so that includes
14   credit reports and employment background reports.  They
15   are all consumer reports under the FCRA.
16   Q.   But specifically with background reports and
17   investigations, you have no experience?
18   A.   No, I have experience.  I've been retained in
19   background employment cases.  Just none of them have gone
20   to trial, they all settled before trial.
21   Q.   But other than, other than being retained as a paid
22   expert, what experience, if any, do you have in that
23   field?  You just said you've never been employed in the
24   field.  You've done in 30 years less than 12 dozen
25   criminal searches, which would mean do you one every two
```

1    and-a-half years approximately.  So what experience do you

2    have vis-a-vis the background searches that are part of

3    this case specifically with criminal, not civil, or credit

4    matters?

5    A.   Well, over the years of both publishing my newsletter

6    and participating or in observing congressional hearings

7    and things like that, I've seen and observed many cases

8    involving consumer background employment checks, how they

9    are compiled.  I was there for the first six years when

10   Congress worked to amend the Fair Credit Reporting Act

11   leading up to 1996 amendments, and there were discussion

12   of background employment issues there and testimony about

13   the issues and about the importance of accuracy.

14       And the same thing happened in the time leading up to

15   the 2003 amendments.  I've covered stories about

16   background employment reports that have turned out to be

17   inaccurate and how people were affected by it.  I was

18   interviewed just a few months ago on CNN by Jerry Willis,

19   a story she had about a case about background employment,

20   turning out to be inaccurate and somebody losing a job

21   offer because of it.

22       So it's something that, because it's interwoven with

23   the issue of consumer reports, it's something that I've

24   seen regularly over the years since I started doing this

25   in the Fall of 1977.

1   Q.   None of the recent testimony before Congress in the

2   FTC though says that you testified on any background

3   investigation issues based on the curriculum vitae that

4   shows on your website, is that fair to say?

5   A.   Right.  Subject to those hearings was more credit

6   oriented, yes.

7   Q.   And also none of the books you've written have had

8   anything to do with the background investigation process

9   with regards to criminal searches, isn't that correct?

10   A.   Well, I don't think you can say it has nothing to do

11   with it because I started by explaining that the Fair

12   Credit Reporting Act describes consumer report as any

13   communication that affects someone's reputation, credit

14   standing, or standing in the community as subject for use,

15   someone can use for employment, for insurance or for

16   credit.  So Congress did this because they wanted to make

17   sure that we as individuals don't have direct

18   relationships with these consumer reporting agencies,

19   whether it's the big three credit bureaus or background

20   check, so they wanted to make sure that anything that was

21   used from a third party to make a decision about you was

22   something that would be covered by this law.

23   Q.   Okay.  It's also fair to say that none of the

24   presentations, CLE seminars or international lectures that

25   are mentioned in your curriculum vitae or in

1    PrivacyTimes.com have to do with background investigations

2    in the criminal area, is that correct?

3    A.   Yes, that is correct.

4    Q.   And on the professional societies that you're a

5    member of, the National Credit Reporting Association and

6    the Access Pro dot org, they are primarily for credit

7    reporting agencies in the civil area, isn't that correct?

8    A.   The -- yes, certainly.  The National Credit Reporting

9    Association concerns more of the mortgage reports but the

10   American side of the access professionals is concerned

11   more with federal agency records covered by the Privacy

12   Act and Freedom of Information Act.

13   Q.   Well, the recordss we're talking about in this matter

14   are in state criminal court records, isn't that correct?

15   A.   Yes, and I've covered, was one of the first ones to

16   cover research done by the Office of Technology Assessment

17   which is a research arm of Congress, back in 1981, which

18   showed that there was a high degree of inaccuracy through

19   criminal records, in part because they weren't

20   standardized.

21       I wrote extensively that the FBI had a system called

22   a national crime information center which is the pointer

23   system they use to point to state criminal records.  Back

24   in those days there was a system called the Triple I

25   index.  So, again, this is a subcomponent of a larger

1    issue of personal records and I've covered all of them

2    through these years and intimately been involved with

3    them.

4    Q.   Well, covering them as a journalist, does that make

5    you an expert?

6    A.   After a certain amount of time goes by, to the extent

7    that I've covered them, because I'm not covering them for

8    the metro page, my readers are the government officials,

9    law professors, law firms, the people that work in the

10   field, so my audience is also the specialists and they

11   rely on my covering it to bring them specialized

12   knowledge, yes.

13   Q.   Do you have any formal education or certification in

14   criminal background investigations?

15   A.   No.

16   Q.   Okay.  Are you a member of the National Association

17   of -- the NAPBS?

18   A.   No.

19   Q.   You're familiar with that organization?

20   A.   Yes, I've met with them and discussed these issues

21   extensively, yes.

22   Q.   Okay, and you're not a member of them as well?

23   A.   No.

24        MR. COFFEY:  I just place my objection, Your

25   Honor.  Thank you.

```
1              THE COURT:  All right.  This is a good place and
2     time for me to acquaint you with the rule on expert
3     witnesses.  Generally speaking, as you've seen, from what
4     you've observed so far of the witnesses who have taken the
5     stand, a trial comes in like a John Grishon novel or Tom
6     Clancy novel in that you may have a cast of characters in
7     the first chapter and entirely different cast of
8     characters in the second chapter.  You get back to the
9     first characters when you get to about chapter five, but
10    then eventually the book, it finally pulls it all
11    together.  That's exactly the way a trial comes in,
12    because basically witnesses can get on the stand and they
13    must be fact witnesses and they must testify to what they
14    participate in or what they observe and that's all they
15    are allowed to testify about.  That means that a
16    particular witness taking the stand may not have the full
17    story or everything that you're going to hear in the case.
18    He or she may not know more than a certain segment of it
19    and that's the way our trials are conducted.
20             Now, we do have one exception to the rule that
21    witnesses can only testify as to facts in their knowledge
22    and that is the so-called expert witness.  A lot of the
23    judges, we had movement among the judges for a number of
24    years to drop the word "expert" and just say person
25    qualified to give opinions rather than to try to mesmerize
```

1   you with the term expert.  In any event, it boils down to

2   that, a person qualified to give opinions.

3           Now, there are several aspects that you have to

4   consider as you weigh the testimony of a person so offered

5   by one of the parties and you'll hear several of them in

6   this case.

7           You have to decide in the first instance after I

8   make the preliminary decision as to whether or not to

9   allow the witness to testify, my decision to allow a

10  witness to testify does not impinge upon your ability and

11  indeed your duty, to take that witness and do whatever you

12  feel is appropriate with that witness as to

13  qualifications.  Does the witness have the qualifications

14  necessary in your mind to give the opinions that the

15  witness is going to give to you?  Do you need the expert

16  testimony, do you need the opinions, or are you capable of

17  deciding the situation yourself and determining the facts

18  without any special knowledge?  You may feel it's an area

19  where special knowledge such as medicine or law is not

20  required and you don't need that help.  So it's up to you

21  to decide what you're going to do with the opinions given

22  by the witness.

23          You can accept them, you can reject them, you

24  can accept them in part, reject them in part.  You can

25  give different weight.  You judge them exactly the same

1   way you judge fact witnesses, by those same tests of

2   judging credibility.

3          So that's how you handle expert testimony.  And

4   I invite you to do that here.  You decide for yourself

5   what his qualifications are, whether they are adequate for

6   him to give the opinions he's giving and whether you need

7   that kind of help.

8          Having said that, I will allow him to testify

9   and leave it up to the jury to decide what weight they'll

10  give his testimony.  All right.

11         MR. STEIGMAN:  Thank you, Your Honor.  The

12  plaintiff offers Mr. Hendricks as an expert witness.

13         THE COURT:  All right, I'll find him qualified

14  to give opinions.  I'll leave to the jury the weight and

15  so on.

16  BY MR. STEIGMAN:

17  Q.   Mr. Hendricks, does the Fair Credit Reporting Act

18  impose requirements on consumer reporting agencies to

19  insure that criminal background checks that they prepare

20  are accurate?

21  A.   Yes.

22  Q.   Can you identify some particulars about the

23  requirements that are imposed on consumer reporting

24  agencies who prepare criminal background checks for

25  employment purposes?

```
1    A.   There's a couple very important requirements.  One is
2    that consumer reporting agencies must follow reasonable
3    procedures to assure maximum possible accuracy.
4    Q.   And the phrase maximum possible accuracy, is that a
5    phrase that's mentioned specifically in the statute
6    itself?
7    A.   Yes, that is a quote from the statute.  They must
8    follow reasonable procedures for maximum possible
9    accuracy, because we know we're dealing with systems that
10   have records on millions of people and there's never going
11   to be perfection but there's no question that accuracy is
12   the paramount goal and anyone who enjoys the benefits of
13   selling these consumer reports has a duty to have in place
14   reasonable procedures to get the maximum possible
15   accuracy.
16   Q.   Mr. Hendricks, who is Congress trying to protect in
17   enacting the requirement that consumer reporting agencies
18   follow reasonable procedures for maximum possible
19   accuracy?
20   A.   The Americans, basically, consumers.  This is well
21   known as a consumer protection statute.  The law says that
22   our system, if the information is inaccurate, then people
23   can end up losing a job or they can lose a loan based on
24   an inaccurate consumer report.
25        So it's not only -- first they try to protect
```

