1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
DEBORAH ADAMS,                  .    Case No. 3:07-CV-01035
                                .    (WWE)
              Plaintiff,        .
                                .    Bridgeport, Connecticut
       v.                       .    December 17, 2009
                                .
NATIONAL ENGINEERING SERVICE.
                                .
CORPORATION, ET AL.,            .
                                .
              Defendants.       .
. . . . . . . . . . . . . . .
```

CONTINUED TRIAL
BEFORE THE HONORABLE WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      Madsen, Prestley & Parenteau
                        By:  WILLIAM G. MADSEN, ESQ.
                             TODD D. STEIGMAN, ESQ.
                        44 Capitol Avenue, 2nd Flr. E
                        Suite 201
                        Hartford, CT 06106

For the Defendants:     Goldstein & Peck
                        By:  ANDREW M. MCPHERSON, ESQ.
                             WILLIAM KUPINSE, JR., ESQ.
                        1087 Main Street
                        Bridgeport, CT 06604

                        Wilson, Elser, Moskowitz
                        Edelman & Dicker
                        By:  MICHAEL W. COFFEY, ESQ.
                        3 Gannett Drive
                        White Plains, NY 10604

Electronic Recorder:    MS. SANDI BALDWIN

Transcriptionist:       MS. BERNADETTE JANKAUSKAS

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.
_____

1         (Proceedings commenced at 8:29 a.m.)

2              THE COURT:  ... that when we selected them.

3    This seems to be a pretty intelligent jury when you

4    look at the background of the people, but they're

5    expressing their concern -- they don't think I'm

6    cracking down hard enough on the lawyers, but you're

7    all experienced lawyers and you know what you have to

8    do to conduct a trial and represent your clients

9    properly.  As I say, you expect the Plaintiff to take a

10   good bit more time than any other witness and that's

11   what happens.

12             So I'm not dissatisfied at all with the

13   progress that counsel are making with the trial, but

14   the jury is, and I'd really like to keep that in mind

15   because they're much more important than I am.  I may

16   be completely satisfied but if they're not, we have

17   problem.

18             So we've got to emphasize to them that we've

19   got to put on a case here, and that counsel are trying

20   to put on a case as quickly as they can, efficiently as

21   they can.

22             So that's what I intend to say to them to try

23   to see if we can nip some of this problem in the bud,

24   and then we'll go to the offer of proof, and I've

25   looked at this overnight, pretty carefully, and I still

1  adhere to the conclusion that the summary judgment

2  rulings of Judge Hall were correct.

3       No question in my mind about the joint user

4  situation.  On the consumer reporting agency, it looks

5  to me as though when you take the statute, she is

6  correct in ruling that NESC can come under that

7  definition of a consumer reporting agency, and the

8  Plaintiff would not be affected.  If the Plaintiff

9  wants to so claim, the Plaintiff would not be affected

10  by Exhibit 1.  I don't know whether Judge Hall ever saw

11  Exhibit 1, it's not referred to, at all, in the ruling.

12       The Exhibit 1 can certainly bind National

13  Engineering and Verifications, provided they are able

14  to ignore the statute, and maybe they can do that if

15  the statute is a statute that says, "This is what you

16  should have to have this qualification, but you don't

17  have to have it, you don't have to do it, and if you

18  want a contract differently, you can do that." So that

19  would become significant on the cross-claims, and the -

20  - I would permit these experts to testify about that on

21  the cross-claims but not on the Plaintiff's case.

22       So, I'm adhering to the ruling, unless the

23  Plaintiff has changed her mind, through counsel, on

24  this position that they've been taking, which is that

25  NESC is a reporting -- consumer reporting agency and

1   not a user, and the usury here seems to be Northeast

2   Utilities.

3            Certainly, when you get into 14, which I

4   knocked out.  I knocked it out on the basis that the

5   person involved with Count 14 would be -- the entity

6   involved with Count 14 would be Northeast Utilities.

7   So I'm still adhering to those rulings, and I'll bring

8   the jury in when we finish the offer of proof and see

9   if I can get them settled down a little bit before we

10   resume with the evidence.

11            Well, I'm ready to go on the offer of proof.

12            MR. KUPINSE:  Thank you, Your Honor.  Anne --

13            THE COURT:  You want to --

14            MR. KUPINSE:  -- Fortney --

15            THE COURT:  -- go on the record now

16   (inaudible)?

17            MR. MADSEN:  Your Honor, just as a point of

18   order here.

19            We did bring a brief in opposition to a brief

20   that National Engineering filed yesterday, So we intend

21   to file that today.

22            THE COURT:  Well, that's on 14?

23            MR. MADSEN:  Correct.

24            THE COURT:  Well, I'm not going to change the

25   ruling on 14, but file whatever you want to file.

1    (Pause.)

2    THE COURT:  The Plaintiff's own expert,

3    yesterday in answer to a question, said that there was

4    no doubt in his mind that the person taking the adverse

5    action was Northeast Utilities under that

6    (unintelligible) B3.

7    UNIDENTIFIED SPEAKER:  (Inaudible).

8    THE COURT:  Yes, Ms. Moore.

9    DEFENDANT'S WITNESS, ANNE FORTNEY, SWORN

10   THE CLERK:  Please be seated.  Please state

11   your name, spell your last name,

12   THE WITNESS:  Yes.

13   THE CLERK:  -- and your city and state.

14   THE WITNESS:  Okay.  Anne Fortney, F-o-r-t-n-

15   e-y, Washington, D.C.

16   THE COURT:  Okay, as you give your testimony,

17   keep in mind what I just stated, that there are two

18   parts here.

19   My ruling following Judge Hall's ruling is that

20   joint user's out and the consumer reporting agency

21   status is that of an ESC, and Mr. Kupinse disputes that

22   very vigorously.  He wants to make an offer of proof

23   with respect to the Plaintiff's case.  He won't have to

24   make an offer of proof on the cross-claim, because I'm

25   going to be ruling in his favor on the cross-claims, if

1    I find -- unless somebody gives me some law of the

2    contrary, I'm going to find that these two parties,

3    Verifications and NESC, are perfectly capable of

4    contracting as they see fit to contract, and NESC is

5    definitely a user under that contract, on the cross-

6    claims.

7            So you may come back here to have to testify

8    on the cross-claims and you'll be allowed to do that.

9            All right, go ahead Mr. Kupinse.

10           MR. KUPINSE:  Thank you, Your Honor, and I

11   have explained the situation to Ms. Fortney, and we

12   will be a little more liberal just before yourself and

13   be a little less liberal in front of the jury.

14                         DIRECT EXAMINATION

15   BY MR. KUPINSE:

16   Q.   First thing I'd --

17           THE COURT:  Yes, well I to be.

18   BY MR. KUPINSE:

19   Q.   -- like to, Mr. Fortney --

20           THE COURT:  Make a complete offer here before

21   --

22           MR. KUPINSE:  I'm sorry?

23           THE COURT:  I say I want you to make a

24   complete offer here --

25           MR. KUPINSE:  Oh, I'm going to, Your Honor,

1    but I think I can do it through the documents

2    primarily.

3              THE COURT:  Okay.

4              MR. KUPINSE:  And that'll move it along

5    faster.

6              THE COURT:  Okay.

7    BY MR. KUPINSE:

8    Q.   Ms. Fortney, I'm going to show you a document.

9    Can you identify this?

10             THE COURT:  By the way, while she's looking

11   at that, let me tell you, in addition to telling the

12   jury about the excellent opening statements, how brief

13   they were, I'm also going to explain to the jury that

14   the practice we're following here is not a practice

15   that is followed, routinely, in every case.

16             We have moved to an exhibit admission

17   procedure that is very, very good.  It's very quick,

18   there's no nonsense, and in a lot of cases you get a

19   lot of nonsense.  I mean, the attorney shows the

20   document to the Court, then shows it to opposing

21   Counsel, and opposing Counsel looks at it as though

22   he'd never seen it before , and finally he makes a

23   decision as to whether they're going to object and then

24   it's marked, and we're avoiding all of that.

25             So the Plaintiff would still be on the stand

1    if we weren't avoiding that.  So I'll make that clear

2    to them.

3            Okay, go ahead.

4            MR. KUPINSE:  Thank you, Your Honor.

5    BY MR. KUPINSE:

6    Q.   Ms. Fortney, is the document which I've handed

7    you, which is marked 535B your curriculum vitae?

8    A.   It's actually two versions of the curriculum

9    vitae.  The first is -- the one on top is the one that

10   I provided along with my first expert report, in

11   September 2008, and the second copy of this curriculum

12   vitae is the one that I provided in connection with a

13   report that I prepared this month.

14   Q.   Thank you.

15           MR. KUPINSE:  And Your Honor, I've just

16   handed 535B to your clerk, and I would have that marked

17   as a court exhibit, --

18           THE COURT:  Yes.

19           MR. KUPINSE:  -- and I've given copies to the

20   other side.

21           THE COURT:  Okay, that would be for -- not to

22   go to the jury, but as part of the offer of proof.  Oh,

23   this is her curriculum vitae.  I'm probably going to

24   let that go to the jury.

25           MR. KUPINSE:  I pointed that out, Your Honor,

1  because I thought you might want that just to go to the
2  jury.
3          THE COURT:  No, that'll go to the jury.
4  BY MR. KUPINSE:
5  Q.  I'm handing you another document, Ms. Fortney.
6      Is that also a copy of your unredacted first
7  report?
8  A.  Yes, it is.
9  Q.  And can you take a look at the last page of your
10 report where the conclusion comes.
11     Is there a typographical error there?
12 A.  Yes, there is.  You have to understand, these
13 reports are prepared pretty quickly, and I did say that
14 Mr. Rodel (phonetic) had erroneously concluded that
15 National Engineering was a consumer reporting agency.
16 In fact, he concluded that National Engineering was a
17 user of the consumer report.
18 Q.  So it would be appropriate, in the very last
19 paragraph on Page 15, to strike, in the sixth line,
20 "consumer reporting agency," and put in, "a user of the
21 report"?
22 A.  Well, except that it was not an erroneous
23 conclusion.  It was a correct conclusion, --
24 Q.  Okay.
25 A.  -- in my opinion, that they were a user, but the

1    erroneous conclusion was that National Engineering had

2    taken --

3    Q.   Right.

4    A.   -- adverse action.

5    Q.   Okay.

6         Now, I'm going to take you through this entire

7    report, but would you -- let me get in a few more

8    documents too.

9         And I'll hand a copy of that unredacted report,

10   which I have marked 535A, to your clerk, and I have

11   made the correction of the typographical error on it.

12            THE COURT:  Yes, let me take a look at that

13   if you mark it.

14            UNIDENTIFIED SPEAKER:  (Inaudible.)

15            THE COURT:  Yes.

16        (Pause.)

17            THE COURT:  Now, this -- what page was that

18   where you made the correction?

19            MR. KUPINSE:  I think it's Page 13, Your

20   Honor.  I don't have one right -- let me -- I do have

21   one, sorry.

22            THE WITNESS:  It's Page 15.

23            MR. KUPINSE:  You'll see a red line down the

24   bottom where I've crossed out, "erroneously," and where

25   I've crossed out --

1            THE COURT:  Oh, I see it.  Yes.

2            MR. KUPINSE:  Yes.

3        (Pause.)

4            THE COURT:  Yes I don't think anybody's in

5    disagreement that these experts did conclude that

6    National Engineering was a user, and I knocked that out

7    because of Judge Hall's ruling.

8    BY MR. KUPINSE:

9    Q.   I'm going to hand you another document which has

10   been marked Defendant's Exhibit 501.

11       Can you identify that?

12   A.   Yes, this is the first page of an FTC staff

13   opinion letter discussing the joint user

14   interpretation.

15   Q.   Thank you.

16            MR. KUPINSE:  I'm gonna ask that that be

17   marked as a court exhibit, Your Honor.

18            THE COURT:  All right.

19   BY MR. KUPINSE:

20   Q.   I'm going to had you another document which is

21   marked as Defendant's Exhibit 502.

22       Can you identify that?

23   A.   Yes, this is a letter -- Federal Trade Commission

24   staff opinion letter discussing the joint user

25   interpretation.

1          MR. KUPINSE:  Can that now be marked as a

2     court exhibit, Your Honor?

3          THE COURT:  Yes.

4          MR. MADSEN:  Can I get copies of these?

5          MR. KUPINSE:  They're in the --

6          THE COURT:  While we're paused for a moment.

7     I'm trying to write down a couple of things here.  Let

8     me get caught up.

9        (Pause.)

10          THE COURT:  Now, the exhibits are 535A and B,

11     and give me those other two exhibits you just marked.

12          MR. KUPINSE:  502, and I'm about to do --

13     501, 502, and I'm about to do 503.

14          THE CLERK:  And 535A is ID only.

15          MR. KUPINSE:  You didn't get 535A?

16          THE CLERK:  I have the old -- I have a

17     replacement for the original 535, and that's all I

18     have.

19          MR. KUPINSE:  But I thought I just handed you

20     --

21          THE COURT:  Oh I have it.  I have it.  I have

22     it here.

23          THE CLERK:  And that's -- but that's ID.

24          MR. KUPINSE:  Yes, yes.

25          THE COURT:  Yes, these will all be in

1   connection with the offer of proof, except that some of

2   them will be admitted to the jury, 535B, for example,

3   will be admitted to the jury.

4          THE CLERK:  Okay (inaudible).

5          MR. KUPINSE:  Well no, if Your Honor please,

6   are we marking these as ID, or are we marking these as

7   court exhibits?

8          THE COURT:  I don't really care.  Do whatever

9   you want to do with it.

10         MR. KUPINSE:  Okay, I thought Mr. Madsen --

11         THE COURT:  As long as it's very clear --

12         MR. KUPINSE:  -- just asked --

13         THE COURT:  -- that they're not full exhibits

14  for the jury.

15         MR. KUPINSE:  Yes, I think perhaps they

16  should be marked as court exhibits, Your Honor.  ID is

17  fine.  ID is fine.

18         THE CLERK:  535B is a full exhibit.  That's

19  okay.

20         THE COURT:  Yes.

21         THE CLERK:  It's the 535A --

22         THE COURT:  And that's ID.  We'll ascribe

23  using ID.

24         MR. KUPINSE:  Let's just mark it all ID.

25         THE COURT:  That's good.  That's fine.

1          THE CLERK:  Okay so 535B --

2          MR. KUPINSE:  Right.

3          THE COURT:  Yes.

4          THE CLERK:  -- is ID now.

5          MR. KUPINSE:  Yes.

6          THE COURT:  And 501, 2, and 3 are all ID at

7    the moment.

8          THE CLERK:  Okay.

9    BY MR. KUPINSE:

10   Q.   Now, I put another document before you which is

11   503 -- Exhibit 503.

12        Can you identify that?

13   A.   Yes, it's an excerpt of the Federal Trade

14   Commission's commentary on the Fair Credit Reporting

15   Act, specifically interpreting the joint users of

16   consumer reports.

17        MR. KUPINSE:  And may that be marked as an

18   exhibit for identification?

19          THE COURT:  Yes.

20          MR. KUPINSE:  (Inaudible.)

21          THE CLERK:  Yes.

22          THE COURT:  Yes.

23          THE CLERK:  Correct.

24   BY MR. KUPINSE:

25   Q.   And did you also prepare a supplemental report in

1    this case?

2    A.   Yes, I did.

3    Q.   Is this a copy of it?

4    A.   Yes, it is.

5         MR. KUPINSE:  That's been marked 553, and may

6    that be marked as an exhibit for identification?

7         THE COURT:  Yes.

8    (Pause.)

9    BY MR. KUPINSE:

10   Q.   Now, before I get to the ultimate conclusion,

11   there were two matters that you mentioned to me this

12   morning, and one was a fact that there was a citation

13   to enact that was never passed.

14        Can you explain that to the Court?

15   A.   Yes, and I think this has been -- let me explain

16   the citation.

17        There was a reference to a 1994 amendment to the

18   Fair Credit Reporting Act.  There was no 1994 amendment

19   to the Fair Credit Reporting Act and, therefore, the

20   committee report that has been discussed, was not

21   applicable.

22   Q.   And where did that reference occur, if you

23   recollect?

24   A.   It was in a pleading by the Counsel for the

25   Plaintiff.

1    Q.   Okay.

2         And there was some discussion of a five-day rule.

3    Can you also explain that to the Court?

4    A.   Yes.  The committee report in question referred to

5    a five-day rule, meaning that an employer had to wait

6    five days after providing a copy of a consumer report

7    to an applicant, or to an employee, before taking

8    adverse action based on that report, and there is no

9    provision in the statute to that effect, and the reason

10   is, that the Fair Credit Reporting Act was amended two

11   years later, in 1996, to provide for the procedures

12   with respect to consumer reports that are obtained in

13   connection with -- well, for employment purposes.

14   Q.   Now, with respect to the ultimate conclusion,

15   you've examined the documentation in this case and the

16   facts, and have you come to a conclusion as to whether

17   National Engineering Service Corporation was a consumer

18   reporting agency or a user?

19   A.   I have come to a conclusion, yes.

20   Q.   And what is that conclusion?

21   A.   The conclusion is, with all due respect, that

22   National Engineering was not a consumer reporting

23   agency.  The record does not support the -- National

24   Engineering as a consumer reporting agency within the

25   definition of the statute, and that National

1   Engineering was a user of the consumer report.  That's

2   entirely consistent with the record in this case,

3   including the agreement between National Engineering

4   and Verifications which, in my experience, is a very

5   standard subscriber/user agreement.

6   Q.   Now, the Judge did refer this morning to

7   Plaintiff's Exhibit 1, which you've just referred to,

8   which is a user agreement, and I'll show you a copy of

9   it.

10              THE COURT:  And that we marked as a full

11  exhibit before the jury.

12              MR. KUPINSE:  Yes, it was marked as a full

13  exhibit --

14              THE COURT:  Yes.

15              MR. KUPINSE:  --before the jury.

16  BY MR. KUPINSE:

17  Q.   That's a user -- the Plaintiff's Exhibit 1.

18       Can you tell the Court what that is?

19  A.   Yes, and this is a document that the Fair Credit

20  Report Act requires, because a consumer reporting

21  agency cannot provide a consumer report to a user

22  unless the user has a permissible purpose and certifies

23  that permissible purpose, and for that reason,

24  Verifications could not have provided the report to

25  National Engineering unless National Engineering had

1    entered into an agreement of this kind, and had

2    certified the purpose for which the report would be

3    used.

4    Q.   Now, is there a different agreement -- are there

5    different agreements, which the Fair Credit Reporting

6    Act requires if you are not a user, you are some other

7    entity?

8    A.   It is a very common practice in the industry for

9    consumer reporting agencies, particularly what's

10   referred to as a repository, such as one of the

11   nationwide consumer reporting agencies and a reseller,

12   to have an agreement where the reseller agrees to

13   obtain the information and to provide that information

14   to a third party, to what's called the end user and,

15   again, the Fair Credit Reporting Act requires that when

16   a consumer reporting agency provides a report to the

17   reseller, the reseller must identify the end user of

18   the report, and that's a very different kind of

19   agreement than appeared here.

20   Q.   And was the -- in your opinion, was National a

21   reseller in this case?

22   A.   No, they were not a reseller.

23   Q.   Okay.

24        And just to make the record, why do you believe

25   that National was not a consumer reporting agency?

A.   For several reasons.  First of all, National
Engineering did not obtain this report for the purpose
of preparing a consumer report.  National Engineering
obtained this report in order to fulfill its
obligations to its client, Guidant (phonetic), in order
to perform the duties of a staffing agency.  Again,
National Engineering had what's called a permissible
purpose to use this report.  So number one, they did
not obtain the report for that purpose of preparing
another report.

Number two, National Engineering did not receive a
fee for this report from Verifications or from anyone
else.  What National Engineering did, was pay
Verifications for the report, and then they recovered
that fee from, I think, Northeast Utilities on sort of
a general, you know, basis that, my understanding from
the record, is that National Engineering would
basically pass the cost of the report to Northeast
Utilities, who would pay for it, but it didn't do this.
It didn't prepare a report for a fee.

There's also nothing in the record that indicates
that National Engineering evaluated this information in
the way that a consumer reporting agency evaluates
information of this kind, and to give you an example of
how a reseller could evaluate information and,

1    therefore, become a consumer reporting agency, that's

2    what Fair Isaac does.  Fair Isaac takes information

3    from a consumer report, and uses a statistical model to

4    evaluate that information and produce what's known as a

5    credit score.  That -- And Fair Isaac, in that

6    situation, is a reseller of the consumer report

7    information.  They're also a consumer reporting agency

8    because Fair Isaac is evaluating the information.  So

9    National Engineering did not evaluate the information.

10       What National Engineering did here -- what Chris

11   Sullivan did, is the very same thing that every auto

12   dealer in America does, every mortgage broker does,

13   when they obtain a consumer report in order to put

14   together an application package for the entity that's

15   actually going to make the decision and can, in fact,

16   take adverse action if that's the result.  For

17   instance, an auto dealer would say okay, this person --

18   to the bank, this person has bad credit, but they're a

19   master (phonetic).  Therefore, you need to give them a

20   break, or a mortgage broker might say, this person has

21   bad credit, but they're putting down 50 percent so the

22   bank's risk is not that great.

23       Those are comments that are made on the consumer

24   report that's being provided to the company that makes

25   the ultimate decision.  Those types of comments are

1    entirely consistent with what Chris Sullivan did here.

2    He made comments on the report.  He didn't evaluate the

3    information for the purpose of preparing a consumer

4    report.

5         Finally, the reason why I don't think National

6    Engineering is a consumer reporting agency, is there's

7    nothing in the record that the type of comment that Mr.

8    Sullivan made on the report is something that they do

9    regularly.  In other words, to be a consumer reporting

10   agency, you can't just take a report and make a comment

11   and give it to somebody else.  This has to be your

12   business.  You have to do it on a regular basis.

13   That's in the statute.

14        So, for all of these reasons I do not believe that

15   National Engineering comes within the definition of a

16   consumer reporting agency.  They were a user of the

17   report.  They used it in connection with their

18   obligations as a staffing agency.  They had a

19   permissible purpose, and that clearly was the

20   understanding of everyone at the time this report was

21   obtained, and at the time that it was used on

22   connection with this application.

23   Q.   Now, as a user, did National comply with the Fair

24   Credit Reporting Act?

25   A.   Yes.   There's also -- As I said, this contract is

1   necessary for Verifications -- this contract meaning

2   Exhibit 1, is necessary for Verifications to comply

3   with its obligations under the Fair Credit Reporting

4   Act.  It's also necessary for National Engineering to

5   comply with its obligations, because the act also says

6   that if you are a user of a consumer report, you cannot

7   obtain and use a consumer report unless you have a

8   permissible purpose.  Again, National Engineering had a

9   permissible purpose.  National Engineering used the

10  report in connection with its obligations as a staffing

11  agency.

12  Q.   And can you explain, quickly, whether or not the

13  sequence of timing was appropriate in terms of, from

14  May 8th when the report with the erroneous information

15  was delivered, until May 11th when the corrected report

16  was delivered?

17  A.   Yes, I can, because again, National Engineering

18  could not make the decision whether Ms. Adams was going

19  to be placed with Northeast Utilities or not.  That

20  decision had to be up to Northeast Utilities, and of

21  course Northeast Utilities relied upon the information

22  provided to it.  Northeast Utilities was the one that

23  would be in a position to take adverse action.

24       So what happened here was that, as I understand it

25  from the record, National Engineering obtained a copy

1    of the report from Verifications, Chris Sullivan saw

2    the report, made his comment on the report, and

3    provided it immediately, as he was required to do under

4    his agreement with Guidant, to Ms. Sheffley (phonetic)

5    at Guidant, and he also, on that very same day

6    discussed, the content of the report with Ms. Adams,

7    and when she disputed the information in the report, in

8    fact, disputed the fact that the report was even on

9    her, he then immediately provided that information

10   regarding that dispute to Guidant, who then would have

11   referred it to Northeast Utilities, but at that point,

12   after National Engineering provided the information to

13   Guidant, it was out of the hands of National

14   Engineering.

15       So whenever adverse action was taken, it would

16   have had to be after National Engineering provided the

17   information to Guidant, and National Engineering also

18   did what was entirely consistent, with my understanding

19   of how the industry works, which is because National

20   Engineering was the party that dealt directly with Ms.

21   Adams, Mr. Sullivan, for National Engineering, provided

22   a copy of the report to Ms. Adams and basically told

23   her how she could dispute it.  She did, and within

24   three days that information had been corrected.

25       So, again, what National Engineering did was

1    entirely consistent with my understanding of how a

2    company in this position should comport itself under

3    the Fair Credit Reporting Act.

4    Q.   Thank you very much.

5              MR. KUPINSE:  I have no further questions on

6    the offer of proof, Your Honor.

7              THE COURT:  All right.

8              Now, I'm assuming that Verifications doesn't

9    want to examine, because I assume you agree with what

10   she said.

11             MR. MADSEN:  I have no questions for --

12             THE COURT:  I thought --

13             MR. MADSEN:  -- Ms. Fortney.

14             THE COURT:  -- so.  All right.

15             Now, the Plaintiff has some options here.

16   Let's decide what the Plaintiff wants to do.  She's put

17   in her testimony, which I think is interesting, and I

18   don't question her testimony at all.  I think that she

19   and Judge Hall never meet in opposite sides directly. I

20   think Judge Hall's perusal of the statute, which I

21   looked at carefully, takes into consideration other

22   aspects than this witness relies upon in giving her

23   opinion.

24             So I think both of them can stand as they

25   are, but if the Plaintiff wants to examine her, you can

1   go ahead and do that.  I -- You are certainly entitled

2   to rely, in the appellate record, to offset the offer

3   of proof by NESC, the findings and conclusions made by

4   Judge Hall in the summary judgment ruling, which is

5   part of the record.  So it's up to you as to what you

6   want to do at this point.

7        (Pause.)

8                    CROSS-EXAMINATION

9   BY MR. STEIGMAN:

10  Q.   Good morning, Attorney Fortney.

11  A.   Morning.

12  Q.   Does the Fair Credit Reporting Act contain a

13  statutory definition of the term, "user" in any

14  provision, to your knowledge?

15  A.   No, it does not.

16  Q.   What is your definition of the term, "user"?

17  A.   My definition of the term, "user," is a person

18  that obtains a consumer report, pursuant to the Section

19  which -- you'll have to forgive me, because I'm most

20  familiar with the statute in terms of section numbers

21  rather than the U.S. Code numbers, so the person who

22  obtains a report in connection with a permissible

23  purpose under Section 604.

24  Q.   Is there anything in the Fair Credit Reporting Act

25  specifically, in any specific provision of it, which

1    precludes an entity from being both a person who

2    obtains a consumer report for permissible purpose, and

3    a consumer reporting agency?

4    A.   Yes.

5    Q.   What provision would prohibit that simultaneous

6    status?

