```
                   UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

DEBORAH ADAMS,                 .     Case No. 3:07-CV-01035
                               .     (WWE)
               Plaintiff,      .
                               .     Bridgeport, Connecticut
        v.                     .     December 18, 2009
                               .
NATIONAL ENGINEERING SERVICE   .
                               .
CORPORATION, ET AL.,           .
                               .
               Defendants.     .
. . . . . . . . . . . . . .    .
```

                         CONTINUED TRIAL
              BEFORE THE HONORABLE WARREN W. EGINTON
                 SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        Madsen, Prestley & Parenteau
                          By:  WILLIAM G. MADSEN, ESQ.
                               TODD D. STEIGMAN, ESQ.
                          44 Capitol Avenue, 2nd Flr. E
                          Suite 201
                          Hartford, CT 06106

For the Defendants:       Goldstein & Peck
                          By:  ANDREW M. MCPHERSON, ESQ.
                               WILLIAM KUPINSE, JR., ESQ.
                          1087 Main Street
                          Bridgeport, CT 06604

                          Lewis, Brisbois, Bisgaard
                          & Smith
                          By:  KEVIN ZIMMERMAN, ESQ.
                          199 Water Street, Ste. 2500
                          New York, NY 10038

Electronic Recorder:      MS. SANDI BALDWIN

Transcriptionist:         MS. BERNADETTE JANKAUSKAS

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.
_____

BOWLES REPORTING SERVICE * P.O. BOX 607 * GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1          (Proceedings commenced at 7:51 a.m.)

2          THE COURT:  Okay we've got a lot of ground to

3     cover so let's get to work on that.

4          On the substantive jury instructions, let's

5     make sure you and I have the same copies here.

6          LAW CLERK:  This is a current copy.

7          THE COURT:  This should be my copy that I

8     marked up last night.  I have a copy I marked up at

9     home last night.  What happened to that?

10         LAW CLERK:  This is a clean copy.

11         THE COURT:  Yeah, I don't need a clean copy.

12    I need my copy which is all marked up.  No, I just -- I

13    left it on the bench right here.  I made sure that I

14    left it right here this morning when I came in, because

15    I had my -- No, that's just a plain copy.

16         I left my copy I marked up last night.  I

17    worked very hard on it last night, too.  I think --

18    unless somebody threw it in there.

19         LAW CLERK:  Oh, here you go.

20         THE COURT:  Well, I don't need a clean copy

21    this morning, but I had a copy I worked on last night.

22    So we'll have to see what we do with it.

23         Let's look at the Plaintiff's mark-ups on it.

24         LAW CLERK:  This light spot is where you

25    marked it.

1          THE COURT:  Okay.  Well I have several other

2     things to add to this.

3          (Pause.)

4          THE COURT:  Well, let's do it page-by-page.

5          Anybody got anything on page 1 of

6     substantive?

7          MR. MADSEN:  Which one, Your Honor?

8          MR. KUPINSE:  Substantive.

9          MR. COFFEY:  Oh, on substantive.  Okay, thank

10    you.

11         MR. MCPHERSON:  Yes, Your Honor.

12         Defendant National.

13         After reviewing the Plaintiff's Complaint, I

14    believe the Court's original version that referenced --

15    it used the term "published" rather than "reported,"

16    which is in line with the Complaint, was actually

17    correct.  If you look at Count One of the Plaintiff's

18    Complaint, it states:

19              "NESC violated Section 1681e(b) because it

20              published inaccurate information."

21         And then later states "NESC's publication" as

22    elements of the crime -- of the statute.

23         THE COURT:  Yes, I would never -- I was never

24    of the opinion that this makes a real significant

25    difference to the jury anyway, but why don't we get

1    back and use what's in the Complaint.

2             MR. STEIGMAN:  Your Honor, we would prefer to

3    use the word "reported" instead of "published" since

4    the word "published" isn't contained in the statutory

5    language itself, and a member of the jury may

6    misinterpret "published" meaning it has to be published

7    in the public, as in a newspaper or something, where

8    the facts in this case involve reporting information

9    not publication to --

10            THE COURT:  Well, they are correct if that's

11   the language you used in your Complaint in paragraph

12   38, but I agree with you that I don't want to get the

13   jury confused.  There wasn't any necessity that

14   anything be published to the public here.

15            I'm well aware you picked it up in the

16   Complaint since you're correct that it's not in the

17   statute.

18            All right, well I'll give the Defense an

19   exception and stick with "reported."  I don't think

20   it's a very important issue.

21            Now, maybe you all understand page 2, but I

22   don't.  If you look at page 1 -- 1, 2 and 3m it's all

23   very clear.  National Engineering negatively failed to

24   comply with 15 United States Code 1681a(b), 1681k,

25   willfully then negligently is 1681b, but I don't

1    understand 4, 5 and 6 so let's -- 12 (phonetic) is okay

2    but 4 and 6 don't make any sense.

3              LAW CLERK:  I fixed 4 and 6.

4              Judge?

5              THE COURT:  Yes?

6              LAW CLERK:  I fixed 4 and 6.

7              THE COURT:  I don't know.  My copy is fouled

8    up then.

9              LAW CLARK:  I fixed it just now.

10             THE COURT:  I better get a copy that the

11   attorneys are working with.

12             LAW CLERK:  (Inaudible) I fixed it --

13             UNIDENTIFIED SPEAKER:  He fixed it on the

14   screen.

15             THE COURT:  It's not fixed yet in writing,

16   all right.

17             How do we fix it?

18             LAW CLERK:  I gotta print it.

19             THE COURT:  What do we got that we're taking

20   out?

21             LAW CLERK:  It'll now read:

22             "That Defendant National Engineering

23             negligently failed to comply with 15 U.S.C.

24             Section 1681k by" --

25             THE COURT:  So we take out "negligently

1    violated"?

2            LAW CLERK:  Take out "violated 15" -- Take

3    out "violated" and the code section.

4            So (inaudible) negligently failed.

5            THE COURT:  So we're taking out, "Negligently

6    violated 15 United States Code 1681k?"

7            LAW CLERK:  (Inaudible) negligently failed.

8            THE COURT:  Oh, all right.  The word

9    "negligently" is stet.

10           LAW CLERK:  Yes.

11           THE COURT:  All right.  That's why I got to

12   see a copy of this as it's finally going to read.

13           "Negligently failed to comply."  Well, the

14   language that was used throughout the others.

15           All right.  So we take it out -- in 6 the

16   same thing.

17           LAW CLERK:  Yes.

18           THE COURT:  "Negligently failed to comply."

19   That's what I wanted to do.  All right.

20           MR. STEIGMAN:  Judge, I don't know if you've

21   seen Plaintiff's revised copy that you have --

22           THE COURT:  I'm looking at it, yes.

23           MR. STEIGMAN:  This would be --

24           THE COURT:  It's hard to understand it, the

25   way it's formatted, but --

1              MR. STEIGMAN:  Suggested the inclusion of the

2       "At the time reporting requirement" in 2, 4 and 6,

3       because that's contained in the statute.  It's not just

4       they have to notify the Plaintiff, but they had to

5       notify (inaudible) time that the public record

6       information (inaudible).

7              THE COURT:  Well, what have you got in your

8       copy that I'm looking at that's different from what

9       I've got here?

10             MR. STEIGMAN:  Well, if you're looking at the

11      copy that we marked up last night, then --

12             THE COURT:  No, I'm looking at one that -- a

13      clean copy that Craig just gave me, and it seems to be

14      the same as what you have.

15             LAW CLERK:  No, they inserted language that:

16             "I notified Plaintiff at the time that the

17             public record information was reported."

18             Insert this.  They inserted this light type.

19             THE COURT:  They took that out?

20             LAW CLERK:  They inserted it.

21             THE COURT:  Oh, I thought they were taking it

22      out.

23             LAW CLERK:  This came out and this came in.

24             THE COURT:  Okay.  That -- I couldn't

25      understand what you all were doing.  I thought the

1    light stuff was what you were taking out.

2              LAW CLERK:  No, those are changes.  This is

3    crossed out and this is inserted.

4              THE COURT:  Boy.

5              What is the final version they want, then?

6              LAW CLERK:  They want it:

7              "That Defendant negligently failed to comply

8              with the law by not notifying Plaintiff at

9              the time, that public record information was

10             reported.

11             THE COURT:  But you see, this is taken out.

12             LAW CLERK:  Yes, because it's crossed out.

13             THE COURT:  This is --

14             LAW CLERK:  There's a line through it.

15             THE COURT:  You can't really see that.

16             LAW CLERK:  It comes out better on the

17   screen.

18             THE COURT:  Oh, boy.  Okay.  This isn't very

19   helpful.

20             Okay.  So let's see if we can do something

21   with this.

22             We have to -- We got to work with some

23   document that we're all working with, so let's decide

24   what we're going -- how we're going to do that.

25             You have made the changes they want, then.

1          LAW CLERK:  Some of them I've put in.

2          THE COURT:  Yes, and some --

3          LAW CLERK:  Well --

4          THE COURT:  Well, -- Boy.  All right.

5          So you all want the stuff that is so light

6    that I can almost not read it in your copy that you

7    gave me.

8          You want the language, "At the time the

9    public record information was reported."

10          MR. STEIGMAN:  That's correct, Your Honor.

11          THE COURT:  Let's get a copy we can work with

12    then, for the love of Heaven, because we got a lot of

13    work to do with this.  I didn't want to spend a lot of

14    time on this first part because we've got a lot we have

15    to do on damages.

16          THE CLERK:  Your Honor?

17          THE COURT:  Yep.

18          THE CLERK:  Craig sent an e-mail to me and

19    you can look at it on the screen here, if that's

20    helpful.

21          THE COURT:  Yes, I don't have the screen

22    so --

23          THE CLERK:  No, but you can look at mine.

24    I'll turn it around.

25          THE COURT:  Yes.

1          THE CLERK:  (Unintelligible.)

2          THE COURT:  Well, what we need is one copy we

3    can work with then everybody's working with the same

4    copy.  I don't need screens so much as I need printed

5    copies, 'cause the attorneys have to work from printed

6    copies.

7        (Pause.)

8          THE COURT:  So you're changing 4 and 6 to put

9    in that -- What's the Defense position on that?  Have

10   you seen a copy of it?

11         MR. MCPHERSON:  I -- Yes, I was -- Just this

12   morning, right --

13         THE COURT:  Uh-huh.

14         MR. MCPHERSON:  -- before I came over to

15   court, Your Honor.

16         THE COURT:  They want that language added,

17   "At the time the public record information was

18   reported."

19         MR. STEIGMAN:  Your Honor, that would also

20   apply to Number 2, 2, 4 and 6.

21         THE COURT:  Oh, I didn't even pick up that

22   that was in 2.  All right.  2, 4 and 6.

23         I think that's probably not very significant

24   and I really do want to get on with the significant

25   stuff so --

1          LAW CLERK:  (Inaudible.)

2          THE COURT:  Yes, let's have the Defense

3     position on it.

4          MR. MCPHERSON:  Defense takes no position,

5     Your Honor.

6          THE COURT:  All right.  Let's get that

7     changed, Craig.  Get changes 1 and 2 changed so we get

8     by that.

9          THE CLERK:  Your Honor, does this help at

10    all?

11         THE COURT:  Not at the moment.

12         THE CLERK:  No?

13         THE COURT:  I'm just -- I just want to look

14    at what the attorneys have in front of them.

15         LAW CLERK:  This is what the attorneys have.

16         THE COURT:  I've got what they have, I hope.

17         THE CLERK:  It's on the screen, what they

18    have.

19         THE COURT:  Oh, you did give them the

20    Plaintiffs?

21         LAW CLERK:  No, this is what the Plaintiffs

22    sent last night to the attorneys.

23         THE COURT:  Yes, but the Plaintiffs -- the

24    Plaintiffs have been working from the same document I'm

25    working from.

1          LAW CLERK:  This is this document.  It's --

2          THE COURT:  I don't want to work from that.

3    I want to work from the copy we're working with.  Let's

4    -- If we're going to incorporate it, let's incorporate

5    it in what we're working on, because we got a lot of

6    work to do on this one that we're working on.

7          So let them take the Plaintiff's version,

8    just take what you're incorporating in --

9          All right.  So we're changing 1 and 2 -- No,

10   I don't need it.

11         We're changing 1 and 2.  All right.

12         LAW CLERK:  2, 4 and 6, Your Honor?

13         THE COURT:  2, 4 and 6.

14         MR. COFFEY:  Just, I'm just getting confused.

15         If we could, I have the official version we

16   have.  If they could just say what the changes are,

17   because I'm not working from their copy.  So I'm

18   getting a little confused.

19         If you could say what page and what number --

20         THE COURT:  So we were all getting confused.

21   That's why -- That's exactly why I wanted just -- I

22   want to work from the same document with all of this.

23         MR. COFFEY:  Thank you.

24         THE COURT:  So what we're doing is 2,4 and 6.

25   We're adding some language, and the language we're

1   adding is the language, "At the time that the public

2   record information was reported," and the fact that

3   public record information is being reported (inaudible)

4   name and address and so on.

5           So that's the language that Craig's putting

6   in on 1 and 2.

7           All right, then we get to page 3.

8           Any changes on 3?

9           MR. STEIGMAN:  Yes, Your Honor.  This is for

10  the Plaintiff.

11          I'm not sure that -- since the Court has

12  already made a finding the report that we're dealing

13  with here is a consumer report, I'm not sure if the

14  jury needs a statutory definition of a "consumer

15  report," since it's nothing they're going to be asked

16  to make a finding on.

17          THE COURT:  Now, you must be talking about

18  something, but where is it on page 3?

19          MR. STEIGMAN:  It's at the top of page 3,

20  Your Honor.  The consumer report (inaudible) was used

21  in a (inaudible) and there's the block quote.

22          THE COURT:  Oh, it's at the bottom of page 2,

23  I see.

24          MR. STEIGMAN:  Okay.

25          THE COURT:  The consumer report is that term

1   in the law.  You're saying you don't need the

2   definition of it on the top of page 3.

3            MR. COFFEY:  Well, Judge, if we're trying to

4   include the statutes and there are definitions, I think

5   it's fair to read the statute -- the definition.  It is

6   helpful to the jury, Your Honor.

7            I mean, I don't -- you know, I think it is

8   helpful because if -- a juror might not know that and I

9   think it's just -- it's very helpful.

10           THE COURT:  I don't think it's really

11   important but I'll leave it in since that's what the

12   statute has.  I don't think the jury's going to worry

13   too much about that.  All right.

14           What do we have now, when we get down to

15   1681e(b)?

16           MR. STEIGMAN:  Judge, we have something

17   before that.

18           THE COURT:  All right, what's that?

19           MR. STEIGMAN:  The entire third paragraph,

20   the negligence and willfulness section, we think that

21   should be taken out because we're not claiming here

22   that any of the Defendants failed to do inadequate

23   reinvestigation.

24           So telling the jury about reasonableness of

25   procedures during reinvestigation, I think, is

1   misleading and unnecessary because we're not claiming

2   that that's (inaudible).

3        MR. COFFEY:  Your Honor, if I can have a copy

4   of -- the copy I printed of Mr. Steigman's revisions,

5   if I could have a copy of it, because I printed it but

6   it didn't print with the redline version on the e-mail

7   you sent me.

8        Do you have a copy of it for me?

9        MR. STEIGMAN:  I just have my copy right

10  here, that has the stuff -- has writing on it.

11       THE COURT:  Well then why don't I give you my

12  copy because I'm not working from it.  I'm working from

13  one I -- that Craig prepared last night, because that's

14  why I marked up last night.

15       I wish I could find the copy I marked up.  I

16  spent a lot of time on it.  All right.  Let's get back

17  to this.

18       What's the position of the Defense on that

19  last full paragraph on page 3?

20       MR. MCPHERSON:  I think it helps explain what

21  reasonableness is, Your Honor.

22       MR. COFFEY:  Well, Judge, I think it does --

23  It explains it, and these charges aren't that super

24  long that there's things that -- I mean, I think it is

25  very helpful about the reasonable procedures, because

1  it is talked about in the questions that are being

2  asked against each of us, and anything that could be

3  illustrative to help the jury.

4       These charges are not extremely long, Your

5  Honor, and I don't think -- I think it helps be

6  illustrative to the jury.

7       MR. STEIGMAN:  Your Honor, I think telling

8  the jury about reasonableness of procedures that we're

9  not complaining are unreasonable is an inappropriate

10  suggestion that they're going to be asked to consider

11  whether the investigation -- the re-investigation

12  procedures, they were reasonable, and that's not the

13  case.

14       MR. COFFEY:  Well, the other thing is, Your

15  Honor, we did go over all of this yesterday, and these

16  are things that Your Honor did rule on preliminarily,

17  and I do add, it is a ten, and if we're going to go

18  back and keep arguing each point that we might not each

19  respectively not like until -- we're never going to get

20  finished today and get this to a jury.

21       THE COURT:  That may be but the other side of

22  that claim is I'm supposed to get this case to the jury

23  properly charged, and that's what I'm concerned about,

24  and I don't want to give the jury anything they don't

25  need to reach a decision.

1          So if we have the explanation in paragraph 2,

2    which we have, I think maybe the use of this

3    illustration might be misleading to the jury, thinking

4    that there is a charge that they failed to follow

5    reasonable procedures.

6          So I'll take it out and give the Defense an

7    exception on that.  All I'm trying to do is charge them

8    on the law.

9          All right, let's get to 1681e(b).

10         MR. STEIGMAN:  Your Honor, this is just a

11   minor typographical issue.

12         The last paragraph in that main section,

13   before you get to the (e)(B), I think the second

14   sentence, "consider" should be in the past tense,

15   "considered."

16         THE COURT:  Oh yes, no question.

17         MR. MCPHERSON:  Your Honor, if we could just

18   go back for one second --

19         THE COURT:  It's not really a past tense.

20   It's active versus passive, but it should be passive.

21   "An action is considered reckless."  Right.

22         Yes?

23         MR. MCPHERSON:  In your definition of

24   reasonableness that you are keeping, the first

25   paragraph?

1              THE COURT:  Yes.

2              MR. MCPHERSON:  Could you include a line

3    that's included in the second paragraph, that states

4    about the cost of requiring consumer reporting agencies

5    and their decisions to -- on making their -- on setting

6    their procedures, because I believe that that goes to

7    the reasonableness standard?

8              THE COURT:  Where are we talking about?

9              MR. MCPHERSON:  The second line of the second

10   paragraph states:

11             "Although the cost of requiring consumer

12             reporting agencies."

13        If you could adapt that sentence so that it

14   goes and explains the reasonableness in the paragraph

15   before it, that costs are something that should  be

16   considered.

17             THE COURT:  I wish I felt it was helpful, but

18   if I can't understand it I don't think the jury will

19   understand either:

20             "The costs of requiring consumer report

21             agencies to go beyond the original source of

22             information, as an initial matter," whatever

23             that means, "outweigh any potential benefits

24             of such requirement."

25             So that -- I don't know why that would be a

1    fair statement of the law.  It would depend on the

2    facts in the particular situation, I would think.

3              MR. MCPHERSON:  I agree with your statement,

4    Your Honor.

5              What I'm saying is to change the sentence so

6    that in the paragraph before, you talk about, "Balance

7    the potential harm from inaccuracy against the burden

8    on the agency," and I think the costs are part of that

9    burden and should be in the instructions.

10             THE COURT:  No, again, that's gets you --

11   I'll let you argue that, but I'm not going to -- that's

12   not part of what -- I didn't spell out there, what the

13   reasonableness would depending upon, what the factors

14   would be, and I don't want to do that.  I just want to

15   charge them on the law.  So I'm not going to get into

16   costs.

17             I'll give you an exception on that.

18             All right.  Let's get back to 1681e(b).

19             MR. STEIGMAN:  Your Honor, at the end of the

20   second full paragraph of 1681e(b), there's that same --

21             THE COURT:  You know, what you've asked me to

22   put in on page 2, it's on page 4.  The thing I took out

23   on -- not on page 2, but page 3.  The paragraph I took

24   out on page 3 is repeated on page 4.

25             MR. STEIGMAN:  Your Honor, I was just going

1  to point that out and ask that it be removed

2  (inaudible).

3      THE COURT:  Yes.  So it's in there anyways,

4  so let's leave it where it is on page 4.

5      MR. STEIGMAN:  Your Honor, can we have an

6  exception on that because we would request that that

7  same language be removed from (inaudible).

8      THE COURT:  Wait a minute.

9      Who needs an exception and why?

10      MR. STEIGMAN:  The Plaintiff is requesting

11  that again, the language that was taken out of the

12  previous section, you also remove from 1681e(b) for the

13  same reasons.

14      We're not claiming anything with regards to

15  the re-investigation.

16      THE COURT:  I'm wondering why we need to

17  double up on explanations here anyway.

18      I'm looking at -- We talk about negligence

19  and willfulness, and we repeat the whole thing when we

20  get into the sections.  So I don't really need that

21  preliminary stuff on page 3, but at the moment I'll

22  leave it in.  We may be giving overkill here because we

23  repeat it under each section.

24      (Pause.)

25      MR. STEIGMAN:  And, Your Honor, in the last

1  paragraph on 1681e(b), the sentences dealing with X and

2  Y that we addressed yesterday, we think those should be

3  taken out for the reasons that we talked about

4  yesterday.

5           THE COURT:  Yes, I am concerned about those.

6  I don't think they help at all.  That just confuses the

7  jury, I think.

8           But getting back to legal procedures, I think

9  there's one part of this that can be put in.  We talk

10  about the balancing the potential harm from inaccuracy

11  against the burden on the agency in safeguarding

12  against such inaccuracy.

13           MR. COFFEY:  But the -- Your Honor, part of

14  the thing with all this about the Plaintiffs saying,

15  "We're not claiming this part of it," that they didn't

16  -- we didn't do what we should have from the outset,

17  part of the whole thing is the experts talked about,

18  though, is that part of it is this is a safeguard, what

19  the people do afterwards.  Did they go back and they --

20  they used reasonable procedures, they have the 30 days,

21  and I think it's kind of -- I mean, if we eviscerate --

22  if we remove every part of that, it almost, to the

23  jury, I think it confuses them because someone -- We do

24  have a right to -- Part of the whole process, the FRCA,

25  the purpose of it is that there's a procedure to

1    safeguard after a decision is made that could be wrong.

2            So to take out everything about what we could

3    have done afterwards that were reasonable, and the jury

4    wouldn't hear any of that, I think, is -- I think could

5    be very confusing to them.

6            THE COURT:  I wish I could ascertain exactly

7    what you're talking about, and I can't because --

8            MR. COFFEY:  Well, I think --

9            THE COURT:  -- what we're talking about here

10   is lines -- Well, they aren't numbered, but this part

11   about the cost, and that's what I'm considering now, is

12   to how to go in before the jury, an aspect that they

13   should consider the costs.  The costs are something

14   that -- to be considered, and that's what I'm looking

15   at now, to see what we might put in there.

16           Maybe we put in (unintelligible) procedures

17   to follow once inaccuracy is established.  The costs

18   can be a factor.

19           MR. KUPINSE:  Maybe, Your Honor, it's just

20   easy enough to put in a sentence that says,

21   "Consideration of costs on the agencies should be taken

22   into account" and --

23           THE COURT:  That's exactly what I'm telling

24   you.

25           MR. KUPINSE:  Yes, and the -- I would add,

1   "and the effect on the public," because we heard that

2   one of the reasons that this procedure is set up is to

3   make the system workable.

4           THE COURT:  I don't know whether they would

5   know what "effect on the public" means, but I agree

6   with what -- your statement.  That's what I was working

7   on, exactly the statement you just made.

8           So we'll say, "The costs of requiring

9   consumer reporting agencies to go beyond the original

10  source of information are a factor to be considered."

11      (Pause.)

12          MR. MADSEN:  Your Honor, may I be excused?

13  I'm going to leave this in Todd Steigman's capable

14  hands?

15          THE COURT:  Yes.  Sure.

16          Now what about this violation thing?  I was

17  concerned about the violation.  I don't think it helps

18  the jury at all.

19          So I think I'll take that --

20          MR. KUPINSE:  If Your Honor please, I think

21  you need to leave something in there, or maybe that

22  isn't the perfect language, but otherwise the jury does

23  get confused and they can say, "Well, four of us

24  thought that action such and such violated, three of us

25  thought that action such and -- next action violated,

1   and two of us thought the next action violated.  So

2   altogether if we add them up we've got a violation."

3          THE COURT:  No, you're correct, but we've got

4   to say something about that somewhere, and I thought we

5   did, but to the extent that you're saying we must put

6   that in, if you want to put it in here, it can go in

7   here, but I need to have you give Craig some language,

8   and the language you just uttered is okay with me.

9          They've got to be able to find unanimously

10  that the particular act they're looking at is a

11  violation and it's part of the claim.  They can't mix

12  up the claims, and I'll keep telling them that

13  constantly, I hope, because they have to keep that in

14  mind.

15         MR. MCPHERSON:  Your Honor, can you also add,

16  and they have to be unanimous on each element of every

17  claim?

18         THE COURT:  I'm sorry, what?

19         MR. MCPHERSON:  Can you add that they have to

20  be unanimous on each element also, of every claim?

21  Because the negligent infliction of emotional distress

22  claim has four elements.  They --

23         THE COURT:  No.  No.  I'm putting in the four

24  elements in the special verdict form, and I thought we

25  covered them here, but that has to do with the four

1   elements of negligent infliction of emotional distress.

2   I haven't gotten that far yet.

3           MR. MCPHERSON:  But also, there's several

4   elements in some of the statutes also.

5           THE COURT:  Well, I don't know about charging

6   those elements.  I thought we went over that in some

7   detail yesterday.

8           You'll have to give language to Craig if you

9   want elements, but I don't -- I felt we went over that

10  pretty thoroughly yesterday.

11          MR. STEIGMAN:  Your Honor, I'd just like some

12  clarification on whether the language regarding the re-

13  investigation is going to be left in.

14          THE COURT:  I don't know, where is it?

15          MR. STEIGMAN:  Section 1681e(b), the second

16  to the last paragraph where we were going over the

17  language about the costs, and Your Honor suggested some

18  possible -- different language regarding the costs.

19          But we were requesting the sentences

20  regarding burden of investigation and re-investigation

21  to be removed, and I'd like to explain why I don't

22  think those --

23          THE COURT:  I didn't put that in.  You're

24  talking about the re-investigating the one piece of

25  disputed information?

1          MR. STEIGMAN:  Yes, (inaudible) --

2          THE COURT:  I took that out.

3          MR. STEIGMAN:  -- if it's going to be left in

4    or taken out.

5          THE COURT:  I took that out.

6          MR. STEIGMAN:  Okay.

7          THE COURT:  I just did what Mr. Kupinse

8    stated, which I thought was very good, "The costs are a

9    factor to be considered," --

10          MR. STEIGMAN:  Okay.  Thank you.

11          THE COURT:  -- when they go beyond the

12   original source of information.

13          Now, the point that was being made about

14   items required by the statute in detail is, I think,

15   sufficiently covered in the one -- I've got it on page

16   5, for example, in Count One.  We go into the factors

17   and I think those are correct factors.  There are four

18   of them listed.

19          MR. MCPHERSON:  Your Honor, may I say

20   something?

21          THE COURT:  Yes.

22          MR. MCPHERSON:  For those factors on Count

23   One to even come into play, it must be found that the

24   credit reporting agency, one, furnished a consumer

25   report for employment purposes, and which, for that

1     purpose, compiles and reports items of information on

2     consumers which are matters of public record.

3                 These things have to be found before the

4     other things can even be considered.

5                 THE COURT:  I thought that's something that

6     with -- preliminary before we get down to Count One,

7     when we talk about 1681k.

8                 MR. MCPHERSON:  I'm sorry, where, Your Honor?

9                 THE COURT:  I thought it was under 1681k at

10    the top of page 5.

11                MR. MCPHERSON:  No, Your Honor, not on my

12    copy.

13                THE COURT:  Well, what -- You've got to give

14    Craig the specific language that you think we should --

15    I thought we went all over this yesterday.  I was

16    getting way beyond this to get to damages, which we

17    need to do a lot of work on, but we're back arguing

18    what we argued yesterday.

19                Now, you've got to give Craig the specific

20    language that you want to put in, and then Defense has

21    to have an opportunity to object to it.

22                MR. MCPHERSON:  Okay.

23                Just like Plaintiff has argued this morning

24    that we should copy the statute, I believe the statute

25    should be copied here because findings have to be made

1    before the Plaintiff's allegations are even relevant.

2           THE COURT:  Have we got that covered in the

3    special verdict form, for them to make those findings?

4           MR. MCPHERSON:  No, Your Honor.

5           THE COURT:  See, that's the problem we got.

6    We've got to give them something that they need to help

7    them answer the interrogatories.  If they don't need

8    it, then we're not going to put it in, but the -- I'm

9    happy with the Count One items I've put in there.

10          Now, what's the Defense position on the

11   argument that's just been raised about other factors

12   that have to be proven?

13          MR. STEIGMAN:  I'd like to see what specific

14   language they're proposing.

15          MR. MCPHERSON:  I'm looking directly at the

16   statute, Section 1681k, Your Honor.

17          THE COURT:  I'd like to know what they're

18   proposing also.  That would be very helpful.

19          MR. COFFEY:  Judge, if I may be excused for a

20   moment.  Counsel can keep speaking, I'm just going to

21   the men's room.

22          Thank you.

23          MR. MCPHERSON:  1861(k)(A) states the

24   findings that must be made prior to what the consumer

25   reporting agency must do at the time such public record

1    is reported to the user.

2         (Pause.)

3              THE COURT:  Well, we've got that language in

4    about the time.  We had that --

5         (Pause.)

6              THE COURT:  Well, you're asking the jury to

7    make these findings under the preliminary part of

8    1681k?

9              MR. MCPHERSON:  Yes, Your Honor.  They have

10   to before even 1861(k)(A)(1) and (2) are even

11   considered by the jury.

12             To get to subsection (1) and (2) you have to

13   find the findings in subsection (A), meaning you have

14   to find that they furnished the consumer report for

15   employment purposes, and which, for that purpose,

16   compiles and reports items of information on consumers

17   which are matters of public record.