```
1    consumers but it also recognizes it's bad for our economic
2    system.  We want people who are qualified to get the jobs
3    they are qualified for.  We don't want inaccurate
4    information getting in the way of that.
5    Q.   And are job applicants who are the subject of
6    criminal background checks during the hiring process
7    considered consumers under the Fair Credit Reporting Act?
8    A.   Yes.
9    Q.   Were there any types of consumer reports that
10   Congress was especially concerned about, such as those
11   dealing with criminal records or for employment purposes?
12   A.   Right.  The act specifically recognizes that when
13   records, when a consumer report is going to include public
14   records which includes court records that are likely to
15   have, lead to an adverse determination of a job applicant,
16   then the act says they must, consumer reporting must not
17   only only follow reasonable procedures for maximum
18   possible accuracy, they must follow strict procedures for
19   maximum possible accuracy.  It recognizes that there's a
20   higher standard of care, or they must give notice at the
21   time that they are going to pass on the report, to the
22   subject of the report.  And the reason they did this is
23   that Congress actually understood that there was this key
24   moment there, that if an employer was looking to hire
25   somebody and they get a report that says they have a
```

1     criminal background, it's going to in most cases lead to

2     just automatic rejection of that applicant.  So they

3     wanted to make sure before that key moment happens, either

4     those strict procedures are followed to make sure that

5     information is correct, or that they notify the individual

6     so the individual knows, realizes, oh, there's bad

7     information in this report, it's inaccurate.  Then they

8     can tell the employer immediately and mitigate the problem

9     to make sure they are not rejected based on false

10    information or being associated with somebody else.

11    Q.   And just to make sure that myself and the members of

12    the jury have it clear, the section requiring reasonable

13    procedures for maximum possible accuracy, that applies to

14    all consumers reports prepared by consumer reporting

15    agencies?

16    A.   Yes.

17    Q.   And then in addition to that, there's another section

18    that imposes requirements on consumer reports that are

19    likely to have an adverse effect on somebody's ability to

20    get a job based on public record information, right?

21    A.   Correct.  It's a higher and more specific standard of

22    care because it's common sense that I, meaning first

23    person, the first thing a person needs is a job and the

24    last thing we need is inaccurate information stopping them

25    from getting the job they deserve.

1    Q.   And so the second category of reports, the ones that

2    are likely to have an adverse effect on somebody's ability

3    to get a job based on public record information, what are

4    the requirements imposed that are imposed on consumer

5    reporting agencies in those circumstances?

6    A.   You need to follow the strict procedures or to

7    provide notice to the consumer at the time, the job

8    applicant at the time that they are sending it to the

9    employer.

10   Q.   And would a background report provided to an employer

11   indicating that a potential job applicant had previous

12   conviction for welfare fraud be an example of such a

13   report that would require strict procedures to be

14   followed?

15   A.   Yes.

16   Q.   So in that situation, what would be required under

17   the section of the statute imposing requirements for

18   strict procedures?  What would the consumer reporting

19   agency have to do in order to comply with that section?

20   A.   There would be a couple things that you generally

21   have to do.  One thing you want to make sure it's up to

22   date.  Sometimes in criminal records, you don't have the

23   standardization because there are, different courts have

24   different ways of formatting their records or keeping them

25   or storing them.  So you want to make sure of the latest

1    news.  So one could get arrested for something and might

2    have have been acquitted so you don't want to say they had

3    a conviction when they never had one.

4         More importantly, you want to make sure you have the

5    right individual.  You want to associate the record with

6    the right individual.  Because one of the reasons

7    counsel's asking why do we have a Fair Credit Reporting

8    Act, well, very early on, nearly 20 years ago, the Federal

9    Trade Commission and the State Attorney Generals got a lot

10   of complaints about inaccurate consumer reports and the

11   leading cause of inaccuracy was a mixed file, was

12   information on one person being mixed to another person,

13   so one person was tagged with someone else's data.

14        And they actually, this involved the big three credit

15   bureaus at the time, TRW, Equifax (ph) and Transunion, and

16   they got them all consent agreements where they pledge to

17   do a better job to avoid this problem of mixed filings.

18   But it was identified early on as the first systematic

19   cause of inaccuracy in these consumer reports.

20   Q.   Okay.  With respect to this particular case,

21   Mr. Hendricks, is it your understanding that Verifications

22   is a consumer reporting agency?

23   A.   Yes.

24   Q.   And is it your understanding that Verifications Inc.

25   in this case was required to follow the requirements of

1    the Fair Credit Reporting Act when they were asked to

2    prepare a report about Ms. Adams?

3    A.    Yes.

4    Q.    And have you formed any opinions as to whether

5    Verifications Inc. followed the requirements of the Fair

6    Credit Reporting Act to use reasonable procedures to

7    assure maximum possible accuracy?

8    A.    Yes.

9    Q.    Okay.  And what is your opinion with respect to that

10   question?

11   A.    Well, my opinion is that, that they didn't, they

12   didn't follow reasonable procedures.  They -- in fact,

13   their procedures were so loose that I thought that they

14   were reckless, that they -- to sell a report like this on

15   an individual, a job applicant, based on the information

16   that they had, because there were major discrepancies in

17   that record, you had a woman with a different spelling of

18   the first name in a different state that plaintiff had

19   never lived in, and most importantly, you have to use a

20   social security number as a tool for accuracy.  You know,

21   when I worked with the Social Security Administration as a

22   consultant, we went on the premise that the vast majority

23   of Americans, everybody is supposed to have one social

24   security number.  It's the closest thing we have to an

25   unique identifier and so to sell a record showing someone

1   who has a criminal background without first checking to

2   see if the person with the criminal background has the

3   same social security number as your job applicant is

4   reckless.  It's -- so it's the opposite of reasonable

5   procedure.

6   Q.   So, at the time that Verifications had knowledge of

7   the discrepancies between the plaintiff in this case and

8   the individual who had the criminal record history in the

9   state of Virginia, what should Verifications have done at

10  that point before sending the erroneous background check

11  along to staffing agency?

12  A.   Right.  They could have done any of one or two, maybe

13  three things to avoid this problem so none of us would

14  have to be here today.  One, they could have sent, they

15  could have closely examined the court record of the person

16  who had the criminal background and seen that that person

17  had a different social security number and realized that

18  they had two different people so they could have carefully

19  considered the document that led them astray.

20       But there's always been a history of public records

21  being subject to misinterpretation.  There's a whole

22  background history on that.  They seemed to be unaware of

23  that, they failed to take that.  And second of all, there

24  are other services they could have used at the time which

25  ultimately they did use after the fact, after damage was

1     done.

2          One is called the Accurate Service (ph) where they

3     could have quickly in a matter of a minute or two for very

4     low cost confirmed that these two individuals had two

5     different social security numbers.

6          So there's a couple ways, but the problem is, what's

7     unreasonable about their procedure is that they are

8     willing to allow this record to be sold with these kinds

9     of discrepancies without checking something so obvious as

10    the social security number.

11    Q.   And based on the materials that you examined, was

12    there any evidence that Verifications made any effort to

13    verify whether the person with the criminal record in

14    Virginia had a different social security number than

15    Ms. Adams, the plaintiff in this case?

16    A.   No.  The whole idea seemed to escape them completely,

17    which I find extremely unreasonable, but when you realize

18    that so much of what they do is based on speed and volume,

19    and they do it in such a hurried way, that ends up being

20    reckless and that's what happened here.

21    Q.   In addition to using the service like the Accurate

22    database, could Verifications have figured out that the

23    individual in Virginia with the criminal record had had a

24    different social security number than Ms. Adams through

25    other reasonable means?

1    A.    Right.  My understanding was that social security

2    number, my recollection was that social security number of

3    the person who had an actual criminal record was on that

4    court record.  So you just had to read it carefully enough

5    and if you're in this business, that should be the first

6    thing you look for.  But not only did they not look at it,

7    it seems like they didn't even consider looking for it.

8    Q.    And would Verifications Inc. have been able to

9    determine the social security number of the individual

10   with the criminal record in Virginia by simply calling or

11   making a direct inquiry to the court's office that housed

12   that criminal record in Virginia?

13   A.    That would be a third way they could have done it,

14   just direct contact.  And sometimes -- well, being a

15   journalist, you think that gives you any expertise, well,

16   a journalist, if you're going to publish something about

17   somebody, you have to show them what you're going to

18   publish first and get their response and so you have to

19   track people down and pick up the phone or you have to

20   check the relevant records or you have to consider them

21   carefully.

22         So I think those principles would have worked very

23   well for the defendants in this case but they are not

24   familiar with them.

25   Q.    Mr. Hendricks, what are some of the factors that one

1    would consider under the Fair Credit Reporting Act?

2         THE COURT:  You want to pull that mic closer?

3    That would help.

4    BY MR. STEIGMAN:

5    Q.   What are some of the factors that one would consider

6    in assessing whether certain procedure followed by a

7    consumer reporting agency was reasonable?  Would they

8    consider such factors as the time that it would take to

9    take the extra step or the cost that would be involved in

10   taking the extra step to assure maximum possible accuracy?

11   A.   That's a good question.  I think there's a couple

12   things you want to take in, you want to balance what is

13   the burden of getting it right, in this case reading the

14   record that you're relying on to make a decision.  So I

15   don't think that's very burdensome, or using another

16   service like Accurate to doublecheck, which is something

17   you do electronically.  It only takes a minute.  Or pick

18   up the phone or contact the court.  And they already had

19   an agent that went to check the court records.  All you

20   had to do was instruct them to make sure you look for the

21   social security number.  I don't think anying's a

22   burden -- you weigh the burden of that against what's the

23   harm to the individual, well, the harm to the individual,

24   someone losing a job that they are qualified for, puts a

25   duty for them to at least take those actions.

1          I think there's another thing in terms of trying to

2     decide what's reasonable, like is this something that just

3     comes out of nowhere?  No.  This was a foreseeable problem

4     because that's why I mentioned that whole problem of mixed

5     files being one of the first causes of systematic

6     inaccuracy.

7          You know, opposing counsel asked me my experience in

8     looking at criminal records.  There's a lot of research

9     showing that there's a high level of inaccuracy in both

10    criminal records and a problem of misinterpreting court

11    records, so that sometimes you misinterpret what they say

12    or you misinterpret what they belong to.  There's a lot of

13    research so it's also -- in determining what's reasonable,

14    that's the history leading up to this, and you have to

15    keep that in mind it seems like that history was totally

16    disregarded as defendants went about their business.

17    Q.   Mr. Hendricks, what is your understanding as to what

18    happened to Ms. Adams' employment status after the

19    inaccurate report was sent by Verifications to National

20    Engineering?

21    A.   Right.  My understanding is that the job offer was

22    immediately and automatically revoked.  It just vanished.

23    Was that key moment that I spoke about earlier, the whole

24    key moment that the law is trying to prevent.  It happened

25    because in my opinion the law wasn't followed.

1    Q.   And the consequence that you just identified, is that

2    a foreseeable consequence under the Fair Credit Reporting

3    Act and one of the things that the statute was enacted to

4    try and prevent?

5    A.   Yes.  I mean that's why the Fair Credit Reporting Act

6    gets so much more specific and strict.  That higher

7    standard of care in this area is because there was

8    foreseeable -- prospective employer sees you have a

9    criminal background, they don't, they don't want you and

10   they don't want to mess with, you know, hearing any

11   explanations about it, they just move on and take somebody

12   else.

13   Q.   So, in addition to complying with the section of the

14   Fair Credit Reporting Act requiring reasonable procedures

15   to assure maximum possible accuracy, moving onto the next

16   section that we addressed earlier in your examination,

17   that particular section dealing with situations where

18   there's public record information that are likely to have

19   an adverse effect on somebody's ability to do the job, so

20   one of those requirements was at the time that the

21   consumer reporting agency sends the background check on,

22   what is something that the statute requires, an option in

23   that circumstance?

24   A.   Is that they notify at the same time, at the time

25   they notify the subject of the report as well.  So the

1    subject of the report can know, oh, this information is

2    being sent about me to someone I'm applying for a job

3    with.  And if the person knows that that report is

4    accurate, they don't need to do another thing unless they

5    know and they learn about the process and some day they

6    might want to check their records just to be sure, but if

7    they knew there's inaccurate information, the notice will

8    tell them there's inaccurate information, that person too

9    will know that there's going to be this horrible thing,

10   this key moment is going to happen where they are going to

11   get a job offer revoked.

12   Q.   And is the purpose of that notice requirement to

13   allow the person to try and take some kind of action to

14   prevent the foreseeable consequence of the job being

15   revoked before it happens?

16   A.   Right, it is the fall-back position to make sure that

17   this tragedy doesn't happen.  And I think it's -- most

18   reasonable people would look at this and say, yes, if the

19   employer at the same time gets the report, the job

20   applicant is saying that's a mistake, that's not me, I can

21   get the -- I can go to the courthouse and get the records,

22   show you it's not my social security number.  Then, in my

23   opinion, most employers are going to be reasonable enough

24   to say oh, I'm glad this isn't you and you got the job.

25   Q.   In this case, is it your understanding that

1  Verifications sent a copy of the erroneous background

2  check to Ms. Adams at the same time that they sent it to

3  National Engineering?

4  A.   No, my understanding is they did not.

5  Q.   In your opinion, did Verifications require strict,

6  follow strict procedures to insure that the public record

7  information that they transmitted to National Engineering

8  was complete and up to date?

9  A.   No, to the contrary, their procedures weren't strict.

10 They weren't reasonable about -- their procedures were

11 reckless because they were hurried and disregarded the

12 damage it potentially could do to Ms. Adams and

13 disregarded the history that should have educated them

14 that this whole thing was foreseeable.

15 Q.   And with respect to National Engineering, is it also

16 your understanding that that defendant acted is a consumer

17 reporting agency in this case?

18 A.   That's my understanding, yes.

19 Q.   So, under the circumstances, would National

20 Engineering have been required to comply with the same

21 requirements of the Fair Credit Reporting Act that you

22 discussed in relation to Verifications?

23 A.   Without question.

24 Q.   In your opinion, did National Engineering follow

25 reasonable procedures to insure that the information that

1  it passed along to the next party was -- had the maximum

2  possible degree of accuracy?

3  A.   Not only did it not follow reasonable procedures, I'm

4  not sure it had any procedures at all except to just take

5  the left hand and hand it out to the right hand.  They

6  seemed to be totally oblivious to the fact they had this

7  duty, this important duty.  And it's -- under the law, if

8  you're dealing in trafficking in these criminal background

9  checks, the first law you need to pay attention to is the

10  Fair Credit Reporting Act, and my understanding is, from

11  what I recall from here is that National Engineering paid

12  no mind to that.

13  Q.   So, in your opinion, should it have been apparent to

14  National Engineering that there were some discrepancies

15  between the information that they got from Verifications

16  and the information in their possession regarding Deborah

17  Adams?

18  A.   Yes, there were discrepancies on that document that

19  they forwarded to the agent for Northeast Utilities and

20  they should have noticed that.  Again, because it was no

21  burden in reading that carefully and noticing it and in

22  mind to the damage that you cause somebody.

23  Q.   So in your opinion, the statute required National

24  Engineering to take some action to follow up or ascertain

25  whether these criminal records should appropriately be

1    attributed to Ms. Adams or were mistakenly attributed to

2    her because they belonged to some other individual before

3    sending along to the agent or NU?

4    A.   Without question.  Discrepancies, given what was at

5    stake here on behalf of Ms. Adams, who had pretty much

6    gotten through most of the process to be eligible for this

7    job, the discrepancy should have first triggered a closer

8    look by National Engineering and then, in looking, they

9    didn't follow the steps we already discussed.  They could

10   have called the courthouse or had someone check the

11   records, or possibly check back with Ms. Adams or sent her

12   a notice at the time that they were about to send this

13   over.  Any of those steps, none of them are burdensome,

14   would have avoided this problem.

15   Q.   Could National Engineering also have simply called

16   Verifications at that point before sending along the

17   erroneous background report to Northeast Utilities and

18   simply asked them did you check and see whether there's

19   any social security number match here?

20   A.   Right.  They could have done that and they could have

21   also done the reasonable step in saying we don't feel

22   comfortable sending this over until you confirm that this

23   social security number, you know, or some other compelling

24   evidence that this is the same person considering that