7    A.   Several provisions.  Number one, Section 607(a),

8    as I've indicated, requires a consumer reporting agency

9    to obtain from a user of a consumer report, a

10   certification that the report will be given -- be used

11   for a permissible purpose, and so you'd have to have a

12   situation where the consumer reporting agency would

13   obtain, from itself, a certification as to the use

14   which, number one, makes absolutely no sense under the

15   Act, number two, Section 604(f), I believe it is,

16   provides --

17            THE COURT:  604 "F," as in Frank?

18            THE WITNESS:  "F," as in Frank, yes.

19            THE COURT:  Okay.

20   A.   Provides that a user of a consumer report may not

21   obtain a consumer report from a consumer reporting

22   agency, unless the user has permissible purpose.  So

23   now you have the strange situation where the user of a

24   consumer report would have to obtain the report from

25   itself.  Again, that doesn't make sense, And probably

1   most significantly, and this is why I said no, is that

2   a consumer reporting agency has to provide a notice to

3   a user of a consumer report of the -- it's a summary of

4   the obligations, the duties of users of consumer

5   reports.

6       So again, the consumer reporting agency would have

7   to provide a copy of this notice to itself, and the act

8   makes, you know, makes it very clear that that's not

9   what envisioned here, that they cannot give a notice to

10  themselves as to their obligations under the Act.

11      Those are just several things that come to mind,

12  but the fact of the matter is, the Act contemplates

13  that there are very separate persons here with respect

14  to a particular consumer report; a consumer reporting

15  agency, a user, a reseller.  There's also a furnisher,

16  which doesn't apply here, but the Act clearly

17  contemplates that there are three or four separate

18  types of persons here with respect to any consumer

19  report, and each person has different obligations under

20  the Act.  That's why the Act -- it is just not possible

21  for someone to be both a consumer reporting agency and

22  a user with respect to the same report.

23  Q.  The adverse action section of the Fair Credit

24  Reporting Act, which I'm familiar with as 1681(b)(3),

25  does that impose obligations on persons, or on -- does

1   it use the term, "user"?

2   A.   I really don't recall which term it uses, but it's

3   within the Section 604, which the heading to Section

4   604 is the use of consumer reports.  So everything in

5   Section 604 applies to users of consumer reports.

6   Q.   And again, the term, "user" is not defined in the

7   statute.  That's just a term that you're using, right?

8   A.   It is a term that has been used since the statute

9   was enacted in 1970.  It is used in every single

10  situation that I can imagine.  We are talking about a

11  person that obtains a consumer report under Section

12  604, or you would say Section 1681(b).

13  Q.   Thank you.

14           MR. STEIGMAN:  No further questions, Your

15  Honor.

16           THE COURT:  All right.  Thank you very much.

17           MR. KUPINSE:  If Your Honor please, if the

18  jury is going to come in, I don't know whether you want

19  me to leave Ms. Fortney up there or not.  Do you want

20  me to leave her there for -- we would put her on now

21  for her testimony before the jury, if Your Honor

22  pleases.

23           THE COURT:  Well, wait a minute, I'm confused

24  --

25           MR. MADSEN:  We had requested (inaudible).

1          THE COURT:  I was going to say that I didn't
2     know we were producing her for anything at this point,
3     other than an offer of proof.
4          Am I wrong about that?
5          MR. KUPINSE:  You were right about the offer
6     of proof.  I had asked whether, since she did come up
7     from Washington, whether we could take her out of order
8     and put her on now, and I thought Mr. Madsen had
9     agreed, but apparently he's not.
10         MR. MADSEN:  Well, I mean, I said that we
11    would definitely get her on today.
12         MR. KUPINSE:  Okay.  We'll wait until Mr.
13    Madsen finishes his case then.
14         Thank you.
15         THE COURT:  Well, let's see what we want to
16    do.
17         MR. MADSEN:  Well, let me --
18         THE COURT:  Is there any doubt about our
19    finishing the Plaintiff's case so we can get on to our
20    -- the Defense case today?
21         MR. MADSEN:  Well, can I just have a moment
22    to confer with Counsel?
23         THE COURT:  Sure.  Yes.
24         Get Craig for me, will you please?
25       (Pause.)

1          THE COURT:  We're going to go to testimony on

2     the record now, Craig, so you don't have to be out here

3     for that, if you don't want -- if you want to work on

4     the charge, but this will just be straight testimony.

5          THE CLERK:  I'm going to (inaudible) make

6     sure everybody's here.

7          THE COURT:  Yes, okay.  Fine.  Tell her about

8     ready to go.

9          THE CLERK:  Okay.

10          MR. KUPINSE:  Your Honor, please, I think

11     that we've reached an agreement, and I think we're

12     going to hold off putting on Ms. Fortney at the moment

13     and we're going to move to recall the witness, Kathy

14     Shapleigh (phonetic), who has come down for one small

15     purpose, and then the Plaintiff is going to proceed

16     with his case and we've, I think, worked out the

17     scheduling, and if I may just approach to take off the

18     exhibits that I showed Ms. Fortney --

19          THE COURT:  Let me ask you one question,

20     though.  Kathy Shapleigh was called as an adverse

21     witness by the Plaintiff.  So I assume she's being

22     recalled in the same capacity.

23          MR. KUPINSE:  It doesn't matter, I can call -

24     -

25          THE COURT:  I'd tell the jury --

1          MR. KUPINSE:  -- her as my own witness too,
2  Your Honor.
3          THE COURT:  -- it doesn't matter who calls
4  her, as a matter of fact.
5          MR. MADSEN:  Yes, I know we have a problem.
6          THE COURT:  But I don't want to confuse them
7  over where they take their --
8          MR. KUPINSE:  Well, you can --
9          THE COURT:  -- notes.
10         Can they take their notes as part of their
11  original notes on Kathy?
12         MR. MADSEN:  Yes, absolutely.
13         THE COURT:  Okay, so --
14         MR. KUPINSE:  Yes, of course, Your Honor.
15         THE COURT:  -- that's all they care about.
16         MR. KUPINSE:  If I may just approach to get
17  the exhibits --
18         THE COURT:  Yes, sure.
19         MR. KUPINSE:  -- so the jury doesn't wind up
20  (inaudible) and have to wait.  Thank you.
21      (Pause.)
22         MR. KUPINSE:  Would you like me to bring Ms.
23  Shapleigh in now, Your Honor?
24         MR. MADSEN:  Yes, put her on the stand.  I'll
25  get her.

1          MR. KUPINSE:  Okay.

2          THE COURT:  Yes, bring Kathy in and put her

3     on the stand, yes.

4        (Pause.)

5          THE COURT:  They all here?  Okay.

6          Welcome back.  You're still under oath.

7          Right, you want to bring them in?

8        (Pause.)

9          THE COURT:  Okay, good morning.

10          ALL:  Good morning.

11          THE COURT:  Now, I'd like to talk to you a

12     little bit about this case after two days and tell you

13     what my reaction to the case is, and so on.

14          When we sought that -- the jury

15     (unintelligible), we knew that this was going to be a

16     case that would not be finished in two or three days as

17     some cases are.  We knew we were dealing with three

18     parties here, not two, and we knew it was Christmas.

19     So we deliberately brought in a hundred people in order

20     to take that into account, and it paid off, because we

21     were able to pick a jury.

22          Now, my impression of you as a jury is that

23     you're pretty intelligent people, you're either above

24     the average of what we get in juries, and we have

25     pretty good caliber juries in federal court.  So you're

1    intelligent people who have had no experience with

2    litigation except for two of you, who have sat on a

3    case before.

4            Litigation is not the most efficient way to

5    conduct disputes, believe me, but we have to do it

6    because if we do an adverse system, the adverse system

7    is the way we find that the truth can be brought out

8    for juries to consider.  Now, we want to make sure.  My

9    job is managing the case, is to make sure that the jury

10   does get every bit of evidence that is relevant and

11   material, that might bear upon the outcome of the

12   questions that have been decided, and now I have told

13   the attorneys that I am satisfied -- more than

14   satisfied, in some ways I'm pleased with the way the

15   attorneys have conducted this trial, because I expect

16   as experienced attorneys that they would do this, and

17   they did.

18           I expected we would have very short opening

19   statements.  Believe me, they were very short opening

20   statements.  We got three opening statements in in 25

21   minutes.  I timed it, and I couldn't have asked any

22   more than that from those attorneys.  They did a great

23   job with those opening statements.

24           Now, the second thing we're doing which may

25   not be obvious to you -- well, except for perhaps the

1    two of you who've had prior jury experience, is the way

2    we're marking exhibits.  Believe me, we have changed,

3    so drastically, the normal way we mark exhibits that we

4    have saved countless, I think hours here, on exhibit

5    marking.  The attorneys have agreed that they don't

6    have to do what is normally done.  What normally is

7    done is, let's take the Plaintiff attorney, Mr. Madsen.

8    He's going to offer an exhibit.  He stands up and he

9    says, "Your Honor, I want to offer Exhibit Number 5,"

10   and he comes up and shows me Exhibit Number 5.  Then he

11   goes to opposing counsel and shows opposing counsel

12   Exhibit Number 5, and very often opposing counsel looks

13   at it as though he's never seen it before, and for 20

14   minutes he's examining Exhibit 5.  Then, finally, he

15   says he has no objection to it.  Then it has to be

16   given to Debbie, and Debbie has to mark it, and about

17   20 minutes have gone by while we're marking one

18   exhibit.

19          Now we said that wasn't going to happen in

20   this case because we knew how many exhibits we have to

21   handle, and the attorneys have cooperated beautifully.

22   We're just putting this thing in, and Debbie marks them

23   as they go in, and there's no offer and so on.  So we

24   didn't waste any time.

25          Now, those are the two aspects of the case in

1   which I am pleased with what the attorneys have

2   accomplished.

3          Also, I would point out to you that in two

4   days, we've heard from five witnesses.  We're about to

5   hear from Kathy Shapleigh, recalled very briefly here,

6   but she's one of the five.  So in two days, covering

7   five witnesses is very good, especially when you

8   consider that one of the witnesses is the Plaintiff,

9   and the Plaintiff is always going to take the longest

10  amount of time, and should, because the Plaintiff is

11  the only person who can testify as to every aspect of

12  the case.  She brought the case, heard all her

13  complaint, and she has knowledge of every aspect that's

14  in the complaint.  So naturally she's going to be

15  examined, at some length, and she's going to be cross-

16  examined by two parties, not just one party.

17         So I knew the Plaintiff would take some time.

18  She did, but she didn't take an unusual amount of time.

19  That's about what you would expect the Plaintiff to

20  take, and many other witnesses have been shorter, and

21  they'll continue to be shorter.

22         Now, I have a vision that we will be able to

23  get this case to the jury on Monday, and I still have

24  the vision we will get to the jury on Monday.  I don't

25  want to be here on Wednesday next week, either.  I

1   don't expect that we will be.  I have every hope that

2   we will get it to the jury Monday, and if not,

3   certainly it won't go beyond Tuesday, but we'll keep

4   moving along, but this jury's are doing a good job for

5   me here and that's all I can ask of them.

6          All I can ask of you is that you apply your

7   intelligence and your patience as well, and we'll go

8   along with 30 minutes on lunch recess, very short ten

9   minute recesses, and if any time you need a recess, let

10  us know and we'll take it, otherwise we'll adhere to

11  the schedule we've been following cut down to 30

12  minutes on lunch.

13         Now we recalled Kathy Shapleigh.

14         MR. KUPINSE:  Thank you, Your Honor.

15         THE COURT:  Mr. Kupinse.

16         CROSS-EXAMINATION (CONTINUED)

17  BY MR. KUPINSE:

18  Q.  Ms. Shapleigh, thank you for coming back today,

19  and I'm going to put before you a document and ask you

20  if you can identify it.

21     (Pause.)

22  BY MR. KUPINSE:

23  Q.  It's Exhibit 505.

24         THE COURT:  Okay.

25  BY MR. KUPINSE:

1    Q.   Can you identify that?

2    A.   Yes.

3    Q.   And tell us what it is.

4    A.   This is an e-mail that I had sent to Patricia

5    Angelo Park with the status of Deborah Adams's

6    eligibility.

7    Q.   And it was an exchange of e-mails between you and

8    Patricia Angelo Park?

9    A.   Yes.

10   Q.   And who is Patricia Angelo Park?

11   A.   One of the NU hiring managers.

12   Q.   And was the -- were these e-mails sent about the

13   time of the incident that we're discussing in this

14   case?

15   A.   Yes.

16   Q.   And that was on May 11th?

17   A.   Yes.

18   Q.   Thank you.

19            MR. KUPINSE:  I offer it, Your Honor.

20            UNIDENTIFIED SPEAKER:  Your Honor?  Is it all

21   right to (inaudible) this?

22            MR. MADSEN:  Yes, the exhibit was being

23   handed out before Your Honor actually ruled on this --

24            THE COURT:  Yes, (unintelligible).

25            MR. MADSEN:  Yes, okay.

1        THE WITNESS:  Thanks.

2   BY MR. KUPINSE:

3   Q.   Now, like most of these e-mails that we put in,

4   you read them from the back; is that correct?  Was that

5   the first of the e-mails, at 4:29, on the second page?

6   A.   Oh, I'm sorry, the second page.  Yes.  Yes.

7   Q.   And did Ms. Angelo Parks raise some questions

8   about the Plaintiff's resume?

9   A.   Yes.

10  Q.   And then on the next page, did you respond to

11  those questions?

12  A.   Yes.

13  Q.   And then finally, did you send over the e-mail

14  indicating that the Plaintiff's background report had

15  been researched, and updated, and cleared?

16  A.   Yes.

17  Q.   And was that before the position had been filled?

18  A.   Yes.

19  Q.   Thank you.  I have no further questions.

20        THE COURT:  Verifications have any questions?

21        MR. COFFEY:  I have no questions.

22        THE COURT:  All right.

23        MR. MADSEN:  Yes.

24        THE COURT:  Mr. Madsen?

25        MR. MADSEN:  Okay, and again in -- I'd like

1    to now get to Plaintiff's Exhibit 32 (inaudible) no

2    objection in the pretrial report.

3            MR. KUPINSE:  Which are we doing, 32?

4            MR. MADSEN:  Thirty-two.

5            THE COURT:  What exhibit is that?

6            MR. MADSEN:  It's 32.

7            MR. KUPINSE:  Give me just a second, Your

8    Honor, before that's distributed.

9            THE COURT:  Well I'm looking at 32 and it --

10   what do you claim 32 is?

11           MR. MADSEN:  Thirty-two is an exhibit that we

12   identified and no objection was made by either

13   Defendant.  So it's going with our protocol, I

14   understand it's a full exhibit.

15           THE COURT:  Yes, I thought you told me it was

16   a pretrial memo.  I was trying to figure out what you

17   meant --

18           MR. MADSEN:  No.

19           THE COURT:  -- by a pretrial --

20           MR. MADSEN:  No.

21           THE COURT:  -- memo.

22           MR. MADSEN:  No, no.  A joint file memo that

23   Judge Hall asked for and (inaudible) for us to identify

24   exhibits, and then each side is given the opportunity

25   to register objections.  No objection was made to this

1   coming in as a full exhibit.

2          THE COURT:  Well, you're offering 32, and I

3   assume nobody has any objection to 32.

4          MR. KUPINSE:  I do.  Give us just a second,

5   Your Honor.  I think there may have been an objection.

6          MR. MADSEN:  No, there wasn't.

7       (Pause.)

8          MR. KUPINSE:  If Your Honor please, even

9   though I didn't enter an objection to this, and I know

10  you just told us how well we're doing on handling the

11  exhibits, I would object to this.

12         I was required to bring Ms. Shapleigh back

13  down.  This is not an e-mail from anyone who has

14  testified.  It's hearsay.  I do object.

15         THE COURT:  Well, the problem is, it

16  certainly is hearsay because it has -- it's an exchange

17  between people in Guidant, and I don't see how I can

18  get around the -- Guidant's not a party here, so I

19  don't -- I can't waive the --

20         MR. MADSEN:  Ms. Shapleigh is a

21  representative.

22         THE COURT:  Yes, but what's she got to do

23  with this -- with 32?

24         Yes, I think I'd better sustain the objection

25  to 32.

1          Now, 505 is something else and I looked at --
2     but I'll sustain the objection to 32.
3     BY MR. MADSEN:
4     Q.  Ms. Shapleigh, again, going back to your testimony
5     yesterday, it's clear, isn't it, that had Deborah Adams
6     passed the background check and the drug test, which
7     she did pass, that she would have started work at
8     Northeast Utilities?
9     A.  Yes.
10    Q.  Thank you.
11         THE COURT:  Nobody has anything else?
12         MR. KUPINSE:  No further questions, Your
13    Honor.
14         THE COURT:  Thank you very much.
15         THE WITNESS:  Thank you.  Happy Holidays,
16    Your Honor.
17         THE COURT:  We won't be calling you again, I
18    promise.
19         THE WITNESS:  Oh please.
20       (Pause.)
21         MR. MADSEN:  Your Honor, the Plaintiff calls
22    Mary Poquette.
23       PLAINTIFF'S WITNESS, MARY POQUETTE, SWORN
24         THE CLERK:  Please be seated.
25         Please state your name, --

1          THE WITNESS:  Thank you.

2          THE CLERK:  -- spell your last name, and your

3    city and state.

4          THE WITNESS:  My name is Mary Poquette, P-o-

5    q-u-e-t-t-e, Wilmington, Minnesota.

6                    DIRECT EXAMINATION

7    BY MR. STEIGMAN:

8    Q.   Good afternoon, Ms. Poquette.  Good morning, I'm

9    sorry.

10   A.   Good morning.

11   Q.   You're currently employed by Verifications, Inc.,

12   one of the Defendants in this case?

13   A.   Correct.

14   Q.   And what position do you currently have?

15   A.   My current position is chief compliance and

16   security officer?

17   Q.   How long have you held that position?

18   A.   By title, about five years; However, the

19   responsibilities of the positions have always been mine

20   throughout my employment.

21   Q.   And as the chief compliance officer for

22   Verifications, it is part of your responsibilities to

23   ensure that Verifications follows the laws and

24   regulations that govern the preparation and production

25   of consumer reports and criminal background checks,

43

1    including the Fair Credit Reporting Act?

2    A.   Yes.

3    Q.   It's an important job of yours to be well versed

4    in the requirements of the Fair Credit Reporting Act;

5    isn't that true?

6    A.   Yes.

7    Q.   Verifications, in fact, relies upon your expertise

8    regarding the Fair Credit Reporting Act in the

9    performance of its business; is that right?

10   A.   Along with others, yes.

11   Q.   To you knowledge, how many criminal background

12   checks does Verifications perform annually,

13   approximately?

14   A.   I would estimate in 2009, we would conduct between

15   two and three million.

16   Q.   Approximately what percentage of those would be

17   for employment purposes?

18   A.   All of them.

19   Q.   Would you agree that accuracy is very important in

20   the preparation of criminal background checks for

21   employment purposes?

22   A.   Absolutely.

23   Q.   Verifications takes that accuracy requirement very

24   seriously, is that your position?

25   A.   Absolutely.

44

1    Q.   To your knowledge, does the Fair Credit Reporting

2    Act require Verifications to follow reasonable

3    procedures to ensure maximum possible accuracy of the

4    criminal background checks that it prepares?

5    A.   Yes; however the requirement is actually higher

6    than that.

7    Q.   In what way?

8    A.   The Fair Credit Reporting Act, in terms of public

9    records, speaks to strict procedures.

10   Q.   And does Verifications follow strict procedures?

11   A.   Yes.

12   Q.   Do you believe that Verifications followed strict

13   procedures in this case?

14   A.   Yes.

15   Q.   Who are the requirements in the Fair Credit

16   Reporting Act, for accuracy and strict procedures,

17   designed to protect?

18   A.   I assume they were designed to protect the

19   consumer -- or I should say, the subject of the

20   consumer report, as well as the users of consumer

21   reports.

22   Q.   So, in this particular case, the requirements for

23   accuracy and strict procedures in the Fair Credit

24   Reporting Act, are in place to protect people like

25   Debbie Adams, right?

1   A.   Yes, that would be one of the parties to be

2   protected.

3   Q.   In this case, do you recall whether May 3rd, 2007,

4   was the date on which National Engineering placed an

5   order with Verifications, Inc., for a criminal

6   background check on Deborah Adams?

7   A.   Yes, I do recall that.

8   Q.   Verifications knew at the time that National

9   Engineering was requesting the background report, that

10   the report was being requested for employment purposes,

11   right?

12   A.   That is correct.

13   Q.   How was Verifications hired by National

14   Engineering to perform and prepare that criminal

15   background check on Ms. Adams?

16   A.   National Engineering had been a client of

17   Verifications, as I recall, since mid-2004.  Is that

18   your question, sorry?

19   Q.   With respect to this particular background report

20   that was requested in 2007 regarding Ms. Adams, how was

21   that order placed by National Engineering to

22   Verifications?

23   A.   The order was submitted electronically.  It was

24   submitted by NESC into Verifications using our online

25   system.

1   Q.   So somebody at National had authorization to go

2   directly into Verifications online system and place the

3   order directly?

4   A.   Yes, someone at National Engineering had a user ID

5   and password, which they have been given, which allowed

6   them to enter an order online.

7   Q.   And to the best of your recollection, that order

8   was placed online on May 3, 2007?

9   A.   Yes, it was placed late in the day.  It was, as I

10  recall, after 6:00 p.m.

11  Q.   Does Verifications require certain minimum

12  information before it accepts an order to perform a

13  criminal background check?

14  A.   Yes, we do.

15  Q.   Okay.

16      Is social security number of the subject of the

17  report one of those required fields?

18  A.   Yes.

19  Q.   And is the social security number required by

20  Verifications before it even accepts an order to do a

21  criminal background check, to ensure it is able to

22  produce an accurate report?

23  A.   Could you repeat that question, please?

24  Q.   Sure.

25      Is one of the reasons why Verifications requires

1  an order to contain a social security number for the

2  subject of the report so that Verifications can assure

3  that it has the information it needs to produce an

4  accurate report?

5  A.   Having the social security number certainly helps

6  us produce an accurate report.  It is an identifier

7  that tags, if you will, the order in our system, along

8  with an order number.  It is a required field when an

9  order is placed.

10  Q.   And is it a required field because it's an

11  important identifier that can be used to produce

12  accurate reports?

13  A.   Yes.

14  Q.   Do you recall what information National

15  Engineering provided to Verifications about Ms. Adams

16  when it placed the order on May 3rd, 2007?

17  A.   Yes.

18  Q.   Did they produce a social security number?

19  A.   The information that they provided online,

20  included the types of background checks that they

21  wanted us to run, that is part of the order.  They also

22  provided the social security number, the first and last

23  name of the applicant, her date of birth, and they

24  would have also provided her current residential

25  address.

1  Q.  And how was Ms. Adams's name spelled by National

2  Engineering when that information was provided to

3  Verifications?

4  A.  Her first name was spelled D-e-b-o-r-a-h, A-d-a-m-

5  s.

6  Q.  Was that the only spelling of Ms. Adams's first

7  name provided to Verifications?

8  A.  Yes.

9  Q.  Did National Engineering provide Verifications

10  with an address for Ms. Adams in West Hartford,

11  Connecticut?

12  A.  Yes.

13  Q.  Was that the only address provided to

14  Verifications by National Engineering for Ms. Adams?

15  A.  Yes.

16  Q.  There was no addresses in Virginia?

17  A.  No, there was not.

18  Q.  And does Verifications online form, that was

19  completed by National Engineering, also contain a space

20  for previous addresses within the last several years?

21  A.  There is the option to -- Yes, there is the option

22  to provide that information.

23  Q.  In this case, National Engineering didn't list any

24  previous addresses for Ms. Adams in the last seven

25  years, did they?

1    A.   They did not.

2    Q.   So at the time that Verifications received the

3    order to do the background check on Ms. Adams, the only

4    address it had for Ms. Adams was West Hartford,

5    Connecticut, right?

6    A.   Correct.

7    Q.   Would you agree that it's important for the

8    spelling of somebody's name to be accurate to ensure

9    the accuracy of a criminal background check on that

10   person?

11   A.   Yes.

12   Q.   Did the information received by Verifications

13   about Ms. Adams, from National Engineering, reflect

14   that she had any middle name?

15   A.   No middle name was provided.

16   Q.   So, after receiving the information about Ms.

17   Adams from National Engineering, on May 3rd, 2007, what

18   did Verifications do next to commence the preparation

19   of the criminal background check?

20   A.   The background check that had been ordered on Ms.

21   Adams was for a database -- a criminal database search.

22   That search is an automated search within our systems,

23   and so we would have automatically sent out to a

24   database, Deborah's last name, the first three

25   characters of her first name, as well as her date of

1   birth, and what that search does is to pull back any

2   possible matches.  That was the first step -- the first

3   thing that was done.  That was the product -- the type

4   of background search that had been ordered.  It --

5   shall I continue?

6   Q.   If you feel you need to continue to complete your

7   answer, then --

8   A.   I'm sorry, I don't remember if you asked me for

9   the whole process or the first step, pardon me.

10   Q.   The first step was -- is fine for now. Is that the

11   --

12   A.   Okay.  Yes, that was the first step.

13   Q.   Okay.

14       So when Verifications searched in the database,

15   the only information it listed for -- it inputted for

16   Ms. Adams was her last name, the first three characters

17   of her first name, D-e-b, and date of birth?

18   A.   That is correct.

19   Q.   No social security number?

20   A.   The database cannot be searched by social security

21   number, so no, it was not used.

22   Q.   Does Verifications have access to other data bases

23   that can be searched by social security number?

24   A.   For criminal record purposes, not to my knowledge.

25   Q.   And you said that information was inputted to

1    obtain possible matches for Ms. Adams?

2    A.   Yes.

3    Q.   And what were the results received by

4    Verifications from that national database search?

5    A.   From that national database search, we found a

6    possible record in Pennsylvania County, Virginia.

7         (Pause.)

8    BY MR. STEIGMAN:

9    Q.   What made Verifications think that the record

10   identified from Pennsylvania County was a possible

11   record for Ms. Adams?

12   A.   Because it matched her name and date of birth.

13   Q.   Well, it didn't match her first name, did it?

14   A.   Not in its entirety, no.

15   Q.   So the only identical matches were her last name,

16   Adams, and her date of birth, right?

17   A.   Yes.

18   Q.   Would you agree that Adams is a common name?

19   A.   Absolutely.

20   Q.   And at that point, Verifications had no

21   information to suggest that Ms. Adams had ever lived in

22   Virginia, right?

23   A.   No, we did not.

24   Q.   And what was the date that Verifications received

25   the results from the national background database?

1   A.   I believe we would have -- Because we received the

2   results electronically, I believe the results came in

3   the evening of May 7th.  Those would have been received

4   as part of an automated transaction.

5        (Pause.)

6             MR. STEIGMAN:  Permission to approach, Your

7   Honor.

8             THE COURT:  (Inaudible).

9             MR. STEIGMAN:  Permission to approach the

10  witness?

11            THE COURT:  Yes, go ahead, you can approach

12  the witness.

13  BY MR. STEIGMAN:

14  Q.   Ms. Poquette, I'm handing you a document that

15  (inaudible) and marked Plaintiff's Exhibit 23.

16       I'm just going to ask you to identify it.

17  A.   This document appears to be screen prints from our

18  processing system, the processing system that is used

19  at Verifications.

20  Q.   (Inaudible).

21            UNIDENTIFIED SPEAKER:  I didn't get the

22  number.  (Inaudible.)

23            THE COURT:  What's the number of the exhibit?

24            MR. STEIGMAN:  Twenty-three.

25            THE COURT:  Twenty-three.

1          MR. STEIGMAN:   Twenty-three, Your Honor.

2     BY MR. STEIGMAN:

3     Q.   Ms. Poquette, does Exhibit Number 23 contain

4     information which shows the date and time on which

5     Verifications received the information back from the

6     national background data search?