18             THE COURT:  Well, you see, that could all be

19   handled on summary judgment motion because that's an

20   issue -- not really a factual issue, it's what happened

21   in this particular case, and I thought we were way

22   beyond that.

23             And the jury really hasn't heard any evidence

24   that I can recall, that would refute this.  The whole

25   issue is, of course we -- which we're going to deal

1   with probably up in the Second Circuit, is whether it's

2   correct to say that National is a consumer reporting

3   agency or it isn't, but it -- once you assume, as I

4   have, that it is a consumer reporting agency, I didn't

5   think the rest of this was in any dispute.

6           MR. MCPHERSON:  Yes, it is, Your Honor.

7           MR. STEIGMAN:  You Honor, in Judge Hall's

8   ruling, page 18, under the 1681k section, she writes:

9           "In this case the threshold requirements for

10          the application of this section are clearly

11          met, as the information concerning

12          applicant's criminal history was recorded for

13          employment purposes, was a matter of public

14          record, and was certainly likely to have an

15          adverse impact on her."

16          THE COURT:  On page 19 of Judge Hall's report

17   they note that, and (inaudible) doesn't contest the

18   fact that its report falls within this section.

19          MR. MCPHERSON:  Your Honor, that's for

20   purposes of summary judgment.

21          THE COURT:  I know.  I'm aware of that.

22          MR. MCPHERSON:  And Judge Hall also did not

23   address the compiles requirement --

24          THE COURT:  Right.

25          MR. MCPHERSON:  -- in the statute, if you

1    notice.

2         THE COURT:  All right.  I'm going to make a

3    ruling that will solve this and that's another ruling

4    that can be appealed, but I'm going to say this is not

5    an issue for the jury.  The Court makes that

6    determination and I adhere to the determination Judge

7    Hall made on it, that it -- the preliminary

8    requirements of 1681k have been met in this case.

9         So I'll deny your request that I put findings

10   in for the jury on that issue.

11        MR. MCPHERSON:  Defendant National asks for

12   an exception, Your Honor.

13        THE COURT:  Yep.

14        MR. COFFEY:  And you'll also note

15   Verifications's exception, Your Honor.

16        THE COURT:  Yep.

17        MR. COFFEY:  Thank you.

18        Your Honor, just so the Court's aware, my

19   expert is outside, Mr. Nagel.

20        THE COURT:  Yes.

21        MR. COFFEY:  So I do have him here, I just --

22        THE COURT:  Okay.  Let's try to look into

23   this in about 15 minutes, if we can.

24        As long as you know basically what I'm going

25   to charge, that's the major thing we have to do.  We

1   can do the nuts and bolts on it later while the experts

2   testify, and Craig can work on this but --

3          All right.  So I'm denying the Defense

4   request that the preliminary of 1681k be put to the

5   jury, and I've given the jury four items under Count

6   One.

7          MR. STEIGMAN:  Your Honor, if we could

8   also have --

9          THE COURT:  Now I have marked up -- Damn it,

10  that's my -- I wish I could find my copy.  This is

11  really fouled up all the way through here and we've got

12  to make changes in it.  I made the changes last night

13  so I've got to be very careful of it.

14         Boy.  All right.  I took out in each part

15  here, and I told you last night I was going to take it

16  out, "You must return a verdict in favor of the

17  Plaintiff."  That all comes out.

18         What -- The language I want is exactly what

19  is in the third line.

20             "Plaintiff has established her claim if she

21             demonstrates," et cetera, et cetera."

22             That's all you need there.

23         MR. STEIGMAN:  Your Honor, in Counts Two,

24  Four and Six we would also request that the same

25  language --

1          THE COURT:  I'm going to go through each one

2    now.  I crossed them out in the original copy that I

3    had.  This makes more English sense anyway, on page 5,

4    because it doesn't have an "if," it just says,

5    "Plaintiff has established her claim if she

6    demonstrates," and then we have the four things, so

7    that then, "You must return a verdict in favor of the

8    Plaintiff" is meaningless, so let's take it out there.

9          Now --

10         MR. MCPHERSON:  Your Honor, one count -- Are

11   we still on Count One?

12         THE COURT:  Well, we can be.  I was about to

13   go to Count Two.

14         MR. MCPHERSON:  Element 3 states:

15              "The Plaintiff was injured by National

16              Engineering's actions."

17              And then Four says:

18              "Such act or omissions were proximate cause.

19              Shouldn't Element Number 3 ask -- state,

20   "whether the Plaintiff suffered any injuries"?  Because

21   the way it's reading now it assumes that she's suffered

22   --

23         THE COURT:  No, no, that's what that means.

24         The Plaintiff has to establish that she was

25   injured by National Engineering's actions.  That covers

1    it.  She's got to suffer injuries and they've got to

2    have been caused by National actions.

3            Now, you may have duplication there.  You may

4    just want to say, in Number 3, that Plaintiff is

5    injured, and that the injuries were caused by acts or

6    omissions of National Engineering.  I don't really care

7    about -- I think it's clear.

8            MR. MCPHERSON:  Okay, I --

9            THE COURT:  We can change it if you want to

10   change it.  You give Craig some language for that.

11           So it's clear the third element is she

12   suffered some injury.  Then the fourth element is the

13   causation.

14           Now getting to Count Two.

15           MR. STEIGMAN:  Your Honor, as to Count Two,

16   we would request that the language that we talked about

17   previously, "At the time that the public information

18   was reported" be inserted into the first element, as it

19   was in (inaudible).

20           THE COURT:  In the other, 2, 4, 6.

21           MR. STEIGMAN:  That's right.

22           THE COURT:  Okay.  Okay.

23           Now, this is -- all has to be changed on each

24   of these and we've got to be careful that we don't miss

25   any of them.  I had my marked up copy where I

1   completely did it.

2          It's improper to say:

3          "Plaintiff has met her burden by showing."

4          What you want to say there is, "Plaintiff

5   bears the burden of showing."  That's what you need

6   there.  "Plaintiff bears the burden of showing."

7          Now, we've got this same problem in every

8   single one of these.

9          We've got to take Counts Three and Five.

10  "Plaintiff bears the burden of demonstrating by a

11  preponderance of the evidence."

12          And this, again, makes no sense to have,

13  "Then you must return a verdict in favor of the

14  Plaintiff."  I don't know why that gets in here

15  because we've got it covered up above when it says,

16  "Plaintiff bears the burden" if she demonstrates -- "of

17  demonstrating by preponderance of the evidence."

18      (Pause.)

19          THE COURT:  Yes. I don't know where this damn

20  language comes from, but we got to get it out

21  everywhere.

22          So in Counts Four and Six we've got to get it

23  out.  "Plaintiff bears the burden of showing that

24  National Engineering," et cetera.

25          The language that is -- The proper language

1    we should be using throughout here is the language used

2    in Count Seven, which says:

3              "To prove her claim, Plaintiff must prove by

4              a preponderance of evidence, each of the

5              following four elements."

6         That's really the good language.  Yes.

7         The way Count Seven is pleaded -- is set

8    forth here is exactly the way all of these counts

9    should be.  "The determination that, and the Plaintiff

10   must establish," and so on.  That's all very good.  All

11   right.

12        Now, I'm going to get to damages and I'm

13   concerned about -- we had an agreement last night which

14   is just not set forth here.

15        (Pause.)

16        THE COURT:  Obviously, we want to take the

17   language which we have in here under "Damages," at the

18   top of page 10, and it's repeated for some reason, and

19   it shouldn't be repeated, on page 11.  That's what I

20   was going to take up and put on page 10, but I

21   discovered it already is there on page 10.

22        (Pause.)

23        THE COURT:  I wanted to take out this

24   language about the "denial of employment" because I

25   don't think that helped the jury at all on that.  So I

1    took it out, those five lines on page 10.

2           What I did put in was this type of language

3    which is now at the top of page 10.

4               "If you found that she's proven liability,

5               you consider what damages, if any, are due to

6               her," and "there are two kinds of damages."

7           And you don't need this repeated on page 11

8    at all.

9        (Pause.)

10          THE COURT:  What we do have to have in here

11   is a statement that I'll put in at the bottom of page

12   10, where it says, "Plaintiff seeks compensatory

13   damages by negligent infliction of emotional distress

14   against both Defendants, and you have to keep the

15   evidence clear as to each Defendant you're considering.

16   You're really trying two cases," and I'll be constantly

17   telling them that they've got to consider the damages

18   resulting from the conduct of each Defendant as they

19   look at each Defendant.

20          MR. STEIGMAN:  Your Honor, is that in the

21   compensatory damages section?

22              THE COURT:  Yes.

23          MR. STEIGMAN:  In that second paragraph,

24   where it only speaks to compensatory damages for

25   negligent infliction of emotional distress, we wanted

1   to insert language there making it clear we're also

2   seeking compensatory damages under the Fair Credit

3   Reporting Act.

4        THE COURT:  Well, we're going to get to that,

5   but we might have to put it in here too.  I think

6   you're right.  It's got -- "She seeks compensatory

7   damages for the statutory violations and for negligent

8   infliction of emotional distress."  That's why I wanted

9   to get that all up front anyway.

10       MR. STEIGMAN:  And I think that some language

11  to that effect can also be inserted in the last

12  sentence of that same paragraph, after where it reads

13  now that "One or both of the Defendants," if you can

14  add that point, "violated any of the Plaintiff's rights

15  under the Fair Credit Reporting Act or negligently

16  inflicted emotional distress."

17       THE COURT:  Yes.

18       Where are you?

19       MR. STEIGMAN:  The last sentence of that same

20  paragraph.

21       THE COURT:  Where are you, page 10?

22       MR. STEIGMAN:  The second full paragraph of

23  "Compensatory damages."  My pagination is different

24  than yours 'cause when I opened up the document it was

25  in a different word processing program.

1          THE COURT:  Oh, you're talking about where I

2    talk -- where I am:

3              "Plaintiff seeks compensatory damages for

4              negligent infliction of emotional distress."

5          MR. STEIGMAN:  That's right.

6          THE COURT:  I said we'd add the statutory

7    violations there.

8          MR. STEIGMAN:  In the first sentence, but

9    also in the last sentence of that paragraph where --

10   after the phrase, "One or both of the Defendants," if

11   we could add the phrase, "Violated any of the

12   Plaintiff's rights under the Fair Credit Reporting

13   Act."

14         THE COURT:  I can't even find anywhere that I

15   talk about one or both Defendants.

16         Oh, you're way up on the beginning thing.

17   Okay.  The only time I talk about that is in general

18   instructions on damages.

19         MR. STEIGMAN:  That's in the same section,

20   Your Honor, in that same paragraph.  The second full

21   paragraph under "Compensatory damages."

22         THE COURT:  Yes.

23         MR. STEIGMAN:  Where the -- The paragraph

24   that starts, "Plaintiff seeks compensatory damages

25   for."  The third sentence in that same paragraph, where

1    it starts:

2          "Now if you have found that Plaintiff has

3          proven."

4          THE COURT:  That's where I'm talking about.

5    That's the paragraph I'm dealing with, --

6          MR. STEIGMAN:  Okay.

7          THE COURT:  -- where I'm going to put in the

8    statutory violations.  That's the only place I can see

9    that.  I don't see that -- Oh, you're talking about the

10   one above -- I took that out because I have it up in

11   the first part on page 10.

12         MR. STEIGMAN:  Okay.

13         THE COURT:  But I really am going to talk

14   about necessity of keeping the Defendants separate.

15         MR. MCPHERSON:  Your Honor, before we move

16   on, can we go back to page 9, "Proximate cause."

17         The very first sentence, I think, needs to be

18   clarified.

19         THE COURT:  Where are you?

20         MR. MCPHERSON:  Proximate cause on page 9.

21         THE COURT:  Uh-huh.

22         MR. MCPHERSON:  Says:

23         "In order for Plaintiff to prevail on

24         respective claims, there must be a showing by

25         a preponderance of the evidence."

1        I think it should state, "In order for

2   Plaintiff to prevail on any of her respective claims."

3        THE COURT:  That's not a bad idea.  Let's

4   change that.  I've got -- I had the "her" written in

5   there anyway.  So it should be, "Any of her respective

6   claims."  Okay.  All right.

7        So we're down to the last part of this.  I

8   think it's all right.

9        MR. KUPINSE:  If Your Honor is going on to

10  page 12, I think you may be able to take out that first

11  bolded "damages for negligence, acts or omissions"

12  since you did put the statutory claims in earlier, in

13  the paragraph starting on page 10.

14       THE COURT:  Well, somewhere I've got to have

15  the definition.

16       MR. STEIGMAN:  We disagree with that, Your

17  Honor.  I think that that's section is just fine as it

18  is.  I think it sets out that you can get damages for

19  statutory claims, and it sets out actual damages.

20       THE COURT:  Well, on page 12, that's the

21  first time I get into this, so I've got to say it

22  somewhere, and I haven't said it earlier at all.

23       I talked about compensatory damages earlier,

24  and I didn't get into the economic at all.  That's why

25  this is in here, to show that actual damages includes

1    the compensatory damages which I just had described,

2    and economic damages.  So that needs to be in there.

3            And the -- When I get to page 13, you've got

4    to say --

5            MR. MCPHERSON:  Your Honor, before you go to

6    page 13?

7            THE COURT:  Yes?

8            MR. MCPHERSON:  On page 12, under damages for

9    willful acts or omissions, --

10           THE COURT:  Yes.

11           MR. MCPHERSON:  You state, the amount of

12   money, "As well as punitive damages as you may allow."

13           Looking at the statutory language of 1681n

14   for willful noncompliance, subsection b(2) states:

15               "Such amount of punitive damages as the Court

16               may allow."

17           I believe it is the Court who is allowed --

18   permitted to award punitive damages, and not the jury.

19           THE COURT:  That's never been true under

20   federal statutes I'm familiar with.  You think this one

21   makes an exception and says that they -- the Court has

22   to do what the state courts do?

23           MR. MCPHERSON:  Yes, Your Honor, it

24   specifically states the Court may allow punitive

25   damages, and not the jury.

1          THE COURT:  Uh-huh.  That's interesting.

2          So you'd have the same procedure that you

3    have in the state courts, where the jury can decide

4    whether punitive damages ought to be awarded, and then

5    the Court determines what they ought to be.

6          MR. MCPHERSON:  Yes, Your Honor.

7          MR. STEIGMAN:  Your Honor, we disagree with

8    that.  I think the punitive damages are appropriately

9    the subject of the jury to making findings of fact and

10   assessing, you know, the purposes of --

11         THE COURT:  Yeah, but why can't we follow,

12   according to what the statute says there, the state

13   court procedures?

14         And Mr. Kupinse pointed out yesterday, the

15   state court procedures are that -- and I act here as a

16   state court, are that the Court takes the finding the

17   jury makes, and on that finding awards the punitive.

18   Looks as though that's what the Congress intended with

19   that Act.

20         Defense have any position on that?

21         MR. MCPHERSON:  Your Honor, our position is

22   that the Court is the one that's -- only one permitted

23   to state punitive damages, to set the amount.

24         THE COURT:  Yes, the amount.  Yes, I think

25   you're right.  That's what it looks like.

1          MR. COFFEY:  Yes, we agree with that

2     interpretation of the statute.

3          THE COURT:  All right.  I think I'd better do

4     that because that seems to be clear in the statute.

5          MR. STEIGMAN:  Your Honor, can we have a --

6     another exception to that.

7          THE COURT:  Yes but, you know, the -- Let's

8     see that again.

9        (Pause.)

10         THE COURT:  It's strange, isn't it, that the

11    -- (b) obviously doesn't apply, so you don't have to

12    worry about (b), but (a) does.

13         And Congress certainly doesn't make very

14    clear what the Court's supposed to do.  I guess it's

15    saying that the Court -- All right.

16         The actual damages will have to be the

17    straight damages, I guess, the compensatory.  So the

18    compensatory are not less than a hundred and not more

19    than a thousand under (n), and are willful.

20         And then the punitive are up to the Court.

21    Let's see if we've got that correctly down here.  I

22    guess we do.  All right.

23        (Pause.)

24         THE COURT:  Aren't we confusing the jury?

25    I'm not quite sure what we ought to do with this.  The

1    actual damages -- Let me see that again.  Yes, it's a
2    very confusing section.
3         Does the jury make the determination of the
4    compensatory damages, and then decide whether it's
5    going to pay no attention to that and award damages of
6    not less than a hundred and not more than a thousand?
7    I don't know where -- what the "not less than a hundred
8    and not more than a thousand" is in there for, and what
9    the purpose of it and who makes the determination.
10   They don't give any guidance there.  Maybe the --
11        Have you discovered case law that gives us
12   any guidance?
13        MR. MCPHERSON:  No, Your Honor.
14        THE COURT:  No.
15        MR. STEIGMAN:  Your Honor, I'm thinking that
16   that may be a situation where in a case where Plaintiff
17   has not suffered any actual damages --
18        THE COURT:  Like nominal.
19        MR. STEIGMAN:  Yes, but in the case of the
20   willful violation Congress still wanted to provide some
21   kind of, you know, --
22        THE COURT:  Nominal damages.
23        MR. STEIGMAN:  -- compensation --
24        THE COURT:  Yes.  Yes, it looks like a
25   nominal damages section.

1               So somebody's got to decide whether -- I

2    guess the jury decides, whether they're going to award

3    compensatory or whether they're going to award the

4    statutory feeling that society wants it to be given

5    with nominal damages.

6               Why don't I take out the punitive because

7    it's going to be for the Court.

8               MR. STEIGMAN:  Are we still going to be

9    asking the jury to make a finding on reckless

10   disregard, even though the Court --

11              THE COURT:  Yes.

12              MR. STEIGMAN:  -- allowed them to --

13              THE COURT:  Yes, they don't have to make a

14   finding for whether I should be awarding punitive, but

15   I would award the punitive.

16              MR. MADSEN:  So we'll have a special

17   interrogatory because it says --

18              THE COURT:  We'll need that just like we do

19   with the state.  Yes, exactly what we do with the

20   state.

21        (Pause.)

22              THE COURT:  Now, I don't need the punitive

23   damages in here, do I?  Yes, I do.

24              MR. MADSEN:  Yes.

25              THE COURT:  Yes, I do.

1          MR. MADSEN:  (Inaudible.)

2          THE COURT:  Yes, but we have to change the

3     language of it.  "How do you determine whether to

4     assess punitive damages.  I will now describe how you

5     determine whether to assess punitive damages," and then

6     we'll say, "Whether you decide to assess punitive

7     damages."  So we'll take out the "any."  "Should be

8     based upon," and so on.

9          I'll take out the, "Law requiring calm

10    discretion" and so on because I'm going to be doing

11    that.  We'll put in, "The Court will award punitive

12    damages."

13         MR. STEIGMAN:  Your Honor, with respect to

14    the (a), (b) and (c) that are set out in that section

15    regarding punitive damages, --

16         THE COURT:  Yes.

17         MR. STEIGMAN:  -- we would suggest that that

18    -- those things be made clearer, or less factors, so

19    our proposal would be just to have, "(a) a willful

20    violation of Plaintiff's rights under the Fair Credit

21    Reporting Act, or (b) reckless disregard of its duties

22    under the Fair Credit Reporting Act," without, "For

23    malicious or intentional or wanton" --

24         THE COURT:  Yes.  I always do that.  You're

25    -- What you're saying is I ought to make clear that

1   it's "or," it's not "and."

2           MR. STEIGMAN:  Well, even remove some of the

3   ways that they can find punitive damages.  Previously

4   there was a definition of "willful" in the earlier

5   instruction, that willful is -- can be found based on a

6   reckless disregard, and that's all that was said, and I

7   think this should track what was said previously about

8   the standards for willfulness, since that's what

9   they're being asked to consider.

10          THE COURT:  Well, I don't know if we have to

11  do that since we did that before, but the -- I can

12  refer them back to my definition of "willful," but I

13  think they -- the word "or" ought to be in here so it's

14  clear that they're or -- and I can refer back to where

15  I had given them the definition of "willful."

16          MR. STEIGMAN:  That's fine, Your Honor.

17  Thank you.

18          THE COURT:  All right. We won't worry about

19  the special verdict forms, we'll work on that later on,

20  but I'm satisfied with this that Craig can go to work

21  on this.

22          Let's get the jury in and -- where's Debbie?

23          UNIDENTIFIED SPEAKER:  (Inaudible.)

24          THE COURT:  Well, somebody's got to get the

25  jury in.  Yes.

1          Here you are.  You can take this and work on

2    this.

3         (Pause.)

4          THE COURT:  Okay, you want to get the jury

5    in?

6          LAW CLERK:  This is -- I just reviewed this

7    case Your Honor.  I didn't have a chance to show --

8          THE COURT:  (Inaudible.)

9          LAW CLERK:  In this case --

10          THE COURT:  Yes, (unintelligible).

11       (Jury in at 8:56 a.m.)

12          THE COURT:  Okay.  Good morning.  We're all

13    set for the expert I guess.  Let's put him on the

14    stand.

15          MR. COFFEY:  Good morning, everyone.

16          At this time, I call Barry Nadell to the

17    stand.

18         DEFENDANT'S WITNESS, BARRY NADELL, SWORN

19          THE CLERK:  Please state your name and spell

20    your last name, and your city and state, for the

21    record.

22          THE WITNESS:  Thank you.

23          My name is Barry Nadell, -a-d-e-l-l.

24          I live in Chatsworth, California, which is a

25    suburb of Los Angeles.

1                        DIRECT EXAMINATION

2    BY MR. COFFEY:

3    Q.   Good morning.  I'm going to try to keep this very

4    brief.

5              MR. COFFEY:  So I have my -- I guess my only

6    exhibit.  I hope it's the last exhibit, the CV of Mr.

7    Nadell.

8              THE COURT:  What did we say about this?  700

9    is your series?

10             MR. COFFEY:  700 is my -- This is my first

11   one.

12             THE COURT:  Okay.

13             MR. COFFEY:  I think this is 700, so you can

14   put in a binder -- I don't have a binder for you.

15             THE COURT:  Yeah, thanks.  I'll get this to

16   you.

17             MR. COFFEY:  Yeah, I don't.

18             THE CLERK:  Okay.  We're going to call this

19   700.

20             MR. COFFEY:  Okay.  Thank you.

21   BY MR. COFFEY:

22   Q.   Now, first things first.

23        You're being paid for your time here?

24   A.   Yes, sir.

25   Q.   And how much have you been paid, approximately, so

1    far, for any of your expert reports or anything you've

2    done in this matter?

3    A.   I don't know exactly but it's somewhere between 10

4    and 15, or $14,000.

5    Q.   Okay.

6         What are you being paid for your time here today?

7    A.   For my time today it's $450 an hour.

8    Q.   Okay.

9         And where is your office located?

10   A.   My office is in Chatsworth, California.

11   Q.   Okay.

12        And you flew out here yesterday?

13   A.   Yes, sir.

14   Q.   Okay.

15        Tell the jury a little bit about your education.

16   A.   I graduated from Arizona State University and went

17   -- and became a investment counselor, as a stock

18   broker.

19        I then became an insurance agent, receiving a

20   chartered life underwriter's degree, and stayed as an

21   insurance agent, where I still maintain my license, but

22   started by business of background screening in 1994.

23   Q.   Okay.

24        And -- Is this the first time you ever testified

25   in federal court?

1    A.   Yes, it is.

2    Q.   And have you handled any other matters as an

3    expert in background screening?

4    A.   Yes, I have.

5    Q.   And let's talk a little about the experience

6    you've had, and how many background investigations,

7    searches, such as the subject matter of this matter,

8    that you've handled in your career.

9    A.   I started my business with my wife in 1994 to do

10   background screening, we thought strictly in Los

11   Angeles County.  However, by January of 1995 we were

12   also doing background screening in most other states as

13   our business quickly expanded because of the need back

14   then.

15        When I started my business it was just she and I.

16   It wasn't until four months later we hired our first

17   employee part-time but -- so my business included not

18   only trying to sell the concept to employers to do

19   background checks, but also going to the court, and

20   doing the research myself, and pulling reports, writing

21   reports, standing at a fax machine, making the copies,

22   filing the information, literally every part of the

23   possible business from the very beginning.

24   Q.   And through your career, how many background

25   investigations have you either personally done or done

1   through the companies that you've owned.

2   A.   I couldn't give you an exact number, however, our

3   firm grew dramatically to the date when I sold it,

4   which was -- I sold my company in June of 2006, and we

5   had done over several hundred thousand background

6   reports for employers all over the nation.

7   Q.   So you have a little experience in doing those?

8   A.   Yes, sir.

9   Q.   Okay.

10      Now, are you a licensed private investigator?

11  A.   Yes.  I'm a licensed private investigator in

12  California.

13  Q.   And have you -- are you an author?

14  A.   Yes, sir.

15  Q.   And what type of -- Have you authored anything in

16  the field of background investigations and, if so, tell

17  the jury what you have.

18  A.   Yes.  Early on I became a student of the laws that

19  surrounded background screening and started speaking to

20  human resource organizations, security organizations,

21  and the public about the laws dealing with background

22  screening.

23      I then started writing articles, which became

24  published in various human resources and security

25  magazines, and then eventually, at the urgence of my

1    wife, decided to write a book on the legal issues

2    surrounding background checks.  That book is called

3    "Sleuthing 101 - Background Checks And The Law," and

4    even to this date it is only book of its kind that

5    strictly deals with the legal issues of background

6    checks.

7    Q.   But just so we're clear, you're not an attorney

8    though, correct?

9    A.   No, I'm not.

10   Q.   Okay.

11        Now, have you ever helped draft any legislation in

12   background investigations and, if so, you -- tell the

13   jury about it.

14   A.   Yes, sir.

15        Being a student of the law and being in

16   California, which has its own laws, there was a law

17   passed that was a very obscure type of law that

18   affected all employers in the way that they did any

19   kind of background checking. I found the law early on,

20   right after it was passed, read it, and because of what

21   it said, called a couple labor attorneys to get further

22   interpretation.  They were not even aware of the law.

23        I then sat down and wrote an eight-page letter of

24   the problems of the law to the author, an assemblyman

25   by the name of Mr. Wright in California.  He took my

1   letter and sent a copy of it to the privacy rights

2   clearing house for their opinion.

3       They came back and said they agreed with 80

4   percent of what I said, and they invited me to draft

5   legislation to change the law that was already passed,

6   and I embarked on that, to draft the new legislation in

7   the state of California.

8       The legislation was written.  I went up to the

9   state and testified for that legislation.  That

10  legislation was passed and put into law, which changed

11  the laws in California.

12  Q.   Now, have you also -- are you a member of the

13  ASIS?

14  A.   As of today, I am not.  I had been a member of

15  ASIS for over 12 years, until I retired from the

16  industry.

17      ASIS was the originally the American Society of

18  Industrial Security, which members include private

19  investigators and individuals who were involved with

20  security, and so I had been a member for many, many

21  years.

22  Q.   At any time were you involved in helping draft any

23  industry-wide standards in regards to background

24  investigations?

25      If so, please explain that to the jury.

1    A.   Yes, sir.   In 2005 I was contacted by the high

2    board of ASIS telling -- asking me if I would join a

3    select group of individuals to help draft guidelines

4    for employers, in the way they do background checks.   I

5    agreed to do so, and so they formed a committee of, I

6    believe, about 20 to 25 individuals throughout the

7    nation, not just background screeners, but also human

8    resource professionals and some others, and we

9    conferenced over a period of a year to draft guidelines

10   for employers.

11        Those guidelines were published in 2006 and became

12   the standard through ASIS, who has well over 100,000

13   member organizations, for background screening.

14        I was then asked, a few years later, to be on the

15   committee to revise those guidelines, and the revised

16   guidelines were published in 2009.

17   Q.   And have you -- are you -- have you spoken on

18   background screening and its issues, at any national

19   conferences, or anything such as that?

20   A.   Yes.   I have spoken at maybe, I don't know, near a

21   hundred national conferences throughout the nation, for

22   various human resource associations, security

23   organizations.   I've spoken to the Bar association

24   meetings.

25        I've spoken to as little as 25 people in the room

1   and as many as 900 human resource professionals in the

2   room.

3   Q.   And have you ever been -- have you done any

4   Webinars?

5   A.   Yes, I have certainly done Webinars, when the

6   technology made it such that I didn't have to travel so

7   much.

8   Q.   And have you ever been on national TV for any

9   background screening issues?

10  A.   Yes.  I have been on a couple -- interviewed on a

11  couple cable channels, and I was actually interviewed

12  on ABC News with Peter Jennings on the subject of

13  background screening.

14  Q.   Okay.

15       And you've also -- In addition to the book you've

16  written, you've published articles?

17  A.   Yes, sir.  I've published many articles that have

18  appeared in HR Magazine, which is the magazine

19  published by the Society for Human Resource Management,

20  known as SHRM, which is the largest international

21  organization for human resource associates.

22       I've been published by PI Magazine.  I've been

23  published by a magazine that's written by ASIS, and

24  just numerous magazines throughout the area, that deal

25  with hiring of employees.

1    THE COURT:  Okay, the jury has his CV.

2    MR. COFFEY:  Okay.

3    THE COURT:  Anybody want to do any voir dire?

4    MR. MADSEN:  No, Your Honor.

5    THE COURT:  Okay.  I'll find him qualified to

6  give an opinion.

7    MR. COFFEY:  Okay.

8  BY MR. COFFEY:

9  Q.   Now, I'm going to cut to the chase on this.

10  613(a) or 613(b).

11    Does that give a couple of different standards of

12  what people can do, and if you could explain that to

13  the jury?

14  A.   Yes, sir.  Actually, it falls back before Section

15  613, where there's a Section of the Fair Credit

16  Reporting Act, and the Fair Credit Reporting Act is the

17  law that Congress passed to -- that deals with any kind

18  of background screening.

19    Section 606 says, except for Section 613, a

20  consumer reporting agency, which is a background

21  screening company, must verify the accuracy of the

22  report that they provide within 30 days.

23    We then go to Section 613.  613 says that if a

24  consumer reporting agency reports anything that may be

25  deemed negative, and I'm just going to summarize it

1    here, anything that may be deemed negative, they -- on

2    a consumer, they have a choice.