25   records we have show that Ms. Adams never lived in

1    Virginia and this person is from Virginia and Ms. Adams is

2    still alive.

3    Q.    If National Engineering felt it was under a

4    contractual obligation to send this information along to

5    Guidant Group, in your opinion would that alleviate

6    National Engineering from their obligation to comply with

7    the requirements of Fair Credit Reporting Act to assure

8    maximum possible accuracy of the information?

9    A.    No, because my understanding is that a contract not

10   does not trump federal law, so no matter what contract

11   you're operating under, you have to follow federal law.

12   Fair Credit Reporting Act is a federal law.

13   Q.    Under the Fair Credit Reporting Act, was Ms. Adams

14   entitled to notice of this criminal information before it

15   was sent along to Northeast Utilities?

16   A.    At a minimum, at the time it was sent, yes.

17   Q.    Is it your understanding that Mrs. Adams is claiming

18   that she suffered damages in this case as a result of the

19   actions taken by the two defendants?

20   A.    Yes.

21   Q.    And in cases involving inaccurate criminal background

22   checks used for employment purposes, what are some of the

23   type of damages that candidates could foreseeably be

24   expected to suffer under those circumstances?

25              MR. KUPINSE:  Objection, Your Honor.

 1          THE COURT:  Yes, I don't know that I'll permit

 2    that.  Lay a foundation if you want to but I don't know

 3    how he's qualified.  I don't know whether the jury needs

 4    any help with that.

 5          MR. STEIGMAN:  Okay, I'll withdraw it, Your

 6    Honor.

 7          MR. KUPINSE:  Just a second, Your Honor.

 8          (Pause)

 9          MR. STEIGMAN:  Your Honor, we have an objection

10    to the entrance of the witness's expert report and CV as

11    an exhibit in the case.  Any objection to it?

12          MR. COFFEY:  Yes.

13          MR. KUPINSE:  Yes.

14          MR. STEIGMAN:  There is objection.

15          THE COURT:  Let me take a look at it.

16          (Hands court.)

17          THE COURT:  Well, I think I'll redact it, is the

18    way to do that.

19          (Pause)

20          THE COURT:  It's a good thing I said it was

21    redacted because we have a lot of duplication.  All right,

22    let's get rid of the duplication first.  I'll give this

23    back to you.

24          THE WITNESS:  Thank you.

25          THE COURT:  All right.  What I'm going to allow

 1    in is his curriculum vitae which starts on page 13, and

 2    goes to page 19.  Got a six page curriculum vitae.

 3              The other general statements he's testifying to,

 4    I will not allow those to be put into evidence.  They can

 5    can be marked for identification.  And that's pages one

 6    through 12 and 20 through 22.  Those will be marked for

 7    identification only.  And you can give it this back to

 8    them.  What Exhibit number is that?

 9              THE CLERK:  Forty-eight.

10              THE COURT:  All right, this is Exhibit 48.

11    That's the correct -- yes, 13 through 19, I think.  13

12    through 19, yes.

13              THE CLERK:  This is ID only.

14              THE COURT:  All right, that's ID only.

15              (Whereupon Plaintiff's Exhibit 48 was marked

16         full.)

17              THE COURT:  What did you say, 38?

18              THE CLERK:  Forty-eight.

19              THE COURT:  Forty-eight?

20              THE CLERK:  Yes.

21              MR. COFFEY:  Your Honor, I think we've agreed to

22    let all of three of our curriculum vitaes in.  We've

23    stipulated to that.

24              THE COURT:  What are we talking about?

25              MR. MADSEN:  Well, I need to just take one last

 1    look at them but in general I agree with that but I do

 2    want to look at them first to make sure.

 3              MR. COFFEY:  Right, absolutely.

 4              MR. MADSEN:  Yes.

 5              THE COURT:  We're talking about the other

 6    experts?

 7              MR. MADSEN:  Correct.

 8              THE COURT:  That's what I thought we'd be

 9    talking about.  I'm going to make the same consistent

10    rulings here.  What's sauce for the goose is for the

11    gander on for these experts on both sides.  I'll allow the

12    CV in.  Okay.

13    BY MR. STEIGMAN:

14    Q.   Mr. Hendricks, I'm just going to be providing you a

15    document asking you to identify it, okay?

16    A.   Sure.

17    Q.   This is Plaintiff's Exhibit 48.  Is the document that

18    I handed to you a copy of your curriculum vitae?

19    A.   Yes.

20              MR. STEIGMAN:  No further questions at this

21    time, Your Honor.

22              THE COURT:  All right, who's going to examine.

23    Mr. Kupinse?

24              MR. KUPINSE:  Yes, Your Honor.

25

1          THE COURT:  I lost my Kleenex to the last

2     witness.  Thank you.

3          (Hands Court.)

4     CROSS EXAMINATION

5     BY MR. KUPINSE:

6     Q.    Thank you.  Mr. Hendricks, I gather from your

7     testimony and from your report that there was a

8     longstanding problem of inaccuracy in consumer reporting

9     data?

10    A.    Yes.

11    Q.    And I also gather from what we've heard so far that

12    the bulk of your expertise seems to involve reporting for

13    credit screening purposes as opposed to reporting for

14    employment screening purposes, is that fair to say?

15    A.    That's right.  There's more cases of credit

16    screening, yes.

17    Q.    And is the bulk of your expertise in credit screening

18    as opposed to employment screening?

19    A.    Well, my I feel my expertise is in the general area

20    of the use of consumer reports, and so when you count the

21    number of cases, yes, there's more credit screening cases.

22    There's more volume in that transactionally as well.

23    Q.    Now, I notice you testified about strict procedures

24    for notifying the consumer?

25    A.    Yes.

1    Q.    And can you tell me the section of the Fair Credit

2    Reporting Act that that appears in?

3    A.    I'm not sure I've memorized the code, but the code

4    number, section number, but I know it has the letter K, I

5    believe, on it.

6    Q.    Okay, and I just want to make sure because I wasn't

7    sure when I listened to your testimony, is that an

8    alternate procedure or does the credit reporting agency

9    have to follow both of those procedures; is it an and/or,

10   is it an or?

11   A.    Are you asking me about strict procedures or sending

12   the notice at the time?

13   Q.    Yes, I'm asking -- first of all, let's agree, is the

14   Fair Credit Reporting Act under 15 United States Code

15   Subsection 1681?

16   A.    Yes.

17   Q.    Yes.  And is it fairly thick?

18   A.    Yes.

19   Q.    Okay.  And fairly complex act?

20   A.    Yes.

21   Q.    Okay.  Now, going to K which you just referred me to,

22   you talked about two things, two possibilities, one using

23   strict procedures and the other notifying the consumer, is

24   that correct?

25   A.    It's an either/or.

1    Q.    It's an either/or, okay.  I just want to make sure

2    it's not an and.  You can do either?

3    A.    You'd have to do one or the other.

4    Q.    Okay.  Now, I notice and I'm not sure they use these

5    exact words but you may have talked about it, an

6    investigative consumer report?

7    A.    Yeah, I haven't used that term today, correct.

8    Q.    Okay, you haven't used that term.  You did use it in

9    your report but you didn't, it's nothing that's in this

10   case whatsoever, is it?

11   A.    Right.  I think that's a distinct type of report

12   based on interviews.

13   Q.    Right, so that isn't in this case at all?

14   A.    Yeah, that's my understanding, yes.

15   Q.    Okay.  And you also talked -- let me go back for a

16   second.  I think in response to counsel's question, you

17   answered that it was your understanding that National was

18   a credit reporting agency?

19   A.    National Engineering, yes.

20   Q.    National Engineering?

21   A.    Yes.

22   Q.    That's my understanding.

23   Q.    How did you come to that understanding?

24   A.    Well, that's -- that's, I guess two parts.  One,

25   based on my understanding of the law, but more importantly

1    in this case that's what the court ruled.

2    Q.   Oh.  Okay.  Did you originally -- withdrawn.

3         Now, you also talked about a contract and was there a

4    contract that you reviewed between Guidant or Comensura

5    and National?

6    A.   I do recall there reviewing contracts.

7    Q.   Okay.

8    A.   And I believe that was the one, but I think counsel

9    was asking me if the contract required them to send it,

10   did that in any way over -- supersede its duties under the

11   Fair Credit Reporting Act.  I think that's how it came up.

12   Q.   Yes, that's the question and I'm asking you if you

13   did in fact review that contract.  Do you remember what it

14   provided?

15   A.   I don't remember the specifics, no.

16   Q.   Okay, so you don't know whether or not that contract

17   said that National was supposed to give notice to

18   Comensura or Guidant?

19   A.   Right.  I don't recall specifically.  It certainly

20   makes sense if someone, you're paying for a service, you'd

21   to have to deliver that, yes.

22   Q.   Okay.  And do you know whether there was a contract

23   between National and Verifications?

24   A.   Best of my recollection, yes, there was, and that's,

25   I -- think there was, to the best of my recollection,

1    there was, yes.

2    Q.   Did you review that contract?

3    A.    I apologize, I think I did but I'm not hundred

4    percent sure.

5    Q.   Now, with respect to the accuracy issue, I think that

6    you've told us that accuracy is very important.  Did you

7    consider accuracy to be important in the report you

8    prepared?

9    A.    Yes.

10    Q.   Are there two separate defendants?

11    A.    In this case?

12    Q.   Yes.

13    A.    Yes.

14    Q.   And what are they?

15    A.    They are National Engineering and Verifications.

16    Q.   Okay.  And do you know whether they have any

17    connection between themselves?

18    A.    No, my understanding is they are separate businesses,

19    separate entities.

20    Q.   Uh huh.  Do you know whether they spun off from

21    Equifax?

22    A.    No, I don't.

23    Q.   You said that in your report?

24    A.    I said that Verifications Inc. --

25    Q.   You said that NESC and Verifications Inc. spun off

1    from Equifax in 1997?

2    A.   Okay, well, I forgot that I wrote that.  This was

3    probably June 2008.

4    Q.   Is that accurate?

5    A.   Well, you seem to be representing to me that it's not

6    and if it's not, I'm happy to correct it, but I don't

7    recall writing that.

8    Q.   How about your accuracy on the criminal charges that

9    the plaintiff was reported as having; do you remember what

10   you said they were?

11   A.   No.  I thought I mentioned there was a welfare fraud

12   charge.

13   Q.   Did you say kidnapping?

14   A.   I don't recall but -- I don't recall kidnapping

15   charge.

16   Q.   No?  You did say it --

17   A.   Okay, no.  If you represent to me that I said it and

18   then if --

19   Q.   That wasn't very accurate either, was it?

20   A.   If it's not true, it's not accurate, no.  Stand

21   corrected.

22   Q.   Did you check, by the way, when you -- did you check

23   the criminal records at all to prepare your report?

24   A.   I checked the ones that were presented to me, I had

25   access to.

1    Q.   So you did not go back to the original records that

2    you suggested the two defendants do?

3    A.   That is correct.

4    Q.   Do you know whether or not Ms. Adams received notice

5    that the inaccurate report had been sent from National to

6    Guidant, Comensura?

7    A.   Did she receive notice?

8    Q.   Yeah, did anyone at National say we're sending this

9    report over to Comensura?

10   A.   That -- no, my recollection is that there was, she

11   was not notified at the time that they were sending it.

12   Seems to me that's what you're asking me.

13   Q.   Wasn't the report -- do you remember when the report

14   was sent over?

15   A.   It was May.

16   Q.   Around what time?

17   A.   I don't remember the exact -- it was in the afternoon

18   I thought.

19   Q.   And do you remember whether there was a conversation

20   following sending that report over between Mr. Sullivan

21   and Ms. Adams?

22   A.   I do recall, and you can correct me if I'm wrong,

23   after the report was sent, Ms. Adams called and spoke with

24   Mr. Sullivan and I think that's when she learned about the

25   report.

1    Q.   And he told you the report had been sent, is that

2    correct?

3    A.   That's my understanding, yes.

4    Q.   Is there a standard in the Fair Credit Reporting Act

5    as to when the client needs, the subject needs to be

6    notified?

7    A.   Yes.

8    Q.   Do you have to do it within 15 minutes, an hour,

9    within two days?

10   A.   Well, you're asking me if there's a standard and the

11   standard is at the time.

12   Q.   Okay, and what does that mean?

13   A.   To me it's the plain language of the statute, it

14   means at the time.  It means you don't wait a couple hours

15   afterwards.

16   Q.   Okay.  Do you have any case law or supporting

17   authority for your interpretation?

18   A.   No, there's not a lot of case law under this section

19   of the law.  I was part of a class action that settled but

20   not, there's not, this is not a litigation rich area yet.

21   It's fairly new.

22   Q.   So, so far as you know, there is no court decision

23   that says that "at the time" means exactly at the time

24   it's sent over?

25   A.   Well, in this case the court said that they did not

1    need to rule whether at the time means exactly at the

2    time, but just that the notice that was given clearly did

3    not qualify as at the time.

4    Q.   Well, let me ask you, is it reasonable to send notice

5    over within five minutes?

6    A.   I think, yeah, five minutes would be reasonable.  I'd

7    prefer they do it right before.

8    Q.   Where do you draw the line?  Is an hour okay?

9    A.   No, I would be worried because, remember, I testified

10   about the key moment when the employer sees this basically

11   figurative scarlet letter hanging over the applicant --

12   Q.   Who was the employer of Ms. Adams in this case?

13   A.   Well, my understanding is that NESC was formally

14   going to be the employer but Guidant was the agent for

15   Northeast Utilities, so it's a multi-tiered process.

16   Q.   Your understanding is Ms. Adams was going to be a W-2

17   employee of National?

18   A.   Yes.

19   Q.   By the way, do you have -- withdrawn.

20        Is there any time within which consumer reporting

21   agency can correct an incorrect report?  Does the Fair

22   Credit Reporting Act committee contain a window to fix

23   it?

24   A.   Yes, they can correct it.  I mean a person any time

25   under the dispute mechanisms of the Fair Credit Reporting

1    Act, there's a 30 day time requirement on

2    reinvestigations.

3    Q.   Actually isn't it a 35 day because don't they have

4    five days to start the investigation?

5    A.   There's been some readjustment under the fact act

6    different, so 30 is kind of a rough estimate.  Yes, there

7    is a five day and then there's another ten day depending

8    on circumstances, yes.

9    Q.   I thought we were being accurate so I'd like to be

10   accurate.

11   A.   Okay.

12   Q.   Don't they have five days to start the investigation?

13   A.   The five day period is, my understanding is the

14   consumer reporting agency is supposed to make sure they

15   give notice of the dispute to the furnisher of the

16   information.

17   Q.   And then after they've started the investigation,

18   they have 30 days to complete it?

19   A.   You know, in terms of being accurate, I'm trying to

20   remember if it's 30 days from now or 30 days from the

21   dispute.  The duty's on the consumer reporting agency.

22   Q.   Okay.  In any event, what was the time period in this

23   case from the time the incorrect report got published

24   until the time the correct report got published?

25   A.   It was a matter of a few days, I thought.

1    Q.   Yeah, it was between the eighth and the 11th, is that

2    right?

3    A.   Yes.

4    Q.   Well, within the time limit required by the Fair

5    Credit Reporting Act?

6    A.   For standard reinvestigations, yes, the one we just

7    spoke about, yes.

8    Q.   Are the exhibits still on the counter in front of

9    you?

10   A.   There are some exhibits here.

11   Q.   Could you see if Defendant's 509 is there?

12   A.   I see 26, 65, 67 and 28.  So I don't believe there's

13   a 509 here.

14   Q.   Let's see, it may have gotten picked up in here.

15   These may be all plaintiffs exhibits.

16        While I'll taking a look for it, do you know whether

17   or not Ms. Adams signed an authorization to send the

18   information from, that National received from

19   Verifications over to Guidant?

20   A.   I think I understand the question but I'm going to

21   ask you to repeat it because I couldn't hear everything.

22   Q.   I'm sorry, I turned away.  I apologize.  Do you know

23   whether or not Ms. Adams signed an authorization for

24   National to send any information they got on a background

25   check over to Comensura, or sometimes called Guidant, and

1    Northeast Utilities?

2    A.   Yes, my understanding is that she signed an

3    authorization, yes.

4             MR. KUPINSE:  And may I approach, Your Honor?

5             THE COURT:  Yes, the 509 I have may or may not

6    be the one you're talking about.  The test release?

7             MR. KUPINSE:  No, the consumer reporting test

8    release.

9             THE COURT:  The test result release.

10            MR. KUPINSE:  And drug, it's both.

11            THE COURT:  All right.

12   BY MR. KUPINSE:

13   Q.   Is that Exhibit 509, is that the authorization?

14   A.   It's entitled Consumer Reports slash Drug Test

15   Release, yes.

16   Q.   Does it authorize National to send the information

17   that it gets on its background check over to Comensura and

18   to Northeast Utilities?

19   A.   Yes.

20   Q.   Now, first of all, let me ask you, is there anything

21   you know of in the Fair Credit Reporting Act that allows

22   or doesn't allow a waiver by the client, by the subject?

23   A.   A waiver of what?

24   Q.   Of an authorization such as put before you, is there

25   anything in the Fair Credit Reporting Act that either

1    allows or doesn't allow an authorization signed in advance

2    by the subject that the information can be sent from

3    National to Comensura and Northeast?

4    A.   Well, my understanding is that the Fair Credit

5    Reporting Act requirement is that the, what they've done

6    here, they notify the job applicant that they are going to

7    do this.  It's another way that they put in a stricter

8    regime because when you apply for credit they don't need

9    you to a sign specific permission to pull your credit

10   report, but this is an authorization on the act that

11   would apply --

12   Q.   Excuse me, I didn't mean to interrupt.  I apologize.

13   A.   When you apply for a job, yes, the requirement is

14   that you have to sign, give your specific permission, yes,

15   you can pull a background report and that's what this

16   represents.

17   Q.   So, National has complied with the FCRA by obtaining

18   that authorization?

19   A.   Yes, that provision of it, yes.

20           MR. KUPINSE:  I have no further questions.

21   Thank you.

22           THE COURT:  Okay, Mr. Coffey.

23           MR. COFFEY:  Thank you, Your Honor.

24

25

CROSS EXAMINATION

BY MR. COFFEY:

Q.   Now, what's different between a credit and a consumer report?

A.   Well, the consumer report is the statutory definition and I don't have -- I'd like to read it to you if I had it in front of me, but a consumer report is any communication that bears on the standing, credit standing, reputation, credit worthiness of the consumer that's going to be used for insurance, employment or credit.

Q.   Now, from all the records that you reviewed, has Verifications or NESC been given any fines, reprimanded or anything regarding their actions in this matter?

A.   Not that I'm aware of.

Q.   Okay.  And are you aware that Ms. Adams filed numerous complaints against them; are you aware of that? That's just a yes or no.

A.   Well, I guess I'm not aware of that.  She did numerous -- I'm not aware of all of them, no.

Q.   So I want you to assume that there was testimony that she said that she never received anything back that there was any action taken against them.  So can you assume that?

A.   Sure.

Q.   Okay.  So then that's fair to say that if it's two