7     A.   It shows that we received a record back on 5/4 at

8     8:07.

9     Q.   8:07 a.m. or p.m.?

10    A.   This would be a.m.

11    Q.   And which page of Exhibit Number 23 shows that

12    information?

13    A.   Yes, I am looking at -- the pages aren't numbered,

14    but I am looking at Page 6.  This shows the history of

15    activity that goes along with our processing.

16    Q.   So, you're referring to the information located at

17    the top of that history section, where it says, "MCRL

18    hit, Pennsylvania, Virginia," and then contains

19    information?

20    A.   Correct.

21    Q.   Verifications didn't receive any information from

22    the national background database listing any criminal -

23    - possible criminal convictions for Ms. Adams in

24    Connecticut, did it?

25    A.   No, we did not.

1    Q.   What were the spellings of the first names

2    associated with the criminal records --

3    A.   They --

4    Q.   -- located by Verifications through the database?

5    A.   Through the database search, the records that were

6    returned had a spelling of D-e-b-r-a.

7    Q.   That's different than the spelling that you have

8    from National Engineering for Ms. Adams, right?

9    A.   That is correct, yes.

10   Q.   And Ms. Adams's residence in Connecticut was also

11   different than this -- that the state in which the

12   criminal records originated from, right?

13   A.   Yes.

14   Q.   And there's no indication in the records, obtained

15   from the national background database, that the social

16   security number of the person with the criminal record

17   in Virginia was the same as the social security number

18   that Verifications had for Ms. Adams, right?

19   A.   There was no reference to any social security

20   number in the database search, that is correct.

21   Q.   So you would agree with me then, that there was no

22   evidence that the social security number of the person

23   with the criminal record in Virginia matched the social

24   security number for Ms. Adams at that point, right?

25   A.   That is correct.

1    Q.   So with knowledge of those differences between

2    these criminal records from Virginia, and the

3    information that Verifications had for Ms. Adams, did

4    Verifications seek any additional information at that

5    time, out of concerns that the record from Virginia did

6    not belong to Deborah Adams from Connecticut?

7    A.   Yes, we did.

8    Q.   Okay.

9        So Verifications had a concern at that point that

10   these records may not have applied to Ms. Adams?

11   A.   Yes.

12   Q.   What actions did Verifications take, at that

13   point, to follow up on the concern that these records

14   may not -- should be -- should possibly not be

15   associated with Deborah Adams from Connecticut?

16   A.   What we did, what we always do, what is our

17   standard practice, we do not report information from a

18   national database like this, and the reason we do not

19   report it from the database to our end user -- to our

20   client, is because the information in these national

21   databases is not necessarily up to date or complete,

22   and so, in order to provide accurate information, and

23   also to comply with the Fair Credit Reporting Act, what

24   we do and what we did in this case, is we sent a

25   request to our field researcher in Pennsylvania County,

1    Virginia, and asked that that researcher go to the

2    court to check the real, if you will, records, the

3    court records themselves.

4         Also, may I add one thing?  I just realized that I

5    had my dates incorrect.  I'm sorry.  We would have

6    received that first electronic order, it would have

7    been the evening of five -- May 3rd, I think.

8    Q.   Yes, I think we established that.

9    A.   Oh, I'm sorry.

10   Q.   The order from National Engineering?

11   A.   Yes.

12   Q.   Was May 3rd, right?

13   A.   Yes, I'm sorry.  I thought I had misspoken and I

14   just wanted to clear that up if I had.

15   Q.   Okay.  Thank you.

16        When Verifications contacted the field researcher,

17   it didn't give the field researcher any specific

18   instruction directing it to determine whether the

19   criminal records belonged to Deborah Adams from

20   Connecticut or a different person, did it?

21   A.   No, the information that we supplied to our field

22   researcher would have been Deborah Adams's name, date

23   of birth, and social security number, and we supplied

24   all three of those identifiers because we had, and we

25   continue to have, a secure transmission method with the

1    researcher.

2    Q.   So even though, at that point you testified that

3    Verifications had a concern that these records may not

4    have belonged to Ms. Adams from Connecticut,

5    Verifications did not give a specific instruction to

6    the field researcher to try and determine whether these

7    records belonged to Ms. Adams from Connecticut, or to a

8    different Ms. Adams altogether?

9    A.   To my knowledge, we did not share with our

10   researcher any information we had obtained from the

11   national database search.  What we want our researchers

12   to do, is as full and complete a search as is possible

13   in the particular court that they are going to.  So we

14   -- So what we would have supplied -- or what we did

15   supply to our researcher was full name, date of birth,

16   and social security number as it was provided to us.

17   Q.   But don't you think that if you wanted the field

18   researcher to try and figure out whether these records

19   were from Deborah Adams from Connecticut or a different

20   Ms. Adams from Virginia altogether, that you would

21   specifically ask them to figure out the answer to that

22   question?

23   A.   No.

24   Q.   (Inaudible).

25   A.   No, because what we want -- we want as much

1    information as exists in the public record that we can

2    access.  That is the job of our field researcher, to

3    get that information, as much as there is, and to

4    return that to us so then we can make a comparison of

5    all of the information that we have, and make a

6    determination as to whether it should be reported to

7    our client.

8    Q.   Okay.

9         Verifications didn't specifically instruct the

10   field researcher to try to locate a social security

11   number for the person with the criminal record in

12   Virginia, did it?

13   A.   We have --

14   Q.   If you can answer yes or no.

15   A.   Then would you repeat the question, please?

16   Q.   Verifications didn't specifically instruct the

17   field researcher to try and locate a social security

18   number for the person with the criminal record, from

19   the criminal record file in Virginia, did it?

20   A.   Correct.

21   Q.   What information did Verifications receive back

22   from the field researcher?

23   A.   We received back a list of offenses, and for each

24   of the offenses on the information that was sent back

25   to us, it showed, typically, the name under which the

1    record was held, the date of birth, the charge, the

2    disposition.

3    Q.   Okay.

4    A.   And there were several records found, as I recall.

5    There were seven or eight of them.

6    Q.   Okay.

7         Isn't it true that Verifications received back

8    information from the field researcher showing that the

9    first name of the Ms. Adams in Virginia was different

10   than the spelling you had for Ms. Adams in Connecticut?

11   A.   Correct.

12   Q.   Isn't it true that there was a middle name

13   included in the records from Virginia and no middle

14   name, as far as Verifications knew, for Ms. Adams in

15   Connecticut, right?

16   A.   That is also correct, yes.

17   Q.   And the field researcher did not return any

18   information listing the social security number of the

19   person with the criminal record in Virginia; isn't that

20   correct?

21   A.   Correct.

22   Q.   So at that point, you still had no knowledge of

23   the social security number for the person with the

24   criminal record in Virginia, but you had one for Ms.

25   Adams, right?

1   A.   Correct.

2   Q.   Did the information from the field researcher

3   contain any indication that the field researcher made

4   an effort to locate a social security number in the

5   conviction records from Virginia?

6   A.   No, it was a standard reply.

7   Q.   So that's no, there was no indication in the

8   information received from the field researcher that

9   they made an effort to locate the social security

10  number from the criminal records?

11  A.   That is correct.  There was no notation that the

12  researcher tried to find a social security number.

13  Q.   So after receiving the information from the field

14  researcher, with full knowledge that the Fair Credit

15  Reporting Act requires reasonable procedures to assure

16  maximum possible accuracy, did Verifications take any

17  steps to figure out whether the criminal records from

18  Virginia were associated with Deborah Adams from

19  Connecticut, or some completely different individual,

20  before sending the criminal background report to

21  National Engineering?

22  A.   When we evaluated the results from the field

23  researcher, and when we reviewed the offenses that were

24  listed, we felt that based on our experience, that we

25  needed to report this information, and so we did report

1    two cases, and we provided the name under which the

2    records have been found, and that name was Debra, D-e-

3    b-r-a, middle name Jean, last name Adams, and with a

4    match on the full date of birth.

5    Q.   Isn't it true, though, that after receiving the

6    information from the field researcher, Verifications

7    took no steps to figure out whether these records

8    should be associated with Ms. Adams, or whether they

9    belonged to some other individual altogether, before

10   the report was sent to National Engineering?

11   A.   We believed we had enough information to make that

12   report.

13   Q.   Okay.

14       So, in response to my question, then it's true

15   that Verifications took no steps, after receiving the

16   information from the field researcher, to ascertain

17   whether these records belonged to a different person

18   before they sent the records along to National

19   Engineering?

20   A.   We evaluated it based on the information from our

21   field researcher.

22   Q.   That's not my question.

23       My question was, did Verifications take any steps,

24   after receiving the information from the field

25   researcher, to figure out whether these records

1   belonged to Ms. Adams from Connecticut, or from a

2   different person altogether, before sending the report

3   to National Engineering?

4           MR. COFFEY:  I'm just going to object, Your

5   Honor, 'cause the answer might not be a yes or no, and

6   if my client could elaborate on it, I would just ask

7   that --

8           THE COURT:  Well, she can say if she feels

9   she can't answer yes or no, she can tell him that and

10  then he can decide whether he wants to rephrase the

11  question.

12  A.   It is -- It's -- A, "yes" or, "no" answer really

13  is not appropriate, or it's not applicable here.

14      When we receive information back from our field

15  researchers, we evaluate what has been provided, and we

16  decide what we should do with that information, if it

17  is reasonable to report it, based upon the identifiers

18  that were found, if we should take other steps to try

19  to obtain more information.

20      In the case of the information that was returned

21  on Deborah Adams, because we know the social security

22  number is not part of the public record index system

23  that one can access in Pennsylvania County, there was -

24  - it was not possible to get the social security number

25  without making a special request to a court clerk for

1    that information.  We felt that we would have been

2    negligent had we not reported this as being a record

3    that might apply, given that we had a match on the last

4    name, the first name of Deborah, albeit with different

5    spelling, as well as a full date of birth match; month,

6    day, year, and we made the decision to report it based

7    upon that.

8    BY MR. STEIGMAN:

9    Q.    So, before Verifications sent the report to

10   National Engineering, the first inaccurate report, did

11   it make a conclusion that these convictions were

12   associated with Ms. Adams from Connecticut?

13   A.    We considered that to be a likely possibility,

14   yes.   That's why we reported it.

15   Q.    Did it make a conclusion that these records

16   actually belonged to Ms. Adams, or was it just a

17   possibility, a likely possibility, in Verifications's

18   mind.

19   A.    It was a likely possibility.

20         It is -- When we report, one of the reasons -- or,

21   in our reports, we always put the identifiers upon

22   which a match was made; first name, last name,

23   spelling, date of birth, whatever was used to match

24   that information to the applicant.

25   Q.    So, on what date did Verifications make the

1   decision to send the inaccurate report to National

2   Engineering?

3   A.   Well, of course we didn't know it was inaccurate

4   when we sent it but --

5   Q.   (Inaudible).

6   A.   -- that would have been on May 8th.

7   Q.   And you admit now that that report was inaccurate.

8   A.   The information in the report itself, it was a

9   real record; however that real record did not belong to

10   the Deborah Adams on whom the search had been

11   requested.  We did not make up the record, I guess that

12   was my point.

13   Q.   But was Verification asked to produce a report

14   that contained real records about somebody else, or

15   were they asked to produce a report that contained

16   records regarding Ms. Adams from Connecticut?

17   A.   We were asked to conduct a criminal records search

18   on Deborah Adams, and there was information that our

19   client, NESC, provided to us.

20   Q.   So Verifications was not asked to produce --

21   A.   An inaccurate report?

22   Q.   Verifications was not asked to produce a report

23   containing real records for somebody else?  Just so we

24   get that clear.  They were asked to produce a report --

25   A.   That would be --

1    Q.    -- regarding Ms. Adams's criminal background.

2    A.    That would be correct.

3    Q.    And so the following day, May 9th, isn't it true

4    that Deborah Adams notified Verifications that she was

5    disputing the accuracy of what we now know to be an

6    inaccurate report, right?

7    A.    Correct, yes.

8    Q.    And on that same day, May 9th, Verifications did a

9    search on a database called, "Accurant," isn't that

10   right?

11   A.    Yes, I believe it was May 9th.  Yes, it was May

12   9th.

13   Q.    And by searching the Accurant database,

14   Verifications was able to identify the social security

15   number of the individual with the criminal record in

16   Virginia, wasn't it?

17   A.    That was part of the information that we used.

18   Q.    So that's a, "yes," that Verifications got

19   information from the Accurant database showing that the

20   criminal record -- the person with the criminal record

21   in Virginia, Debra Jean Adams, had a different social

22   security number than Ms. Adams.

23   A.    By itself, it was not conclusive, but we had

24   additional information which Ms. Adams had provided to

25   us.  She, in fact, -- It was relatively easy to

1   eliminate the record as belonging to her once we had

2   the information she provided.

3   Q.   Isn't it true that Verifications's actions,

4   following the dispute by Ms. Adams on May 9th, was the

5   first time that Verifications took an affirmative

6   effort to figure out the social security number for the

7   person with these records in Virginia?

8   A.   If the social -- I'm sorry, I can't answer that,

9   "yes," or, "no."

10      If the social security number had been part of the

11  criminal record available to us when we did our search

12  at the County level, we certainly would have used it

13  then.  It was not.

14      (Pause.)

15          MR. STEIGMAN:   Permission to approach, Your

16  Honor?

17          THE COURT:   Yes.

18  BY MR. STEIGMAN:

19  Q.   Ms. Poquette, can you identify what I've handed

20  you, and is marked as Plaintiff's Exhibit 22?

21  A.   These are -- these are screen prints -- screen

22  shots from our processing system.

23      (Pause.)

24          MR. STEIGMAN:   Your Honor,  there's no

25  objection, we'd like to introduce Exhibit 22 as a full

1    exhibit.

2              THE COURT:  Which exhibit is it?

3              MR. STEIGMAN:  Twenty-two.

4              THE COURT:  Twenty-two, okay.

5         (Pause.)

6    BY MR. STEIGMAN:

7    Q.   Ms. Poquette, I'd like to direct your attention to

8    what I believe is the 9th page of Exhibit Number 22.

9    A.   I think I have that page.

10   Q.   Okay.

11        I'm sorry, I think it's actually the 10th page.

12   It's the one where, at the top of the history, it's the

13   date and time is 5/10/07, 16:14?

14   A.   Five --

15   Q.   With an entry --

16   A.   Oh, --

17   Q.   -- called check status.

18   A.   -- yes.

19   Q.   I think it's the 10th page.

20   A.   Yes, I have it.

21   Q.   Can you just read that first entry, the one for

22   5/10/07, 16:14?

23   A.   Yes, it says:

24        "Ran Accurant on Deborah Adams and address,

25        Danville, Virginia, 85 hits, but searched for the

1          matching DOB 7/29/59, and D for deceased comes up

2          with SSN of 227-31- will rule out."

3    Q.   So based on that entry, is it the case that on May

4    10th, 2007, Verifications ran an Accurant check in the

5    database for Debra Adams, D-e-b-r-a, with an address of

6    Danville, Virginia, with a matching date of birth of

7    July 29th, 1959, D for deceased, and it came up with a

8    social security number of -- which started 227-31?  Is

9    that what that entry means?

10   A.   Yes.

11   Q.   So based on the information entered into the

12   Accurant database, Verifications discovered that not

13   only did Debra Adams with the criminal record in

14   Virginia have a different social security number than

15   Ms. Adams from Connecticut, but she was also already

16   deceased.

17   A.   Yes.

18   Q.   Is this information that Verifications could have

19   sought from the Accurant database before it sent the

20   inaccurate report to National Engineering?

21   A.   Yes.

22   Q.   How much time did it take for Verifications to get

23   that information from the Accurant database that she

24   not only had a different social security number, but

25   she was already deceased?

1   A.   I didn't run the Accurant myself, but I would

2   guess it only required a few minutes.

3   Q.   Less than five minutes?

4   A.   Probably.  Probably five.

5   Q.   To your knowledge, did Verifications also contact

6   the Pennsylvania court, directly, after Ms. Adams

7   disputed the accuracy of the initial report?

8   A.   I believe we did, but I can't recall with complete

9   certainty.  I would have to go back to my notes.

10  Q.   Would Exhibit Number 22 contain that information?

11       (Pause.)

12  BY MR. STEIGMAN:

13  Q.   I believe it's on the second-to-last page.

14  A.   Thank you.

15  Q.   The entry for May 17th, 2007, 12:14 p.m.

16       (Pause.)

17  A.   Yes.

18  BY MR. STEIGMAN:

19  Q.   Can you please read that entry into the record.

20  A.   "I called the number below and talked to Katie

21       Owen, who confirmed that the SSN of our applicant

22       is not the SSN on file for this Deborah Adams.  I

23       then provided her with the first six digits from

24       the Accurant trace and she said those matched her

25       Debra Adams.  Compliance will provide applicant

1     with a letter detailing how we ruled her out."

2    And then it lists the Pennsylvania County court's --

3    the address and phone number.

4    Q.  Okay.

5     So that entry indicates that on May 17th, after

6    sending the inaccurate report to National Engineering

7    and in response to the complaint by Deborah Adams,

8    Verifications actually called the court clerk's office,

9    and the court clerk told Verifications that the social

10    security number on file in the clerk's records was

11    different than the social security number that

12    Verifications had for Deborah Adams from Connecticut,

13    right?

14    A.  Yes.

15    Q.  Verifications never took that step before sending

16    the inaccurate report to National Engineering, did it?

17    "Yes," or, "no," is what I'm looking for.

18    A.  That is correct.  We did not call the court.

19    Q.  Was there anything preventing Verifications from

20    calling the court before sending the inaccurate report

21    to National Engineering?

22    A.  There was -- It's not a yes or no answer.

23     There was nothing preventing us from calling the

24    court --

25    Q.  But that's all my question asked.  Was there

1    anything preventing.

2         MR. COFFEY:  Judge, she said that it's not a,

3    "yes," or, "no," so if she could finish her answer.

4         THE COURT:  Okay.

5    A.   Thank you.

6         The reason it's not -- If we called the courts for

7    every criminal record search that we conducted, the

8    courts -- the clerks would quickly stop assisting us.

9    It is -- It -- When we -- For example, when we called

10   this clerk and explained that we were working on the

11   resolution of a dispute and providing additional

12   information, typically a clerk will help us in a

13   situation like that.  They -- We cannot simply call

14   courts and ask them for information millions of times a

15   year, they would not assist us.  They don't have the

16   staff to do so.  That's why they say that they have

17   public access index systems.

18   BY MR. STEIGMAN:

19   Q.   But this report wasn't like all the other reports

20   that Verifications did.

21        You testified earlier that before Verifications

22   sent the report to National Engineering, when it

23   initially got the information back from the database,

24   Verifications had a concern that this report may not

25   have belonged to Ms. Adams from Connecticut.  So this

1  wasn't just any old report.  Verifications had a

2  specific concern before sending the report, didn't it,

3  based --

4  A.   We --

5  Q.   -- on your earlier testimony?

6  A.   I'm sorry, what was the last part?

7  Q.   Based on your earlier testimony, you said that

8  Verifications had a concern, before sending the

9  inaccurate report, that this criminal record may not

10  have belonged to Ms. Adams.  So this wasn't just like

11  all the other reports that Verifications does every

12  year, was it?

13  A.   It was not -- There is a certain percentage of

14  criminal background checks that we do, of course, that

15  come back with a record, and so while not all of them

16  have records, a certain percentage do.  We had a

17  concern as to whether this record, as provided to us in

18  this database, we had a concern whether it was accurate

19  and, of course, we couldn't report it based on the

20  database alone.  That is not permitted under the Fair

21  Credit Reporting Act, and so we took the second step of

22  having our researcher go to the court in Pennsylvania

23  County and use the public access system, which goes to

24  a certain depth into the record, but it doesn't go as

25  far as the social security number.  It provides name,

1    date of birth, and some additional information as to

2    the charge and disposition and so on.

3    Q.   After Verifications received the information back

4    from the field researcher, this is before it sent the

5    inaccurate report to National Engineering,

6    Verifications had the ability to ask the field

7    researcher to go back and review the physical court

8    file to get additional information, didn't it?

9    A.   Yes.  Excuse me, yes.

10   Q.   In fact, Verifications does, on occasion, go back

11   to the field researcher and ask for the collection of

12   additional information, right?

13   A.   That is correct.

14   Q.   Verifications could have made such a request to

15   the field researcher in this case easily by a phone

16   call or through an e-mail, right?

17   A.   We could have.

18   Q.   But Verifications never did that before sending

19   the inaccurate report to National Engineering, did it?

20   A.   We did not believe it was necessary, given the

21   identifiers we had.

22   Q.   Verifications was wrong about that, wasn't it?

23   A.   That is correct.

24        (Pause.)

25   BY MR. STEIGMAN:

1   Q.   When Verifications was doing it's reinvestigation

2   of this case in response to Ms. Adams's dispute on May

3   9th, the company's objective was to determine whether

4   the record in Virginia belonged to the same person that

5   was the subject of the report, right?

6   A.   Yes.

7   Q.   Shouldn't that have been Verifications objective

8   before it sent the report, not just in response to a

9   dispute?

10   A.   It was our objective.

11   Q.   Verifications certainly tried a lot harder after

12   the dispute than it did before it sent the wrong

13   application, didn't it?

14   A.   Yes, we did.

15   Q.   To your knowledge, did Verifications follow its

16   standard procedures for conducting criminal background

17   checks in preparation of the initial background check

18   it did on Ms. Adams in this case?

19   A.   Yes.

20   Q.   Verifications didn't follow procedures that were

21   lower than its normal standards for accuracy in this

22   case, did it?

23   A.   Would you repeat that, please?

24   Q.   Verifications didn't follow procedures, in this

25   case, that required a lower degree of accuracy than

1    Verifications usually requires in the preparation of

2    its background reports, did it?

3    A.    That's correct.

4    Q.    And Verifications didn't follow procedures in the

5    preparation of this report about Ms. Adams that

6    required a higher degree of accuracy than Verifications

7    usually requires in its background checks, did it?  It

8    was just the standard procedures was what Verifications

9    followed.

10   A.    We followed our standard procedures, yes.

11   Q.    Do you believe that Verifications standard

12   procedures that were followed in this case were strict

13   procedures?

14   A.    Yes, I do.

15   Q.    Do you really think that Verifications's

16   procedures followed in this case, were reasonable to

17   assure maximum possible accuracy about the information

18   that it reported about Ms. Adams?

19   A.    Yes, I do.

20   Q.    At the time that Verifications sent the initial

21   inaccurate report to National Engineering, it knew the

22   information was being used for employment purposes,

23   right?

24   A.    Yes.

25   Q.    And Verifications had to know that the information

1    communicated in that initial report was likely to have

2    a negative effect on Ms. Adams to get employment in the

3    position that she was seeking, right?

4    A.   Yes.

5    Q.   At the time that Verifications sent the initial

6    inaccurate report to National Engineering on May 8th,

7    Verifications did not notify Ms. Adams, at the same

8    time, that it was reporting that inaccurate information

9    to National Engineering, did it?

10   A.   No, we did not.

11   Q.   Do you believe that Verifications's initial

12   inaccurate report to National Engineering was partially

13   caused because Deborah Adams never disclosed to

14   National Engineering, before the report was ordered

15   that, she had a similar problem with Choice Point in

16   2006?

17   A.   The question was did that cause the inaccurate

18   report?

19   Q.   Do you believe that Ms. Adams's failure to

20   disclose the previous problem she had with Choice Point

21   in 2006, was a partial cause of Verifications's

22   inaccurate report to National Engineering?

23   A.   No, I don't believe it was the cause.  It would

24   have certainly been very helpful to have that

25   information, but it was not the cause.

1    Q.   Did Verifications' online system, through which

2    National Engineering ordered this report, have a space

3    in which National Engineering could have notified

4    Verifications about a previous problem with Choice

5    Point?  Verifications's online order form doesn't have

6    a space for previous problems in background checks,

7    does it?

8    A.   It certainly -- I'm trying to remember if it had a

9    comments field at that time, and I really can't recall.

10   Certainly, there was -- there's never been a field that

11   said -- that addressed the situation you just

12   described, no.

13   Q.   But you would like to think that if Verifications

14   knew that Ms. Adams had this previous problem with

15   another credit reporting agency in 2006, that

16   Verifications wouldn't have made the same mistake in

17   2007, right?

18   A.   I'm sorry, could you repeat that please?

19   Q.   Do you believe that Verifications had knowledge of

20   Ms. Adams's previous problem with Choice Point before

21   it did the initial report, that it would have made the

22   same mistake it did in 2007 in reporting this

23   information to National Engineering?

24   A.   If we -- I'm not sure I understand the question,

25   so, if we had had Ms. Adams's information in May of

1   2007, then we would not have reported our initial

2   results.

3   Q.   Because Verifications would have already known

4   that another credit reporting agency made the same

5   mistake the previous year, right?

6   A.   We would have known that this had occurred in a

7   prior background check that Ms. Adams had done, yes.

8   Q.   Ms. Poquette, isn't it the case that in June of

9   2008, Verifications made the same mistake about Ms.

10  Adams and attributed the same criminal information to

11  her to another employer in 2008, after it already knew

12  from its 2007 experience, that this person not only had

13  a different social security number and was already

14  dead?

15  A.   That is correct, we did report it again in 2008.

16  Q.   So what makes you think that if Ms. Adams reported

17  that information to Verifications in 2007 from her

18  Choice Point experience, that Verifications wouldn't

19  have made the same mistake again?  I mean, in this

20  situation, Verifications knew in 2007 and discovered

21  its own mistake, and then it made the same mistake

22  again in 2008, right?

23  A.   Yes, in 2008 we followed the same procedures that

24  were followed in 2007.  When we removed the criminal

25  record in 2007, there was no marker, there was no flag,

1   if you will, that stayed attached to Ms. Adams's record

2   because the case was gone.  That lack of a marker or

3   indicator was a deficiency in our technology system,

4   and so when we had a request to do another background

5   on her a year later, we did do the exact same thing.

6   We did the national database search, we sent a

7   researcher back to Pennsylvania County, and we reported

8   the same thing.

9        Back to your -- the first part of your question --

10  at least what I think was the first part of your

11  question, if Ms. Adams had provided the information in

12  2007, the difference would have been, in terms of the

13  dates, there would -- if she had provided it at the

14  time we were doing the initial search, we would have

15  kept that information together.  There was about a year

16  that elapsed between the first and the second searches,

17  and several million searches went through in between.

18  Q.   So you admit that at this time in 2007,

19  Verifications had a deficiency in its procedures.

20       Is that what you just testified to?

21  A.   Yes.

22            MR. STEIGMAN:   Permission to approach, Your

23  Honor?

24            THE COURT:   Yes.

25            MR. STEIGMAN:   (Inaudible) 39.

1   BY MR. STEIGMAN:

2   Q.   Ms. Poquette, will you please identify Exhibit 39.

3            THE COURT:  What's this?

4            MR. STEIGMAN:   Thirty-nine, Your Honor.

5   A.   This is a letter we received from Deborah Adams

6   dated June 19th, 2008.