3         The first choice is to notify, and that's

4    613(a)(1), to notify the consumer that they're

5    reporting something, or sending a report, and who

6    they're sending it to.  The law does not state anything

7    more than that.

8         They don't have to send a copy of the report.

9    They don't have to say what's in the contents of the

10   report, nothing.  All they do is say, "We're sending a

11   report," and who we're sending it to.

12        613(a)(2) says that in lieu of doing that, they

13   can take additional steps, or they must take additional

14   steps if they're not going to do Section (1), and go to

15   the source of the information and verify the accuracy

16   of the source of the information before giving that

17   information to the end user of that report.

18        So they can either, one, notify the consumer that

19   they're sending out a report; or two, they can actually

20   go back to the source and verify the information before

21   they give that source to the third party.

22   Q.   Could you -- In your opinion, what is better?

23   Which is a better procedure to follow?

24   A.   As far as a better procedure to follow, I've

25   always been of the opinion that because the Fair Credit

1   Reporting Act requires every consumer reporting agency

2   or every employer to notify the consumer that a

3   background check may be done, and who is doing the

4   background check, that the consumer already knows that

5   there's going to be a background check done.  So

6   613(a)(1) is kind of meaningless.  They know a

7   background check's already going to be done, and they

8   know who it's going to be done for.

9       It seems to me, in my opinion, that 613(a)(2) is

10  far better for the consumer, because before they are

11  going to report any negative information, they're going

12  to verify it and make sure that the source has the same

13  information that they're going to be reporting.

14  Q.   And which procedure was (unintelligible) from your

15  review -- Well, you've reviewed numerous things in this

16  matter, documents and such; isn't that correct?

17  A.   Yes, sir.

18  Q.   And which -- what did Verifications do here?

19  A.   In this particular -- In this case, which is

20  according to their guidelines that I read, they did

21  613(a)(2), which is to verify the accuracy of the

22  information.

23  Q.   Okay.

24       And is that in accord with the industry standards?

25  A.   That is definitely in accord with the industry

1   standard, although I must say that there are some

2   companies that simply do the 613(a)(1) because it's

3   simpler, it's cheaper, and it's -- and they just do it

4   because it's in the law.

5        My opinion is 613(a)(2) is going that extra step.

6   Q.   So you think -- Do you think the actions of

7   Verifications were reasonable?

8   A.   I think the actions of Verifications were

9   reasonable and more than reasonable.  They acted

10  professionally in doing that.

11  Q.   Okay.

12       And do you think they were negligent in any way,

13  with the procedures that they followed?

14  A.   Not at all.

15  Q.   Now, one of the other things is the court systems,

16  and based upon your understanding of court systems in

17  the data, the field researcher, are you aware they went

18  out there to the site, out in Pennsylvania County?

19  A.   Yes.  Background screening companies are charged

20  with the duty of doing a background check and providing

21  the service that is requested by the employer.  The

22  employer is given a list of the various kinds of

23  background checks that can be performed.  They may

24  include reference checking, they may include license

25  verification, or a myriad of things.

1          In this particular case, as you are all aware, the

2     employer asked for a criminal check using a database

3     source, and so Verifications did exactly what they were

4     told to do and did a criminal check using a database

5     source.

6     Q.   And what is a "database source"?  Just explain

7     that a little to the jury.

8     A.   When I first started the business there were no

9     databases available.  The technology wasn't there.  And

10    so we literally went to the court for records.

11         Over the years -- Over the last five or six years,

12    or maybe a little longer, some companies actually went

13    to the courts because courts became more electronic,

14    and they were able to buy their tapes and records in

15    bulk, and so they would buy criminal records in bulk,

16    put it into their systems, and then sell access to that

17    information.

18         Those companies would continually update those

19    bulk records so that they would be more accurate than

20    just buying them once and never updating them again.

21         National Background Data was one of the first

22    companies to do that, and that was one of the -- that

23    was the company used in this case, where a background

24    screening company can go to that source.  That source

25    had millions and millions and millions of criminal

1    records, and they would access the information that was

2    in their files, but their files were -- only contained

3    the information that they received in bulk from the

4    courts themselves.

5    Q.   Now, I'm going to ask you a few other questions,

6    and to cut it -- cut down, I'm not going to take you

7    back through the whole procedure, and what your review

8    of the records are.  The jury knows everything such as

9    that.  I'm going to ask you things that get to the

10   heart of your expert opinion.

11       Did you -- Do you believe that Verifications

12   negligently failed to follow reasonable procedures to

13   assure maximum accuracy of the information?

14   A.   In my expert opinion, Verifications did not in any

15   possible way violate procedures.  As a matter of fact,

16   not every company has a procedure that requires

17   verification of the information before they report it.

18   Verification (phonetic) is one of the few professional

19   companies -- Well, there are more than a few but, the

20   larger companies that are very professional in nature,

21   to protect the public, have put systems in place to

22   require verification of the information before they

23   report it.  Verifications is one of those companies,

24   and because they have that system in place to verify

25   the information before they report the possibility of

1    an error.  I believe, sincerely, that they were

2    absolutely not negligent.

3    Q.   And do you -- Let me ask another question.

4         Do you believe that Verifications negligently

5    failed to maintain strict procedures to ensure that

6    whatever public information is likely to have an

7    adverse effect on the Plaintiff's ability to obtain

8    employment is reported, it is complete and up to date,

9    do you believe that they violated that?

10   A.   I -- No, they -- In answer to that long question,

11   they did not violate the strict procedures.  As a

12   matter of fact, they followed them to the letter.

13        Those procedures were specifically that if they

14   received information that could be deemed negative from

15   that database source, their strict procedure was to go

16   to the source, professionally pull the record from that

17   source, and then if the record was found to be the

18   same, then report it, and they followed those

19   procedures exactly.

20   Q.   I want you to assume that there's been testimony

21   that Mr. Hendricks said that in his experience, he

22   would have advised Ms. Adams with the -- knowing what

23   happened with Choice Point, to advise people about this

24   in the future, when she had -- went through background

25   searches.

1      Do you agree or disagree with Mr. Hendricks on

2  that, and if you could explain why and why not.

3  A.   Okay.  Being a reasonable person, it would make

4  sense that if something were to happen to me and I was

5  aware of it, and that it could happen again, is to

6  advise, you know, a potential employer of, you know,

7  that kind of a situation.

8      So without a doubt, I agree with Mr. Hendricks

9  that, you know, it would have been a much better result

10 if she would have advised that this could have been a

11 problem before it became a situation.

12 Q.   Now, that information -- Is it fair to say the

13 information of Ms. Adams will always exist in the NBD

14 data search?  That information in that database itself,

15 that will always be there when they run those

16 identifiers; isn't that correct?

17 A.   Yes, sir, that's correct, because even though MBD

18 gets updates from the court continually, the court

19 still has the name Deborah, spelled a little

20 differently, Adams, which is spelled correctly, with

21 the exact same date of birth, which is the only

22 identifier in the court system.

23     And by the way, they took other identifiers out of

24 the court systems because of the years of dealing with

25 identity theft.  So the fact that when you go to the

1    public access terminal, or whatever the court provides

2    for us to be able to research a record, the only thing

3    we see is a name and a date of birth, and I have been

4    on committees and written letters to courts on behalf

5    the National Association of Professional Background

6    Screening Companies because several courts have even

7    tried to take date of birth out of their records, and

8    if they took that out of the records, then all we'd

9    have is the name as an identifier, and so I've been on

10   committees and written letters to try to even save date

11   of birth, but other identifiers are not there.

12        So, you know, if a consumer knows that there may

13   be an issue, it would, to me, behoove the consumer to

14   advise everybody that there may be an issue up front.

15   Q.   Now, the other thing is, based on your experience,

16   are Social Security numbers in public access

17   information that's available to the public?

18   A.   Social Security numbers are not in public access

19   to the public.  Social Security numbers are used by

20   thieves and perpetrators of identify theft and, as we

21   all know, we all keep our Social Security numbers

22   private.

23        As a matter of fact, Social Security numbers were

24   used for various types of identity years ago and

25   everybody was free to give them out, but as we all know

1    today, you want to keep your Social Security number

2    private.

3              THE COURT:  The thing that's no longer

4    private is your mother's maiden name.

5              THE WITNESS:  That's true.

6    BY MR. COFFEY:

7    Q.   Just a couple more questions.

8         One of the other things that I wanted to ask you

9    about, now, I want you to assume that Anne Fortney

10   testified and said that NESC and Verifications were not

11   negligent and compliant with the FCRA.

12        Do you agree with her opinion?

13   A.   I agree absolutely with her opinion.

14   Q.   Now, there was testimony that Ms. Adams made

15   complaints to the FTC, and to date she said that

16   there's been nothing -- Well, Mary Poquette from

17   Verifications said to date they haven't been fined,

18   there's been no type of decree sent down, and Ms. Adams

19   also agreed that she never received anything showing

20   that they were fined, or anything such as that.

21        In your experience, is that relevant, and what

22   does it show, the fact that they haven't been fined?

23   The FTC has not found that they've done anything wrong;

24   is that correct?

25   A.   I don't know what part of the FTC would be

1    involved in that, but the fact that there has been no

2    fine, there's been no charge by a -- any governmental

3    body for wrongdoing here, certainly does say something.

4              MR. COFFEY:  I have no further questions.

5    Thank you very much.

6              THE COURT:  Mr. Kupinse?

7                    CROSS-EXAMINATION

8    BY MR. KUPINSE:

9    Q.   Morning, Mr. Nadell.

10   A.   Good morning.

11   Q.   I noticed in your testimony you referred, as many

12   experts, including Anne Fortney, seem to do, to section

13   numbers in the 600s.

14   A.   Yes, sir.

15   Q.   Are those the numbers of the Act, and not the

16   numbers that are in the U.S. Code?

17   A.   They're the numbers -- Yes.  They're the numbers

18   in the Act and not in the U.S. Code.

19        Section 613 in the U.S. Code is 15 U.S.C. 1681k.

20   Q.   I just wanted to clear that up a little bit for

21   the jury, so that when you refer to the 600 numbers,

22   you're talking about the same statutes that ultimately

23   the Court is going to charge the jury on?

24   A.   Yes, sir.

25   Q.   Okay.

1      And I guess your final conclusion was that you

2 agree with our expert that neither Verifications nor

3 National did anything incorrectly under the FCRA?

4 A.   With regard to this area of notification, as far

5 as the background search work, there was nothing wrong.

6 I do -- And if I may amend a little bit of what I said,

7 I do have an issue with regard to adverse action

8 notice, that the employer did not provide Ms. Adams an

9 adverse action notice in writing and -- because I

10 haven't seen that.

11 Q.   Okay.

12      And are there documents which you did not see in

13 connection with this case, some of the exhibits?

14 A.   No, I believe I've been given every single exhibit

15 and every single document.  I'm just saying that I

16 haven't -- not among them was any kind of a letter in

17 writing providing the required adverse action notice.

18 Q.   And again, with respect to the employer, who is

19 the technical employer of Ms. Adams, in this case?

20 A.   Well -- You asked who the technical employer was.

21 It is somewhat of a gray area of whether NESC was an

22 employment agency or the employer.

23      When I looked at the documentation that Ms. Adams

24 filled out, it certainly seemed to me that the forms

25 were designed to indicate that NESC was the employer of

1    record, although they were hiring her on behalf of a

2    third party where she would actually be working.  So

3    it's a little bit muddy.

4    Q.   Right.

5         And again, maybe you don't know this because I

6    recognize you were an expert for Verifications and not

7    for us, but do you know whether -- who had the final

8    say on any adverse action, if adverse action were to be

9    taken?

10   A.   What you're asking is who would have the final

11   say?

12   Q.   Yeah.  Who could take adverse action?  Was it

13   National or was it the company for which National was

14   hiring?

15   A.   I believe either company could have taken adverse

16   action.  The company that they were hiring for could

17   have said, "No," or NESC, if they learned that she was

18   unfit in any way, could have said, "No," and not placed

19   her with any company.

20   Q.   Okay.

21        If I told you that there has been testimony to the

22   effect that NESC did not have any authority to take

23   adverse action, and that the only party that could take

24   adverse action was Northeast Utilities, would that

25   affect your opinion on that?

1    A.    As I -- As I'm not an employment lawyer, I really

2    can't answer that one way or another.

3    Q.    Okay.  Let me show you Plaintiff's Exhibit 1.

4          That is a user agreement with -- between

5    Verifications and National; is it not?

6    A.    Yes, it is, sir.

7    Q.    Is that a standard agreement under the Fair Credit

8    Reporting Act?

9    A.    It does look standard -- fairly standard to me,

10   yes.

11   Q.    And is that an agreement required under the Fair

12   Credit Reporting Act, if you know?

13   A.    This agreement does have clauses in it that are

14   required under the Fair Credit Reporting Act, and it

15   does have clauses in it that would be specific to the

16   background screening company's relationship with their

17   end user.

18   Q.    Thank you.

19         And is it true that a credit reporting agency

20   itself is not allowed to take adverse action?

21   A.    Your question is, is a credit reporting agency

22   allowed to take adverse action?

23   Q.    Yes.

24   A.    The answer is, they are not allowed to take

25   adverse action.

1        As a matter of fact, in the adverse action notice
2   section of the Fair Credit Reporting Act, the adverse
3   action notice itself specifically says that that notice
4   must indicate that the consumer reporting agency is not
5   taking adverse action, and does not know why adverse
6   action may be taken.
7   Q.   Okay.  So, and stick with me on this, --
8   A.   Sure.
9   Q.   -- because it may be a little bit difficult.
10       So if I were to tell you that National is a credit
11  reporting agency, could National have taken adverse
12  action?
13  A.   If they're a credit reporting agency, no, they
14  could not have taken adverse action.
15  Q.   Thank you very much.
16  A.   Certainly.
17            THE COURT:  Mr. Madsen?
18            MR. MADSEN:   (Inaudible.)
19                  CROSS-EXAMINATION
20  BY MR. MADSEN:
21  Q.   Good morning, Mr. Nadell.
22  A.   Good morning.
23  Q.   You generated a report in connection with this
24  case, didn't you, on behalf of Verifications?
25  A.   Yes, sir.

1    Q.   In your report, you stated that this Court should

2    dismiss all of Deborah Adams' claims against

3    Verifications, didn't you?

4    A.   Yes, sir.

5    Q.   Including the negligent infliction claim, right?

6    A.   Yes, sir.

7    Q.   Negligent infliction claim is defined under what

8    body of law?

9    A.   I couldn't tell you offhand.

10   Q.   You ever practice law in Connecticut?

11   A.   No, sir.

12   Q.   You ever lived in Connecticut?

13   A.   No, sir.

14   Q.   You ever been retained in Connecticut in a

15   Connecticut-based case?

16   A.   No, sir.

17   Q.   Who dismisses the claims?

18   A.   Who dismisses the claims?

19   Q.   Yeah, who -- you said the claims should be

20   dismissed.

21        Who dismisses the claims?

22   A.   I would imagine a court dismisses a claim.

23   Q.   To your knowledge, did the Court dismiss the

24   negligent infliction claim?

25   A.   I have no knowledge of such.

1    Q.   Do you know whether Verifications asked this Court

2    to dismiss the negligent infliction claims?

3    A.   I have no knowledge of such.

4    Q.   Now, you agreed with Evan Hendricks on a portion

5    of his report, didn't you, in your report?

6    A.   On a portion, yes, sir.

7    Q.   Which portion?

8    A.   May I look at my report to remind me?  I have a

9    copy of it.

10   Q.   Yeah.

11           (Pause.)

12   A.   Sorry.

13   Q.   Take your time.

14   A.   I have to go through it again here.

15   Q.   Well, you know, I think --

16   A.   Yeah, I'm sorry.

17   Q.   You find it?

18   A.   I believe in the section I wrote, based upon the

19   Adams report, should Verifications obtain a felony or

20   misdemeanor hit from an NCRL, which is the database

21   name, Verifications is to advise the client of the

22   following, And that is correct.

23   Q.   I'm sorry.

24           Can you just describe what --

25   A.   They advised that additional research at the

1    jurisdiction level was required to complete this check.

2    Q.   Okay.

3         Why don't you turn to -- And what page are you

4    reading from?

5    A.   Page 8 of 21.

6    Q.   Okay.

7         Why don't you turn to page 17.

8    A.   Okay.  That will help.

9         And where, specifically, on page 17, should I

10   look.

11   Q.   Actually, that's where you begin your discussion

12   but --

13   A.   Okay.  I see.

14   Q.   -- if you turn to page 18, you have a sentence

15   which starts out:

16        "I very much concur with Mr. Hendricks' opinion."

17        Okay.  Can you --

18   A.   Yes, sir.

19   Q.   Just identify in your own words what it was that

20   you agreed with Mr. Hendricks on, where you very much

21   concurred with him.

22   A.   Well, once again, in my belief that NESC -- I'm

23   sorry -- NECS was the employer of record --

24             MR. COFFEY:  Well if you don't object, we

25   need a side-bar.

1             THE COURT:  Okay.  Come up.

2        (At side-bar:)

3             UNIDENTIFIED SPEAKER:  That's exactly what

4    Your Honor said not to talk about --

5             THE COURT:  Wait a minute.  Wait a minute.

6             UNIDENTIFIED SPEAKER:  (Inaudible.)

7             UNIDENTIFIED SPEAKER:  (Inaudible.)

8             THE COURT:  All right.  I got to send you

9    back.  It's going to take a couple minutes.

10        (End of side-bar.)

11        (Jury out.)

12             THE COURT:  Okay.

13             Defense state the basis of the objection.

14             MR. COFFEY:  Yes, sir.

15             I would just say based on the findings in the

16   case, it says:

17             "I very much concur with Mr. Hendricks'

18             opinion regarding NECS and their duty to

19             follow adverse action procedures before they

20             put a dagger through the heart of her chances

21             for the NE job."

22             Now, that goes right against the finding, and

23   that's why I kept Mr. Nadell away from any discussion

24   between NECS, and the ruling of both Your Honor and

25   Judge Hall about that they're a consumer reporting

1    agency.

2              THE COURT:  Yes.

3              MR. COFFEY:  So this would seem to -- It

4    would really seem to muddy that issue, and I thought,

5    for what we were trying to focus on the issues here, I

6    thought Your Honor wanted us to stay away from that,

7    and that's really between Attorney Kupinse and myself

8    in a subsequent trial, these issues.

9              THE COURT:  Well, to some extent you're

10   correct, but there was some testimony earlier, and I

11   thought it was on your exam but -- let me -- or maybe

12   it was on Mr. Kupinse's exam, that a consumer reporting

13   agency may not take adverse action.

14             MR. KUPINSE:  That's exactly the point, Your

15   Honor.

16             I asked Mr. Nadell, and I suspect if we ask

17   him out of the presence of the jury, if he thinks that

18   my client was a consumer reporting agency, I'm going to

19   guess he might say "No," but --

20             THE COURT:  Well, I suppose he would because

21   you already said that.

22             MR. KUPINSE:  Well that's the problem.  He

23   has to assume that my client is a consumer reporting

24   agency, --

25             THE COURT:  Yes.

1         MR. KUPINSE:  -- and once he has to assume

2    that my client is a consumer reporting agency, then he

3    cannot come to the conclusion that Mr. Masden

4    (phonetic) is trying to get him to come to, namely

5    that, in fact, my client could take adverse action.

6    That's why I asked him, "If you assume that my client

7    is a consumer reporting agency, could they take adverse

8    action?", and he has to say "No" to that.

9         THE COURT:  As I recall --

10        MR. KUPINSE:  And now Mr. Masden's trying to

11   get him to say "Yes" to some things my clients could

12   do, as far as an adverse action.  That's exactly the

13   problem.

14        THE COURT:  As I recall the testimony of the

15   other experts, and I recall it pretty well, I think,

16   the adverse action that everybody was talking about at

17   this point was taken by Northeast Utilities.

18        MR. KUPINSE:  Well, that's another issue.

19        THE COURT:  That's the only entity that could

20   take adverse action.  I thought we -- And the experts,

21   I think, agreed with that, where you had testimony from

22   both of them, that Northeast Utilities was the person

23   taking the adverse action, and that's why I'm concerned

24   about this.

25        Now, let me hear your question to him and let

1   me -- I'll rule on it.

2   BY MR. MADSEN:

3   Q.   Yeah, was there -- Did you, in fact, agree with

4   Mr. Hendricks in connection with a portion of his

5   report?

6   A.   Yes.

7   Q.   Okay.

8        Can you please indicate what portion of his report

9   you agreed to?

10          THE COURT:  Now, is this -- We have a problem

11  here because the jury has gotten curriculum vitae from

12  these experts.  I have not allowed the reports to go

13  into evidence at all, not going to the jury.

14          So this witness, I don't know how he can

15  testify here because I'm not going to let him testify

16  about the report.  He can only testify about Mr.

17  Hendricks' testimony.  He didn't hear Mr. Hendricks'

18  testimony.  So I don't know how he's going to answer

19  the question.

20          MR. MADSEN:  But he -- Your  Honor, he based

21  his report on materials that he had reviewed, and his

22  testimony today is -- and his -- the opinion he's

23  rendered today is based on materials that he reviewed.

24          THE COURT:  Yeah, but I don't --

25          MR. MADSEN:  He testified he disagreed --

1          THE COURT:  -- I don't think you base your

2     opinion on Mr. Hendricks?

3          THE WITNESS:  No, sir, I don't.

4          THE COURT:  Okay.

5          THE WITNESS:  I just agreed with what he

6     said --

7          THE COURT:  Well that's the area -- that's

8     the area we may not be able to get into, yes.

9          Let's make this question very specific, then

10    I can rule on it.

11          MR. MADSEN:  Okay.

12    BY MR. MADSEN:

13    Q.   Do you understand in this case that NESC is a --

14    for the purposes of this case, NESC is a consumer

15    reporting agency?  You understand that, correct?

16    A.   I understand that as of today, yes.

17    Q.   Okay.

18          THE COURT:  That that's the Court ruling.

19          THE WITNESS:  Yes, sir.

20    BY MR. MADSEN:

21    Q.   Okay.

22          And did you, in fact, render an opinion with

23    respect to whether NESC met it's obligations as a

24    consumer reporting agency?

25    A.   No, I did not.

1   Q.   Didn't you, in fact, agree with Mr. Hendricks that

2   NESC had a duty to follow adverse action procedures

3   before they, "Put a dagger through the heart of her

4   chances for the NU job?"  Didn't you agree with that?

5   A.   I agreed with that.  I agreed with that prior to

6   any knowledge of them being a consumer reporting

7   agency.

8           THE COURT:  Yeah, I'm not going to let him

9   get into that before the jury.

10          I'm going to sustain the objection.

11          MR. MADSEN:  Okay.

12          THE COURT:  You can have an exception.

13          You ready to have them bring back?  Let's get

14   them out of here so we can get down to it.

15          By the way, we have a problem.  Let me

16   acquaint you so you can start thinking about with what

17   I'm going to be doing before I let you do your

18   summations to the jury.

19          Attorneys, in their summations, very often

20   refer to the special verdict form, the interrogatories,

21   and I expect maybe the attorneys will, so we've go to

22   agree on those interrogatories.  I think I find nothing

23   wrong, from my viewpoint, with the interrogatories

24   submitted to me this morning by the Plaintiff, with the

25   changes the Plaintiff has made in them.  So I want you

1    to take that.

2            Have they all got copies of that?

3            MR. STEIGMAN:  Yes, Your Honor.  I gave

4    copies this morning.

5            THE COURT:  All right, because that's what

6    we'll work from.  We'll work quickly from it before we

7    start the summations.

8            Okay, bring the jury in.

9        (Jury in at 9:44 a.m.)

10           THE COURT:  Yeah, go ahead.

11           MR. MADSEN:  Thank you, Your Honor.

12               CROSS-EXAMINATION (CONTINUED)

13   BY MR. MADSEN:

14   Q.   Mr. Nadell, in your report you made reference to

15   the situation that arose with Ms. Adams and Choice

16   Point in 2006, didn't you?

17   A.   Yes, sir.

18   Q.   And, in fact, you made reference to it during your

19   testimony this morning, didn't you?

20   A.   Yes, sir.

21   Q.   Now, the FCR -- the Federal Fair Credit Reporting

22   Act doesn't impose obligations for employees to self-

23   report a crime they didn't commit, does it?

24   A.   Not at all.

25   Q.   So is it your testimony that had Deborah Adams

1   self-reported this crime that she didn't commit, that

2   this whole situation might not have arisen?

3   A.   Your question calls for a conclusion based on

4   hindsight, which is going to be very, very difficult.

5   Q.   I thought hindsight was 20/20, Mr. Nadell.

6   A.   Well, it's, you know -- I think, first of all, the

7   background screening would have been requested.  It

8   would have been done.  The findings at the Court would

9   have still be reported.  Verifications is a consumer

10  reporting agency and is required to report information

11  that they find, and so consequently, you know, the

12  report would have not changed.  However, in the -- SC

13  -- I forget the name, would have been aware that

14  something like that would have occurred, and maybe some

15  other things would have happened, because they were

16  aware that a court record would have some information

17  that might not be accurate.

18       So I think nothing would have changed with

19  Verifications because they're required to report what

20  they found, but the employer or the employment agency

21  and the employer may have been aware that something was

22  there, in advance.  So it might have changed some of

23  this, you know, happening.

24  Q.   Let me see if I understand you.

25       So if Deborah Adams informed National Engineering

1    that --

2    A.   Okay.

3    Q.   -- that a false report had been generated a year

4    before, on an individual with a different Social

5    Security number and a different spelling to her name,

6    and living in a different state, if she had done that,

7    and that information was passed to Verifications, is it

8    your testimony that Verifications still would have

9    produced the report to National Engineering, which

10   identified the wrong Deborah Adams as a criminal

11   history related to our Deborah Adams?  Is that your

12   testimony?

13   A.   They would have still produced a report -- they

14   would have still produced a report.

15   Q.   That report.

16   A.   They would have still produced a report -- it's

17   how the report was used and verified that would have

18   been different.

19   Q.   So Verifications would still -- still would have

20   been obligated to produce that inaccurate report.

21        Is that your testimony?

22   A.   Yeah, they still have to report what the court

23   says because, once again, it's -- there are probably

24   many Deborah Adams' with the common name and the same

25   date of birth out there somewhere, and who's to really

know that this is that particular Deborah Adams, --

Q.   That's exactly my --

A.   -- with the information that the court provides.

Q.   That's exactly my point.

Who is to know who is the real Deborah Adams?

A.   Uh-huh.

Q.   Isn't that what background check agencies are for, to figure out who is the real Deborah Adams?

A.   Background screening companies report the information that is given to them by the court.  They do not analyze that information in any way.  They are a reporting agency.

Q.   Mr. Nadell, are you aware that the year after this situation arose with Verifications, that Verifications again issued the same exact false report on Deborah Adams in connection with another employment application she made?  Are you aware of that?

A.   Yes.

Q.   And is that just something she's going to have to deal with for the rest of her life?  Is that your testimony?

A.   Until -- Will she have to deal with it for the rest of her life?  Until the court record adds additional identifiers that separates her out from the Deborah Adams that that court record shows, yes, she

1  will have to deal with this with every potential

2  employer that does a background check with any

3  background screening company, and that's my opinion.

4          MR. MADSEN:  I have no further questions.

5          THE COURT:  Anything else?

6                    REDIRECT EXAMINATION

7  BY MR. COFFEY:

8  Q.   Now, the national database is not kept by

9  Verifications or NESC, isn't that correct?

10  A.   That's correct. It's a separate company.

11  Q.   I have no further questions.  Thank you.

12          THE COURT:  Okay.  Thank you very much.

13          I'm going to send you back and then we're

14  going to go forward as soon as we can with the

15  summations and the charge.  Leave everything here if

16  you want to, it's up to you, or you take your notes

17  back with you.  Leave whatever you want to leave or

18  take back with you whatever you want to take back.

19      (Jury out at 9:51 a.m.)

20          THE COURT:  Okay.  We're ready to get into

21  the special verdict form -- the interrogatories, which

22  I want to use the Plaintiff's version on.

23          Before I do that, let me make a ruling so

24  it's very clear for the summations, what you can do and

25  what you can't do.

1          Defendant National made a motion for the

2     Plaintiff to -- for the Court to eliminate Plaintiff's

3     Count Fourteen, and I thought the arguments set forth

4     in National's motion were very clear and I agreed with

5     them completely.

6          The Defense has filed a brief in -- I mean,

7     sorry, the Plaintiff has filed a brief in opposition to

8     the Defense motion on Count Fourteen.  The Plaintiff

9     wants to have the cake and eat it too.

10          Judge Hall was ignored by the Plaintiff's

11     brief in opposition.  Judge Hall went beyond saying the

12     joint user was not part of the Congress's intention in

13     the statute.  She found that National is a reporting

14     agency, not a user, and she's is very clear on that.

15          So I'm not going to let them find, under the

16     circumstances of this case, that there was any duty on

17     the part of National Engineering Service to worry about

18     informing anybody before taking adverse action because

19     they never took any adverse action under the definition

20     of that, as I see it in the case and as Judge Hall saw

21     it.  So Count Fourteen is still out.

22          All right.  Let's get to the special verdict

23     form --

24          MR. KUPINSE:  If Your Honor please, before we

25     get into that, may we just present a motion for --

1    written motion for judgment as a matter of law with

2    respect to Plaintiff's Counts Two and Four?

3              THE COURT:  Yes.  Yes.

4         (Pause.)

5              THE LAW CLERK:  Do you want me to change the

6    organization as he did, first actual damages and

7    punitive damages as to 1681e, --

8              THE COURT:  Uh-huh.

9              THE LAW CLERK:  -- punitive as to 1681k,

10   and then actual damages on negligent and special

11   (inaudible) and that would also need a line, should the

12   Court award.

13             THE COURT:  Yes, you need a line on punitive

14   damages.

15             Right.  I'm going to send Counts Two and Four

16   to the jury.  I can rule upon this motion for judgment

17   as a matter of law later, and I don't believe that I

18   will rule in their favor, but the Plaintiff can

19   certainly respond to the motion for judgment as a

20   matter of law in Counts Two and Four.

21             MR. MADSEN:  Yes, Your Honor.

22        (Pause.)

23             THE COURT:  All right.

24             Anybody got any problems with the Plaintiff's

25   special verdict form version?