```
 1    and-a-half years later, at this point that there will be
 2    no action against them for their actions here, isn't that
 3    fair to say?
 4    A.   Yeah, I think if she filed some sort of complaint
 5    with the government agency and they haven't responded by
 6    now, then I think that's fair to say, yes.
 7    Q.   Now, you wanted to, you said before you wanted to
 8    make sure that things are accurate, that's an important
 9    thing, correct?
10    A.   Yes.
11    Q.   Now, one of the things with regards to the criminal
12    searches, you've done about 12 of them over 30 years,
13    where you've personally gone down and looked at them?
14    A.   Yes.
15    Q.   Okay.  Now, what's -- Verifications is not a private
16    investigator, correct?
17    A.   Correct.
18    Q.   And they were not hired to conduct investigations,
19    isn't that correct?
20    A.   Right, that's kind of a separate entity.
21    Q.   And what -- they were retained to retrieve
22    information and, notably here, a criminal search?
23    A.   That's my understanding, yes.
24    Q.   And here the plaintiff, Ms. Adams gave her consent to
25    the background check, correct?
```

1    A.   Yes.

2    Q.   So there was not any type of invasion of her privacy?

3    A.   Not on that level, no.

4    Q.   And you were aware she'd been through the process

5    before?

6    A.   Yes.

7    Q.   And she was generally aware of the process and her

8    rights?

9    A.   Yeah, I think that's fair.  She was aware of the

10   process, yes.

11   Q.   Had you ever spoken with her?

12   A.   I have spoken to her on the phone, yes.

13   Q.   When was that?

14   A.   Probably around the time that I did my expert report,

15   summer of 2008.

16   Q.   And there were several -- Verifications collected

17   several identifiers to conduct this search, is that

18   correct?

19   A.   Yes.

20   Q.   And Verifications had no knowledge of the plaintiff

21   other than identifiers that were provided by NESC?

22   A.   That's my understanding, yes.

23   Q.   And what were those identifiers, as far as you were

24   aware, that were provided?

25   A.   If I looked at the form, probably -- my understanding

1    is that they had her name and her address and her social

2    security number.

3    Q.   Now, and there was no knowledge of her being in any

4    criminal cases outside the identifiers provided, correct?

5    A.   I'd have to -- I don't quite understand.

6    Q.   So, you say there was nothing that she had any

7    interaction with the criminal system in the past?

8    A.   To my knowledge, I didn't know.  I didn't -- to my

9    knowledge Ms. Adams did not have any criminal record.

10   Q.   And would Verifications -- and what they did is not

11   match people, rather it matches identifiers, isn't that

12   what happens in the procedure?

13   A.   That's the way Verifications does it, yes.

14   Q.   Okay.  And that -- now, were you also aware that

15   Ms. Adams had the same thing happen a year before with

16   Choice Point?

17   A.   I do recall that, yes.

18   Q.   And did you review any of the documents that she had,

19   that she had received from Choice Point?

20   A.   I'm, I can't remember if I reviewed the document but

21   I know similar problems arose in that Choice Point

22   process, yes.

23   Q.   And at the time she received some correspondence back

24   from Choice Point that went through the procedures that

25   they followed, did you review any of that information?

1    A.    I'm aware of them.  I can't remember everything I

2    reviewed sitting here now today but I'm aware that that

3    happened, yes.

4    Q.    And afterwards she kept all that information.  Were

5    you aware that she had copies of all these letters and

6    documents?

7    A.    Yeah, I believe that's what I recall, yes.

8    Q.    Now, you also -- you're a consultant.  Would you have

9    advised her to have told NESC about this problem before

10   the search was undertaken, if she's had this problem in

11   the past?

12   A.    If I were her consultant, I would have advised her to

13   pull her own report independently before even talking to

14   NESC to see what that report would show.  And then, to

15   answer your question, I probably would advise to say that,

16   you know, I went through this process before and this

17   inaccurate record came up, yes.

18   Q.    Do you know why she didn't do that here?

19   A.    I don't know.

20   Q.    Now, the presence of a social security number, a lot

21   of what your research and your publications talk about is

22   identity theft and protecting rights of people, isn't that

23   correct?

24   A.    Yes.

25   Q.    So isn't one of the things that people are supposed

1   to keep most close to the vest is their social security

2   number?

3   A.   Yes, the social security number is the first tool of

4   choice of an identity thief.

5   Q.   Right, so isn't it also fair to say through all of

6   the criminal records that are out there, all the

7   documents, dockets that the criminal courts take great

8   pains to protect those social security numbers and in fact

9   they are not found in the vast majority of criminal

10  records, as your footnote from 1982 mentions in your

11  report, isn't that correct?

12  A.   In recent years there's definitely been a movement

13  afoot to, because court records are all public records, so

14  they realized just putting people's' social security

15  numbers in a court record was probably not a great idea,

16  so counselor is correct in saying there's been a trend in

17  recent years to redact them, to protect them, and not make

18  them available so any person can get them for any purpose.

19  Q.   But also this criminal conviction here was -- what

20  year was it from, if you recall?

21  A.   I don't recall the year it was from.

22  Q.   Well, there's 3,000 county municipalities in the

23  United States of America, is that fair to say?

24  A.   Yes.

25  Q.   And all 3,000 of them have different standards and

1    different systems, some are computerized, some are not, is

2    that correct?

3    A.    Right, there's a lack of standardization in a lot of

4    court records, yes.

5    Q.    So these records that were in that county, what

6    specifically -- what document did you review that showed

7    these social security numbers in that document?

8    A.    I don't recall the specific document but it was the

9    document that reflected the criminal, the welfare

10   conviction.

11   Q.    Do you have that document anywhere?

12   A.    No, I don't have it here with me, no.

13   Q.    Okay.  All right.  Now, are you aware of what

14   Verifications did, are you aware that they sent field

15   investigators down to that courthouse before that report

16   was generated from the outset; were you aware of that?

17   A.    Yes.

18   Q.    Okay.  So you're saying that they, that they, that

19   that was not proper or they shouldn't have done that?

20   A.    No, no.  I think it's fine to send somebody but you

21   have to send them with the proper guidance.

22   Q.    Well, what record is it, because I don't know where

23   this record exists that has the social security number.

24   Do you have a copy of it that shows the social?

25   A.    No, I don't have a copy of it here.  I didn't bring

1  any papers with me here.

2  Q.   Okay.  You didn't mention in your report though that

3  I reviewed a document that included the social security

4  number of Debra Jean Adams, isn't that fair to say?  It's

5  not in your report?

6  A.   Okay, but it's also fair to say it's true that there

7  was a record with social security numbers.

8  Q.   You don't reference it in your expert disclosure, in

9  your report?

10 A.   I might have learned it subsequent to my report.

11 Q.   Where did you learn that subsequent?

12 A.   Probably from plaintiff's counsel.

13 Q.   Did you read that document yourself?

14 A.   I believe it was shown to me, yes.

15 Q.   Where was it shown to you?

16 A.   It was either turned into a P D F and emailed to me

17 or mailed to me.

18 Q.   Accuracy is important.  Do you have a copy of that

19 P D F that was sent to you?

20 A.   I already said I don't have any records with me, no.

21 Q.   Do you know what date it was dated?

22 A.   I don't recall what day it was, no.

23 Q.   Do you know who searched for that document?

24 A.   Anyone who searched for it?

25 Q.   How did you come into possession of it?

1    A.   It was sent to me by plaintiff's counsel.

2    Q.   Well, it's not in evidence.

3    A.   (Pause)

4    Q.   Well, you talk about typical identifiers or names

5    with or without middle names and date of birth, is that

6    correct?

7    A.   Yes.

8    Q.   And here there were no indications that Verifications

9    was informed that Ms. Adams had no middle name, is that

10   correct?

11   A.   Would you repeat that one?  I apologize.

12   Q.   All right.  Were you aware she had no middle name?

13   A.   Yes.

14   Q.   Is that unusual?

15   A.   Yes.

16   Q.   Now, Verifications also used a national database

17   maintained by National background data; are you familiar

18   with that company?

19   A.   Yes.

20   Q.   And they used their stored record for a search, is

21   that correct?

22   A.   Yes.

23   Q.   Now, what was, what was problematic with using that

24   stored record for the conducting of this search?

25   A.   I'm not sure there's anything problematic as far as

1    it went, no.

2    Q.   They, when they take the additional step of ordering

3    the current record, wouldn't that be complying with the

4    Fair Credit Reporting Act?

5    A.   When you say they took the additional step of --

6    Q.   Well, did the database search, then they sent someone

7    else out to make sure they had a fresh report; isn't that

8    what everyone recommends in the industry as the standard

9    that should be achieved, fresh reports are the gold

10   standard?

11   A.   Well, you know, an industry does develope its own

12   procedures and standards but sometimes those standards

13   don't really meet the standards in the law and so that

14   becomes problematic.

15   Q.   Well, when you're saying they were reckless, would

16   that have been the actions of someone that was reckless,

17   to search one of the largest national databases and send

18   field researchers out?  Does that really in your mind rise

19   to the level of reckless?

20   A.   Well, the reckless part was the fact that it was not

21   hard, first of all, to notice the discrepancies in the

22   data that we've talked about at length, and with those

23   discrepancies, not to prompt a closer look that would make

24   sure that you find out these two different individuals,

25   two different social security numbers.