7            MR. STEIGMAN:  Your Honor, there's an

8   objection from Defense Counsel to this exhibit.

9       (Pause.)

10           THE COURT:  What's the objection?

11           MR. COFFEY:  If I could have a side-bar?

12           THE COURT:  Well, I suppose we could send you

13   out for about ten minutes anyway, give you that break

14   now.

15      (Jury out at 10:29 a.m.)

16      (At side-bar:)

17           THE COURT:  Okay, what's the objection?

18           MR. COFFEY:  Just the -- Again, the

19   prejudicial value would outweigh any probative value.

20   It's not a part of any of the counts in the summons and

21   complaint, and I just think it would be overly

22   prejudicial.

23           THE COURT:  She just testified to exactly

24   what's the point of this.

25           I'll overrule the objection.

1          MR. COFFEY:  Okay.

2       (End of side-bar.)

3          THE COURT:  All right, we'll take about ten

4    minutes while the jury's out.  We'll be back then at

5    10:40.

6          (Recess at 10:30 a.m., until 10:44 a.m.)

7                    AFTER RECESS

8          THE COURT:  Okay, we'll consider that the

9    mid-morning recess.  It was a little early, but if we

10   can get through to 1:00 o'clock, we'll try to do that

11   without another recess.

12          All right, go ahead and start.

13          MR. STEIGMAN:  Your Honor, we're going to be

14   passing out Exhibit Number 39 to the jury.

15       (Pause.)

16          THE COURT:  Okay, go ahead, Mr. Steigman.

17             DIRECT EXAMINATION (CONTINUED)

18   BY MR. STEIGMAN:

19   Q.  Ms. Poquette, I'd just like to ask you again to

20   identify what Exhibit 39 is for the jury.

21   A.  Exhibit 39 is a letter to Verifications's

22   compliance department from Deborah Adams.

23   Q.  And what's the date of the letter?

24   A.  The date is June 19th, 2008.

25   Q.  Did you receive this letter on or about that date?

1    A.   Yes, I believe so.  It was sent via fax, so it's

2    probably the date we received it.

3    Q.   Can you please read the second paragraph of the

4    letter?

5    A.   "It was reported to me on this day by Kelly Law

6         Registry, a division of Kelly Services in

7         Hartford, Connecticut, that criminal information

8         of a person with a similar name and same date of

9         birth was provided to them.  This information is

10        being disputed as incorrect and not belonging to

11        me."

12   Q.   This is in relation to a background check

13   performed by Verifications about Ms. Adams, and passed

14   on to Kelly Services in Connecticut on or about June,

15   2008?

16   A.   Yes.

17   Q.   And Ms. Adams's representation is about the

18   inaccurate -- inaccuracy of that report are correct,

19   aren't they?

20   A.   Yes.

21   Q.   Can you please turn to the second page of Exhibit

22   39.

23        Does the second page of Exhibit 39 contain an e-

24   mail regarding an unfavorable background check on

25   Deborah Adams?

1    A.   Yes, it does.

2    Q.   And does that e-mail contain the same criminal

3    information that Verifications incorrectly attributed

4    to Ms. Adams the previous year, in 2007?

5    A.   Yes.

6    Q.   And so, at the time that Verifications did this

7    2008 incorrect report about Ms. Adams, it had already

8    known for a year that these criminal records did not

9    belong to Ms. Adams, right?

10   A.   Yes.

11   Q.   It had already known for a year that the person

12   who these criminal records belonged to had a different

13   social security number, right?

14   A.   That information was all in our files, yes.

15   Q.   And it also -- Verifications's files also

16   contained information confirming that the person who

17   these criminal records belonged to was already

18   deceased, right?

19   A.   Yes.

20   Q.   And at this time, June of 2008, Ms. Adams was

21   pursuing this law suit against Verifications about the

22   previous incorrect background report, right?

23   A.   Yes.

24   Q.   Wasn't bringing a law suit about the 2007

25   incorrect report enough for Ms. Adams's to get

1    Verifications's attention that she wasn't this person?

2              MR. COFFEY:  Objection.

3              THE COURT:  Sustained.

4              Look we've been over this.  You went all

5    through this before, you showed her the exhibits, so

6    we're now getting repetitive on this.

7              This is where you said the marker was not

8    placed in the file, isn't it?

9              THE WITNESS:  Correct.

10             THE COURT:  We've been all --

11             THE WITNESS:  Correct.

12             THE COURT:  We've been all over that.

13   BY MR. STEIGMAN:

14   Q.  Ms. Poquette, do you believe that Verifications,

15   Inc., is responsible for Ms. Adams losing her position

16   at Northeast Utilities?

17             MR. COFFEY:  Objection.

18             THE COURT:  You've got to start using the mic

19   and reach the volume, otherwise we're not going to hear

20   the question.

21             Try it again.

22   BY MR. STEIGMAN:

23   Q.  Do you believe that Verifications Inc. is

24   responsible for Ms. Adams losing her position at

25   Northeast Utilities?

1          MR. COFFEY:  Objection.

2          THE COURT:  Well, this is where any real time

3    -- Say it slowly so I get the last few words of what it

4    is you're asking her, because I missed the last four

5    words of it completely.

6    BY MR. STEIGMAN:

7    Q.  Do you believe that Verifications is responsible

8    for Ms. Adams losing her position at Northeast

9    Utilities in 2007?

10          MR. COFFEY:  Objection.

11          THE COURT:  Sustained.

12       (Pause.)

13          MR. STEIGMAN:  No further questions, Your

14   Honor.

15          THE COURT:  All right.  Mr. Kupinse?

16            CROSS-EXAMINATION BY MR. KUPINSE

17   BY MR. KUPINSE:

18   Q.  You were asked about whether you speak -- spoke,

19   in this case, directly to your client, National

20   Engineering, on this search.

21       Are there occasionally times when you do get

22   information directly from the client?

23   A.  Yes.

24   Q.  And did you feel there was any need to do so in

25   this case, To speak to them by phone when they got the

1    order in?

2    A.   Prior to conducting a search?

3    Q.   Prior to conducting a search, or once the search

4    came back.

5    A.   No, we had the information that we needed to

6    conduct the search.

7    Q.   Okay.  Thank you.

8        And I notice that at one point, Counsel, in

9    questioning you, referred to Deborah or Deborah Adams

10   as, "Debbie."

11       Did you understand who he was talking about?

12   A.   Yes.

13   Q.   Thank you.

14            THE COURT:  Mr. Coffey?

15            MR. COFFEY:  Yes.  Thank you.

16              CROSS-EXAMINATION BY MR. COFFEY

17   BY MR. COFFEY:

18   Q.   Morning.

19   A.   Good morning.

20   Q.   Now, one of the things that was just talked about

21   was the 2008 with Kelly Law Registry.  As part of Kelly

22   Law Registry, what you're aware of, wasn't a credit

23   report that identified Deborah Adams as -- this Deborah

24   Adams as Deborah Jeans Adams that exists out there in

25   the system?

1  A.    Yes.

2  Q.    And that was -- that credit report is referring to

3  this Deborah Adams, that she has used -- that -- a

4  credit agency has identified her, different from the

5  criminal background check, but in a civil setting, she

6  has been identified at Deborah Jeans Adams; is that

7  correct?

8  A.    That's correct, yes.

9  Q.    Okay.

10       Now, when you were talking about that there is a

11  deficiency in your computer system, that doesn't mean,

12  in any way, that the -- it was a violation of the Fair

13  Credit Reporting Act; is that correct?

14  A.    That is correct.

15  Q.    Okay.

16       But you -- you're just saying you put different

17  safeguards in your own software for your own company;

18  is that correct?

19  A.    Yes, as much as possible we try to build in

20  technology safeguards.

21  Q.    Okay.

22       Can you tell us a little bit about your background

23  at Verifications, and what your training is, and what

24  you -- what your experience is in this industry.

25  A.    Okay.  I started to work for Verifications in

1   August of 1995.  At that time Verifications employed --
2   I think I was employee number ten.  I was hired as a
3   general manager and vice president by the owner and
4   CEO, and my direction was to do whatever it took to
5   grow the company.
6       As a result, I did pretty much everything from
7   criminal record searches, data entry, I participated in
8   sales events, I sold directly, I cleaned the
9   refrigerator when I had to, and over the course of the
10  years, the company has grown, and as we have grown, I
11  have handed off different parts of the organization to
12  people that are functional specialists, like a real
13  sales VP, and a real controller, and somebody who was
14  familiar with ISO quality systems, and so on, and the
15  responsibility that I have retained, is that of
16  compliance and security --
17  Q.   Okay.
18       And --
19  A.   And we now have about 450 employees.
20  Q.   Okay.
21       And are there any industry trade groups that
22  you're a member of?
23  A.   Verifications is a member of the National
24  Association of Professional Background Screeners.
25  Q.   Okay.

1      And have you been responsible -- are you active

2  with that organization?

3  A.   Very much.

4      Verifications was a founding member in 2004.  I

5  was part of the original board of directors for four

6  years and served as its co-chair for one year.

7  Q.   And have you been responsible in reviewing or

8  drafting any of the industry standards?

9  A.   NAPBS is -- currently has, in beta test, a

10  consumer reporting agency accreditation program, and I

11  was part of the task force that drafted that standard.

12  Q.   Okay.

13      Now, is there -- why do people do background

14  investigations?

15  A.   People do background investigations, I believe,

16  based on what I've been told, to match people with

17  certain qualifications to specific positions.  Also,

18  people are not always honest about their

19  qualifications.

20  Q.   Is there any studies that have been done about

21  what percentages of people are not truthful?

22          MR. STEIGMAN:  Your Honor, I'm just going to

23  object.

24          This is beyond the scope of our examination.

25          MR. COFFEY:  Oh I'm not -- I'm going to make

1   it quicker for the jury.  I'm not going to put Ms.

2   Poquette on my case, Your Honor, so I'm just going to -

3   -

4            THE COURT:  I'll let you go beyond the

5   direct.

6            She's his client, really, so you're gaining

7   again a Defendant on the Plaintiff's case and he's

8   entitled -- we want him to have her exposed to you all

9   in one exposure.  That makes it easier for you to judge

10  credibility.  So I always encourage attorneys, when

11  this happens, to just go ahead and do the complete

12  exam.  So go right ahead.

13           MR. COFFEY:  Okay.

14  A.   I'm sorry, I forgot the question.

15  BY MR. COFFEY:

16  Q.   I did too.

17           THE COURT:  By the way, while he's thinking

18  about that, you're out of Garrison Keeler country and

19  this all 410 out there?

20           THE WITNESS:  Is it what?

21           THE COURT:  All 410 in Minneapolis?

22           THE WITNESS:  No, actually, our corporate

23  headquarters is in Minneapolis, --

24           THE COURT:  Yes.

25           THE WITNESS:  -- and our operations centers

1    are in South Dakota, in Mitchell, Aberdeen, and

2    Watertown, South Dakota.

3           THE COURT:  Okay.

4    BY MR. COFFEY:

5    Q.   So --

6           THE COURT:  So most of these people in South

7    Dakota.

8           THE WITNESS:  Most.  Our operations people,

9    meaning the people that conduct the background checks

10   and call schools, call employers, work with our field

11   researchers, they are all in South Dakota.  Well,

12   they're almost all in South Dakota.  Our corporate

13   offices, our IT, compliance, finance, things like that.

14          THE COURT:  So how's your breakdown -- how

15   many people roughly are in Minneapolis?

16          THE WITNESS:  I would estimate that we have

17   probably 65 to 70 people in Minneapolis.

18          THE COURT:  Everybody else in South Dakota.

19          THE WITNESS:  Everybody else is in South

20   Dakota, yes.

21          THE COURT:  Okay.  All right.

22   BY MR. COFFEY:

23   Q.   So I apologize, I have a Long Island accent, so

24   you sound a little different, so that's -- your

25   accent's from out there, is that fair to say?

1   A.   Yes, I guess that's fair to say.

2   Q.   So the -- What my last question was, I remembered

3   it.

4        Are those statistics about the percentage of

5   inaccuracy in -- or studies in background -- that you

6   find in background searches, and if so, what is your

7   experience on that?

8   A.   Many studies have been done.  A lot of information

9   was published about the percentage of people that

10  falsify their resume and/or their employment

11  application.  Typically people falsify a resume more

12  than an employment application because a resume is

13  generally not signed.

14       On an employment application, usually before the

15  signature, there's some sort of a statement where the

16  person attests that the information they provided is

17  truthful.  The studies range anywhere from 60 percent

18  embellishment to all kinds of numbers.  I know our

19  numbers, in terms of how often people falsify, and 24

20  percent of the time, people falsify their academic

21  credentials.  That is the thing that people lie about

22  the most.  Sometimes it's little, where they create a

23  fake GED, sometimes it's big where they create a fake

24  MBA transcript and kind of everything in between.

25  That, with the exception of credit, which we really

1  don't look at very carefully in terms of those

2  percentages, it drops from academic.  When we get into

3  criminal records, typically there is somewhere between,

4  depending on the industry, eight and 13 percent

5  falsification, meaning people do not admit to a prior

6  conviction.

7  Q.   And does that -- is it true to say there's over

8  3,000 municipal entities or counties in the United

9  States of America?

10  A.   It would be more fair to say there's 3,142

11  actually.

12  Q.   Well, I apologize.

13  A.   Counties.  Counties.  So yes, I'm sorry.

14  Q.   So I guess my question is, do they all have

15  different standards in their public record keeping

16  departments at -- different counties and different

17  States have different standards?

18  A.   Yes.

19       Typically what happens is the State, and sometimes

20  at the county level, court administrators will make

21  decisions about how records are to be kept.  Every

22  system is typically different in some way, which is one

23  of the reasons that we -- one of the qualifications for

24  field researchers, is to understand how the computer

25  system, the public access system, works in a particular

1   jurisdiction.

2        For example, sometimes, like in the State of New

3   York, for example, if we submitted my name, my first

4   and last name, if my crimes were on record and included

5   my middle name, those records would not come back, and

6   that's the way the New York system works.  It is an

7   exact name and date of birth match.

8        In other places, something called a, "Soundex"

9   system was used.  A smarter system, if you will.  So,

10  for example if someone's name is Robert, a search will

11  return Robert, Rob, Bob, Bobby, and so on.  So all of

12  those systems are different.

13       I'm sorry, I lost track of the question.

14  Q.   That's fine.

15       Now, with the -- a couple things here.

16       Does the Fair Credit Reporting Act, does that

17  require perfection?

18  A.   No.

19  Q.   Okay.

20       And what is it -- what standard does it require

21  you to adhere to, as best as you're aware?

22  A.   It requires that we have procedures.  It speaks to

23  reasonable procedures to ensure accuracy, and it talks

24  about that in reference to consumer reports in general,

25  and it speaks to strict procedures for accuracy when it

1    comes to public records, and so we have very detailed

2    documented procedures for how we do what we do.

3    Q.   Now, who's created those detailed procedures at

4    Verifications?

5    A.   I created the original set of procedures in the

6    90's when I first started.  Those have subsequently

7    been enhanced.  They were enhanced during our ISO

8    certification process, and they, of course, are changed

9    as our systems change and our information sources

10   change.

11   Q.   What is an ISO certification?

12   A.   ISO is a quality standard.  It's a quality

13   management system from the International Standards

14   Organization, and we have been certified since July of

15   2001 in that our quality management system, meaning the

16   way we handle our processes, the way we do our

17   research, the records that we keep, the consistency of

18   procedures, all of that has met the ISO 9001-2000

19   standard.

20   Q.   And what -- in that standard -- So they reviewed

21   all the procedures that you utilize, and they awarded

22   you that standard?

23   A.   Yes, and they have --

24            MR. STEIGMAN:  Your Honor, I have an

25   objection to this.

1        If we could -- I think it might be appropriate to
2    have a Side-bar.  It won't take long.
3            THE COURT:  Well let's try to keep those to a
4    minimum, because I -- Can you fix this on the Side-bar?
5    Rita?  Okay.  She can do that now.  We couldn't do that
6    with the court reporter, we can do it now.  So you
7    don't have to go anywhere.
8            All right, come on up here and we'll have it.
9        (At side-bar:)
10           COUNSEL:  (Inaudible.)
11           THE COURT:  Well I usually don't worry about
12   the interrogatories unless there's some inconsistency
13   that -- they're usually regarded as admissions, so
14   let's see what we got here.
15           UNIDENTIFIED SPEAKER:  It's the next page,
16   Your Honor.
17           UNIDENTIFIED SPEAKER:  It's the next page.
18           THE COURT:  Third page?
19           UNIDENTIFIED SPEAKER:  Yes, third page.  I
20   believe it's Number 6.6.
21           THE COURT:  Okay, they refused to answer it,
22   on trade secret.  Okay.  What about it?
23           UNIDENTIFIED SPEAKER:  (Inaudible)
24   information (inaudible) used to produce during
25   discovery (inaudible).

1           THE COURT:  Well, that -- I think what's

2    allowed here as long -- you're willing to waive the

3    trade secret situation now are you?

4           UNIDENTIFIED SPEAKER:  Yes, (inaudible).

5           THE COURT:  All right.  I'm not -- I'll

6    overrule the objection.  Go ahead.

7       (End of side-bar.)

8    BY MR. COFFEY:

9    Q.   Now the other thing, it's in evidence, the user

10   certification.  I'll just show it to you briefly.  It's

11   the -- I just want to confirm, it's the certification

12   of client service agreement that was in place between

13   Verifications and the National Engineering, back on the

14   date that this occurred.

15   A.   I have a -- There's a copy up here.

16   Q.   And, okay, is that correct -- is that a correct

17   client service agreement, in force between the two

18   companies, as far as you're aware?

19   A.   Yes.

20   Q.   Okay.

21       Now, you heard -- you've been sitting here in

22   court every day.  You heard Ms. Adams talk that she

23   filed complaints with the FTC, numerous state attorney

24   generals.

25       As part of your responsibility, if the FTC or any

1    of the states attorney generals were to either audit,

2    issue fines, if they were to issue any -- put you under

3    monitoring, or subject to audit and inspection, which

4    are all remedies that they can do, would you have heard

5    about that?

6    A.   Yes.

7    Q.   And as we sit here today, has either the FTC, any

8    of the states' attorney generals taken any action

9    versus Verifications regarding Ms. Adams, and what your

10   company did do in regards to Ms. Adams?

11   A.   No action has ever been taken.

12   Q.   And no fines and nothing whatsoever; is that

13   correct?

14   A.   That is correct.

15   Q.   It appears that Verifications, within 30 days --

16   the -- 30 days, if you could explain the adverse action

17   process and how, here, Verifications complied with

18   turning around a report within three days.  If you

19   could just describe that to the jury.

20   A.   Okay, I'll try to do that quickly.

21        As I said earlier, the Fair Credit Reporting Act

22   is designed to protect consumers and it's also designed

23   to protect employers, and one of the ways in which

24   consumers are protected, is through something called,

25   "adverse action," and what that means is, if we return

1   a report to one of our clients, and there is something

2   on the report which, whether it is their entire or

3   partial reason for not moving forward with an

4   employment action, like not hiring, not promoting, not

5   retaining, if there's anything on the background report

6   that is going to contribute to that decision, then

7   before they make the decision, they must provide, to

8   the applicant, a copy of the background report, a

9   summary of their rights as drafted by the Federal Trade

10  Commission, and they must give the applicant the

11  information to contact the consumer reporting agency,

12  including a toll free number, so they can reach us so

13  they can dispute.  That's the first part of the adverse

14  action process.

15       Once the applicant has a copy of the report and a

16  summary of their rights, the Fair Credit Reporting Act

17  doesn't say how long an employer must hold a position

18  open while the applicant is disputing, but the Federal

19  Trade Commission has suggested that five days is

20  probably reasonable.  So in that five days, the

21  applicant, if they wish to dispute, would contact

22  Verifications.  We would immediately put the order on

23  hold so our client couldn't see any more results, and

24  we would reinvestigate, using whatever additional

25  information the applicant could provide, as well as

1    information that we can find at the court level and
2    wherever else.
3        We have -- Under the law, we have five days to
4    begin the reinvestigation.  We have up to 30 days to
5    complete it.  If -- So, in the case of Ms. Adams, we
6    were able to complete the reinvestigation and change
7    the report.  Within three business days, the whole
8    thing was done.
9        To step back to the general process, as I said,
10   adverse action really is a two-part process.  The first
11   part of the process is telling the applicant they --
12   the company may make a negative decision if what's on
13   the report is true.  The second part is, if no dispute
14   occurs, or if the dispute does not change the result of
15   a background, then the action that the company must
16   take is to actually tell, or put in writing to the
17   applicant, that the final decision has been made and
18   they're no longer being considered for employment.
19   That's the adverse action process, in summary.
20   Q.   Now, one of the things, with the information that
21   Ms. Adams was in possession of about her 2006
22   experience, would that have been helpful to have had
23   that from the outset?
24   A.   If we had had it prior to doing the investigation,
25   we could have eliminated the record we found in

1    Pennsylvania County, immediately.  We never would have

2    reported it.

3    Q.   Okay.

4         Now, one of the other things, Plaintiff's 22.  I

5    believe you have up there.  It's -- I'll draw you to

6    page -- the same page you're on, I think it's page 10.

7    A.   Okay.

8    Q.   Just -- I just wanted to draw your attention to

9    the entry under the 2:14 -- 16:14, which is military

10   time for 2:14.

11   A.   I'm sorry, on what date?

12   Q.   On May 10th.

13   A.   May 10th.  Okay.

14   Q.   At 2:11.  Three minutes before you ran the

15   Accurant check with the database, you sent

16   documentation that the applicant had received from

17   Trace Point.  Will call court in the morning to verify

18   IDs.

19        Is that when you received it?

20   A.   Yes.

21   Q.   And then you were able to run an Accurant database

22   search after that; is that correct?

23   A.   Yes, we ran the Accurant search to help us confirm

24   the information that Ms. Adams had provided.

25   Q.   Right.

1          And then the other thing is, when you conduct
2     criminal background -- the criminal background
3     searches, then the database that you used, is that the
4     typical data that -- you don't use Accurant for
5     criminal searches; isn't that correct?
6     A.    That is correct.
7     Q.    And there's a difference in the data that's
8     included in those databases?
9     A.    Yes.  Accurant is more -- well, it's not a
10    criminal record data base.
11    Q.    So in order to do criminal databases, you search
12    criminal databases, is that correct, to do a criminal
13    database search.
14    A.    Yes, we use a database that is specifically
15    designed to provide criminal records, but we always go
16    to the originating jurisdiction to do additional
17    research whenever we have a possible match, always.
18    Q.    And why is that?
19    A.    To ensure that the information that we are
20    reporting is as accurate as possible, because even
21    though -- for example, even though Ms. Adams had never
22    lived in Virginia, and we were aware of that, that was
23    evident to us, I mean, we go to the court to further
24    confirm the information that -- people that are trying
25    to hide things in their background, they know that

1    researchers -- companies like Verifications have to go

2    to the court in a specific county.  I mean, a lot of

3    times people think that all of the court records are

4    all connected.  They're not.  They're all separate

5    blocks of information at the county level, and so if

6    you knew that you had a conviction in Miami, Florida,

7    and you were smart, you would never tell us you lived

8    in Miami.  So the fact that the cities didn't match was

9    not a -- was not unusual.

10   Q.   Okay.

11        Now one of the other things.  Was Verifications

12   ever part of Equifax?  There was testimony yesterday --

13   A.   No.

14   Q.   -- where, and I just wanted to ask you.  You've

15   been with the company for a long time.  Is it fair to

16   say you were never part of Equifax?

17   A.   We were never part of Equifax.  Equifax is one of

18   the three major credit bureaus.

19   Q.   Now, on the record -- the research screen, at some

20   point did you talk to the field researcher?

21   A.   Yes.

22   Q.   And who was the field researcher?

23   A.   The field researcher, the gentleman's -- it's

24   Moore Information Systems.  The gentleman's name is

25   James Morman, and I spoke to him and I asked him to

1    provide to me, besides the summary information he had

2    given to us, I wanted to see the actual screen prints,

3    and he provided that to me.

4    Q.   Okay, now on data screens, when you talk about

5    that.  Now, are these field researchers going in and

6    pulling the whole criminal file, or are they typically

7    searching computer databases in the clerk's offices.

8    A.   Yes.  They are going into the court, they are

9    typically using a public terminal, and they're

10   accessing what is sometimes called the, "docket

11   system," or, "the public records system," and as I said

12   before, depending upon the jurisdiction, it will go to

13   a certain level in the records.  It does not go all the

14   way down in terms of all of the filings and plea

15   agreements and all of that.  It is at a higher level,

16   and some jurisdictions, particularly very rural

17   jurisdictions, still have docket books, hard copy

18   docket books that you have to go through.

19   Q.   Now, in this county, do they use -- ask for social

20   security numbers --

21   A.   No.

22   Q.   -- in their available data screens for the public

23   to utilize?

24   A.   No.  There is no social security number on any of

25   the publicly available data screens.

1    Q.   Now under the Fair Credit Reporting Act, what is

2    the standard for what depth of research you are to do

3    when you do these searches?

4    A.   The standard is reasonable.

5    Q.   Okay.

6         And typically in the industry, has reasonable been

7    that you searched the data screens for public

8    consumption inside the clerk's offices in the counties

9    where the researcher has gone to?  Is that typically

10   what is done?

11   A.   I'm sorry, could you repeat the question?

12   Q.   Okay.

13        Is it typical that the researchers go to the

14   county and search the public record screens?

15   A.   Yes.

16   Q.   Okay.

17        And that is typically the industry standard, as

18   well as the standard that is adhered to by

19   Verifications?

20   A.   Yes.  Within the industry, typically we will use

21   the tools that are available to the public, without

22   having court clerks pull entire files and typically, we

23   can find enough information, usually that is two

24   identifiers upon which to report.

25   Q.   Now, your company is also Safe Harbor Certified.

1   Can you explain what that is?

2   A.   Safe Harbor Certified is a self-certification,

3   which means that we comply with certain security

4   standards in terms of transferring information from the

5   United States to the European Union, and back.  We also

6   do a fair amount of international background checks.

7           MR. COFFEY:  I have no further questions,

8   thank you.

9           THE COURT:  Okay.  Mr. Steigman.

10          (Pause.)

11                     REDIRECT EXAMINATION

12  BY MR. STEIGMAN:

13  Q.   Ms. Poquette, you testified that Verifications

14  currently has over 400 employees; is that correct?

15  A.   Yes.

16  Q.   And that when you began with the company, you were

17  tasked with the job of doing what it takes to grow the

18  business?

19  A.   Yes.

20  Q.   What is Verifications's annual revenue, if you

21  know.

22  A.   We are --

23          MR. COFFEY:  Objection.  Objection.

24          Outside the scope of my questioning.

25          THE COURT:  All right.  Repeat the question

1    for me again.

2           MR. STEIGMAN:  What is Verifications's annual

3    revenue.  In other words, to what extent has

4    Verifications been successful in growing its business,

5    as you testified.

6           THE COURT:  Oh, no, I'll allow that.  I think

7    it's open enough to allow it.  Go ahead.

8    A.   Okay.  As I said, we are a privately held company.

9    I believe that our revenues, this year, will probably

10   be around 60 million.