1          MR. COFFEY:  Yes.  Yes, I do, Your Honor.

2          You want me to start from page 1, and that

3    would probably be counsel for NESC.

4       (Counsel confer.)

5          THE COURT:  Now, they took out Part B.

6          MR. COFFEY:  Your Honor, I don't know why

7    Part b., and here's one of the -- of the holding of

8    this case.

9          (Unintelligible):

10          "Has the Plaintiff proven by a preponderance

11          of the evidence that the Defendant" National

12          -- "Verifications reported inaccurate

13          information about the Plaintiff?"

14          That's a question, actually, that I think has

15    to be one of the unintended consequences of the holding

16    so far, of Judge Hall, is that the publication would be

17    -- we're both CRAs.  So if I share information with

18    another CRA, I do not believe that that would be

19    publication, because the publication is not among CRAs.

20          I think there's -- they have to show that I

21    published it, my client published it, and we're not

22    jointly and severally liable on that, and I think it

23    has to be included in my question.

24          THE COURT:  Well I don't see why we don't

25    follow the rule that we want to get all the possible

1    information we can get out of the jury.  This is a

2    special verdict form.  So I'm surprised that b. got

3    taken out.  I -- This is a -- I didn't know it was

4    going to be taken out until I saw this version this

5    morning.  So I'm perfectly happy to leave it back in.

6            That would apply to the later one, also, not

7    just 1.b. on --

8            MR. MADSEN:  I just want to confirm, he --

9    Attorney Coffey was just speaking on behalf of

10   Verifications.

11           Count One refers to National Engineering.

12   National Engineering clearly reported it.  They've

13   admitted they reported it.  It's undisputed that they

14   reported it.

15           So I don't see why the jury has to rule on

16   that with respect to Count One.  To the extent that --

17           THE COURT:  I'll let you argue that in your

18   summation, that they've admitted that, but I'll have to

19   get a jury finding because you have a jury finding also

20   on Verifications, which is 2.b. on page 5.

21           I don't think we should make a distinction

22   between the two Defendants.

23           Other than that, leaving those two things in,

24   does anybody else have any problems with the

25   Plaintiff's version?

1          MR. MCPHERSON:  I'm sorry, Your Honor, I did

2     not hear that.

3          Could you repeat that, Your Honor?  I didn't

4     hear it.

5          THE COURT:  I just said, does anybody have

6     any other problems with the Plaintiff's version?  I'm

7     going to use the Plaintiff's version as the

8     interrogatories unless somebody has a problem with it.

9          I want you to know, as you do your

10    summations, what it is that the jury is going to be

11    reviewing and answering because very often you refer to

12    those in your summations and take the juries through

13    what you think they ought to answer, and I'll permit

14    that to be done if Counsel decide to do that, so I want

15    to make sure you agree with the way that the special

16    verdict form is going to go to the jury.

17         MR. COFFEY:  The only other thing I would

18    talk about on the NIED claim, Your Honor, --

19         THE COURT:  Yes.

20         MR. COFFEY:  -- I would just ask -- I mean --

21    isn't that one that there is -- there has been a

22    discussion throughout this case that even Attorney

23    Madsen, under the questioning of their experts asked,

24    "Are you saying that Ms. Adams didn't do anything

25    wrong?"

1          On the negligent infliction of emotional

2    distress, it would we not be entitled to a comparative

3    trial element of that, or duty to mitigate on that

4    charge itself?

5          THE COURT:  You're entitled to a duty of

6    mitigation, yes.  Always you're entitled to mitigation

7    on negligent infliction of emotional distress.

8          MR. COFFEY:  So if I -- I would ask if we

9    could add that, the duty to mitigate, in the charge, as

10   well as have something on the special interrogatories

11   reflecting that --

12         THE COURT:  You better tell Craig what you

13   want, and then we'll consider that that's going to be

14   done.  You may consider that's going to be in there

15   because mitigation, I always put in.

16         MR. MADSEN:  Your Honor, to the extent -- I

17   was not even aware, you know, based on the way this

18   trial has been conducted, that Defendants were

19   continuing to assert special defenses for which they

20   have the burden -- the duty to mitigate.

21         That being the case, I move for judgment as a

22   matter of law that they have failed to meet the

23   standard to even present a failure to mitigate to the

24   jury --

25         THE COURT:  I can't recall any evidence --

1      MR. MADSEN:  (Inaudible.)

2      THE COURT:  -- given by anybody on

3   mitigation.  Any -- She was not asked, on her exam,

4   what she could have done to avoid the distress that she

5   had.

6          Now, of course, they're going to be able to

7   argue, and they can argue, that as a single mother

8   bringing up a obviously pretty wild character, that she

9   had other reasons for emotional distress.  I certainly

10  would let them argue that.  But that doesn't need an

11  interrogatory.  That's not mitigation.

12         I think what I'll do is sustain your

13  objection based upon the evidence status in this case,

14  and not put in the normal mitigation that I would put

15  in, since there's been no evidence of mitigation claim

16  being pressed by the Defendants.

17     MR. COFFEY:  Well, Your Honor, if I could?  I

18  think there was a discussion of mitigation.  The

19  mitigation is that if -- To get to the jury she has

20  said that she did not tell anyone about this thing that

21  exists out there.  Her own expert spoke about -- Mr.

22  Hendricks spoke himself that she should have mitigated

23  by telling people about this.

24         So I think that goes to the heart of

25  mitigation.

1           MR. MADSEN:  That -- Mitigation -- That comes
2    up after the fact.
3           THE COURT:  I agree, I agree with you.
4           All right, I'll adhere to my ruling.
5           Okay, let's get to work and are you ready to
6    go, Mr. Madsen?
7           MR. MADSEN:  Sure am, Your Honor.
8           THE COURT:  Okay.
9           MR. MCPHERSON:  Your Honor, just one more
10   thing.
11          On the 1681k counts against National.
12          THE COURT:  Yes?
13          MR. MCPHERSON:  Again, I believe there should
14   be a joint interrogatory about whether National
15   furnished the report and also compiled public records,
16   in line with the statutory language.
17          THE COURT:  Yes, and I've ruled against you
18   on that.  I'm not going to send that issue to the jury.
19   I found that issue in favor of the Plaintiff.
20          MR. MADSEN:  Your Honor, the one indulgence I
21   would ask is when I give my summation I would like to
22   have a special -- the final version of the special
23   verdict form.
24          Can we just have that printed out?
25          THE COURT:  Will I print out the Plaintiff's

1    -- I got a copy of it here.

2              THE LAW CLERK:  That's -- I'll get it.

3              MR. COFFEY:  And, Your Honor, if -- while

4    it's getting printed, if I could be excused for a

5    minute?

6              THE COURT:  Sure.

7              MR. COFFEY:  Thank you.

8              MR. KUPINSE:  And before Mr. Coffey leaves,

9    if I could just catch him at the door, do I understand

10   that --

11             THE COURT:  He may be in a hurry.

12             MR. COFFEY:  That's all right, I (inaudible).

13             MR. KUPINSE:  -- do I understand that Your

14   Honor is going to charge that the jury can determine

15   punitives?

16             THE COURT:  Yes, because the cases are so

17   clear.  The Court's have interpreted that section of

18   the federal -- of the Fair Credit Reporting Act not to

19   give that burden of determining punitive damages to the

20   Court, but make the Court a reviewer of what the jury

21   does.

22             In other words, the Courts have consistently

23   held, including Judge Covello, my colleague here, and

24   the Second Circuit in reviewing Judge Covello's

25   decision, has held that the intention of Congress was

1    merely to have the Court have a final say over possible

2    excessive punitive verdicts, but not to take away from

3    the jury, the right to determine the amount of punitive

4    damages in the initial phase.  While we have only a

5    reviewing --

6            MR. KUPINSE:  We have not had an opportunity

7    to review that law, but even without it, I recognize

8    what Your Honor -- the position Your Honor has taken

9    and I just note an exception, please.

10           THE COURT:  Yes, there are three cases, not

11   just one, but every case we've been able to find is

12   consistent in saying that the Court should not take

13   that away from the jury, and I'll give you an

14   exception.

15           MR. KUPINSE:  Thank you, Your Honor.

16           If I, too, may be excused for a moment, Your

17   Honor?

18           THE COURT:  Yes.

19       (Pause.)

20           THE CLERK:  Your Honor, the jury's all set

21   with lunches.  I had Cheryl -- Cheryl and I went and

22   spoke with them earlier this morning and made their

23   selection.

24           THE COURT:  Fine.  Good.  Thanks.

25       (Pause.)

1           MR. MADSEN:   Your Honor is just -- is there

2     ordinarily something that goes to the jury which asks

3     them to just verify that it's a unanimous verdict, or

4     does that just happen when they come in?

5           THE COURT:   That happens when they come in.

6     I ask them.  I ask the foreperson, "Ms. So-and-So, has

7     the jury reached unanimous answers to the

8     interrogatories?"

9           MR. MADSEN:   Okay.

10           THE COURT:   And they tell me that.  I will be

11     charging them, of course, as we said several times,

12     that they've got to all agree on each element.  They

13     can't agree on Element A, half of them, and half of

14     them agree on Element B, and combine them.  They've got

15     to give separate consideration to everything, each

16     claim, and reach unanimity on each finding that they

17     make.

18           MR. MADSEN:   Okay.

19         (Pause.)

20           THE COURT:   Craig, I see you finally gave up

21     discrimination.  You put "Foreperson" instead of

22     "Foreman."

23           THE LAW CLERK:   Getting to be a liberal guy.

24           THE COURT:   Okay.

25           Mr. Madsen, look carefully at the special

1    verdict form and make sure it's okay, and then you'll

2    have a copy of it as you give your summation.

3            THE LAW CLERK:  Make sure the substantive

4    charges have all the pages (inaudible) copy problems

5    (inaudible).

6        (Pause.)

7            THE LAW CLERK:  Judge, this came up before.

8    We have the definition for "consumer report" in here,

9    right?  Judge Hall already found that.  She found that

10   they are consumer reports.

11           THE COURT:  Uh-huh.

12           THE LAW CLERK:  So the attorneys brought this

13   up and you said that it should stay in --

14           THE COURT:  Yeah, well I talked to counsel

15   about that.  I felt -- I was asked to rule on it and I

16   thought I had taken it out, but let's see what counsel

17   think I did.

18           THE LAW CLERK:  The Judge wants to confirm

19   that "consumer reports" should stay in (inaudible).

20           MR. COFFEY:  Yes, I think it should stay in.

21   Yes, it is --

22           MR. MADSEN:  Yeah, we did take exception on

23   that.

24           THE COURT:  Yeah, I thought so.

25           Okay, we ready to go, Mr. Madsen?

1          MR. MADSEN:  Your Honor, if I could have a

2     couple minutes.

3          THE COURT:  Okay.  Let me know when you're

4     ready to go.

5          MR. STEIGMAN:  (Inaudible.)  The only thing

6     I'm noticing is that the references:

7               "If you answer "Yes" to all the questions, be

8               sure to answer the questions in Section 3."

9          THE COURT:  Yes.

10         MR. STEIGMAN:  It needs to be modified

11    (inaudible) now doing that --

12         THE COURT:  I'm sorry, what are you asking?

13         MR. STEIGMAN:  The -- On the interrogatories,

14    if the jury answers "Yes" to all the questions, there's

15    a direction to go to Section 3.

16         THE COURT:  Yes.

17         MR. STEIGMAN:  You have (inaudible) damages.

18    The section -- letters in Section 3 need to be modified

19    to correspond to the newest version.  That can be done.

20    We just need to make sure that it happens.

21         THE COURT:  You understand what he's talking

22    about, that I don't?  Well, what's the problem?

23         THE LAW CLERK:  The way this was changed to,

24    there's no distinction in this question, between which

25    law is being violated -- which -- because of which

1  violation damages are being awarded, right?  So if --

2  If, say, one Defendant violated 1681e and one Defendant

3  violated 1681k, there's no distinction.  I don't know

4  of there needs to be a distinction.

5          THE COURT:  Well, I thought that the answers

6  they give to the prior ones will enable us to figure

7  out what --

8          THE LAW CLERK:  Right.

9          THE COURT:  -- without --

10          THE LAW CLERK:  I just want to point that

11  out.  I think it's fine.

12          THE COURT:  I think it's --

13          THE LAW CLERK:  I think it's fine, but --

14          THE COURT:  I think it's --

15          THE LAW CLERK:  -- just wanted to bring it to

16  your attention.

17          THE COURT:  But you got his point, whatever

18  it is?

19          THE LAW CLERK:  Yes, sir.

20          THE COURT:  Okay.  All right.

21          I guess we can bring the jury in.

22          UNIDENTIFIED SPEAKER:  Going to make it?

23          MR. COFFEY:  Yep.

24      (Jury in at 10:15 a.m.)

25          THE COURT:  Okay.  Now, the first thing for

1     me to tell you is to put away the notebooks.  The

2     evidence is all in.  The notebooks are designed for

3     evidence only, nothing else.  You're not going to put

4     anything in your notebooks about the summations or

5     about my charge because you'll have a copy of the

6     charge.

7              Now we've reached your important phase of the

8     case.  The case is now your case.  What you do is this:

9              You listen very carefully to the summations.

10    Keep in mind the summations are not evidence; they're

11    the counsels' statement as to what they believe they've

12    proved by the evidence in the case.  Pay close

13    attention to them because I think you'll find those

14    summations helpful.

15             Then we will get to my charge, and I will

16    charge you, as I said, three aspects of the case:

17             The standard charge, which is mostly how to

18    judge credibility of witnesses, which you've already

19    been considering;

20             Secondly, the substantive law charge.  You'll

21    have five copies of that in your deliberations; and

22             thirdly, the special verdict form which will

23    be the essence of the interrogatories.

24             And I'm quite confident that in their

25    summations the attorneys will take you though those

1    interrogatories and tell you how they think they ought

2    to be answered.

3            And then when I charge you, you will have

4    copies of those interrogatories, and we'll go over them

5    together before you start your deliberations.

6            The Plaintiff has the burden of proof by

7    preponderance of the evidence, so the -- Mr. Madsen

8    will open first for the Plaintiff.

9            MR. MADSEN:  Thank you, Your Honor.  If you

10   don't mind, I'm going to just reposition this.

11           THE COURT:  Whatever you want to do.

12           MR. MADSEN:  Ladies and Gentlemen of the

13   jury, Your Honor, Counsel, may it please the Court.

14           I stood before you on Tuesday and told you

15   that I was honored to represent Deborah Adams at this

16   trial.  Now you know why.  Deborah is one of our

17   country's unsung heroes.  She's a woman who has worked

18   hard to support her small family, has persevered and

19   endured the difficult circumstances that confront a

20   single mother earning a modest income, and has done so

21   with honor and integrity.

22           She is a very deserving client, and I

23   consider myself fortunate as a lawyer to have had the

24   privilege of representing her.

25           Now, I'm going to have a few words to say

1    about the larger issues that loom in this case, but

2    right now, I want to get to the nuts and bolts of our

3    claims, and the substantial evidence that support each

4    and every element of those claims.

5         Deborah has asserted claims under the Fair

6    Credit Reporting Act against both Verifications and

7    National Engineering.  The Judge will soon instruct you

8    as to the legal requirements of those claims.

9         Before you begin your deliberations, I want

10   to draw your attention to the pertinent evidence you

11   have heard, which demonstrate that both Defendants

12   violated this very important statute.

13        Now, in deciding this case, you are to make

14   all of your determinations by a standard known as

15   "preponderance of the evidence."  Recall, if you will,

16   the Judge's explanation at the beginning of this trial,

17   by reference to the scale on the bench right there.  If

18   the evidence for Deborah Adams is placed on one side of

19   the scale and the evidence for each Defendant with

20   respect to each claim is placed on the other, you must

21   find for Deborah Adams if the scale tips in her

22   direction, even if it tips ever so slightly.

23        There are a total of eight claims that you

24   must decide, five against National Engineering and

25   three against Verifications.  You will be presented

1  with a special verdict form which first addresses the
2  five claims against National Engineering, then turns to
3  the three claims against Verifications, and then asks
4  you, if appropriate, to award damages.
5        Now, everyone has endeavored to keep this as
6  simple as possible, but these claims just don't seem to
7  roll off the tongue with great ease.  I will do my best
8  to keep this as straightforward as possible.
9        Now, Section 1681e(b) of the Fair Credit
10  Reporting Act requires that, and I quote:
11        "Whenever a consumer reporting agency
12        prepares a consumer report, it shall follow
13        reasonable procedures to assure maximum
14        possible accuracy of the information
15        concerning the individual about whom the
16        report relates."
17        Deborah Adams claims that Verifications and
18  National Engineering violated this section.  She claims
19  that National Engineering willfully and negligently
20  violated this section, so that comprises two counts,
21  one for willful and one for negligent.
22        She claims that Verifications negligently
23  violated the same section, thereby comprising one
24  count.
25        I will start off with the claim against

1    National Engineering for willful violation of this

2    provision.  This will be presented to you in the first

3    four questions on the special verdict form.

4            First, you are asked to determine, in

5    Question A, whether National Engineering willfully

6    failed to follow reasonable procedures to assure

7    maximum possible accuracy of the information regarding

8    the Plaintiff.

9            Now, bear in mind that the term "willful" is

10   a legal term which is not limited to the ordinary,

11   conventional meaning that we are all accustomed to,

12   such as consciously, deliberately intending.  As the

13   Judge will instruct you, the term "willfulness"

14   includes a reckless disregard of National's duties

15   under the law.

16           We maintain that the evidence presented

17   through trial easily demonstrates that National

18   Engineering was, at the very least, in reckless

19   disregard of its requirements of Section 1681e(b) of

20   the Fair Credit Reporting Act.  Again, that section

21   requires that National follow reasonable procedures to

22   assure maximum possible accuracy.

23           Not only did National not follow reasonable

24   procedures to assure maximum possible accuracy, the

25   evidence has established that National had no

procedures, much less reasonable ones, to assure that
it reported information that had maximum possible
accuracy.

Recall that Jack Madden, president of sales
for National Engineering, testified that he was not
familiar with the Fair Credit Reporting Act, and that
the company did no training of its sales force to
ensure that they followed this law.

Chris Sullivan, the account manager of
Defendant National, who passed on the erroneous
background report to Guidant on May 8th, without taking
any action to verify the accuracy of the information
by, for instance, calling Deborah to hear her comments
before the damage was done, he also admitted that he
was not familiar with the Fair Credit Reporting Act.

Now, beyond National's complete failure to
abide by its statutory obligations, its actions also
illustrate the recklessness of its conduct.

Defendant National knew that Deborah lived in
Connecticut and had previously resided in Springfield,
Massachusetts.  It was in possession of her resume,
Exhibit 500 in this case, which indicated that she had
lived and worked in Connecticut and Massachusetts back
to 1998.

National knew that Deborah had worked in

1    various jobs in Connecticut for the previous ten years,

2    many of which would clearly have required background

3    checks, like the time she spent working at the Royal

4    Australian Navy and the Transportation Security

5    Administration of the Department of Homeland Security.

6              Would that have raised a red flag as to

7    whether or not she had committed a felony in the 1990s?

8              Defendant National also knew that Plaintiff's

9    named was spelled D-o-b-o-r-a-h (sic) and not D-e-b-r-

10   a.  Yet, when confronted with a consumer report

11   containing information regarding an individual with a

12   different spelling of her first name, a different state

13   of residence, and criminal convictions in Virginia

14   during the same time period in which she was working in

15   Connecticut, National Engineering took no action and

16   had no procedures in place to investigate the

17   discrepancies, the glaring discrepancies between the

18   information it knew about Deborah and the information

19   contained on the criminal record.  Instead, National

20   Engineering immediately passed the information to

21   Guidant.  The damage was done and the course of

22   Deborah's life tragically altered.

23              To the extent that Mr. Sullivan and Mr.

24   Madden testified that they didn't know about the

25   requirements, there is not and cannot be a defense of

1    ignorance, which in any event is no defense.  You have

2    before you Exhibit 1, an agreement between

3    Verifications and National, in which National agrees

4    that, and I quote, "It must comply with the FCRA."

5         Corporations under these circumstances,

6    companies which are sophisticated, have access to

7    counsel, should know how to comply with the law of this

8    land.

9         They also engage in transactions which deeply

10   impact on people's lives and well-being, and they are

11   reckless if they do not incorporate any procedures, as

12   National failed to do, to assure maximum possible

13   accuracy.

14        Based on the evidence, Defendant National

15   woefully violated the requirements of Section 1681e(b).

16        You should answer Question A in the

17   affirmative.

18        Now, in this special verdict form, you're

19   going to be asked a number of questions where the

20   answer is obvious.  For instance, you will be asked

21   whether National reported inaccurate information.  That

22   is beyond dispute.  Chris Sullivan reported it the

23   instant he received it, to the Guidant Group.

24        Question B must be answered in the

25   affirmative.

1          Question C asks whether Deborah Adams was

2     injured by these actions.  Again, the evidence is

3     clear.  Kathy Shapleigh testified that she immediately

4     lost her job, and everyone connected with her situation

5     testified that had Deborah passed the criminal

6     background check, and had that -- or that information

7     been corrected before it was sent to Guidant, no one

8     had any reason or information to dispute, that she

9     would have started that job on May 14th.

10          Lastly, Question D asks whether National

11    Engineering was the proximate cause of Deborah Adams'

12    injuries.

13          Now, the Judge will instruct you that in

14    order to be a proximate cause, the Defendants' conduct

15    must be a "substantial factor in producing the injury

16    or damage," and not a mere condition of, or incident to

17    the harm.

18          Again, this is clear.  Everything that

19    Deborah Adams experienced, the emotional distress, the

20    lost wages, the pain and suffering associated with

21    eviction, being forced to store her belongings, being

22    separated from her son, meets this standard.

23          Question D should be answered in the

24    affirmative.

25          Based on that willful violation, plaintiff is

1    seeking an award of punitive damages in addition to
2    actual damages, and compensatory damages from Defendant
3    National.  I will speak more about damages later.
4           In addition, plaintiff claims that both
5    Defendant National and Defendant Verifications acted
6    negligently and violated those same requirements in
7    Section 1681e(b), to follow reasonable procedures to
8    assure maximum possible accuracy.
9           The evidence demonstrating that Defendant
10   National recklessly violated the requirements
11   establishes that Defendant National negligently
12   violated those standards.
13          All of the questions relating to reporting
14   the inaccurate information, suffering injury, and
15   proximate cause with respect to the negligent count
16   should likewise be answered in the affirmative.
17          And you will see the way the special verdict
18   form is written is that they're all written, "Has
19   Plaintiff proven by a preponderance of the evidence."
20   So in order to find for Deborah Adams, you must answer
21   "Yes."
22          Verifications also violated the same
23   provision, and did so negligently.  The facts in this
24   case clearly show that the inaccurate background report
25   prepared by Verifications was the result of its failure

1    to have reasonable procedures in place to maximum

2    possible accuracy.

3            Most importantly, Mary Poquette admitted

4    during her testimony, that Verifications's procedures

5    were deficient.  This is a profound admission.  How can

6    deficient procedures be reasonable?  Those deficiencies

7    not only produced this erroneous background report, but

8    also led Verifications to make the same mistake about

9    Ms. Adams the following year.

10           In short, Mary Poulette's admission that

11   Verifications's process was deficient should leave no

12   question about whether Verifications should be held

13   liable on that claim.

14           There is no dispute in this case that

15   Verifications reported inaccurate information about

16   Deborah Adams in a criminal background check.

17   Verifications admitted that it passed along the

18   individual -- the information belonging to an

19   individual with a different social security number and

20   who was also deceased, in a background check about

21   Deborah Adams.

22           Significantly, Verifications admits that when

23   it got the initial results from the national background

24   database, it had a concern that the records identified

25   from Virginia may not have belonged to Deborah Adams

1  because it realized the differences in the spelling and

2  the differences in the state of residence.

3        Verifications admits that when it sent the

4  information to the field researcher, Verifications

5  never specifically requested that the field researcher

6  take any action that would help to determine whether

7  the criminal records belonged to our Deborah or to some

8  other individual.

9        Verifications further admits that it never

10  specifically requested that the field researcher try to

11  obtain the social security number from the court file,

12  regarding the criminal records in Virginia.

13        It further acknowledged that when it got the

14  information from the field researcher, it did not ask

15  the field researcher to go back and get more

16  information from the court file, such as the social

17  security number, although it could have done so, and

18  even though it has asked field researchers in other

19  cases to get additional information.

20        Verifications has also admitted that it not

21  -- that it did not take additional action to determine

22  whether the criminal records in question belonged to

23  Deborah, before it sent the inaccurate report to

24  National Engineering, even though it could have

25  searched an electronic database called Accurint, or

1   called the Virginia court directly.

2            Recall Mary Poquette's testimony that

3   searching the Accurint database would have taken less

4   than five minutes.  Moreover, calling the Virginia

5   court directly would have similarly not required much

6   effort.  Yet Verifications did not take those

7   reasonable actions before sending the erroneous report

8   to National Engineering on May 8th.

9            However, unfortunately for Deborah Adams, by

10  the time the record was sent, it was too late.  As

11  Kathy Shapleigh explained, the job offer, once passed

12  on to Guidant, was automatically terminated when Ms.

13  Adams was deemed ineligible due to this earlier

14  erroneous background report.

15           Now, I will now turn to the claims under

16  Section 1681k, which are asserted against both

17  Defendants.  There are a total of three claims asserted

18  here, two against National Engineering and one against

19  Verifications.

20           The two against National Engineering are for

21  willful and negligent violation of this section, and

22  the one against Verifications is for negligent

23  violation of this section.

24           Under Section 1681k, if a consumer reporting

25  agency is going to furnish information from a public

1   record, such as a criminal conviction record obtained

2   from a court, that is likely to have a negative impact

3   on the ability to obtain employment, the consumer

4   reporting agency must undertake one of two protective

5   measures.

6          First, the agency may, at the time the

7   information is reported to the user of the information,

8   notify the consumer of the fact that the public record

9   information is being reported by the consumer reporting

10  agency, together with a name and address of the person

11  to whom such information is being reported.

12         Alternatively, the agency may maintain strict

13  procedures, that is the term from the statute, "strict

14  procedures," designed to ensure that whenever public

15  record information which is likely to have an adverse

16  effect on a consumer's ability to obtain employment is

17  reported, it is complete and up-to-date.

18         We claim that both defendants violated this

19  section.  The evidence presented through trial

20  demonstrates that National was reckless in its

21  disregard of the requirements of Section 1681k.

22         Similar to its reckless disregard of the

23  section I discussed earlier, National had no procedures

24  and no training in place to ensure that it followed the

25  requirements of Section 1681k.

1              National's reckless disregard of its

2    obligations under the law caused Chris Sullivan to be

3    unaware of the requirements of that section.

4    Consequently, at the time that Chris Sullivan reported

5    the erroneous background report to Kathy Shapleigh on

6    May 8th at 3:49 p.m., he did not notify Deborah of the

7    fact that public record information is being reported,

8    together with a name and the address of the person to

9    whom such information is being reported.

10             As Deborah Adams testified and Chris Sullivan

11   confirmed, he did not notify her that the erroneous

12   background had been reported to Guidant until the

13   following week, on May 14th.  That is the day on which

14   Deborah Adams wrote back, starting with the two words,

15   "I see."  That's Exhibit 29.  Thus, he clearly did not

16   notify her of the fact that the information was being

17   reported to Guidant Group at the time that it was

18   reported.

19             Likewise, the evidence establishing that

20   National did not maintain reasonable procedures to

21   ensure maximum possible accuracy requires the

22   conclusion that it did not maintain strict procedures

23   to ensure that the public record information it

24   reported about Deborah Adams was complete and up-to-

25   date.

1            National had no procedures that complied with

2    this requirement.  Since the public record in Virginia

3    contained the social security number, notes entered

4    into Exhibit 22 and Exhibit 31, and National reported

5    information from the criminal record in Virginia that

6    did not list the social security, National's report

7    clearly was not complete.  Moreover, for the public

8    record to be complete, it must also be accurate.

9            Based on the evidence, National was also

10   negligent in its failure to comply with 1681k.

11           Turning to Verifications:  The evidence shows

12   that Verifications failed to comply with the

13   requirements of 1681k.  Like National, Verifications

14   did not send a copy of the erroneous report to

15   Plaintiff Deborah Adams.  At the time that it reported

16   the inaccurate public record information, it did not

17   have strict procedures to ensure that the public record

18   that it was reporting, was complete and up-to-date.

19           If Verifications's procedures were not

20   reasonable to assure maximum possible accuracy, then

21   how could they be strict procedures?  Thus, the same

22   evidence demonstrating that Verifications did not

23   maintain reasonable procedures also establishes that

24   Verifications did not have strict procedures.

25           The Judge will also instruct you as to what

1    Deborah Adams must prove in order to prove her claim

2    for negligent infliction of emotional distress, which

3    is brought against both defendants.  The testimony of

4    the witnesses in this case support a finding for

5    Deborah on all the elements of that claim as well. The

6    conduct of Verifications and National created an

7    unreasonable risk that Plaintiff Deborah Adams would

8    suffer emotional distress.  The burden on Verifications

9    and National, to produce a correct report was minimal.

10          I need not restate all of the acts and

11   omissions which have established a very reckless course

12   of conduct.  In short, all the questions relating to

13   negligent infliction of emotional distress should be

14   answered in the affirmative.

15          I have now reviewed the eight claims that you

16   must decide.  Before discussing damages, I would like

17   to make a few comments about the bigger picture here.

18   Excuse me.

19          Ladies and Gentlemen, on one level, this is a

20   case about a woman who did not get a fifty-week

21   assignment at $21 per hour because two companies broke

22   the law.  It wasn't a $300,000 a year job.  It wasn't a

23   high-level, managerial position.  It was a technical,

24   administrative and clerical position.  She would have

25   earned about $840 per week with a potential for

1   overtime; over a fifty-week period, about $42,000.

2           It might seem unusual, given those

3   circumstances, that high-paid experts would be flown

4   across the country to testify in this case.  I am

5   certain that has not gone unnoticed by you, but there

6   is a reason for that.