```
1    Q.   Right, and also under the Fair Credit Reporting Act,

2    1681 -- 1681 K says that the consumer reporting agency,

3    here Verifications, can either provide notice of a fresh

4    report or provide notice to the consumer, is that correct?

5    A.   It doesn't use the term fresh report.

6    Q.   Well, fresh report, isn't that essentially what it's

7    saying?

8    A.   Well, if you're -- I mean I don't know if fresh

9    report, if the fresh report is about somebody else; no,

10   you should not be providing that.

11   Q.   Right.  Well, are you aware that the NAPBS advocates

12   that the CRAS provide fresh reports?

13   A.   Yes.

14   Q.   And so is the NAPBS authoritative in your estimation?

15   A.   NAPBS stands for National Association of Professional

16   Background Screeners.  They are the trade association of

17   the companies that participate in this industry.  You're

18   asking me if I think they are authoritative.  I told you

19   earlier that I met with some of their members to discuss

20   some of these issues and that I told them that I was just

21   utterly bewildered on how they interpreted the Fair Credit

22   Reporting Act and that I strongly disagreed with their

23   interpretation, but only courts could really, you know,

24   decide who was right.

25   Q.   And this is the first time that you're in court being
```

1    offered as an expert in this field, is that correct?

2    A.    Right.  This is the first time this kind of case has

3    gotten this far, yes.

4    Q.    Okay.  And you do not dispute Verifications provided

5    a current and up-to-date report?

6    A.    Well, I mean answering that I have to defer to the

7    court's holding in this case, that --

8    Q.    Well, I'm not going to ask you to recite that so let

9    me ask you if you think there was a current and up-to-date

10   report?

11   A.    About Ms. Adams, no, I do not believe there was one.

12   Q.    Okay.  Now, under 1681 A B, doesn't it discuss the

13   standard of care for accuracy of reports is

14   reasonableness?

15   A.    Resembleness for maximum possible accuracy, yes.

16   Q.    So you disagree, you believe that Verifications was

17   not reasonable in its actions; that's your opinion?

18   A.    They did not have reasonable procedures for maximum

19   possible accuracy.

20   Q.    Have you ever been in this, in the business of owning

21   or running a company on the credit, any credit reporting?

22   A.    No.

23   Q.    Have you ever been employed by one?

24   A.    No.

25   Q.    Now, isn't it important, isn't currentness also

1    important with criminal records?

2    A.    Yes.

3    Q.    And is that because criminal records can change over

4    time, cases are sealed, expunged, reversed, dismissed?

5    A.    Yes.

6    Q.    So there's no issue that the report accurately

7    transmitted the information that they found in the court

8    files, is that correct?

9    A.    Well, they found this report and I think the report

10   was accurate in relation to who it dealt with, yes.

11   Q.    So, by all measures the report was an accurate

12   description of the record on file, was up to date?

13   A.    I think you said and accurate, not inaccurate?

14   Q.    It was an accurate report?

15   A.    An accurate report.  It was an accurate report about

16   the other Ms. Adams, yes, to the best of my knowledge.

17   Q.    And so the use of the docket for the report, that was

18   also -- that's also proper and that follows industry

19   practice, isn't that correct?

20   A.    It's hard for me to answer that.  There's nothing

21   wrong with finding that there's a docket, there's nothing

22   wrong with finding there's a record about Ms. Adams, so I

23   don't have a problem with that.

24   Q.    And also the reporting of the names is within the

25   industry practice and of returning records that contain a

1    form of subject's name along with another identifiers,

2    isn't that correct?

3    A.   Yes, it's my understanding that the industry is, has,

4    sets a very low bar of just using this sort of a name

5    match and a date of birth.

6    Q.   So that's the industry standard?  You agree, you

7    believe the industry standard and what's used out there is

8    too low of a bar?

9    A.   Right, and that's what I told the members of that

10   trade association.  I said, you know, industry standards

11   don't, you know, these are, you know, literally sent by

12   the industry.  They just come and say, okay, this is our

13   standard.  This is the way we like to do it, and I told

14   them but that doesn't trump the law.  The law sets the

15   standard which is higher than that.  So, you know, I

16   disagree and I think you should change and we're going to

17   agree to disagree and see what the court said.

18   Q.   But in some ways what you recommend would create

19   unnecessary risk to the public, co-workers and employees?

20   A.   How would that be unnecessary risk?

21   Q.   Would you agree that the names sound similar, Debra,

22   Deborah?

23   A.   Yes.

24   Q.   In society don't people always ask how do you spell

25   that on certain names?

1    A.   Yeah, there's a lot of similar names, absolutely.

2    Q.   And sometimes also don't people just write down names

3    they are most familiar with?

4    A.   I would be willing to agree that happens, yes.

5    Q.   And also in criminal records, in criminal records

6    they frequently contain aliases, nicknames, they'll say

7    also known as, other similar names, like Michael -- I'm

8    Michael, could be Mike, it could be many things.  William

9    could be Bill, Billy, Bud, is that fair to say?

10   A.   Absolutely, yes.

11   Q.   And sometimes maybe someone never met a Deborah but

12   has known Debra, Debbie or Deb or visa versa?

13   A.   Right.

14   Q.   And it doesn't, the CRA, how do -- Verifications

15   wouldn't know which have spellings, actually the spelling

16   people have can be wrong in some of the records that are

17   out there.  Quite frequently don't people with criminal

18   records try to mislead by misspelling their name, say

19   where they are from, give different states ands stuff like

20   that?  And that's why the criminal system is designed and

21   that's why these records sometimes have all these

22   different things in them?

23   A.   That's definitely a factor, yes.

24   Q.   And that's also a factor why there's so much

25   incorrectness from 1982 in the congressional study in

1    criminal records, is that fair to say?

2    A.   I would agree that was a factor, yes.

3    Q.   But then under the Fair Credit Reporting Act,

4    reporting of records with similar though not identical

5    information can be or is a reasonable procedure because

6    the records may be referring to the same person because

7    there are differences in data that may be due to errors in

8    data preparation or collection, isn't that correct?

9    A.   Well, what's reasonable really depends on the facts

10   and the circumstances and the context, so it may be

11   reasonable in some facts and circumstances and context but

12   in my opinion it's not reasonable here.

13   Q.   Well, here Verifications did make sure that NESC knew

14   of the name variance and any issues that were cleared up,

15   and then the issues were cleared up when Ms. Adams alerted

16   ASC that the record didn't belong to her.  They never said

17   it was an exact match, isn't that correct?

18   A.   I'm trying to recall exactly what they said.

19   Generally, yes, it's my understanding that companies like

20   VI and VI in this case doesn't -- it has some language,

21   but I'm not certifying that this is 100 percent accurate,

22   something like that.

23   Q.   Now, if Verifications had simply reported the records

24   without noticing the variations, that wouldn't be in

25   accordance with the industry practice of identifying the

1   name variation on the record, which made the report

2   accurate under the Fair Credit Reporting Act, isn't that

3   correct?

4   A.   Well, I'm having trouble with -- you're saying in

5   that question there's a statement that Verifications Inc.

6   made the report accurate?

7   Q.   By also noting the variations, and that's in accord

8   with industry standards?

9   A.   Okay, so I believe I understand you to say that if,

10   if they simply pass on a report about somebody else but

11   they know that there's some variations in the name, then

12   that meets the industry standards of accuracy.

13   Q.   What I'm saying is that if -- the report here

14   specifically drew the user's attention to the issue of the

15   name, which allowed NESC to address the issue with Ms.

16   Adams, did they not?  They said Deborah Adams and then

17   Debra Jean Adams.  They did note that.  They didn't say

18   there was a conviction for Deborah Adams.  The report

19   clearly didn't say that, correct?

20   A.   Right, and my opinion is that instead of just

21   bringing someone else's attention to these differences,

22   Verifications Inc. should have put enough of their own

23   attention into it because if you're going to have the

24   benefits of selling and being in the business of selling

25   this data, you have to take responsibility for it.  And so

1    if you notice these variations, you have to take

2    responsibility to know, to find out, are these variations

3    significant enough that it means they are two different

4    people, and that's what I feel Verifications did not do in

5    this case.

6    Q.   Well, at the time though, if they were given data

7    that did not show -- that showed only going back seven

8    years, that there was data out there they had lived

9    somewhere else before that, how would they know that?  How

10   would Verifications have known that?

11   A.   How would Verifications know like her address

12   history?  They could have, again, used the Accurate

13   service, would have shown that.

14   Q.   Well, there's not always social security numbers, and

15   also this isn't like a criminal, there's not a fingerprint

16   search done, isn't that correct?

17   A.   Right.

18   Q.   So that's another system that the government uses

19   that is more highly accurate if you fingerprint someone,

20   is that correct?

21   A.   Fingerprints are very accurate, yes.

22   Q.   And also there was no photos sent.  Photos could have

23   been searched against mug shots, that would have been in

24   the file but Verifications had no way of knowing what

25   Deborah Adams looked like, is that correct?

1    A.    Verifications had the job applicant, plaintiff's

2    social security number.

3    Q.    Are you saying they had the plaintiff's job

4    application?

5    A.    No, you had her social security number, the job

6    applicant's social security number.

7    Q.    That is correct.  Now, Verifications also did not

8    have access to Ms. Adams to discuss anything, isn't that

9    correct?

10   A.    I mean I'm not sure I agree with that.

11   Q.    Are you saying that the CRAs typically call up people

12   who they are screening?

13   A.    I'm saying they typically don't but that you have

14   to -- you asked me did they have access to her and there's

15   nothing to stop you from calling her if you wanted to.

16   Q.    Is that the industry standard?

17   A.    Definitely not.

18   Q.    Have you ever heard of people doing that?

19   A.    I've heard -- in your industry, no.

20   Q.    Now, be under 1681 BB 3, the copy of the report, the

21   report was issued May 8th, the plaintiff contacted

22   verifications May 9 and the clear was issued on the tenth.

23   You don't disagree with that timeframe, is that correct?

24   A.    No, if you represent to me, that squares with my

25   recollection, yes.

1    Q.   Now, when your report also talked about you like to

2    look at things in context, would it be important to look

3    at context in the report and see that the security, that

4    security did check the name because they looked at the

5    name variations?  Wouldn't that be important to take away

6    the contextual approach to it?

7    A.   Right, I believe you've added that in, yes, and yeah,

8    I noticed that too.

9    Q.   Now, hasn't the law also been in this field it's

10   unreasonable as, as a matter of law, to require a CRA to

11   look beyond the docket sheet when reporting court records?

12   A.   There are -- I do recall from the court's opinion in

13   this case citing to a case that did have that holding that

14   you can't, in the context of that earlier case, not this

15   one but an earlier case, the court held that it was

16   unreasonable to expect the CRA in that context to look

17   beyond the record, the source record.

18   Q.   So in that way your opinion would be unsupported and

19   has been rejected, is that fair to say?

20   A.   No, I don't think it's fair to say at all because the

21   court in this case considered that opinion and rejected it

22   applying to this case.

23   Q.   Now, your opinion is beyond what the cases currently

24   hold to be unreasonable and a burdensome procedure for

25   CRAs to follow?

1    A.    Okay, I don't want to answer until I make sure I

2    understand the question so please repeat it.

3    Q.    Okay.  I'll withdraw it.

4         Now, you also said in your report that Verifications

5    could have gone to the Social Security Administration to

6    verify the social security number of Debra Jean Adams.

7    How does one do that when there's privacy concerns all

8    over the place?  Just call up and say, hey, I've got this

9    Debra Jean Adams, give me her social security number?  Is

10   that is what you're saying they should have done?

11   A.    No, there's, there's a death -- there's a service to

12   check if a social security number belongs to a deceased

13   individual.

14   Q.    And there's also a procedure called de-archiving,

15   correct?  Are you familiar with that?

16   A.    Not by that term.  I think I know where you're going.

17   Were, in looking for her records, Debra Jean Adams, ever

18   de-archived that would have allowed such a deep intrusion