11   BY MR. STEIGMAN:

12   Q.   Ms. Poquette, you also testified that in some

13   cases, people falsify information to hide things,

14   right?

15   A.   Yes.

16   Q.   Do you have any evidence that Ms. Adams falsified

17   any of her information in this case to hide anything?

18   A.   No, I do not.

19   Q.   To your knowledge, Ms. Adams isn't making any

20   claim in this case that Verifications failed to

21   complete its reinvestigation within 30 days, is she?

22   A.   I don't believe so, no.

23   Q.   I believe you also testified that if Verifications

24   had had the information regarding the Choice Point

25   experience in -- from 2006, then it wouldn't have

1    reported the information in 2007, but you have the

2    information from Verifications's own mistake in 2007,

3    but you still reported it in 2008, didn't you?

4    A.   Yes, we did.

5    Q.   Does -- I believe you also testified that you

6    believe that Verifications's actions in this case

7    complied with what you believe to be the industry

8    standard; is that right?

9    A.   Yes.

10   Q.   Does the Fair Credit Reporting Act require

11   Verifications to comply with the industry standard, or

12   to comply with the requirements for maximum possible

13   accuracy in the statute?

14   A.   It requires compliance with the statute.

15   Q.   You also asked a couple questions regarding the

16   complaints that Ms. Adams had filed with government

17   agencies such as FTC, correct?

18   A.   Yes.

19   Q.   Do you know of all the communications that Ms.

20   Adams had with the Federal Trade Commission or with any

21   State agency regarding this case?

22   A.   I'm sorry, I don't understand --

23            THE COURT:  I didn't understand the question

24   either.  Go ahead (unintelligible).

25   BY MR. STEIGMAN:

1    Q.   Could there be communications between Ms. Adams

2    and any of these agencies to which she complained that

3    you don't know about?

4    A.   I suppose so.

5    Q.   Do you know whether she was advised by any of

6    those agencies to pursue a civil action?

7    A.   No, I do not.

8    Q.   You don't claim that Verifications was ever

9    exonerated by any of the agencies that Ms. Adams

10   contacted?

11   A.   No.

12   Q.   I believe you also testified that the Fair Credit

13   Reporting Act doesn't require perfection, right?

14   A.   That's correct --

15   Q.   There's (inaudible) --

16   A.   -- (inaudible) remember.

17   Q.   Based on your experience, and all your years in

18   compliance in this area, how much imperfection is

19   allowed under the statute?

20   A.   I don't know that I can apply a number.

21        MR. STEIGMAN:  No further questions, Your

22   Honor.

23        THE COURT:  Mr. Kupinse?

24        MR. KUPINSE:  Just a couple of quick

25   questions.

1              RECROSS-EXAMINATION BY MR. KUPINSE

2     BY MR. KUPINSE:

3     Q.   You were asked if Ms. Adams had provided any false

4     information, and you answered that you -- the answer

5     was, "no," but you didn't know that before you ran your

6     check, did you?

7     A.   No.

8     Q.   So for all you knew, she could have been one of

9     the eight to 13 percent, and that's what the purpose of

10    the check was, to determine that, wasn't it?

11    A.   Yes, that's correct.

12    Q.   Right.

13         And by the way, do you have to live in a state in

14    order to commit a crime in it?

15    A.   No.

16    Q.   Thank you.

17              THE COURT:  Mr. Coffey?

18              MR. COFFEY:  No further questions.

19              THE COURT:  All right, please step down.

20    Thank you very much.

21         (Pause.)

22              MR. MADSEN:  Your Honor, at this time the

23    Plaintiff rests.

24              THE COURT:  Did they complete Sullivan?  I

25    thought we interrupted Sullivan?

1          MR. MADSEN:  Well, the -- National

2     Engineering, excuse me, has indicated that they will

3     just put Mr. Sullivan on in their case.

4          THE COURT:  In their case.

5          Okay, so you're all content to leave Sullivan

6     where we left off with at the moment.  Okay.

7          MR. KUPINSE:  We did stop in the middle, Your

8     Honor, but we're willing to just -- to move things

9     along, put him on in our case, because we --

10         THE COURT:  All right.  Fine.

11         MR. KUPINSE:  -- would have anyway.

12         THE COURT:  All right.

13         I don't even want to send the jury back out.

14    The Plaintiff's resting?

15         MR. MADSEN:  Correct.

16         THE COURT:  All right.  I'll deem all motions

17    made and we'll hold off on arguing them until lunch

18    recess.

19         All right, let's go to the Defense case, the

20    NESC.

21       (Pause.)

22         THE COURT:  Now, we had predicted that the

23    Plaintiff's case would get in in two days, and

24    fortunately it did.  They did it just about what we

25    expected, 'cause your also heard, as you learn now,

1    part of the Defense case, because Ms. Poquette will not

2    be recalled on the Defense case.  You've heard that

3    part of the Verifications case.

4              So we're making some progress.  All right.

5              THE CLERK:  Your Honor, (inaudible).

6              THE COURT:  Yes.

7         DEFENDANT'S WITNESS, ANNE FORTNEY, SWORN

8              THE CLERK:  Please state your name, spell

9    your last name, city, and state.

10             THE WITNESS:  Anne Fortney, my last name is

11   spelled F-o-r-t-n-e-y, and I'm from Washington, D.C.

12                       DIRECT EXAMINATION

13   BY MR. KUPINSE:

14   Q.   Ms. Fortney, what is your profession?

15   A.   I am an attorney.

16   Q.   And have you been asked, by us, to render an

17   opinion in this case?

18   A.   Yes, I have.

19   Q.   And I'm going to show you a document and ask you

20   if this is a copy of your curriculum vitae?

21             THE COURT:  Yes, remind me of the number on

22   that again.

23             MR. KUPINSE:  This is 535 --

24             THE COURT:  Thirty-five --

25             MR. KUPINSE:  -- B, Your Honor.

1              THE COURT:  -- B, okay.

2              MR. KUPINSE:  And I think this has already

3     been admitted as an exhibit --

4              THE COURT:  Yes, you're right.

5              MR. KUPINSE:  -- but if it is not, I would

6     ask it be at this time.

7              THE COURT:  You're right.

8              MR. KUPINSE:  That's not in the book, Your

9     Honor.  That's the one I divided out this morning.

10             THE COURT:  Oh, I guess you have it?

11             THE CLERK:  (Inaudible).

12             MR. KUPINSE:  Your court has a copy.

13             THE COURT:  Yes.

14             MR. KUPINSE:  And may we distribute copies to

15    the jury?  I believe there's no objection.

16             THE COURT:  Yes.

17             MR. KUPINSE:  Thank you.

18        (Pause.)

19    BY MR. KUPINSE:

20    Q.   You have a rather long curriculum vitae.

21         Can you sort of hit the high spots quickly for the

22    jury?

23    A.   Well, actually this is two versions of the

24    curriculum vitae.  One was prepared and provided in

25    September of '08, and the one on the bottom, I provided

1    this month.  It just updates the information that's in

2    the first one.

3         As it indicates, I am an attorney.  I practice in

4    Washington, D.C. with a small firm called Hudson Cook.

5    I'm a partner in that firm, and the work that I do

6    involves primarily privacy, especially the Fair Credit

7    Reporting Act, and also issues of data protection,

8    identity theft, ut most of my work does involve

9    privacy, and in that work I counsel companies that

10   comply with the Fair Credit Reporting Act.  That

11   includes consumer reporting agencies, it also includes

12   companies that use consumer reports and includes

13   companies that furnish information to consumer reports.

14   So it's a very broad range of clients that are subject

15   to this act.

16        I also, on occasion, testify before Congress as an

17   invited witness on the Fair Credit Reporting Act.  I am

18   -- I've written a number of articles and compliance

19   materials on the Fair Credit Reporting Act, and I also

20   speak fairly often to industry trade associations and

21   similar groups on the Fair Credit Reporting Act and on

22   other privacy laws.  So it really is my area of

23   concentration.

24        In addition, I am very active in the American Bar

25   Association, which is the association for --

1    professional association for attorneys, and I have been

2    in positions of leadership in the American Bar

3    Association, particularly with respect to privacy and

4    also other consumer protection laws, and in that

5    regard, I want to mention one thing that is on my

6    resume, and that is that I served at the Federal Trade

7    Commission.  I did that twice.  I began as an attorney

8    adviser to a commissioner.  The commission has five

9    commissioners, and then I went back and I directed what

10   was then called the division of credit practices.  It's

11   now got a different name, but it's the same division

12   generally, and that division in the Federal Trade

13   Commission enforces the Fair Credit Reporting Act

14   throughout the nation.  So I was very involved in the

15   enforcement, involved in the interpretations, and

16   developed a lot of familiarity with the Act.

17        I continue to work, on a very regular basis, with

18   people at the Federal Trade Commission, obviously on

19   behalf of clients.  I discuss interpretations with

20   them.  I get involved if the FTC investigates one of my

21   clients.  So that's another aspect of my work as well.

22   Q.   Do you feel comfortable in dealing with questions

23   concerning the Fair Credit Reporting Act?

24   A.   I do it on a daily basis.

25   Q.   Thank you.

1      And we have paid you for your services, have we

2  not?

3  A.   Yes, you have.

4  Q.   And can you tell the jury what your rate is?

5  A.   My hourly rate for expert work is $595 an hour,

6  and that reflects the fact that I have been practicing

7  in this area for almost 35 years.  I've been a lawyer

8  for 40 years, but I didn't work, involving the Fair

9  Credit Reporting Act and similar statutes, until about

10  35 years ago, and so I bring to this area, I believe,

11  an expertise -- a range and depth of expertise that is

12  shared by only a handful of other people in this

13  country.

14  Q.   Now, you did prepare a report for us and a

15  supplemental report; did you not?

16  A.   Yes, I did.

17  Q.   I'm going to show you a copy of your report which

18  has been redacted in part.  It's marked as Defendant's

19  Exhibit 535.

20           THE COURT:  It's 535A?

21           MR. KUPINSE:  No, 535, Your Honor.  This is

22  the exhibit which is in the exhibit book.  535A was the

23  one we used this morning before the jury came in.

24           THE COURT:  Yes.

25           MR. KUPINSE:  This is the redacted report,

1   Your Honor.

2            THE COURT:  Oh, okay.

3   BY MR. KUPINSE:

4   Q.  Is that a copy of your report with some redactions

5   in it?

6   A.  Yes, it is.

7            MR. KUPINSE:  And if Your Honor please, I

8   would offer that at this time as an exhibit.

9            MR. MADSEN:  There's an objection --

10           THE COURT:  Yes, I better look at it.

11       (Pause.)

12           THE COURT:  Yes, I'll take -- make the same

13   ruling I made on Hendricks (phonetic).  It'll be marked

14   for identification, but it won't be sent to the jury.

15           MR. KUPINSE:  Thank you, Your Honor.

16   BY MR. KUPINSE:

17   Q.  Ms. Fortney, did you review the facts in this

18   case?

19   A.  Yes, I did.

20   Q.  And can you give us a quick summary of what you

21   understood, particularly with that critical period

22   around May.

23   A.  Right.  I know you've heard a lot of testimony,

24   I'm not going to go into great detail, but I think

25   what's relevant for my opinion is that National

1   Engineering, which is a staffing agency, obtained a
2   consumer report from Verifications, And they did that
3   in connection with their work as a staffing agency for
4   their client.  They received the report on May 8th.
5   They forwarded that report to Guidant, as they were
6   required to do under their agreement with Guidant, and
7   they also -- Chris Sullivan, from National Engineering,
8   spoke with Ms. Adams about the content of the report,
9   and as you know, she disputed the fact that the report
10  was even about her.
11      On that same day Mr. Sullivan relayed Ms. Adams's
12  dispute to Guidant and also sent her a copy of the
13  report, and told her how she could dispute the
14  information in the report, and she did so, and then
15  within a three-day period, from May 8th to May 11th,
16  that information was -- actually, the dispute was
17  received by Verifications on May 9th.  They conducted
18  the investigation and concluded, based on additional
19  information -- based, in part, on additional
20  information provided by Ms. Adams, that indeed the
21  report was not about her, and they communicated that to
22  National Engineering, and I understand that National
23  Engineering relayed that information to Guidant.
24      So within a very short period of time, the
25  information was corrected and the correction was

1   relayed to Guidant, and I also understand that within

2   that time period, Ms. Adams wrote to the Federal Trade

3   Commission, wrote to various attorneys general, and she

4   did so even before Verifications had an opportunity to

5   conduct the investigation, and as you've also heard,

6   National Engineering -- I'm sorry, Verifications would

7   have had up to 30 days to conduct that reinvestigation.

8   So they did it in a very quick time period and,

9   therefore, all of this was resolved literally within

10  days.

11  Q.   Thank you.

12       Now, we've heard that 30 days mentioned a number

13  of times.  Can you explain what the 30 days means, and

14  what an employer, for example, could do during those 30

15  days?

16            THE COURT:  Okay, good time to interrupt.

17            Any objections to her qualifications to give

18  opinions?  Anybody want to do any Voir Dire?

19            MR. MADSEN:  No objection.

20            MR. COFFEY:  No objection.

21            THE COURT:  Okay.

22            I'll find her qualified to give an opinion.

23            THE WITNESS:  Okay.  Thank you.

24            MR. KUPINSE:  Okay.

25            THE WITNESS:  Thank you.

BY MR. KUPINSE:

Q.   Okay, going back to my question, --

A.   Right.

Q.   -- just to refresh everybody's recollection.

We've heard about this 30 days.  Can you just explain what that 30 days is for and what each of the parties can do during that time, the agency that produced the report and the client that got it, and the employer?

A.   Uh-huh.  Well, the 30 days is provided for in the statute, and this is what's known as the dispute investigation period.  When a consumer disputes directly to a consumer reporting agency, the accuracy or completeness of information in their report, then the consumer reporting agency must conduct an investigation, and they have 30 days from the receipt of the dispute to do so.

The employer, which in this case would have been Northeast Utilities, would have to be sure that the consumer had a copy of the report before taking any adverse action, and -- but once she had -- once the applicant received a copy of the report, whether or not the applicant disputed the information, the employer could have done whatever it wanted to with the report. It had a permissible purpose to receive the report.  It

1    did not have to wait 30 days, and there's been some

2    discussion about, you know, five-day period or things

3    of that kind.  It's not in the statute.  The Federal

4    Trade Commission has said in one context, maybe five

5    days, but it's also said that, you know, it's a

6    reasonable period of time.  It depends on the

7    circumstances.  So the whole purpose here of the

8    notification to the consumer, is to give them the

9    chance to be aware of the information and discuss it

10   with the employer or with somebody who is acting on

11   behalf of the employer, in order to give them a chance

12   to respond to any information, but what's interesting

13   here, and this is I think very important, is Congress,

14   at one point, considered putting in an absolute period

15   of time within which an employer could not act prior to

16   -- after receipt of the report, and prior to the

17   consumer having a chance to dispute, perhaps correct

18   the information, and what Congress did was recognize

19   that that's not going to work in all situations, and

20   this is a statute that has a lot of flexibility worked

21   into it, because it can -- it affects, you know,

22   millions and millions of situations every day.

23        And so what Congress did instead was require that

24   an employer, or someone acting on behalf of the

25   employer, give the consumer notice before the report is

1   obtained, and give him a notice of what -- you know,

2   that the report will be obtained, and actually get the

3   written authorization to obtain the report, and the

4   thinking there, I believe, based on my experience, is

5   Congress anticipated that if there was something there

6   that was negative, or something that indicated there

7   could be a problem or that the applicant would want to

8   explain, the applicant would have a chance to do it

9   right then and there, before the report was provided to

10  the employer, and before the employer would take

11  adverse action, so -- or not before the employer would

12  take adverse action but before the whatever explanation

13  or dispute or whatever, could get resolved before the

14  employer had the report, and before the time period

15  would start ticking within which the employer could

16  take adverse action after providing a copy of the

17  report to the consumer.

18      So there's a recognition here that there really

19  two parties here that have to think about what this

20  report might say.  Obviously the employer wants to know

21  what's going to be in that report, but the consumer,

22  who is now applying for a position, Congress

23  recognized, should know ahead of time that this

24  information would be sought on the consumer, so if

25  there is something negative in their background or some

1    explanation, then the applicant would have a chance to

2    explain it, or to say, you know, this has happened

3    before and I don't think you're going to find the right

4    report on John Doe.  This is what Congress anticipated,

5    I think, with the advance notice to the consumer and

6    the written authorization that the report be obtained.

7    Q.    Do you recall whether there was a written

8    authorization from the Plaintiff in this case?

9    A.    Yes, there was.

10   Q.    And that was in compliance with the Fair Credit

11   Reporting Act?

12   A.    Yes, it was.

13   Q.    I should have asked you before.

14         In reviewing a number of documents, it looks like

15   you reviewed about 29 documents, some of which were

16   relatively lengthy; is that correct?

17   A.    I think it's even more than that because -- I

18   didn't keep track, but seemed like a lot, yes.

19   Q.    Okay.  Thank you.

20         One thing that I'd also like to come back to is

21   that you reviewed the e-mail in which Mr. Sullivan sent

22   the report over to Guidant; did you not?

23   A.    Yes, I did.

24   Q.    And Mr. Sullivan put some comment on it, do you

25   recall that?

A.   Yes, I do.

Q.   And was that an evaluation, in your opinion, of that report?

A.   No, it was not.  It was a comment.  It was certainly a comment that was made, but it's very similar to what happens in other types of situations when, you know, a report is reviewed and the party that is reviewing the report is working with someone else in the same -- same transaction, and the example that comes to mind is when somebody applies for financing in auto dealership.  The auto dealer obtains a copy of the consumer report, but the auto dealer doesn't usually provide the financing.  The auto dealer goes to the bank or other lender to get the credit, but before the auto dealer will agree to provide the financing, they have to get the approval of the bank.

So -- I've been involved in situation where the auto dealer gets the consumer report, is on the phone with the person that's going to be making the loan, and says, "Oh yes, this person has bad credit, but he's a minister, and so you have to take into consideration that he's going to be honorable in paying his debts."

That's the kind of comment that is made on a report in a very typical situation.  Similarly, a mortgage broker could say to the bank that's going to

1    actually make the loan, Yes this person has bad credit,

2    but they're putting down 50 percent so you don't have

3    much risk.  So it's a very common practice, especially

4    when you have a report that is being shared in this

5    type of context, for the party that receives the report

6    to make some comment, but it's not an evaluation, as I

7    would consider an evaluation to occur when a company,

8    like Verifications, is pulling together information

9    from various sources, assembling it and also evaluating

10   that information.

11   Q.   Now, we've heard some testimony that Ms. Adams had

12   some information about her possible mixed information

13   before this all started.

14        Do you have an opinion as to what she might have

15   done with that or should have done with that?

16   A.   Well, if I had counseled her, and I think also if

17   Mr. Hendricks, who you heard from yesterday, had

18   counseled her, I think we would have said that it would

19   have been a good practice to inform National

20   Engineering of this background -- of this mix-up in the

21   past just so that there would not be any type of a

22   glitch in the processing of her application.

23   Q.   Now, we've also heard some testimony with respect

24   to the use of a name other than Deborah and social

25   security.

1          Can you comment on that in the area of

2     investigations?

3     A.    Yes, I can, and again, I do a lot of work with the

4     consumer reporting industry.  You know, most of the

5     work does involve credit reporting, but I also do a

6     fair amount of work, and have done work, on issues

7     involving employment background checks and, you know,

8     consumer reports of that kind, and what happens in

9     every case is the consumer reporting agency is trying

10    to match the information.  Misspellings, I mean, my

11    name -- my first name is spelled with an "e."  I can't

12    begin to tell you how many times people leave that "e"

13    off.  Deborah does have several spellings, so it's not

14    an uncommon thing for, either in the credit reporting

15    industry or other aspects of the consumer reporting

16    industry, for a name to be returned that has a

17    different spelling.

18         Now, on the issue of social security, that is a

19    problem, and the reason is that the various counties,

20    and actually some other municipalities and some States,

21    have been taking measures to protect consumers,

22    rightfully so, against identify theft, and so there

23    have now been restrictions on the availability of

24    social security numbers in some instances, and so it's

25    been an issue, because the -- people's social security

numbers are a unique identifier, and instead of going
to a system and perhaps having some redacted social
security number, a lot of States, and in fact even the
federal government in some instances, have prohibited
the use, or tried to prohibit the use of social
security numbers, which makes it more difficult,
obviously, to be searching for the correct person if
the social security number is not always going to be
available in a public record.

Q.   We've heard some testimony, too, about adverse
action.

     Can you explain to the jury what adverse action
is?

A.   Yes, and it's the thing that basically triggers
the dispute in many instances.  Congress has actually
said that they don't expect perfection in consumer
reporting.  There are literally billions, now, of
consumer reports provided each year, particularly in
the credit area.  I think it's about two billion credit
reports every single year, and that works out to about
five-and-a-half million credit reports every single
day, and it's a voluntary system.  The information's
provided by the furnisher to the consumer reporting
agency, or else the consumer reporting agency gets it
from a public record, and then the information is

1    provided to the company that has a permissible purpose

2    in order to get the report from the consumer reporting

3    agency, and Congress recognizes, as I've said -- that

4    they've said, that there will not be perfection, but

5    they also recognize a need.  In fact the statute, in

6    the preamble, talks about the need of the industry for

7    this accurate information.

8         So the Act has worked into it -- and this has been

9    there ever since the Act was originally enacted, it's

10   been modified somewhat, but the basic premise is that

11   when a adverse action is taken against the consumer,

12   they have the right to know that.  They have the right

13   to be told that adverse action has been taken, to be

14   given notice of the action.  The consumer is also given

15   the name and contact information of the consumer

16   reporting agency that provided the information and also

17   some other information about that -- the adverse

18   action, including -- and there's also a summary of the

19   consumer's rights.  Then armed with that information,

20   the consumer can go to the consumer reporting agency

21   and obtain, for free, a copy of the report.

22        Now, in the employment situation's, it's a little

23   bit different because in employment situation, the

24   consumer actually gets -- is entitled to a copy of the

25   report before adverse action is taken, or the time

1    adverse action's taken.  In a credit situation, it

2    isn't.  So it's -- but when the consumer goes to the

3    consumer reporting agency after getting an adverse

4    action notice, that is what then triggers what we

5    discussed before, which is the dispute verification or

6    investigation system.

7         So, the idea is that because mistakes will happen,

8    consumers should be told about those mistakes.

9    Consumers should have the opportunity to correct any

10   inaccurate information.  That will, of course, protect

11   consumers, but also, it protects the industry that

12   relies on this information because the industry is --

13   relies on, as Congress has recognized, the industry

14   relies on accurate information in consumer reports,

15   recognizing that it's just not possible to have a

16   hundred percent accuracy and, in fact, if the Fair

17   Credit Reporting Act required any consumer reporting

18   agency to have a hundred percent accuracy, then the

19   whole system would break down.  We would not have a

20   system, because it's impossible.

21        It's also why the statute talks in terms of

22   reasonable procedures to ensure maximum possible

23   accuracy.  It doesn't say that each time a consumer

24   reporting agency prepares a report, it must have

25   maximum possible accuracy.  It says it must have

1    reasonable procedures to assure maximum possible

2    accuracy.  In other words, it must take reasonable

3    steps to assure that accuracy, recognizing it's not

4    gonna hit it a hundred percent of the time.

5    Q.   In this case -- Withdrawn.

6         First of all, I think you said before, and I just

7    want to reaffirm on what you just said, was the

8    consumer, in this case the Plaintiff, provided with a

9    copy of the report before any adverse action?

10   A.   Yes.

11   Q.   And in fact, was there any adverse action taken on

12   the basis of the erroneous report?

13   A.   The record does not indicate that any adverse

14   action was taken based on the erroneous report.

15   Q.   Now, when Northeast Utilities determined not to

16   offer the position, let's forget about what led up to

17   that, would that have been adverse action?

18   A.   Yes.

19   Q.   And who in this case, if anyone, besides Northeast

20   Utilities, committed some act of adverse action?  Did

21   National?

22   A.   National did not.

23   Q    Okay.

24   A.   National did not.

25   Q.   And so I think what you've said, and correct me if

1    I'm wrong, is that there probably wasn't any adverse

2    action taken, but if it was, it wasn't National, it was

3    Northeast.

4    A.   It was -- exactly.  If there was any adverse

5    action taken, and again, my understanding is whatever

6    action Northeast Utilities took, it took after May

7    11th, 2007.

8    Q.   Now in the course of looking at the materials, you

9    had an opportunity to look at the report of Mr.

10   Hendricks, which did not go into the jury, as ours did

11   not --

12   A.   Right.

13   Q.   -- and you had a chance also, I believe, to look

14   at his testimony, did you?

15   A.   Yes, I did.

16   Q.   And --

17   A.   Oh, I'm sorry, I did not have a chance to look at

18   his testimony.  It came in at 1:00 this morning.

19   Q.   Oh.

20   A.   I was asleep.

21   Q.   And with respect to Mr. Hendricks's comments, do

22   you agree with him that National did anything

23   incorrectly in this process?

24   A.   I do not believe that National did anything

25   incorrectly in this process, and here, what I want to

1   say, is the procedures they followed were consistent

2   with the industry standards, and the significance of

3   that is that if a company provides -- follows

4   procedures that are consistent with the industry

5   standard, then that has bearing on whether the

6   procedures were reasonable.

7   Q.   And you also had an opportunity to look at a

8   report by an expert that has not yet testified, Mr.

9   Barry Nadel (phonetic), who will be called by

10  Verifications, and did you find anything in that report

11  that you would agree caused you to believe that

12  National did anything wrong?

13  A.   There's nothing in the report that led me to

14  conclude that National did anything wrong.  Again,

15  their actions were entirely consistent with the

16  industry standards.

17  Q.   And turning to your ultimate conclusion, you've

18  come to the conclusion that National acted reasonably

19  and consistently with industry standards in obtaining

20  the consumer report from Verifications in responding to

21  Ms. Adams's claim that the report was not accurate, and

22  that this was an appropriate action on the part of

23  National; is that correct?

24  A.   That's correct.

25  Q.   Is there anything I didn't ask you that you'd like

1    to add?

2    A.   I can't think of anything.

3    Q.   Thank you very much.

4    A.   You're welcome.

5           THE COURT:  All right, Mr. Coffey?

6              CROSS-EXAMINATION BY MR. COFFEY

7    BY MR. COFFEY:

8    Q.   Good morning for two more, almost three more

9    minutes.

10         Now, is it unusual for names with alternative

11   spellings to be included on consumer reports?

12   A.   Yes.

13   Q.   Okay.

14         It's -- In some cases, names with alternative

15   spellings, like Debra and Deborah, Debra, D-e-b-r-a and

16   Deborah, would be included on consumer reports?

17   A.   That a consumer report could be obtained on

18   somebody named Deborah Adams, regardless of the

19   spelling.

20   Q.   Right.

21         And then, because in some cases, is it your

22   experience there can be spelling errors?

23   A.   There could be spelling errors and, you know, a

24   lot of applications are taken orally.  Even if it's an

25   employment application, somebody comes in, and they

1  start writing down the information.  So the person

2  who's taking down the information could have spelled

3  the name differently.

4  Q.   And in other cases, the same person can use

5  different spellings, or they can be reported from

6  multiple sources with different spellings?