7           With respect to the claims brought under that

8   portion of the Fair Credit Reporting Act which requires

9   reasonable procedures to assure maximum possible

10  accuracy, you, the jury, will get to -- will be

11  deciding what is reasonable in this case.  The

12  Defendants and their experts are claiming that the

13  procedures had to be reasonable and that the process

14  worked exactly as it should have, because it was

15  consistent with industry practice.

16          I have three points to make on that:

17  Initially, I ask you not to take the assertion that

18  Defendants followed industry practice at face value.

19  The facts before you establish that Deborah Adams had

20  numerous background checks done, and but for two

21  agencies, Choice Point and Verifications, she passed

22  those background checks without any issue.  Clearly,

23  those other consumer reporting agencies must have

24  followed a different industry practice.

25          Secondly, to the extent that some

1    corporations within the industry followed the

2    procedures adopted by Verifications and National

3    Engineering, those procedures are simply not

4    reasonable.  Mr. Nadell's deeply, deeply disturbing

5    statement this morning, that these practices

6    unfortunately mean that Deborah Adams will have to deal

7    with these issues for the rest of her life, is an

8    indictment on these so-called industry practices.

9            And thirdly, the law, as you will be

10   instructed by Judge Eginton, does not ask you to

11   determine whether the procedures followed were

12   consistent with industry practice.  You will be asked

13   whether those practices were reasonable.  It is neither

14   the lawyers nor the experts who will be deciding what

15   is reasonable; it is you, the jury.

16           We maintain that the evidence has exposed a

17   deeply flawed process.  Deborah Adams was attributed

18   with a criminal report belonging to a person whose

19   named was spelled differently, who lived in a different

20   state, who, unlike our Deborah, had the middle name

21   "Jean," who had a different social security number, and

22   who, it turns out, was deceased.

23           Defendants ask you to find that this mixup

24   was reasonable.  Verifications wants you to excuse this

25   mishap because it would be too difficult for them to

1    have gotten it right in the first instance because,

2    after all, there are over 3,000 counties in this

3    country, and it is a very complex maze that they have

4    to navigate.  Yet what do the facts show?  They show

5    that a simple telephone call to the clerk's office, or

6    a few key strokes entered into the Accurint system

7    would have cleared things up.

8            Verifications's response, "Clearly, you can't

9    expect us to do that with the millions and millions of

10   background checks that are performed every year."

11           Ladies and Gentlemen, you are not here to

12   decide millions and millions of cases, you are here to

13   decide one case, whether the procedures they followed

14   in this case was reasonable, and it wasn't.

15           So they make another argument.  Defendants

16   and their experts assert that Deborah Adams is

17   partially to blame for the reason behind this whole

18   mess.  After all, had she been up front about the fact

19   that she had encountered a false report once before, in

20   the context of a different staffing agency and a

21   different consumer reporting agency, had she been up

22   front and warned these corporations about a mistake

23   that they might make if they weren't careful, this

24   never would have happened to her.

25           Ladies and Gentlemen, that claim boggles the

mind.

First, the law, as Defendants' experts have acknowledged, imposes no obligation on Deborah Adams to alert these sophisticated corporations about a problem she encountered on a prior occasion.  The Fair Credit Reporting Act imposes no such obligation on Deborah Adams or any other consumer the law is designed to protect.

Second, do you think it is really reasonable to expect a person to start off an interview by confessing to a crime they didn't commit, stating, "Hey, be on the lookout for a felony when you look into my background, but don't worry, it's not me."  There is nothing on the release form which requested that information, much less was there a reasonable basis for Deborah to imagine that lightening could strike twice in the same place, especially when so many other background checks went through without a hitch.

The most truly remarkable thing about this case is that lightening didn't only strike twice in the same place, it struck a third time.

Exhibit 39 is a truly remarkable document. After everything Deborah went through with Northeast Utilities, after sending letters to attorneys general, the FTC, and even filing this lawsuit, Verifications

1    did it again.  Confronted with that exhibit, even Mary

2    Poulette had to admit, as she did, that the procedures

3    they had in place at the time were deficient.

4            Any claim by Verifications that Deborah Adams

5    didn't do her job in notifying them of a potential

6    error has absolutely no place in this case.  The

7    procedures used by Verifications were flawed.

8            I want to spend a few minutes talking to you

9    about damages.  Depending on what counts you find that

10   Deborah Adams has established, you will be asked to

11   award different types of damages.  The first damages

12   are damages relating to economic loss.  In this case,

13   admittedly, they are modest.  It was a fifty-week

14   contract that would have paid Deborah at a rate of $840

15   per week.

16           Admittedly, she was employed for part of that

17   time, as reflected on Exhibit 500, which shows two,

18   three-month assignments during that fifty-week contract

19   she would have obtained but for the wrongful actions of

20   the Defendants.  That leaves a balance of 24 weeks at

21   $840 per week or $20,160 in lost earnings.  I leave it

22   to you to look at the evidence, look at your notes, and

23   calculate the damages.

24           But that is not the real loss suffered here.

25   You have heard Deborah Adams testify about the pain,

1   the humiliation, the embarrassment and the distress

2   that she suffered as a result of this experience.  She

3   obtained counseling and was put on medication.  She

4   suffered the profound indignities of facing eviction,

5   having to store belongings in a storage unit, where she

6   fell behind in her storage rent and risked losing those

7   possessions.

8           Most traumatically of all is that she had to

9   downsize.  She was separated from her son for over a

10  year.  That is a hurt that is nearly incomprehensible.

11  It has been said that perfect justice would turn back

12  time and undo the harm that was suffered.  We don't

13  have perfect justice.  All that can be offered to

14  Deborah Adams is monetary compensation.

15          Considering that Deborah, when not working,

16  would have easily spent seventy hours a week with her

17  son, in one capacity or another, eating meals together,

18  picking up around the house, all of the interactions

19  which seem so trivial and which are taken so much for

20  granted but which, when lost, create a gaping void.

21  Surely, those hours spent between a mother and her only

22  child are much more valuable than the $21 per hour she

23  would have earned at Northeast Utilities.

24          I ask you to identify a fair value to that

25  lost time, and calculate that value by seventy hours

1   per week for a year.  I will not even propose a value.

2   I offer that simply as one way to approach your award.

3   I ask you that you consider that in addition to

4   compensation for the distress and indignities I

5   discussed previously.

6          Lastly, you will be asked to award punitive

7   damages against National Engineering based on its

8   reckless indifference to the Fair Credit Reporting Act,

9   assuming that you find that they did violate that

10  claim, that statute.

11         You have heard evidence that its net revenue

12  is 30 percent of thirty million dollars, which is nine

13  million dollars.  I ask you to consider that number

14  when determining what amount of award would be

15  sufficient to deter this type of conduct from taking

16  place in the future.  You may consider 2 percent of

17  nine million dollars to be sufficient, you may consider

18  1 percent, you may consider 5 percent.  I offer that as

19  a way of approaching it.  I do not offer a specific

20  amount.  I leave that within your capable hands.

21         In closing, you may recall that I stated to

22  you in my opening statement, that this was a case about

23  two companies which refused and continue to refuse to

24  take responsibility for their own actions.  So Deborah

25  Adams now turns to you and respectfully and humbly asks

1    you to hold them accountable.

2          Thank you.

3          THE COURT:  Mr. Kupinse?

4          MR. KUPINSE:  Thank you, Your Honor.

5          I'm trying to find a spot where the sun is

6    not in my eyes.  I think I've got it now, except the

7    sun will keep moving.

8          Ladies and Gentlemen of the jury, Your Honor,

9    Counsel, I'm not at the point where I'm going to give

10   you my closing statement.  In my opening statement, I

11   compared the trial to a play.  Judge Eginton actually

12   picked up on that literary theme and analogized the

13   trial to a novel by Grisham or Caldwell.

14         Going back to my analogy, I told you that in

15   a search for truth about the death of his father,

16   Hamlet, at the end of the play within a play, turned to

17   the queen, his mother, and asked, "Madam, how like you

18   this play?"  We're now close to the point where we will

19   turn to you and ask you for your verdict.

20         First, my client and I want to thank you for

21   your service as jurors.  We know how much you've given

22   up to sit this close to the holidays.  Take heart,

23   however, that your service supports an essential

24   American right to a trial by jury, and upholds our

25   heritage of a nation under law.

1          Shortly, the Judge will charge you as to the

2     law.  While I and my fellow counsel have referenced or

3     will reference the law, and we will try to be correct,

4     the Judge's instructions will ultimately control.

5     Likewise, Mr. Madsen and I will, and Mr. Coffey will

6     refer to facts, but as to the facts, you have the sole

7     prerogative.

8          First a couple of preliminary comments on the

9     law.  Remember that the Plaintiff has the burden of

10    proving her case.  Judge Eginton's example of the scale

11    is appropriate.  If the scale deflects in the

12    slightest, in the direction of the Defendant, the

13    Plaintiff has not proved her case.  But more

14    importantly, if the scale remains exactly even, the

15    Plaintiff has not proved her case.

16          The other preliminary comment that I would

17    make on the law is that the Judge will charge you on

18    some statutory claims which the Plaintiff's claim

19    apply.  Once again, while the Judge will charge you on

20    the law, you are the judge of the facts.  You determine

21    how the facts are to be applied under those statutes.

22          Facts, as I have just said, are your domain,

23    but this is our chance to let you know how we see them.

24    As I expected, you've heard a lot of testimony in this

25    case, and you've received a lot of documents.

1                    At the start of the trial, I asked you to

2      keep to the forefront, the critical period of May 8th,

3      2007 through May 11, 2007.  I still think that's a good

4      starting point in your deliberations, although I will

5      bring to your attention, some other facts.  Don't

6      panic, not all of them, and I won't replay in detail

7      the testimony or any of the exhibits, which I know

8      you've been paying close attention to.

9                    And I won't footnote in my discussion, every

10     exhibit.  You'll have the exhibits with you in your

11     jury deliberations and, if needed, which I would

12     suspect may not be the case, you can get play backs of

13     the testimony.

14                   You also have your notes, and I suspect that,

15     again, those will be helpful to you in your

16     deliberations.

17                   I agree with the Plaintiff's counsel that

18     this is a complex issue, and I think you've heard that

19     the statutes are complex.

20                   I think you've heard from the experts who

21     testified on the statutes what their view of our

22     procedures and handling of those rights and obligations

23     under the statutes were.

24                   Everyone except -- All of the experts -- Both

25     of the experts, except for Mr. Hendricks, have

1    unequivocally agreed that both National and
2    Verifications did nothing incorrect under the statutes
3    that Mr. Madsen took you through.  I'm not going to go
4    through that again.  I'll talk a little bit about it
5    later, but I think that's important.
6              Even Mr. Hendricks, when asked if we had done
7    certain things wrong said, "No, you complied with the
8    statutes."  And, again, it's your recollection of what
9    he said that controls.
10             Going to the heart of the case.
11             On Tuesday, May 8th, our Co-defendant
12   Verifications, Inc. who, like my client, National
13   Engineering Service Corporation, took no action which
14   violated the Fair Credit Reporting Act.  And I'm going
15   to make a little side trip here, just to tell you --
16   I'm not going to argue, obviously, all of
17   Verifications's defenses, but I'm sure you'll hear just
18   as well about them from Mr. Coffey.
19             Likewise, I'm sure that he won't argue any of
20   my defenses.  On the other hand, I think you can
21   probably be able to tell by the end of this procedure,
22   that we do not point the finger at either of us, that
23   we're both saying that we did the right things in this
24   case.
25             Turning back to where I was, both of our

1    clients did not violate the Fair Credit Reporting Act,

2    but National did send a -- Verifications did send a

3    background report on the Plaintiff to National.

4    There's no dispute that the report contained some

5    incorrect information.

6          Around 4:00 o'clock in the afternoon, Chris

7    Sullivan of National sent that report to Kathy

8    Shapleigh of Guidant, Comensura, as it was called then,

9    as National was required to do by its contract, which

10   again, our experts have told you was not in violation

11   of the Fair Credit Reporting Act, and that action

12   itself was told -- you were told by Anne Fortney, our

13   expert, that it was not violative of the Fair Credit

14   Reporting Act.

15         About 6:00 o'clock, Chris Sullivan speaks to

16   the Plaintiff and discovers for the first time that

17   this is the second time that this had happened to the

18   Plaintiff, and that she had in her possession for about

19   a year, information to refute the incorrect information

20   but didn't tell anyone.

21         Incidentally, let me break again at this

22   point.  The Plaintiff argues that the Defendant had

23   other background checks and the information didn't come

24   up.  As I hope you realize from the questioning, the

25   Plaintiff really doesn't know that because she didn't

1    get every job she applied for, she didn't see every

2    background report.  Unfortunately, it may be out there,

3    and as each and every one of the experts testified, she

4    should have been counseled to bring that to the

5    attention of a prospective employer.  Is it a

6    requirement or a mandate under the Act?  Absolutely

7    not.  But it does deal with the reasonableness of the

8    conduct.

9           Anyway, about Chris -- about 6:00 o'clock,

10   Chris Sullivan speaks to the Plaintiff, discovers that

11   prior information for the first time.  And he gets --

12   This information is immediately sent over to Guidant,

13   to Kathy Shapleigh, together with the information that

14   the Plaintiff is challenging the report.  The events of

15   Tuesday, May 8th take about two and a half hours.  Do

16   these events meet the requirements of the FCRA?  Our

17   experts testified that they do.

18          On Wednesday, May 9th, moving quickly from

19   the evening of the eighth to the next morning, Maura

20   Demars of National, notifies Verifications that the

21   Plaintiff is disputing the report.  With this

22   information and the information now provided by the

23   Plaintiff for the first time, Verifications confirms

24   that the records are not those of the Plaintiff,

25   revises the report, and sends the corrected report to

1    National at about 5:20 on Thursday, the 10th.   Eighth,

2    ninth, tenth, they've already got it corrected.

3           On Friday, the 11th, Chris Sullivan and Kathy

4    Shapleigh speak, and Kathy Shapleigh learns that the

5    erroneous information has been cleared.  Kathy and

6    Patricia Angelo Park (phonetic) begin an exchange of e-

7    mails at about 4:30 on Friday, May 11th, still before

8    the start date.  So by -- from the 8th through the

9    11th, the report has been cleared.

10          The e-mails are contained in exhibit --

11   Defendant's Exhibit 505.  This was the exhibit to which

12   you may recall the Plaintiffs objected to its entry

13   and I had to bring Kathy Shapleigh back down from

14   Hartford to get it identified so as you could have it

15   for -- so that you could have it as an exhibit.

16          I suspect that probably the Plaintiff knew

17   that I could bring Kathy back down, hoped I wouldn't,

18   and not get that piece of evidence in, and it's the

19   only piece of evidence that I'm really going to refer

20   to specifically at this point, because I think it's

21   very important.

22          This exchange of e-mails is on Friday, the

23   11th, before the 14th start date, and it starts with

24   Patricia Angelo Park from Northeast Utilities sending

25   an e-mail to Kathy.  This is even before Patricia

1    Angelo Park has been told that the report has been

2    cleared.

3            So before she's told that, she sends a letter

4    to Kathy:

5            "Just reviewed Deborah's resume.  Lots of

6            jobs, like we discussed.  Can you provide any

7            insight into that fact?  Do you see anything

8            to be concerned about or aware of in this

9            string of jobs?  My first thought in general,

10           after getting past the list, is that our $21-

11           per-hour job is well beneath her abilities.

12           Let me know your thoughts as I continue to

13           ponder my options.  Pat."

14           Very clear that the position had not been

15   denied on the basis of the report, at that point,

16   because Pat did not have the corrected report.  Very

17   clear that she was still considering the Plaintiff for

18   that position.

19           Well, Kathy responds to that e-mail:

20           "Pat:  The positions listed on Deborah's

21           resume were contract jobs, with the exception

22           of Chubb, Bradley Airport and GEERC Life

23           Reinsurance.  I have contacted our staffing

24           company for the particulars regarding her

25           departure from those positions.  I will be in

1          touch with you with that feedback as soon as

2          it's received.  Deborah earned $20 an hour at

3          Webster Bank, $19 at The Hartford, and $20.25

4          at Genworth Financial.  The contract

5          assistant order seems to be a competitive

6          rate for her.  Hope this information helps."

7      Kathy, despite what she said on the stand,

8  that it was an automatic disqualification, is still, at

9  this point, dealing with that as if it is an open job.

10  And more importantly, the manager at N.U., who had the

11  final say, is dealing with it as an important job -- as

12  an open job.

13      Kathy then sends a second e-mail to Pat:

14          "Pat:  I just received an e-mail from

15          Verifications, Inc., the background drug

16          screen company, that Deborah Adams's

17          background report has been researched and

18          updated to reflect a clear result.  Deborah

19          is eligible to work at N.U.  Thanks."

20      Sounds to me that she did not lose her job

21  over the report with the erroneous information in it.

22      As I mentioned, the Plaintiff had not been

23  automatically excluded, as the Plaintiff's attorney may

24  argue, before her start date.  She was still under

25  consideration by one of the hiring managers at N.U.

That hiring manager, however, had some questions as to
the number of jobs that the Plaintiff had held, and as
to whether the $21-an-hour job would be under the
Plaintiff's abilities -- under the Plaintiff's
abilities.

Kathy answered some of the questions and
indicated that she would get further information, and
we're left with the fact that Kathy then sends the
corrected report to the manager, who was still
pondering her options, all before the start date.

Why then, was the Plaintiff not hired?  The
truth is, we do not know.  The Plaintiff claims that
she was not hired because of the report with the
incorrect information.  I'm not sure that the e-mail
doesn't completely negate that thought, but we don't
know that she was not hired because of the incorrect
information, just as we don't know that Patricia Angelo
Park, the hiring manager at N.U., may have had concerns
about her job.  She may have had concerns about whether
this $21 job was appropriate for the Plaintiff.

She may have had some concerns because
somebody at N.U. found out that the Plaintiff wasn't
paying her utility bills to N.U., or maybe someone at
N.U. decided that they'd save $54,000 by hiring an
intern, or someone at N.U. got wind of all the

1    complaints that the Plaintiff was filing during this

2    period, and didn't want to take the chance on being the

3    subject of a complaint themselves, or who knows?

4         We don't know, and that's the crucial

5    element, Ladies and Gentlemen.  At best, I think the

6    scales are tipped in favor of the Defendants.  But at

7    best, it's just a crucial element which the Plaintiff

8    has not proved in this case.

9         What I do know is I know who knows, and

10   that's Patricia Angelo Park.  But it's strange that the

11   Plaintiff did not subpoena her.  I wonder why.  While

12   it's true we could have subpoenaed her also, to

13   testify, but it's not our job, as the Judge will tell

14   you in his charge, to disprove the Plaintiff's case.

15   It's the job of the Plaintiff to prove it, and again,

16   this is where the scale comes in.  The Plaintiff has

17   not proved that she lost her job opportunity at N.U. by

18   anything that the Defendants did.

19        As long as I'm wondering, I suppose I ought

20   to wonder why the Plaintiff didn't sue Guidant and

21   didn't sue N.U.  Too big?  No, I don't think so.  I

22   think probably, if I had to speculate, that the

23   Plaintiff thought, incorrectly, as our experts have

24   told us, that there was a technical violation of the

25   Fair Credit Reporting Act which she could take off on.

1   I think she may have thought that from, as you heard

2   her testify, her prior research and experience, and

3   thought it might be an easy case against both of us.

4           Well, where does this all lead us, in any

5   event?  Clearly, the Plaintiff has not met her burden

6   of showing that the actions of the -- of National or

7   Verifications, for that matter, were the proximate

8   cause of her damages.

9           You heard a little bit of discussion about

10  proximate cause, and I urge you to keep your eye

11  closely on that.  The Judge will define "proximate

12  cause" for you, but I might simply say it is the legal

13  requirement that anything the Defendants did or didn't

14  do was a substantial factor in damaging the Plaintiff,

15  in causing any injuries that she claims.

16          Thus, for example, even if the Defendants did

17  not comply with the Fair Credit Reporting Act, which

18  they did, if the Plaintiff does not prove by a

19  preponderance of the evidence, that that non-compliance

20  was a substantial factor in causing the damages the

21  Plaintiff claims, she cannot recover.  And I think I've

22  argued from this e-mail that it was not a factor, much

23  less a substantial factor.

24          The Plaintiff's claim that not getting the

25  N.U. job constituted an adverse action by National

1    prohibited by the Fair Credit Reporting Act, is not so.

2            First, as we pointed out, we know that the

3    erroneous report did not result in the loss the job,

4    so there was no adverse action.

5            We also know that even if there had been an

6    adverse action, the employer could have taken it

7    without waiting for the error to be corrected, so long

8    as the notice requirements on the Fair Credit Reporting

9    Act were met, which they were.

10           We know, most importantly, that if there was

11    adverse action, which there was not, N.U. had the call,

12    and not National.  Anne Fortney clearly indicated that

13    National complied with the Fair Credit Reporting Act

14    and, this morning, Mr. Nadell told us that if we are to

15    consider National as a consumer reporting agency, they

16    can't take adverse action.  It's not something consumer

17    reporting agencies do.

18           I mentioned Anne Fortney a couple of times.

19    How about Anne?  I feel like Joe Pesci in the movie "My

20    Cousin Vinny," when he's praising Marisa Tomei, who

21    just reduced the prosecuting attorney and his expert

22    witness to a couple of puddles based on her knowledge

23    of the automobile industry.  If you haven't seen the

24    movie, rent it.  You'll really enjoy it after having

25    sat through this trial as a juror.

1        Anyway, to carry on with my Joe Pesci

2   analogy, wasn't Anne a terrific witness?  I mean, I

3   like Mr. Nadell, too, but in comparison to Mr.

4   Hendricks, I have to say that she was knowledgeable,

5   she was qualified, she spoke well, she pointed out

6   things that were important, and she took us through a

7   very complex Act in a very understandable and pleasant

8   way to listen to.

9        Take a look at her resume, which is going to

10  be in there with you when you look through, and see the

11  qualifications that she brought to this trial.  And

12  while you'll be the people who weigh her opinion as you

13  do the opinion of other experts, I can't help but think

14  that you will find her as convincing and as correct as

15  I did, and with the backup background information to do

16  that.

17       Even though Anne testified that we did not

18  violate the FCRA, the Plaintiff has told you that we

19  did.  There are a couple of sections which she claims

20  we violated.  The Judge will charge you eventually, as

21  to each of those sections, but I want to point out that

22  the plaintiff claims that we violated them negligently

23  and intentionally.

24       While negligence is, in my opinion, in this

25  case a giant leap, an intentional violation is even

1    more remote.

2            There's also the non-federal claim of

3    negligent infliction of emotional harm, again, in which

4    I think negligence is a far leap, but intentional?  I

5    think the Judge will charge you, as the Plaintiff's

6    counsel said, on the issues of recklessness, and I

7    think you should weigh that carefully, but in my

8    opinion, there was no recklessness, there was no

9    intentional violation, and there was, of course, not a

10    negligent violation.

11            So I think in the end, you should have no

12    hesitation in going down that jury questionnaire form

13    and filling in the "No" boxes.  I really think that

14    this is a case in which, while sometimes we feel

15    sympathy for the Plaintiff, as the Judge -- as the

16    Court knows, part of -- we are not to consider sympathy

17    in our verdict, we're to consider what's been put

18    before you by way of evidence, and I think that that

19    would result in a Defendants' verdict for both

20    Defendants on all counts and claims.

21            The Judge will charge you on damages, and

22    when he does, he'll tell you something like because

23    he's charging you on damages, it doesn't mean that he

24    thinks you should reach the issue of damages.

25            Likewise, I'm going to tell you a little bit

1   about damages, but I don't think you'll ever reach the
2   issue of damages.

3          Just as I don't believe the Plaintiff has
4   proven liability, I do not believe she has proven any
5   damages, or if she even can claim to have proved them,
6   they are so minor that they really don't exist.

7          All we have is the Plaintiff's testimony, not
8   one piece of hard evidence for her claimed doctors'
9   visits, not one bill, not one report, nothing.  We have
10  nothing except testimony on her alleged wage loss for
11  being out of work initially, for about ten or twelve
12  weeks.  I must admit, I didn't count it exactly.

13         And the only thing that we really know about
14  her wages between 2006 and 2007, was they were just
15  about the same.  They were about $1,800 apart, without
16  considering her unemployment compensation and without
17  considering any of those side jobs which she mentioned
18  she did not put on her resume.

19         And we also must wonder why the Plaintiff has
20  been out of work longer since her last job, short of
21  going to school, than she was after the loss of the
22  N.U. job.

23         I can't give much credence to Plaintiff's
24  counsel's claim that this was a tragic, life-changing
25  event for her, and I think you need to consider whether

1   it was when you consider damages.  By the time she

2   didn't get the N.U. job, unlike, as Mr. Madsen argued

3   just a few minutes ago, she was already behind in her

4   rent, she was already being evicted from her apartment,

5   she was already behind in her car payments, which

6   resulted in the repossession of her car.  She was

7   behind in her N.U. bills and probably other

8   obligations.

9           The failure to get a $21 N.U. job, even if it

10  were our fault, which it is not, certainly was not

11  going to pull her out of the hole that she dug herself

12  into, and it wasn't the cause, as Mr. Madsen would have

13  you believe, of any tragic, life-changing event.

14          I could try to review every bit of evidence

15  in this case, and have responses, but I want to hold my

16  closing to a reasonable length, and I think I've

17  pointed out the crucial areas.

18          When I finish, Mr. Coffey will have a chance

19  to present his closing on behalf of Verifications.

20  After that, under our rules, Mr. Madsen will get up and

21  speak again on behalf of the Plaintiff.  He's awarded

22  that second bite at the apple because he has the burden

23  of proof.

24          When he gets up, I won't be able to get up

25  again and address anything he says, or raise anything

1   that may raise some questions from what he says.  I may

2   have not responded to some of the questions you have,

3   and I certainly won't be able to respond to any that he

4   raises in his second bite at the apple, but you can be

5   sure that I did have a response, and I would urge you

6   to carefully consider the testimony and the exhibits,

7   and see for yourselves what that response would have

8   been.

9             My client and I thank you for your service

10  and attention.  And as I'm about to close, I want to

11  remind you of a few things.

12            First of all, the Plaintiff filed complaints

13  with a number of agencies, which resulted in no

14  actions.  She received settlements from at least two of

15  her prior employers, and she has a pending

16  discrimination claim.  I urge you not to add the

17  Defendants in this case to her list.

18            In my opening statement and at the beginning

19  of these remarks, I quoted from Hamlet's question to

20  his mother, "Madam, how like you this play?"  I didn't

21  tell you her answer, which some of you may actually

22  know, but I will now.  When Hamlet turned to the queen

23  and asked that question, she replied, "The lady doth

24  protest too much, methinks."  I think the same thing

25  about the Plaintiff in this case.

1          Thank you.

2          THE COURT:  Mr. Coffey?

3          MR. COFFEY:  Good morning, everyone, Your

4    Honor, Counsel.

5          Last, and I hope least, I am one of the only

6    things that stands between you and the jury room, so

7    I'm going to try to -- after Attorney Kupinse, I'm

8    going to try to keep it a lot briefer, if I can,

9    because I don't want -- you're probably one of the

10   smartest juries I've ever had, and I don't want to

11   repeat everything.  But we'll start out, grab your

12   Bibles, we're going to go through every exhibit.  No,

13   I'm only kidding.

14         What I'm going to say is, there is a term,

15   and I guess I used to attribute it to my grandfather,

16   but I did a little research on it and I guess it's

17   probably not his.  It should be attributed to Jimmy

18   Durante.  Dictionary.com said the definition is "To

19   exaggerate the importance or make an issue out of

20   something."  The free dictionary called it, "To make

21   something seem more important or obvious than it really

22   is."  And answers.com said, "Gives undue importance to

23   an issue."

24         Well, some of it could be a little ironic

25   here.  The term that I wanted to use is, "There's no

1    need to make a federal case out of it."

2           Now, unfortunately, we're here in federal

3    court, and that's the Plaintiff's right.  Everyone has

4    a right to bring a case.  Everyone is entitled to their

5    day in court.  But under our justice system, everyone

6    is not entitled to recover.  And I agree with almost

7    everything Attorney Kupinse has said, that we do not

8    believe that Ms. Adams is entitled to recover here.  I

9    believe that.  I believe the evidence has shown that.

10          Now, a lot of the things we talked about were

11   meant to take your eye off the ball.  I think one of

12   the things are, "What did the evidence show?  What did

13   the evidence not show?"  Those are the important things

14   that you're going to be asked to decide in that room.

15   All we say -- We're actually mouthpieces here, as

16   attorneys.  I'd like to tell you we're something

17   different than that, and I probably explain that to my

18   four kids, that I'm like a super hero, but the reality

19   is, we only can -- this is about evidence.  This is

20   what you've seen.  It's about what you've not seen.

21          One of the most important things that I think

22   you've seen and what you've not seen is the Judge

23   talked to you about the importance of expert testimony,

24   and it's up to you to decide who is credible, who is

25   not credible.  There are certain issues that are

1    without -- The reason you get to use expert testimony

2    is because there are certain things that a jury gets to

3    hear about.  Expert testimony is there because it's

4    meant to assist the jury in things that are outside the

5    purview of your daily experience.

6            Now, this is one of the things, the Fair

7    Credit Reporting Act.  You might see it in a paper.

8    You might hear about it.  It's not something that most

9    jurors would be intimately familiar with on a daily

10   basis.  That's why we brought in experts.  That's why I

11   brought in Barry Nadell.  That's why Mr. Hendricks came

12   in, and that's why Ms. Fortney came in, because they

13   were meant to assist you.

14           Now, once we get past that they were meant to

15   assist you, one of the things you need to do is look at

16   how credible you think each of them are.

17           Now, what made someone credible was

18   experience in the relevant field.  Now, that's where I

19   think there's a big difference that you need to look

20   at.  The big thing is, Ms. Adams made complaints to

21   numerous attorney generals, to the Federal Trade

22   Commission.  There was no fines.  There was no consent

23   decrees.  There's absolutely nothing about her

24   complaint which she delineated, about what happened

25   here to them.  They didn't act.