19   into her personnel records, all her personal records, or

20   no?

21   A.    Okay, no, I have to admit you lost me.  You say Debra

22   Jean Adams's records were --

23   Q.    You're saying she would be open to anyone in the

24   public, for anyone to go peruse her records, Debra Jean

25   Adams?

1    A.    There's the court record, and then I also mentioned

2    Social Security Administration has a service that you can

3    check for social security numbers associated with a

4    deceased individual.  That's what I was referring to.

5    Q.    Right.  Now, is this the industry standard or is what

6    your suggesting would be a best practice?

7    A.    I'm saying it's an action you could have taken to --

8    I was trying to list some non-burdensome actions that

9    could have been taken to verify that the subject of the

10   welfare fraud record was not the same as the plaintiff.

11   Q.    Now, is background screening different in many ways

12   from credit reporting?

13   A.    They are clear distinctions, yes.

14   Q.    And what are some of the distinctions?

15   A.    Well, the credit reporting industry is older and much

16   more developed and it's also, there's the big three,

17   Equifax, Trans Experion, and they developed a standardized

18   system for all the creditors to furnish data and it's

19   called Metro 2 and so there's, it's basically a

20   standardized field, you know, put name here, the address

21   here, the social, here's the account, here's the code that

22   says it's a revolving credit card account or is it a

23   mortgage account.  So there's a code for everything.  It's

24   very rational.  Where in this, the background court

25   records I think we've discussed several times how it

1    doesn't have that kind of standardization.  So that's one.

2        The credit reporting field deals with getting credit

3    and so it's very, you know, very important part of life,

4    you have to be able to get credit, but if something goes

5    wrong and there's an inaccuracy, it could, the act

6    basically feels you have a right to dispute it, thirty

7    days to correct it and if you can get credit 30 days later

8    or 60 days later, it would be nice if it worked the first

9    time, that would be good, but it's not a life or death

10   issue.

11       But the act says when it comes to background check

12   reporting, it has a higher, it's a more specific standard

13   of care because someone losing a job they were qualified

14   for based on an inaccurate report can be a life changing

15   event so it's much more profoundly serious.

16   Q.   Now, you also talked about the FTC opinion letter of

17   Helen Goth Foster which says CRA's can follow Section 613

18   in considering up-to-date information, in considering

19   being up-to-date by going to the latest public record

20   source which is the county courthouse, isn't that correct?

21   A.   Yes.

22   Q.   And now, did you also -- now, did you also read the

23   agreement between, it was noted in one of your footnotes

24   there was an agreement between Verifications and NESC?

25   A.   Yes, I recall seeing that, yes.

1    Q.    Okay.  I just want to show that to you.

2    A.    Thank you.

3          MR. COFFEY:  I'm going to show this to the

4    plaintiff.  It was in your book under Plaintiff's Number

5    One.  It's the plaintiff's number one exhibit and I'll

6    give copies to the court.

7          THE COURT:  There can't be a defendant's number

8    one.

9          MR. COFFEY:  No, it's not.  It's Plaintiff's

10   Number One.  I'm just handing it up.

11         (Hands Witness.)

12         THE COURT:  All right, Plaintiff's Number One.

13   This is a good time to take a break, ladies and gentlemen.

14   Let's take it for about ten minutes.

15         (Whereupon the jury left the courtroom at 3:45

16   o'clock, p. m.)

17         THE COURT:  All right, let's talk about this --

18   yes, you can step down.

19         (Witness excused)

20         THE COURT:  See what everybody's position is.

21         (Pause)

22         MR. COFFEY:  Your Honor, could we be excused for

23   a moment?

24         THE COURT:  No, I'm going to have to make a

25   ruling on this before the jury comes back in, so have

1    somebody stick around so they can hear my comments on it.

2         MR. MADSEN:  Your Honor, as a point of order we

3    do want to let you know there's no objection by anyone to

4    this exhibit.

5         THE COURT:  Well, I have an objection to it.

6    You're going to confuse the living daylights out of the

7    jury.  I don't know that Judge Hall was aware of it when

8    they made their summary judgment motion.  That's why I'm

9    looking it over to see if she ever mentions it.

10        (Pause)

11        THE COURT:  Well, the factual background set

12   forth in Judge Hall's ruling up to page ten doesn't

13   mention this contract at all.  Let me go into the

14   analysis.

15        (Pause)

16        THE COURT:  I've already told you what I think

17   about the Count 14 situation.

18        (Pause)

19        THE COURT:  Now, the FCRA claim begins at page

20   11 of the opinion and she deals directly with the NESC

21   argument, that it's not a consumer reporting agency.

22   Claims it's a joint user.  Therefore it's exempt.  And she

23   goes through all of the authority she can find and I agree

24   with the authority.  The only case she finds that differs

25   is Eastern District of Pennsylvania, she distinguishes

1    that from the FTC commentary, a joint user, she finds that

2    unpersuasive.  Now her ruling is the one I'm adhering to

3    also.  Congress did not intend to authorize the FTC to

4    create a joint user exception to the FCRA's definition of

5    a consumer reporting agency and it's contrary to the

6    intent of Congress.  So the court firmly rejected NESC's

7    argument that it's mainly a joint user.  And it goes on to

8    that and says that NESC is a consumer reporting agency.

9         And she cited the statute and holdings firmly at

10   page 14 that NESC is a consumer reporting agency, a

11   standing agency that's bound by the requirements of the

12   FCRA.

13        All right.  Now as far as the two defendants are

14   concerned, this may become important on the cross claim

15   when we get to that stage.  It's clear that Verifications

16   did not regard National Engineering as a consumer

17   reporting agency.  In fact, Verifications says it's the

18   consumer reporting agency and it regards National

19   Engineering Service Corporation a user and says that.

20        Now, if I let the jury see this thing I'm going

21   to be charging them that the ruling in this case,

22   regardless of Exhibit One, is that these are both consumer

23   reporting agencies and the jury's bound by that ruling of

24   law.  If it's wrong the Court of Appeals can reverse it

25   but I think it's a correct ruling.

1          So I'm not going to hold this court responsible

2    to the two defendants on what their understanding may have

3    been between them as to what they were doing, who had what

4    responsibilities under the act.  So let me make that

5    clear, if the jury's going to see Exhibit One.  I have no

6    idea whether that was ever called to Judge Hall's

7    attention or not.  There's no argument, no discussion of

8    it in any papers that I've seen until this one.  So that's

9    where we are.

10          MR. STEIGMAN:  Your Honor, if I just may be

11   heard on that briefly?

12          THE COURT:  Yes.

13          MR. STEIGMAN:  I think Judge Hall's discussion

14   of joint user is a distinct issue in whether National

15   Engineering can be a user under what was called in Judge

16   Hall's opinion as Count 14.  Obviously we agree with Judge

17   Hall's opinion and this court's affirmation of it that

18   there is no joint user exception.

19          THE COURT:  She goes beyond that.  She says that

20   NESC is a consumer reporting agency.  She didn't stop at

21   the joint user.  That's where I had stopped on the

22   original ruling I made because nobody called my attention

23   to this issue.  That came up yesterday for the first time

24   about what National Engineering Service Corporation is.

25   And she said clearly they are a consumer reporting agency.

1            MR. STEIGMAN:  Your Honor, I think that it's our

2      position in this case that National Engineering can be a

3      consumer reporting agency and also use a consumer report

4      to take adverse action under 1681 BB 3.  I don't think

5      those are inconsistent holdings under the statute.  I

6      don't think there's anything in the statute that prohibits

7      a holding that --

8            THE COURT:  Well, the statute is pretty clear,

9      but the, the contract here is very clear too.  This is a

10     user certification required by the FCRA and it says by

11     using the services of Verifications, client is considered

12     a user of consumer reports under the FCRA.  It's not what

13     she held and not what I hold.

14           MR. KUPINSE:  If your Honor please, I understand

15     the ruling of Judge Hall and I understand the ruling of

16     this court and, as you may have noticed, we have been

17     kicking and screaming ever since the initial ruling.  We

18     asked for an immediate certification for an appeal with

19     all due respect to Judge Hall.  We just think she's

20     absolutely and totally incorrect.

21           Now, if I may say a little more, there are three

22     potential agreements that could be in your hands instead

23     of that one.  One could be an agreement to be a reseller;

24     there is absolutely no evidence that we are a reseller of

25     consumer agency reports.  The other is that it could be a

 1    agreement that in effect says we're a consumer agency and

 2    we don't have that.  And that's the problem we're

 3    struggling with.

 4           And as far as Mr. Steigman's argument about the

 5    statute, Your Honor is absolutely correct, that is a user

 6    statute and we've been pointing that out for a long time

 7    now.  We, unfortunately are going to be placed in the

 8    position of taking an appeal in this case.  It is just too

 9    urgent an issue and I think if you look at the expert's

10    reports, as I have pointed out, each and every one of the

11    experts has said that we are a user.  Even Mr. Hendricks,

12    even co-defendants' expert and our expert.  As a matter of

13    fact, since we're in court and not before the jury, my

14    expert will not even testify as to what our obligations

15    were as a CRA because everytime I ask her, she says but

16    you're not a CRA.  So we have a real problem here --

17           THE COURT:  Well --

18           MR. KUPINSE:  -- been trying to bring to the

19    attention of the court.

20           THE COURT:  I didn't know a thing about it

21    because we're in the middle of the trial and I looked over

22    the ruling she made and I agree with the ruling and I

23    would have had argument if I'd seen the Exhibit One before

24    now as to how that impacted and we could research it

25    thoroughly.

1          Now, Mr. Steigman is telling me that National

2     Engineering can be a consumer reporting agency and still

3     can be a user regardless of this contract that it entered

4     into with Verifications.  He may be right.

5          MR. KUPINSE:  I do not believe there's any

6     authority for that under the Fair Credit Reporting Act and

7     I can almost tell you assuredly and I think the experts

8     will tell you the same thing, that that doesn't occur.

9          THE COURT:  Well, everybody had a chance to

10    thoroughly brief this before Judge Hall and they had a

11    chance to brief it before me too when I ruled on the joint

12    user situation and, your point is, of course, that even

13    accepting that there's not a joint user situation here,

14    Judge Hall's ruling went too far in saying that NESC is a

15    consumer reporting agency, but nobody called that to my

16    attention until yesterday, and now I see this thing and

17    you've got to deal with this.

18          So I'm going to adhere to the ruling of the

19    case.  That's where you can find it, unless the parties

20    want to confer overnight and agree that we can consider,

21    regardless of what you call NESC, Judge Hall's summary

22    judgment ruling left four issues open for contest among

23    the parties, so it may be that we're dealing with a matter

24    here that, despite Mr. Kupinse's conclusion, is really not

25    proven.  It doesn't change the obligations under the

```
 1    statute, but that is something we have to deal with when I
 2    charge the jury on it.
 3             MR. KUPINSE:  And just very briefly, if I may,
 4    Your Honor, it does change the obligations of whether
 5    you're a user or a CRA, and that was brought, plaintiff's
 6    opinion was before Judge Hall.
 7             THE COURT:  Well, the plaintiff's got to take
 8    its chances with the rulings in the case.  They've been
 9    made, they have stood for a long time and I ran over her
10    opinion very carefully, looked at all the arguments that
11    were made at the time and agreed with her completely.
12    This document, Plaintiff One, I would have had examination
13    on if I'd been dealing with it at the time.  It wasn't and
14    I'm dealing with it now, and I think we'd better keep
15    going down the road we're going unless the plaintiff wants
16    me to change it over before we charge the jury on the law.
17    And that's a little way off so they can consider it
18    anyway.  But that's where we are.
19             I certainly am not going to change any part of
20    the ruling that deals with what I would permit the experts
21    to testify about.  They would not be able to testify about
22    joint users and I made that very clear.  Now the problem
23    we have is with the testimony of the expert tomorrow
24    morning who wants to say that NESC is not a consumer
25    reporting agency, and that may be where we're at a
```

```
 1    critical point in the case.