7  A.   That's correct.

8  Q.   Is that an unusual occurrence, or is that an

9  industry-wide occurrence that occurs with fair

10 regularity?

11 A.   I can't speak to how often it occurs, but it's

12 certainly not an unusual occurrence.

13 Q.   And it's fair to say a first name mismatch is not

14 a reliable indicator that there are two different

15 people?

16 A.   It is not a reliable indicator.

17 Q.   Is it uncommon for persons to alter spellings of

18 first or last names to avoid detection of criminal

19 reports?

20 A.   That is especially true in the case of criminal

21 reports, yes.

22 Q.   And why is that, typically?

23 A.   In order to avoid detection.

24 Q.   Did the presence or absence of a middle name, is

25 that an indicator that there are two people involved?

1    A.    No.   In fact, many applications do not -- again,

2    just speaking generally in the industry, do not call

3    for or include a middle name.

4    Q.    And are middle names legally required?

5    A.    No.

6    Q.    And they're not consistently in the -- they're not

7    always consistently used or reported, is that fair to

8    say?

9    A.    That's correct.

10   Q.    And the middle name, in and of itself, is not a

11   factor that a background investigator or a CRA would

12   rely upon in deciding whether or not to report

13   information.

14   A.    That's correct.

15   Q.    And one of the more unique identifiers, like a

16   date of birth, isn't that more commonly, in the

17   industry, seen as an accurate predictor of a person's

18   identity, and why is that?

19   A.    Well, it is.   In fact, as I indicated, because of

20   concern about the use of social security numbers, we're

21   now going into a situation where in many instances, the

22   only identifiers that are available are the name and

23   the date of birth.

24   Q.    And is -- if there is a similar name and date of

25   birth, is it likely the same person is involved?

1   A.   If there's a similar name and the same date of

2   birth, yes.

3   Q.   And would you have expected, in this instance, for

4   Verifications to report this to NEC on its report?

5   A.   Yes.

6   Q.   And why is that?

7   A.   Because they had the identifiers that matched and,

8   as I think there's also been testimony in this case,

9   this had never happened before.  I don't know how often

10  it happens, that two people with the same name and same

11  date of birth have this type of situation, but I

12  imagine it's unusual.

13  Q.   And within two or three days, the corrected report

14  was posted by Verifications?

15  A.   That's correct.

16  Q.   So in your opinion, the procedure worked.  NESC

17  forwarded a complaint to Verifications, they

18  reinvestigated and submitted an updated report within

19  three days.

20  A.   That's correct.

21  Q.   And --

22       (Pause.)

23  BY MR. COFFEY:

24  Q.   Now, why is the dispute process in place?

25  A.   Well as I indicated, it's in place because

1    Congress recognized that there will be information in

2    consumer reports that is not accurate, and consumers

3    need to have the opportunity to correct that

4    information and -- because otherwise the information is

5    going to remain inaccurate going forward and also, if

6    the consumer has been a subject of adverse action they

7    -- or could be the subject of adverse action, they will

8    want to have the information corrected.

9    Q.   Do you agree that -- Did you have an opinion on

10   Mr. Hendricks' credentials when you reviewed his report

11   and CV?

12   A.   Yes, I have dealt with Mr. Hendricks a lot over

13   the years.

14   Q.   And what is your opinion?

15   A.   Mr. Hendricks is a -- essentially a newspaper --

16             MR. STEIGMAN:  Your Honor, I'm not sure this

17   is part of the -- this is not appropriate examination

18   with respect to what this expert has been put on the

19   stand for.

20             MR. KUPINSE:  I would support it, Your Honor.

21   I did ask if she reviewed Mr. Hendricks' report.

22             THE COURT:  Yes, I think I'll allow that.

23   This is all a matter of credibility and you've got to

24   judge the credibility of each of these experts and use

25   the information if you think it's helpful to you, and

1    if you don't think you need it, you're going to use it

2    or you discount it.  It's up to you to determine what

3    use you will make of this expert testimony, but this is

4    sort of the pot calling the kettle black, I suppose,

5    but I'll allow this testimony, and you can take it for

6    what you think it's worth.

7              All right, go ahead.

8    A.   Yes, as I was saying, I believe Mr. Hendricks is

9    essentially an advocate.  He advocates primarily from

10   the consumer's point of view on privacy issues.  He

11   does publish a newsletter called, "Privacy Times."  He

12   has self-published a book in this area and he, like I,

13   has testified before Congress.

14        When Congress has asked you to testify, it's

15   basically, what do you think consumers think should be

16   done in this area?  It's not about the law.  Mr.

17   Hendricks is not a lawyer, and for that reason I don't

18   think has the same degree of familiarity with the Fair

19   Credit Reporting Act.

20        To my knowledge, Mr. Hendricks does not counsel

21   people on the Fair Credit Reporting Act the way I do,

22   so he has some background in this area, but it's

23   primarily as an advocate.

24   BY MR. COFFEY:

25   Q.   Do you agree that most of his report had little to

1    do with this case?

2    A.   Yes.

3    Q.   Now, employment screenings.  Why are they an

4    important tool to the industry?

5    A.   Well, as I think has been discussed today,

6    unfortunately, applicants are not always honest --

7    applicants for employment are not always honest with

8    respect to their credentials.  This is particularly

9    true if there is a criminal record, and the other thing

10   is, it's really important that employers, such as

11   Northeast Utilities, be protected because of the nature

12   of their work, because of the value of, you know,

13   utilities and how you want to be sure that the people

14   who have access to their -- to a business, are people

15   who do not have any criminal records and also, of

16   course, don't have any history of drugs or any of that

17   kind, which I know is not an issue here, but -- so,

18   it's not just the value of background checks for

19   employers generally.

20        I think we also need to look at these are

21   particularly valuable when you get into certain types

22   of industries where it's key that the people who have

23   access to the business, are those who come from a --

24   who don't have a criminal background.

25             MR. COFFEY:  I have no further questions,

1    thank you.

2              THE COURT:  Mr. Madsen?

3              MR. MADSEN:  Yes, Your Honor.

4                CROSS-EXAMINATION BY MR. MADSEN

5    BY MR. MADSEN:

6    Q.   Now it's afternoon.  Good afternoon, Ms. Fortney.

7    A.   Good afternoon.

8    Q.   Okay.

9         Now you testified, I believe that you're earning

10   about $595 an hour?

11   A.   For this work.

12   Q.   For this work.

13   A.   I don't earn the same amount for my counseling.

14   Q.   Okay.

15        How much money have you earned in connection with

16   this case to date, do you have any idea?

17   A.   I don't have any idea, because --

18   Q.   More than a thousand dollars?

19   A.   Well, more than a thousand dollars --

20   Q.   More than five?

21   A.   Well, Yes, more than five, but I don't -- because

22   you have to understand, I serve as an expert on these

23   cases, but it's not a major part of my business.  Most

24   of my business involves counseling.

25   Q.   I wasn't asking you what the major part of your

1    business.  I was asking you on this case, have you
2    earned more than $5,000?
3    A.   Yes.
4    Q.   Have you earned more than $10,000.
5    A.   I believe so.
6    Q.   Okay.
7         Now, you talked about Mr. Hendricks being
8    principally a consumer advocate, correct?
9    A.   Correct.
10   Q.   Would you agree that the Fair Credit Reporting Act
11   was principally designed to protect consumers?
12   A.   I think the --
13            THE COURT:  Wait.  You want to change over?
14            UNIDENTIFIED SPEAKER:  (Inaudible.)
15            THE COURT:  Yes, go ahead.  You want to
16   change over now?  Yes.
17            MR. MADSEN:  Okay, so we have to suspend the
18   --
19            THE COURT:  Take a minute while I change over
20   --
21            UNIDENTIFIED SPEAKER:  They can keep going,
22   Your Honor.  They can keep going.  It's okay.
23            THE COURT:  Okay.  It won't affect us?
24            UNIDENTIFIED SPEAKER:  (Inaudible.)
25            THE COURT:  All right.  Okay, keep going, I

1    guess.

2    BY MR. MADSEN:

3    Q.   Again, would you agree that one of the principal

4    purposes of the Fair Credit Reporting Act is to protect

5    consumers?

6    A.   The Fair Credit Reporting Act has several

7    principal purposes --

8    Q.   Okay, but --

9    A.   -- one is to protect consumers, the other is to

10   protect the industry.

11   Q.   So the answer is yes, that one of the principal

12   reasons is to protect consumers?

13   A.   One of the principal reasons is to protect the

14   privacy, and confidentiality, and accuracy of

15   information in consumer reports.

16   Q.   People like Deborah Adams?

17   A.   Sure.

18   Q.   Okay.

19        And isn't it true, you testified that Mr.

20   Hendricks has primarily been engaged in advocating on

21   behalf of consumers.

22        Do you recall that testimony?

23   A.   Yes.

24   Q.   Isn't it fair to say that you have primarily,

25   i.e., more than 50 percent of your time, spent

1      representing the interests of industry?

2      A.   Yes, but not as an advocate.

3      Q.   Okay.

4           And you get paid by the industry?

5      A.   I get paid by clients.  I'm a lawyer.

6      Q.   But those are members -- your clients are members

7      of the industry?

8      A.   Yes.

9      Q.   Okay.

10          Including other background check companies?

11     A.   I don't know if I currently represent any

12     background check companies.

13     Q.   In the past have you?

14     A.   Yes.

15     Q.   Okay.

16          A number of them, correct?

17     A.   I don't recall how many.

18     Q.   All right.

19          And now you've -- you talked extensively about,

20     "reasonable procedures," correct?

21     A.   Correct.

22     Q.   And that is your opinion as to the law under the

23     Fair Credit Reporting Act --

24     A.   No.

25     Q.   -- isn't it?

1   A.   No, I am not opining here on the law.  I'm opining

2   on the reasonableness of procedures based on my 30 --

3   almost 35 years experience working in the consumer

4   reporting industry.

5   Q.   Clearly, you have talked at length about the Fair

6   Credit Reporting Act in your examination earlier today.

7   A.   But the --

8   Q.   (Inaudible).

9   A.   -- most of the procedures goes to my understanding

10  of how they comport with the industry standards. That's

11  my testimony.

12  Q.   And I had moved onto another question.

13  A.   Uh-huh.

14  Q.   My question is, you've talked extensively about

15  the requirements of the Fair Credit Reporting Act,

16  correct?

17  A.   In response to questions, yes.

18  Q.   Okay.

19       And you understand that this is a court case?

20  A.   Yes.

21  Q.   You understand that the jury is going to be

22  sitting, and is sitting, and will be deciding this

23  case?

24  A.   Well, of course.

25  Q.   Okay.

1        And do you understand that in a case like this,

2    it's the Judge's instructions on the law that govern --

3    A.   Yes.

4    Q.   -- as to what the Fair Credit Reporting Act

5    requires?

6    A.   Of course.

7    Q.   Okay.

8        Now, you provided a report in this case, didn't

9    you?

10   A.   Yes, I did.

11   Q.   Isn't it true that in that report, you faulted

12   Deborah Adams for what happened to her, in part.

13   A.   I wouldn't characterize it that way.

14   Q.   Well, didn't -- isn't it true that you said that

15   had Ms. Adams provided this information to National

16   Engineering when she signed the authorization form, she

17   could have avoided any confusion about whether she was

18   Deborah Jean Adams.

19       Didn't you write that in your report?

20   A.   Well, of course, and that was also my testimony.

21   Q.   I understand.

22       And didn't you say that if she had done so, you

23   said:

24       "In fact, I would expect National Engineering to

25       seek further independent investigation to confirm

1              that the conviction involved a person other than

2              Ms. Adams."

3              Did you state that in your report?

4      A.    I said that had she provided that information,

5      then yes, they would have had additional information.

6      Q.    Okay.

7      A.    Yes.

8      Q.    So had she done that, you would have expected

9      National Engineering to seek further independent

10     investigation.  You said that in your report, didn't

11     you?

12     A.    Yes.

13     Q.    Now, are you claiming that Ms. Adams was

14     negligent, in any way, in not providing information to

15     National Engineering?

16     A.    I think it would have been more reasonable for her

17     to provide the information up front.

18     Q.    To you knowledge, does the Fair Credit Reporting

19     Act have any provision for a contributory negligence

20     claim to be brought against a consumer?

21     A.    That's not the issue.

22     Q.    Did you understand my question?

23            Does the Fair Credit Reporting Act have any

24     provision that allows for a contributory negligence

25     claim to be brought against a consumer?

1   A.   The Fair Credit Reporting Act has no provisions

2   regarding negligence one way or the other.

3   Q.   Okay.

4        And do you think that a consumer might

5   legitimately have a concern about going to an employer

6   and saying, "Hey look, I know you're doing a background

7   check on me, but I want to let you know in advance, in

8   the past there's been a positive background check where

9   I'm identified as having committed a felony, but don't

10  worry, It's not me.  I just want to let you know that."

11       Do you think that might be a legitimate concern by

12  a consumer?

13  A.   I think that the consumer would have to balance

14  the possibility of how that might be received with the

15  possibility that a incorrect report would be obtained.

16  Q.   What if a consumer happens to be a single mother

17  struggling to make ends meet and really needs to get a

18  job?  Might that impact the decision of the consumer?

19  A.   I think under those circumstances, the consumer

20  would be well advised to be up front about everything

21  that could adversely affect the report.

22  Q.   So under that situation -- but you're not claiming

23  the Fair Credit Reporting Act imposes such an

24  obligation on someone like Ms. Adams, are you?

25  A.    Well, the Fair Credit Reporting Act does not take

1    into consideration the circumstances of any particular

2    applicant.  It does provide notice to the consumer,

3    ahead of time, so that if there's anything the consumer

4    wants to explain, they can do so.

5    Q.   Okay.

6         MR. MADSEN:  Your Honor, can I ask to have a

7    question read back?  Is that possible?

8         THE COURT:  Want to try it?  Well, why don't

9    you just repeat it?

10        MR. MADSEN:  Well, that's okay -- I'll move

11   on.

12   BY MR. MADSEN:

13   Q.   Now, you believe -- do you recall testifying that

14   the report was provided to Ms. Adams before adverse

15   action was taken?

16   A.   Yes.

17   Q.   Okay.

18        And that was an assumption that you operated on in

19   preparing your report, wasn't it?

20   A.   Yes.

21   Q.   And it was an assumption that you operated with in

22   rendering your opinion here today?

23   A.   Yes.

24   Q.   And wouldn't you say that's a critical assumption?

25   A.   Critical in what respect?

1  Q.  Well, I mean, that's an important fact here, isn't

2  it, your assumption here that Ms. Adams was provided

3  the report before adverse action was taken.

4      Don't you think that's an important factor?

5  A.  Well, I think the timing -- I mean the record

6  speaks to the timing of it, I'm going to let -- you

7  know, I don't know what you mean by important factor.

8      The reality is, Ms. Adams was given an opportunity

9  to dispute the information in the report before, the

10  record indicates, that Northeast Utilities did

11  anything.

12  Q.  Okay.

13      Well, are you aware of the fact that the report

14  was in fact transmitted to Guidant Group before 4:00

15  o'clock on May 8th?

16  A.  Yes, and I testified to that effect.

17  Q.  And are you aware of the fact that it was

18  immediately passed on to Northeast Utilities

19  management?

20  A.  Yes.

21  Q.  Are you aware of the fact that Ms. Adams's offer

22  of employment was automatically rescinded as of that

23  point in time?

24  A.  No.

25  Q.  Now, you've testified about Accurant, right?

1    You've testified about a service called, "Accurant"?

2    A.   I don't recall, but I am familiar with the

3    service.

4    Q.   Okay.

5         And what is Accurant?

6    A.   Accurant is a service that provides information.

7    Q.   Okay.

8         What kind of information does it provide?

9    A.   Identifying information.

10   Q.   And in this case, did Verifications end up using

11   Accurant?

12   A.   Yes.

13   Q.   And were they able to ascertain, by using

14   Accurant, that the social security number belonging to

15   the individual in Virginia with a criminal conviction

16   did not match Mrs. Adams -- Ms. Adams.

17   A.   When Ms. Adams --

18   Q.   (Inaudible).

19   A.   -- was given the information to Verifications,

20   they then ran a check through Accurant.  That's the

21   testimony.

22   Q.   And my question is, were they able, via Accurant,

23   to determine that --

24   A.   At that point -- I'm sorry.  Go ahead and finish.

25   Q.   -- that the social security number belonging to

1    the person who was convicted in Virginia did not match

2    Ms. Adams.

3    A.   At that point in time, yes.

4    Q.   And you're not aware of any technological barrier

5    that would have prevented Verifications from using

6    Accurant before they produced the initial report, are

7    you?

8    A.   No.

9    Q.   You're not aware of any legal barrier that would

10   have prevented Verifications from utilizing Accurant

11   before they produced the initial report?

12   A.   There's no legal barrier.  There's a very

13   practical barrier.

14   Q.   And does the practical barrier impinge on industry

15   standards, to your -- based on your view?

16   A.   Based on my view, it's -- there's a question here.

17   At what point does a company providing a consumer

18   report have to check every single possible source, and

19   again, there's a balancing here, and that's what I

20   think went on in this case.

21   Q.   In this case, the balancing didn't work out in Ms.

22   Adams' favor, did it?

23   A.   And that is why there is the dispute procedure.

24   Q.   Okay.

25        Now, you also referred to a contract between

1    Verifications and National Engineering.

2        Do you recall that testimony?

3    A.   Yes.

4    Q.   Okay.

5        You're not saying that whatever a contract

6    provides between two parties would supercede or trump

7    their independent requirements and obligations under

8    the Fair Credit Reporting Act, are you?

9    A.   It would reflect their understanding of their

10   obligations.

11   Q.   Okay.  Again, that's not my question.

12       Does the understanding, memorialized in the

13   contract, superceded federal law?

14   A.   Well of course not, but it does reflect their

15   understanding.

16   Q.   You don't claim, in this case, that Ms. Adams was

17   dishonest, do you?

18   A.   What I claim in this case --

19   Q.   No --

20   A.   You asked me what I claim.

21   Q.   No, I said you don't claim, in this case, that Ms.

22   Adams was dishonest, do you?  The question is, do you

23   claim that she was dishonest?  It really does call for

24   a, "yes" or, "no" answer.

25            MR. KUPINSE:  Well, if Your Honor please, I

1   object.

2          She started to answer the question with more

3   than a yes or no answer and I do --

4          THE COURT:  He's had a lot of trouble getting

5   this witness, who -- She's a lawyer and lawyers can

6   make this a problem for us, you know that.  She should

7   be answering his questions.  She knows that.  She's on

8   cross-examination, but she's volunteering and I'm going

9   to let him go until he gets an answer, "yes" or "no."

10  I mean, she ought to keep that in mind because I'll

11  crack down if I have to.

12          It will get you off the stand a lot faster if

13  you just answer his question.  Go ahead.

14  A.   I don't know whether she was dishonest.

15  BY MR. MADSEN:

16  Q.   Okay.

17       So you're not claiming that she was dishonest.

18  A.   I'm not claiming she was dishonest.

19  Q.   Now, have you ever lost a job because someone

20  provided an inaccurate background report on you?

21  A.   No.

22  Q.   I believe you testified, and I believe these are

23  your words, you said, "The procedure worked in this

24  case."

25          Do you recall that?

1    A.   Yes.   The dispute procedure worked in this case.

2    Q.   Did everything in this case, to your knowledge,

3    everything work according -- in -- consistent with the

4    requirements of the Fair Credit Reporting Act?

5    A.   Well, yes.

6    Q.   Okay.

7         And yet Ms. Adams lost a job.

8    A.   Yes.   Well, I don't know why Ms. Adams lost a job.

9    Q.   Well --

10   A.   I never opined as to why she lost the job.   I'm

11   telling her -- what I'm saying is, that when Northeast

12   Utilities -- my understanding is, that when Northeast

13   Utilities took adverse action, they had the corrected

14   report.

15   Q.   So in your opinion, the process worked in the case

16   as it was designed to work.

17   A.   Yes.

18            MR. MADSEN:   No further questions.

19            THE COURT:   Mr. Kupinse.

20            MR. KUPINSE:   Thank you, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. KUPINSE:

23   Q.   I'm showing you a copy of what's been marked as

24   Plaintiff's Exhibit 1.

25        (Pause.)

1    BY MR. KUPINSE:

2    Q.   When Mr. Madsen asked you questions about the

3    contract between Verifications and National, was that

4    the document to which he was referring?

5    A.   Yes.

6    Q.   Can you tell us whether that is a standard or an

7    un-standard document in the industry?

8    A.   It is a standard document in the industry.

9    Q.   Is it required under the Fair Credit Reporting

10   Act?

11   A.   Yes, it is.

12   Q.   And does it set the obligations between

13   Verifications, Inc. and National Engineering Service

14   Corporation in accordance with the standards of the

15   Fair Credit Reporting Act?

16   A.   Yes.

17   Q.   And I know you may not have read it within the

18   last three minutes, but is -- was there anything in

19   there that you could find that overrode the Fair Credit

20   Reporting Act or attempted to override?

21   A.   No.

22   Q.   Okay.  Thank you.

23        Mr. Madsen also asked you whether one of the

24   principal purposes of the Fair Credit Reporting Act was

25   to protect consumers, and you answered, "yes."

1      Were there other principal important points of the
2 Fair Credit Reporting Act?
3 A.   Yes.   The Act, as I've indicated, in the preamble,
4 the statement of reasons for the Act discusses the fact
5 that the industry -- they're referring primarily to the
6 banking industry, because this was enacted in 1970, but
7 now there are many aspects of the industry, including
8 the employment industry, rely on consumer reports in
9 order to conduct their business.
10 Q.   And Mr. Madsen asked you if the Plaintiff had
11 provided the information, which she had, why would you
12 seek further information?
13      Do you have an answer for that?
14 A.   If she provided the information, in other words,
15 that this had happened before?
16 Q.   Yes.
17 A.   Then in that case, I think that National
18 Engineering would have provided that information to
19 Verifications, Verifications would have had that
20 information, and everything would have been resolved up
21 front.   That's --
22 Q.   And when things --
23 A.   -- why the Act requires advanced notice.
24 Q.   And when things work in accordance with the Fair
25 Credit Reporting Act, does it necessarily mean that

1    everybody who applies for a position is going to get

2    it?

3    A.   No.

4    Q.   Thank you.

5             MR. KUPINSE:  I have nothing further.

6             THE COURT:  Mr. Coffey?

7             MR. COFFEY:  I have no further questions.

8             THE COURT:  All right.

9             MR. MADSEN:  Nothing further.

10            THE COURT:  All right.

11            You may step down.  Thank you.

12            MR. KUPINSE:  Mr. McPherson will take Mr.

13   Sullivan at this point.

14       (Pause.)

15     DEFENDANT'S WITNESS, CHRIS SULLIVAN, SWORN

16            THE CLERK:  Please be seated.

17            Can you state your name, spell your last

18   name, and your city and state?

19            THE WITNESS:  My name is Chris Sullivan, S-u-

20   l-l-I-v-a-n, Dover, New Hampshire.

21            THE COURT:  All right, you're still under

22   oath.

23            Go ahead.

24                      DIRECT EXAMINATION

25   BY MR. MCPHERSON:

1   Q.   Good afternoon, Mr. Sullivan.

2   A.   Hello.

3   Q.   I have a few questions concerning your testimony

4   yesterday.

5       You testified that you thought National has

6   revenues of approximately $30 million.

7   A.   Yes.

8   Q.   Does this include money that National has to pay

9   to its temporary placements, such as Deborah Adams, if

10  she got the job at Northeast.

11  A.   No.

12  Q.   It does not include that?

13  A.   It does not.

14  Q.   What does it include?

15  A.   That is the total number that we would bill out,

16  and then you would have to subtract the -- each

17  contract employee's salary, employment tax,

18  unemployment tax --

19  Q.   Okay, let me --

20  A.   -- payroll burden.

21  Q.   Let me stop you right there.

22  A.   Sure.

23  Q.   So you just said you have to subtract what you pay

24  to the temporary employee?

25  A.   Correct.

1    Q.   So the $30 million does include what you pay the

2    temporary employees?

3    A.   Oh, yes.

4    Q.   Okay.

5         So just so the record's clear, 30 million does not

6    -- 30 million is not National's profit.

7    A.   No.

8    Q.   Okay.

9         Out of the percentage of the 30 million that -- of

10   revenues National gets, or got last year, what

11   percentage went to temporary employees?

12   A.   Well more than half.

13   Q.   More than half, okay.

14        Now, what's left over, is that National's profit?

15   A.   No.

16   Q.   Why not?

17   A.   Because we're still obligated to pay unemployment

18   tax, various insurance taxes, payroll burden, et

19   cetera.

20   Q.   Okay.

21        You testified yesterday that you made $78,000 last

22   year.

23   A.   Yes.

24   Q.   Okay.

25        Does this include the commissions you made and

1  also your base hourly rate?

2  A.   Yes.

3  Q.   Okay.

4       You also testified that you generated

5  approximately 12 to $14,000 of revenue, per week, last

6  year.

7  A.   Yes.

8  Q.   Is that profit to National?

9  A.   No.

10 Q.   Now also, your testimony regarding Ms. Adams's

11 background check was somewhat confusing to me.  You

12 testified that it was done in a joint fashion between

13 Verifications and National, and then you testified

14 National didn't do anything in conjunction with

15 Verifications.

16 A.   I did say that, yes.

17 Q.   Okay.

18      To be clear, was National involved in the actual

19 background investigation?

20 A.   Not in the investigation, no.

21 Q.   What was National's only part of it?

22 A.   We answered the information online.

23 Q.   Okay.

24      And as far as you know, all the information was

25 entered correctly?

1   A.   Yes.

2   Q.   How long has Verifications done background checks

3   for National?

4   A.   I believe we started working with them in 2004.

5   Q.   Based on your experience, is Verifications a

6   reputable company in the industry?

7   A.   Yes.

8   Q.   So Verifications does not have a reputation for

9   doing sloppy work or making a lot of mistakes?

10  A.   Not that I've ever come across.

11  Q.   Has National ever received a complaint related to

12  a background check done by Verifications, prior to the

13  incident that we're here for, for Deborah Adams?

14  A.   No.

15  Q.   Did National compile information on Ms. Adams and

16  combine it with other information, and then send it to

17  the Guidant Group?

18  A.   No.

19  Q.   Now Attorney Madsen asked you if you made a pretty

20  basic evaluation of a background report that National

21  received from Verifications.

22       Is part of your job to evaluate background checks?

23  A.   No.

24  Q.   To your knowledge, does Guidant, or National, or

25  Northeast Utilities rely on you to make an evaluation?

1   A.   No.

2   Q.   Do you get paid to make an evaluation?

3   A.   No.

4   Q.   So was your comment on that e-mail an official

5   evaluation?

6   A.   No.

7   Q.   You also testified that you received faxed proof

8   from Ms. Adams, within a short time span of talking to

9   her, on May 8th, 2007.

10   A.   Yes.

11   Q.   Was that statement accurate?

12   A.   I believe it wasn't that evening, it was that

13   morning, but it was within about a 12-hour span.

14        (Pause.)