1          Now, I think it's a much higher standard than
2     a preponderance.  So, you know, what we're thinking
3     about is, it's two years later.  Mr. Hendricks said to
4     you that it shows two and a half years later, that
5     nothing would be -- no action was taken.  That is
6     significant.  Well, if Plaintiff's own expert says
7     that, that's a big admission.
8          Now, one of the other things about assessing
9     the credibility, Mr. Hendricks does not have experience
10    in background searches.  He said he's participated in
11    about 12 of them in a 30-year career.  That would mean
12    once almost every two and a half years, he did one.
13    That's his experience that you need to weigh, that you
14    need to weigh when you look at the scales, and you need
15    to weigh who was more credible.
16         Was Ms. Fortney?  Now, Ms. Fortney was
17    someone who -- she's not my expert but I'll tell you, I
18    was impressed by her.  Here's someone who was an
19    attorney for the FTC, drafted many of these things, and
20    had a payment.
21         Mr. Nadell, He's done 300,000 of these
22    background investigations.
23         Now, each of them have a good basis and
24    understanding of both the law, the common sense
25    practicalities, what actually occurred here, and what

1    was reasonable, not reasonable, and what procedures

2    were followed or not followed, and were people

3    negligent?  And both of them unequivocally said, "No,

4    NESC and Verifications were not negligent.  They did

5    nothing wrong."

6            Now, I think that counters with an expert who

7    said to you, "I cut and pasted my report."  Now, he's

8    an expert.  He said he cut and pasted his report.  He's

9    Mr. Accuracy and he's telling you he had the wrong

10   criminal charge in his report.  He had a kidnaping, and

11   he said, "Oh, that must have been a mistake."

12           He also told you that our companies were

13   related, in his report, and that we were spun off of

14   Equifax, and then he said, "Oh, I guess I was wrong."

15   Well, that's someone who's not credible, when you weigh

16   the reliability of expert testimony.

17           So as the Judge said, you can regard it or

18   disregard it.  You're free to regard or disregard.  I

19   think you should disregard entirely, his testimony,

20   because I think it was not credible and it added

21   absolutely nothing.  He's no better than any fact

22   witness or a person off the street who wanted to talk

23   in this field.

24           Now, what else did you see, what we did?  I

25   don't need to go through the facts about what we did.

1    We searched a database.  We sent a field investigator

2    out there.  We prepared a report.

3            It said that it was a similar name.  We never

4    said it was an exact name.  That's the way that the

5    systems are utilized and that's what the procedures

6    are.  We followed a reasonable procedure.

7            Now, in hindsight, the result, I have to

8    agree, it sounds like an, "Aha," like a "Gotcha"

9    moment, but we're not looking at what the result was.

10   The result of what we have to look at, were the

11   procedures reasonable at the time the test was -- the

12   search was done for Ms. Adams?  And both experts said,

13   "Yes, they were."  We weren't negligent.  I don't need

14   to go past that, I think, because I think you

15   understand that, and I'm not going to go through it for

16   a long time.

17           One of the other things are -- that I think

18   that you need to take a look at is, it's what you see

19   and what you're not going to see, and I think the big

20   things that you didn't see, and I think the biggest

21   thing you've got to ask Attorney Madsen is, "Where was

22   Patricia Angelo Park?  Why wasn't she here?"  The only

23   person who could have proved his case, that would have

24   put a feather on the scale of justice and tilted it in

25   his favor did not take that stand.  He did not read a

1   deposition transcript for you.  You did not hear from

2   this person.

3           So the only communication you're left with is

4   the devastating e-mail that was sent from -- between

5   Kathy Shapleigh and Ms. Park.

6           Now, you've got to remember, Kathy Shapleigh,

7   why might she not want to testify about certain things?

8   I'll tell you why, because she does a lot of work for

9   Northeast and she has a lot of money potentially at

10  stake because she could have been in this litigation as

11  well, if she didn't try to shift the burden to other

12  people.  So that's the reason.

13          So when you sit there and you assess the

14  credibility, that e-mail,  Ms. Park said unequivocally

15  that that job was open.  And I agree with Attorney

16  Kupinse, that that means it is not the proximate cause

17  of any of the damages, and that you can answer "No."

18          I think the other thing you have to ask,

19  there are several things, you've got to ask Attorney

20  Madsen, why, why wasn't the doctors brought in here?

21  Got up there and said there's doctors who were treating

22  her, and all this stuff.  Well, okay, we all go to

23  doctors and we talk about what we do get or what we

24  don't.  Where's the records?  Everyone has a record, a

25  record of their medical -- medical records.  Where are

1    the medical records?  We don't have any.  We don't have

2    any of them.

3            The doctors.  How come none of the doctors

4    got on the stand and said Ms. Adams had all the -- all

5    this emotional distress occurring.  She said she

6    underwent treatment for it.

7            There's a lot of things we didn't see about

8    the loss of income.  Where is the documentation, the

9    other subsequent years, tax returns, all the W-2s,

10   things that we know in our every-day life.  And every

11   one of you on this jury works.  You all know what it's

12   like.  You know what you receive when you work.  You

13   get W-2s.  You file income tax statements.  How come

14   none of that was presented to you?

15           All that was presented to you was Ms. Adams

16   telling you, "I've lost" this -- "this amount."  Well,

17   it changed from that she lost a fifty-week job, that

18   she did go back to work for a period of time.  She

19   acknowledged on the stand that there were periods of

20   time within which she did work, but doesn't reflect it

21   on her resume.

22           And she also acknowledged, under cross-

23   examination, that during the period immediately

24   thereafter, it didn't come out from Attorney Madsen,

25   but under cross she said that she's been on

1    unemployment.  Well, that's another thing that would be

2    a reduction in the income that you're being asked to

3    give.  How come that wasn't given out to you, that

4    that's a possible thing, that she was receiving that?

5         It's meant to pull at heartstrings, and we're

6    not here -- you're told -- The Judge is going to tell

7    you, you need to exclude sympathy.  Sympathy is not

8    relevant.

9         One of the other things that she didn't talk

10   about was the -- her departure from employment from

11   Chubb and G.E.  Well, at the deposition, it's told

12   confidentiality, we can't talk about it.

13        Now, we don't know what happened there.  We

14   do know she has an open EEOC claim that she's claiming

15   one of her subsequent jobs, that have occurred since

16   then, that she's already left.  That was one of the

17   subsequent jobs for the State of Connecticut.  She says

18   that she was age discriminated against and racially

19   discriminated against.

20        We have none of that paperwork here, as well,

21   but we also had to pull that out on cross-examination.

22   You have to remember that the light of the day, the

23   attorneys' cross-examination, is what got those facts

24   out.  The case that was presented to you -- it didn't

25   come out on the Plaintiff's direct case.  We had to

1    bring that out.  It is relevant.

2         Now, it's also one of the other things -- I

3    think Attorney Kupinse went through the many reasons

4    that an employer might not have liked Ms. Adams, from

5    an employment standpoint.  One of them is the arrears

6    to Northeast.  I mean, if you're a hiring person, would

7    you really want to hire someone that's going to be --

8    Remember, we're not talking a seven-dollar-an-hour job.

9    We're talking someone who is twenty dollars-plus per

10   hour.  And they're going to question -- We're almost

11   putting you up to a mid-level manager salary range, and

12   you are in arrears into the very company that you want

13   to work.

14        Now, you've got to ask yourself, a critically

15   sensitive company like Northeast Utilities, there's

16   sensitive data there.  She's going to be a contract

17   person, a contract specialist.  Would this be someone

18   who you would necessarily want working with money on a

19   daily basis?  That's a concern that they might have,

20   but the only person who could have told you that

21   equivocally or unequivocally is Ms. Park, and they

22   chose not to put her on the stand.

23        Now, I'm going to try to keep it as brief as

24   possible so we can finish up.  But the other thing is

25   when you look at what we did or didn't do, we did turn

1    a report around in several days after being given this
2    information.
3            Now, we're not saying that the Plaintiff had
4    an obligation to give it to us.  We're saying it would
5    have been helpful.  Her own expert said -- Mr.
6    Hendricks said he would have counseled her to tell
7    people about that.
8            Now, that's important.  We're not saying it's
9    an affirmative obligation, but it is a factor that you
10   have to ask yourself, and the question has to resonate.
11   Was it meant that she -- Why wasn't it said?  Could it
12   be something that could be, "Hey, this happened with
13   Choice Point.  I did ultimately get the job, but if
14   this were to happen again, hey, I got them.  I got them
15   in a lawsuit and I can keep doing this, and I'll get
16   people, and I can file claims against them."  We don't
17   know the answer to that.
18           Now, one of the other things that we talked
19   about is that they did -- if this happened on May 8th,
20   by three days later a report was turned around.
21   There's a lot being made of the Accurint site and
22   social security numbers.
23           Well, first of all, Accurint is not the
24   criminal -- the criminal database.  So when someone
25   orders, as NESC did, they ordered a criminal background

1    search.  They did not order a civil search.

2         Now, the National Business data site is the

3    site that's used for the information.  They searched

4    that.  They sent a field investigator out there.

5         After this report came back, Ms. Adams gave a

6    lot of information that formed the basis that they were

7    able to go fix the report within three days.  That was

8    why it was helpful, and with the subsequent data that

9    she gave them, they were able to get the Accurint

10   report.

11        But I think when you look at that, they were

12   reasonable.  They were not negligent.  And I think,

13   again, I think the two experts are definitive in what

14   they said, if we were negligent or reasonable.

15        Now, the other thing is -- that we talked

16   about was that Ms. Poulette talked about a subsequent

17   search in 2008.  One thing that never came up was, and

18   Ms. Adams didn't talk about, one of her credit reports

19   that Ms. Poulette spoke about has her identified as

20   "Deborah Jean Adams."  I guess the credit agencies had

21   a reason to use that as a middle name, and Ms. Poulette

22   told you that she saw that report, she reviewed it in

23   2008, and Ms. Adams never said a word about it, either

24   on the stand or through Attorney Madsen.  Nothing was

25   ever said about it.

1          So the thing that we acknowledged, the

2     deficiency, again, is a red herring.  There was no

3     deficiency that we acknowledged in our reasonableness

4     of our procedures, with regards to the background

5     search, and whether our actions were reasonable or we

6     have strict procedures.  Those of you in business know

7     how hard ISO accreditation is.  They are an ISO-

8     accredited company.

9          So using common sense in the business world,

10    you all know what a strict standard it is, that they

11    review companies' procedures, that they go through

12    whether they have strict adherence to industry

13    standards, to the law, not just industry standards,

14    whether they follow the law.  That is one of the

15    hardest accreditations to get, ISO, and they have it.

16         Mr. Hendricks didn't get up there and tell

17    you anything about specifically, "What I don't like

18    about their procedures."

19         So I think that when you go in there, and

20    I'll try to wrap this up, I think that the answers to

21    the questions about whether we were negligent are all

22    "No," and I think whether we were the proximate cause

23    are all "No."

24         I think the experts are really the people who

25    should be the guiding light, and that's why I think you

1   should award Ms. Adams zero in damages.

2          And I just want to say one thing.  I really

3   appreciate you taking time, and Mary Poulette and

4   Verifications does, at this time of year, because we

5   all know how hard it is, and we also know you've all

6   been working very full days, very, very full days.

7   We've all been starting early and going late, and I

8   know that takes people away from places they'd rather

9   be than sitting here listening to us, but we thank you

10  very much.  It's very important to us.  And the -- I

11  think -- I just want to say thank you very much.

12         And I would say, I really wish -- one of the

13  things I don't like about the federal rules is Attorney

14  Madsen gets to go last because just like Attorney

15  Kupinse said, I would have a lot to say and I would --

16  so I would wish that the rules were a little different

17  so I had a second bite at that apple, because I would

18  eat that whole apple.

19         So thank you very much and thank you.

20         THE COURT:  Mr. Madsen?

21         MR. MADSEN:  Your Honor, I'm going to decline

22  an opportunity to take a second bite at the apple.

23         THE COURT:  Okay.

24         All right, Ladies and Gentlemen, it's now

25  11:40.

1          Do they have lunch back there?

2          THE CLERK:  We scheduled approximately

3     between 1:00 and 2:00.

4          THE COURT:  Oh, okay.  Well then, I'll go

5     ahead with the charge.

6          Let's take about a fifteen-minute break and

7     then I'll charge you.

8        (Recess at 11:39 a.m., until 11:59 a.m.)

9                      AFTER RECESS

10         THE COURT:  Bring them in.

11         MR. MADSEN:  Your Honor, before we begin, in

12    light of the closing statements, we are going to

13    request two additional instructions to be given.

14         THE COURT:  Well, you'd better do it.  Put it

15    on the record.

16         MR. MADSEN:  Okay.

17         The one instruction, during the closing Mr.

18    Kupinse made the statement that the Defendants are not

19    pointing the finger at each other.

20         I -- That's not -- First of all, that's not

21    true.

22         Secondly, I would, you know, I think the best

23    way to handle it is for you to instruct them not to

24    consider that statement because it's irrelevant, and I

25    think especially since it's not true, I believe that

1    something has to be said to the jury, not necessarily

2    saying that Mr. Kupinse made a misrepresentation, but

3    simply that they are not to consider that as any

4    evidence.

5            Second, --

6            THE COURT:  Yes, I think I can say that

7    that's not an issue for them.

8            MR. MADSEN:  Okay.  That's fine.

9            MR. KUPINSE:  Well, if Your Honor please, I'm

10   not so sure it isn't true because at this stage of the

11   case we are not pointing the finger at each other.

12           THE COURT:  Yeah, but I don't want to give

13   them any impression that there aren't any cross-claims.

14   The -- Later they're --

15           MR. MADSEN:  Right.  I understand that.

16           THE COURT:  Later, they're going to hear that

17   there are cross-claims.

18           MR. KUPINSE:  Yeah.

19           MR. MADSEN:  The other thing is that there

20   was substantial testimony -- I mean, statements made

21   about witnesses who didn't come and who might have said

22   this, that or the other.

23           I believe that an instruction is in order

24   from Your Honor which says that they are not to

25   speculate as to what potential witnesses -- why

1    potential witnesses might not have been called or what

2    they might have testified to.

3          THE COURT:  No, I won't do that because I

4    wondered about the missing witness, too.  I would have

5    given a straight missing witness charge if I had been

6    asked to do it, so I won't do anything about that.

7          I was surprised that nobody was called to

8    explain why she was terminated, and that's something

9    that the jury can legitimately consider, so I won't do

10   that, but you have the exception to that.

11         But I will comment on the cross-claim

12   situation by just saying that's not an issue for them.

13         All right, then.

14      (Jury in at 12:02 p.m.)

15         THE COURT:  Okay, we're ready to go for the

16   charge.

17         First, I want to say to you that -- as I

18   think I did say to you several times, as you deliberate

19   in this case, you are not considering counsel.  Counsel

20   are professionals who do their job professionally.

21   Their credibility is not anything for you to consider.

22         If you developed any likes or dislikes toward

23   counsel, put those aside because they have nothing to

24   do with how you judge your case.

25         As I've told you, the opening statements and

1   the closing summations of counsel are not evidence, and

2   you may not consider them as evidence.  You can

3   consider them as the arguments of counsel, as to what

4   they wanted to persuade you they had proven through

5   their evidence.  That's why I didn't have you take any

6   notes on the summations.

7          Now, Mr. Kupinse made a comment in his

8   closing statement that the two Defendants were not

9   pointing fingers at each other.  That's not an issue

10   for you to be concerned about.  Whether or not they are

11   or not would be an issue for the Court at this point,

12   not for you.  So you are not to draw any inference as

13   to what the positions of the Defendants are vis à vis

14   each other.  That has nothing to do with your

15   deliberations at this stage.

16          Okay.  Now, it is your job to follow the law

17   as I'm giving you the law -- as I'm about to give you

18   the law.  You apply the law to the facts as you find

19   those facts.

20          The way this trial worked out, it was usually

21   a situation that I was already seated on the bench when

22   you walked in and took your seats in the jury box.

23          Sometimes in a case, it happens that I come

24   in and out of the courtroom and all these people out

25   here stand up.  And when you come in and exit, they all

1   stand up and I don't.  You may wonder about that.  The

2   reason I don't stand up when you come in or out is that

3   I don't expect you to stand up when I come in or out.

4   That's because we're equals.  I'm judging the case on

5   the law for you, but you're judging the case.  We're

6   both equals here.  This is not a job for a judge, it's

7   a job for a jury.  That's why you're so important.

8           So if you had any feeling that I should have

9   stood up, that's why I didn't.  I don't think that

10  happened in this case anyway.

11          But the important point about it is that we

12  are equals and that you do have the job of deciding

13  this case for us.  Remember, you took your oath saying

14  that you would decide the case without any prejudice,

15  sympathy or bias.

16          Now, Mr. Kupinse made a statement in his

17  closing that I have to caution you about.  We generally

18  discourage anyway, the reading back of testimony.  The

19  reason it would be difficult for us to read back any

20  testimony for you in this case is it's compounded by

21  the fact that we had two live court reporters on two

22  days, and I wouldn't know how to locate them for you at

23  this stage.  I don't know where they are today.

24          We have this machine and we had two operators

25  of the machine.  If we were to try to read back

1   testimony for you, it might take a half a day to find

2   that testimony, so please don't ask us to read back

3   testimony.  Rely on your notes.  That's why we let you

4   take your notes.

5          Now, you have a citizen employee who --

6   prospective employee, who is suing two corporations.

7   As I told you at the outset, it makes no difference to

8   you that they're corporations, because corporations

9   connect through only individuals, and that's what you

10  had.  You had corporations representing several

11  individuals who were employed by them.  So that's what

12  you're considering.

13         You consider these parties as equals, except

14  to the extent that the law, as I'm giving you the law,

15  imposes certain rights and obligations upon an

16  applicant for employment, and certain rights and

17  obligations on employers and on people who screen for

18  the employers, so that that may create some

19  differences, but other than that, you treat the parties

20  as equals.

21         It's very important for you to keep in mind,

22  two things as you weigh the evidence in this case.

23  You're really trying two different cases, and the

24  interrogatories, as you heard, are set up to compel

25  you, as we should compel you, to give individual

1    consideration to Verifications and to National.  Take

2    the evidence that's in common for both of them and

3    consider it, but take evidence that may be applicable

4    only to one of them, and consider it only against that

5    Defendant.  So you must constantly keep that in mind.

6         Secondly, there are several Plaintiff claims

7    in this case.  There are several elements to some of

8    those claims.  You must reach unanimity on everything.

9    In other words, you must reach unanimity in order to

10   answer any interrogatory, and any aspect of that

11   interrogatory.

12        And you can't say that -- Say four of you

13   feel or five of you feel that the Defendant violated

14   the law in one respect, and five of you feel the

15   Defendant violated the law in some other respect.  That

16   won't work.  You can't mingle that together.  It's got

17   to be all ten of you in agreement on every single point

18   as you go along, before you can go on to the next

19   point.

20        Now, what is the evidence in the case?  The

21   evidence in the case is the sworn testimony of the

22   witnesses under oath, testifying on the stand, I'll

23   talk about the experts later on, and the documents.

24   There are a lot of documents, so you have big books of

25   documents.  That's what the evidence is and that's all

1    that the evidence is.

2           If you have knowledge of the case outside of

3    that, you put that aside and you don't consider it; you

4    consider only the evidence.

5           Remember, I told you at the outset that

6    counsel's questions to the witnesses are not evidence.

7    They become evidence if the witness accepts the

8    statement of counsel and makes it testimony of the

9    witness.  Then it does become evidence, but only then.

10          As counsel frankly told you, and they were

11   correct in telling you, if your memory of the facts or

12   the evidence differs from what they told you in their

13   summations, it's your evidence of the facts (phonetic)

14   that counts.  I think they gave the law to you

15   correctly.  I didn't detect any incorrections, but if

16   you detected any incorrections from what I tell you

17   now, accept what I tell you now as being the law,

18   because it has to come from me.

19          In every case, we have two types of evidence:

20   Direct evidence and circumstantial.  Let's talk about

21   direct evidence first because when we talk about direct

22   evidence, we're talking about two elements you have to

23   take into account.

24          Direct evidence is given to you by somebody

25   who is a witness to, or a participant in something that

1    happened, and that's exactly what direct evidence is.

2    They're testifying from direct knowledge of what

3    happened.  Only the Plaintiff could really give you an

4    overall view of the case from her standpoint.  Even

5    there, there are a lot of things that you heard about

6    that the Plaintiff had no ability to testify about, and

7    that is any evidence offered by Verifications or

8    National, as to what they did at certain times, or what

9    they said at certain times, some of which was

10   communicated to the Plaintiff by e-mails, but much of

11   which was not, as the testimony that was given to you

12   goes beyond what the Plaintiff was able to testify to.

13           And as counsel reminded you and as I said at

14   the opening, a trial comes in, as you've now seen, over

15   several days.  A trial comes in, in piecemeal fashion

16   and it all has to be put together at the end.  By the

17   end of the trial, you've heard all the evidence that

18   the parties wanted to offer, and you can put it

19   together.  But while you heard it, it was kind of

20   disconnected.

21           You had to take down notes about what one

22   witness was able to tell you, and then go on to notes

23   as to what another witness was able to tell you, and

24   now you've got to put it all together.  It's easy to do

25   that as you look back on it, and that's what we ask you

1    to do.

2             The direct evidence not only involves what

3    the witness is able to tell you, but what the witness

4    was able to remember after the passage of time.  You

5    saw that the depositions were used here.  Depositions

6    have two purposes, one of which was not used in this

7    case.  One is to preserve testimony and used in place

8    of testimony.  That didn't happen here.  But

9    depositions were used her to refresh the witness'

10   recollection.  That's happened several times.  And the

11   witness would look at the deposition and then testify

12   from it as refreshed.

13            You may decide that that refreshing of the

14   witness' recollection was entirely understandable and

15   there's no reason to doubt the witness' credibility

16   just because the memory had to be refreshed, or you may

17   find that the memory was -- the witness was trying to

18   duck or dodge and avoid answering truthfully until

19   refreshed by a deposition or something else.  That's

20   entirely up to you.  But it may be that you can find

21   that in each case here, a refreshing -- it was

22   understandable as to why it would have to be done.

23            So when you deal with direct evidence, that's

24   what you're considering.  What was the ability to be a

25   witness at that time?  Was the witness close at hand?

1    Was the witness able to hear and see everything that

2    was being said or done at that time?

3            A lot of this evidence came in through e-

4    mails and they present an interesting aspect as to that

5    because there is no direct presence involved, you're

6    just reading and interpreting the e-mail.

7            As you judge credibility, what you're judging

8    is the ability of the witness to be truthful and to be

9    accurate in what the witness testifies about.  You can

10   consider that the witness has an interest in the

11   outcome of the case.  The witnesses who were employees

12   of parties obviously have an interest in the outcome of

13   the case.

14           It doesn't have to be a direct, monetary

15   interest, it can be an emotional interest, an interest

16   in wanting to be credible, and to be believed to be

17   credible.  So witnesses do have an interest, some of

18   them.  Some of them don't.  You may have some witnesses

19   who come in who do not have any particular interest in

20   the outcome of the case, but that's a factor you can

21   consider, as some people are better able than others,

22   to give you a complete narrative and an accurate

23   narrative, even though they have an interest in the

24   outcome, other people are not so able to do that.

25           You may decide the witness is not telling you

1    the truth in an aspect of the case that you consider to

2    be reasonably important.  If you find that, what do you

3    do with that testimony of that witness?  You decide

4    what you do with it.  You may accept almost all of the

5    testimony of the witness and reject the part that you

6    find not credible.  You may feel that the witness'

7    credibility has been so damaged that you're not going

8    to believe anything the witness told you, or you may

9    believe that the witness is telling you truth, even in

10   a situation where there is a conflict over what the

11   testimony should be.

12          Now, if you find that a witness has told you

13   something and nobody has contradicted it -- there's no

14   evidence that contradicts it, either by testimony of

15   other witnesses or by documents, you may give that less

16   weight than 100 percent for any reason acceptable to

17   you.  You may feel that, well, the witness told you

18   something and nobody contradicted it, but you don't

19   think the witness was really in a position to be that

20   confident about what the witness was testifying about.

21   That, again, is up to you.

22          Don't sit there and count numbers and say,

23   "Three people testified one way, one person testified

24   another."  That's dangerous because the three may have

25   their information from a common source, but you do

1    consider weight, and if testimony has been corroborated
2    by documents and by other testimony in the case, that
3    may add to the weight of it.  If it's been contradicted
4    by other testimony, that may detract from the weight as
5    you look at it.  That's entirely up to you.

6           What I want to emphasize is that credibility
7    is for you.  It's not a matter of scientific abilities
8    or some technical or professional education or
9    training.  You judge credibility of people all the time
10   in your daily lives, and that's what we're asking you
11   to do here.

12          When you're considering the testimony, as
13   I've really said to you but I'll underline it now, you
14   never do it in a vacuum.  You don't take just that
15   statement that's before you.  You take it and compare
16   it and contrast it with the other evidence in the case,
17   determine whether it's been impeached or whether it
18   hasn't been impeached, and so on, whether there's
19   inconsistency in what the witness is saying now and
20   what the witness may have said at some time earlier,
21   either in writing or orally.

22          Now, I want to spend a little time on expert
23   testimony, but before I do that, let me add one more
24   thing about evidence.  And that is that in addition to
25   direct evidence, there is what we call "circumstantial

1    evidence."  Circumstantial evidence is reached by

2    drawing inferences.  In other words, you find that some

3    proposition that the Plaintiff is offering to you as an

4    example here, has been proven, and you find that a

5    fact, which you're going to find determined as a fact

6    in the case.

7         From that, you're asked, however, to draw an

8    inference that something logically follows from what

9    you have found, in other words, that somebody said

10   something, or did something, or acted in accordance

11   with the logical inference that that's what they would

12   have done after hearing or knowing about the fact that

13   you found on direct evidence.

14        If you do draw circumstantial evidence, you

15   treat that circumstantial evidence by the same tests

16   that you treat direct evidence.  There's no difference

17   in how you treat it or how you weigh it.

18        Now, you have three experts here, people

19   qualified to give opinions.  The opinions were

20   obviously conflicting, to some extent.  To some extent,

21   they -- the claim was made that one of the experts

22   agreed with something that the opposing expert said or

23   concluded, but you had some conflict.

24        Now, as you weigh the testimony of these

25   people who were allowed to come in and give opinions,

1   you consider all of the things I told you about, about

2   considering fact witnesses.  Consider their

3   credibility.  You consider their qualifications to give

4   you the opinion they're giving you.  You may give them

5   less weight or no weight on any one of several grounds:

6          One, that you don't think they're qualified

7   to give that opinion; or

8          two, that you don't think you need the

9   opinion, that you can judge that fact and reach that

10  fact based upon your own background and knowledge in

11  life, and you don't need the experts.

12         But to the extent that you do, then you're

13  entitled to take that expert opinion and use it as you

14  see fit.  You weigh it by the same considerations you

15  gave any other type of witness.

16         Now, if you find that the expert or any other

17  witness or the lawyers made a statement about what law

18  is applicable, and how you interpret the Fair Credit

19  Reporting Act, the law is to come from me, and you

20  accept only the law as I'm giving it to you now, about

21  to give it to you, when I get to the substantive

22  charge.

23         As we told you, and this is about the third

24  or fourth time now you will have heard it, on judging

25  burden of proof, burden of proof is preponderance of

1    the evidence.  When you apply that burden to the

2    evidence, you take that scale, or the imaginary scale,

3    and you put all the pro evidence on one side and the

4    con evidence on the other side, and see how the scale

5    reacts.  If it tips ever so slightly, or more than ever

6    so slightly in favor of the proposition, then the

7    person bearing that burden of proof prevails on that

8    proposition, in your mind.  You can find that fact.

9           If the scale tips ever so slightly, or more

10   than ever so slightly against the proposition, then the

11   Plaintiff, or the person bearing the burden of proof,

12   has not prevailed.

13          The key is, of course, as counsel pointed out

14   and as I pointed out, if it doesn't move at all, if it

15   actually remains in balance, in equipoise, then that's

16   speculation, and the Plaintiff, or whoever bears that

17   burden of proof, may not prevail on that because that's

18   the requirement of preponderance of the evidence, that

19   there be a preponderance of the evidence, not a

20   balancing, not a speculation.

21          Now, I think we'd all better be very careful.

22          Craig, why don't you take this, show it to

23   counsel, make sure this is the right copy because the

24   jury is going to get it, and I'm going to read it to

25   them.  I don't want to read you one that's one of the

1    earlier drafts we went through, so make sure that

2    that's what I'm supposed to be reading to them and

3    that's what they're going to get.

4        (Pause.)

5            THE COURT:  It's okay?  All right.

6            I will read you the substantive juror

7    instructions.  I have to read them to you because

8    you're going to have five copies of them with you.

9            In this case, Plaintiff Deborah Adams brings

10   claims under the federal Fair Credit Reporting Act and

11   Connecticut common law against the Defendants National

12   Engineering and Verifications.

13           Specifically, the Plaintiff asserts the

14   following claims:

15           Defendant National Engineering willfully

16   failed to comply with 15 United States Code 1681e(b) by

17   not following reasonable procedures to assure maximum

18   possible accuracy of the information concerning the

19   Plaintiff.

20           That's the first claim.

21           Second claim:

22           That Defendant National Engineering willfully

23   failed to comply with 15 United States Code 1681k by

24   not notifying Plaintiff at the time that the public

25   report information was reported of the fact that public

1    record information was being reported by it, together

2    with the name and address of the person to whom such

3    information is being reported, and by not maintaining

4    strict procedures designed to ensure that whenever

5    public record information which is likely to have an

6    adverse effect upon Plaintiff's ability to obtain

7    employment is reported, is complete and up-to-date.

8            You might want to make a change in this, and

9    I'll leave that to counsel to look at and consider, and

10   if we have to make a change, we'll make the change and

11   let the jury know we're doing that, but I don't know

12   whether we do or not.

13           In Number 2 and in Number 4, we use the term

14   "Public record information," and we use it throughout.

15           At one point we say, "By not notifying

16   Plaintiff at the time," that public report information.

17   I don't think it should read that way.  I think it

18   should be "Public record information being reported."