 2            MR. KUPINSE:  If your Honor please, I will

 3    adhere to the court's ruling thus far and she is going to

 4    testify and an offer of proof that they are not a CRA, but

 5    in front of the jury she will be very careful to maintain

 6    your ruling not to discuss user.

 7            THE COURT:  I think we'll have to do it that way

 8    and let the appellate court decide whether we're right or

 9    wrong on these rulings.  All right.

10            MR. COFFEY:  A brief moment so we can -- if I

11    could be excused for a minute?

12            THE COURT:  We won't call the jury until you

13    come back.

14            (Pause)

15            THE COURT:  All right.  She's ready on the

16    record.  We have a lot -- I want to make one thing clear,

17    we have a lot of interesting problems.  We're going to let

18    Exhibit One in but it will be more important I think on

19    the cross claims issue than on the main case, but we had a

20    lot of rulings that will be tested out from the 2nd

21    Circuit but there's one ruling I want to make clear so the

22    parties don't get confused tomorrow.  And that's with this

23    Count 14, I'm going to just knock that out because as I

24    look at the statute and what its intent of Congress was,

25    was to prevent adverse action being taken by the employer
```

1    and this in this case they didn't mean the employer NESC,

2    they mean Northeast Utilities, because the statute says

3    they want to give the employer time to reconsider the

4    aspects of it and permit some corrective action to be

5    taken by the employer.  That's why they have that statute

6    in.  And it's not just not applicable here to what NESC

7    did.  The intent of the plaintiff is to say that NESC in

8    forwarding the information to the employer created the

9    violation of the statute.  I don't read the statute that

10   way.  I read that statute designed to be directed toward

11   NESC -- toward Northeast Utilities.

12               All right.  I guess --

13               MR. STEIGMAN:  Your Honor, can I just have the

14   opportunity to file a brief and submit it in the morning

15   just for the court --

16               THE COURT:  I'm going to want to see it before I

17   get to the point we have to talk to the jury about it, but

18   that's my intention.

19               MR. STEIGMAN:  Okay.

20               THE COURT:  I think you may be over-reaching on

21   this and I think I may have to protect the record if it

22   gets over-zealous here.  I think I'd be making an error to

23   allow 14 to go to that jury.

24               All right, let's -- as soon as Debbie comes

25   back, we'll get the jury in.  Mr. Hendricks is all set.

1    Mr. Coffey, are you ready to come back here?

2              MR. COFFEY:  Yes, Your Honor.

3              (Pause)

4              THE COURT:  Well, you missed a very important

5    colloquy.  I'll let the lawyers bring you up to speed

6              Bring the jury in, yes.

7              THE COURT:  All right, I guess we can pick up

8    where we left off with Exhibit One.  By the way, this is

9    an extra copy of it, I have a copy.

10             (Whereupon Plaintiff's Exhibit 1 was marked

11        full.)

12             MR. COFFEY:  Thank you.

13             (Whereupon the jury entered the courtroom.)

14             THE COURT:  All right, Mr. Coffey.

15             MR. COFFEY:  Yes, if I may, Your Honor.

16   BY MR. COFFEY:

17   Q.   The user -- the certification of the client services

18   agreement, you have that?

19   A.   Yes.

20   Q.   And under that agreement, who is responsible for the

21   any adverse actions?

22   A.   In this agreement?

23   Q.   Yes, if you read it?

24   A.   Well, the user is responsible for adverse action

25   notices.

1    Q.   Okay.  What is the adverse action procedure as you're

2    aware?  Overall, is that designed to be a safeguard for,

3    for people in the general public?

4    A.   Yes, the adverse action is to say that, that a

5    decision was taken about you based, in whole or in part,

6    on information in a consumer report and then to give you

7    the name of the consumer reporting agency and instruct you

8    now get in contact with them and advise you you have the

9    right to get a free report from them.

10   Q.   Okay, and at some point you are aware that NESC did

11   provide the report to Ms. Adams as well as something that

12   delineated her rights, isn't that correct?

13   A.   That's my understanding, yes.

14   Q.   So that was complied with?

15   A.   Well, they -- they gave her a report and it included

16   statement of her rights.

17   Q.   Now, one of the things I just wanted to clear up, in

18   your report you said that NESC was related to

19   Verifications and spun off from Equifax in 1997.  Where

20   did you get that data from?

21   A.   And I apologize.  I don't recall where I got that

22   from.  And other counsel told me that this was a mistake

23   and if it's a mistake, I stand corrected.

24   Q.   So you stand corrected.  And when was your report so

25   you could reasonably be standing corrected a year

1    and-a-half after your report was issued?

2    A.   Right, this is June 2008, I mean the report's not

3    published anywhere.

4    Q.   Well, it is important in this matter.  Isn't accuracy

5    important to the jury?

6    A.   Absolutely.  I'm glad you corrected me.

7    Q.   So it could be wrong.  And also you said kidnapping;

8    now you are aware that kidnapping, there's no kidnapping

9    in this case?

10             THE COURT:  That's why I left the report out.

11   That was one of the major reasons I didn't allow that

12   report into evidence.

13   A.   Right.  Didn't raise it in any testimony either.

14   You're the one raising it.

15   Q.   It's one of the things we base what goes on in the

16   case is the accuracy of the expert reports, isn't that

17   fair to say?

18   A.   Sure.

19   Q.   Now, have you had any other cases that did have

20   kidnapping in there, it was a left over from another

21   report you had done?

22   A.   That could be the case, yes.

23   Q.   So the reports that you generate, do you have the

24   same word processor that you knock the reports out with?

25   A.   Well, there's, I do cut and paste from different

1  sections of different reports if there are similar issues,

2  and so there is some cutting and pasting and it could

3  cause that mistake, yes.

4  Q.   It could have.  Now, also some of the things that

5  were left in the expert report that had to do with the,

6  with the -- with civil and with credit searches that were

7  left in there, clearly a lot of them were not applicable

8  to this matter, isn't that fair to say?

9  A.   Yes, there was general sections on the general use of

10  credit reports that would have been from other reports,

11  yes.

12          THE COURT:  The idea here was to keep you from

13  the major part of this report because his report is not

14  going to be helpful to you as compared to his testimony.

15  His testimony is what you should pay attention to.  The

16  report you're not going to ever see because it had too

17  many different things in it that I wouldn't have allowed

18  to come in, which is why you're not getting it.  You're

19  getting his curriculum vitae and that's it.

20          MR. COFFEY:  I have no further questions, thank

21  you.

22          THE WITNESS:  Thank you.

23          THE COURT:  All right.  Mr. Steigman?

24

25

1    REDIRECT EXAMINATION

2    BY MR. STEIGMAN:

3    Q.   Mr. Hendricks, in response to questions by counselor

4    for Verifications Inc., you were asked several, at several

5    points the term industry practice, do you recall that?

6    A.   Yes.

7    Q.   Does the Fair Credit Reporting Act require consumer

8    reporting agencies to comply with the statute or with what

9    they declare is industry practice?

10   A.   To comply with the statute.

11   Q.   And do you recall when Attorney Coffey from

12   Verifications Inc. was asking you questions about whether

13   information from a file was current or up to date?

14   A.   Yes.

15   Q.   Does the Fair Credit Reporting Act require consumer

16   reporting agencies to provide information that is complete

17   and up to date or is it current and up to date?

18   A.   It really requires them to follow reasonable

19   procedures for maximum possible accuracy.  So the --

20   that's really the standard, or in a case, unless the

21   standard for strict procedure kicks in, that involves that

22   public records information, but there's no such standard

23   as the current or fresh standard.  There's no such

24   standard as that in the law.

25   Q.   And to your knowledge is Ms. Adams making a claim

1    that either Verifications or National Engineering failed

2    to reinvestigate her dispute within 30 days of this case?

3    A.   No, I don't recall a reinvestigation claim.

4         (Pause)

5              MR. STEIGMAN:  Your Honor, the plaintiff would

6    like to submit Exhibit Number 33.  Verifications Inc. just

7    has an objection to it so he'll leave it to Your Honor.

8              THE COURT:  Thirty-three.  This is a document

9    from the court in Virginia?

10             MR. STEIGMAN:  Excuse me, Your Honor?  This is

11   the records from the court, correct.

12             THE COURT:  Yes, court in Virginia.  Okay.  All

13   right.

14   BY MR. STEIGMAN:

15   Q.   Mr. Hendricks, I'm going to be handing you a document

16   for purposes of identification and ask you a follow up

17   question.

18             MR. COFFEY:  Your Honor, if we approach for a

19   moment for sidebar?

20             THE COURT:  I thought there was no objection.

21             MR. COFFEY:  There was an objection.

22             THE COURT:  There is objection?

23             MR. COFFEY:  Yes, and I'll explain at the

24   sidebar, if I may.

25             THE COURT:  Oh, boy, all right, send you back.

1    Sorry, but Susan can't handle a sidebar with her

2    equipment.

3              (Whereupon the jury left the courtroom.)

4              THE COURT:  Okay, what's the sidebar?

5              MR. COFFEY:  Well, I just wanted to point out to

6    the court if you look at Plaintiff's Exhibit 54.

7              THE COURT:  Yes, I've looked at 54.

8              MR. COFFEY:  Those are the materials that

9    Ms. Adams suggested that she provided at the time that

10   the, the day before it was, the report was cleared up.

11   The report, and that shows the clerk of the court, the

12   clerk sent in one page letter back.  That is the last

13   page.

14             THE COURT:  Sentencing order.

15             MR. COFFEY:  Yes, and that sentencing order is

16   one page in length.  Now, the one that was dated then,

17   May 29th of 2007, is different.  First of all it doesn't

18   bear any of the indicia, there's no raised seal on it and

19   then it has a social security number that says redacted.

20   So I think it could mislead the jury into believing that

21   that was provided from the get go in the public records

22   which it clearly was not.

23             THE COURT:  Well, what was provided was what was

24   in 54.

25             MR. COFFEY:  What was provided was what was in

1    54 plus a database search at the court, so to add records

2    that were searched afterwards would be misleading to the

3    jury.  And they also don't bear the official indicia that

4    takes the social security number in fact and then it would

5    be on, that it would be on the sentencing order is just

6    highly unusual.  And it does not come with any public

7    record attached to it that it was transmitted in that way.

8    I'm not accusing anybody of anything but I'm just saying

9    it doesn't bear that indicia.

10            THE COURT:  Oh, I see what you mean, the S S N

11   there, it says redacted.

12            MR. COFFEY:  I've just never seen something like

13   that on a document.  I'm not saying it wasn't provided,

14   I've just never seen it and there's no public transmittal.

15            THE COURT:  Well, I don't see what it's going to

16   add to the jury, so why don't I just sustain the objection

17   and we'll go with 54.

18            MR. STEIGMAN:  Your Honor, this is material that

19   the witness can testify he relied upon.

20            THE COURT:  Your voice is very soft so you'll to

21   use -- in fact, come up to this mic because this mic is

22   good.  Get right up to it and tell me what you're saying.

23            MR. STEIGMAN:  This is information containing

24   the social security number from the court record that will

25   support the expert witness' testimony that he relied on

1    and reviewed information from the court record indicating

2    that the social security number was available there.

3    Especially, it's appropriate especially since on cross

4    examination defense counsel attempted to attack his

5    credibility on that particular point, but also supports

6    plaintiff's contention in this case that documents

7    containing the social security number were available in

8    the court file.

9            THE COURT:  Well, you're claiming that this is

10   designed to impeach Verifications' claim that it did what

11   it could do to get the records; you're saying this is a

12   record that would have been available?

13           MR. STEIGMAN:  It's publicly available, could

14   have been obtained before the report was transmitted to

15   National Engineering.  In fact, the third page of it is a

16   memo to the plaintiff from the court containing social

17   security information from the court file.  It easily could

18   have been obtained by anybody, including Verifications or

19   National.

20           THE COURT:  Is this material that plaintiff

21   obtained later on on the 29th of May?

22           MR. COFFEY:  On the 31st of May.  It says

23   there's a memo in the page or after it, sent from the

24   deputy clerk, wrote a memorandum on this topic.

25           MR. STEIGMAN:  The fax at the top at least with

 1   respect to the first page and the second page.

 2              THE COURT:  Well, the 31st of May.  I see.  Yes.

 3   Yep.

 4              MR. STEIGMAN:  Some pages were faxed on May 29

 5   but that memo is dated the 31st.

 6              THE COURT:  Now, she doesn't make any claim that

 7   she showed this to anybody at the time, because 54 was

 8   what she sent at the time, so for your purposes is to show

 9   this is what would have been available to Verifications.

10              MR. STEIGMAN:  That is correct, and to respond

11   to the questions on --

12              THE COURT:  All right, I'll admit it over

13   objection but charge the jury that that's the sole reason

14   it's being offered.