15           THE COURT:  Yes, we're just talking about the

16   exhibit number?

17           MR. MCPHERSON:  Plaintiff's 54.

18           THE COURT:  Fifty-four?

19           MR. MCPHERSON:  Yes, Your Honor.

20           THE COURT:  That's already been marked?

21           MR. MCPHERSON:  Yes.

22           THE COURT:  Yes.  Okay.

23   BY MR. MCPHERSON:

24   Q.   Can you please review what's been marked as

25   Plaintiff's Exhibit 54?

1     Can you explain what Plaintiff's 54 is?

2  A.   It's the paperwork that Deb had faxed over to me

3  in regards to her previous experience.

4  Q.   Now, is this the paperwork that Deborah Adams

5  referenced in your conversation at approximately 6:20

6  on May 8th of 2007?

7  A.   It is.

8  Q.   Did she tell you, on May 8th, 2007, during this

9  conversation, that she had proof in her possession that

10  the convictions in Virginia did not belong to her?

11  A.   She did.

12  Q.   Okay.

13     Is this the first time that -- When you received

14  this fax, was it the first time that you received the

15  proof?

16  A.   It is.

17  Q.   Did she tell you about the criminal convictions

18  that were attributed to her in 2006, incorrectly, prior

19  to your conversation on May 8th, 2007?

20  A.   She didn't.

21         MR. MADSEN:  I'm sorry, Your Honor.

22         I do need to have that question read back,

23  because I think -- or can you restate it?

24         THE COURT:  Just rephrase it.

25         MR. MCPHERSON:  I'll restate it.

1    BY MR. MCPHERSON:

2    Q.   Prior to your conversation on May 8th, 2007, did

3    Deborah Adams explain to you that previously, in 2006,

4    a background check showed criminal convictions against

5    her incorrectly in Virginia?

6    A.   She did not.

7    Q.   Who makes the decision to offer a temporary

8    contract position?

9    A.   In this particular case, it would be a higher

10   manager at Northeast Utilities.

11   Q.   Okay.

12        Was National involved in the decision, in any way

13   --

14   A.   No.

15   Q.   -- to offer the position?

16   A.   No, sir.

17   Q.   In the normal course of business, does National

18   even usually know the name of the person who makes the

19   decision -- or persons?

20   A.   No.

21   Q.   Did National receive signed authorizations from

22   the Plaintiff for a background check to be performed?

23   A.   Yes.

24        (Pause.)

25             MR. MCPHERSON: Okay, I'm showing the

1    Plaintiff -- the witness Plaintiff's Exhibit 65.

2              THE COURT:  Six-five?

3              MR. MCPHERSON:  Yes, sir.

4              THE COURT:  Okay.

5    BY MR. MCPHERSON:

6    Q.   Can you please review Plaintiff's Exhibit 65?

7         Do you remember sending Plaintiff's Exhibit 65?

8    A.   I do.

9    Q.   You do.

10        Why did you send it?

11   A.   I sent it, at the time, because I felt like it was

12   necessary that Kathy hear about my conversation with

13   Deb.

14   Q.   Did you want the Plaintiff to get the job?

15   A.   Absolutely.

16        (Pause.)

17              MR. MCPHERSON:  I'm showing the witness

18   Plaintiff's Exhibit 66.

19              THE COURT:  Six-six.

20   BY MR. MCPHERSON:

21   Q.   Can you please review Plaintiff's Exhibit 66?

22        Do you remember sending Plaintiff's Exhibit 66?

23   A.   Yes.

24   Q.   Why did you send it?

25   A.   It was another element of the conversation that I

1    was having with Deb that I felt was important that

2    Kathy see.

3    Q.   Is it in your financial interest for the Plaintiff

4    to get the job?

5    A.   Yes.

6    Q.   Why is that?

7    A.   Well on the basis that if she's not working for

8    us, then we're not billing anything, per hour, to our

9    client.

10   Q.   Since the Plaintiff did not get the job, does that

11   mean National did not get paid?

12   A.   Correct.

13   Q.   Do you remember when you found out that the

14   Plaintiff's background check was corrected?

15   A.   I believe it was on the 11th.

16   Q.   And what did you do after you found out?

17   A.   I immediately sent it to Kathy.

18   Q.   At this time, were you aware of any of the actions

19   that -- or decisions Northeast Utilities had made?

20   A.   I was not.

21   Q.   Do you know why, ultimately, Northeast Utilities

22   decided not to continue to extend the offer to Ms.

23   Adams?

24   A.   I do not.

25   Q.   Did National submit any other candidates for the

1    position?

2    A.    No.

3    Q.    If Ms. Adams did eventually get the position, and

4    she lasted 15 weeks, and it was extended, would

5    National also make more money?

6    A.    We would continue to make money, yes.

7    Q.    So the basic line is that it was in National's

8    financial interest, also.

9    A.    Absolutely.

10    Q.    Does National ever use background reports that are

11    received from companies, like Verifications, to make a

12    decision on its own to no longer submit a candidate to

13    a client, such as Northeast Utilities?

14    A.    No, we do not.

15    Q.    So National does not use -- So it this correct?

16         Does National use background reports as a way to

17    screen employees for its own decision?

18    A.    No, we do not use it as a pre-employment screen.

19              MR. MCPHERSON:  No further questions.

20              THE COURT:  Mr. Coffey?

21              MR. COFFEY:  Just a couple of brief

22    questions.

23                 CROSS-EXAMINATION BY MR. COFFEY

24    BY MR. COFFEY:

25    Q.    Good afternoon.

1          I'm just going to show you what's in evidence as

2     Plaintiff's 1, which is the (inaudible).

3               THE COURT:  Yes, go ahead.

4     BY MR. COFFEY:

5     Q.   That's a contract that was in effect between

6     Verifications and NESC, is that correct?

7     A.   Yes.  it appears to be, yes.

8     Q.   Okay.

9          And just one final question.  Ms. Adams never gave

10    you any of the information, initially, about the 2006

11    incident; is that correct?

12    A.   No, she did not.

13    Q.   Thank you very much.

14               THE COURT:   Madsen.

15               MR. MADSEN:  Sure.

16                CROSS-EXAMINATION BY MR. MADSEN

17    BY MR. MADSEN:

18    Q.   Good afternoon, Mr. Sullivan.

19    A.   Hello again.

20    Q.   Now, you just testified that National had a very

21    limited role in connection with the investigation --

22    the background investigation of Deborah Adams.

23         Do you recall that?

24    A.   Yes.

25    Q.   Okay.

1          Now, National was responsible for collecting

2      information from Deborah Adams in connection with a

3      background check, correct?

4      A.   Yes.

5      Q.   National was involved in making sure that the

6      background check was done out of an obligation to

7      Guidant Group, correct?

8      A.   In the sense that we had to enter the information,

9      yes.

10     Q.   National was responsible for getting the form

11     signed by Deborah Adams?

12     A.   Yes.

13     Q.   Sent it out to her to her address?

14     A.   Yes.

15     Q.   Got it back?

16     A.   Yes.

17     Q.   Looked at it to make sure it was done right?

18     A.   Yes.

19     Q.   National was responsible for entering the

20     information accurately into the system?

21     A.   Yes.

22     Q.   National was responsible for transmitting the

23     information to Verifications?

24     A.   From the online submission?  Yes.

25     Q.   National was responsible for communications with

1    Deborah Adams regarding the background report, correct?

2    A.   Upon receiving them?

3    Q.   Absolutely.

4    A.   Yes.

5    Q.   In other words, Deborah Adams didn't place the

6    order with Verifications, National did, correct?

7    A.   Correct.

8    Q.   As a matter of fact, until after you told her to

9    contact Verifications, she only had National to go to

10   with respect to the background report; isn't that

11   right?

12   A.   Correct.

13   Q.   Now, you testified that National gets reimbursed

14   for the costs of the report incurred by Verifications;

15   is that right?

16   A.   I don't believe I testified to that, but that is

17   true.

18   Q.   It is true?

19   A.   We are reimbursed by the client.  We bill the

20   client for that.

21   Q.   Okay.

22        So in this case, did Guidant Group reimburse

23   National for Deborah's background report?

24   A.   That is information I'm not --

25   Q.   You just (inaudible).

1    A.   -- entitled to.

2    Q.   Okay.

3         And isn't it the case that with respect to all the

4    activities that you just described; spending time

5    collecting the information, mailing out, getting the

6    form back, responsible for transmitting information

7    accurately, you don't bill separately to Guidant Group

8    or Northeast Utilities for those activities that you do

9    in connection with a background report, do you?

10   A.   No.

11   Q.   Isn't it assumed that upon the successful

12   placement of Deborah Adams, that the fee National

13   receives, that $6.30 spread that we talked about

14   yesterday, isn't it true that that's intended to

15   compensate National for all the work that it's done in

16   connection with the placement?

17   A.   Yes.

18   Q.   And that includes the time that's spent by

19   National in making sure that information is collected,

20   questions are answered, and the information is

21   transmitted properly to Verifications.

22   A.   Yes.

23            MR. MADSEN:  No further questions.

24                    REDIRECT EXAMINATION

25   BY MR. MCPHERSON:

1    Q.   Mr. Sullivan, did you ever tell the Plaintiff to

2    contact Verifications directly?

3    A.   Yes.

4    Q.   Did the Plaintiff notify you that that was her

5    intent?

6    A.   Yes.

7    Q.   And to your knowledge, do you know whether the

8    Plaintiff contacted Verifications and the issue was

9    ultimately resolved?

10   A.   Yes.

11        MR. MCPHERSON:  No further questions, Your

12   Honor.

13        MR. COFFEY:  No further questions.

14        THE COURT:  Okay, you can step down.

15     DEFENDANT'S WITNESS, JOHN MADDEN, SWORN

16        THE CLERK:  Please be seated.

17        Please state your name, spell your last name,

18   your city and state.

19        THE WITNESS:  My birth given name is John

20   Madden, my -- M-a-d-d-e-n.  I live in North Andover,

21   Massachusetts, and in the Court documents my name is

22   Jack.

23                   DIRECT EXAMINATION

24   BY MR. KUPINSE:

25   Q.   Mr. Madden, you work for National Engineering

1   Service Cooperation?

2   A.   I do.

3   Q.   And what's your position?

4   A.   President of sales.

5   Q.   How long have you been with them?

6   A.   Twenty-five years July.

7   Q.   And can you tell us a little bit about the

8   business of National Service Engineering Cooperation?

9   A.   Well, we supply engineer, design, drafting, IT

10  technicians all across the country.

11  Q.   And when you say, "all across the country," do you

12  have locations in several places?

13  A.   We did.  We have closed a few.

14  Q.   Okay.

15       Where do you -- First of all, where did you have

16  them back at the time of this incident in 2007, if you

17  can remember?

18  A.   I believe we had one in Arizona, California,

19  Massachusetts, New Hampshire, Houston.

20  Q.   And where do you work out of?

21  A.   Portsmouth.

22  Q.   And was that where the work, with respect to

23  Deborah Adams, took place?

24  A.   Yes.

25  Q.   We've heard something about the income of National

1    Engineering Service Corporation.

2        Can you tell us what that $30 million consists of?

3    A.   That $30 million consists of our annual billings.

4    Basically, the billing would be for every hour somebody

5    works, we'd bill a certain amount of money.  Out of

6    that hourly rate, probably 70 to 75 percent of it goes

7    to wages.

8    Q.   And so what would be the net, for example, to

9    National --

10   A.   If the annual --

11   Q.   -- approximately?

12   A.   -- sales is 30 million, take 70 percent of that's

13   gonna be -- I'm not a mathematician but --

14   Q.   So about 30 percent, of 70 million --

15   A.   Right.

16   Q.   -- would be the money that comes in above what you

17   pay employees.

18   A.   Correct.

19   Q.   Okay.

20       Now, when you say, "employees," is that people who

21   you have placed somewhere,  or does that include --

22   A.   It does not include --

23   Q.   -- (inaudible) --

24   A.   That is people that we have placed across the

25   country, that's correct.

1   Q.   Okay.

2        So about -- leaves you -- after you pay for the

3   people you have placed, it leaves you about 30 percent.

4        Now out of that, do you have to pay your own

5   employees, and your own overhead, and your own --

6   A.   Well not only that, we also have to pay all

7   applicable state, federal taxes, unemployment

8   insurances, Workers Compensation insurances, our own

9   employees, our overheads.

10  Q.   Okay.

11       And we've had a little bit of discussion about the

12  markup from $21 to $27.30, I think in this case.

13       Can you explain what that goes for and how it's

14  used?

15  A.   I believe in this case, I don't recall the exact

16  figure, but I think it was $21.60 maybe, and we were

17  going to bill $27.30, I think one of the numbers that

18  were being thrown around.  Out of that there's what we

19  call, "spread," and that was the difference between

20  billing and paying.  So if there's $6.10 or $6.30, out

21  of that spread, out of that four dollars and some-odd

22  cents goes to the payroll burden, which is the state,

23  federal, unemployment taxes, your state sales tax in

24  Connecticut, so you're probably going to net about

25  $2.10 for every hour the person works.

1   Q.   Uh-huh.

2        And incidentally, does National try to place a lot

3   of employees who don't get placed?

4   A.   No, that's not in our financial interests.

5   Q.   Okay.

6        And with respect to your agreements with Guidant,

7   do you have a contract with Guidant?

8   A.   Yes.

9   Q.   And is that contract intended to override, in any

10  way, the Fair Credit Reporting Act?

11  A.   Absolutely not.

12  Q.   And does that contract require you to do anything

13  with respect to background reports which you receive?

14  A.   I'm sorry, could you repeat the question?

15  Q.   Sure.

16       Does the contract that National has with Guidant

17  require you to do anything with background reports

18  which you receive?  Do you have to do anything with the

19  background report when you receive it?

20  A.   Was required to send over the information to

21  Guidant.

22  Q.   Okay.

23       If you did not do that, would you be able to

24  continue to be a, what they call a partner of Guidant?

25  A.   No.

1    Q.   Okay.

2         Now, we've heard testimony and I don't want to

3    bore everyone, but do you have any part in the process

4    of determining whether the Plaintiff in this case was

5    hired by Northeast Utilities?

6    A.   No, nor do we have any part in any of the people

7    that we place, or whether or not they're hired.

8    Q.   Okay.

9    A.   I wish it was that easy.

10   Q.   Now I think you have in front of you, an agreement

11   with Verifications, which has been marked Plaintiff's

12   Exhibit 1, or at least somewhere up there on that desk.

13   Have you found it?

14   A.   I do.

15   Q.   And is that the agreement that you had with

16   Verifications at that time?

17   A.   It is.

18   Q.   How do you come to use -- And again, let me ask a

19   background question on that.

20        Does that contract between National and

21   Verifications intend, in any fashion, to override the

22   Fair Credit Reporting Act?

23   A.   It is not.

24   Q.   And is it required, in fact, under the Fair Credit

25   Reporting Act?

1   A.   It is.

2   Q.   How do you come to use Verifications rather than

3   some other background checking agency?

4   A.   Well, we do a lot of work all across the country,

5   and a lot of companies that we do business with kind of

6   direct us to the background company that they want us

7   to use.  In this particular situation, I believe this

8   was an NU choice that they had Guidant use

9   Verifications.  So, of course we wanted to do business

10   at NU, we had to use Verifications.

11   Q.   Now, Kathy Shapleigh, I think you were here when

12   she testified, that she didn't believe that was the

13   case, were you?

14   A.   She did testify to that.  I do remember hearing

15   that.

16   Q.   Do you agree with her?

17   A.   I disagree with her.

18   Q.   Okay.

19        Now, how do you bill -- I assume Verifications

20   charges you for these background reports?

21   A.   They do.  I don't know the exact amount.

22   Q.   Okay.

23        And how do you -- do you bill those to someone?

24   A.   We would bill that, I believe, to Guidant, to NU,

25   and I'm -- believe only if the person gets the job.

1    Q.   Okay.

2         And when you get -- when you bill it through, do

3    you mark it up?

4    A.   No.  It's a pass (unintelligible).

5    Q.   Prior to Ms. Adams's complaints, when you worked

6    with Verifications, have you had any other complaints

7    about background reports which they produced?

8    A.   We have had none.

9    Q.   And as a matter of fact, since Ms. Adams's

10   reports, have you continued to use Verifications?

11   A.   We have.

12   Q.   And have you received any complaints?

13   A.   We have not.

14   Q.   Now, we also heard that Ms. Adams complained to

15   the South Dakota attorney general, the Connecticut

16   attorney general, the New Hampshire attorney general,

17   Connecticut consumer reporting agency, and the Federal

18   Trade Commission.

19        Have you received any contact from any of those

20   agencies?

21   A.   Not a one.

22   Q.   Okay.

23        And no action has been taken against National in

24   any fashion?

25   A.   None.

1    Q.   Do you know who at Northeast Utilities had the

2    authority to make the decision whether to employ or not

3    employ the Plaintiff (inaudible) by name?

4    A.   I don't.  I mean, I'm -- I've heard the testimony

5    to who it was, but I did not prior to today.

6    Q.   Okay.

7    A.   Through this court process.

8    Q.   And again, the same question that went to Mr.

9    Sullivan, can you have any contact directly with

10   Northeast Utilities?

11   A.   It's against our agreement.

12   Q.   And your only contact is with Guidant?

13   A.   That's correct.

14   Q.   Now, about how many assignments do you put out of

15   the New Hampshire office each week, month, year,

16   whatever you want to do it by, do you have any idea?

17   A.   Probably somewhere around 1500 a year.

18   Q.   Okay.

19        And do some of those fit the qualifications of the

20   Plaintiff?

21   A.   Yes.

22   Q.   And after the Plaintiff did not get this job, did

23   she ever come back to National and ask for a placement

24   in another job?

25   A.   Did not.

1  Q.   And had she come back, what would have been your

2  position?

3  A.   We would put her to work.

4       (Pause.)

5  BY MR. KUPINSE:

6  Q.   Oh, incidentally, did -- we saw some agreements

7  come in that were put in that were part of the package

8  that was sent to the Plaintiff, and did National

9  Engineering Service Corporation ever sign those

10 agreements?

11 A.   No, we did not.

12 Q.   Why not?

13 A.   We normally don't sign agreements before we send

14 them out, so that we make sure that all the documents

15 that are coming back is correct and nothing has been

16 changed.  So before we fully execute a document, we

17 make sure that the information coming back is correct.

18 Q.   Now when you hire -- Again, the Plaintiff would

19 have been your W2 employee; would she not?

20 A.   She would.

21 Q.   And when you hire a W2 employee, do you -- I

22 recognize you have people who work in the staffing

23 area, but when you hire an outside independent person

24 as a W2 employee, do you have a lot of jobs you can

25 assign them for, or do you assign them to a specific

1  job usually?

2  A.   Well, we normally assign them to a specific job

3  that they're capable of doing.  We're not going to put

4  somebody into a position that they can't do.

5  Q.   Uh-huh.

6       And again, you only receive a fee if, in fact,

7  Northeast Utilities had hired the Plaintiff?

8  A.   That's correct.

9  Q.   Who has the authority to direct what hours the

10 employee of you that you assign out works?

11 A.   Client.

12 Q.   And who has the authority to determine whether the

13 client's -- whether the employee's performance is

14 satisfactory?

15 A.   Client.

16 Q.   And incidentally, I'm going to ask you a series of

17 these, do you have any input in this?  Could you say to

18 Northeast, for example, "Well gee, you really shouldn't

19 be complaining about so-and-so because they're doing a

20 good job"?

21 A.   No.

22 Q.   Under the agreement between National and Guidant,

23 who owns all the work that the employee signed out

24 produces?

25 A.   If you're referring to if they invent something or

1   something like that?

2   Q.   (Inaudible) --

3   A.   The work --

4   Q.   -- invention, whatever.

5   A.   The work is all by NU, or by the client that we

6   happen to assign the person to.

7   Q.   Okay.

8      (Pause.)

9   BY MR. KUPINSE:

10   Q.   And do you know why Northeast Utilities ultimately

11   did not offer the job to Plaintiff?

12   A.   No idea.

13   Q.   And again, is it your understanding that before

14   the job was offered to someone else, Guidant had

15   received a copy of the corrected report?

16   A.   Yes.

17        MR. KUPINSE:  I have no further questions.

18        THE COURT:  Mr. Coffey?

19        MR. COFFEY:  I have no questions, thank you.

20        THE COURT:  Mr. Madsen.

21        MR. MADSEN:  Thank you, Your Honor.

22         CROSS-EXAMINATION BY MR. MADSEN

23   BY MR. MADSEN:

24   Q.   Good afternoon, Mr. Madden.

25      What is your current salary?

1          MR. KUPINSE:  Objection, Your Honor;

2     relevant.

3          THE COURT:  I'll allow it.

4     A.   Sixty thousand dollars.

5     BY MR. MADSEN:

6     Q.   Do you get incentive compensation?

7     A.   I do.

8     Q.   What is that based on?

9     A.   Putting people to work.

10    Q.   Okay.

11         And is it paid out in bonuses?

12    A.   No.

13    Q.   How is it paid out, commissions?

14    A.   Weekly commission.

15    Q.   Okay.

16         Do you recall how much you got in weekly

17    commissions last year, total?

18    A.   I can -- Yes, probably about 118,000.

19    Q.   So you made -- Plus you made $60,000 on top of

20    that?

21    A.   (No audible response.)

22    A.   Okay.

23         And who do you report to?

24    A.   Lennie Teeney (phonetic) and James Klein

25    (phonetic).

1    Q.   And who are they?

2    A.   They're the owners.

3    Q.   And in your job as president of sales, do you take

4    -- do you get guidance from those two gentlemen?

5    A.   Do I get guidance?

6    Q.   Yes -- Well, let me -- They're your boss, correct?

7    Is that right?

8    A.   That's correct.

9    Q.   Okay.

10        And do they manage you?

11   A.   To some extent.

12   Q.   Okay.

13        And you receive instruction from management?

14   A.   To some extent.

15   Q.   Okay.

16        And you run the sales force; is that correct?

17   A.   Correct.

18   Q.   How many people?

19   A.   Sales wise probably 12 to 13.

20   Q.   Okay.

21        Does the company have a general counsel?

22   A.   Mean in-house attorney?

23   Q.   Yes.

24   A.   No.

25   Q.   Do they have an outside law firm that they

1    regularly use?

2    A.   We have a few.

3    Q.   Okay.

4         And you consult with them to make sure that you

5    operate your business in accordance with applicable

6    laws and regulations; is that correct?

7    A.   That's correct.

8    Q.   And has management ever said to you, "I don't want

9    you to be calling lawyers because they're too

10   expensive"?

11   A.   No.

12   Q.   Which maybe some people could understand, but

13   that's never been communicated to you?

14   A.   Never.

15   Q.   All right.

16        And isn't it true that over the years, you have,

17   in your capacity as president of sales, you've received

18   guidance regarding appropriate legal procedures for

19   conducting business in sales?

20   A.   Yes.

21   Q.   Okay.

22        So there are a lot of regulations out there, is

23   that fair to say?

24   A.   It's fair to say.

25   Q.   And you're out there transacting business,

1   correct?

2   A.   Correct.

3   Q.   Entering into contracts?

4   A.   When I enter into a contract, I normally send it

5   out for an attorney to review.

6   Q.   Okay.

7        But you do -- The company does enter into

8   contracts?

9   A.   We do.

10  Q.   All right.

11       And you have certain procedures in how the sales

12  people conduct business, is --

13  A.   Yes.

14  Q.   -- that fair to say?

15       They have to document certain things; is that

16  correct?

17  A.   Yes.

18  Q.   Okay.

19       And there are legal parameters surrounding the way

20  the sales people conduct themselves in transacting

21  business on behalf of National Engineering, isn't that

22  fair to say?

23  A.   I'm not sure what you're getting at.

24  Q.   Okay, that there are procedures that people have -

25  - that your sales force need to follow.

1   A.   Such as picking up the telephone, making a phone

2   call -- yes,  I mean that's pretty much --

3   Q.   Okay.

4        And some of those procedures are maintained in

5   order to comply with legal obligations?

6   A.   Again I'm not sure what you're getting at.

7   Q.   But I'm just asking, do you know the answer to

8   that?

9   A.   I don't.

10  Q.   You don't.  Okay.

11       Have you ever -- Prior to this law suit, did you

12  ever get training in the Fair Credit Reporting Act?

13  A.   I have not.

14  Q.   Did you ever ensure that your sales staff got

15  training in the Fair Credit Reporting Act?

16  A.   I did not.

17  Q.   Now, you testified that there's a contract between

18  National Engineering and Guidant, correct?

19  A.   That's correct.

20  Q.   And I believe you testified that under that

21  contract, National Engineering is required to forward

22  the background report to Guidant; is that right?

23  A.   Yes.

24  Q.   All right.

25       Now, in this particular case, are you aware of the

1  fact that Maura Demars had forwarded the report to

2  Chris Sullivan when it first came back?

3  A.   I am.

4  Q.   And then Chris Sullivan, in turn, sent it over to

5  the Guidant Group --

6  A.   I am.

7  Q.   -- by e-mail?  You're aware of that.

8       Now, and this was the peculiar situation where he

9  actually appeared to send the e-mail out to Guidant one

10  minute before you received it from Maura Demars, do you

11  remember that?

12  A.   I do.

13  Q.   Okay.

14       And if Mora Demars had sent the e-mail to Chris

15  Sullivan at 12:49 and Chris Sullivan was out having

16  lunch and he returned an hour later, saw the e-mail and

17  then forwarded it on to Guidant Group, he would have

18  met his obligations under the contract, correct?

19  A.   I believe so.

20  Q.   Okay.

21       If he had been sick that day, and was able to get

22  back into the office by 4:30 in the afternoon, saw the

23  e-mail, and then forwarded it on to Guidant Group, he

24  would have met the obligations of the contract,

25  correct?

1    A.   I believe so.

2    Q.   If he had been out sick that whole day and the

3    next morning he comes in, he sees the e-mail from Mora

4    Damars, and then he forwarded it on to Guidant Group he

5    would have complied with the contract, wouldn't he?

6    A.   I believe so.

7             MR. MADSEN:   No further questions.

8                      REDIRECT EXAMINATION

9    BY MR. KUPINSE:

10   Q.   Notwithstanding all the hypotheticals you were

11   given, Chris was not out, was he, that day?

12   A.   No he was not.

13   Q.   And is it your practice to send the report as

14   quickly as possible when somebody is available?

15   A.   It is.

16            MR. KUPINSE:   Nothing further.

17            MR. COFFEY:   Nothing further.

18            THE COURT:   Okay, you can step down.   Thank

19   you.

20            All right, we'll make it 10:30.   We will see

21   you at 10:30, at least the lawyers will

22   (unintelligible)-- 1:30.   I'm looking at this clock up

23   here and it looks as though it says ten but it says

24   one, so I'll see you at 1:30 and we'll all be here if

25   you get back, but otherwise we'll start when you get

1   back.

2       (Jury out at 1:00 p.m.)

3           THE COURT:  (Inaudible) always does that,

4   says 10:03.