19   I think it should be consistent throughout.

20           MR. COFFEY:  That's fine, Your Honor.

21           THE COURT:  So we'll change that wording

22   before we give it to the jury.  I'll make a note here

23   and you can change it --

24           MR. MADSEN:  That's fine with us.

25           THE COURT:  -- before they get it.

1          MR. KUPINSE:  And for National.

2          THE COURT:  It's not important, but we just

3     don't want to confuse you by changing any terms in

4     here.  Okay.

5          That's the second claim.

6          The third claim is a little bit different.

7     The third and fourth claims are a little bit different

8     than the first and second claims in the language, and

9     it's a very important difference.  There's one major

10    difference.

11         The first two talk in terms of willful

12    failure, "willfully failed."  The third and fourth,

13    "negligently failed."  In other words, these are not

14    willful claims, these third and fourth claims.  There's

15    the same violations of the statute, but the standard is

16    not willful, it's negligent violation.  So it's a

17    different standard that you apply, and I'll be charging

18    you on that.  Otherwise, the counts are the same.

19         So the third reads that Defendant National

20    Engineering negligently failed to comply with 15 United

21    States Code 1681e(b) by not following reasonable

22    procedures to assure maximum possible accuracy of the

23    information concerning the Plaintiff.

24         And four, that Defendant National Engineering

25    negligently failed to comply with 15 United States Code

1     1681k by not notifying Plaintiff at the time that the

2     public record information was reported, of the fact

3     that public record information was being reported by it

4     together with the name and address of the person to

5     whom such information is being reported, and by not

6     maintaining strict procedures designed to ensure that

7     whenever public record information, which is likely to

8     have an adverse effect upon Plaintiff's ability to

9     obtain employment, is reported, is complete and up-to-

10    date.

11            Five, that Defendant Verifications -- We're

12    shifting now over to Verifications and we're going to

13    repeat what we had to say about National.

14            Five says that Defendant Verifications -- But

15    we're only talking about negligence here, we're not

16    talking about willful.  So you're not repeating one and

17    two, you're repeating three and four as to

18    Verifications.  You're dealing only with negligence.

19            Defendant Verifications negligently failed to

20    comply with 15 United States Code 1681e(b) by not

21    following reasonable procedures to assure maximum

22    possible accuracy of the information concerning the

23    Plaintiff.

24            Craig, we have to change six also, when we're

25    changing two and four.  I'll change it now.

1           Six, that Defendant Verifications negligently

2    failed to comply with 15 United States Code 1681k by

3    not notifying Plaintiff at the time that the public

4    record information was reported, of the fact that

5    public record information was being reported by it,

6    together with the name and address of the person to

7    whom such information is being reported, and by not

8    maintaining strict procedures designed to ensure that

9    whenever public record information which is likely to

10   have an adverse effect upon Plaintiff's ability to

11   obtain employment is reported, is complete and up-to-

12   date.

13           So you have a lot of repetition to consider

14   because we're talking about the same statute -- the

15   same sections of the statute.

16           You're applying "willful" on one Defendant.

17   You're applying "negligent" on both defendants, of the

18   same statute sections.

19           That Defendant National Engineering

20   negligently inflicted emotional distress upon the

21   Plaintiff.  That's a state common law claim, and I'll

22   be giving you different law about that, how you apply

23   that.

24           That Defendant Verifications negligently

25   inflicted emotional distress upon the Plaintiff.

1   Again, you have the same test as to National and

2   Verifications, as to whether they negligently inflicted

3   emotional distress upon the Plaintiff under Connecticut

4   common law.

5           Now, when I say you're looking at both

6   Defendants under the same standard, that is true.  The

7   evidence applicable to National on this count, and

8   applicable to Verifications on this count may not be

9   the same.  It does not have to be the same.  So you

10  must remember that you're trying two separate

11  defendants here, and when you look at the emotional

12  distress, you've got to look at what National is

13  claimed to have done, and what Verifications is claimed

14  to have done that would have inflicted emotional

15  distress upon the Plaintiff.  Keep them separate.

16          Now, the Court has found in this case, that

17  both Defendants, National and Verifications, are

18  consumer reporting agencies that prepared consumer

19  reports, as those terms are used in the law.

20          A "consumer report," as that term is used in

21  the law, means any written law or other communication

22  of any information by a consumer reporting agency

23  bearing on a consumer's credit worthiness, credit

24  standing, credit capacity, character, general

25  reputation, personal characteristics or mode of living,

1    used or expected to be used or collected, in whole or

2    in part, for the purpose of serving as a factor in the

3    establishing of the consumer's eligibility for

4    employment purposes.

5           Now, we're going to talk about negligence, to

6    give you a standard to apply, and we're going to apply,

7    and we're going to talk about willfulness, to give you

8    a standard to apply.

9           The Plaintiff claims, as to the violations of

10   the Fair Credit Reporting Act, that Defendant acted

11   negligently and/or willfully, and I'm going to explain

12   to you what the law means by both of those.  Let's

13   start with negligent.

14          Acting negligently means the actor failed to

15   act as a reasonably prudent actor would do under the

16   circumstances.  Negligence may consist either in doing

17   something that a reasonably careful actor would not do

18   under like or similar circumstances, or failing to do

19   something a reasonably careful actor would do under

20   like or similar circumstances.

21          In evaluating the reasonableness of an

22   actor's actions, you must balance the potential harm

23   from inaccuracy against the burden on the agency, of

24   safeguarding against such inaccuracy.

25          A party acts willfully when that party acts

1   in reckless disregard of its statutory duty.  That's

2   the definition of "Willfully."  An action is considered

3   reckless when it entails an unjustifiably high risk of

4   harm that's either known or so obvious that it should

5   be known.

6          Section 1681e(b).  Section 1681e(b) of the

7   law requires that whenever a consumer reporting agency

8   prepares a consumer report, it shall follow reasonable

9   procedures to assure maximum possible accuracy of the

10  information concerning the individual about whom the

11  report relates.

12         Reasonable procedures under the law requires

13  you to consider what a reasonably prudent person would

14  do under the circumstances.

15         Evaluating the reasonableness of an agency's

16  procedures involves balancing the potential harm from

17  inaccuracy against the burden on the agency, of

18  safeguarding against such inaccuracy.  The cost of

19  requiring consumer reporting agencies to go beyond the

20  original source of information is a factor that you may

21  consider.

22         1681k.  In 1681k, a consumer reporting agency

23  must undertake one of two protective measures:

24         First, the agency may, at the time that the

25  public report information was reported -- That should

1    be "public record" to again make that consistent, so

2    that will be another change we'll make on page 4.  So

3    we always talk about public record information being

4    reported.

5            Notify the consumer of the fact that public

6    record information is being reported by the consumer

7    reporting agency, together with the name and address of

8    the person to whom such information is being reported.

9            Alternatively, the agency may maintain strict

10   procedures designed to ensure that whenever public

11   record information which is likely to have an adverse

12   effect on a consumer's ability to obtain employment is

13   reported, it's complete and up-to-date.

14           As to the second option, the law provides

15   that items of public record relating to arrests and

16   convictions shall be considered up-to-date if the

17   current public record status of the item at the time of

18   the report is reported.

19            I wanted to make sure this language accords

20   with the earlier language I gave you, and it does.

21   Okay.

22           Count One.  In the first count, Plaintiff

23   claims that National Engineering willfully failed to

24   follow reasonable procedures to assure maximum possible

25   accuracy of the information concerning the Plaintiff.

1          To prove her claim, the Plaintiff must prove

2     by a preponderance of the evidence that:

3          One, National Engineering reported inaccurate

4     information about the Plaintiff;

5          two, National Engineering acted in reckless

6     disregard of its duties by failing to use reasonable

7     procedures to assure maximum possible accuracy of the

8     information concerning the Plaintiff; and

9          three, Plaintiff was injured; and

10         four, that National Engineering acts or

11    omissions were a proximate cause of injuries to the

12    Plaintiff.

13         Count Two.  In the second count, Plaintiff

14    claims that National Engineering willfully failed to

15    comply with the requirements of law by failing to

16    notify the Plaintiff at the time that public report

17    information was reported.

18         Again, that's got to be "public record

19    information."  We've got a lot of changes to make here

20    in this.  We'll do it before you get it.

21         That the public record information is being

22    reported by National Engineering together with the name

23    and address of the person to whom such information is

24    being reported; and

25              two, by failing to maintain strict procedures

1   designed to ensure that whenever public record

2   information which is likely to have an adverse effect

3   on a consumer's ability to obtain employment is

4   reported, it's complete and up-to-date.

5          You should bear in mind that items of public

6   record relating to arrests and convictions shall be

7   considered up-to-date if the current public record

8   status of the item at the time of the report is

9   reported.

10          To prove her claim, Plaintiff must prove by a

11   preponderance of the evidence that National Engineering

12   acted in reckless disregard of its duties by failing to

13   perform both of these requirements, and such failure

14   was a proximate cause of Plaintiff's injuries, if any.

15          All right.  We've dealt with the willful

16   counts.  Now we'll deal with the negligence counts,

17   three and five.

18          In her third and fifth counts, Plaintiff

19   claims that National Engineering and Verifications both

20   negligently failed to follow reasonable procedures to

21   assure maximum possible accuracy of the information

22   concerning the Plaintiff.

23          To prove her claim, the Plaintiff must prove

24   by a preponderance of the evidence:

25          One, that such Defendant reported inaccurate

1    information about the Plaintiff;

2            that such Defendant acted negligently by

3    failing to use reasonable procedures to assure maximum

4    possible accuracy of the information concerning

5    Plaintiff;

6            three, Plaintiff was injured; and

7            four, such acts or omissions by one or both

8    of National Engineering and Verifications were a

9    proximate cause of injury to the Plaintiff.

10           A lot of this, you'll see you're applying the

11   same standards throughout.  Again, the evidence may be

12   different but the standards you apply will be the same.

13           In the fourth and six counts, Plaintiff

14   claims that National Engineering and Verifications were

15   negligent -- negligently failed to comply with the

16   requirements of the law by failing to notify Plaintiff

17   of the fact that public record information was being

18   reported to such Defendant, together with the names and

19   record of the person to whom such information is being

20   reported, and by failing to maintain strict procedures

21   designed to ensure that whenever public record

22   information which is likely to have an adverse effect

23   on a consumer's ability to obtain employment is

24   reported, it's complete and up-to-date.

25           Bear in mind that items of public record

1    relating to arrests and convictions shall be considered

2    up-to-date if the current public record status of the

3    item at the time of the report is reported.  Again,

4    that is the same standard we're applying throughout.

5            To prove her claim, the Plaintiff must prove

6    by a preponderance of the evidence, that National

7    Engineering and/or Verifications acted negligently by

8    failing to perform both of these duties, and that such

9    failure was a proximate cause of Plaintiff's injuries,

10   if any.

11           Now we get to the state common law, Counts

12   Seven and Eight.

13           Plaintiff claims that Defendants' conduct

14   negligently inflicted emotional distress.  I will now

15   speak to you about the elements needed to prove

16   negligent infliction of emotional distress upon the

17   Plaintiff.

18           To prove her claim, the Plaintiff must prove

19   by a preponderance of the evidence, each of the

20   following four elements:

21           One, that the Defendants' conduct created an

22   unreasonable risk of causing emotional risk (phonetic),

23   and that's the Defendant you're considering.

24           Remember, you must consider each Defendant

25   separately as you look at Counts Seven and Eight.

1              That the Defendant knew or should have known

2       that its conduct created this unreasonable risk;

3              that the Defendant knew or should have known

4       from the facts known at the time it acted, that the

5       emotional distress, if caused, might result in injury

6       to the Plaintiff; and

7              four, that Defendants' conduct actually

8       caused the Plaintiff to suffer emotional distress.

9              So you must first determine whether the

10      Plaintiff has proven by a preponderance of the

11      evidence, that one or both of the Defendants' conduct

12      created an unreasonable risk that would cause her to

13      suffer emotional distress.

14             An "unreasonable risk" is a risk that a

15      reasonably prudent actor would not take under the

16      circumstances.

17             The second element the Plaintiff must

18      establish by a preponderance of the evidence is that

19      such Defendant knew, or should have known, that its

20      conduct created unreasonable risk that the Plaintiff

21      would suffer emotional distress.  In other words,

22      Plaintiff must prove that either the Defendant actually

23      was aware of the risk created at the time, or that a

24      reasonable actor in the same circumstances should have

25      been aware at the time that the conduct would expose

1    Plaintiff to an unreasonable risk of emotional

2    distress.

3            Plaintiff must also prove by a preponderance

4    of the evidence, that from the facts known to the

5    Defendant at the time, it should have realized that the

6    distress, if it were caused, might result in emotional

7    distress.  In other words, a Defendant's conduct must

8    be more than just upsetting.  The Plaintiff must prove

9    that that Defendant should have realized its conduct

10   was sufficiently improper that there was a reasonable

11   probability that the emotional distress it might cause

12   would result in illness.

13           The fourth and last element the Plaintiff

14   must prove by a preponderance of the evidence is that

15   Defendants' actions were a substantial factor in

16   causing emotional distress, if the Plaintiff is found

17   by you to have suffered any.  This involves two

18   questions.

19           First, you must determine whether Plaintiff

20   has suffered emotional distress at all.  In other

21   words, you must decide whether the Plaintiff

22   established by a preponderance of the evidence, that

23   she actually suffered emotional distress.

24           Second, you must determine whether the

25   Defendant's conduct legally caused that emotional

1    distress, if any existed.  A Defendant's conduct is a

2    legal cause of Plaintiff's injuries if it directly, and

3    in natural and continuous sequence, produces or

4    contributes substantially to producing such injury.  So

5    it can reasonably be said that except for the conduct,

6    the injury would not have occurred.

7        Now, with respect to all of these claims, of

8    course, you must find a causation factor.  In other

9    words, in order for the Plaintiff to prevail on any of

10   her claims, there must be a showing by her, by a

11   preponderance of the evidence, that one or both of the

12   Defendants' conduct was found to be in violation of

13   federal or state law, was a proximate cause of the

14   injury -- of injuries to the Plaintiff.

15       Proximate cause -- We use that phrase in the

16   law.  It means that cause or act which, as a natural

17   sequence, produces the injury or damage, and without

18   which the injury or damage would not have occurred.  In

19   other words, a Defendant's conduct must be a

20   substantial factor in producing the injury or damage,

21   not a mere condition, or incident to the harm.

22       This does not mean, however, that the law

23   recognizes only one proximate cause of an injury or

24   damage.  On the contrary, many factors, or things, or

25   the conduct of more than one person may operate at the

same time, either independently or together, to cause
injury or damage.  In such a case, each may be a
proximate cause of that injury or damage.

Now, if you found that Plaintiff has proven
her claims by a preponderance of the evidence, then you
may consider what damages, if any, are due to her.  The
fact that I'm giving you instructions on damages at
this point should never be taken by you as an
indication that I think that you should or should not
award damages.  That's your determination entirely.
I'm instructing you on principles governing damage
awards, just so that in the event you find liability on
the part of one or both of the Defendants, you know on
what basis to consider any assessment of damages.

There are two kinds of damages in the law
that you may consider.  The first is known as
"Compensatory damages."

Compensatory damages represent a sum of money
that will fairly, adequately and reasonably compensate
a person for harm proximately caused by the conduct of
another.  Compensatory damages are never allowed as
punishment.  They cannot be imposed or increased to
penalize a Defendant.  Neither can such damages be
based upon speculation, because it is only actual or
compensatory damages which are recoverable.

1        Plaintiff seeks compensatory damages on her

2   claims under the Fair Credit Reporting Act and for

3   negligent infliction of emotional distress.  The

4   violation of Plaintiff's rights should be compensated

5   by damages, only to the extent that the damages are

6   reasonably quantifiable.

7        It is for you, in the exercise of your best

8   judgment, to say what is fair and just compensation to

9   the Plaintiff insofar as money can compensate her for

10  the damages she has sustained.

11       Determining damages in a case of this sort

12  involves a certain degree of estimation.  Often,

13  certain types of damages cannot be proven with

14  mathematical certainty.  You have to apply sound

15  judgment and common sense in reaching the proper amount

16  of damages.  However, there must be evidence to

17  establish damages with at least a reasonable degree of

18  certainty.  You may never guess or infer or speculate

19  as to damages.  You use your best judgment, remembering

20  it's incumbent upon the Plaintiff to prove by a fair

21  preponderance of the evidence, the amount of damages to

22  which she's entitled.

23       Compensation may be awarded for any emotional

24  harm to the Plaintiff during and after the events

25  (unintelligible) including emotional distress or pain,

1  humiliation, personal indignity, embarrassment, fear,

2  anxiety or anguish that you find Plaintiff has

3  suffered, and you find caused by the conduct of a

4  Defendant.

5         Now we're going to talk about the Fair Credit

6  Reporting Act, and as you apply that and consider

7  damages, if you've found there were negligent

8  violations of the law under the Fair Credit Reporting

9  Act.

10        The Plaintiff is entitled to recover any

11  actual damages sustained by the Plaintiff as a result

12  of that Defendant's failure to comply with the law.

13        Now, what does this term "actual damages"

14  mean?  It includes both compensatory damages, as I've

15  just finished describing compensatory damages to you,

16  and economic damages.  So when you're considering the

17  Fair Credit Reporting Act violation claim, you must

18  include economic damages in that.

19        The Fair Credit Reporting Act provides that

20  for willful violations of the law, Plaintiff is

21  entitled to recover actual damages as a result of such

22  failure to comply with the law, or damages of not less

23  than $100 and not more than $1,000, as well as any

24  punitive damages that you may allow.  And I'll be

25  talking about the punitive now.

1          Whether or not you're going to award punitive

2     damages is up to you, of course.  In this case, you may

3     consider whether National Engineering's acts or

4     omissions, if you find them to be proved, were so

5     serious that National Engineering should pay a penalty

6     to deter it from engaging in the same conduct in the

7     future.  Whether you decide to assess punitive damages

8     should be based on whether you find National

9     Engineering engaged in the following things:

10         One, willful violations of Plaintiff's rights

11    under the Fair Credit Reporting Act or intentional act

12    by National Engineering in gross disregard of the

13    Plaintiff's rights, or reckless disregard by National

14    Engineering as to whether they were violating

15    Plaintiff's rights.

16         If you find any one of those three things to

17    have been proven, then you are free to assess punitive

18    damages.  The law requires that punitive damages, if

19    assessed, must be fixed by you with calm discretion and

20    sound reason.  You must never assess or fix an amount

21    because of bias, sympathy or prejudice with respect to

22    any party in the case.

23         Now we turn to negligent infliction of

24    emotional distress.

25         If you find one or both of the Defendants

1    liable for negligent infliction of emotional distress,
2    you may award compensatory damages, as I described them
3    earlier.  That's not economic damages, that's the
4    compensatory damages, pain and suffering type of thing.
5            You're going to be asked to answer several
6    questions, and we'll be talking about those now.  I'll
7    be distributing a set of those questions to each of you
8    and we'll go over them together.
9            Only the foreperson -- You are going to
10   select the foreperson.  You do that, I do not do that
11   for you.  The foreperson will have a copy of the
12   special verdict form.  It will differ from the other
13   nine copies only in one respect, it's six pages long.
14           At the bottom of page 6, one of the copies
15   will have a space for the foreperson's signature and
16   the date.  There will be only one copy given you that
17   has that on it.  The other nine copies will not.
18           The foreperson has only clerical
19   responsibility.  The foreperson is otherwise equal to
20   all the rest of you.  The foreperson is charged with
21   the responsibility of organizing and leading your
22   deliberations, mainly because somebody has to do that,
23   and so we pick a foreperson to do that, but the
24   foreperson's opinion as to what the evidence adds up to
25   is no more binding than any other person's opinion.  We

1    do want you to consider one another's opinions, that's

2    what you're supposed to do in deliberations, and I'll

3    talk in more detail about that.

4              Now, as we look at the interrogatories, you

5    will be asked to answer several questions concerning

6    the issues in the case.  The questions you will be

7    asked to answer often can be answered "Yes" or "No."

8    Several of the questions need to be answered only if

9    you give a certain answer to a prior question or

10   answers to prior questions.  You should never answer

11   any question one way or another to avoid answering a

12   later question.  It may turn out you don't have to

13   answer all of the questions.

14             Each answer -- Each question that you answer

15   should be given individual consideration based upon the

16   facts applicable, the evidence applicable to that

17   question and the law as I give it to you, applicable to

18   that question.

19             Never assume from the wording of any

20   question, nor from the fact that a question is even

21   asked, that there's a particular answer you're supposed

22   to give.  Your answers should be given solely on the

23   basis of your assessment of the evidence and the

24   application of the law.

25             Okay, do you want to distribute those?  I

1   have the foreperson's copy here, so they won't get that
2   now.
3           All right, now, I think it would be helpful
4   in this case for you to follow the order of the
5   interrogatories.  I have often instructed jurors that
6   if they get hung up at one point, they can leave it
7   aside and go on to another point and come back to it
8   later.  I don't think that would be a wise idea in this
9   case.  I think you'd be better off, logically, if you
10  follow the order of these interrogatories, so I'm going
11  to suggest you do that, and you can't proceed to the
12  next interrogatory until you've reach unanimity on the
13  interrogatory you're conceding (phonetic).
14          As I told you, you must be unanimous on each
15  detail of each claim of the Plaintiff.
16          "Has Plaintiff proven by a preponderance of
17          the evidence that Defendant National
18          Engineering willfully failed to follow
19          reasonable procedures to assure maximum
20          possible accuracy of the information
21          concerning the Plaintiff?"
22          And you're going to find this language
23  repeated several times throughout, as I did it in the
24  charge.
25          So here, what you're doing is considering

1    National and considering willful, the willful standard,

2    and when you reach a unanimous decision on A, you may

3    go on to B, and you must go on to B whether you found

4    "Yes" or "No" on the A.

5            "Has Plaintiff proven by a preponderance of

6             the evidence that Defendant National

7             Engineering reported inaccurate information

8             about the Plaintiff?"

9            You answer "Yes" or "No."

10           Now, we didn't put in an instruction here,

11   but I'll instruct you now, and keep it in mind, that if

12   you answer "No" as to A and B, you should not answer C

13   and D, because you've not found any liability for

14   willfulness.  So don't answer C and D unless you answer

15   "Yes" as to A or to B, and if you answer "Yes" as to A

16   and "Yes" as to B, or "Yes" as to A or "Yes" as to B,

17   you must answer C and D.

18           Has the Plaintiff proven she was injured?

19   Has she proven by a preponderance of the evidence that

20   Defendant National Engineering Service Corporations

21   were a proximate cause of Plaintiff's injury?

22           Really, what I would prefer to have you

23   consider here on D, and we may change this before you

24   get it, I think we will, if you answer "Yes" to

25   question 1.C., then you've got to answer 1.D., because

1    you're not going to answer 1.C. unless you answered

2    "Yes" to either A or B.  So we'll change that to say if

3    you answer "Yes" as to 1.C., then you must answer 1.D.

4    to find proximate cause.

5          Now, when we get to Count Two, it's again

6    National Engineering, it's again willful, but it's a

7    different statute.  It's 1681k.

8          "Has Plaintiff proven by a preponderance of

9          the evidence" --

10         You're looking at different evidence now.

11   You're taking this claim, regardless of what you did on

12   Count One.  Regarding -- You may have found "No"

13   answers -- You may have answered "No" to Count One.

14         You give independent consideration to Count

15   Two.  You have independent evidence.  You're looking at

16   that evidence as to National Engineering, and you must

17   give us an answer to Count Two.

18         Has Plaintiff proven by a preponderance of

19   the evidence that Defendant National Engineering

20   willfully failed to notify her at the time that the

21   public report information was reported, of the fact --

22   and then that's got to be "public record," and we've

23   got to change this as well as we change the standard --

24   the substantive law charge.

25         So it will say "public record information was

1   reported," of the fact that public record information

2   was being reported to National Engineering Service

3   Corp., together with the name and address of the person

4   to whom such information was being reported.

5            When you unanimously agree on that, you

6   answer "Yes" or "No."

7            Then you go to F:

8            "Has Plaintiff proven by a preponderance of

9            the evidence that Defendant National

10           Engineering Service Corporation willfully

11           failed to maintain strict procedures designed

12           to ensure that whenever public record

13           information which is likely to have an

14           adverse effect on Plaintiff's ability to

15           obtain employment is reported, it's complete

16           and up-to-date."

17           Now, that's separate evidence and we must

18   answer that regardless of how you answered E.

19           Now, if you answer yes, and that should not

20   read the way it does.  It should say "and/or."

21           If you answer "Yes" to question 1.E. and/or

22   1.F.:

23           "Has Plaintiff proven by preponderance of the

24           evidence that Defendant National Engineering

25           acts or omissions were a proximate cause of

1          any injury to her," you answer that "Yes" or

2          "No."

3      (Pause.)

4          THE COURT:  And I think what I'll do is say

5  here, "If you answered "Yes" to question 1.G., then be

6  sure to answer questions 3.A. and 3.C., and we'll get

7  to that later, but you've found liability and you've

8  found proximate cause.  You can't find liability in a

9  vacuum, you've got to find proximate cause.  That's why

10  the proximate cause interrogatory will enable us to

11  kick into damages, and that's why it's the only one I'm

12  going to refer to and cross-reference.  It will be 1.G.

13          All right, Count Three.  We'll now shift to

14  negligence, National Engineering Service negligent

15  standard on Section 1681e(b).

16          "Has Plaintiff proven by a preponderance of

17          the evidence that Defendant National

18          Engineering Service Corporation negligently

19          failed to follow reasonable procedures to

20          assure maximum possible accuracy?"

21          That's the same as you had in Count One, but

22  it's going to be "negligence" rather than "willful."

23  You answer "Yes" or "No" when you reach unanimity on

24  that.

25          "Has Plaintiff proven by a preponderance of

the evidence that Defendant National

Engineering reported inaccurate information

about the Plaintiff?

All right.  You must answer "Yes" or

"No" as to that.

Then you go on, unless you answered "No" as

to H. and I.  If you answered "No," then you don't

answer J.  But if you answered "Yes," then you answer

J.

And I'll change K to make it read that just

J/, because if you answer J. you'll have found the

liability and we go to proximate cause.  If you

answered question 1.K., then you've got to be sure to

answer 3.A.  We'll change that there, also.

Count Four is negligence failure on the part

of National Engineering to comply with Section 1681k.

"Has Plaintiff proven by a preponderance of the

evidence that Defendant National negligently failed to

notify her at the time that the public report

information was reported," that should be "public

record information," we'll change that again for you,

"was being reported by National Engineering Service

Corporation together with the name and address of the

person to whom such information was being reported?"

When you agree unanimously on that, you go to

1   M.

2           "Has Plaintiff proven by a preponderance of

3           the evidence that Defendant National

4           Engineering Service Corporation negligently

5           failed to maintain strict procedures designed

6           to ensure that whenever public record

7           information which is likely to have an

8           adverse effect is reported, is complete and

9           up-to-date?"

10          All right.  If you answer "Yes" to questions

11  1.L. and/or 1.M., I'll change that:

12          "Has Plaintiff proven by a preponderance of

13          the evidence that Defendant National

14          Engineering Service Corporation's acts or

15          omissions were a proximate cause of any

16          injury?"

17          "Yes" or "No"?, and I'll change the thing

18  down below so it will say, "If you answered 'Yes' to

19  question 1.N., be sure to answer question 3.A.

20          Now, finally, we get to negligent infliction

21  of emotional distress, and that's the Connecticut

22  common law.

23          "Has Plaintiff proven by a preponderance of

24          the evidence that Defendant National

25          Engineering negligently inflicted emotional

1               distress by meeting all of the elements

2               listed in the substantive law charge?"

3               You'll refer back to the substantive law

4    charge and that will give you the elements of emotional

5    distress -- negligent infliction of emotional distress.

6               When you've done that you answer "Yes" or

7    "No."  Remember, you must find each of those elements

8    to be proven by a preponderance of the evidence.

9               If you find each of those elements to have

10   been proven, then you can answer "Yes" as to O.

11              A JUROR:  Your Honor, may I ask a question?

12              THE COURT:  Yes.

13              A JUROR:  I just want to make sure I've

14   understood.  If of any of these four points, the answer

15   is "No," then the O is "No"?  (Inaudible) four points

16   must be "Yes"?

17              THE COURT:  All four points must be "Yes," I

18   told you in the substantive charge.  You'll find that

19   in the substantive charge.

20              A JUROR:  Okay.

21              THE COURT:  And I'm completely wrong.  I'm

22   completely wrong and Craig is completely correct.

23   Okay.

24              The elements we're talking about here, to

25   prove negligent infliction of emotional distress, are

1    indeed -- I wondered why Craig had turned over the

2    numbers.  Those are the four elements.  They are set

3    forth right here, and that's what we're talking about.

4          And I did talk about those four elements in

5    the substantive law charge, but they are given to you

6    here.  That's why O. is listed as O.  I was looking at

7    it trying to find out why it was listed as O.

8          I thought he was going to proximate cause but

9    he was not.  He was putting in all four elements, and

10   you must find all four elements.

11         I'll leave it to counsel -- I think we've got

12   to decide what we want to do here before we send this

13   into the jury.  My own preference would be take

14   (unintelligible) this way: Plaintiff must prove by a

15   preponderance of the evidence that Defendant National

16   Engineering Service Corporation negligently inflicted

17   emotional distress upon her by proving all four

18   elements listed below.

19         I wouldn't ask for a "Yes" or "No" there.  I

20   don't want to risk an inconsistent verdict.  So let

21   them go ahead and consider all four elements, and if

22   they find "Yes" to all four elements, we will know that

23   they have found negligent infliction of emotional

24   distress.

25         And then it says at the end of it, "If you

1    answer "Yes" as to question" -- well, as to all four

2    questions under O., answer question 3.D.

3            Then we go to Verifications.  We have Section

4    1681e(b).  You'll find the same language you had before

5    as to National.  I didn't make any changes when we were

6    dealing with Count Three, with one exception.  We'll

7    change Count Five D. and take out A. and B.  We'll just

8    make it, "If you answered 'Yes' to Question 2.C."  If

9    they answer "Yes," then we get to the proximate cause

10   question.