15              (Whereupon Plaintiff's Exhibit 33 was marked

16       full.)

17              THE COURT:  Okay, bring them in.

18              (Whereupon the jury entered the courtroom.)

19              THE COURT:  Okay, I'm going to admit Exhibit 33

20   for a limited purpose only.  Not that there's any claim by

21   the plaintiff that the plaintiff obtained these materials

22   and then gave them to NESC or to Verifications, but

23   because 54 is the one you have that showed shows what she

24   did see.  54 is an exhibit that shows exactly what she

25   sent.  You'll see a difference between that and this.  The

1    sole purpose of permitting this is to show what would have

2    been available to an investigator investigating the court

3    records at Pennsylvania County in Virginia.  Okay.

4    BY MR. STEIGMAN:

5    Q.    (Hands witness.)

6    A.    Thank you.

7    Q.    Mr. Hendricks, I've just handed you a document that's

8    been marked as Plaintiff's Exhibit 33.

9    A.    Yes.

10   Q.    Are any of those documents familiar to you?

11   A.    Yes, this is the one I was referring to earlier.

12   Q.    I'd like to first direct your attention to the first

13   two pages of Exhibit 33.  Do these bear the sentencing

14   order from the Pennsylvania County Court in Virginia?

15   A.    Right, you see at the top it's entitled Sentencing

16   Order.  Says the County, Pennsylvania County Court, has

17   the name Debra Jean Adams in the case -- bless you.  And

18   the case number.

19   Q.    And is this a document, sentencing order that would

20   be publicly available?

21   A.    Yes, this is a typical sentencing order that's

22   available in the court's public records.

23   Q.    I'd like to ask you to turn to the second page?

24   A.    Yes.

25   Q.    Of Exhibit Number 33.  Toward the bottom of the

1    second page do you see the letters S S N?

2    A.    Yes, under the heading Defendant Identification.

3    Q.    And typically in court files what does S S N refer

4    to?

5    A.    Social security number.

6    Q.    In this case that number's been partially redacted,

7    but the last four digits would -- those are the last four

8    digits of the defendant's social security number who was

9    sentenced in this particular case?

10   A.    Yes, 1879.

11   Q.    And would this be a document that a consumer

12   reporting agency who wanted to follow reasonable

13   procedures to assure maximum possible accuracy would try

14   and identify and obtain before submitting a consumer

15   report, a background check, to a potential employer that

16   would have adverse consequences on the candidate?

17   A.    Yes.

18   Q.    Especially if there were discrepancies with respect

19   to the spelling of the name?

20   A.    Yes, and the, the residence, the state of residence.

21   Q.    And the next page of Exhibit 33 --

22   A.    Entitled -- with the clerk of the court heading on

23   the letterhead.

24   Q.    Does that appear to be a memo to Deborah Adams from

25   the deputy clerk from Pennsylvania County, Virginia?

1    A.   Yes.

2    Q.   And what type of information is contained in this

3    memo?

4    A.   It's confirming they are faxing a certified copy of

5    the revocation order of Debra Jean Adams with her date of

6    birth and her social security number, with the first five

7    numbers redacted but the last four, 1879, showing, as well

8    as her address in Danville, Virginia.

9    Q.   Did Deborah Adams have some special privilege that

10   allowed her to get this information from the clerk in

11   Pennsylvania County?

12   A.   No, just being the right of an American citizen, the

13   right to get records out of a court.

14   Q.   Is this information that Verifications could have

15   obtained itself before it sent the information to

16   National?

17   A.   Yes.

18   Q.   Is this information that National Engineering could

19   have obtained itself before it sent the inaccurate report

20   to Guidant Group?

21   A.   Yes.

22   Q.   Is it difficult to obtain this kind of information

23   typically from a clerk's office?

24   A.   No.

25   Q.   Can you do it through a phone call in most instances?

1    A.   Yes.

2    Q.   The next two pages, do those appear to be the

3    revocation order that was referenced in the memo from the

4    deputy clerk?

5    A.   Yes.

6    Q.   And does the last page of the revocation order appear

7    to also contain the redacted social security number of the

8    defendant Debra Jean Adams from Virginia?

9    A.   Yes, it's right in the middle of the page just below

10   left of the seal.

11          MR. STEIGMAN:  No further questions, Your Honor.

12   CROSS EXAMINATION

13   BY MR. KUPINSE:

14   Q.   Does the fact that the social security number appears

15   on Exhibit 33 conclusively establish that that was the

16   social security number of the defendant  that appeared

17   before the court in Virginia?

18   A.   When you use the term conclusively, I think it's

19   compelling.

20   Q.   I think it's probably compelling too, I'm just asking

21   if it's conclusive?

22   A.   Under -- I suppose under the rules of evidence and

23   the way it uses the terms conclusive, it might not be.

24   Q.   So if an investigator did go out, did look at it,

25   would that investigator still have an obligation to send

1     along a report that said here's a suspicious problem we

2     don't know the answer to?

3     A.    No, I disagree.  My opinion, given the preponderance

4     of the evidence here, that --

5     Q.    You've never heard of criminal defendants giving

6     false social security numbers?

7     A.    I've heard of it, yes.

8     Q.    Oh, okay.

9           One thing you mentioned when Mr. Coffey was examining

10    you was adverse action, and can you tell us what adverse

11    action is?

12    A.    It's something, taking an action that's negative to

13    the individual.

14    Q.    Well, let me quote from the statute and see if this

15    meets your definition.  Talking about adverse actions,

16    quoting from the Fair Credit Reporting Act, the term

17    adverse action and there's a whole bunch of things, but it

18    does say denial of employment or any other decision on

19    employment.  Is that fair, part of the definition?

20    A.    Yes.

21    Q.    Okay.  And who had the authority in this case to deny

22    the plaintiff employment?

23    A.    I believe the decision was made by Guidant.

24    Q.    Or --

25    A.    And Northeast Utilities.

1   Q.   Thank you.  Not National?

2   A.   Well, yeah, they didn't make the decision to, my

3   understanding is they did not make the decision to

4   terminate her employment.  It was the other two entities.

5           MR. KUPINSE:  Thank you.

6           THE WITNESS:  Sure.

7   RECROSS EXAMINATION

8   BY MR. COFFEY:

9   Q.   Just a couple questions.  Now, showing you

10  Plaintiff's Exhibit 54, you have that?

11  A.   No, I think I just have 33 now.

12          THE COURT:  Give him a copy.

13  Q.   If I may approach?

14  A.   Thank you.  (Hands witness.)

15  Q.   Those include the materials that Ms. Adams had in

16  2006 with Choice Point that Choice Point's investigation

17  of the records showed.  It's also the same records that

18  the Verifications' investigation showed.  Can you tell me

19  on those initial records where the social security number

20  is?

21  A.   There's -- are you referring to the social security

22  number on the third page of this?

23  Q.   No, no, on the --

24          THE COURT:  Talking about the Choice Point, I

25  got it here.

1    A.    We can save time if you point to the page.

2    Q.    (Indicating)  There's two pages there.  There's a

3    page where Ms. Adams sent a letter to the clerk of the

4    court and then they gave her information back in 2006,

5    isn't that correct?

6    A.    Yes.

7    Q.    And can you tell me if any of the information they

8    transmitted back in 2006 included the social security

9    number back then?  The 2006 data which is different from

10   the other, the other exhibit you were handed, what I've

11   just handed up to you?

12   A.    Right.  I mean this letter -- I'm sorry, I'm a little

13   confused but the letters from Deborah Adams is here --

14   Q.    And the page from the court is the last page which I

15   showed you that was identified as from the clerk, from the

16   court.  I'll come up and show you.

17   A.    I think it's this one, right?  No?

18   Q.    Yes.

19   A.    Okay, this one, right.  This page, correct me if I'm

20   wrong, this page does not have a social security number on

21   it.

22   Q.    Okay.  So back in 2006, the clerk of the court did

23   not give Ms. Adams' or Choice Point the social security

24   number, is that correct?

25   A.    That's what it appears from those documents, yes.

1    Q.   Okay, and that's also when we sent a field researcher

2    out in 2007, the social security number was not on the

3    court records that were available for the public in the

4    database.  Is that fair to say?

5    A.   Well, but it shows in this 2007 --

6    Q.   Well, does -- because they de-archived the records at

7    that point, would that be fair to say because there's a

8    personalized letter to the clerk of the court from

9    Ms. Adams on May 29th of 2007, it would appear that she

10   had explained her plight to the clerk of the court?

11   A.   And then the --

12              MR. STEIGMAN:  Objection, objection, Your Honor.

13              THE COURT:  I'm trying to figure this thing out.

14   Exhibit 54 has --

15              MR. COFFEY:  Letters --

16              THE COURT:  Letters from Deborah Adams.

17              MR. COFFEY:  The last page, Your Honor.

18              THE COURT:  It has, yeah, the last page is what

19   I'm trying to figure out.  I don't -- would have thought

20   this was the last one, but this is back in the Choice

21   Point one?

22              MR. COFFEY:  Yes, Your Honor.

23              THE COURT:  I didn't realize that.  I knew that

24   she had claimed that Choice Point sent her information and

25   I guess it's connected with her letter of April 7th, 2006

1    which I didn't realize.  Deals with the welfare fraud one

2    back in 1996, 1997.  And hearing date was September 20th,

3    1999 before Judge Alexander.  And that's all Choice Point,

4    that's not the later sentencing.

5              MR. COFFEY:  No, that was the Choice Point,

6    that's why I'm asking was there any social security number

7    in any of the materials from 2006.

8              THE COURT:  On the social security numbers, so

9    you don't get confused, the social security numbers shown

10   in this Exhibit are the plaintiff's social security number

11   which she spells out in full in her letters to the clerk

12   of the circuit court.

13   BY MR. COFFEY:

14   Q.   So in the 2006, when Choice Point did their

15   investigation, when Ms. Adams did her own investigation,

16   there was no social security number given to her by the

17   court, is that correct?

18   A.   Yes, I would agree with that from these documents.

19   Q.   So are you saying at that time Ms. Adams'

20   investigation in Choice Point, they did not fully

21   investigate it or -- May 29th of 2007, upon her talking to

22   the clerk of the court, the clerk took sympathy with her

23   plight and helped her out, is that more fair to say?

24             MR. STEIGMAN:  Objection.

25             THE COURT:  I'll allow it.

1    A.    Yeah, it sounds like when you're saying it was

2    de-archived, that means the clerk made an extra effort to

3    find the records she needed to establish, to firm up what

4    the plaintiff was trying to show.

5    Q.    So that's fair to say that that would have been,

6    would not have been readily accessible in the court record

7    because you do not de-archive every record every time

8    someone is making a criminal search, isn't that fair to

9    say?

10   A.    Well, yes, you have to ask for it like Ms. Adams did.

11   Q.    In order to get it de-archived, you don't just walk

12   in and ask for a year's old record and they hand it to you

13   and ignore the database of dispositions, isn't that

14   correct?

15   A.    I think we're agreeing, in order to have a

16   de-archiving, you have to ask for it.

17   Q.    And it still has redacted social security numbers

18   because they were not releasing a full social security

19   number for privacy concerns, isn't that correct?

20   A.    Right, but you only needed those last four digits to

21   help prove her point.

22   Q.    And did you ever talk to the clerk of the court

23   yourself?

24   A.    No.

25

1    Q.   Thank you.

2         Couple other questions.  Adverse action, is it fair

3    to say it's a two part process?

4    A.   I think so but if you spell it out, I mean I can

5    agree quickly.

6    Q.   Well, at one point you advised the applicant of the

7    potential for adverse employment action, they get provided

8    a copy of the report, they get provided a summary of their

9    rights and then at some point they give, they are given,

10   the applicant's given time to dispute it before making a

11   decision and then a final decision is made?

12   A.   Right, applying that context I would agree with you,

13   yes.

14              MR. COFFEY:  I have no further questions, thank

15   you.

16              THE WITNESS:  Thank you.

17   FURTHER REDIRECT EXAMINATION

18   BY MR. STEIGMAN:

19   Q.   I have one question, Mr. Hendricks.  Does the Fair

20   Credit Reporting Act impose any obligations on Ms. Adams

21   to notify either National or Verifications before the

22   background check is done she had a problem once with

23   another background check?

24   A.   No, not that I know of, no.

25              THE COURT:  Okay.  I guess you can step down.

```
 1              (Witness excused)

 2              THE COURT:  All right, ladies and gentlemen,

 3    we'll resume with you at 9:00 o'clock.  We'll get in here

 4    earlier to handle a prospective witness.  And I think we

 5    can do that in proper time, can be ready for you at

 6    9:00 o'clock, and then we'll go 5:30 tomorrow.  We'll cut

 7    the lunch recesses to half hour, if you can do it.

 8    Remember there is a shop right in the courthouse

 9    downstairs if you want to use that.  And the attorneys

10    I'll let have their lunch in the courtroom.  And we'll go

11    until 5:30 tomorrow night and then Friday we'll go 8:30 to

12    5:30.

13              Thank you very much for your patience and

14    everything else.  Just leave everything back in the jury

15    room and we'll see you in the morning.

16              (Whereupon the above matter was adjourned at 4:50

17    o'clock, p. m.)

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761