5           THE CLERK:  I know, but you can't see

6   (inaudible).

7           THE COURT:  It's a great clock, though.  It's

8   (inaudible) to me, because I can tell exactly what the

9   timing is and put it in my notes.

10          MR. COFFEY:  Judge, if we could just briefly,

11  just to apprise Your Honor.

12          The schedule that we had anticipated was that

13  Mary Poquette would be all afternoon.  My expert is

14  flying, he's probably over Kansas City about right now.

15  So I don't have him til tomorrow morning.  So that was

16  what we had agreed to when we set the schedule.  So --

17          THE COURT:  You know what I said about this

18  jury.  What's the status on the national case?

19          MR. KUPINSE:  We're going to rest, Your

20  Honor.

21          THE COURT:  I'm sorry, I can't hear you.

22          MR. KUPINSE:  I'm sorry, Your Honor.

23          We have presented all the evidence on our

24  case we intend to present.

25          THE COURT:  You're resting.

1      MR. KUPINSE:  Yes, we're resting.

2      THE COURT:  And you only have one witness?

3      MR. COFFEY:  I have and expert witness, and

4  he's not going to be in til 7:00 o'clock tonight.

5      THE COURT:  And that's the only witness?

6      MR. COFFEY:  That's it, because I took Ms.

7  Poquette out of turn.  That was it.

8      THE COURT:  So what we'll tell the jury is we

9  will use this time for a charge conference so we get

10  that done, and I guess the jury is going to get this

11  case tomorrow, which I didn't want that happening on a

12  Friday, but I guess we're going to do it.

13      We'll have that one witness and then at least

14  we can to do -- oh boy, I hate -- this puts us in a

15  real bind, because (inaudible) you know how this jury

16  feels about Monday.  They don't to do it.  I don't like

17  that so (inaudible) the charge and then have a whole

18  week (inaudible), but we don't have any choice.

19      Yes, that's too bad we didn't get this guy in

20  so we could finish up today.  You always want to

21  anticipate these things but, all right, can't do much

22  about it except tell them we'll go to work on the

23  charge.

24      MR. MADSEN:  Your Honor, if we're starting

25  tomorrow at 8:30, when we finish with the witness,

1   isn't it possible that we can do the summations and

2   argument and get it to the jury by 1:00 o'clock?

3         THE COURT:  I think we've got to do that,

4   because this jury will be antsy as all get out.  I

5   don't like to have them deliberate on a Friday

6   afternoon, you know.  I hate to have juries deliberate

7   on a Friday.  It puts a lot of pressure on them,

8   especially with Christmas, but I think we going to have

9   to do it.

10        MR. KUPINSE:  If Your Honor please, shall we

11  come back at 1:00 o'clock, 1:30 because there are some

12  motions I'm sure we want to make and you -- then we can

13  go to a charging conference?  Is that the plan?

14        THE COURT:  Well what we'll do is, we'll send

15  the jury home --

16        MR. KUPINSE:  Yes. Yes.

17        THE COURT:  -- when they get back,

18  (inaudible) begin working on the charge.

19        MR. COFFEY:  What time do you want us back

20  then for lunch -- from lunch, Judge?

21        THE COURT:  That's true, there isn't going to

22  be any evidence, is there?  There better be at least

23  one lawyer since we -- I didn't even know this was

24  going to happen or I would have given the jury -- I

25  would have sent them home and I wouldn't even had the

1    30-minute lunch.  They want 30-minute lunch because

2    they think there's going to be a lot more testimony.

3              MR. KUPINSE:  Most of them are still here,

4    Your Honor.

5              MR. MADSEN:  Your Honor, they're still here.

6              THE COURT:  They're still there?

7              THE CLERK:  Want me to bring them back in,

8    Your Honor?

9              THE COURT:  Oh yes.

10             THE CLERK:  Okay.

11             THE COURT:  Yes, because we won't need them.

12   They're still here -- we thought they'd be all gone out

13   for lunch.

14       (Pause.)

15             THE CLERK:  They're here in the building.

16   Two went out, though.

17             THE COURT:  You think you can get them all?

18             THE CLERK:  If I can run downstairs and see

19   if I can -- I'm not sure where one went, but --

20             THE COURT:  Yes.

21             THE CLERK:  -- I can give it a shot.

22             THE COURT:  Tell them we've got a changed

23   circumstance so it's worth bringing them in.

24             THE CLERK:  Okay.

25       (Pause.)

1          THE COURT:  Yes, hold the others.

2          UNIDENTIFIED SPEAKER:  Yes, I'm going to go

3   back to his chambers (inaudible).

4          THE COURT:  Yes, we have to have the charge

5   conference this afternoon.

6      (Pause.)

7          THE COURT:  Pardon me?

8          THE CLERK:  I found two, but (inaudible)

9   stuff and coming right back up.

10          THE COURT:  So that'll get us the ten?

11          THE CLERK:  I think so, I'm going to go back

12   down.

13          THE COURT:  Okay. Okay.

14      (Pause.)

15          THE CLERK:  Okay, that'll be the ten, when

16   the two get back up here.

17          THE COURT:  Bring them in.

18          THE CLERK:  Yes, they're going to knock on

19   the door when --

20          THE COURT:  Yea.

21          THE CLERK:  --(inaudible).

22          THE COURT:  All right.

23      (Pause.)

24          THE COURT:  The attorneys certainly responded

25   well at the (inaudible).

1           THE CLERK:  Yes, sir.

2       (Pause.)

3           THE COURT:  Oh, why don't we do this while I

4   guess Sandy's here.

5           You want to rest on the record for NESC?

6           MR. KUPINSE:  If the record is going now, the

7   Defendant, National Energy Service Corporation, rests.

8           THE COURT:  All right.

9           Then we go to the case for Verifications.

10  They say they have --

11          MR. KUPINSE:  I'm sorry, I said, "energy,"

12  and it should be National Engineering Service

13  Corporation.

14          THE COURT:  Okay.

15          MR. KUPINSE:  I misspoke.

16          THE COURT:  I didn't even notice the slip.

17  Okay.  That's my problem, I called the Fair Credit

18  Reporting Act, federal, okay.

19          Well, anyway, you're resting on the record.

20  Verifications has a witness they have to put on.  They

21  can't put him on today, so they'll put him on at 8:30

22  tomorrow morning.  So I would ask you to rest until

23  that witness comes.

24          MR. COFFEY:  Judge, I would just ask, we had

25  scheduled it like this among counsel, so if you could

1    just not tell -- if -- I would just ask your indulgence

2    that you don't say I didn't have my witness, Your

3    Honor.  We were scheduled to put him on Friday.  So if

4    the jury -- if you could just explain that.

5              THE COURT:  Oh, I'll just explain he -- I'll

6    tell them he wasn't available til Friday.

7              MR. COFFEY:  Well, he would have been

8    available today if we had known --

9              THE COURT:  Yes, but they don't have to know

10   that.

11             MR. COFFEY:  Okay.

12             THE COURT:  I'll just say the witness was

13   just not available til tomorrow.

14       (Pause.)

15             THE COURT:  Again with National, I'll make

16   the same comment I made with the Plaintiff, that all

17   motions will be deemed made and preserve so you don't

18   lose any rights to make motions.  We'll have those in

19   due course.

20             Used to scare the living daylights out of me

21   when I was a practicing lawyer.  I used to worry about

22   two things; missing a statute of limitations.  One day

23   I wake up at 2:00 o'clock in the morning wondering if I

24   was about to miss a  statute of limitations.  The other

25   thing was failure to make motions.  If -- You're

1    penalized if you didn't make the motions but not any

2    more, but you used to.

3         (Pause.)

4              That was a quick lunch.  I've been on this

5    job for 30 years after I practiced for 30 years, and

6    I've learned in my 60 years of doing all this that

7    litigation is always full of surprises, and litigation

8    is full of surprises today.

9              All right, I had no idea when I sent you out

10   for supposedly a 30 minute lunch that the attorneys had

11   heeded what I said to them this morning before I spoke

12   to them about your desire to speed up this case,  that

13   they would do that so efficiently that they speeded up

14   the case.

15             So the Plaintiff rested, as you heard.  The

16   Defense, National, has rested.  Now we go to the

17   Defendant, Verifications.

18             Now Defendant, Verifications, only has one

19   witness.  They put on other people as you saw, but --

20   mainly Ms. Poquette, but they have one witness who just

21   can't be available until tomorrow morning.  So we're

22   going to put this afternoon to very good use, and I

23   want to tell you about that because you should

24   understand, fully, what we are doing to push this case

25   along.

1          We will start at 8:30 tomorrow morning with

2    this expert, Barry Nadel, who'll be the expert for

3    Verifications.  He'll be the last witness, and then we

4    will go right from him to summations and charge.  So

5    you should get the case by about 1:00 o'clock tomorrow.

6    We'll have a lunch brought in.

7          Now, some of the things I want to warn you

8    about, about this.  We are going to spend an afternoon

9    that will be very important from your standpoint,

10   because the -- as a couple of you who have been in jury

11   trials before are aware, the attorneys cannot sum up to

12   you until they know what I'm going to charge on the

13   law, and they won't know what I'm going to charge on

14   the law until we have a charge conference, which we're

15   obliged to have.  So this afternoon we'll have a charge

16   conference, both off and record and then on the record.

17   So that as we start tomorrow morning, the attorneys are

18   in a position to go right into summations and I go

19   right into that charge.  We'll have done all our work

20   this afternoon.  So it's valuable time for all of us,

21   for you and for us to work while you go off and do your

22   Christmas shopping.  So you get the afternoon off.

23         Now, there's an obligation I want you to take

24   very, very seriously.  I utterly dislike, and I've

25   always disliked, sending cases to a jury for

1   deliberation on Friday afternoon, let alone a Friday

2   afternoon before Christmas.  It puts a lot of pressure

3   on the jury.  Resist the pressure, please.

4           What we want you to do and what your oath

5   requires you to do, is to give this case the

6   consideration that it deserves.  The parties have spent

7   a lot of time, money and energy on it, and they're

8   going to present their summations and tell you how they

9   view the case.  Pay close attention to those

10  summations, pay close attention to my charge, and then

11  remember your oath, which was to give deliberate

12  consideration to all of the evidence in the case, apply

13  the law.  If you can reach an agreement, fine, but

14  don't press yourselves to reach an agreement for any

15  reason other than your view of the evidence and the law

16  as I give it go you.

17          If you cannot reach an agreement, we'll let

18  you go as late as you want to tomorrow, and if you

19  cannot reach an agreement, be prepared to come back in

20  Monday and resume your deliberations on Monday.  That's

21  your obligation really as jurors.

22          We've tried to do our duty by you by pushing

23  the case along and I think we've succeeded.  So all we

24  do is ask you to do your duty by us.

25          So head out to a long lunch now if you want

1    to, not a 30-minute lunch, and I'll see you at 8:30

2    tomorrow morning.  Don't discuss the case.

3          JUROR:  May I ask one question (inaudible) in

4    the summations, and then you tell us the charge or does

5    it go the other way around?

6          THE COURT:  Now I haven't got a mic for you

7    over there, but --

8          JUROR:  I can speak louder.

9          THE COURT:  Yes, speak louder.

10          JUROR:  I've got a good voice.

11          I wanted to confirm the order is that after

12    the last witness is presented, they will sum and you

13    will then give us the charge, --

14          THE COURT:  Yes, that's --

15          JUROR:  -- or we get the charge first and --

16          THE COURT:  Yes, that's a good point for you

17    to make, because I sit over in White Plains, and I've

18    been educated to what the Southern District of New York

19    does, which always amazes me.  They do the charge

20    before they do the summations.  That never seemed to

21    make any sense to me because very often, I've seen the

22    charge influenced by what is stressed by the lawyers in

23    the summations.  So I think it's much, much better for

24    the charge on the law to be given to you after the

25    summations.

1          So the summations will go as follows

2     tomorrow, because of the burden of proof.  The

3     Plaintiff will open with the -- I don't limit the

4     lawyers on time, and I haven't found that abused.  The

5     lawyers understand that the jurors don't want a lot of

6     repetition, and (inaudible) a summation more organized,

7     so they've been very good about that, and these are

8     good lawyers.  So I assume the summations will be

9     reasonable in length.

10          The Plaintiff will open with the summation,

11     then the Defense, National, will have its summation,

12     Defense, Verifications, will have its summation, then

13     the Plaintiff will have a rebuttal summation and that's

14     it.  Those are the summations.  We will know at the end

15     of the summations what I will be doing about the

16     charge, but a lot of this depends upon how long the

17     expert will take, and I don't know how long that will

18     be, so I can't predict timing tomorrow.  Optimistically

19     we can get it all in by 1:00 o'clock.  I'm hopeful we

20     can do that if we start at 8:30.  So I will then charge

21     you.

22          The charge I do know about, that will take

23     about hour.  It never takes longer than an hour.  It

24     may take only 40 minutes, but the charge is divided

25     into three parts.  The first part is what we call

1    "Helpful hints from Helouise."  That is designed to
2    give you our experience on judging credibility.  That's
3    what that's all about.  There are some things in the
4    standard charge -- what we call a standard charge for
5    any civil case that are binding on you, such as the
6    burden of proof, but I will tell you, I don't read that
7    charge to you, I talk to you, and because you'll fall
8    asleep if I read to you.  People tend to -- their eyes
9    glaze over if you read to them.  So I'm not going to
10   read to you, I'm going to talk to you, but I will cover
11   that standard charge.

12          When I finish that standard charge we will go
13   to the substantive charge on the law, and that I will
14   read to you because you're going to have three -- what
15   are we going to do on that, let's see.  You'll have
16   five, five copies of the subject charge so you can
17   share two to a copy.  So as you deliberate, you will
18   have the substantive charge on the law right in front
19   of you.  I will read it to you and then you will be
20   given copies of it.

21          Then we go to the questionnaire.  I don't
22   know, at this point, what the questionnaire will say,
23   but I'll know that by the end of the day today, and you
24   will get the charge on the questionnaire, and I assume
25   you'll be using a questionnaire instead of a verdict

1    form.  I may be wrong about that.  So we'll see how

2    that all plays out, and then you will get the case for

3    deliberation.

4           So that's how tomorrow will go.  So I'll see

5    you all tomorrow.  Forget about the case tonight.

6    Enjoy whatever you're doing, and do your Christmas

7    shopping, and we'll see you tomorrow morning.

8        (Jury out at 1:22 p.m.)

9           THE COURT:  Okay, thanks to you gentleman, I

10   think we've changed this jury over from a mutinous, or

11   if not mutinous, at least sullen jury, as of Debbie's

12   talks with them last night, and a happy jury now

13   because we've exceeded their expectations, and I think

14   they're happy about that.

15          I think they will honor their oath.  I hope

16   they will, but I have a feeling they will, and I'll

17   keep stressing that to them.

18          So it's now 12:30.  If you can get back by

19   1:30, we'll start the charge conference then.  The

20   charge conference will be off the record first, but I'm

21   going to keep somebody around, either Sandy or Rita, so

22   we can -- when we're ready to put the charge conference

23   on the record, they will put it on the record with us.

24   And then we'll finish up for the day.

25          I would think, given the nature of this case,

1    we ought to be able to get out of here by about 4:00

2    o'clock at the latest, but maybe I'm too optimistic,

3    but it's good lawyering so that may help us.

4            All right, we'll see you later.

5            (Recess at 1:23 p.m., until 2:43 p.m.)

6                        AFTER RECESS

7            THE COURT:  Okay, we can stay off the record

8    til we get a chance to take a look at this.

9        (Pause.)

10           THE COURT:  We can't deal with them tomorrow,

11   I think we ought to deal with them on the record before

12   we get to the summations and charge.

13           THE CLERK:  (Inaudible.)

14           MR. KUPINSE:  Okay, if Your Honor please, I

15   would move that judgment be entered in favor of the

16   Defendant, National, on the basis of several grounds,

17   and on all of them, and the first ground I would urge

18   is proximate cause.

19           I don't believe that there is any evidence,

20   whatsoever, that our actions, in any way, led to the

21   damages of the Plaintiff.  We did not -- Whatever we

22   did, I think there's been testimony both from our

23   expert, and both from the e-mails between Ms.

24   Shapleigh, that the possibility of the job being open

25   was still there.  So I don't think our damages caused

1     anything, and I won't get into the fact that I'm not
2     even sure what damages we're talking about, but I think
3     that's true.
4             I think, also, that there was no indication
5     of an adverse decision, period, but if there was an
6     adverse decision, again as revealed by the evidence
7     before this Court, that adverse decision certainly came
8     not from National, but came from Northeast Utilities,
9     or if you take Mr. Madsen's argument, that in fact
10    there was some kind of a automatic termination of the
11    employment, which is absolutely not what the evidence
12    shows, but if you take that position, then in fact once
13    again, it wasn't us that automatically terminated it,
14    it was the non-parties in this case, Guidant or
15    Northeast Utilities, and then finally I would suggest,
16    Your Honor, that with respect to the damages
17    themselves, there has been no evidence, whatsoever,
18    that those damages came to us.
19            Now, I would also make for the record, and I
20    understand Your Honor has already ruled upon this, but
21    I would make for the record that we are not, as I think
22    became clear toward the end of this trial, a consumer
23    reporting agency, so that many of the claims against us
24    should have been dismissed, and I make that for the
25    record, recognizing that Your Honor has followed Judge

1    Hall's ruling on that.

2            So I would urge that all of the counts

3    against us should be dismissed.  There certainly was no

4    evidence of the kind of wilfulness that we were just

5    talking about in terms of rising to the level that the

6    Supreme Court case dictates, as quoted in Judge Hall's,

7    and I don't believe there was any negligence, I don't

8    believe there was any proximate cause, I don't believe

9    there was any adverse action, and if there was, it

10   wasn't us, and I would urge that we not -- that none of

11   the claims against National go to the jury, but

12   certainly not the wilful claims.

13           THE COURT:  You know, it's interesting.

14   Another reason for having this separate trial on the

15   cross-claims later on is that after the jury verdict

16   comes in, if it is adverse to you, you've made these

17   motions on the record, I'm going to have to deal with

18   it, and this is a special verdict form.

19           So you may persuade me that I should not adhere to

20   Judge Hall's ruling.  I'm not concerned about the joint

21   user ruling, I think that's a very solid ground ruling.

22   I am more concerned about the reporting agency ruling.

23   I looked at the statute and I think she had a basis for

24   the ruling she made, that's why I've followed it, but

25   you may persuade me otherwise by the arguments and deep

1    research into the statute and the fact that the claim

2    is made, which I haven't really delved into at all, by

3    these experts, and Anne was -- your expert, was very

4    strong on this, that Exhibit 1, which I don't have any

5    knowledge to whether Judge Hall ever saw Exhibit 1 or

6    not, it's not referenced in her opinion, but Exhibit 1

7    I regard as being binding as between Verifications and

8    National on the cross-claims.  I don't regard it as

9    being binding on the Plaintiff, and I've discussed this

10   with my law clerk, and he and I are in agreement on

11   that, that it wouldn't be binding on the Plaintiff.

12            Now, the experts claim that it is, because

13   the experts claim that it is a contract required by the

14   statute, that you can't operate under that statute

15   without this type of a contract.  I don't know anything

16   about that, the validity of that argument.  So that's

17   where we may get into a deep briefing on that and I'll

18   consider it if I have to.  It depends on what the jury

19   does.

20            All right, you've made your motion.

21            MR. KUPINSE:  Thank you, Your Honor.

22            THE COURT:  And what about Verifications?

23            MR. COFFEY:  Yes, thank you, Your Honor, if I

24   may.

25            Do you mind if I sit, I can get the mic

1   closer to my mouth.

2            THE COURT:  Go ahead and sit.

3            MR. COFFEY:  Oh, okay.  I think I can.

4            THE COURT:  The rule in this courtroom is

5   sit.

6            MR. COFFEY:  I know, it's easier this way.

7            I would also follow in line with Attorney

8   Kupinse in asking for dismissal on the proximate cause

9   issue.  I think the record is devoid of any evidence

10  that shows that there was proximate cause, and I think

11  that many of the things are speculative -- it's

12  speculation.

13           I think that the -- that there is testimony,

14  and especially today.  The e-mail that Kathy Shapleigh

15  put into evidence, that shows that Pat Angelo Clark,

16  the position had stayed open in her mind.  She did

17  raise significant concerns about the employability of

18  the Plaintiff, and I think that that is an extremely

19  important e-mail.  I think it's also important because

20  it's what the evidence has shown and what the evidence

21  has not shown.

22           The one witness that was not put on the stand

23  by the Plaintiff is, to use your own analogy, Your

24  Honor, is there a witness who could have really tipped

25  the scales of justice in the balance, would have been

1   Patricia Angelo -- Pat Angelo Clark, and she was not

2   brought in here to testify, and all -- the e-mail from

3   her showed, it evinced that in her state of mind, was

4   that that job was still open.  Kathy Shapleigh's

5   response to that e-mail said that the job was still

6   open.  Pat Angelo Clark said that she was concerned

7   about the transient employability of Ms. Adams.  They

8   did go on in the conversation, via e-mail, ended with

9   that the position was still open.  So I think that

10  shows that any other finding would be speculative,

11  because even if there was a breach of the statute,

12  whether we were negligent in any way, you still have to

13  get to proximate cause, and there's been no finding by

14  a preponderance that shows it could be looked at in

15  that way.

16          The other thing is, the damages that have

17  been put on, there was no damages really proven.

18  There's not a single document or any other piece of

19  evidence put on.  The only thing was the witness's own

20  testimony about her diminution.  Upon cross-

21  examination, she said that she was on unemployment at

22  the time.  Her resume also had some gaps,  and she said

23  under cross-examination that if she worked a few days

24  here, a few days there, she wouldn't put them on the

25  resume, and there was nothing proven, in those ten

1   weeks, that she wasn't employed in another job or other

2   positions.  So I think that's the other thing.

3          The other thing is the -- that we look at is

4   whether we would prove to not be reasonable on the

5   Plaintiff's direct case.  I think that the Plaintiff's

6   expert witness, Mr. Hendricks, he was -- he admitted,

7   which I have to say in my career is a first, an expert

8   witness, I was troubled to hear that he admitted that

9   he cut and pasted his expert report.  That's -- That

10   gets about as, you know, maybe he's the most honest

11   witness of all time, but it was kind of troubling to

12   hear that he cut and pasted an expert report.  He did

13   acknowledge that he had erroneous information in his

14   report --

15          THE COURT:  He forgot to cut and paste out

16   the kidnappings.

17          MR. COFFEY:  He also said that he had

18   information that we were united in interest and spun

19   off of Equifax, and upon cross he had no idea where he

20   got that information from, and I think he -- it was --

21   he -- it was the first the time he was presented in

22   court as one of these witnesses and I find his

23   testimony -- I don't think it takes a legal

24   (unintelligible) to say his testimony was as close to

25   someone being found not competent to testify as an

1    expert witness, and I know that's a real leap to argue

2    that, but as I say, I've never had an expert, on his

3    first time on the stand, talk about that he cut and

4    pasted his expert report.

5          So if you could also -- if he was the expert,

6    he also testified that he has looked at 12 criminal --

7    that he has conducted 12 criminal background

8    investigations in 30 years in the industry, not even in

9    the industry.  He said he's never worked in the

10   industry.  He's been a reporter, essentially, so that

11   would mean he's worked on (inaudible) two-and-a-half

12   years, and he acknowledged that all of his experience

13   was not within this field, which is contravened by Anne

14   Fortney, who took the stand today, and was total --

15   just a different type of witness.

16         He was someone who's positive as an expert

17   witness who, when you look at what his sum and

18   substance was, I think his credibility was extremely

19   undermined and also, he did not -- I don't think he met

20   a standard that would say that we violated either being

21   reasonable, or that we adhered to strict standards.

22         So for those reasons, I would make an

23   argument to Your Honor that I think the counts should

24   be dismissed versus Verifications.

25         Thank you very much, Your Honor.

1          THE COURT:  One of the reasons I wanted to

2    have you argue these motions tonight rather than some

3    point tomorrow, not just the logistics of how you do it

4    tomorrow, but I thought you ought to have an

5    opportunity before your summations, and that's what Mr.

6    Coffey has done beautifully.  I hear his summation a

7    little echo exactly what he said on the motion.  Very

8    good summation.  So anyway, that always -- I find that

9    happens a lot when they make the motions at the end of

10   the case, they really have gone a long way towards

11   fixing up their summations to the way they want to

12   present them.  So I'll listen to summations with great

13   interest tomorrow.

14          I don't know what the jury's going to do.

15   The jury may agree with you completely.  We may have no

16   problems with the jury coming in with a Defense

17   verdict, but we'll see.  There's a lot of sympathy

18   here, I suppose, for the -- because you can't say that,

19   on the proximate cause issue, which doesn't bother me

20   at all, that just because the decision was made by

21   Northeast Utilities, that the Defendants are not

22   responsible for it.  I think the Northeast Utilities,

23   as I hear the Plaintiff's argument on it, would be a

24   natural, logical, unbroken consequence of the

25   inaccurate information about the -- a felony of really

1    some significance.  That other lady in Virginia

2    committed a real fraud situation and that's what they

3    hit her on as the major.  There were other charges

4    against her, but that was the major charge.

5          So I will ask you to give Craig contact

6    information so he can send you an e-mail tonight with

7    what he comes up with, and we'll meet at 7:30 to -- and

8    Sandy we're going to need somebody at 7:30 to get all

9    this on the record so that we can start with the

10   witness at 8:30.

11         All right, and thank you, by the way, for a

12   well-tried case because you really, as I said to you

13   earlier, that you took the jury from being pretty

14   sullen about what they thought was a dragging case, to

15   one that was tried with expedition.  I didn't think you

16   could get this case in as quickly as you did with all

17   the three parties.  It was very well done.  Hope you

18   get some sleep.

19         COUNSEL:  Thank you, Your Honor.

20      (Proceedings concluded at 5:26 p.m.)

21

22

23

24

25

INDEX

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE PLAINTIFF: | | | | | |
| Kathy Shapleigh | -- | 36 | -- | -- | -- |
| Mary Poquette | 42 | 85 | 106 | 110 | -- |
| WITNESSES FOR THE DEFENDANT: | | | | | |
| Anne Fortney | 112 | 133 | 154 | -- | -- |
| Chris Sullivan | 157 | 167 | 171 | -- | -- |
| John Madden | 172 | 183 | 190 | -- | -- |

| EXHIBITS: | | Offered | Admitted |
|---|---|---|---|
| P-22 | Screen shots from Verifications processing system | 66 | 67 |
| P-32 | E-mail (no description given) | 39 | -- |
| P-39 | Letter to Verifications compliance department from D. Adams dated 6/19/08 | 80 | 81 |
| D-501 | First page of FTC staff opinion letter regarding joint user interpretation | 11 | 11 |
| D-502 | FTC staff opinion letter regarding joint user interpretation | 12 | 12 |

```
EXHIBITS:                                    Offered  Admitted

D-535A    Anne Fortney unredacted report    10       --

D-535B    Anne Fortney curriculum vitae      8        8

D-503     Excerpt of an FTC commentary on

          Fair Credit Reporting Act         14       14

D-505     E-mails between K. Shapleigh and

          P. Angelo Park dated May 11th     37       37

D-535     A. Fortney redacted report        117      117

D-553     A. Fortney supplemental report    15       15
```

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          August 1, 2010

STEPHEN C. BOWLES