11           You're not to answer C. unless you find A.

12   and B. violations.  I told you that when I was dealing

13   with that before.

14           A JUROR:  Your Honor, A. and B. or A. and/or

15   B.?

16           THE COURT:  Yeah.  I told you on Count Three,

17   if you do not answer "Yes" to either H. or I., then

18   what you've got is no need to answer J. or K.

19           You follow that right down through Count

20   Five, and you don't answer C. unless you answered "Yes"

21   to A. or B.  We'll have the reference over to C. and D.

22   to answer question 3.A.

23           All right.  We'll go to Count Six, negligent

24   failure to comply with 1681k.  This tracks, again, the

25   language of -- although we screwed it up on all the

1    other points where we've changed "report" over to

2    "record," it was not screwed up here.  It does have it

3    correctly set forth here, "at the time that public

4    record information was reported," so we don't have to

5    make any change there.

6         All right.  So we'll make one change there,

7    under G., "If you answered 'Yes' to questions 2.E.

8    and/or 2.F.  So if you answer "Yes" to Question 2.G.,

9    then be sure to answer 3.A.

10        Then we go to negligent infliction of

11   emotional distress against Verifications, which should

12   track what we had against National, and it does.  We'll

13   do this.  We're not going to ask "Yes" or "No."  We're

14   going to say, "Plaintiff must prove by a preponderance

15   of the evidence that Defendant Verifications

16   negligently inflicted emotional distress upon her by

17   proving all four elements listed below," same language

18   we used before, and we'll have the four elements there.

19        All right.  Then you get to damages only if

20   you -- and we kept instructing you as we went through,

21   that you must answer certain questions only if you

22   answer "Yes" to certain other questions, and that's all

23   explained as we went through, and we repeat it back

24   here.

25        That's the way I want it in the final section

1   in each one, 1.D., 1.G., 1.K., 1.M., 2.D. and 2.G.

2   That's the only ones I want to refer back to, and we

3   figured that out earlier.

4           So if you found liability, and that's what

5   this really means, we found liability against one or

6   both on one or more claims, you can fill in economic

7   damages, if you are talking about the violation of the

8   statute.  You may not include economic damages if you

9   found only negligent infliction of emotional distress.

10          Compensatory damages -- She's entitled to

11  recover only one set of compensatory damages based upon

12  the injury you find.  That doesn't change with the

13  number of violations.  It depends upon what damage you

14  find, total damage.  Different violations may cause

15  different damages, if you so find, but you give her

16  only one compensatory damages based upon what you find

17  she suffered.

18          Now, if you --

19          A JUROR:  I have a question.

20          THE COURT:  Yes.

21          A JUROR:  There's no allocation of damages

22  (inaudible).

23          THE COURT:  No, no, no, not compensatory.

24  You never allocate compensatory damages.  Compensatory

25  damages --

1          A JUROR:  (Inaudible) only one.

2          THE COURT:  Only one?

3          A JUROR:  Okay, excuse me.

4          THE COURT:  I hope not.  Compensatory

5     damages, unlike punitive -- When we get to punitive,

6     we'll be talking about allocation.  When we're talking

7     about compensatory, she's entitled to one set of

8     damages.  You're not going to divide the compensatory

9     damages up among the two defendants, if you find

10    liability against both Defendants.  You just award the

11    compensatory damages.  We'll worry about how to divide

12    it up, if it's to be divided, if she's entitled to

13    compensatory damages.  You're getting into a question

14    of who pays those compensatory damages.  That's not for

15    you to worry about, that's for me to worry about.

16          If you do award violation of the statute,

17    economic damages, then, of course, you would total the

18    whole thing, economic and compensatory.

19          Otherwise, if you didn't, if you found only

20    negligent infliction of emotional distress damages,

21    then you would have the -- only the compensatory

22    damages and the total would be the same.

23          Now, when you get to punitive, we're talking

24    about National Engineering only, on punitive.  You're

25    talking about willful acts by National Engineering, if

1    you find them under violation of either 1681e(b) or

2    1681k or both.  You give separate consideration to

3    that, if you decide that punitive damages are in order.

4    That's up to you.  On the basis of the criteria I gave

5    you, you put in the punitive damages.

6            Now, the punitive damages can be separate.

7    In other words, you can award punitive damages for a

8    violation of 1681e(b), you can award punitive damages

9    for violation of 1681k, or you may decide that she's

10   not going to get -- because they all go to her.  The

11   assessment of the damages go to her.

12           You can decide that -- If you find violations

13   of both statutes for which you want to award damages,

14   you can indicate to us, the foreperson can, in writing,

15   whether they're to be added or whether they're to be --

16   if they're the same figure and -- they're not to be

17   doubled, they're just to be the punitive damages.

18   We'll leave that up to you.

19           Now, with respect to the violation of state

20   law -- state common law, that's what D. is all about.

21   After you finish with punitive damages under the

22   statute, you get to the punitive damages under the

23   negligent infliction of emotional distress, and that

24   can only be compensatory, that cannot be punitive.  The

25   problem is, we did not ask you a question we have to

1      ask you, and that is whether I should award punitive.

2              Okay.  I think Craig took care of this.  The

3      damages under 3.A. are going to be very straightforward

4      for you, because when you look at 1.D., 1.G., 1.K.,

5      1.N., 2.D. and 2.G., they all refer to the federal

6      claims under the statute.  Therefore, you are

7      considering economic damages in A.  You will be

8      considering that.  And then compensatory damages for

9      violation of the statute, and the total will be what

10     you find for those violations.

11             Now, when you get to punitive, as I told you,

12     you're dealing only with National and you're dealing

13     with 1681e(b) and 1681k.  So when you get down to D.,

14     that's where you leave out the economic damages.  And

15     if you -- That's why we say there, "Compensatory

16     damages."  So if you find a violation of the negligent

17     infliction of emotional distress on state law, then you

18     put in only compensatory damages, you leave out the

19     economic damages.

20             Now, what you have to do, and we didn't ask

21     you to do it but I will ask you to do it, is advise me

22     as to whether or not you want the Court to assess

23     punitive damages under the Connecticut common law.  You

24     have to tell me that.  If you tell me that, I will be

25     the one who will assess it, but we haven't put that in

1    there for you.  We will do that.

2         All right.  It's obvious we have several

3    changes to make in both the substantive law charge

4    before we give it to you in final form, not very much

5    there, but a lot of changes to make in the

6    interrogatories before we give those to you.  So we'll

7    get those changes made and you can go ahead and eat

8    your lunch in the mean time, appoint your foreperson,

9    and we'll get the substantive jury instructions in to

10   you as soon as we have those changed, and we'll get the

11   special verdict form in to you as soon as we have that

12   changed.

13        Meanwhile, you can go ahead and --

14        Is there lunch in now?

15        THE CLERK:  Yes, their lunch is there.

16        THE COURT:  We'll have you start on your

17   lunch and we'll get this right in to you.

18        Give those back.

19        Now, let me give you one final charge here.

20        Now, you're going to retire to the jury room

21   now and you're going to appoint your foreperson.  I

22   told you, the foreperson is equal to all the rest of

23   you.  What I want the foreperson to do, if you have any

24   requests for any help from us, of any type, I'd like

25   the foreperson to print out a note to us.

1          The reason I ask the foreperson to print is

2     we didn't require that all ten of you take the Palmer

3     Penmanship Test, so we don't know how legible your

4     handwriting is.  If it's like doctors, and I've found

5     lawyers can be just as bad as doctors on sending me

6     illegible communications, there's nothing as illegible

7     as a doctor's prescription, however, but anyway, we

8     don't want to take that risk of spending a day trying

9     to decipher your note, so print the note and sign your

10    name to it.

11         Wait, we decided we're not signing anymore

12    because we're not using names.  Don't bother to sign at

13    all.  Just send the note in to us, printed, and we'll

14    reply to the note.

15         And common sense.  If you write the note,

16    don't give us any indication of the status of your

17    deliberations.  We're not permitted to know that you're

18    split 6/4 or 7/3, or something like that.  That's

19    common sense.  We're not permitted to know anything

20    about your deliberations, but just send us a note for

21    whatever help you need, if you need any.

22         Now, as you do your deliberations, determine

23    the facts on the basis of the evidence as you've heard

24    that evidence.  Apply the law as I've outlined the law

25    to you.  Render your verdicts fairly, uprightly and

1    with no prejudice.  You must all agree before you an

2    answer a particular interrogatory.  You must agree on

3    each element of that interrogatory.

4            It's the duty of each of you to discuss and

5    consider the evidence and the law and the opinions of

6    the other jurors.  If, in the course of your

7    deliberations, you become convinced that the original

8    views you held are erroneous, never hesitate to

9    reexamine those views and change your opinion.

10   Ultimately, however, each of you must decide the case

11   for yourself.  Never surrender your belief as to the

12   proper weight of the evidence, solely because of the

13   opinion of other jurors or for the mere purpose of

14   returning a verdict.

15           Go and start your deliberations and give

16   considered opinions.  As I told you, don't get rushed

17   by the fact that it's Friday.  Give this evidence and

18   the law the consideration that you've given in your

19   oath -- you've said in your oath you will give it.  If

20   you can't reach unanimity today, we'll bring you back

21   Monday to finish up Monday.  So go as late as you want

22   to go tonight.  Just let us know how late you want to

23   go and we'll turn you loose on that.

24           Okay.  Go back and we'll get these things

25   corrected.

1          (Jury out at 1:27 p.m.)

2              THE COURT:  Let me ask first the Plaintiff,

3      any exceptions to the charge as not previously

4      preserved?

5              MR. MADSEN:  Yes, Your Honor.

6              First of all, you indicated an intention in

7      Count Two as well as Count Four as well as Count Six

8      that you were going to put in "and/or" for the first

9      two elements.  We maintain that it should be "and."

10     They have to find -- In other words, the Defendant can

11     meet its obligation if they either notify her at the

12     time of a report, record information was reported, of

13     the fact that it was being reported, together with a

14     name and address, or they must maintain strict

15     procedures.

16             So the Plaintiff has to show that they failed

17     in both regards.

18             THE COURT:  I know.  I understand.  I agree

19     with you on that, but let's get the maximum information

20     we can get, so I'll leave it "and/or" and we'll take

21     care of that.

22             It's an advisory set of interrogatories, but

23     your point is well made on the record.

24             MR. MADSEN:  If they answer -- The problem is

25     if they answer or -- they can come back and just answer

1   "Yes" (inaudible) without hitting F., and then go to

2   G., or they may operate with a false assumption that

3   they will be able to award the Plaintiff damages if

4   they answer "Yes" to E., you know, 1.E. and "No" to

5   1.F.  I think --

6           THE COURT:  That's right, they may, and

7   that's the problem.  I think I'd rather get the full

8   information on that.

9           How does Defense feel about it?

10          MR. KUPINSE:  If Your Honor please, I think

11  we were acceptable (inaudible) to the proposal

12  (inaudible).

13          THE COURT:  But if you agree with Mr. Madsen,

14  I'll make the -- I'll leave it as it is, with the "and"

15  and not the "or."

16      (Pause.)

17          MR. KUPINSE:  I think the Defense believes

18  that it should just be "and," Your Honor.

19          THE COURT:  Okay.  So you all agree?

20          MR. COFFEY:  Yes.

21          THE COURT:  Okay.  We'll go back to the

22  original.

23          MR. STEIGMAN:  Your Honor, everything that

24  was "and" before should stay "and."

25          THE COURT:  I'm sorry, what?

1          MR. STEIGMAN:  Everything that was "and" in

2    the original version should stay "and," I think.

3          THE COURT:  Okay.  I have no problem with

4    that.

5          So keep that in mind, Craig, as you do it.

6          Now, there's something else I had in mind

7    here, though, that --

8          MR. STEIGMAN:  Your Honor, also, I think with

9    respect --

10         THE COURT:  Oh, I know what I had in mind.

11   Just leave not only "and," leave all the questions that

12   I had taken out, like E. and F.  When you're giving the

13   instructions on going over to damages, just put those

14   back in after 2 and 4 and 6.

15         Yeah?

16         MR. MADSEN:  Your Honor, the other thing is

17   you indicated that you -- on the negligent infliction

18   claim, that you had asked them whether they award

19   punitive damages.

20         THE COURT:  Yes.

21         MR. MADSEN:  We -- We concede -- The

22   Plaintiff concedes that punitive damages are not

23   awardable under that claim.

24         THE COURT:  Okay.  Just take it out

25   completely.

1          So the way it reads now, they aren't in.  So
2   we'll just leave it the way it is now.
3          MR. MADSEN:  That's right.
4          THE COURT:  Okay.  Fine.
5          That's another thing you can leave the way it
6   is, Craig.
7          Okay, that's the special verdict form.
8          Now, I wanted to ask you about --
9          MR. KUPINSE:  If I can just ask you one more
10  thing on the special verdict form, Your Honor.
11         THE COURT:  Yeah, Defense -- Let's get the
12  defendants.
13         MR. KUPINSE:  There seemed to be a couple of
14  questions when you got to -- for example, in Number 1,
15  you were telling them that if they answered no to A. or
16  B. -- A. and B., then they don't have to go to C, and I
17  wonder whether that might not be worth putting it in
18  rather than just telling them.
19         THE COURT:  I think it should be in there.
20         MR. KUPINSE:  Yeah.
21         THE COURT:  We usually have an instruction
22  like that in there.
23         MR. KUPINSE:  Yeah.
24         THE COURT:  "If you answer 'Yes' as to A. or
25  B., then answer C. and D.

1          MR. KUPINSE:  Yes, I agree.

2          THE COURT:  All right, if you put that in,

3    Craig.

4          MR. STEIGMAN:  Your Honor, I think that

5    should be an "and," not an "or."  They have to answer

6    "Yes" to A. and B.

7          THE COURT:  I think you're probably correct

8    because I was thinking they were two separate things,

9    they aren't.  They're both under Section 1681e(b).

10   Okay, that's what it is.  That's the way it reads now,

11   so it just stays "and," as it is.  We won't change it.

12         So the only thing we're basically getting

13   ready to change is change that "report" over to

14   "record" each time.

15         MR. MADSEN:  Your Honor, since you did tell

16   the jury that it could be "and/or," that they're going

17   to change to "and/or," and I think there was a question

18   that was specific on that, will you be clarifying that?

19         THE COURT:  I think we should recharge the

20   jury as we hand them this.

21         MR. MADSEN:  Okay.

22         THE COURT:  Now, I wanted to ask you, some

23   boiler plate got back into this that, in my judgment,

24   shouldn't get back in, but I'll listen to what the

25   attorneys say.

1          But let's first find out, any other

2    objections to the charge by either Defendant?

3          MR. KUPINSE:  Well, if Your Honor please, I

4    assume that all the objections we made when we were

5    constructing this are still on the record.

6          THE COURT:  Yes.

7          MR. KUPINSE:  And just because of the

8    seriousness of the situation, I would renew our

9    objection that we are not a consumer reporting agency,

10   for the record.

11         THE COURT:  And you're going to prevail on

12   that if there's a cross-claim, I'll tell you that.  I'm

13   going to have that on the cross-claims.  It will be

14   that Exhibit Number 1 will be pretty important.

15         MR. COFFEY:  The Defendant Verifications have

16   no objections to Your Honor's reading of the charges,

17   just anything that we spoke about earlier today, just

18   reserved for the record.

19         THE COURT:  Okay.

20         MR. COFFEY:  Thank you, Your Honor.

21         THE COURT:  Thank you.  I have my own

22   objection to the charge.  There's a boiler plate I

23   tried to get out of here that keeps creeping back in.

24   I don't have the slightest understanding what it means.

25   I've asked attorneys in case after case what it means.

1    They don't know either.

2            It got into Devit Blackbar (phonetic), I

3    think, or maybe it was either Doug -- my favorite state

4    court judge, who's still alive in a retirement home,

5    Doug Wright (phonetic).  Doug wrote the Connecticut law

6    on charges, and it's in his -- I think it's in Doug

7    Wright -- I don't understand it at all.

8            Read compensatory damages on page 10 and tell

9    me what the deuce it means.  I've taken it out

10   (unintelligible).

11           What I do leave in is the last sentence in

12   the first paragraph, to this extent.  I say:

13               "Damages cannot be based upon speculation."

14           I don't understand what that language means:

15               "Because it is only actual or compensatory

16               damages which are recoverable."

17           We've given them a definition of "actual" and

18   "compensatory," and in this case, maybe it makes sense

19   because there are actual damages in this case, but in

20   other cases where we've had it, I've taken it out

21   routinely, and just said, "You can't speculate."

22           MR. STEIGMAN:  We would agree with that.

23           THE COURT:  Yeah, let's take it out, Craig.

24   I told Talbot years ago to take that out of our

25   standard boiler plate charge.

1           All right.  I don't have anything else.

2           We have the several changes in the

3   substantive charge we've got to make on that putting

4   the "record" in there, and I'll let Craig go to work.

5   As soon as he's ready, send in the -- Let's -- Let us

6   take a look at it because we'll recharge the jury on it

7   after it's all ready.

8       (Pause.)

9           MR. COFFEY:  Your Honor, if I may?  You're

10  only going to recharge on the changes we made, not the

11  whole charge; is that correct?

12          THE COURT:  Oh, yeah, I'm not going to --

13          MR. COFFEY:  Oh, okay.  No, I just -- I was a

14  little confused.

15          THE COURT:  I'm not going to read that whole

16  charge.

17          MR. COFFEY:  That's why I just wanted to make

18  sure.  Thank you.

19          THE COURT:  Good lord, no.

20          MR. COFFEY:  That's what I thought.

21          THE COURT:  That's the last thing I want to

22  do.

23      (Recess at 1:38 p.m., until 1:54 p.m.)

24          THE COURT:  Oh, well that's all right.  Let

25  me finish with the substantive so I can get the

1    substantive into the jury, with the exhibits.

2        (Pause.)

3            THE COURT:  Craig, have we got enough copies

4    of this (unintelligible)?

5            THE LAW CLERK:  (Inaudible.)

6        (Pause.)

7            THE COURT:  Yes, it's fine with me.

8            Is it okay with counsel?

9            MR. KUPINSE:  Substantive?

10           THE COURT:  Yes.  The only change we made, I

11   think of, is putting the word "record" in.

12           I think everything else, I don't have to

13   recharge the jury on that substantive at all.

14           MR. MADSEN:  Yes, we're fine, subject to the

15   exceptions that we made.

16           THE COURT:  Yes.  Okay, that's fine.  So all

17   we're going to change is the special verdict form.

18           Why don't you -- Craig, why don't we get the

19   five copies into the jury as fast as we can, with the

20   exhibits.

21           All right.  Let's go to work on the special

22   verdict form.

23           MR. MADSEN:  Okay, Your Honor, if you turn to

24   page 3, Count Seven, negligent infliction.

25           THE COURT:  Let me make sure that page 2 has

1     been changed.  I think it has.  Yes, page 2 is fine.

2              Okay.  We're up to page 3.

3              MR. MADSEN:  Yes.  Now, if -- if you will

4     notice, we had taken out the "Yes" and "No" directly

5     below "O."

6              THE COURT:  Yes.

7              MR. MADSEN:  Do you remember that?

8              Now, if you turn to the next page, at the

9     every end, it says -- after the fourth one, it says,

10    "If you answered 'Yes' to (inaudible)."

11             THE COURT:  Yes, I changed that, and this is

12    the way I changed it.  Let me show you.  I wrote down

13    what I changed it to.

14             MR. MADSEN:  Okay.

15             THE COURT:  Here's what I said about it.  "If

16    you answered 'Yes' to all four questions under O."

17             That's the way I would like that to read.

18             MR. MADSEN:  Right.  That's what -- That's

19    what we're looking for.

20             MR. KUPINSE:  That's fine.

21             THE COURT:  That's the way it should read,

22    "If you answered 'Yes' to all four questions under O."

23             MR. MADSEN:  And 2.H. has the same issue.

24             THE COURT:  Yes.  Right.

25             MR. MADSEN:  Directly under "H," you still

1    have "Yes/No."

2              THE COURT:  Yes.  Yes, we have to change

3    that.

4              He has it correct on page 5.  Under H., all

5    four questions under H.

6              Now we'll go on page 6.

7              I think that's the only change.  Okay.

8              Yes, make those two changes for us.

9              All right.  Let's get everything in to the

10   jury that we can get in, and I'll recharge them as soon

11   as --

12             MR. KUPINSE:  Did Your Honor intend to re-

13   comment on the punitives under negligent infliction?  I

14   think since you said that you could award punitives,

15   perhaps there should be an instruction that we've all

16   agreed that punitives are not required under negligent

17   infliction of emotional harm.

18             THE COURT:  That's got to be, as it will read

19   for them, it reads the way it read originally as -- the

20   copies they had.

21             MR. KUPINSE:  Right.

22             THE COURT:  I had erroneously told them they

23   would have to add a section on punitive damages.  I'll

24   tell them there are no punitive damages under the

25   Connecticut common law.

1          The only thing I'm going to recharge them on

2     is I'm going to tell them that the special verdict form

3     which they will have in front of them, which I'll make

4     sure they have, it's now to be "and" as it reads on

5     page 1, as it read when they had it.  They never had it

6     any differently.  We didn't make any changes.

7          I orally told them we were going to make

8     changes.  I'll tell them I was wrong.

9        (Pause.)

10        THE COURT:  Do us a favor.  When you leave,

11    if you leave, and some of you have local offices, leave

12    with Debbie, a number where we can reach you on your

13    cell phone or something.

14       (Pause.)

15        THE COURT:  I asked them to leave you a cell

16    phone number where they can reach you.

17           THE CLERK:  Yes.  Okay.

18           THE COURT:  All right.  Now we have -- You

19    have five copies?

20           THE CLERK:  (Inaudible.)

21           THE COURT:  Okay, but five for the jury?

22           THE CLERK:  Yes.

23       (Pause.)

24           THE COURT:  And you're waiting for Craig to

25    give you ten copies of the --

1          THE CLERK:  Yes, (inaudible).

2          THE COURT:  Yes.  Sure.  Sure.  Might as well

3    get started.

4       (Pause.)

5          THE COURT:  Oh, okay.  Fine.  Why don't you

6    just give it -- This is ten copies?

7          THE CLERK:  (Inaudible.)

8          THE COURT:  Okay.  You want to take the

9    foreperson and nine and give them to Debbie?

10          We'll leave the label on because that's

11   helpful.  There.  Oh, wait 'til she comes out and then

12   you can give her the ten.

13       (Pause.)

14          THE COURT:  Oh, we have to change this.

15   We'll get it right eventually.  We have to change this

16   again.  Let's get it right this time.

17          All right.  If you look, Gentlemen, at the

18   negligent infliction of emotional distress on page 3,

19   against National Engineering, we say that they have to

20   prove all four elements, and then we say at the end of

21   that:

22          "If you answered yes to all four questions

23          under 1.O., be sure to answer question 3.D."

24          Oh, boy, I'm sorry, this is -- It's wrong

25   here, too.  I didn't realize it was wrong in both

1    places.

2         Listed below is what I said.  All right.  So,

3    I don't want to confuse them.

4         Let's take and change the bottom of page 3 to

5    read, "Plaintiff must prove by a preponderance of the

6    evidence that Defendant National Engineering Service

7    Corporation negligently inflicted emotional distress

8    while proving all four elements set forth below."

9         And we'll do that same thing back on the

10   later page, on page 5.  So it will be on page 3 and

11   page 5.

12        THE CLERK:  Anything else, Judge?

13        THE COURT:  No.  Okay, here you go.  Make

14   those two changes.

15        You didn't give them the substantive charge?

16   I mean, you didn't give them the special verdict form

17   so I --

18        THE CLERK:  No, (inaudible).

19        THE COURT:  We have to change them.  They're

20   all being changed.

21      (Pause.)

22        THE CLERK:  (Inaudible.)

23        THE COURT:  Yes, they have to  -- Tell them

24   we can't let them go except if they're under escort.

25        That's an important thing.  They probably go

1    down to smoke, they have to have an escort.

2              THE CLERK:  (Inaudible.)

3              THE COURT:  What did they tell you about

4    time?

5              THE CLERK:  (Inaudible.)

6              THE COURT:  Yes.  Yes.  They've had their

7    lunch.

8              THE CLERK:  (Inaudible.)

9              THE COURT:  Yes.  I assume they've had their

10   lunch.  Yes.

11             THE CLERK:  (Inaudible.)

12             THE COURT:  Um.  I think it's about quarter

13   to seven, isn't it, they have to --

14             THE CLERK:  I've been told that (inaudible.)

15        (Pause.)

16             UNIDENTIFIED SPEAKER:  (Inaudible.)

17             THE COURT:  Yes, I'll keep it for the moment

18   (inaudible).

19        (Pause.)

20             THE COURT:  Give Deb the ten, then

21   (inaudible).

22        (Pause.)

23             THE COURT:  Okay.  Taking them in and we'll

24   give them the ten copies.  I have the foreperson's

25   copy, and find out for me the foreperson's name, and

1    I'll put the number.  I have the numbers of the jurors

2    here.

3         (Jury in at 2:15 p.m.)

4              THE COURT:  Have you picked the foreperson?

5              A JUROR:  Yes.

6              THE COURT:  Okay, I just need the number.  I

7    guessed right, Number 339.  Okay.  Fine.

8              We haven't made any changes in the

9    substantive charge, and you have it.  You each have

10   five copies of it.

11             We corrected a couple of typos in the

12   substantive charge, but that's all.

13             Now, on the special verdict form, we did a

14   couple of things which should be, I think, helpful to

15   you.

16             One was to straighten out my incorrect

17   charge.  The charge I gave you on the first element and

18   some of the other elements was not correct, but the

19   special verdict form, as it read, was correct.  I told

20   you I was going to make changes in it.  We haven't made

21   any changes to it.

22             So you must -- as you look at Count One,

23   willful failure to comply, you must answer "Yes" to

24   both A. and B. before you have to answer C.  You can't

25   find liability unless you find both.  So A. and B. have

1    to be answered "Yes" in order to find liability.

2            If you find "No" to both of those or to one

3    of those, then you do not go back to answer question C.

4    You see that instruction we gave you there?  If you

5    answer "Yes" to questions 1.A. and 1.B., "Has Plaintiff

6    proved by a preponderance of the evidence she was

7    injured?", so that's what your -- you follow your

8    instructions there and you'll come out okay on that.

9            And the instruction at the bottom is very

10   much correct now.  If you answered "Yes" to Questions

11   1.A., 1.B., 1.C. and 1.D.," you must answer "Yes" to

12   all four of those to find liability on the willful

13   failure to comply with Section 1681e(b).

14           If you don't find "Yes" to all four, then

15   obviously, you haven't found any liability and we don't

16   ever get to damages, which is why that bottom of the

17   page reads the way it does.

18           Same thing with Count Two on page 2, willful

19   failure to comply with 1681k.  You must answer "Yes" to

20   all of those in order to find liability.

21           If you find that one of them is "No," then

22   you haven't found liability.  So keep that in mind.

23   That's why it says you don't go to damages unless

24   you've answered yes to 1.E., 1.F. and 1.G.

25           Count Three, you must answer on negligent

1    failure, "Yes" to both in order to find liability, and
2    that's why it reads that way.  If you answered "Yes" to
3    questions 1.H. and 1.I., "Has Plaintiff proven that she
4    was injured?"
5         Then you get to the top of page 3.  If you
6    answer "Yes" to questions 1.H., 1.I., 1.J. and 1.K. --
7    In other words, you've got to answer "Yes" to
8    everything on these counts, in order to find liability.
9    If you don't answer "Yes" to everything, you have not
10   found liability.
11        That's why you've got to give individual
12   consideration to each one of these things, and consider
13   all the evidence relevant to each one, and don't mix up
14   or counter-mix the Defendants.  In other words, they've
15   got to be kept separate.
16        Now, we changed Count Seven to make that
17   simpler for you.  Plaintiff must prove by a
18   preponderance of the evidence that National negligently
19   inflicted emotional distress by proving all four
20   elements set forth below.  So you answer question O by
21   answering the elements.  And unless you find all four
22   elements were proven, then you do not go to damages.
23   That's why it says there, if you answer yes to all four
24   questions under 1O, be sure to answer question 3D.
25   That's damages.  You don't get to damages unless you

1    answer yes to all four questions under 1O.

2         So that's the way this whole thing reads.

3    Basically, you've got to answer yes to everything in

4    order to get to damages.  There isn't a single change

5    in that.  In every single one of them, you'll see you

6    have to answer yes or find all four elements under

7    emotional distress.

8         Now, one more thing I should tell you.  I

9    said I was going to ask you a question about punitive

10   damages under Connecticut state law.  We've agreed that

11   we're not going to be asking you anything about

12   punitive damages under state law.  So what you have

13   there in damages on the last page is economic and

14   compensatory for the violations of the federal statute,

15   if you find such violations, and then you can consider

16   punitive and you can award punitive.

17        But when you get to the state claim under D,

18   you're just going to award compensatory.  If you find

19   that all four questions prove liability for negligent

20   infliction of emotional distress, then you just award

21   compensatory, you do not award punitive.

22        Okay, I think we can put you to work.  I'm

23   going to send in the foreperson's copy.  You can keep

24   those copies.  Give -- I should have written it down.

25   I didn't.  I have the number somewhere.  Here it is

1    right here, okay.  339, I think, isn't it?  339, I'm

2    right, okay.

3            339, you get the foreperson's copy.  We'll

4    get it to you right now and you can give me your copy.

5    You're the only one who makes any marks at all on your

6    copy.

7            The rest of you, please don't make any marks

8    on your copies of the special verdict form.  Make them

9    in your notes if you want to but not on the form.  Only

10   juror 339 can make any marks, and he will then put his

11   number in.

12           By the way, don't put your name in, just put

13   the number in, 339, where it says "Foreperson," and

14   date it, when you've reached unanimous agreement on

15   everything.

16           Okay, go back to work.

17       (Jury out at 2:22 p.m.)

18       (Proceedings concluded.)

19

20

21

22

23

24

25

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE PLAINTIFF: | | | | | |
| None. | | | | | |
| WITNESSES FOR THE DEFENDANT: | | | | | |
| Barry Nadell | 50 | 68 | 86 | -- | -- |

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          August 1, 2010

STEPHEN C. BOWLES